# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

American Foreign Service Association, et al.,

*Plaintiffs*,

v.

President Donald J. Trump, et al.,

*Defendants*.

Case No. 1:25-cv-00352

---

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER

The United States Agency for International Development (USAID), an agency critical for worldwide humanitarian aid and United States international relations, is suffering an onslaught of unconstitutional and illegal attacks, leaving its workers, contractors, grantees, and beneficiaries deserted in the wreckage and a global humanitarian crisis in the wake. From Defendant Trump's Executive Order instructing a "90-day pause" in foreign aid funding,[1] to Defendants State Department's and Rubio's stop-work orders to the USAID workforce,[2] to the directive ordering that "all USAID direct hire personnel [] be placed on administrative leave globally" by tonight,[3] Defendants have deliberately dismantled USAID's infrastructure. They also appear to be

---

[1] Reevaluating and Realigning United States Foreign Aid, Exec. Order. No. 14169, 90 Fed. Reg. 8619 (Jan. 20, 2025).
[2] Dep't of State, Memo. 25 STATE 6828; *see also* Press Release, U.S. Dep't of State, *Prioritizing America's National Interests One Dollar at A Time* (Jan. 29, 2025), https://tinyurl.com/2n4zyp8f (confirming the existence of the January 24 order).
[3] U.S. Agency for International Development, https://www.usaid.gov/.

poised for a near-final killing blow. As reported by *The New York Times* yesterday evening, Defendants plan to reduce the agency's staff from more than 10,000 to just 290 employees.[4] Defendants have halted USAID's vital work to provide food, medicine, and support to countless people across the globe and have frayed international relationships that serve our national security.

Given the few hours that remain before Defendants place nearly every employee of USAID on administrative leave, cutting off nearly all global beneficiaries from life-saving support, a temporary restraining order is critical to maintain the status quo until the Court has an opportunity to more fully consider the illegality of Defendants' actions.

## BACKGROUND

In 1961, President John F. Kennedy created USAID to "provide[] assistance to strategically important countries and countries in conflict; lead[] U.S. efforts to alleviate poverty, disease, and humanitarian need; and assist[] U.S. commercial interests by supporting developing countries' economic growth and building countries' capacity to participate in world trade."[5] In the Foreign Affairs Reform and Restructuring Act of 1998, Congress established USAID as an independent agency outside of the Department of State.[6] The act allowed the president a 60-day window to submit a "reorganization plan and report" for USAID which allowed the president to "provide for the abolition" of

---

[4] Karoun Demirjian & Aishvarya Kavi, *Trump Administration to Lay Off Nearly All of U.S. Aid Agency's Staff*, N.Y. Times (Feb. 6, 2025), https://tinyurl.com/yvycmvcc.

[5] Cong. Rsch. Serv., U.S. Agency for International Development: An Overview (Jan. 6, 2025), https://tinyurl.com/4dc4wjhp; see also The Am. Presidency Proj., *Executive Order 10973 - Administration of Foreign Assistance and Related Functions* (Nov. 3, 1961), https://tinyurl.com/3pwptwat (text of Executive Order 10973).

[6] "[T]here is within the Executive branch of Government the United States Agency for International Development." 22 U.S.C. § 6563.

USAID, transfer its functions to the Department of State, or submit a plan to Congress for the "transfer to and consolidation" of certain USAID functions and "additional consolidation, reorganization, and streamlining" of USAID.[7] President Bill Clinton's report, submitted on December 30, 1998, determined that "USAID will remain a distinct agency with a separate appropriation."[8]

Since the Foreign Affairs Reform and Restructuring Act of 1998, Congress has repeatedly appropriated funds for USAID as an independent agency, including in the Further Consolidated Appropriations Act, 2024 ("Appropriations Act").[9] The 2024 Appropriations Act explicitly restricted the authority to reorganize USAID, providing that "funds appropriated by this Act, prior Acts making appropriations for the Department of State, foreign operations, and related programs, or any other Act may not be used to implement a reorganization, redesign, or other plan . . . by the Department of State, the United States Agency for International Development, or any other Federal department, agency, or organization funded by this Act without prior consultation by the head of such department, agency, or organization with the appropriate congressional committees."[10] The Act also specified that no funds shall be available for obligation to "suspend or eliminate a program, project, or activity," "close, suspend, open, or reopen a

---

[7] 22 U.S.C. § 6601(d), (a).

[8] Reorganization Plan and Report Submitted by President Clinton to the Congress on December 30, 1998, Pursuant to Section 1601 of the Foreign Affairs Reform and Restructuring Act of 1998, as Contained in Public Law 105-277, https://tinyurl.com/48kthcr8.

[9] Pub. L. 118-47 § 7063(a), 138 Stat 460 (2024).

