# EXHIBIT E

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| AMERICAN FOREIGN SERVICE ASSOCIATION, et al., | ) ) ) ) | |
| *Plaintiffs*, | ) ) | Civil Action No. 1:25-CV-352 |
| v. | ) ) ) | |
| DONALD TRUMP, et al., | ) ) | |
| *Defendants.* | ) ) ) | |

**DECLARATION OF CAROL DOE**

I, Carol Doe, declare the following under penalties of perjury:

1. I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2. I am a member of the Association of Foreign Service Officers.

3. I am a Contracting and Agreement Officer for the US Agency for International Development (USAID). I have been employed with the Agency for six years and six months. I hold a $25 million Contracting and Agreement Officer warrant, issued by the same Agency. I am currently the Deputy Director of a Mission's Office of Acquisition and Assistance. I directly manage an acquisition and assistance portfolio valued at approximately $1,525,000,000. I manage 24 awards directly and as the Deputy Director oversee the management of 62 awards, valued at approximately $2.2 billion.

4. On Friday, January 24, 2025, the Secretary of State issued a cable (25 STATE 6828) that said "For existing foreign assistance awards, contracting officers and grant officers

shall immediately issue stop-work orders, consistent with the terms of the relevant award, until such time as the Secretary shall determine, following a review. Decisions whether to continue, modify, or terminate programs will be made following this review.

5. On the same day, the USAID Acting Administrator issued an email entitled "Follow-Up instructions for Implementing Executive Order Reevaluating and Realigning United States Foreign Aid." This email stated: "In addition, I am immediately directing all contracting and agreement officers to issue stop-work orders or bilateral amendments, consistent with the terms of the relevant awards or agreements, until determinations are made following the review." Later, on January 24, 2025, the USAID Senior Procurement Executive further sent out guidance that "Contracting and Agreement Officers shall immediately issue stop-work orders, amend, or suspend existing awards, consistent with the terms and conditions of the relevant award."

6. No additional information related to the scope of the suspension/stop work orders were provided. CO/AOs, though, had to determine what the framework for these suspension/stop-work orders would be in order to communicate what work should stop. Based on the information I had—including my understanding that some awards could continue after the 90-day foreign assistance review—-I determined that the most prudent and reasonable framework for these suspension/stop-work orders would be to request that all implementing Partners maintain operational readiness. This means that all programmatic activities and costs were to be suspended/stopped, but that all non-programmatic costs, including salaries and indirect costs, would be considered eligible and reasonable and could continue to be incurred.

7. Therefore, with no further guidance having been issued, on Sunday, January 26, 2025, I issued suspensions/stop-work ordered for all ongoing activities, in accordance with the above directives. Contracts and grants were stopped pursuant to their respective

authorities.[1]

8. For all cost-reimbursement contracting and assistance, costs were to be minimized and all non-programmatic costs could be maintained. For Fixed Amount Awards, all work was to stop and no deliverables submitted. All work was stopped for subcontracts and subawards. These suspensions/stop-work orders were issued for a 90-day-period or until rescinded.

9. In the days that followed, I received various emails directing Contracting Officers to take action on certain aspects of the President's Executive Orders.

10. On January 29, I received an email from the Senior Procurement Officer, with a list of certain awards considered to have DEI included in them attached. The email directed Contracting Officers to take immediate action to de-scope or terminate all of the awards on the spreadsheet and to report other awards that may have components that are contrary to any existing Executive Orders.

11. Given that all of the contracts and agreements that I manage have components of gender and, in certain cases references to inclusivity, and to be in full compliance with all outstanding Executive Orders, I determined it was necessary to issue an administrative modification for all active agreements. These modifications were necessary to be in full compliance with the President's Executive Orders. Based on the direction provided by the Senior Procurement Executive, I began moving my team into motion to modify every existing agreement.

12. On January 30, my team, including the Acquisition and Assistance (A&A) Specialists and necessary members of the technical team, began processing the modifications.

---

[1] *See* FAR Part 42.1303, FAR 52.242-15 Alt I, Mandatory Standard Provision Award Suspension and Termination, and 2 CFR 700.14.

The team drafted all modifications and the technical team put in requisitions for administrative modifications. These were no-cost, administrative modifications only. My team of A&A specialists prepared the necessary documentation, including modification in GLAAS (the electronic system that is utilized to execute any award or modification to awards) in some cases and negotiation memoranda. We processed 5 awards by 6pm that evening.

