### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA


AMERICAN FEDERATION OF                     Civil Action
GOVERNMENT EMPLOYEES, et al.,              No. 1:25-0352
        Plaintiffs,

    vs.                                    Washington, D.C.
                                      February 7, 2025
DONALD J. TRUMP, et al.,
        Defendants.              3:08 p.m.
_____ /



TRANSCRIPT OF TEMPORARY RESTRAINING ORDER
**BEFORE THE HONORABLE CARL J. NICHOLS**
UNITED STATES DISTRICT JUDGE



APPEARANCES:

**For the Plaintiffs:**    **Lauren Bateman**
                                  **Allison Marcy Zieve**
                                  PUBLIC CITIZEN LITIGATION GROUP
                                  1600 20th St NW
                                  Washington, DC 20009
                                  202-588-7739

                                  **Karla Gilbride**
                                  **Kaitlyn Golden**
                                  **Kayla Kaufman**
                                  **Skye Perryman** - by phone
                                  DEMOCRACY FORWARD FOUNDATION
                                  P.O. Box 34553
                                  Washington, DC 20043
                                  202-448-9090

APPEARANCES CONT'D.:


**For Deft. Trump:**          **Christopher D. Edelman**
                             **Dorothy M. Canevari**
                               U.S. DEPARTMENT OF JUSTICE
                               1100 L Street, NW
                               Washington, DC 20530
                               202-305-8659


**Also Appearing**
**for Defendants:**          **Brett Shumate**
                             **Harry Graver**




**Reported By:**             **Lorraine T. Herman, RPR, CRC**
                               Official Court Reporter
                               U.S. District & Bankruptcy Cts.
                               333 Constitution Avenue NW
                               Washington, D.C. 20001
                               lorraine_herman@dcd.uscourts.gov




*** Proceedings recorded by stenotype shorthand.
*** Transcript produced by computer-aided transcription.

1                    **P R O C E E D I N G S**

2              **DEPUTY CLERK:**  Good afternoon, Your Honor.  This

3    is civil case year 2025-352, *American Federation of*

4    *Government Employees, et al versus President Donald J.*

5    *Trump, et al.*

6              Counsel, please come forward and introduce

7    yourselves for the record and introduce yourself for the

8    record, beginning with the plaintiffs.

9              **MS. GILBRIDE:**  Karla Gilbride for the plaintiffs.

10             **THE COURT:**  Ms. Gilbride.

11             **MS. BATEMAN:**  Lauren Bateman, also for plaintiffs.

12             **THE COURT:**  Good afternoon.

13             **MS. KAUFMAN:**  Kayla Kaufman.

14             **THE COURT:**  Ms. Kaufman.

15             **MS. GOLDEN:**  Kaitlyn Golden.

16             **THE COURT:**  Ms. Golden.

17             **MS. ZIEVE:**  Ms. Zieve, also for plaintiffs.

18             **THE COURT:**  Ms. Zieve.

19             **MR. SHUMATE:**  Good afternoon, Your Honor.  Brett

20   Shumate, on behalf of the defendants.

21             **THE COURT:**  Mr. Shumate.

22             **MR. GRAVER:**  Harry Graver, for the defendants.

23             **THE COURT:**  Counsel.

24             **MR. EDELMAN:**  Christopher Edelman from DOJ, for

25   the government.

1              **THE COURT:**  Counsel.

2              **MS. CANEVARI:**  Dorothy Canevari, for the

3    defendants.

4              **THE COURT:**  Good afternoon.

5              We are here on plaintiffs' motion for a TRO.

6              Just to let people know, what I've done to prepare

7    for today, I've reviewed plaintiffs' brief and all of the

8    supporting declarations.  So I am prepared to hear argument

9    from the parties, but the thing I'd like to hear first is

10   whether and to what extent the parties have discussed

11   whether I need to take this up today or if there can be a

12   pause of any sort on the challenged actions, to allow this

13   to be done in a more reasonable and rational timeframe?

14             Why don't we hear from the plaintiffs first.  Come

15   on up to the podium.  Ms. Moore will assist you.

16             **MS. GILBRIDE:**  Thank you, Your Honor.  We have not

17   spoken with the defendants regarding a stipulation to a

18   pause, but certainly it's plaintiffs' position and, indeed,

19   the relief that we seek is that there be an immediate pause

20   of any further evacuation orders from USAID International

21   postings, that there be no placement of additional

22   individuals on administrative leave and that people be

23   restored and access be restored to people's computer systems

24   who are in the field, and all USAID employees and

25   contractors regain access to their USAID computer systems.

1          If the government is willing to stipulate to those

2     terms on a temporary basis while the Court —— while we

3     engage in briefing and while the Court has more time to

4     evaluate the legal arguments, that would certainly be

5     satisfactory to the plaintiffs.

6          **THE COURT:**  Thank you, Ms. Gilbride.  Mr. Shumate.

7          **MR. SHUMATE:**  May it please the Court, Your Honor,

8     the defendants are unwillingly to alter their current plans,

9     but I can make three proffers of additional facts that I

10    don't think are in the record that we heard from the State

11    Department.

12         **THE COURT:**  So there is nothing in the record from

13    the government, so this would be --

14         **MR. SHUMATE:**  Right.

15         **THE COURT:**  -- more than zero.

16         **MR. SHUMATE:**  More than zero.

17         I don't think the plaintiffs' papers offered the

18    following information.  So, first, 2200 individuals will be

19    put on administrative leave at the end of the today.  I've

20    been told it's paid leave.  It's not unpaid leave.  One

21    fact.

22         Second fact, is that there will be 611 essential

23    personnel that will remain at USAID, who will not be placed

24    on leave.  And then the third fact we've heard is that there

25    are about 500 individuals who are already on leave prior to

1    today.  The government has no plans to alter the current

2    plans.

3              **THE COURT:**  Okay.  Then I will hear from

4    plaintiffs about why I should enter the TRO they are

5    requesting today.

6              **MS. GILBRIDE:**  Thank you, Your Honor.

7              Within just a few hours from now, several hundred,

8    at a minimum ——

9              **THE COURT:**  2200 it sounds like.

10             **MS. GILBRIDE:**  Yes.  If defendants', you know,

11   figure is accurate and these numbers continue to change over

12   time, this factual picture continues to evolve quickly.

13             But 2200 Americans, within a matter of a few

14   hours, will be cut off from their access to essential

15   government systems that give them information about security

16   threats.  Many of these people are in war-ravaged areas of

17   the world, where the situation is unstable, where there are

18   terrorist threats.

19             So the fact that they may be placed on paid

20   administrative leave for some uncertain amount of time, does

21   not remove the imminent risks to security that they are

22   under --

23             **THE COURT:**  Do you have an understanding of what

24   it means for a USAID employee, stationed overseas, to be put

25   on paid administrative leave?  The person gets paid but what

1    about the employment relationship changes as a result of

2    being placed on administrative leave?

3         **MS. GILBRIDE:**  Well, what has happened to the

4    individuals, our clients' members, who have already been

5    placed on administrative leave, is that they are locked out

6    of all of the computer systems, payment systems, email

7    systems, and as I mentioned, the scary, panic security

8    system that would alert them to threats in the area.

9         That ongoing removal of access to key information

10   is not only imperiling their safety, but it also imperils

11   the continued operations of USAID and all of the partner

12   organizations that USAID works with around the world.  When

13   institutional partners who manage humanitarian programs

14   delivering aid to malnourished children in the Gaza region,

15   where USAID workers are deployed to manage and monitor and

16   try to preserve the ceasefire between Hamas and Israel.

17   Their systems are not working.  When the folks on the ground

18   are not able to communicate with their partners at USAID;

19   that adds to the instability of these unstable regions, can

20   cause a security situation in those areas to degrade and

21   imperils, makes it difficult, if not impossible, for USAID

22   to perform its vital humanitarian mission.

23         **THE COURT:**  Which of the counts in the Complaint

24   is most aligned with the action to place these 2200 people

25   on administrative leave?  Put differently, what in the

1    plaintiffs' view is unlawful about doing so?