[10] *Id*. The Act defined "reorganization, redesign, or other plan" to include, inter alia, any action to "eliminate, consolidate, or downsize covered departments, agencies, or organizations," any action to "eliminate, consolidate, or downsize the United States official presence overseas," or "reduce the size of the permanent Civil Service, Foreign Service, eligible family member, and locally employed staff workforce" of USAID "from the staffing levels previously justified to the Committees on Appropriations for fiscal year 2024." *Id*. § 7063(b).

mission or post," or "create, close, reorganize, downsize, or rename bureaus, centers, or offices" unless "previously justified to the Committees on Appropriations or such Committees are notified 15 days in advance of such obligation."[11]

On January 20, 2025, Defendant Trump issued an Executive Order titled "Reevaluating and Realigning United States Foreign Aid," which directed an immediate "90-day pause in United States foreign development assistance for assessment of programmatic efficiencies and consistency with United States foreign policy."[12] Defendant Trump's order stated that it applied "immediately" to all "obligations and disbursements of development assistance funds."[13]

Four days later, on January 24, 2025, Defendants State Department and Rubio directed the immediate issuance of stop-work orders on USAID foreign assistance awards.[14] In turn, Defendant USAID issued stop-work orders to contractor and grantee partners, requiring them to cease their critical work and minimize the incurrence of costs during the period of work stoppage. On January 26, 2025, at least fifty-six senior career agency staff were put on administrative leave.[15] By January 29, 2025, hundreds of institutional support contractors were laid off.[16] William Malyszka, USAID's top human resources official, reportedly refused defendants' directives to put thousands more staff

---

[11] *Id*. § 7015(a).

[12] Reevaluating and Realigning United States Foreign Aid, Exec. Order. No. 14169, 90 Fed. Reg. 8619.

[13] *Id*.

[14] Dep't of State, Memo. 25 STATE 6828; *see also* U.S. Dep't of State, Office of the Spokesperson (Jan. 29, 2025) https://tinyurl.com/2n4zyp8f (confirming the existence of the January 24 order).

[15] Ellen Knickmeyer & Matthew Lee, *US places dozens of senior aid officials on leave, citing possible resistance to Trump orders*, AP (Jan. 27, 2025), https://tinyurl.com/37r6pb2y.

[16] Anna Gawel, *Furloughs hit hundreds of USAID contractors*, Devex (Jan. 29, 2025), https://tinyurl.com/ycxpb54h.

on administrative leave, before he, too, was pushed out.[17] Concurrently, Defendant Trump named Defendant Rubio as acting administrator of USAID, and Defendant Rubio in turn notified Congress that he would complete a "review" of the organization "with an eye towards potential reorganization."[18]

Although the State Department issued two limited waivers of its order to halt foreign assistance through USAID—including for "life-saving humanitarian assistance"[19] and "[l]ife-saving HIV care and treatment services"[20]—the waiver has provided scant relief in practice,[21] in part because the USAID staff who would normally restore funding are either on administrative leave or subject to bans on communicating with implementing partners.[22] Beyond the futile waivers, little to no relief was offered to USAID partners who suffered in the face of the defendants' funding freeze. Over one-thousand USAID institutional support contractors, along with thousands more employees of USAID contractors and grantees, have been laid off or furloughed.

---

[17] Elissa Miolene, *Top USAID HR officer pushed out after refusing to fire more staff*, Devex (Feb. 4, 2025), https://tinyurl.com/4pujyp5t.

[18] Press Release, U.S. Dep't of State, Secretary Marco Rubio Appointed as Acting Administrator for the United States Agency for International Development (USAID) (Feb. 3, 2025) (https://tinyurl.com/znt34s64)

[19] Available at U.S. Dep't of State, *Emergency Humanitarian Waiver to Foreign Assistance Pause* (Jan. 28, 2025), https://tinyurl.com/34wmfvu8.

[20] John Hudson (@JohnHudson), X (Feb. 1, 2025, 3:15 pm) https://tinyurl.com/43mdff3p (posting an image of the first page of the order); Adva Saldinger, *Exclusive: Some PEPFAR programs get waiver to restart operations*, Devex (Feb. 1, 2025), https://tinyurl.com/28sk6xf5.

[21] Karoun Demirjian & Aishvarya Kavi, *Trump Administration to Lay Off Nearly All of U.S. Aid Agency's Staff*, N.Y. Times (Feb. 6, 2025), https://tinyurl.com/yvycmvcc ("U.S.A.I.D. officials and contractors have reported that they cannot gain access to the funding for projects that received a waiver").

[22] Charles Kenny, *Secretary Rubio: The Waivers Aren't Working, Please Fix the Process*, Center for Global Development (Feb. 4, 2025), https://tinyurl.com/44sb347k. *See also* Ex. F ¶ 10 (explaining that "life saving aid has still not been given a waiver").

This past week, the onslaught on USAID has continued. Elon Musk and members of the so-called "Department of Government Efficiency" (DOGE) reportedly demanded access to classified USAID systems without requisite security clearances; USAID officials who attempted to block them were placed on administrative leave.[23] Musk posted on February 3 that he spent the previous weekend "feeding USAID into the wood chipper," and that same day, USAID headquarters shut down.[24] More than 1,000 employees—including some in war zones—were locked out of their computer accounts and work systems necessary for monitoring issues critical to safety domestically and abroad.[25] The usaid.gov website now indicates that "all USAID direct hire personnel will be placed on administrative leave globally" by Friday, February 7, 2025, at 11:59 pm.[26] And these actions seem to be a mere prelude to Defendants' forthcoming plans: reporting just last night suggests Defendants plan to cut the USAID workforce from over 10,000 to about 290 positions and to cancel about 800 awards and contracts administered through the agency.[27]