13. Shortly thereafter, we received an email from GLAAS Support informing us that there was an additional clearance process added to the system. In a typical process, someone from the technical team enters a requisition, which then must be cleared by the Program Office, the Office of Financial Management, the Resident Legal Office and then an A&A Specialist. Typically, once the Specialist finalizes their review, it gets moved to the Contracting/Agreement Officer for final approval and is then released to the partner. On January 30, a new level of review, at the State Department, was added between the review of the Specialist and the Contracting/Agreement Officer. This was a paralyzing move, which has and will continue to cause substantial delay of all contracting work at USAID. It also diminished the role of a Contracting Officer, as well as the authority of their warrant to make decisions within their authorities. With this GLAAS update, I was forced to stop all modifications, even those meant to put awards in compliance with the Executive Orders, until otherwise authorized to do so.

14. Further guidance issued by the Senior Procurement Executive, the Acting Administrator and Management Bureau officials stated that no one in the Agency is to communicate with partners without authority from the State Department. Later guidance then indicated that Contracting Officers could communicate with partners for stop work orders, but should not provide details on costs or other details on the stop-work order until provided answers by the Senior Procurement Executive. This directive runs afoul of the requirements in FAR 42.1303, which states that Contracting Officers must provide guidance

4

on the stop work order. This change puts Contracting Officers—including myself—at risk of legal liability for monetary damages.

15. If I fail to provide my partners with guidance on what costs can reasonably be incurred during the stop-work order, they might incur costs that will ultimately not be reimbursed by USAID. If that occurs, they have a legal cause of action to sue me as an individual and I could be liable for those costs. To date, I believe my partners have incurred approximately $20 million in costs that have yet to be approved and they have not been given guidance to reduce those costs, as I have not been able to provide that guidance. Additionally, they are also due tens of millions of dollars in reimbursements for costs incurred prior to January 24, 2025, for which they have not be reimbursed due to freezes in our financial systems.

16. In addition to the mixed and confusing guidance being provided to me as a Contracting Officer, which was in direct contrast to my warrant authorities, I was also receiving constant information regarding my role as a Foreign Service Officer, my standing in the Agency, and my employment status. This included being told if we do not take a "fork in the road" offer, that we could be let go from duties—-indications that the usual Reduction In Force (RIF) process will not be followed. We also received constant news out of Washington that thousands were or are being put on administrative leave. As this occurred, and as our contacts were being put on administrative leave, guidance from Washington began to go silent. We then received a generic email on February 5, indicating that all Foreign Service Officers would be put on administrative leave and removed from their posts, unless otherwise designated "mission critical."

17. The actions taken since January 24, 2025 have caused substantial emotional distress for me and my family and have placed me at risk for liability to Implementing Partners, as discussed above.

5

18. Professional Harm. By diminishing my warrant authority and instructing me to take actions contrary to what is prescribed by statute and by regulations, the Agency has put me at risk of having Implementing Partners bring claims against me under all of the agreements that I manage. There are approximately $800 million dollars in unobligated and/or unreimbursed obligations that I could be liable for in my direct portfolio. In sum, if the Shutdown process is not halted and reversed, I could be personally liable for hundreds of millions of dollars.

19. Emotional Distress. The constant barrage of emails, most of which come in throughout the night in my time zone, some of which have derogatory language in them, have caused tremendous emotional distress for me and, as a result, for my family. I wake up in panic, panting throughout the night. I have a feeling of constant worry, sadness, and anger, which has made it extremely challenging to stay focused on my work. My children have, as a result, also experienced distress. My daughter has been crying often at school and my son, who has never had disciplinary issues, has been acting out. My husband is also under tremendous stress, as he is an Eligible Family Member employee of the State Department and is at risk of losing his job as well.

20. Financial. I am at risk of substantial financial loss on a personal level, in addition to the potential financial loss that could occur if claims are brought against me by Implementing Partners, as stated above. Most immediately, I had annual leave planned for two weeks in February. I had booked a complete trip, valued at approximately $5,000, which I will not be able to recover. If we are required to evacuate and are not provided per diem or lodging, it will cost me approximately $250 for every day to cover the expenses for my family to stay in the United States. I will also lose the approximately $6,000 in school fees paid for the rest of the school year for my 3 year old son. My husband will also lose his job, which pays $46,000/year. If our household items are not repatriated, I will lose approximately $30,000

6

in personal effects.

  I declare under penalty of perjury that the foregoing is true and correct.

  Executed on February 7, 2025.


              _/s/ *Carol Doe*_
              Carol Doe