2          **MS. GILBRIDE:**  So all of the actions that have

3    been taken in the last two weeks by President Trump and his

4    designees have been taken in excess of executive --

5          **THE COURT:**  I get that.  I want to be very focused

6    for a second.

7          **MS. GILBRIDE:**  Uh-huh.

8          **THE COURT:**  In other words, if hypothetically,

9    USAID was moved under the auspices of the State Department.

10   I get plaintiffs would say it is unlawful for various

11   reasons, but that wouldn't cause them harm in the sense that

12   being placed on administrative leave does.  I just want to

13   talk about what is unlawful or what makes it unlawful to

14   place 2200 people on administrative leave tonight?

15         **MS. GILBRIDE:**  So the 2024 Appropriations Act,

16   which set conditions for any reduction or more than a

17   *de minimis* reduction in force, closure of offices,

18   reorganization of functions within USAID prohibited any of

19   those actions from being taken without first consulting with

20   the duly authorized congressional committees.

21         To our knowledge, that consultation has not taken

22   place for any of the actions, the placement of people on

23   administrative leave and this new plan to place 2200

24   additional people on administrative leave, which as I

25   mentioned, does not cause them to be on leave but interrupts

1    the essential functions of USAID, its humanitarian missions

2    its stability preserving missions in conflict areas.

3        **THE COURT:**  Would placing these 2200 people on

4    administrative leave violate or in your view, potentially

5    violate some employer/employee relationship standard,

6    whether it's law, union contract or otherwise?

7        **MS. GILBRIDE:**  It may or may not do those things,

8    but the basis of our complaint and why we are in court today

9    is that the major reduction in force, as well as the closure

10   of offices, the forced evacuation and relocation of these

11   individuals, you know, uprooting them and their families

12   from places that they have been living for years, were all

13   done in excess of the executives authority in violation of

14   separation of powers, and in violation of at least two, and

15   probably more, statutes that reserve to Congress the ability

16   to make these sorts of major changes to the organization of

17   USAID.

18        So that action, that's the unlawfulness.  The fact

19   that this is within Congress' province to do, and that's not

20   what's happening, and it's a whole series of actions, you

21   know, from the accessing of private, secure information and

22   health information of these individuals, which to our

23   knowledge is ongoing.

24        **THE COURT:**  I get that.

25        I'm trying to focus, at least in the first

1    instance, on the placement of people tonight on

2    administrative leave.  And it seems to me that that is not,

3    at least directly, caused by or perhaps even indirectly

4    caused by going into email systems.  We have a prior

5    statement confirmed today in court that 2200 people are

6    going to be placed on administrative leave tonight.

7            I just want to drill down on exactly how that, in

8    your view, is unlawful.  I think the answer is, That is in

9    effect a riff, a riff is permitted only in certain

10    circumstances that are not met here.

11        **MS. GILBRIDE:**  So the term that the Appropriations

12    Act of 2024, you know, it refers to closure of offices, it

13    refers to reorganization and it refers to termination of

14    personnel, which if, you know, the placement of people on

15    administrative leave may be a prelude to terminating them.

16    Certainly in the immediate term it takes them off the field

17    of play, because it takes away their access to their

18    computer systems, their ability to communicate in the field

19    with institutional partners.

20            So whether they are being paid or not does not

21    change the fact that the USAID ceases to function.  It

22    ceases to carry out its mission, which is not lawful.

23        **THE COURT:**  But the plaintiffs are organizations

24    that have standing, either on their own or on behalf of

25    their members, I'm trying to talk about the harm to those

entities, the plaintiffs and plaintiffs' members.  Harm to

USAID, that is harm to the government or maybe to the public

interest.  I want to focus on the irreparable harm to the

plaintiffs.  It sounds to me like what you are saying is,

talking just about the 2200 people who are about to be put

on administrative leave, while they might be paid, because

of the other effects of being placed on administrative

leave, they are placed at risk of various kinds described in

the declarations, so long as they remain overseas or perhaps

otherwise.

**MS. GILBRIDE:**  They are placed in an informational

vacuum.  If they remain in the countries where they

currently reside —— so there are two directions this could

go.  If they are placed on administrative leave but told to

stay where they are, then they are staying where they are in

often dangerous conditions, where they're cut off from any

information from the government.  In some cases their

immunity, diplomatic immunity privileges have been revoked,

which places them at even greater risk.  And their access to

payment systems is cut off, which means that costs that they

incur are, you know, not reimbursed.  That they are paying

for these things out of pocket.

In many cases, these individuals are responsible

for liabilities on the contracts that they administer.  And

with the payment and invoices on those contracts not being

1    paid, all funds being frozen, these individuals are

2    personally liable for the costs that are mounting on those

3    contracts.

4         One of our declarants, as you may have seen, is

5    facing liability in the hundreds of thousands of dollars.

6         **THE COURT:**  But that doesn't flow from being

7    placed on administrative leave.  Right?  That flows from

8    something else.  That flows from potentially or at least

9    most directly from the cutting off of funding.  Right?  And

10   then the cutting off of funding, combined with certain of

11   the organizations here, members having particular legal

12   obligations as contracting officers and otherwise.

13        **MS. GILBRIDE:**  Being cut off from Phoenix payment

14   system does flow from being —— or at least has, in the case

15   of many of our clients' members who we have spoken with and

16   some of whom we have given declarations on the record to

17   this Court.  When they are cut off from the Phoenix payment

18   system, as part of being placed on administrative leave,

19   that means they are not being reimbursed from costs that

20   they incurred.

21        **THE COURT:**  I agree with that.  I thought you were

22   talking about this other subset of USAID employees, who may

23   be at risk of incurring personal liability because some

24   USAID contractors aren't being paid.  And in their capacity

25   as contracting officers or otherwise, they are sort of, at

1    least potentially, on the hook for what would otherwise be

2    the debts of the U.S. government.

3         **MS. GILBRIDE:**  That is an additional risk that

4    contracting officers face; that risk and that injury is on

5    going.  So it is present now.  It's present an hour from now

6    and it's present at 11:59 p.m. tonight.  It's not tied, in a

7    causal sense, to the administrative leave.  But in term of

8    Your Honor's original question, What is the exigency, that

9    is an exigent and clear and present irreparable harm that

10   these individuals are suffering.

11        **THE COURT:**  Am I right that the harms that the

12   2200 people who would be placed on administrative leave

13   tonight, if nothing else happens, are the same harms, in

14   effect, that the 500 people who have already been placed on

15   leave would presently be suffering?

16        **MS. GILBRIDE:**  I think they are similar harms.  I

17   mean, the people who have already been placed on leave

18   have —— they are differently situated in that the harms have

19   already occurred.  And for those 2200 and any others that

20   the government adds to that list --

21        **THE COURT:**  They would be ongoing.

22        **MS. GILBRIDE:**  Yes.  They are at imminent risk.

23   The harm extends beyond them and also encompasses those who

24   have already been placed on leave.

25        **THE COURT:**  What I am really trying to get at is

1     we have a universe of potentially 2700 people, who as of

2     tomorrow would be on administrative leave.  Some that has

3     already happened.  Some it would happen.  But those two

4     groups that make up the 2700, the 500 that it's already

5     happened and the 2200 that it's to happen.  They are

6     essentially indistinguishable for purposes of thinking about

7     whether the harm has already started or is to start, they

8     are similar.

9            **MS. GILBRIDE:**  Similar, yes, but not exactly the

10    same, Your Honor.  Because for the 2200, you know, this

11    Court's action stands between whether the harm has

12    occurred ──

13           **THE COURT:**  Sure.  Sure.  No.  I said, if nothing

14    happens, as of tomorrow -- if we have 2700 people on

15    administrative leave tomorrow, 500 as to whom that happened

16    already and 2200 to whom it would happen at midnight

17    tonight, at that point, at 5 p.m. tomorrow they will all be

18    essentially similarly situated.  Yes?

19           **MS. GILBRIDE:**  I believe that is correct, yes,

20    Your Honor.

21           **THE COURT:**  Okay.