Meanwhile, the USAID workforce has been thrown into uncertainty with serious consequences. Like anyone facing sudden and grievous job loss, Plaintiffs' members who are USAID workers are plagued with concerns about the status of their career and benefits,[28] the resulting professional harms,[29] and the impending consequences to their

---

[23] Margaret Brennan, et al., *Two top security officials at USAID placed on leave, sources say*, CBSNews (Feb. 3, 2025), https://tinyurl.com/54z6pnu2.
[24] Elon Musk (@elonmusk), X (Feb. 3, 2025, 1:54 AM), https://tinyurl.com/mskvue6w.
[25] Hana Kiros, *America Can't Just Unpause USAID*, The Atlantic (Feb. 4, 2025), https://tinyurl.com/54w83yz4.
[26] U.S. Agency for International Development, https://www.usaid.gov/.
[27] Karoun Demirjian & Aishvarya Kavi, *Trump Administration to Lay Off Nearly All of U.S. Aid Agency's Staff*, N.Y. Times (Feb. 6, 2025), https://tinyurl.com/yvycmvcc
[28] *See, e.g.,* Ex. I ¶¶ 19, 28–31.
[29] *See, e.g.,* Ex. I   36.

families.[30] But USAID workers face special concerns, too: risk of severe financial liability, with some potentially legally liable for hundreds of millions of dollars in absence of USAID support,[31] as well as risk to physical safety, with life-threatening consequences for those in war torn areas.[32] USAID implementing partners, key collaborators in the successes of USAID's humanitarian efforts, have been left in the dark, resulting in jeopardization of these relationships and projects that have been years in the making.[33]

Without agency employees and partners to implement USAID's mission, or even to execute the limited waivers,[34] the humanitarian consequences have been catastrophic. Medical clinics have stopped distributing HIV medication in South Africa,[35] as well as drugs used to stop hemorrhages in pregnant women and treat life-threatening diarrhea in toddlers in Zambia.[36] Soup kitchens that feed nearly a million people in famine-stricken Khartoum were shut down.[37] Humanitarian operations at refugee camps in Syria ceased operations, leaving thousands vulnerable to instability and violence at the hands of ISIS.[38]

---

[30] *See, e.g.,* Ex. D ¶¶ 4–8; Ex. K   8; Ex. C ¶¶ 5–7.

[31] *See, e.g.,* Ex. E ¶¶ 14–15, 18, 20 (approximating $20 million in liability to date and $800 million in upcoming liability); Ex. I ¶¶ 20-27, 32–35, 37 (similar concerns of legal liability and other incidental expenses); Ex. H   9 (similar).

[32] *See, e.g.,* Ex. I ¶¶ 13–18, 23 (describing loss of access to the USAID safety app and Diplomatic Security Systems, uncertainty with chief-of-mission authority); Ex. H   8; Ex. G   8.

[33] *See* Ex. I   38; Ex. J   10.

[34] Brett Murphy & Anna Maria Barry-Jester, *"People Will Die": The Trump Administration Said it Lifted its Ban on Lifesaving Humanitarian Aid. That's Not True*, ProPublica (Jan. 31, 2025), https://tinyurl.com/y7stwsua.

[35] Melody Schreiber, *Trump's 'stop-work' order for PEPFAR cuts off anti-HIV drugs for patients*, NPR (Jan. 28, 2025), https://tinyurl.com/bdf52kas.

[36] Stephanie Nolen, *Health Programs Shutter Around The World As Trump Pauses Foreign Aid*, N.Y. Times (Feb. 1, 2025), https://tinyurl.com/56j4yw74.

[37] Sui-Lee Wee, et al., *How the World is Reeling from Trump's Aid Freeze*, N.Y. Times (Jan. 31, 2025), https://tinyurl.com/2fjm79nh.

[38] Tom Bateman, *How a US freeze upended global aid in a matter of days*, BBC (Jan. 29, 2025), https://tinyurl.com/27k3mjue.

Medical facilities in Sudan that treat severely malnourished children were forced to choose between obeying Defendants' orders and "let[ing] up to 100 babies and toddlers die."[39] These are just a few of the countless programs led by USAID that have been forced to halt their operations, leaving the crucial aid-led work to disappear from the lives of so many who rely on it.

## LEGAL STANDARD

To obtain a temporary restraining order, "the moving party must show: (1) a substantial likelihood of success on the merits; (2) that it would suffer irreparable injury if the [temporary restraining order] were not granted; (3) that [such an order] would not substantially injure other interested parties; and (4) that the public interest would be furthered" by the order. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (citations omitted); *see also Hall v. Johnson*, 559 F. Supp. 2d 1, 3 n.2 ("[T]he same standard applies to both temporary restraining orders and to preliminary injunctions." (citation omitted)). "When the movant seeks to enjoin the government, the final two TRO factors—balancing the equities and the public interest—merge." *D.A.M. v. Barr*, 474 F. Supp. 3d 45, 67 (citing *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016)).