22           **MS. GILBRIDE:**  The other category of harm that I

23    just want to speak because opposing counsel did not refer to

24    this, but it's something we have heard from our clients'

25    members is already starting to happen, is that people are

```
1    being evacuated from their placements and sent back to the
2    United States.  And those relocations are happening very
3    quickly in a chaotic --I hear an echo.
4              THE COURT:  Ms. Gilbride, just pause for
5    one second.  Ms. Moore, go ahead.
6              DEPUTY CLERK:  Ms. Perryman, please mute your
7    phone.
8              THE COURT:  Thank you, Ms. Gilbride.
9              MS. GILBRIDE:  Sure.
10             And those relocations, which are happening very
11   abruptly, without the time to plan and make logistical
12   arrangements that normally occur when people have to
13   relocate from ──
14             THE COURT:  Ms. Gilbride, I apologize.  The person
15   who dialed in, at my permission needs to either mute his/her
16   phone or hang up.  And if that doesn't happen, we will hang
17   up.
18             Ms. Gilbride, you may continue.
19             MS. GILBRIDE:  So the chaotic and rushed nature of
20   these evacuations is also a source of irreparable harm,
21   which I believe is ongoing.
22             THE COURT:  Right.  So it seems to me that this is
23   related but different.  So just tell me where I've got this
24   wrong.  Even if these 2200 or 2700 people weren't placed on
25   administrative leave, and they were just employed as they
```

1    had been, put it that way, the government is also

2    accelerating, from your perspective, their removal from

3    their location of employment.

4         Again, correct me if I have it wrong, it's

5    something like, normally in a more rational process, the

6    employees would get, like, 90 days' notice or something, and

7    that would enable them to plan and take care of their

8    affairs and otherwise have 90 days to come back.  Just cut

9    the line off.

10        (Echo continued and the call was disconnected.)

11        But what is happening now, I take it, from your

12   perspective, is that time period is being significantly

13   truncated for some portion of the workforce and they are

14   being brought back to the United States much faster than 90

15   days, with a cascade of harms, from your perspective; is

16   that all basically correct?

17        **MS. GILBRIDE:**  That is correct.  In some cases,

18   families are being separated.  If one person needs to leave

19   and the rest of the family remains in country, children are

20   being pulled out of school during the middle of the school

21   year at developmentally fragile time periods.  People are

22   being, you know, cut off from their access to healthcare,

23   without being able to make arrangements for new healthcare

24   providers when they have serious health conditions.  People

25   are being asked to go back to the United States where they

1    may not have housing, they don't have a home to come back

2    to.  They are being asked to do that with no, you know,

3    source of income or dim prospects, based on the statements

4    about reductions and employees.

5            **THE COURT:**  Let's just assume, and I get from

6    plaintiffs' perspective these are all things that are things

7    that are happening and I shouldn't disaggregate them in the

8    way I am about to, but assume I am going to for a

9    hypothetical.

10           Imagine people are not on administrative leave at

11   all, but they are being required to come back to this

12   country, ordered to come back to this country faster, what

13   is unlawful about that?

14           **MS. GILBRIDE:**  The way the repatriation is being

15   done, again, it's being done —— it is incident to the

16   closure of offices, the closure of overseas stations which

17   is something that as an independent agency authorized by

18   Congress under the Foreign Service Reform and Reorganization

19   Act is not something that the president can unilaterally do

20   and that is who is unilaterally doing it.  There should be

21   congressional oversight there should be an independent

22   direct o of the agency as opposed to this being delegated to

23   the Secretary of State.  So the whole administration of

24   these series of actions, placing people on administrative

25   leave, the closure of offices, is being done in excess of

1    executive authority, the president does not have the

2    authority to do this.  It's an independent agency created by

3    Congress.  If it is to be reorganized in this manner, it

4    needs to be done through the proper congressional path.  So

5    that is why it is unlawful.

6              **THE COURT:**  Okay.  So now let's just take another

7    thing that I believe the plaintiffs say I believe may be

8    causing them harm.  So, again, I am just going to pose this

9    hypothetical.  Imagine that the government wasn't placing

10   employees on administrative leave and was not recalling them

11   in a manner that was either too fast or was otherwise not

12   inconsistent with all of the things you just said, but the

13   government says, as it has, We are going to stop funding.

14   Either funding of USAID or USAID partners.

15              In that scenario,again, just to be very clear, no

16   administrative leave.  No change to the manner or timing in

17   which people are re-called, but simply no funding or reduced

18   funding, what if any harm the plaintiffs or the plaintiffs'

19   members suffer?

20              **MS. GILBRIDE:**  Well, we talked about one of the

21   harms, which is for those who are personally liable for

22   contractual expenses.  If those expenses are not being paid

23   under the terms of the contract, that leaves these

24   individual Foreign Service Officers or other employees

25   holding the bag and financially responsible for those costs.

1          In addition, for everyone in a situation which

2     they are being asked to continue to do their jobs, but there

3     is no funding with which to operate these programs, then

4     they're, you know, being set up to basically watch a

5     slow-speed train wreck or, perhaps, a fast train wreck.

6          **THE COURT:**  Do you have an understanding, and I

7     apologize for the interruption, is what's been ordered or

8     contemplated that funds to USAID contractors must be cut off

9     with certain exceptions or that funds to USAID itself get

10    cut off?

11         **MS. GILBRIDE:**  I think I understand the

12    distinction that you are drawing, Your Honor.

13         **THE COURT:**  In other words, like, an agency like

14    USAID needs a budget to pay its own employees, direct USAID

15    employees needs a budget for its employees, for its offices,

16    for its costs.  And then it has budget for funds that are

17    granted or paid to other entities.  I mean, somebody who

18    gets a USAID grant for some program in Africa or is a

19    contractor of USAID in Italy, or whatever it is, do you have

20    an understanding of whether what's been ordered is a freeze

21    on just the latter, that is to say a freeze on the outflow

22    of funds to partners or is it a freeze on the use of funds

23    by USAID, for lack of a better word, internal purposes?

24         **MS. GILBRIDE:**  I know the freeze applies to funds,

25    grants and contracts to partners; and that is why many of

1    the organizations that manage contracts that receive USAID

2    funding, have in recent weeks, once that funding stopped,

3    been forced to furlough or in many cases lay off large

4    numbers of employees.  And these are not USAID employees,

5    but they're private sector employees of these contractors.

6    That is, again, what part of the, sort of, public interest

7    ripple effects that these unlawful actions have had by

8    destabilizing --

9            **THE COURT:**  Right.

10           Imagine the world is one where USAID —— again,

11   this is probably an oversimplification of the world —— but

12   USAID's internal budget is fully funded, the employees are

13   not on administrative leave, and they aren't re-called to

14   the country faster than they would have been normally, but

15   funding is cut off to external groups.  What harm would flow

16   to USAID employees in that circumstance?

17           **MS. GILBRIDE:**  So I think that my answer to that

18   question is the same as the one I gave earlier.  There are

19   two primary harms.  One is that they would be hamstrung in

20   their ability to do their job and, you know, these are

21   people who are dedicated public servants, you know, it's a

22   calling for them.  It's not just a way of making money.

23   They're living in dangerous places all over the world and

24   for them to have to stand by and watch, you know, children

25   who are dying of malnutrition, not being able to provide

1    medicines, having food spoil on shelves because it can't be

2    distributed, I think would cause some severe emotional

3    injuries to these individuals, in addition to financial

4    exposure to being personally liable for payment on

5    contracts, if the government is not going to pay contracts

6    because of the freeze on funding.

7              **THE COURT:**  On that one, can we just talk a little

8    bit about that?  So why would that be irreparable?  It seems

9    to me that the following would all have to be true for that

10   harm to be irreparable; that the government cuts off funding

11   to some contractor of USAID.  For reasons that aren't

12   totally clear to me, the contracting officer or some USAID

13   employee with a special legal status suddenly becomes

14   obligated for the government's existing obligation to that

15   contractor and has some personal liability as a result, and

16   no recourse against the government to recoup that liability.

17   That, at least, seems pretty far-fetched that that would

18   happen.