Courts in this Circuit continue to apply a "sliding scale" approach, wherein "a strong showing on one factor could make up for a weaker showing on another." *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 726 (D.C. Cir. 2022) (internal quotation marks and citation omitted) (noting potential tension in case law but reserving the question of "whether the sliding-scale approach remains valid"); *National Railroad*

---

[39] Brett Murphy & Anna Maria Barry-Jester, *"People Will Die": The Trump Administration Said it Lifted its Ban on Lifesaving Humanitarian Aid. That's Not True*, ProPublica (Jan. 31, 2025), https://tinyurl.com/y7stwsua.

*Passenger Corp. (Amtrak) v. Sublease Interest Obtained Pursuant to an Assignment and Assumption of Leasehold Interest Made as of Jan. 25, 2007*, Case. No. 22-1043, 2024 WL 3443596, at *1-2 (D.D.C. July 15, 2024) (recognizing that district courts remain bound by sliding-scale precedent).

## ARGUMENT

All factors favor Plaintiffs. Defendants have violated the Constitution and federal law through their systematic shutdown of USAID. If the shutdown is allowed to continue, Plaintiffs and their members will suffer increased risks to their physical safety, irreparable harm to their health and family lives, exposure to legal liability,[40] and devastating financial consequences, among other injuries.[41] And there is no public interest served by Defendants' illegal and unconstitutional dismantling of USAID. On the contrary, the public interest demands that USAID be permitted to continue operating to avoid further loss of jobs, deliver critical medical, food, and other aid, and prevent the potential loss of life while Plaintiffs' claims are pending. The court should issue a temporary restraining order to preserve the status quo until the Court is able to further consider the case.

**I.    Plaintiffs are likely to succeed on the merits.**

Plaintiffs bring four causes of action challenging Defendants' decision to shut down USAID: (1) Defendant Trump's actions to dissolve USAID, on his own and through the actions of the remaining defendants, violate the constitutional principle of the separation of powers; (2) Defendant Trump's actions to dissolve USAID, on his own and through the actions of the remaining defendants, violate the Take Care Clause of the Constitution,

---

[40] *See, e.g.*, Ex. E ¶¶ 18, 20 (explaining that as a result of the agency's lawless dysfunction, she is personally liable as a contracting officer for hundreds of millions of dollars owed to implementing partners); Ex. A    17 (discussing this kind of liability).
[41] *See generally* Exhibits A–L.

art. II, § 3; (3) The decision by Defendants Department of State, USAID, Treasury Department, Rubio, and Bessent ("Agency Defendants") to shut down USAID violates the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(C), because it exceeds their statutory authority; and (4) Agency Defendants' decision to shut down USAID violates the APA, § 706(2)(A), because it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. Plaintiffs are likely to prevail on the merits of each of their claims.

*First*, Defendant Trump's decision to dissolve USAID violates the constitutional principle of the separation of powers, and is thus ultra vires. "The President's power, if any, to issue [an] order must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). "There is no statute that expressly authorizes the President to" dissolve USAID, "[n]or is there any act of Congress . . . from which such a power can be fairly implied." *Id.*

To the contrary, Congress established USAID as an independent agency in the Foreign Service Reform and Restructuring Act of 1998 ("FSRRA"). 22 U.S.C. § 6563 ("there is within the Executive branch of Government the United States Agency for International Development"). Moreover, in passing the FSRRA Congress carved out a specific, time-limited role for the president, giving him the option of retaining USAID as an independent agency or allowing it to be absorbed into the Department of State. 22 U.S.C. § 6601(d). Whichever choice the president made, it was to be memorialized in a report to be submitted to Congress within 60 days. 22 U.S.C. § 6601(a). President Clinton made his choice, and his report concluded that USAID should remain an independent agency. Once the 60-day period for presidential review expired, by operation of statute

neither President Clinton nor any future president retained the authority to unilaterally reorganize USAID; rather, that power reverted to Congress, who created the agency in the first place.

Defendant Trump's actions in seeking to eliminate USAID derive from any power conferred by Article II of the Constitution. And in seeking to usurp a power reserved to Congress, Defendant Trump violated one of the central tenets of our Constitutional system, that "the branches of government should be kept separate in all cases in which they were not expressly blended, and the Constitution should be expounded to blend them no more than it affirmatively requires." *Myers v. United States*, 272 U.S. 52, 116 (1926); *see also Humphrey's Executor v. United States*, 295 U.S. 602, 630 (1935) (recognizing the "principle that makes one master in his own house precludes him from imposing his control in the house of another who is master there"). Because Defendant Trump violated this foundational principle of separation of powers, his and his agents' actions in dissolving USAID were ultra vires, and Plaintiffs are likely to succeed in establishing this claim.

*Second*, Defendant Trump's shutdown of USAID violates the Take Care clause, which confers upon the President the duty to "take care that the Laws be faithfully executed." U.S. Const., Art. II § 3. Though the Take Care Clause has been interpreted to confer substantial executive authority on the president, that substantial authority must be exercised in service of executing "the laws," that is, the Constitution as well as statutes passed by Congress.

Here, Defendant Trump's actions did not faithfully execute Congressional enactments but rather overtly flouted them. The president's unilateral dissolution of

USAID both violated the 1998 FSRRA and violated multiple provisions of the 2024 Appropriations Act, as discussed at greater length below. Thus Plaintiffs are likely to succeed in establishing that Defendant Trump and his agents acted unconstitutionally by violating the Take Care Clause.