19             **MS. GILBRIDE:**  I would submit, Your Honor, that

20   even if ultimately the individuals in that position could be

21   reimbursed or could have recourse, the uncertainty and the,

22   you know, sort of watching the ticker go up as their

23   potential financial exposure rises and rises, as the

24   government continues to not pay these obligations, would be

25   injurious.  Just the uncertainty and risk associated with

22

1    that would be an injury, even if, you know, months or years

2    down the line it would be possible for some reimbursement to

3    occur, especially for individuals where that exposure is

4    really ruinously expensive.

5              **THE COURT:**  And just to go back to the first step

6    in the analysis, why is it that an individual employee of

7    USAID could become personally liable for an obligation of

8    the United States?

9              **MS. GILBRIDE:**  So it may be specifically an

10   obligation assigned to the contract or the contractor.  We

11   are getting into a level of detail here that, I must admit,

12   you know, I may need to get some additional factual

13   development, if the Court wants to know more.  But I know

14   that individuals are responsible for payment on the

15   contracts if there is not prompt payment.

16             Again, going back to our legal arguments about the

17   statutes that are being violated here, we focused a lot, so

18   far today, on the Foreign Service Reform Act and the fact

19   that Congress has to be consulted for any reorganization.

20             In addition to that, the way that these contracts

21   are being frozen and payment on invoices both, certainly

22   externally and perhaps, also, internally, to your

23   distinction.  Prompt payment is not being made in violation

24   of the Prompt Payment Act.  So that would be another type of

25   immediate relief that we would seek from the Court in a

1    Temporary Restraining Order, would be in addition to, you

2    know, cessation of putting people on administrative leave,

3    not sending people home, not closing overseas posts, would

4    also be to pay all overdue invoices.

5         **THE COURT:**  Are there other imminent irreparable

6    harms that we haven't, from your perspective we haven't

7    discussed that you assert here?  I understand that there are

8    counts or claims of illegality in the Complaint that we

9    haven't talked as much about in terms of just the detail,

10   but just to focus first on the question of What are the

11   harms that are both imminent and irreparable?  Are there any

12   that we haven't discussed that you want to raise at this

13   time?

14        **MS. GILBRIDE:**  So with regard to our plaintiffs

15   that are our clients and their members, the irreparable

16   harms are, you know, their physical safety, which again, is

17   tied to being placed on administrative leave and being cut

18   off from those essential government communication systems;

19   their family stability, which is implicated by these rapid

20   repatriation efforts; and the financial and other sort of

21   instability that's caused by the non-payment of the invoices

22   and freezing of the contracts.

23        I would say that the individuals who remain

24   overseas, as situations destabilize, you know, with the

25   contracts not being paid, essential services not being

1    provided in these developing countries, you know, that can

2    have security implications, destabilize the environment in

3    those countries, which is not just a humanitarian disaster

4    for the people directly impacted but also as our clients'

5    members remain in those places.  They are caught up in those

6    destabilized and dangerous conditions.

7        **THE COURT:**  Counsel, thank you.  I would like to

8    hear from the government, and I will give you an opportunity

9    to rebut.

10        Mr. Shumate.

11        **MR. SHUMATE:**  May it please the Court.  The Court

12    should deny the TRO because the plaintiffs have not

13    established any of the elements required to obtain emergency

14    injunctive relief.  The plaintiffs have framed their case as

15    the next *Youngstown Steel*.  This case is a far cry from

16    that.  This is a personnel action.  The president has

17    decided to exercise his Article II power to place these

18    individuals on administrative leave.

19        Now, to be sure, it's a large number of

20    individuals, but it is still a personnel action.  And the

21    plaintiffs who are in this court --

22        **THE COURT:**  What is the urgency of doing it

23    tonight?

24        **MR. SHUMATE:**  The president has decided there is

25    corruption and fraud at USAID and immediate action --

1          **THE COURT:**  Where is that reflected in something

2    official?

3          **MR. SHUMATE:**  There's a personnel action

4    announced --

5          **THE COURT:**  Does it talk about corruption and

6    fraud?  Is that a basis for the administrative leave?  In

7    other words, does the placement of these 2700 or 2200 people

8    tonight on administrative leave, are there findings about

9    the reason for it?

10         **MR. SHUMATE:**  I'm not aware, Your Honor, but I'm

11   aware --

12         **THE COURT:**  So how can I say, this placement of

13   administrative leave is being done for a particular reason?

14         **MR. SHUMATE:**  When the president exercises his

15   Article II power to remove somebody or place them on

16   administrative leave, he doesn't have to give cause.  And

17   that's what the --

18         **THE COURT:**  Did the president do that here?  Who

19   put these -- who is exercising the authority to put these

20   people on administrative leave?

21         **MR. SHUMATE:**  Ultimately the president.

22         **THE COURT:**  No, who -- That's not my question.  My

23   question is, who took the action?

24         **MR. SHUMATE:**  Ultimately, it would be

25   Secretary Rubio, who is now the acting administrator.

1          **THE COURT:**  And does Secretary Rubio not have to

2    say anything about why he put 2700 people on administrative

3    leave?

4          **MR. SHUMATE:**  If the plaintiffs want to contest

5    that, they can contest that after the fact.  Through the

6    MSPB, through the FLRA, they can contest each of the

7    individual actions.  But what they can't do is go to court

8    and get an emergency injunction to prevent --

9          **THE COURT:**  So what finding supports the need to

10   do this this week or tonight?

11         **MR. SHUMATE:**  I don't believe that Secretary Rubio

12   needs to provide any factual basis or explanation --

13         **THE COURT:**  So the answer is, there isn't one.

14   You just don't think there has to be one?

15         **MR. SHUMATE:**  There does not have to be one.  The

16   government does this across the board every day, put people

17   on administrative leave.

18         **THE COURT:**  Sure, it puts individual people on

19   administrative leave.

20         **MR. SHUMATE:**  And that's what's happening here.

21   It's just a large number of people.

22         And if every employee who gets placed on

23   administrative leave could come into court and seek an

24   injunction against the president and ask the Court to enjoin

25   the president's removal power and superintend the functions

1    of the Agency, the executive branch could not function.

2    Ultimately, the president is here.  As you know,

3    all executive powers are vested in the president.  He is

4    exercising his Article II power.  He's also exercising his

5    foreign affairs power.

6    He doesn't have to justify to the plaintiffs or

7    the Court how he exercises his foreign affairs power.  And

8    the president has determined, in his view, significant and

9    serious action needs to be taken tonight to prevent taxpayer

10   funds from being sent outside the United States that are

11   being used for purposes that he doesn't think are

12   appropriate.

13   **THE COURT:**  So, I mean, we've now -- that argument

14   has focused on administrative leave which, of course, is the

15   thing that has us here today, at least as it relates to what

16   happens tonight.  But there's also two other things that

17   we've been talking about.  One is the re-call and then the

18   other is the stop of the funding.

19   As to the latter, so that, at a minimum,

20   implicates the Appropriations Act of 2024.  Do you agree?

21   Whether the president can stop funding that Congress

22   authorized.

23   **MR. SHUMATE:**  I think the action that we're

24   talking about is Secretary Rubio's pause on funding which

25   happened on January 25th.

1      What they're challenging today is the employment

2  action and their claims are directed toward the employment

3  action --

4      **THE COURT:**  Well, I don't think the TRO is so

5  narrow, certainly the complaint isn't.  And I explored with

6  plaintiffs' counsel the claimed harm that flows from the

7  stopping of funding and also what that means in practical

8  terms.

9      Do you have an understanding of what

10  Secretary Rubio's pause on funding actually means in

11  practical terms?

12      **MR. SHUMATE:**  Yes, I mean, it -- I believe it's in

13  the record.  He paused all new obligations of funding

14  pending a review for foreign assistance programs funded by

15  or through the department and USAID.

16      So it's prospective.  It's pausing new

17  obligations.  I don't believe the plaintiffs are challenging

18  this.  No plaintiff in any court has challenged this.  What

19  the plaintiffs are challenging is the employment action

20  today.