*Finally*, Plaintiffs can show a substantial likelihood of success on their APA claims. The APA authorizes this Court to hold unlawful and set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

As a threshold matter, Agency Defendants' decision to shut down USAID constitutes final agency action and is thus subject to review by this Court. Agency Defendants' decision to dissolve USAID is evident from their actions laying off staff and contractors, halting foreign assistance funded by USAID, issuing stop work orders, closing down USAID headquarters, and taking down USAID's website. Public statements confirm that Agency Defendants intend for their actions to shut down USAID. Final agency actions are those (1) that "mark the consummation of the agency's decisionmaking process" and (2) "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotation marks omitted).

Shuttering the operations of USAID marks the end of the decisionmaking process by Agency Defendants to dissolve USAID—a decision that includes the immediate halting of USAID programs and operations and the firing and furloughing of USAID employees and contractors. *See Biden v. Texas*, 597 U.S. 785, 808–09 (2022) (Department

of Homeland Security decision to end the Migrant Protection Protocols program was final agency action because it forbade staff "to continue the program in any way from that moment on" (internal quotations omitted)). Rights and obligations flow from the decision to shut down USAID: thousands of USAID employees and contractors have been laid off or furloughed, and numerous USAID grant recipients have suddenly lost the funding necessary to provide their foreign aid services. Thousands more USAID employees will imminently be placed on administrative leave as a result of Agency Defendants' decision.

The decision to shut down USAID is in excess of the Agency Defendants' statutory jurisdiction, authority, and limitations, in violation of 5 U.S.C. § 706(2)(C). In passing the Foreign Affairs Reform and Restructuring Act of 1998, Congress established USAID as an independent agency. 22 U.S.C. § 6563(a). The authorities of the USAID Administrator, originally established by the Foreign Assistance Act of 1961, *see id.* § 6562(b), as subsequently amended, include overseeing USAID's programs and operations.[42] These encompass programs providing refugee assistance and funding to combat the spread of HIV/AIDS.[43] The Secretary of State's authorities with respect to USAID include overseeing and providing foreign policy guidance to the Administrator and coordinating U.S. development and economic assistance across agencies.[44] But no statute or delegation of authority gives the Secretary of State, the Administrator of USAID, or any Agency Defendant the power to dissolve USAID.

---

[42] Cong. Rsch. Serv., *U.S. Agency for International Development (USAID): Background, Operations, and Issues*, at 1-3, 50-51 (updated July 21, 2015), https://tinyurl.com/yuak545r.

[43] *Id.* at 8, 11, 15.

[44] *See* Reorganization Plan and Report Submitted by President Clinton to the Congress on December 30, 1998, Pursuant to Section 1601 of the Foreign Affairs Reform and Restructuring Act of 1998, as Contained in Public Law 105-277, https://tinyurl.com/48kthcr8.

Indeed, abolishing USAID violates a clear statutory limitation on Agency Defendants' authority. Pursuant to the Further Consolidated Appropriations Act of 2024, neither the Department of State nor USAID may use any appropriated funds to "implement a reorganization, redesign, or other plan . . . by the Department of State, the United States Agency for International Development, or any other Federal department, agency, or organization funded by th[at] Act without prior consultation by the head of such department, agency, or organization with the appropriate congressional committees." Pub. L. 118-47 § 7063(a), 138 Stat. 460 (2024). Congress defined such a plan to "include any action to–

> (1) expand, eliminate, consolidate, or downsize covered departments, agencies, or organizations, including bureaus and offices within or between such departments, agencies, or organizations, including the transfer to other agencies of the authorities and responsibilities of such bureaus and offices;

> (2) expand, eliminate, consolidate, or downsize the United States official presence overseas, including at bilateral, regional, and multilateral diplomatic facilities and other platforms; or

> (3) expand or reduce the size of the permanent Civil Service, Foreign Service, eligible family member, and locally employed staff workforce of the Department of State and USAID from the staffing levels previously justified to the Committees on Appropriations for fiscal year 2024.

*Id.* § 7063(b). The Act further requires that the congressional committees must be provided a "detailed justification for any proposed action." *Id.* § 7063(a). Although Defendant Rubio stated that he "notified Congress that a review of USAID's foreign assistance activities is underway with an eye towards potential reorganization,"[45] to Plaintiffs' knowledge, Agency Defendants did not consult with the appropriate congressional committees or provide them with a "detailed justification" for shutting

---

[45] Press Release, U.S. Dep't of State, Secretary Marco Rubio Appointed as Acting Administrator for the United States Agency for International Development (USAID) (Feb. 3, 2025) (https://tinyurl.com/znt34s64).

down USAID prior to implementing any reorganization, as the statute requires. More fundamentally, the Further Consolidated Appropriations Act does not provide any authority to dissolve USAID entirely. Agency Defendants' decision to shut down USAID thus flatly violates this statutory limitation on reorganizing USAID.

The decision to shut down USAID is also arbitrary and capricious. Under arbitrary-and-capricious review, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks and citation omitted). "Normally, an agency [decision] would be arbitrary and capricious if the agency . . . entirely failed to consider an important aspect of the problem . . . or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* In considering an agency's action, the reviewing court "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Id.* (internal quotation marks and citation omitted).