21      And their claims -- so let's talk about their

22  claims.  So their statutory claim or their constitutional

23  claim, they have take-care clause claim and a separation of

24  powers claim.  Those are not constitutional claims.  They

25  are statutory claims.  They are claiming the president has

1    violated statutes.

2         Those are truly APA claims.  If they believe the

3    government has violated a federal statute and acted contrary

4    to law, they can bring an APA claim.  But of course, there

5    was no APA cause of action against the president.  And the

6    APA claims that --

7         **THE COURT:**  Well, there is against

8    Secretary Rubio.

9         **MR. SHUMATE:**  There are.  And what they -- they

10   have not challenged any discrete final agency action.  They

11   have challenged broad -- well, a broad programmatic attack,

12   like the one in *Lujan*, against the president and

13   Secretary Rubio.

14        They just don't like how this agency is being

15   administered, but they haven't identified any concrete,

16   discrete final agency action that would give rise --

17        **THE COURT:**  That might all be right and perhaps,

18   with briefing and more than four hours, you might convince

19   me of that.

20        The problem is, I have something like eight hours,

21   no brief from the government and at least the hypothetical

22   possibility that 2200 people will be placed on

23   administrative leave in 12 hours and at least a claim that

24   there is ongoing irreparable harm.

25        Why isn't it prudent to just pause things for some

1    short period of time to allow the briefing to be done and

2    actual argument that isn't -- that is at least reasonably

3    well-considered and thought through?  Why doesn't that make

4    prudent sense?

5              **MR. SHUMATE:**  Because they're asking you to

6    appoint yourself as a receiver of USAID.  If you read their

7    proposed order, they are asking you to enjoin all --

8              **THE COURT:**  I didn't ask about granting their

9    order.  I asked about pressing pause on at least the most

10   imminent actions.

11             **MR. SHUMATE:**  If you pause this action today, then

12   what's going to stop the next plaintiff, you know, a group

13   of ten people, one person?  The irreparable harm here is

14   still individualized.  That's what they're -- yes, it's a

15   magnitude of a large number of people.  But still, each

16   person has to establish irreparable harm.  So the only thing

17   that's different about this case than any other employment

18   case is the number of people.

19             And here, to the extent these individuals suffer

20   any harm, they will have remedies after the fact.  They can

21   always bring claims at the MSPB or to the FLRA to the extent

22   they are suffering any financial harm.

23             The other harms that my friend has described,

24   they're all -- they're not concrete.  They're all

25   hypothetical.  They're speculative.  If we're talking about

1    money, these people will be paid.  It's paid administrative

2    leave.  To the extent they're upset about not being able to

3    do their jobs, that's not really something the Court can

4    remedy.

5              Again, what the plaintiffs are asking for is for

6    the Court to superintend all of the actions at USAID, to not

7    only enjoin the president and the secretary from placing

8    individuals on leave but also to appoint an acting

9    administrator to control the website and do all sorts of

10   things that really would disrupt the functioning of the

11   executive branch.

12             **THE COURT:**  Is Secretary Rubio's pause on funding

13   that you just mentioned or however it relates to what's

14   going on at USAID, is that consistent with the preliminary

15   injunction that Judge AliKhan ordered in the case in front

16   of her?

17             **MR. SHUMATE:**  Well, this, Secretary Rubio's freeze

18   happened before Judge AliKhan's TRO.

19             **THE COURT:**  Right.

20             **MR. SHUMATE:**  So it's not enjoined where plaintiff

21   has argued -- it's not implicated, no.

22             **THE COURT:**  Okay.  Well, it seemed to me hers was

23   directed at something that flowed out of OMB.

24             **MR. SHUMATE:**  Correct.

25             **THE COURT:**  And I thought at least a portion of it

1    was, at least could have had to do with foreign assistance

2    in a way that would overlap with what's here.

3         **MR. SHUMATE:**  Secretary Rubio's pause occurred

4    before the OMB freeze.  There has been no allegation that

5    Secretary Rubio's pause is implicated by any of the other

6    litigation about pauses.  I think, of every cabinet

7    official, Secretary Rubio has extraordinary statutory

8    authority to pause funding.  Nobody has even challenged

9    that.

10         So that is not challenged in this case.  What is

11   being challenged in this case is an employment action.  Yes,

12   the magnitude is high.  But, again, these individuals are

13   being placed on administrative leave.  To the extent they

14   have complaints about being placed on administrative leave,

15   there will be remedies after the fact.

16         There is nothing irreparable to them about what

17   will happen tonight other than the fact that they don't get

18   to do their jobs.  And Courts typically do not issue

19   injunctions in the employment context because there are

20   always remedies after the fact.

21         **THE COURT:**  What about -- so we went,

22   administrative leave, funding; and then there's this middle,

23   maybe, category about pulling people back from their posts

24   to here.  Plaintiffs' claim is that that's at least being

25   done in a more-accelerated way than normal.  What's your

1    response to that?

2           **MR. SHUMATE:**  My response is that I think the

3    Secretary has broad authority over foreign affairs and

4    diplomats and foreign service officers and can order them

5    likely anywhere in the world that he would like them.  If he

6    wants them back in the United States, I don't understand why

7    that would be --

8           **THE COURT:**  Does the Secretary of State, without

9    reorganization, actually make those decisions for USAID?

10           **MR. SHUMATE:**  He is currently the acting

11   administrator.

12           **THE COURT:**  He is but so maybe talk about him as

13   the administrator but, I mean, at least right now, USAID is

14   a distinct juridical entity, right, and is independent from

15   the State Department.

16           So when you're talking about -- you're talking

17   about Administrator Rubio?

18           **MR. SHUMATE:**  Administrative Rubio, yes.  Yes,

19   sorry.

20           **THE COURT:**  Okay, fair enough.  Yeah.  So does the

21   administrator of USAID have broad power over foreign

22   relations as you just said?  Probably not.

23           **MR. SHUMATE:**  I don't know, Your Honor.

24           **THE COURT:**  No.

25           **MR. SHUMATE:**  But he does have control over the

1    workforce and we can brief that issue.  I don't know.  But

2    individuals who work for the federal government are subject

3    to instructions from their superiors about where to go, when

4    to do and what to do.

5            That doesn't establish irreparable harm.  I don't

6    know if we have -- the record has identified those

7    individuals or explained what their concrete harms are.

8    It's really speculative and hypothetical at this point.

9            **THE COURT:**  The declarations go into -- you know,

10   there are a number of them.  And just in general, they say,

11   you know, the normal process is you provide 90 days or more

12   of notice; that allows the person who's being re-called, for

13   lack of a better word, to do all sorts of things to get his

14   or her affairs in order.

15           Here, that's happening on a much more accelerated

16   timeframe and that is causing the following harms, health,

17   financial and otherwise.

18           **MR. SHUMATE:**  I still think it's quite

19   speculative.  We don't know exactly what those harms would

20   be.  And I don't know for sure, but I assume all of those

21   costs, those travel costs, will be paid by USAID and State

22   Department.

23           I don't think -- I wouldn't expect that these

24   costs would be incurred by the individuals.  Again, they're

25   still on paid leave.  They're not being terminated.  We'd

1    have to consult with our clients about exactly how these

2    individuals are going to be brought home.

3            But, that is not a basis for the type of TRO

4    they're asking for or even any type of TRO.  They also have

5    to establish likelihood of success on the merits, and they

6    have not come even close to that.  Their constitutional

7    claims are really claims that statutes are being violated,

8    which they are not.  Those claims can be brought under the

9    APA.  They have not established final agency action.

10            **THE COURT:**  They do have APA claims.

11            **MR. SHUMATE:**  They do have APA claims, but they

12    have not established final agency action.  This is a broad

13    programmatic attack, the shotgun approach, to we don't like

14    the funding freeze, we don't like all these personnel

15    actions.  Typically those employment actions are not APA

16    claims.  They're not subject to the APA.  They're brought

17    under other statutes after the fact.