Agency Defendants articulated no satisfactory explanation for their decision to shut down USAID. "To judge the adequacy of agency decisionmaking, [the Court] must look to the agency decisions themselves." *City of Kansas City v. HUD*, 923 F.2d 188, 193-94 (D.C. Cir. 1991). Yet Agency Defendants proffered no formal decision at all, let alone one which articulates the decision's rationale. Potential rationales for dissolving USAID can only be gleaned from a handful of public statements or social media posts by Defendants or those acting under their authority. These potential rationales include that

"USAID is a criminal organization,"[46] that USAID is run by "radical lunatics,"[47] and "rank insubordination."[48] Agency Defendants provided no factual support for these assertions, some of which post-date the decision to shut down USAID. For this reason alone, Agency Defendants' decision is arbitrary and capricious. *See Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1404 (D.C. Cir. 1995) (explaining that "[t]he requirement that agency action not be arbitrary and capricious includes a requirement that the agency adequately explain its result" and holding invalid agency action where agency "failed to provide anything approaching a reasoned explanation for its decisions").

The decision to shut down USAID is also arbitrary and capricious because Agency Defendants failed to consider its harmful consequences. For example, shuttering USAID has already resulted in the loss of thousands of jobs and threatens the survival of companies that contract with USAID. The decision also risks the lives and wellbeing of millions of people. Absent USAID staff and monetary support, refugees are vulnerable to violence at the hands of ISIS, people in famine-stricken areas have lost access to food, and at least 300 babies that would not have had HIV but for Agency Defendants' dismantling of USAID now do. Not only did Agency Defendants fail to consider these and other disastrous effects; they also neglected to consider the reliance interests of USAID employees, contractors, aid distributors, and aid recipients, for whom an abrupt and complete halt in USAID programs and services is harmful, disastrous, or life-threatening. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 ("When an agency changes course, as [USAID] did here, it must be cognizant that

---

[46] Elon Musk (@elonmusk), X (Feb. 2, 2025 12:20 PM), https://tinyurl.com/5bzyhpkj.
[47] Elizabeth Chuck, *What is USAID? How it works and what could happen if Trump and Musk shut it down*, NBC NEWS (Feb. 3, 2025), https://tinyurl.com/4twvhajj.
[48] Karoun Demirjian & Aishvarya Kavi, *supra* note 4.

longstanding policies may have engendered serious reliance interests that must be taken into account." (internal quotation marks and citations omitted)).

Finally, Agency Defendants' decision to shut down USAID is contrary to law. Pursuant to 5 U.S.C. § 6329a(b)(1), "an agency may place an employee in administrative leave for a period of not more than a total of 10 work days" during a calendar year. Yet Agency Defendants already placed employees on administrative leave beginning on January 27, 2025, and have stated an intent to place thousands more on administrative leave, for an indefinite period. In shutting down USAID's operations—including timely payment of contractors—Agency Defendants have also violated the Prompt Payment Act, 31 U.S.C. § 3901 *et seq.*, and implementing regulations. The Prompt Payment Act requires agencies to pay valid invoices by their contracted due date or within 30 days. *Id.* § 3903(a)(1). "Each agency head is responsible for" "[e]nsuring timely payments and payment of interest penalties where required." 5 C.F.R. § 1315.3(e). Yet Agency Defendants have caused USAID to stop payments to contractors—even for work already performed—in violation of the Prompt Payment Act and regulations.

For each of the reasons discussed above, Plaintiffs are likely to succeed on the merits of their claims that Agency Defendants' decision to shut down USAID violates the APA.

## II.    Plaintiffs will suffer immediate, irreparable injury should the agency shutdown continue.

"An irreparable harm is an imminent injury that is both great and certain to occur, and for which legal remedies are inadequate." *Beattie v. Barnhart*, 663 F. Supp. 2d 5, 9 (D.D.C. 2009). Plaintiffs in this case are two unions who represent the USAID workforce: (1) the American Foreign Service Association (AFSA), which represents

members of the U.S. Foreign Service and (2) the American Federation of Government Employees (AFGE), which represents civil service employees at USAID. Plaintiffs' members face ongoing and imminent irreparable harm as a result of the USAID shutdown.

*First*, as part of the effort to dismantle its workforce, USAID has issued a mandatory recall notice to more than 1,400 Foreign Service Officers (FSOs) serving overseas. Ex. A ¶7. The notice—which provided no explanation, no timeline for its duration, and no details on what FSOs will do upon their return to the U.S—will force Plaintiff AFSA's members to repatriate within 30 days. Ex. A ¶¶ 7-8. This rushed process is a stark departure from the usual process, which provides six to nine months to allow FSOs time to plan for an international move. Ex. A ¶13. Such time is necessary to make arrangements, including arranging for housing, selling belongings and cars (which often cannot be imported back to the states, Ex. A ¶13, enrolling children in new schools, finding new employment for an FSO's spouse, and similar logistical tasks.