18            At the end of the day, if we're focused purely on

19    irreparable harm, these individuals will have remedies after

20    the fact.  They can bring claims against the United States

21    through the MSPB or through the FLRA.  There's no basis for

22    a broad injunctive order that would prevent the president

23    and Secretary Administrative Rubio from controlling the

24    functions of the agency, USAID.

25            So we would ask the Court to deny the TRO.  I'm

1    happy to answer any further questions.

2              **THE COURT:**  Thank you, Counsel.  I'll hear from

3    plaintiffs' counsel, rebuttal.

4              Ms. Gilbride.

5              **MS. GILBRIDE:**  Thank you, Your Honor.

6              So defense counsel has repeatedly said that this

7    is an employment dispute.  This is a dispute about the

8    unlawful dismantling of the USAID, and that full-scale

9    attack has proceeded in several incremental steps.  The

10   first step was the freezing of funding on contracts to

11   institutional partners which has caused untold devastation

12   around the world.

13             The second step was the placement of I guess now

14   it's up to 500 people on administrative leave.  Now, we're

15   dealing with an escalation where more people are going to be

16   placed on leave.

17             There's talk of contracts being permanently

18   terminated, not just placed on pause but permanently

19   terminated.  And I can, based on statements that the

20   president has made as recently as today, I don't think it's

21   at all a remote possibility to think that there will be

22   other further escalations, you know, leading to permanent

23   dissolution or drastic reduction of the agency.

24             And all of those actions are being done in

25   violation of the president's authority under Title II --

1    Article II of the Constitution, which, you know, grants

2    broad executive authority but only to carry out duly enacted

3    statutes.  There's no statutory authority for what the

4    president is doing.

5            In fact, as we've been discussing today, it is

6    contrary to multiple statutes.  And each of those actions,

7    in addition to being unlawful, is causing concrete, ongoing

8    harm to our clients and their members.  And those harms

9    will, you know, increase.  As this escalation of the

10   campaign to dissolve USAID speeds up, the harms are going to

11   multiply.  And that's why we're asking for the Court to

12   intervene.

13           **THE COURT:**  Right.

14           But I think the thrust of Mr. Shumate's argument

15   is, at least in this case -- putting aside whether there

16   might some other case regarding what's happening at USAID,

17   this case is brought, in effect, by USAID employees.

18           As a result, this case implicates the

19   employer/employee relationship.  Those claims by federal

20   government employees against federal government employers

21   are typically, not necessarily always but typically,

22   channeled through a particular process where the person

23   says, I was fired unlawfully, I was placed on leave

24   unlawfully, I -- something else happened to me and it was

25   inappropriate as it relates to my relationship with the

1    employer.

2              And so while I get that there are broader claims

3    here and, you know, it may be that there are other

4    plaintiffs that would have other claimed harms or other

5    claimed relationships with USAID or the government or other

6    claimed irreparable harm, the plaintiffs here -- and I

7    think, as we were exploring earlier, the harm derives almost

8    entirely from that employer relationship.

9              So why isn't it that this is a employer/employee

10   case though brought on behalf of essentially a class?

11             **MS. GILBRIDE:**  Two reasons, Your Honor.  First, as

12   your colloquy with opposing counsel brought to light, this

13   is not, you know, an employer/employee situation where

14   individuals are being placed on leave.  This is the

15   full-scale gutting of all of or virtually all of the

16   personnel at an entire agency.  That is not a typical --

17   that would be like the entire company, you know, being --

18   you know, all of the workforce being fired en masse.

19             The second --

20             **THE COURT:**  If -- can I just ask -- sorry to pause

21   there just --

22             **MS. GILBRIDE:**  No problem.

23             **THE COURT:**  If these 2700 people were placed on

24   administrative leave for a month and then reinstated or the

25   leave was rescinded, would there be any problem with that?

1        **MS. GILBRIDE:**  Yes, there would, Your Honor, and

2    that's the second point I was going to make.

3        **THE COURT:**  Okay.

4        **MS. GILBRIDE:**  Which is that these are also not

5    typical employees because they are, you know, in many cases,

6    stationed abroad.  And they rely on the government for their

7    safety, for their safety, for information.  They're often,

8    you know, sometimes in embassy housing.  They're not just

9    going home to their private residences.

10        They are, you know, in a country, you know, under

11    the auspices for their job.  And because of that, you know,

12    they need certain information.  They need certain security

13    protections, all of which is being denied to those

14    individuals who are on administrative leave status.

15        So they may be getting paid but, in other ways,

16    you know, they're being cut off from personal security.  And

17    that is not a typical employment situation and is a harm

18    that is outside the bounds of the sorts of remedial methods

19    that opposing counsel is pointing to, you know, MSPB, FLRA.

20        None of those agencies which deal with employment

21    harms get at the irreparable security risks and then the

22    risks we spoke about earlier regarding repatriation and

23    being separated from family.  This is not the typical, you

24    know, I was -- I didn't get a promotion or there is

25    something unlawful about my pay, which would be the province

1    of those employment tribunals.

2            Another point I wanted to make regarding -- there

3    was a discussion about funding and the ability for Secretary

4    of State Rubio to, sort of, pull everyone back.  I guess it

5    was actually in the context of pulling people back en masse.

6            Now, certainly, you know, in his capacity as

7    Acting Administrator of USAID, you know, if there were some

8    operational reason, for example, it was unsafe to remain in

9    a particular area because of conflict, you know, there are

10   operational reasons why people may need to be moved around.

11           But if there is -- you know, contrary to statute,

12   which we've talked about in terms of not having the

13   authorization to do this, but our other APA challenge is

14   that the action here is arbitrary and capricious.

15           There is no reason for it to be done so hastily

16   and it's not accounting for the severe harm and humanitarian

17   carnage that is being caused by pulling all of these people

18   out, leaving their institutional partners without contacts,

19   without ongoing, you know, nutrition aid, medical aid,

20   vaccines, things that are making the difference between life

21   and death and, you know, without any justification or reason

22   given why that human suffering and destabilization

23   throughout the world is necessary.

24           So the actions are arbitrary and capricious.  They

25   are in violation of statute and, you know, they are also,

1    with regard to the freeze of funding, it's not just

2    spending, you know, and undertaking new obligations, which I

3    think I heard, I may have misheard, but the funding on

4    existing already-appropriated funds.

5            The paying out on contracts for funds that were

6    already appropriated in fiscal year 2024 and even earlier is

7    being paused indefinitely; and that is also in violation of

8    statute.  And there's no authority for the agency defendants

9    to freeze those already-appropriated funds.

10           **THE COURT:**  So can I just make sure I understand

11   it?  Am I right that, to the extent Administrator Rubio

12   froze the obligation of funds in the last week of January,

13   you challenge that here or not?

14           **MS. GILBRIDE:**  So the fact that contracts are not

15   being paid, I think within the four corners of our

16   complaint, we talk about actions being arbitrary and

17   capricious and in violation of statute, including under the

18   Prompt Payments Statute, so the invoices are not being paid.

19           **THE COURT:**  I'm trying -- maybe, and I apologize.

20   Maybe I didn't focus on this distinction before.  The

21   United States government has entered into obligations

22   through USAID up until recently.

23           **MS. GILBRIDE:**  Uh-huh.

24           **THE COURT:**  It has those obligations and those

25   obligations include, presumably, to pay funds to grantees or

1    contractors.  Right?

2              **MS. GILBRIDE:**  Uh-huh.

3              **THE COURT:**  Those are existing obligations that

4    require the payment of funds by the United States?

5              **MS. GILBRIDE:**  Yes.

6              **THE COURT:**  Is it your understanding that

7    Secretary Rubio has said, Do not pay those existing

8    obligations or is it instead your understanding that

9    Secretary Rubio has said, Do not enter into any additional

10   new obligations?

11             **MS. GILBRIDE:**  It is my understanding that the

12   former is correct.  We may benefit from hearing from the

13   government on the factual matter of how often new funds are

14   obligated.  But certainly there are contractors -- there are

15   grants that have been canceled that, you know, were

16   multi-year grants.  And they've been cut short, you know,

17   because of Acting Administrator Rubio's actions.