In contrast to the normal process, the 30-day mandatory recall will wrench AFSA's members—many of whom have lived in their current locations for years—away from their homes in a chaotic fashion that will disrupt and upend their lives. Such disruption will have lasting consequences. For example, one AFSA member has two children who have conditions that require occupational therapy (OT) and care that is coordinated between multiple providers and their schools. Ex. D ¶5.[49] "Uprooting [the

---

[49] The member declarations supporting this motion are submitted anonymously. An association may establish standing even though its identified members are anonymous. *See Advocs. for Highway & Auto Safety,* 41 F.4th at 594 ("anonymity is no barrier to standing on this record") (citing *NB ex rel.Peacock v. District of Columbia,* 682 F.3d 77, 86 (D.C. Cir. 2012)); *See also Hotel & Rest. Emps. Union, Loc. 25 v. Smith*, 846 F.2d 1499, 1506 (D.C. Cir. 1988) ("Naming those [union] members adds no essential information bearing on the injury component of standing."). Declarants here are current

FSO's] children from their school, OT service providers, and child therapist in the middle of the school year will undoubtedly set back their development with possible lifelong implications." *Id.* ¶6; *see also id.* ¶7 (explaining that continuity in their care is critical to avoiding "setbacks."). And the recall would disrupt families in other ways. For example, if forced to return to the States, another AFSA member will be separated from her spouse for at least 8 months, who is employed in her current host country on a contract that goes through December 2025. Ex. H ¶7. And given the gratuitously rushed nature of the recall, most FSOs have no idea where they will live when they return to the States. Ex. F ¶12.

*Second*, the chaos introduced by the recall is only exacerbated by the potential loss of income, health insurance, and various other financial harms caused by the shutdown. As noted above, USAID has placed the vast majority of its staff on administrative leave and is reportedly planning to reduce its workforce to 290 employees worldwide. *Supra* at 2. These actions affect both AFSA and AFGE members. Ex. A ¶19; Ex. G ¶¶ 6, 7. Plaintiffs' members will therefore lose their source of income and the benefits that come with employment such as medical insurance. This lost income will hit doubly hard for some families because the recall will also cause many spouses of FSOs to lose their jobs. Ex. A ¶ 15.

As the Supreme Court has recognized, loss of employment may constitute irreparable injury when "the circumstances surrounding an employee's discharge, together with the resultant effect on the employee, … depart from the normal situation"

---

employees of Defendant USAID and are fearful of harassment and retaliation in light of the ongoing attacks on USAID employees on social media and in the press. *See, e.g.*, Ex. F ¶¶ 7-8 (social media attacks against USAID include calling staff criminals and bragging about putting the agency through the wood chipper); Ex. I ¶ 16 (similar). Accordingly, the declarations are submitted with pseudonyms and in redacted form to protect their anonymity.

of a lost job. *Sampson v. Murray*, 415 U.S. 61, 92 n. 68 (1974). The mass-termination of the USAID workforce is such an instance. For example, many FSOs who have chronic or severe health conditions will lose their health insurance without any prospect of finding new employment in a timely fashion. *Penland v. Mabus*, 643 F. Supp. 2d 14, 22 (D.D.C. 2009) (collecting cases demonstrating that loss of medical benefits can constitute irreparable harm); Ex. F ¶14 ("[A]s someone dealing with a medical condition that requires continued treatment[,] the possibility of suddenly not having health insurance is terrifying."); Ex. I ¶26 (explaining that terminated USAID workforce members will have difficulty finding employment in a "job market that is greatly constricted due" to "large-scale staffing and funding cuts").  In short, if the shutdown and recall are allowed to go forward, many AFSA and AFGE members "will be back in the United States homeless, without a car, without a school district, without employment, without a pension, and without health insurance." Ex. D ¶8.

*Third*, many of Plaintiffs' members face increased threats to their physical safety because they have lost access to USAID's security apparatus, such as the agency's internal security warning/alert systems. Ex. A ¶18; see also Ex. I ¶13 (explaining that many in the USAID workforce have lost access to a safety app called Scry Panic 2.0). Many more will lose access to such systems when they are put on administrative leave tonight. Ex. H ¶8. These systems are vital for keeping AFSA's members safe while they are abroad. FSOs and other USAID personnel frequently serve in "high-risk environments where access to security resources is critical." Ex. I ¶13; Ex. H ¶8. ("I live in a country with high rates of violent crime.").

AFGE will also suffer irreparable injuries in its own right if this Court does not act. AFGE will lose hundreds of members if the forecast drastic workforce reductions occur. Ex. B ¶8. It will also be required to divert significant resources from other priorities to address pressing needs of its USAID employee members. Ex. B    7.

### III.    The balance of equities and the public interest favor Plaintiffs.

Enjoining Defendants from dissolving USAID until the Court has an opportunity to consider the merits of Plaintiffs' claims would serve the public interest. "It is well established that the Government cannot suffer harm from an injunction that merely ends an unlawful practice." *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (internal quotation marks and citations omitted). Likewise, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017). "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws—such as the APA, as well as regulations . . .—that govern their existence and operations." *Id.* (internal quotation marks and citations omitted). Thus, for the same reasons that Plaintiffs are likely to succeed on the merits, equity requires relief.