18             There are also ongoing contracts in which people

19   were being paid for their work and those -- the employers

20   who are paying the individual institutional support

21   contractors to do various functions, the spigot of funding

22   cut off, it stopped.

23             The employers were not able to make their payroll

24   obligations and have had to lay people off as a result.  So

25   that is ongoing.  You know, as we speak, those things are

1    happening.

2            **THE COURT:**  So perhaps, let me just -- can I ask

3    it in a simplified way, which is, If in a non-exempt, at

4    least, setting, USAID had an agreement or a grant or

5    something that was signed in 2023 or 2024 and that obligated

6    it to pay in February or March of 2025 some person, some

7    contractor, some entity, some funds, so it's a prior

8    obligation but requiring the future payment of funds, your

9    understanding or at least your position here is that has

10   been -- so long as it's not in an exempt area, that has been

11   frozen?

12           **MS. GILBRIDE:**  That is my understanding.

13           **THE COURT:**  Those funds would not currently flow?

14           **MS. GILBRIDE:**  That is my understanding.

15           **THE COURT:**  Okay.  Anything you'd like to add,

16   Ms. Gilbride?

17           **MS. GILBRIDE:**  I guess I'll just say one more

18   thing since you mentioned exemptions.

19           **THE COURT:**  Yes.

20           **MS. GILBRIDE:**  Another consequence and another,

21   you know, harm, and this is, again, more of a harm

22   implicating the public interest, but the cutting people off

23   from access to their computer systems means that, even those

24   who are, you know, whether they're placed on administrative

25   leave, whatever their exact employment status is, you know,

1    they can't have any sort of correspondence with grantees who

2    may even be eligible for these waivers.

3              And so what we are hearing from, you know,

4    individual members of our clients, some of whom have

5    submitted declarations in this case, is that, you know,

6    they're trying to find out about the waivers or have their

7    grantee partners apply for the waivers.  But because

8    everything has been shut down and frozen, in terms of the

9    communications and access to email and payment systems,

10   there's not an ability on the ground, in practice, to

11   actually access those waivers.

12             **THE COURT:**  But that doesn't cause harm to the

13   employee in any serious sense.  Right?

14             **MS. GILBRIDE:**  Right.  That's what I -- yeah,

15   that's right.  It's really more of how, you know, the

16   ability of USAID to function is being imperilled and so the

17   waiver may exist in practice or in theory but cannot

18   actually be accessed in practice.

19             **THE COURT:**  Right.

20             **MS. GILBRIDE:**  And so, you know, I just would end

21   by asking the Court, at a minimum, to issue an order

22   preventing any additional individuals from being placed on

23   administrative leave, restoring computer access and access

24   to government systems for security and other purposes and to

25   halt any closure of overseas offices or USAID offices and

1    any evacuations or accelerated return of individuals to the

2    United States, as well as lifting the freeze on payment of

3    invoices and previously obligated funds.  Thank you,

4    Your Honor.

5            **THE COURT:**  Thank you, Counsel.

6            Mr. Shumate, you want to briefly respond?

7            **MR. SHUMATE:**  Sure.

8            Just a couple of quick points, Your Honor.

9            So first of all, on Secretary Rubio's funding

10   pause, it was very clear on the face of it, Paragraphs 1, 7

11   and 9, that it is for no new obligations.  So my

12   understanding of this document --

13           **THE COURT:**  So the government's official position

14   is that it is presently paying all previously obligated

15   grants, contracts, debts or otherwise?

16           **MR. SHUMATE:**  Your Honor, I can't --

17           **THE COURT:**  And I need to know what the

18   government's official position is right now.  What is

19   happening?  Is the government paying people or not?

20           **MR. SHUMATE:**  My understanding is that

21   Secretary Rubio's instruction is only applying to new

22   obligations.  I don't know if there's -- what's happening

23   with specific grants.

24           **THE COURT:**  So Secretary Rubio, at least on the

25   face -- Administrative Rubio or --

1          **MR. SHUMATE:**  This is Secretary.

2          **THE COURT:**  This is Secretary, but the -- on its

3    face, it's supposed to be saying, USAID, you may not enter

4    into any new obligations for -- well, whatever.  If they're

5    new obligations, you can't enter into them.  And it, at

6    least in theory, has no effect on what USAID should be doing

7    with pre-existing obligations because it doesn't say

8    anything about those.

9          **MR. SHUMATE:**  That is my understanding.  I don't

10   know whether, with respect to particular grants, decisions

11   have been made on an individualized basis to pause certain

12   grants.  But at least on the face of the Rubio pause, which

13   is not challenged here, it only applies to new obligations.

14         But I think the broader problem is that the

15   plaintiffs claim again it's a shotgun approach to many

16   different things that they complain about that the

17   government is doing with respect to foreign aid, employment

18   decisions and USAID generally.

19         Again, this is a broad programmatic attack.  It's

20   not a challenge to any discrete agency action.  Again, this

21   is an employment case.  What the plaintiffs are asking the

22   Court to do is to enjoin a contemplated employment action

23   that will happen.

24         That would be an extraordinary intrusion on the

25   government's -- the president's executive -- Article II

1    executive power to place individuals on administrative

2    leave.  It would open a Pandora's box to every plaintiff

3    coming --

4          THE COURT:  So, hypothetically, if the attorney

5    general announced that he was terminating all employees in

6    the civil division effective at midnight tonight, no Court

7    could get involved in that?

8          MR. SHUMATE:  In that situation, those individuals

9    would have a post hoc remedy.  That's a decision that the

10   attorney general would get to make, and the attorney general

11   would pay a political consequence for that decision.

12         Civil division couldn't carry out its functions in

13   that situation and Congress would be upset.  But it's not

14   something that a Court could do to enjoin the attorney

15   general from taking that action.  The only difference

16   between this case and any other employment case is the

17   number of people involved.  If we open up the door --

18         THE COURT:  Right.  That's why I used civil

19   division as the analog because that's 700 or so lawyers

20   but...

21         MR. SHUMATE:  I wouldn't be here to represent the

22   United States anymore, Your Honor.

23         THE COURT:  Right.

24         MR. SHUMATE:  I think that's all I have,

25   Your Honor.  Just this is an extraordinary remedy the

1      plaintiffs are asking for.  And at the end of the day, what

2      their proposed order asked for is a receivership of USAID --

3              **THE COURT:**  Well, that's the long-term potential

4      order from your perspective.

5              **MR. SHUMATE:**  That's the proposed order they put

6      before you today.

7              **THE COURT:**  That is the proposed order but, in a

8      way, we are discussing a much narrower question, which is

9      whether, in light of the fact that I have no brief from the

10     government, a number of open-ended questions, the fact that

11     we're on a TRO and the fact that the receivership question

12     is much distinct from whether I should put some very limited

13     pause on, for example, the placement on administrative

14     leave, I don't need to bite off the ultimate relief the

15     plaintiffs want when I'm thinking about the narrow and very

16     imminent question.

17             **MR. SHUMATE:**  On that question, Your Honor, I

18     think we've covered the ground why that's not irreparable.

19     There is a channeling provision to these individuals to the

20     extent they are harmed financially.  I don't see how they

21     could be because they're being placed on paid leave.  Maybe

22     they would have a better case if this was unpaid leave or

23     terminations.  But again --

24             **THE COURT:**  Right.  Again, I get it.  I get your

25     argument may be that every single harm that the plaintiff

1    has articulated is channeled to the MSPB or some other

2    place.  I don't have a brief.  I don't have a single case

3    from you that stands for that proposition.

4              I'm having to -- would be denying the TRO on that

5    ground without knowing whether every harm the plaintiffs

6    have articulated would be reparable through that process.

7         **MR. SHUMATE:**  I think what we've heard today, the

8    plaintiffs have not established irreparable harm, even

9    without a brief from the government.  What we know for a

10   fact is that these individuals are being placed on paid

11   leave.

12        **THE COURT:**  Yes.

13        **MR. SHUMATE:**  They're not going to suffer any

14   financial harm.  They are going to be continued to be paid.