Without agency employees and partners to implement USAID's mission, and in the face of the agency's dissolution, the humanitarian consequences have been catastrophic affecting public interest worldwide. Medical clinics have stopped distributing HIV medication in South Africa,[50] as well as drugs used to stop hemorrhages in pregnant women and treat life-threatening diarrhea in toddlers in Zambia.[51] Soup

---

[50] Melody Schreiber, *Trump's 'stop-work' order for PEPFAR cuts off anti-HIV drugs for patients*, NPR (Jan. 28, 2025), https://tinyurl.com/bdf52kas.
[51] Stephanie Nolen, *Health Programs Shutter Around The World As Trump Pauses Foreign Aid*, N.Y. Times (Feb. 1, 2025), https://tinyurl.com/56j4yw74.

kitchens that feed nearly a million people in famine-stricken Khartoum were shut down.[52] Humanitarian operations at refugee camps in Syria ceased operations, leaving thousands vulnerable to instability and violence at the hands of ISIS.[53] Medical facilities in Sudan that treat severely malnourished children were forced to choose between obeying Defendants' orders and "let[ing] up to 100 babies and toddlers die."[54] These are just a few of the countless programs led by USAID that have been critically impacted by this halt in operations, leaving the crucial aid-led work to disappear from the lives of so many who rely on it.

Like Plaintiffs' members, many other USAID workers and beneficiaries not currently before this Court face ongoing, immediate, and severe losses—of jobs, safety, financial liability, and critical aid provisions, not to mention the lifesaving aid for food, medical needs, and more on which so many rely. These harsh consequences weigh heavily in favor of granting the temporary restraining order. Plaintiffs' members and other USAID workers are not only suffering unforeseeable job loss, professional harms, and resulting personal instability, *see* Ex. D ¶¶ 4–8, but also risk of severe financial liability, *see* Ex. E ¶¶ 14–15, 18, 20 (approximating $20 million in liability to date and $800 million in upcoming liability), Ex. I ¶¶ 20–27, 32–35, 37 (similar concerns of legal liability and other incidental expenses), Ex. H ¶9 (similar). Many also face threats to personal safety, with life-threatening consequences due to placements in unstable war zones. *See* Ex. I ¶¶ 13–18, 23 (describing loss of access to the USAID safety app and

---

[52] Sui-Lee Wee, et al., *How the World is Reeling from Trump's Aid Freeze*, N.Y. Times (Jan. 31, 2025), https://tinyurl.com/2fjm79nh.

[53] Tom Bateman, *How a US freeze upended global aid in a matter of days*, BBC (Jan. 29, 2025), https://tinyurl.com/27k3mjue.

[54] Brett Murphy and Anna Maria Barry-Jester, *"People Will Die": The Trump Administration Said it Lifted its Ban on Lifesaving Humanitarian Aid. That's Not True*, ProPublica (Jan. 31, 2025), https://tinyurl.com/y7stwsua.

Diplomatic Security Systems, uncertainty with chief-of-mission authority); Ex. H ¶8; Ex. G ¶8. USAID implementing partners, who collaborate for USAID's mission success and rely on USAID workers for critical updates and program continuity, have been ignored, jeopardizing these relationships and humanitarian projects that have been years in the making. *See* Ex. I ¶38; Ex. J ¶10. From harm to USAID's individual workers to its status as a globally critical agency, the public interest cannot abide the dissolution of USAID.

The Government, too, is deeply affected by this sudden shutdown: assets are wasted and endangered, political and contractual relationships are strained, and the strength of our diplomatic ties and national security are at risk.[55] Moreover, continuing to fund USAID through congressionally authorized appropriations is not harmful to Defendants. Restoring USAID to functioning order would not only preserve the status quo, but also help Plaintiffs, as well as countless beneficiaries of USAID's important work, and the Government itself, avoid certain and substantial harms flowing from its unlawful dissolution.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant their motion and enter a temporary restraining order enjoining Defendants immediately from taking any further actions to shut down USAID operations and requiring Defendants immediately to take the remedial measures outlined in the Proposed Order until further order of this Court.

---

[55] *See* Samantha Powers, *I Ran U.S.A.I.D. Killing It Is a Win for Autocrats Everywhere*, N.Y. Times (Feb. 7, 2025), https://tinyurl.com/2z3yd9kd.

Dated: February 7, 2025                    Respectfully submitted,

                                           /s/ *Kristen Miller*

Lauren Bateman (DC Bar No.                 Kristen Miller (DC Bar No. 229627)
1047285)                                   Kaitlyn Golden (DC Bar No. 1034214)
Karla Gilbride (DC Bar No. 1005886)        Rachel L. Fried (DC Bar No. 1029538)
Allison Zieve (DC Bar No. 424786)          Kayla M. Kaufman* (DC Bar No. 90029091)
Public Citizen Litigation Group            Robin F. Thurston (DC Bar No. 1531399)
1600 20th Street NW                        Skye L. Perryman* (DC Bar No. 984573)
Washington, DC 20009                       Democracy Forward Foundation
(202) 588-1000                             P.O. Box 34553
lbateman@citizen.org                       Washington, DC 20043
                                           (202) 448-9090
                                           kmiller@democracyforward.org


                                           *motion to appear *pro hac vice* forthcoming