15   The other harms that have been described are all

16   speculative.  They are not the type of harms that would give

17   rise to a TRO.

18             And again, you can read the face of the

19   plaintiffs' complaint and their TRO motion, which again,

20   they filed at noon today.  They have not established any

21   likelihood of success on the merits, either on their

22   constitutional claims, which are truly statutory claims, or

23   on their APA claims.

24             They have not established final agency action or

25   that there is any violation of those statutes at all.  So we

50

1    urge the Court to deny the TRO, consider the weighty

2    constitutional question that they're asking the Court to

3    decide by enjoining the employment action and enjoining the

4    president himself.

5         **THE COURT:**  Thank you, Mr. Shumate.

6         What I'm going to do is I'm going to take a short

7    recess --

8         **MS. ZIEVE:**  I just wanted to correct a factual

9    point of the existing obligated grants that have been --

10   with obligated funds.  Those are all frozen.  We've talked

11   to dozens of grantees.  They can't draw down.  Many of them

12   can't even access any grant officers; that's been widely

13   reported that the grants are all frozen pursuant to

14   Secretary Rubio's order.

15        **THE COURT:**  But let me just --

16        **MS. ZIEVE:**  Whether --

17        **THE COURT:**  -- let me make sure I understand it.

18   So whether that is required on the face of the order, as I

19   was discussing with Mr. Shumate, plaintiffs' view is that is

20   in fact what is occurring, in other words, that payments on

21   previously obligated obligations are not being paid.  And

22   that's just true from a factual perspective or at least the

23   record so reflects?

24        **MS. ZIEVE:**  It's true from a factual perspective,

25   and I think Secretary Rubio has acknowledged that that was

1      his intent.  It's certainly how, both at State and USAID,

2      it's been interpreted.  Those grants have been shut down.

3      That's why they're talking about whether they get waivers.

4      The waivers are for existing grant programs.

5              For instance, the PEPFAR program of USAID, there

6      was -- the Secretary issued a waiver around some of those

7      grants that have already been obligated to be paid.

8              **THE COURT:**  To be paid?

9              **MS. ZIEVE:**  I don't know if that relates to the

10     narrower order that Your Honor was discussing, but I thought

11     it was important to correct that, that they're saying

12     Article II allows them to withhold the allocated funds.

13             **THE COURT:**  Right.  There's a legal question

14     there.  But really, what I was trying to get at was the

15     factual question about, is the direction that USAID may

16     simply not enter into future obligations or is it that

17     the -- whether it's in the Secretary Rubio directive or

18     otherwise or is it that USAID is not to pay on existing

19     obligations?

20             And your position is, the record -- whatever the

21     Rubio order or directive says on its face, the facts on the

22     ground are that USAID is not paying obligated obligations,

23     grants or whatever?

24             **MS. ZIEVE:**  They're not allowing the take-down of

25     grant funding since the Rubio memo.  That's our

1    understanding.  Thank you.

2              **THE COURT:**  All right.  Thank you, Counsel.

3              So I am going to take a 12-minute recess.  We'll

4    be back at 4:30 and I'll let everyone know what the plan is.

5    Thank you, all.

6         (Recess at 4:18 p.m. to 4:33 p.m.)

7              **DEPUTY CLERK:**  Your Honor, we are now back on the

8    record.

9              **THE COURT:**  Thank you, Ms. Moore.

10             I will be entering tonight, sometime between now

11   and midnight, a limited, very limited TRO that is directed

12   or will be directed at the placement of the 2200 or 2700

13   employees on administrative leave and then the accelerated

14   removal of people from their countries.

15             That order will explain in a little bit more

16   detail why I'm doing that.  I'm not going to go into it in

17   detail right now because it would be really to do so on the

18   fly.

19             But I think it's important for people to recognize

20   that this case is brought by employees or organizations

21   representing employees of USAID.  Those employees are

22   alleging and allegedly suffering harm or future imminent

23   irreparable harm in connection with, principally, their

24   status as employees.

25             And so, whereas there are lots of counts and

1    claims in this case, what I really have before me is the

2    question of how are the employees potentially, irreparably

3    and imminently harmed from the challenged actions, not

4    whether there's a good -- this is a good idea, not whether

5    some contractor might have a claim for payments that it's

6    entitled to.

7            This is about how employees are harmed in their

8    capacity as employees in the employee/employer relationship.

9    And it seems to me that, for reasons I will discuss in this

10   order that I will enter, the plaintiffs have established at

11   least that there is irreparable harm as it relates to that

12   relationship; that they have shown enough of a likelihood of

13   success on the merits; that, frankly, there's essentially

14   zero harm to the government in, at least as the record sits

15   before me, to pausing this for some short period of time as

16   it relates to the employee/employer relationship.

17           But really fundamentally, there are important

18   questions here, including those that I raised with both

19   counsel and that were argued on both sides, but especially

20   on the government's side, that require further analysis and

21   briefing.

22           And so my order is going to require -- it's going

23   to be a very short TRO and it's going to require expedited

24   briefing and, very likely, argument on those questions.

25           So I wanted to, even though what I've just said is

1    not -- should not be viewed, for appellate or other

2    purposes, as the reasoning for the order, I wanted you to

3    know that's coming so that no one was going to be surprised

4    by it.  We have some work to do, and you will see an order

5    from me sometime in the next seven and a half hours.  Okay?

6            That order will include a schedule for those

7    additional briefs.  In any event that the parties think that

8    that schedule is unworkable for whatever reason, you can, of

9    course, file a motion to ask for a different schedule or, as

10   always, perhaps, if you were to talk and agree on something,

11   you could communicate that through Ms. Moore or otherwise.

12   And I'm sure, if the parties were to agree on something, I'd

13   be very likely to adopt it.  Okay?

14           Anything, Ms. Gilbride, you would like to discuss

15   before we recess?

16           **MS. GILBRIDE:**  No, Your Honor.

17           **THE COURT:**  Mr. Shumate, anything you would like

18   to?

19           **MR. SHUMATE:**  Yes, Your Honor.

20           What would you like to advise USAID right after

21   this hearing?  It's unclear to me what --

22           **THE COURT:**  They should not put those 2200 people

23   on administrative leave tonight.

24           **MR. SHUMATE:**  So you're ordering a pause?

25           **THE COURT:**  A pause for a -- let me -- so the

1    answer is, yes, as to those 2200.  What I'm not sure about

2    yet is whether I'm also going to order that the 500 that are

3    on leave should be removed from it.  I'm not -- I need to

4    think through that question.  But I also don't know how long

5    the duration is on the pause.

6            MR. SHUMATE:  So we should instruct our client to

7    pause what was planned for tonight?

8            THE COURT:  For tonight, yes.

9            MR. SHUMATE:  Okay.

10           THE COURT:  It seems to me that they should do

11   that.  And then, if for some reason something else has to

12   happen with respect to the 500, then that leave has already

13   occurred so that would be, sort of -- I get that they would

14   have to figure that out later.  So, yes.

15           Okay?  Thank you, all.

16           MR. SHUMATE:  Thank you for the clarification.

17           MS. GILBRIDE:  May I be heard, Your Honor --

18           THE COURT:  You may.

19           MS. GILBRIDE:  -- on a point of clarification.

20           On the 2200 and I know you're still thinking about

21   the 500 --

22           THE COURT:  Yes.

23           MS. GILBRIDE:  -- will the order address their

24   access to computer systems?

25           THE COURT:  Yes, it will.

1          **MS. GILBRIDE:**  Since we had an extended discussion

2     on that?

3          **THE COURT:**  It will, yes.

4          **MS. GILBRIDE:**  Okay.  Thank you, Your Honor.

5          **THE COURT:**  Okay.  Thank you, all.

6       (Proceedings concluded at 4:39 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **C E R T I F I C A T E**

2

3           I, **Lorraine T. Herman, Official Court Reporter,**

4    certify that the foregoing is a true and correct transcript

5    of the record of proceedings in the above-entitled matter.

6

7

8

9

           February 8, 2025            /s/ Lorraine T. Herman
10                 **DATE**                    **Lorraine T. Herman**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25