**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

AMERICAN FEDERATION OF                    Civil Action
GOVERNMENT EMPLOYEES,                      No. 1:25-0352

        Plaintiffs,

    vs.                                   Washington, D.C.
                                          February 13, 2024

DONALD J. TRUMP, et al.,

        Defendants.                   11:07 a.m.
_____ /


TRANSCRIPT OF PRELIMINARY INJUNCTION PROCEEDINGS
**BEFORE THE HONORABLE CARL J. NICHOLS**
UNITED STATES DISTRICT JUDGE


APPEARANCES:


**For the Plaintiffs:**        **Karla Gilbride**
                               **Lauren Bateman**
                                 PUBLIC CITIZEN
                                 1600 20th St NW
                                 Washington, DC 20009
                                 202-588-7739

                               **Kaitlyn Golden**
                               **Kayla Kaufman**
                               **Rachel Fried**
                                 DEMOCRACY FORWARD FOUNDATION
                                 P.O. Box 34553
                                 Washington, DC 20043
                                 202-448-9090

APPEARANCES CONT'D.:


**For Deft. Trump:**          **Eric Hamilton**
                              **Christopher D. Edelman**
                              U.S. DEPARTMENT OF JUSTICE
                              1100 L Street, NW
                              Washington, DC 20530
                              202-305-8659




**Reported By:**              **Lorraine T. Herman, RPR, CRC**
                              Official Court Reporter
                              U.S. District & Bankruptcy Cts.
                              333 Constitution Avenue NW
                              Washington, D.C. 20001
                              lorraine_herman@dcd.uscourts.gov




**\*\*\*** Proceedings recorded by stenotype shorthand.
**\*\*\*** Transcript produced by computer-aided transcription.

1          **P R O C E E D I N G S**

2          **DEPUTY CLERK:**  Good morning, Your Honor, this is

3    civil case year 2025-352, *American Federation of Government*

4    *Employees, et al. vs. President Donald J. Trump, et al.*

5          Counsel, please come forward to introduce

6    yourselves for the record, beginning with the plaintiffs.

7          **MS. GILBRIDE:**  Good morning, Your Honor.

8          **THE COURT:**  Ms. Gilbride.

9          **MS. GILBRIDE:**  Karla Gilbride, Public Citizen, on

10   behalf of the plaintiffs.

11         **THE COURT:**  Good morning.

12         **MS. BATEMAN:**  Good morning, Lauren Bateman, also

13   on behalf of the plaintiffs.

14         **THE COURT:**  Counsel, Ms. Bateman.

15         **MS. KAUFMAN:**  Good morning, Your Honor.  Kayla

16   Kaufman, for the plaintiffs.

17         **MS. FRIED:**  Good morning, Your Honor.  Rachel

18   Fried, also for the plaintiffs

19         **THE COURT:**  Counsel, good morning.

20         **MS. GOLDEN:**  Kaitlyn Golden on behalf of the

21   plaintiffs.

22         **THE COURT:**  Also good morning.

23         Defense counsel.

24         **MR. HAMILTON:**  Good morning, Your Honor.

25   Eric Hamilton, U.S. Department of Justice for the

1    defendants.

2                THE COURT:  Mr. Hamilton.

3                MS. WETZLER:  Good morning, Your Honor,

4    Lauren Wetzler, also on behalf of defendants.

5                THE COURT:  Good morning, Counsel.

6                MR. EDELMAN:  Good morning, Your Honor,

7    Christopher Edelman, Department of Justice, on behalf of the

8    defendants.

9                THE COURT:  Also, good morning, Counsel.

10               So we're here today, the second hearing in this

11   matter obviously.  I had a hearing last week.  As everyone

12   knows, I granted a TRO at the end of that hearing that I

13   then explained, to some extent, later that day.

14               That TRO expires, at least presently by its own

15   terms, this Friday.  And as I also explained in the TRO, I

16   was going to conduct a preliminary injunction hearing

17   yesterday with the benefit of briefs from the defendant and

18   then a reply brief from plaintiff and had intended to do

19   that yesterday but the court was closed.  So we're here

20   today.

21               What I'd like to do is basically treat this as I

22   would any PI hearing, which is to hear from the plaintiffs,

23   then from the government, then from the plaintiffs again.

24   But this is a unique situation in the sense that I already

25   obviously had dug in quite a bit to plaintiffs' motion and

1    some of the arguments that had been presented there.

2          And then I've had the opportunity, of course, to

3    consider what the defendants said in their briefs and

4    declaration together with what plaintiffs said.  Both

5    plaintiffs said, both in their reply and the declarations,

6    which are attached to the motion to supplement the record or

7    however it was styled and which, by the way, I am inclined

8    to grant.

9          But I think, for present purposes, the most

10   important thing is that plaintiffs' counsel and defense

11   counsel should be aware that I've read all of those

12   declarations.  So I am familiar with what's stated therein.

13         So why don't we start with you, Ms. Gilbride.  I

14   am happy to hear from you on any and all topics you'd like

15   to discuss.  As occurred last week, I'll have my own set of

16   questions as we go.  Okay?

17         **MS. GILBRIDE:**  Thank you, Your Honor.

18         Defendants are engaged in a whole scale and rapid

19   campaign to dissolve the U.S. Agency for International

20   Development in its entirety.

21         That campaign has begun with the freezing of all

22   funding on USAID projects, as well as --

23         **THE COURT:**  Oh, wait.  Just pause there.  That's

24   not true.  As I understand it, not all projects

25   are -- funding on all projects is not frozen.

1      **MS. GILBRIDE:**  The existence of waivers or the

2   potential to, on paper, based on statements from Secretary

3   of State and Acting Administrator Rubio that waivers are

4   available, does not match the reality on the ground that the

5   funding system, the payment system that is used to disperse

6   money, whether it is for outgoing fund allocations through

7   project partners --

8      **THE COURT:**  Well, that's whether the waivers and

9   exemptions to allow payments on existing contracts are

10  working.  But at least, as I understand it, the government's

11  position articulated by very senior people in the

12  administration, is, Yes, we are pausing funding on some

13  contracts, but we have every intent to pay funding on

14  others.

15     **MS. GILBRIDE:**  So, again, as I mentioned, there is

16  a campaign of actions.  And the first action was the

17  freezing of funds.  Subsequently, there have been other

18  actions, the wholesale closure of hundreds of contracts at a

19  very rapid pace with, in fact, contracting officers being

20  given a quota of a certain number of contracts they need to

21  cancel each hour.

22     So, again, while, on paper, the statement may be,

23  and I've read the government's statements, just the fact

24  that, you know, some funding will come back online,

25  exceptions are being made, other actions are being taken

1    simultaneously that tell a different story, a story of

2    massive downsizing, of whole-scale elimination of large

3    swaths of the development and humanitarian efforts that this

4    agency engages in and at a pace which would not allow for

5    the sort of individualized assessment as is each one of

6    these contracts consistent with the president's priorities

7    with the America First agenda.

8          You know, there are numerical targets for

9    contracts that have to be canceled, and it is not consistent

10    with what the declaration is saying, that this is just a

11    pencils-down pause.  A pencils-down, you know, chance to

12    review, which is what the 90-day Executive Order suggested.

13          In the past, when there's been a change in

14    presidential administrations, there are often realignments

15    of priorities.  Several of our declarants speak to this

16    because they're let long-tenured foreign service officers

17    who have been present for other changes of administration.

18          And certainly with respect to new -- entering into

19    new contracts, adjusting, you know, within existing

20    appropriations, what will be prioritized and what may be

21    deprioritized, but it is not standard to stop paying out on

22    existing contracts on previously appropriated funds.

23          And our declarants point out that the bills that

24    they are trying to pay and are unable to access the Phoenix

25    system in order to make those payments, those are all

1    obligations that predate January 20th.

2          So this is not about a realignment based on new

3    presidential priorities that are causing, you know,

4    different contractual decisions to be made going forward.

5    This is about payment on existing obligations.

6          **THE COURT:**  Right.  But as we discussed on Friday,

7    or perhaps to put a finer point on it, we're not here on the

8    merits.  We are here at the preliminary injunction stage.

9    And to get a preliminary injunction, plaintiffs have to show

10   that the challenged actions would cause them irreparable

11   harm.  And you haven't said anything yet about how either

12   the plaintiffs themselves or their members would be harmed

13   in any way by these actions.

14          I think it's incumbent on us to focus very sharply

15   on how the current situation, if not enjoined, would cause

16   irreparable harm to USAID employees who the unions

17   represent.

18          **MS. GILBRIDE:**  I can certainly speak to

19   irreparable harm, Your Honor.

20          Again, the fact that payments are not being made

21   that the system is -- that the Phoenix system is not

22   operable or at least, you know, that there are significant

23   problems with it that are preventing controllers and other

24   USAID employees from accessing the system, which is a

25   violation of the TRO because that is one of the systems that

1    access was supposed to be restored to, but across the board,

2    USAID employees do not have access to the system.

3         And the way that is harming them, the way that

4    the -- the fact that payments are not going through is

5    harming them right now, is that utility bills are not being

6    paid to local vendors in the countries where individuals are

7    serving, risking termination of --

8         **THE COURT:**  Okay.  Let me just pause.  So I don't

9    see much in the papers about this Phoenix system and I need

10   to understand it more.  Am I understanding that the Phoenix

11   system is a system that pays not just grantees and

12   contractors but is the system through which regular payments

13   for travel, utilities and the like are made?

14        **MS. GILBRIDE:**  That is correct, Your Honor.

15        **THE COURT:**  And so are you representing that, as a

16   result of the Phoenix system's shutdown -- again, I don't

17   see anything about this in the declarations -- that USAID

18   employees overseas are not having their utilities paid for?

19        **MR. HAMILTON:**  Yes.  This is --

20        **THE COURT:**  Where is that in the record?

21        **MS. GILBRIDE:**  In the Exhibit 24-12, declaration

22   of Walter Doe, who is a controller with USAID.  There is a

23   discussion of how the Phoenix system is not currently

24   operable and that the types of payments that that system is

25   used to make include both operating expenses for employees

1    as well as legitimate business expenses, which under the

2    terms of the -- under Secretary of State Rubio's

3    January 24th memorandum --

4           **THE COURT:**  I'm sorry to interrupt.  I was looking

5    at 24-12; that is not the Walter Doe declaration, 24-11 is.

6           **MS. GILBRIDE:**  24-11.  Sorry.

7           **THE COURT:**  What paragraph should I be looking at

8    here?

9           **MS. GILBRIDE:**  So beginning at Paragraph 3.

10          **THE COURT:**  Uh-huh.  Okay.

11          Let's assume, hypothetically, that some USAID

12   workers, at least those overseas, are not having certain of

13   their living expenses paid for.  And assume further that

14   that is inconsistent with the government's obligations.  Why

15   isn't that harm reparable?

16          I mean, in other words, imagine you just had a

17   single USAID employee stationed in -- I'm not trying to pick

18   any particular place -- Switzerland, to pick a neutral

19   place, and that USAID employee for some reason had payment

20   to his or her utilities cut off, perhaps all living expenses

21   were cut off.  Why wouldn't that harm, which is a financial

22   one, be reparable through a claim against the government,

23   that the government failed to fulfill its obligations,

24   vis à vis, the employee, and also the kind of claim that

25   should go through whatever the relevant employment

1    administrative scheme is?

2         **MS. GILBRIDE:**  I will take that in two parts,

3    Your Honor.

4         As I said, each of these symptoms that's

5    happening, the whole-scale cancellation of contracts, the

6    inability to pay on existing obligations, you know, the

7    cancellation of the lease for the USAID headquarters,

8    they're all symptoms and manifestations of a larger, this

9    very rapid dismantling of the agency, which is being done in

10    a chaotic manner.

11         And that is causing irreparable harms because it

12    is putting people's safety in jeopardy.  People don't have

13    clear lines of communication or guidance on whether there

14    are --

15         **THE COURT:**  I want to talk about the safety in a

16    minute.  I'm trying to understand when it comes to the

17    payment for expenses incurred by employees.  Safety, to me,

18    is a different question, and it's obviously something that

19    motivated my TRO.  When we're talking about payment, about

20    utilities and travel and the like, why aren't those

21    reparable harms?

22         **MS. GILBRIDE:**  Because in the immediate, if

23    there's a financial outlay, perhaps that financial outlay is

24    reparable, but the consequences of having utilities cut off

25    if the utilities are cut off to the mission post abroad,

1    then where are those employees going to go?

2              **THE COURT:**  Is there anything in the record that

3    would suggest right now that a mission post or an individual

4    employee is about to have his or her utilities cut off?

5              **MS. GILBRIDE:**  There are no declarations in the

6    record speaking to utilities, but there are declarations

7    speaking to payments are not coming through and the types of

8    payments that are not coming through include utility

9    payments, payments to local vendors for things like cell

10   phone service, internet service.

11             If the situation continues, if the funding does

12   not come back on, if USAID and defendants are allowed to

13   continue to wreak havoc on this agency and gut it from

14   within, then the chaos the people on the ground are going to

15   be experiencing and the destabilizing of their living

16   arrangements is only going to increase.  That is the

17   irreparable harm.

18             It is the risk of being cut off, you know, not

19   able to pay for connectivity for cell phone and internet

20   technology and being in, you know, parts of the world where

21   we also have local partners, the U.S. has local partners on

22   the ground who are also not getting their bills paid, have

23   not been getting their bills paid for months.  And there may

24   be some, you know, unrest and anger associated with people

25   being frustrated that their bills have not been paid.

1          And we have U.S. citizens, who have diplomatic

2    passports and have come to these parts of the world to serve

3    their country who are in unstable situations because of this

4    coordinated campaign to dissolve the agency, to take away

5    people's protections, to not pay obligations and there's no

6    clear line of command as to where people are supposed to go

7    to get information or to get answers.

8          Things are being transferred to the State

9    Department, but the State Department, you know, does not

10   have the personnel in place.  There was an entire line of

11   command and system within USAID for handling these matters

12   in terms of day-to-day operations.

13         And with the agency lines of authority being

14   drastically and suddenly and, without warning or plan, cut

15   off and redirected through the State Department, those lines

16   of communication have broken down.

17         People don't have an understanding of, you know,

18   how to do the jobs they're being asked to do in terms of

19   implementing, the waiver programs and other things, again,

20   that are supposed to provide some sort of a cushion to the

21   humanitarian blow that these actions are causing, but there

22   is so much chaos in the way that it's being implemented,

23   that it is not functioning in practice.

24         And the people that that puts most in harm's way

25   are the employees, are the members of my clients who are on

1    the ground, in these places all around the world, trying

2    their best to do their job under very unclear and lack of

3    transparency and lack of direction.  But they're not the

4    only ones being harmed.

5         **THE COURT:**  So I obviously read, as I said

6    earlier, the declarations that plaintiff submitted recently,

7    including the ones that described a very harrowing situation

8    in Africa by a number of declarations.

9         Is it plaintiffs' position that that security

10   situation was caused, in part, by the administration's

11   efforts vis à vis USAID or, instead, is it that that

12   situation occurred, it was always a risk there or somewhere

13   else and then, once it occurred, the USAID employees, who

14   are having to deal with its occurrence, are facing all of

15   these difficulties because of what the administration is

16   doing with USAID?

17        **MS. GILBRIDE:**  Of course there were other factors

18   that caused that situation but, because the USAID employees

19   who were on the ground, were not able to and did not have

20   access to their systems, their security, their

21   communications, all of the infrastructure that would allow

22   them to handle that to, you know, be as safe as possible.

23   Safety of course is never guaranteed.

24        But when we put our American civil servants and

25   foreign service officers in dangerous situations, there are

1    certain protections that they should be able to expect from

2    this country.  And because of this campaign, you know,

3    defendant's desire to shut down the agency without

4    consulting with Congress and without --

5              THE COURT:  I'm not sure you quite answered my

6    question.

7              MS. GILBRIDE:  -- following normal protocols.

8              THE COURT:  So I understand that plaintiffs'

9    position is that USAID workers were placed at additional

10    risk in the situation because they didn't have the same kind

11    of communications that they should have been entitled to and

12    the like.

13              What I am asking is, was the unrest in the Congo,

14    in plaintiffs' view, caused in part by a response to what

15    the administration is doing vis à vis USAID?

16              MS. GILBRIDE:  I --

17              THE COURT:  Because I didn't see that in your

18    papers.

19              MS. GILBRIDE:  It's not -- you know, again, this

20    is a declaration from an individual who had that experience,

21    who is reporting what they experienced on the ground.  It's

22    not plaintiffs' position in this case, you know, to have a

23    view about what the cause of unrest is.

24              But, you know, I would direct the Court to the

25    report of the Inspector General of recently.  You know,

1    former Inspector General of USAID, who talked about the

2    larger security risks that the manner in which this

3    dissolution is taking place is making it more difficult to

4    trace where money is going.

5         It is increasing the risk that money will find its

6    way into the hands of terrorists.  So not only is there a

7    huge humanitarian, you know, harm to all sorts of people

8    around the world, not our clients' members, but the food

9    that is spoiling, the children who are not getting needed

10   medical care.

11        But there's also a risk to security, you know, for

12   this country and for the world's stability if the checks

13   that would allow us to control where money is going and

14   knowing what's happening to it are not present because

15   people are being drawn down at a very rapid rate.  People

16   don't know what is happening.

17        There is a lack of transparency into the process,

18   and that is destabilizing and that could have national

19   security implications.  Those were the conclusions in the

20   report of the Inspector General that we cited in our brief.

21        **THE COURT:**  Am I right that most of the potential

22   risks and harms we've been discussing, at least so far, are

23   ones that would affect only USAID employees overseas?

24        **MS. GILBRIDE:**  No, Your Honor, because, again, the

25   type of monitoring and making sure that the infrastructure

1   of the agency functions is work that is done by employees

2   all over the world, not just overseas but also here in D.C.,

3   as well as in other parts of the U.S.

4          But those D.C.-based employees can no longer

5   report to their office because the building has been taken

6   over, the lease is now, according to the supplemental

7   declaration from AFSA, the lease under GSA records now show

8   that USAID no longer hold that lease.  The signage has been

9   removed from the building.

10          And when employees reported to work on Monday,

11   February 10th, they were not allowed to enter the building

12   because it has been physically taken over.  And if they have

13   a need to access secure systems in order to do their vital

14   work to make sure that USAID funds are reaching their

15   intended destinations and not being misdirected, you know,

16   they can't get into a secure room to access those secure

17   files --

18          **THE COURT:**  Right.  But, but, but --

19          **MS. GILBRIDE:**  -- because they can't physically

20   access the building.

21          **THE COURT:**  Okay.  What is the irreparable harm to

22   those employees from the situation you just described?

23   There may be harm to the mission.  There may be harm to the

24   contracts.  USAID may be harmed.  What harm does the

25   employee suffer irreparably in the United States from the

1    situation you just described?

2    **MS. GILBRIDE:**  The employees, well, first of all,

3    the unions, who are our clients, suffer irreparable harm.

4    **THE COURT:**  All right.  Let's start with

5    employees.  USAID employee lives in the D.C. area and works

6    at USAID headquarters at the Reagan Building --

7    **MS. GILBRIDE:**  Uh-huh.

8    **THE COURT:**  -- is now affected, as an employee in

9    the ways you just described.  What is the irreparable harm,

10   current situation, to that employee?

11   **MS. GILBRIDE:**  That employee is suffering the

12   irreparable emotional harm of not being able to do their

13   job, that, you know, they care deeply about and feeling, you

14   know, that they're partially responsible for these

15   downstream consequences that I just described.

16        But they are being, you know, asked to basically

17   stand down and take actions that they understand to be

18   counterproductive to the oath that they took to the

19   Constitution and to defend the country, because the way that

20   this campaign to dissolve the agency is being carried out in

21   a reckless manner is making the country less safe.

22        And they must either do nothing or, in some cases,

23   they're being asked to cancel contracts.  They're being

24   asked to go through these lists and, without individualized

25   assessment, without individualized -- the opportunity to

1    determine if these contracts fit with the President's

2    priorities of "America First."

3              Just, you know, 50 have to get canceled today.

4    I'm just drawing that number out.  It's not an actual

5    number.  But there are numerical quotas of how many

6    contracts need to be canceled, which is antithetical to the

7    mission of this agency, which has had funding appropriated

8    by Congress to provide humanitarian aid and peace-building

9    aid throughout the country.

10              And now, you know, all of those programs are being

11    dismantled extremely quickly and in a broad-brush,

12    one-size-fits-all, non-individualized manner.

13          **THE COURT:**  Let's just stay with this employee who

14    I've defined generally.

15          **MS. GILBRIDE:**  Uh-huh.

16          **THE COURT:**  Let's imagine, instead of the current

17    situation, that employee was terminated tomorrow; given no

18    reason but just terminated; said, You are no longer employed

19    here.

20              It seems to me that that employee would suffer

21    some emotional, potentially some emotional harm.  It would

22    be perhaps different from the kind you've just articulated,

23    but I can imagine any employee terminated with no notice

24    would suffer emotional harm.  And the employee would also

25    suffer a series of financial consequences, especially if the

1    employee is no longer paid and the like.

2          Wouldn't that employee have to bring his or her

3    claims against USAID through an employment-specific

4    administrative channel?  Again, just sticking with my

5    hypothetical.

6          **MS. GILBRIDE:**  If the -- in your hypothetical, the

7    employee would have a claim related to exploit from a

8    federal employee against a federal employer, there are

9    statutory procedures and statutory adjudicatory bodies that

10   are set up for that, the MSPB, in the case of civil service

11   officers, and the FSGB, in the case of foreign service

12   officers.

13         In the actual situation that I described, which is

14   what is going on, not the hypothetical, the claim is not an

15   employment claim.  The claim that plaintiffs have here is

16   that this agency is being dismantled in an unconstitutional

17   and unlawful manner in excess of the executive's authority,

18   in excess of law under the Administrative Procedure Act and

19   in excess of the separation of powers in violation of the

20   separation of powers and the take care clause --

21         **THE COURT:**  So let me ask you this then:  If what

22   happened tomorrow was that the administration terminated the

23   employment of 300 people at USAID but said it was that the

24   employment relationship was being terminated as part of an

25   effort to downsize USAID, is it your view that those claims,

1    when those 300 people sue for unpaid, back and front pay and

2    all of the financial consequences of being terminated

3    tomorrow plus whatever claims they could bring, that those

4    would have to or would not have to go in front of the MSPB

5    or at least for civil services officers?

6        **MS. GILBRIDE:**  The MSPB does have jurisdiction

7    over reductions in force.  And so if the employees who

8    were -- who are terminated wanted to avail themselves of

9    MSPB remedies for being subjected to a riff that that might,

10   you know, that they would have the right to do so.  I think

11   there are unique, unprecedented --

12       **THE COURT:**  Okay.  Let me just now move you

13   one step, perhaps, closer to this case.  Imagine the

14   government said tomorrow, and I know this has already

15   happened to some extent, you 300 employees, we're going to

16   put you on administrative leave tomorrow.

17       Why is that not the kind of thing that would be a

18   lesser-included step toward a reduction in force and would

19   also have to go to the MSPB?

20       **MS. GILBRIDE:**  Because the MSPB handles claims for

21   things that have already occurred to provide recompense,

22   whether it's reinstatement or back pay, monetary remedies.

23       What is happening here is that an entire agency is

24   being decimated, and the MSPB as well as the other separate

25   statutory schemes that the government invokes and says that

1    these claims should go to, those are all statutory schemes

2    that take years to reach a conclusion.

3          And so under the *Thunder Basin* factors, there

4    would be no meaningful judicial review if the claim here,

5    which is that the agency should not be dissolved.  It is

6    unconstitutional for defendants to dissolve it in the manner

7    that they are doing without consultation with Congress.

8          By the time, you know, the MSPB process goes

9    through its three stages of, first, going to the agency,

10   then going to the MSPB Board, then coming to the federal

11   circuit, a year or many years may have passed.  If the

12   defendants are left to conduct this campaign unobstructed

13   and unimpeded, there will no longer be a USAID for

14   individuals to return to.

15         **THE COURT:**  So I understand all of that.  But if,

16   at the end of that process, the result is that the

17   plaintiffs recover or are made whole, at least for the

18   quantifiable losses that they incurred, the loss in pay, the

19   loss in benefits, perhaps even the emotional harm of going

20   through this; in any event, if they get a damages award,

21   what more should an employee be entitled to than that?

22         **MS. GILBRIDE:**  Your Honor, the unions that are in

23   this case are not seeking damages or back pay on behalf of

24   their members.  What they're seeking is that USAID not be

25   unconstitutionally dissolved.

1      **THE COURT:**  No, I understand that, but the

2  plaintiffs here, the union and the individual plaintiffs,

3  have to have standing to pursue that claim.  Their standing

4  relates to injury in fact.  And the injury in fact, at least

5  a significant part of the injury in fact would be the kind

6  that could be redressed through a later damages award.

7      **MS. GILBRIDE:**  The injuries, the irreparable harms

8  that cause the plaintiffs to be here before you on an

9  emergency basis seeking preliminary injunctive relief are

10  not about their entitlement to back pay or whether the

11  reason for given for their being placed on administrative

12  leave was valid.  I mean, no reason was given for being

13  placed on administrative leave.

14      **THE COURT:**  But what is the injury in fact

15  suffered by a U.S. employee of USAID other than the injuries

16  that arise in the context of the employer employment

17  relationship?

18      **MS. GILBRIDE:**  This is a unique situation because

19  even the U.S.-based employees of USAID, they are being

20  asked, in essence, to standby passively or to participate

21  actively in the destruction of this agency through canceling

22  contracts, through watching the building, you know, that

23  they've worked in every day have black tape put over the

24  door, have the USAID flag come down and have them told,

25  while they're still putatively employed by the company, You

1    may not enter the building, you know, this is not USAID

2    building or this is a takeover of the entire agency.  And

3    that is not an employment claim.  All of the cases that --

4            **THE COURT:**  Then why isn't it --

5            **MS. GILBRIDE:**  -- the government cites --

6            **THE COURT:**  Why isn't it a -- if it's a claim that

7    doesn't relate to their employment, then why isn't it a

8    diffuse injury, in fact, of the kind that usually isn't

9    enough for Article III standing?

10           Why isn't it the same injury that you suffer

11   potentially by watching what's happening to USAID?  I mean,

12   the standing doctrine, generally speaking, says there's a

13   set of injuries that are suffered by everyone that are too

14   diffuse for any particular person to pursue.  And then there

15   are individualized injuries that are specific enough for the

16   person to pursue.

17           If the employees have the ability to sue about

18   what's going on, why isn't that specific injury arising out

19   of their employment relationship?

20           **MS. GILBRIDE:**  There are a number of injuries that

21   AFGE and AFSA members have, that they have averred and

22   discussed in their declarations and that this Court found,

23   you know, were irreparable harms in at least the context of

24   the TRO and some of the overseas employees whose families

25   face separation and uprooting of children from their

1    schools.

2            We have several declarants that we submitted

3    statements from who are pregnant and who risk traveling

4    during a high-risk portion of their pregnancy when there is

5    uncertainty about what sort of funding they're going to, you

6    know, get given the fact that everything is up in the air

7    and chaotic with respect to USAID disbursements.

8            So there are many types of irreparable harms,

9    health-related harms, family-related harms, safety and

10   security harms.  And if there are some members of the

11   plaintiff unions who have those harms, in addition to the

12   unions having their own organizational standing, that is

13   sufficient, as a matter of associational standing, you know,

14   to -- I don't think --

15           **THE COURT:**  I agree with that.

16           **MS. GILBRIDE:**  -- Article III standing for every

17   single employer.

18           **THE COURT:**  No.  No.  I wasn't suggesting that,

19   but I was suggesting that if the reason that there is

20   Article III standing, the reason that there is an injury in

21   fact, is because of the employment relationship.  In other

22   words, there is an injury that arises out of the government

23   doing something to the employee as employee, changes of

24   benefit, terminates, places on administrative leave, doesn't

25   pay for utilities, obligates them to come back from their

1      foreign service earlier than anticipated.

2              If those are the harms that create injury in fact,

3      but they arise out of the employer/employee relationship,

4      why aren't these the kinds of claims that would go to the

5      employer/employee scheme for resolution of them?

6          **MS. GILBRIDE:**  Well, I think it might be helpful

7      for me to spend a little more time walking through the three

8      factors under *Thunder Basin* --

9          **THE COURT:**  Sure.

10         **MS. GILBRIDE:**  -- for when an exclusive

11     alternative to District Court is intended to be preclusive.

12         **THE COURT:**  One question I was wondering is if you

13     know the last time the D.C. Circuit or the Supreme Court

14     said that a government employee's claim against the

15     government could proceed outside of the employee

16     administrative scheme?  I think it's been a very long time.

17             In other words, the case law, to be sure in

18     different contexts, is pretty consistently to suggest that

19     claims by government employees against the government almost

20     always go to the relevant agency that's designed to

21     adjudicate them.

22         **MS. GILBRIDE:**  When they are the type of claim

23     that that statutory scheme was -- that Congress intended for

24     that statutory scheme to handle; and that's what the Supreme

25     Court said in the *Axon* case; is that you look at, Is this

1    the type of claim that Congress had in mind and thought

2    belonged within that statutory extreme.

3            If you look at the constitutional claims that were

4    sent to separate statutory schemes in the past -- in the

5    *Elgin* case of the Supreme Court, the MSPB handled that

6    claim, even though it was a constitutional claim, because it

7    was about the person being fired for not registering for the

8    draft.

9            In the *AFGE versus Trump* case in the D.C. Circuit,

10   that claim went to the FLRA because it had to do with an

11   Executive Order involving labor relations, which the

12   D.C. Circuit found was precisely the type of labor relations

13   issues were within the FLRA's area of expertise.  And so if

14   the --

15          **THE COURT:**  Yes, but the courts have also said,

16   actually, it doesn't really even matter if the MSPB can

17   decide the question, not even whether it has expertise.

18   Courts have said it doesn't even matter if the MSPB can

19   decide the question so long as there is judicial review of

20   the question thereafter, such as in the federal circuit.

21          **MS. GILBRIDE:**  And again, in the judicial review,

22   that it comes at a time when it would be able to afford

23   relief.  And in the *Free Enterprise Fund* case, the Supreme

24   Court talked about, you know, relief essentially coming too

25   late --

1          **THE COURT:**  Right.

2          **MS. GILBRIDE:**  -- because the injury would have

3     already occurred.  And here, the injury will have already

4     occurred.  By the time the MSPB process reaches its

5     culmination with judicial review in the federal circuit, you

6     know, two or three years from now, even if the federal

7     circuit says, oh, it was actually illegal for your agency to

8     have been disbanded, the harm will have already occurred.

9          **THE COURT:**  Well, but that's why I started with

10    harm because, I mean, when one is fired, the harm occurs.

11    As we were talking about before with the single employee in

12    the United States who works at USAID headquarters,

13    termination, there is harm.  But that harm gets redressed

14    later and, at least in an ideal world, the employee gets

15    made whole, even though that is very much retrospective.

16    The harm occurs and it's redressed later.  So, again, what

17    are the harms that the employees of USAID are presently

18    suffering that would be irreparable by such a later

19    retrospective-looking award?

20         **MS. GILBRIDE:**  Well, I think I've articulated some

21    of them.  They are, their harms are being placed at risk of

22    personal safety because this is being done in a chaotic

23    manner.

24         **THE COURT:**  Right.  I want to talk about that in a

25    sec, yes.  Yes.

1          **MS. GILBRIDE:**  Their harms are that their, you

2     know, families are losing their continuity, that they had

3     certain expectations that they were going to be in these

4     posts, that it's the only home their kids --

5          **THE COURT:**  Can we just pause there?  So the

6     government's declaration says, We're not forcing anyone from

7     coming back -- we're not forcing anyone to return from their

8     country post in 30 days.  That's not true.  What we're doing

9     is we're giving people a choice.

10         As I understand it, the government says, the

11    choice is as follows:  Either come back within 30 days and,

12    if you do, great, that's your choice and we'll pay for it

13    all.  Alternatively, you can stay.  You can stay on paid

14    administrative leave, so you'll keep getting paid.  And then

15    we're not guaranteeing that you'll have your return trip

16    paid for, but you can apply for an exception.

17         Do I have that right, at least from your

18    understanding of what the government is saying?

19         **MS. GILBRIDE:**  That is my understanding of, again,

20    what they are saying on paper and, as with the waivers, what

21    is perhaps aspirationally stated as what should happen is

22    not what is happening given the chaotic manner in which the

23    last two weeks of changes to USAID through this very rapid

24    campaign of dissolution has caused things not to go

25    according to plan.

1          **THE COURT:**  Let's imagine that the government

2    doesn't grant waivers and exceptions to certain people who

3    should have been entitled to them.

4          In other words, there's a subset of people

5    overseas who say, I want to stay.  I have my kids in school.

6    I have all sorts of reasons that I would like to stay in

7    country.  It's too disruptive for me to pack up and leave

8    within 30 days.  I'm going to stay and keep getting paid.

9    And I realize that I might not -- I'm going to apply for an

10   exception to get my travel paid coming back.  And then, at

11   the end of all of this, the government doesn't pay for the

12   travel.

13         Doesn't the employee, if the employee is right

14   that the government should have paid for the travel, have a

15   claim at that point for reimbursement of those funds?  In

16   other words, isn't that harm redressable later?

17         **MS. GILBRIDE:**  So there's two different issues

18   that we're kind of going back and forth between.

19         **THE COURT:**  We are, yes.

20         **MS. GILBRIDE:**  One issue is do they have standing.

21   And the financial harm, whether they're paying for something

22   out of pocket because they don't get reimbursed, that is

23   sufficient financial injury to give them standing.

24         **THE COURT:**  Yes, that's why I said redressable.

25         I mean, it seems to me that, if the government

1    says, We're not going to pay for this cost, you have

2    standing, but that doesn't mean that it's the kind of injury

3    that creates irreparable injury for PI purposes.

4         **MS. GILBRIDE:**  Well, I think there are also

5    irreparable injuries, which I articulated a moment ago

6    regarding safety, regarding --

7         **THE COURT:**  Right.  I want to pause safety for a

8    second.

9         **MS. GILBRIDE:**  Yes.

10        **THE COURT:**  I want to get back to that.

11        Just with respect to the question of being allowed

12   to come back to the United States or not.  On Friday,

13   through no fault of anyone's, because I was relying on what

14   I had before me at the time, I was under the impression that

15   the government had said to employees, You must come back

16   within 30 days.  And now, as I understand it, it is a

17   different situation.  It is for overseas employees.  You can

18   come back within 30 days and we guarantee that your travel

19   will get paid for.

20        If you decide you want to stay, you have to seek

21   an exception.  Obviously, the exception may or may not be

22   granted.  And if it's not granted, obviously that implies

23   that you would have to pick up your travel expenses; that's

24   the situation, as I understand it.

25        And I get, from your perspective, those exceptions

1   might not be granted in as many or all situations as they

2   should have been.  But as to that question, what is the

3   irreparable harm from the employee facing that choice?

4          **MS. GILBRIDE:**  The irreparable harm that these

5   employees are being put to is that the situation is changing

6   from day to day.  They got one set of instructions on

7   February 4th that, you know, everyone would have to leave

8   within 30 days unless they qualified for an exemption.

9          Then there was different guidance, you know, a

10  couple days later.  And this has been the way that this

11  has -- this situation has been unfolding has been a lack of

12  guidance, confusion, often people are being cut off from

13  their communication channels, although that has been

14  restored for many.

15         A subgroup of employees stationed -- working for

16  USAID and stationed abroad, the U.S. personal services

17  contractors, have, by and large, not had their email access

18  and computer access restored, even though they're doing

19  exactly the same work and are being paid exactly in the same

20  manner.

21         So people are being -- the irreparable harm that,

22  you know, this entire group of employees is facing is having

23  to make life decisions in a vacuum of information, decisions

24  that affect their families, without knowing if they can

25  trust and, in fact, you know with increasing levels of

1    distrust.

2              Given the way that they are being spoken of, you

3    know, in media accounts and things that are being said about

4    them as a whole, just all painted with the same brush as

5    being fraudulent and criminal and having done something

6    wrong, they don't trust, you know, that this is being

7    carried out in good faith, but they still have to make these

8    decisions, you know, for themselves and their families.

9              And that irreparable harm is, you know, the

10   impossible position which they're being placed to make these

11   decisions for themselves.

12             **THE COURT:**  I want to talk about safety risk in

13   one second, but I just want to ask a question, which I'll

14   ask the government about.

15             The government's declaration goes through

16   different buckets of employees who were or were not placed

17   on administrative leave.  And the government says that, of

18   the 2,140 employees who had been placed on paid

19   administrative leave before the TRO hearing here, 98 percent

20   of them were physically located within the continental

21   United States.

22             So the vast majority of those employees, the

23   concerns associated with foreign service, foreign risks,

24   foreign harms are very unlikely to exist.  Do you have an

25   understanding about what percentage of the 2,014 employees

1    approximately who were to have been placed on administrative

2    leave, but for my TRO, what percentage of those employees

3    are physically located or were at the time physically

4    located outside the United States?

5            **MS. GILBRIDE:**  I think it is a higher percentage

6    than 2 percent, Your Honor.  I don't have the exact

7    number --

8            **THE COURT:**  Is it 98 percent or, like, 30?

9            **MS. GILBRIDE:**  I would not want to give a

10   speculative answer.  I think that we have aggregate data as

11   to the number of people who are stationed abroad versus in

12   the U.S.  But how that maps on to people who were in the

13   first tranche placed on administrative leave and those who

14   were going to have been placed on administrative leave on

15   the 7th, might be a better question to ask.

16           **THE COURT:**  Yeah, yeah.  And I'll ask the

17   government this too.

18           So the government says there are 4,765 direct

19   hire, full-time equivalent employees at USAID.  And I get

20   "FTE" doesn't mean numbers of people.  I understand that.

21   But do have a sense of that workforce, that 4765,

22   what percent age of those are overseas, approximately?  I'm

23   not going to hold you to it.  I know that you haven't put

24   this in your declarations.  I was just trying to get a sense

25   at a high level of generality, if you knew.

1    **MS. GILBRIDE:**  You know, our clients might have

2    that information, but the percentage of direct hires, I

3    think -- I know for the personal services contractors I saw

4    a number that, around, 40 percent were overseas.

5    **THE COURT:**  Uh-huh.

6    **MS. GILBRIDE:**  For the direct hires, it may be a

7    slightly higher percentage that's overseas of the direct

8    hires.

9    **THE COURT:**  One thing I wasn't clear about, are

10    personal services contractors members of either of the

11    plaintiff unions?

12    **MS. GILBRIDE:**  The American Foreign Service

13    Association is, in addition to being a bargaining

14    representative for its foreign service officer members, it

15    is also a professional association, so I know that personal

16    services contractors are eligible to join as associate

17    members of AFSA.

18    **THE COURT:**  Do you know if any have?

19    **MS. GILBRIDE:**  I do not.

20    **THE COURT:**  Okay.

21    Let's go back to risk, personal, physical risk.

22    Obviously we discussed this quite a bit at the TRO hearing.

23    And the government says, again, in the Morocco declaration

24    some version of, We did not intend to place any employee in

25    a high-risk location, on paid administrative leave, one.

1          And I'm paraphrasing here.  Two, even if we did,

2     we would have ensured that such employees, maybe not even

3     just those in high-risk areas but employees in high-risk

4     areas have access to the necessary security infrastructure

5     that would ensure they're not harmed as a result of being

6     placed on paid administrative leave.

7          I get that's not exactly how the government says

8     it, but that's how I read their declaration, all of which I

9     think is designed to say, Placing employees on paid

10    administrative leave does not put them at risk to their

11    safety.  What is your response to that?

12         **MS. GILBRIDE:**  My response is that, in reality,

13    when people cannot -- and you referenced the Olivia Doe

14    declaration regarding the situation in the Congo.  You know,

15    when people are in unstable situations, information is

16    essential.  And when people are placed on administrative

17    leave, they do not have access to their email, to the SCRY

18    panic system for providing information about threats.

19         They don't have ways of reaching their colleagues

20    quickly, and there are also accounts of, you know,

21    diplomatic immunity in this, sort of, unstable and chaotic

22    situation with people being placed on administrative leave,

23    furloughed, prepared for evacuation that they no longer have

24    access to their diplomatic status with the embassy which

25    also places them at risk.

1          We talked about utility payments earlier and cell

2     phone payments.  The fact that these bills cannot be paid

3     and have not been paid now going back to, you know,

4     December and November, several months in arrears, that also

5     places people at risk if they are cut off, because their

6     cell phone service is disconnected.

7          Their internet service is disconnected.  They are

8     not able to access transportation from local service

9     providers to get out of a bad situation because the local

10    taxi company no longer will honor -- you know, doesn't

11    consider the USAID people's money to be good because, unless

12    they're paying out of personal funds, they can't be

13    guaranteed that they'll actually ever get paid.

14         So that does place people at risk, whether they're

15    on administrative leave or not.  Certainly, being placed on

16    administrative leave and losing access to the electronic

17    systems accentuates and elevates their risk.

18         But even in absence of being on administrative

19    leave, in a situation where, you know, the U.S. government

20    has not been paying its bills to these local vendors and

21    local partners for several months, that, you know, at least

22    inherently makes the situation more unstable and less safe

23    for the people who are living there.

24         **THE COURT:**  I know you mentioned and, as I said,

25    there are a number of declarations relating to the situation

1       in the Congo.  But you mentioned the Olivia Doe declaration.

2               Can you point me to the specific parts of the

3       declaration where she faced increased risk of harm because

4       of being placed on administrative leave or, more generally,

5       because of the USAID situation?

6               **MS. GILBRIDE:**  No.  The reason for referencing her

7       is just to reference some of the dangerous, you know, parts

8       of the world in which USAID employees are stationed.

9               **THE COURT:**  Is anything in the Congo

10      declarations -- does anywhere in those declarations or maybe

11      a better question is, can you point me to where in those

12      declarations there are facts that essentially say -- I'm not

13      asking -- I'm trying not to be too specific -- but basically

14      go to the point of, This is a dangerous situation and it was

15      more dangerous for me as a USAID employee than perhaps it

16      was for my State Department embassy colleagues because of

17      placement on administrative leave or just things going on

18      with USAID generally?

19              **MS. GILBRIDE:**  Yes.  I would point the Court to

20      the declarations of Wanda and Sara Doe, who are both USAID

21      employees, who are at the later stages of their pregnancy.

22              **THE COURT:**  Right.

23              **MS. GILBRIDE:**  And who, because of the upheaval

24      that USAID has been thrown into, the normal way in which

25      they're both in countries in which it's not safe for them to

1    give birth where they're located.  And in the normal course,

2    and presumably, what would happen if you were not a USAID

3    employee in this current transitional time, you would be

4    able to have, you know, your evacuation to another country

5    where you would have your expenses covered and reimbursed.

6            **THE COURT:**  Right.  But those declarations, I get

7    what they say, but those are not USAID employees in Congo?

8            **MS. GILBRIDE:**  No.  No.

9            **THE COURT:**  And my question was, Is there anything

10   in these declarations from the people in Congo, again a

11   harrowing situation to be sure, that would suggest that

12   those employees, those USAID employees were at more risk,

13   again, than perhaps their embassy or State Department

14   colleagues because of what's going on with USAID?

15           **MS. GILBRIDE:**  Well, if something like that

16   happened, you know, at a time when they did not have access

17   to communications technology, for example, if, you know,

18   their utilities are cut off for ongoing nonpayment, then

19   that is the sort of risk or those are the factors that would

20   cause them to be at heightened risk in a dangerous place

21   like the Congo compared to those who did not lose their

22   access.  So they're more vulnerable.  They're in a more

23   tenuous position because of what is going on with USAID.

24           And, again, this is a coordinated and accelerating

25   campaign that is being done without any constitutional

1    authority and in contravention of the laws passed by

2    Congress.  So it's necessary that the Court extend the order

3    and grant preliminary injunctive relief so that the

4    situation does not continue to get worse.

5            Now, what we're hearing is that people's

6    authorization to travel from one post to another has been

7    cut off, suggesting that, again, you know, there is a plan

8    to just wind this agency down.

9            The rapid termination of contracts, the fact that

10   people received emails saying, you know, the former USAID

11   headquarters is now under different ownership, and that

12   other buildings around the world, not just the Ronald Reagan

13   Building, but other leases have changed hands, that they're

14   no longer under the control and that they no longer belong

15   to USAID.

16           These are not a few isolated incidents.  And

17   they're not a few incidents that just involve employment.

18   This is an unprecedented dismantling of a congressionally

19   created agency.  Our clients' members, because they are the

20   employees who work for this agency, either out in the field

21   in dangerous locations, which affect their safety, or in

22   this country where they're being asked to, sort of,

23   participate in the dismantling of their own agency, they are

24   all being harmed.  They are being harmed by actions that are

25   unconstitutional and ultra vires.

1          And this court, getting back to the issues about,

2     you know, separate employment-based adjudicative agencies --

3          **THE COURT:**  Right.

4          **MS. GILBRIDE:**  -- this court is the only forum

5     that can address these harms, you know, on the time scale

6     that this urgent situation demands.

7          The three factors that *Thunder Basin* looks at to

8     say whether or not, whether there is a scheme that provides,

9     you know, an alternative adjudicative procedure, does this

10    fall outside of it?

11         The claim here falls outside of it for all three

12    of those reasons.  Again, there is no way to have meaningful

13    judicial review of these claims, these claims for injunctive

14    relief to halt the dissolution of the agency.  Once the

15    agency is dissolved, it cannot be put back together again.

16         Certainly, it can't be put together again by the

17    MSPB or the FLRA, which are focused on, you know,

18    individualized employment disputes.  That's not what this

19    is.  And it can't be put together again by the federal

20    circuit, you know, two or three years from now.  There is no

21    way that that toothpaste can come back into the tube once

22    the contracts have been dissolved, once there is a whole

23    different structure.

24         And so when there is an unprecedented usurpation

25    of power that does not belong to the executive branch, that

1    is different from all of these other cases, you know, that

2    things, again, like the *AFGE v. Trump* case where the FLRA

3    had -- there were specific employment-related issues there,

4    labor-related issues there that it was best situated to

5    handle.

6            You know, same thing with the *AFGE Secretary of*

7    *the Air Force* case regarding the uniforms and dress code.

8    There were specific expertise in that agency.

9            Here, these claims are entirely collateral to the

10   employment and labor relations issues that the MSPB and FLRA

11   handle.  And they would not have the capacity to handle, you

12   know, basically the entire USAID workforce, all 4,000 and

13   some direct hires, you know, coming in all at once to say,

14   Our agency should not have been dismantled.

15           Not only that, but for the 1100 or so personal

16   services contractors who do the exact same work as the

17   direct hire employees in the exact same, you know, overseas

18   posts, often in, you know, side by side with their

19   colleagues, the MSPB has no jurisdiction over them.

20           They don't have civil service protection.  So they

21   could not go to these administrative agencies to seek some

22   post hoc, which is not what anyone here is seeking.  But it

23   would not even be something that those agencies would be

24   able to provide for those employees, who are also American

25   citizens, you know, with diplomatic passports who are

1    serving their country and who are being left out and exposed

2    and, you know, in harms way because of this coordinated and

3    unconstitutional campaign to dismantled the agency.

4          I haven't talked very much about likelihood of

5    success on the merits and about the specific APA and

6    separation of powers claims.  I am happy to do that.  I know

7    Your Honor has been wanting to focus on the irreparable harm

8    issues.

9          **THE COURT:**  I mean, I do think that obviously

10   one of the government's main arguments is no likelihood of

11   success on the merits because of no jurisdiction.

12         **MS. GILBRIDE:**  Yeah.

13         **THE COURT:**  But, sure, I am happy to hear from you

14   on why the ultimate acts challenged in this case are

15   unlawful.

16         **MS. GILBRIDE:**  So the ultimate act here is

17   President Trump's statement that -- which he has now made on

18   a couple of occasions, including on Truth Social, that the

19   USAID as an agency should be shut down.  So not, you know,

20   have a pause to review all of the contracts and make sure

21   they're aligned but it should be shut down.

22         And that, you know, is not something that the

23   President, through his agents within the executive branch,

24   has the authority to do.  There is no constitutional source

25   of power that would allow the President to amend or to

1    repeal a congressionally enacted statute that -- the Supreme

2    Court said that in *Clinton vs. City of New York*.

3          Here, the USAID was created in the FSRA in 1998 as

4    an independent agency within the executive branch under

5    22 U.S.C. 6563.

6          **THE COURT:** Isn't the USAID shutdown, quote

7    unquote, not particularly imminent?

8          [Laughter]

9          Well, people laugh but, I mean, there are more

10   than 600 employees that have been -- are working, and there

11   are all sorts of contracts that the government says it's

12   going to continue paying for present purposes.  And so

13   why -- at least why wouldn't I take that up when the

14   shutdown occurs?

15         **MS. GILBRIDE:** Well, I think the reaction, you

16   know, you heard maybe suggests like the -- on the ground,

17   for people who are trying to work for this agency, it feels

18   like the shutdown is occurring right now.  And every day

19   there are more signs of the shutdown occurring.

20         It is not -- I mean, the letter that

21   Secretary Rubio sent to Congress said he was going to, you

22   know, embark upon or initiate a consultation about

23   potentially reorganizing the agency.  The Appropriations Act

24   of 2024 says that, you know, that no action can be taken

25   until consultation occurs.

1          It's not clear that any consultation with the

2     appropriate congressional committees has still yet occurred

3     but all sorts of actions have been taken.  The lease has

4     been handed over to a different agency, to CBP.  There

5     are -- hundreds of contracts have been canceled not with the

6     necessary review but just in a wholesale blunder bust

7     manner.

8          You know, other offices around the world have been

9     closed.

10         **THE COURT:**  Imagine, again -- everyone should

11    understand these are my questions exploring the situation

12    rather than reflecting a particular view.

13         But if a statute said, There shall be a U.S.

14    Attorney's Office in the District of Columbia and it happens

15    to be that the current U.S. Attorney's Office has 500

16    prosecutors, and the government comes in and says, We want

17    to understand whether we really need 500 prosecutors in the

18    U.S. Attorney's Office for the District of Columbia.  We're

19    going to pause some of their work.  Some of the people are

20    going to keep working and we're undertaking a review.

21         Does that mean that a shutdown of the U.S.

22    Attorney's office is imminent and that the statute requiring

23    the U.S. Attorney's Office to exist is currently violated?

24         **MS. GILBRIDE:**  If all you did was, you know, say,

25    We're going to do a study --

1        **THE COURT:**  No, no, I'm saying 400 of the 500

2   prosecutors have to stop prosecuting cases.

3        **MS. GILBRIDE:**  Well, it would certainly be a

4   severe disruption of the U.S. Attorney's Office functions.

5   And here, when not only is there a pause on, you know,

6   funding for new contracts but payments are not being made on

7   existing contracts, that is causing disruption on a global

8   scale.

9        It's certainly affecting our clients' members.

10  For all the reasons that we've been discussing, they're

11  not -- you know, can't make payments for their children's

12  schools.  There is issues with payments for health care

13  coverage, issues for payments for utilities, travel

14  reimbursements, all of those, what's called OEs, operating

15  expenses.

16       But also payments aren't being made to

17  humanitarian partners around the world.  And that is having,

18  again, irreversible consequences in terms of lives lost, in

19  terms of avoidable suffering of, you know, disease spreading

20  that could reach our borders but certainly just making the

21  world, in general, less healthy, less safe.

22       And those humanitarian consequences, again, are

23  just not consistent with a, we're going to pause and just

24  sort of take a look at things.  It is an irreversible --

25  once those relationships are harmed with partners on the

1      ground, it's difficult if not impossible to rebuild them.

2            Once the infrastructure is destroyed, you know,

3      you can't just turn that switch back on a month or two

4      months from now and say, okay, you know, let's just resume

5      things.  The things will be broken and they will be broken

6      beyond repair.

7            And so it is not consistent with, you know, sort

8      of a, Well, we're just going to sort of take a look at this.

9      And certainly again, you know, if you look at the language

10     from the 2024 Appropriations Act in terms of what would

11     Congress need to be consulted for, it is a reorganization or

12     a redesign, which is defined as to eliminate, consolidate or

13     downsize any agency or to transfer the authorities and

14     responsibilities of that agency to another agency.

15           And that is exactly what's happening here.  We

16     have a massive downsizing.  We have elimination of, you

17     know, entire programs and transferring of authorities and

18     responsibilities to the State Department.

19           When Congress created USAID as an independent

20     agency in 1998, it considered and gave the president the

21     option of transferring USAID's functions and

22     responsibilities to the State Department.  There was a

23     60-day window in which the president could study that option

24     and offer a report one way or another.  What am I going to

25     do?

1          So Congress, again, created, when it created the

2     agency, a role for the President to play.  And when the

3     President acts outside and in contravention of a

4     congressional design and takes measures incompatible with

5     the expressed or implied will of Congress -- this is quoting

6     from the Jackson concurrence in *Youngstown Steel* -- his, the

7     president's power is at its lowest ebb, because he can only

8     rely upon his powers under the Constitutional minus any

9     constitutional powers of Congress.

10          Here, Congress has constitutional appropriations

11     powers.  It appropriated, it created this agency.  It

12     appropriated funds for this agency in 2024 and said, If you

13     are going to make these sorts of major changes to the

14     agency, you need to come to us.

15          That did not happen.  The defendants did not act

16     within the law, which is a violation both of the separation

17     of powers by basically dissolving, by fiat, an agency that

18     was created by Congress.  And it was arbitrary and

19     capricious in violation of the Administrative Procedure Act,

20     because all of the sort of consequences that we've been

21     talking about were entirely foreseeable.

22          The State Department and Treasury Department and

23     the new administration of USAID has not explained why this

24     needed to be done so quickly and on such a compressed time

25     scale and why this funding had to be frozen.

1          You know, again, even if there are waivers on

2     paper, the way that this entire process is being done,

3     without transparency, without a functioning actual payment

4     system to disperse those payments -- that's going back to

5     the Phoenix system, which we talked about at the very

6     beginning -- and if, you know, what -- realizing that all of

7     these severe, destabilizing consequences, both for the USAID

8     workforce and for local partners and the international

9     community and the world, starting to see those consequences,

10    what an agency acting within the law and not in an arbitrary

11    and capricious manner, you would expect to do is to, you

12    know, pull back from that timetable and say, This is having

13    unintended and harmful consequences.  Let's reevaluate our

14    plan here.

15          Instead, they have doubled down.  They have

16    escalated this campaign of dissolving the agency, picking up

17    the pace of canceling contracts, again, just yesterday,

18    making further cuts to people's access to PSC travel.

19          And so, instead of pausing and reevaluating and

20    mitigating some of these harms, this wrecking ball is just

21    continuing to make its way through our clients' members'

22    lives.  They are, you know, at continually heightened risk.

23    The longer these bills go unpaid, the longer they, you know,

24    don't know what their futures hold and have to make

25    decisions against that backdrop of uncertainty, but the

1    world is also placed at larger risk.

2            We filed an amended complaint this morning which

3    is not pertinent to this preliminary injunction proceeding.

4    But just to sort of dramatize, you know, the Oxfam America,

5    the additional plaintiff that we added, works on these

6    humanitarian issues around the world in trying to help

7    people in poverty.

8            And they will have to divert their resources in a

9    massive way to make up for the billion-dollar gap, the

10    vacuum that USAID leaving the fields will create where other

11    NGOs and other humanitarian aid groups in the private sector

12    will try their best to fill in that gap.

13            But once there is, you know, such a major player

14    as USAID has been over the last 60 years, is no longer doing

15    the good work that it's done, the damage that that does, you

16    know, to our standing in the world and the follow-on effects

17    for the developing worlds for some of the most vulnerable

18    people, you know, in our global community, you know, those

19    harms cannot be undone.

20            And since, you know, Your Honor is looking also at

21    the public interest and the balance of equities in this

22    case, I think it's important to think about, you know, just

23    the longer that this goes on, it is an unfolding and

24    deepening humanitarian crisis.

25            And anything that can be done to halt that

1    destruction, because it doesn't seem that -- unfortunately,

2    you know, it's the arbitrariness and capriciousness of this

3    has not abated.

4          It's only continuing and, you know, we would ask

5    for the Court's intervention, both, you know, for the

6    irreparable harms that our clients are continuing to suffer,

7    whether they're here in the U.S. or abroad, but also keeping

8    in mind, the broader public interest that's at stake because

9    this is an urgent situation.

10          It's unfolding daily and so intervention, you

11    know, as quickly as possible to at least restore the funding

12    that should have been appropriated for existing contracts

13    and restore access to, you know, the essential services

14    around the world that employees have access to information

15    on the -- in the physical buildings, on their USAID

16    websites, so that they can more effectively do their job so

17    that money, at least as to previously appropriated funds,

18    can flow and so that, you know, the humanitarian harm that

19    this policy is causing can be stemmed and at least lessened

20    from what we're currently seeing on the ground right now.

21          **THE COURT:**  Thank you, Counsel.  I'm going to let

22    the government --

23          **MS. BATEMAN:**  Your Honor, may I ...

24          **THE COURT:**  Sure.

25          **MS. BATEMAN:**  Thank you, Your Honor.  Lauren

1    Batement for the plaintiffs.

2           I know Your Honor was interested in a specific

3    record citation about the danger created by defendants in

4    the Democratic Republic of the Congo

5           **THE COURT:**  Yes.

6           **MS. BATEMAN:**  That's in the Marcus Doe

7    declaration, Paragraph 14 and subsequent paragraphs.  That

8    declaration makes clear that the evacuation was not funded

9    by defendants; that a waiver was sought and not received;

10   and that the evacuation took place without a waiver.

11          Thank you.

12          **THE COURT:**  Thank you, Counsel.

13          I will hear from the defendants now and will give

14   the plaintiffs an opportunity for a short rebuttal.

15          **MR. HAMILTON:**  Your Honor, we would request a

16   brief recess before making our presentation.

17          **THE COURT:**  Ten minutes.

18          **MR. HAMILTON:**  That would be great.

19          **THE COURT:**  Why don't we come back on at

20   12:35 p.m.

21       (Recess from many 12:26 p.m. to 12:37 p.m.)

22          **DEPUTY CLERK:**  Your Honor, we are now back on the

23   record.

24          **THE COURT:**  Thank you, Ms. Moore.

25          I'll hear argument from the government now.

1           **MR. HAMILTON:**  Thank you and good afternoon,

2     Your Honor.

3           This Court should deny plaintiffs' motion for a

4     preliminary injunction.  President Trump campaigned on a

5     promise to change the country's foreign policy.  And

6     immediately after taking office, he signed an Executive

7     Order putting in place a brief 90-day pause of foreign

8     assistance aid.

9           The purpose of this pause is to allow him and his

10    administration to understand the current landscape of

11    foreign aid and to recalibrate it to match the country's new

12    foreign policy.  The pause is not absolute.  A waiver of

13    process ensures that foreign aid continues to flow where it

14    aligns with President Trump's foreign policy.

15          And as the Morocco declaration explains, a number

16    of those waivers have already been granted.  Plaintiffs

17    attack a strong man.  All four of their claims ride on the

18    allegation that defendants are "dissolving USAID."  They are

19    not.

20          Instead, the administration is conducting a 90-day

21    study to understand USAID's work.  While USAID intends to

22    place a number of its employees on administrative leave, the

23    Morocco declarationmakes clear that hundreds of other USAID

24    employees will not.

25          In the end, plaintiffs want a federal court to put

1    USAID back to how it was under a previous President's

2    foreign policy.  Where our brief made arguments specific,

3    for example, to the administrative leave issues that were

4    important in the TRO hearing, plaintiffs responded, as they

5    do on Page 5 of their reply, that we impermissibly "divided

6    plaintiffs' claim of unlawful dissolution."

7              That claim, however, fails factually and legally.

8    Your Honor is familiar with the four-factor test that

9    applies to requests for preliminary injunctive relief, like

10   that made by the plaintiffs.  I would note, at the outset,

11   our argument that this four-factor test requires a showing

12   on each of the merits or each of its elements and is not a

13   sliding scale.

14             And I'll start with likelihood of success on the

15   merits.  Plaintiffs have not carried their burden on this

16   element --

17             **THE COURT:**  Let's start, instead, with irreparable

18   harm.  I realize that each of the four factors is very

19   important.  It seems to me, though, it's, as a general

20   proposition, very unlikely that a plaintiff would get a PI

21   without some showing of irreparable and then, on the other

22   hand, a very strong showing of irreparable harm can be

23   relevant.

24             And let's focus, in particular -- I mean, I do

25   think that there is a ships-passing-in-the-night quality to

1    some of this, because there are the ultimate claims in the

2    case by the plaintiffs about the dissolution of USAID and

3    the lawfulness of that and the like.  But then there are

4    much more particularized irreparable imminent harms that

5    they focus on, and I want to talk about those in particular.

6             As you know, on Friday, I was very concerned about

7    the extent to which placement on administrative leave, which

8    did and was happening, that is a fact, that is not even an

9    imminent thing, it was a thing that had already occurred,

10   whether the placement of at least employees overseas on

11   administrative leave would cause them irreparable harm in

12   the sense that they would be an increased security risk.

13            So what is the government's response to that?  I

14   don't think -- that has nothing to do with whether there's

15   going to be an ultimate shutdown.  It is, there's no doubt

16   that the administration presently intends to place a number

17   of those employees on administrative leave so it's imminent.

18            We can talk about whether and to what extent there

19   is likelihood of success as to that claim, but I want to

20   start with irreparable harm.

21            So why is it that the plaintiffs haven't

22   established the possibility of irreparable harm flowing from

23   what has already or would already occur, which is the

24   administrative leave question?

25            **MR. HAMILTON:**  Well, we share the concern about

1    the security of USAID employees and are committed completely

2    to their security.  I direct the Court to, specifically

3    Pages 7, 10 and 11 of the Morocco declaration, which talk

4    about the extent to which employees in high-risk countries

5    were on administrative leave.  At the time of the Friday

6    hearing, 98 percent of those on administrative leave were in

7    the United States.  The remaining were in developed

8    countries like the United Kingdom.

9            **THE COURT:**  Is it the government's present

10   intention that, if it is permitted by me to place employees

11   overseas on administrative leave, that it will not do so

12   with respect to employees in high-risk countries?

13           **MR. HAMILTON:**  From what I understand, employees

14   in high-risk countries may be placed on administrative

15   leave.  But I direct the Court to Paragraph 27 of the

16   Morocco declaration, which states that there is no plan to

17   shut out employees in high-risk posts from overseas security

18   resources.

19           In other words, anyone in a high-risk country, you

20   know, we will ensure there are resources in place for them.

21           **THE COURT:**  Right.  There's some tension between

22   that and Paragraph 13.  Paragraph 13 implies that, at least

23   to the first tranche of employees, that anyone in a

24   high-risk location would not have been placed on

25   administrative leave because of that fact.

1          And then Paragraph 27 suggests, at least from what

2     I can tell, that, yes, there may actually be some employees

3     in high-risk locations that are put on administrative leave,

4     but that's okay because we're going to take these other

5     steps to ensure their safety.

6          So I'm just trying to understand which is it.  If

7     you have a high-risk country, pick your high-risk country,

8     is it the government's position that no employee in the

9     high-risk country will be placed on administrative leave?  I

10     think that's not the government's position.  The

11     government's position is we might, but we'll take steps to

12     ensure that such employees remain safe.

13          **MR. HAMILTON:**  That's exactly right, Your Honor.

14          **THE COURT:**  So tell me how.

15          **MR. HAMILTON:**  Well, I don't have facts to add

16     beyond the Morocco declaration.  We can attempt to answer

17     specific questions with our clients.

18          **THE COURT:**  So my understanding is that, if you're

19     placed on administrative leave, you lose access to email,

20     maybe lose access to cell phones and devices, maybe lose

21     access to this app that governs overseas employees and

22     information about safety and security and the like, and that

23     that means that employees on administrative leave are at

24     least at risk of being in an information vacuum if a risk

25     occurs.  Do I have any of that wrong?  And what's happening

1    to ensure that that's not the case?

2            **MR. HAMILTON:**  Well, I think the missing piece is

3    that there are other security resources that will be made

4    available.

5            **THE COURT:**  Such as?

6            **MR. HAMILTON:**  I don't have detail to add beyond

7    the Morocco Declaration.  But the electronic resources

8    that --

9            **THE COURT:**  You can understand, I'm sure, why I

10   would not want to be in a position of having -- and it

11   sounds like you wouldn't either, I hope -- of having

12   government employees overseas be at risk of something

13   physical or otherwise happening to them in a high-risk

14   situation because they're placed on administrative leave.

15           But I need to know the details of how the

16   government is going to prevent that.  And you're not, here,

17   able to say, at least with particularity, how that will

18   work.

19           **MR. HAMILTON:**  I don't have specifics on that and

20   the details may change or vary depending on the country

21   we're talking about.  We can work to provide additional

22   information in a supplemental filing --

23           **THE COURT:**  Why not just commit to not put

24   employees on administrative leave who are in high-risk

25   countries?

1          **MR. HAMILTON:**  Well, administrative leave is

2     about, sort of, the employees' functions and what they're

3     working on.  It's about their access to emails, which would

4     include documents about the nation's foreign policy.  And

5     it's within the president's authority and leadership for

6     these agencies to determine whether those employees are

7     going to have access to foreign policy documents and

8     information.

9          But what, I think, the bottom line here is, is we

10    are committed to every USAID's security, and we'll be taking

11    steps to ensure that everyone is kept safe.

12         **THE COURT:**  Okay.  Let's turn now to the, for lack

13    of a better word, the re-call offer or choice.  You heard my

14    questions to plaintiffs' counsel about how I understood the

15    Morocco declaration and the nature of the offer, for lack of

16    better word, that's being given to the plaintiffs.

17         From your perspective, did I have anything wrong

18    about that.  And then the second question is, just walk me

19    through, from your perspective, why that scenario doesn't

20    create irreparable harm for overseas employees?

21         **MR. HAMILTON:**  Yes, Your Honor.  I did hear you

22    describe your understanding of the Morocco declaration and

23    we believe it is correct.

24         There are possibilities for employees who are

25    stationed at post abroad to request waivers of that 30-day

1    limit.  And you know, to the extent an employee is unhappy

2    with a decision that has been made on that, it would be more

3    appropriate for those employees to pursue those claims

4    individually than for a union to come to a Federal District

5    Court and attempt to bring something on a class-wide basis

6    that just challenges the policy wholesale in the abstract

7    outside of any specific application of the policy to facts.

8         **THE COURT:**  Put differently, although maybe this

9    is obviously how I was framing it but, I mean, is it the

10   government's position that to the extent an employee says,

11   I'd rather not leave the country for 30 days or in the next

12   30 days because I have these ties to the country, my child's

13   in school and the like, so I don't want to disrupt my

14   family, the government's position is you can do that.  You

15   can make that choice.  But you may not, depending on the

16   exception and that process, you may not get your return

17   travel paid for.  Right?

18        **MR. HAMILTON:**  [Nodded]

19        **THE COURT:**  But also, I hope, but tell me if this

20   is wrong, the employee could make a claim -- I don't know

21   whether it's going to be strong or weak or whatever, but the

22   employee would have the opportunity to make a claim against

23   the government in some proceeding for reimbursement of those

24   travel expenses on the ground that the waiver should have

25   been provided.  Right?

1          **MR. HAMILTON:**  I assume that's correct.  I don't

2     know the specific procedure for that, but we certainly don't

3     think that unions coming to a Federal District Court, even

4     before the 30-day period has closed, is the right forum to

5     litigate that.

6          **THE COURT:**  Well, I thought the government's

7     argument here was, Each of these claims should be channeled

8     into the MSPB or some other administrative process, which

9     means that these can be litigated somewhere.

10          So I would have thought your answer would be, Yes,

11     we're a hundred percent sure that a USAID employee overseas,

12     who applies for a waiver for travel reimbursement because he

13     doesn't or she doesn't take the 30-day deal, can at least

14     present the claim and try to, at some point, tell the

15     government, you screwed up and didn't give me the waiver.

16          **MR. HAMILTON:**  Well, it's certainly true with

17     respect to the administrative leave issue, and I suspect

18     it's true with respect to reimbursements as well.

19          **THE COURT:**  So on the administrative leave issue,

20     does that mean, just as a general proposition, if we were to

21     go back to the hypothetical that I had raised with

22     plaintiffs' counsel, if you took a U.S.-based employee at

23     USAID headquarters who is placed on administrative leave,

24     that that employee, at some point in the future if she would

25     like to, could raise a claim against USAID in front of the

1    MSPB, for example, saying that she was harmed by placement

2    on administrative leave?

3              **MR. HAMILTON:**  Yes.  That is within the mainstream

4    of that forum's sort of work; that's the appropriate way for

5    that to move forward.  And also, a very important fact on

6    administrative leave, as borne out in the Morocco

7    declaration, is that there's no one reason that USAID

8    employees have been put on administrative leave.

9              As we explain on January 27th and February 1st,

10   for example, about a hundred employees were put on

11   administrative leave for reasons like insubordination,

12   questionable contracting practices.  And then later,

13   different categories of employees were slated in for

14   administrative leave or actually placed on administrative

15   leave as part of conducting this 90-day pause and having the

16   new leadership take control of the agency.

17             **THE COURT:**  Is it crystal clear that every

18   employee of USAID will remain paid even if on administrative

19   leave unless and until some future date occurs or, perhaps,

20   is the government prepared to commit to me today how long

21   employees will remain paid even if on leave?

22             **MR. HAMILTON:**  I don't have a commitment to

23   provide on that, but I can say that the administrative leave

24   that we're talking about right now is employees continuing

25   to receive salary, continuing to receive benefits.

1          The only thing that's changing is whether they are

2     doing work, having access to work systems and so on.  That

3     makes this very much a personnel dispute and not the sort of

4     challenge appropriate for Federal District Court.

5          **THE COURT:**  If at some point in the future, so

6     imagine, hypothetically, that the government has argued I

7     should deny the PI -- and I'm not saying I'm going to; I'm

8     just saying, hypothetically, I do that.  I still have the

9     case.

10         If it were determined by the administration, for

11    example, we are going to terminate 75 percent of the USAID

12    workforce and we're going to eliminate -- and I use that in

13    the most general sense -- the outflow of 75 percent of

14    funds, two questions.

15         I mean, the case would still be before me and, at

16    that point, what comes later would now no longer be

17    hypothetical.  It would have occurred.  So it would be

18    imminent or actually have occurred.  Is it the government's

19    view that those actions, if taken, would have to go to the

20    MSPB?

21         **MR. HAMILTON:**  Certainly, termination of employees

22    would be the sort of conduct that would have to go --

23         **THE COURT:**  Right.  Let's just talk about

24    employees.  Fair enough.  Yeah.  Yeah.

25         So if the administration says, We have this plan

1    for USAID, we think it's 75 percent too big, we're going to

2    eliminate, as a result, 75 percent of the workforce and

3    75 percent of the funding, at least as to the employee

4    relationships, those 75 percent, the government's position

5    is -- and even though that may raise questions of the kind

6    that plaintiffs have raised here, that that would have to be

7    channeled into the MSPB or, you know, obviously, there

8    are -- I'm just using MSPB as shorthand for the relevant

9    employment regime.

10             **MR. HAMILTON:**  Yes.

11             **THE COURT:**  And so at that point, even if that

12   action is taken, the government's argument would be, you,

13   Judge Nichols, lack jurisdiction?

14             **MR. HAMILTON:**  Yes, Your Honor.  That's the sort

15   of dispute that the MSPB and the other entities that we're

16   using that as a shorthand for, would handle every day.

17             And on this point, I'd add some very new authority

18   from just yesterday.  Yesterday, in a different case being

19   litigated by AFGE, the Federal District Court in Boston in a

20   case called *AFGE against Ezell*, No. 25-CV-10276, held that

21   the statutory schemes we're talking about preempted the

22   union's challenge to the Trump administration's voluntary

23   resignation program, popularly known as the "Fork in the

24   Road" program.

25             That program works somewhat like the

1    administrative leave we're talking about here because, in

2    both, employees are placed on administrative leave.  And the

3    District Court in Boston last night held that CSRA, FSL-MRS,

4    both preempted the challenge to administrative leave that

5    the union was bringing.

6            **THE COURT:**  Preempted substantively or that the

7    District Court judge lacked jurisdiction?

8            **MR. HAMILTON:**  Lacked jurisdiction under the

9    *Thunder Basin* test.

10           **THE COURT:**  I haven't read that opinion obviously,

11   but as I understand it then, it's the "Fork in the Road"

12   offer is, at its core, goes to the employment relationship.

13   As a result, the claims by the unions there can't go forward

14   in District Court.  They have to go through the relevant

15   statutory regime, which is different depending on the

16   employee, and, at least as to the employees in front of that

17   judge, they had to be channeled there.  So dismiss the case

18   for lack of subject matter jurisdiction?

19           **MR. HAMILTON:**  That's right.

20           **THE COURT:**  Or held that the plaintiffs weren't

21   entitled to a preliminary injunction, whatever it was.

22           **MR. HAMILTON:**  That's right.  And we explained to

23   the District Court that the way the "Fork in the Road"

24   program operated was that employees would be placed on

25   administrative leave for a period of time.

1          But here, the case for a lack of subject matter

2    jurisdiction is even greater, because we have factual

3    dissimilarity among the employees that were placed on

4    administrative leave and are slated for placement on

5    administrative leave.

6          THE COURT:  So does that mean, for example, just

7    to pick numbers out of the Morocco declaration, the 58

8    employees placed on administrative leave on January 27th,

9    2025, their claims might be different from one another, of

10   course, I understand that, but might be different from the

11   57 placed on administrative leave the following Saturday,

12   might be different from the 616 employees who were placed

13   and then the ones that were to be placed?

14         In other words, at least while I don't have the

15   facts about those here, the government's position is the

16   reasons for placing at least those different buckets of

17   employees on administrative leave could very well be

18   different.  And so litigation regarding them is the kind of

19   individualized stuff that should go in front of the MSPB or

20   whatever the relevant entity is?

21         MR. HAMILTON:  That's exactly right, Your Honor.

22         THE COURT:  So but what about the, what you call

23   it, the other 4,000 employees who were placed and then were

24   to be placed on administrative leave?  Is there anything

25   about them that is different than, We're putting you on

1    administrative leave to pause things so we can do a review

2    or is that a consistent similarity across those folks?

3         **MR. HAMILTON:**  I don't know that that can be said

4    with respect to everyone who had not been placed on

5    administrative leave at the time of the Friday hearing.

6    Certainly, there is a category of employees who, from what I

7    understand, were scheduled for administrative leave or had

8    been placed on administrative leave just as part of the

9    desire of implementing the 90-day pause policy and having

10   the new leadership be able to take stock of the situation in

11   the agency.

12        **THE COURT:**  I apologize, I meant to ask this

13   earlier when we were talking about one of the two harms that

14   I was most or potential harms I was most focused on on

15   Friday about the re-call from the, you know, the post.

16        Given what the Morocco declaration says about the

17   offer that has been made, is there anything about my TRO

18   that is causing the government to act differently than it

19   would have been otherwise?

20        **MR. HAMILTON:**  Well, because of the TRO, we have

21   removed people from administrative leave.

22        **THE COURT:**  Yeah.  I know.  That's administrative

23   leave.  I was thinking of them, at least to some extent, as

24   distinct propositions.

25        **MR. HAMILTON:**  Oh, I see, on the evacuation point?

1          **THE COURT:**  Yes, uh-huh.

2          **MR. HAMILTON:**  I do not know the answer to that,

3    Your Honor.  You know, I don't know whether there were plans

4    to immediately evacuate people short in time after the Court

5    held the hearing.

6          But in any event, as the Morocco declaration makes

7    clear, it's a choice for USAID employees stationed at post.

8    And so, to the extent someone were to be evacuated, I would

9    think it would have been at their choice.

10         **THE COURT:**  Right.  And, I mean, things are not

11   always as precise as they might be when done at light speed.

12   But certainly, my TRO was to say, Don't evacuate people who

13   don't want to be evacuated.  But if somebody wants out,

14   surely it can be done.

15         And at least with that modification, it seems to

16   be pretty consistent with what the Morocco declarationsays

17   is going on, at least as a general proposition.  In other

18   words, with that caveat on my TRO, if someone says they want

19   to take the 30-day offer then -- or not, and that's what

20   happens, the government is complying with the TRO.

21         **MR. HAMILTON:**  Right.  Right.  Yeah.  Yeah.

22         It's a voluntary repatriation from post.

23         **THE COURT:**  Right, from the government's

24   perspective.

25         **MR. HAMILTON:**  Yes.

1          **THE COURT:**  I'm not suggesting the plaintiffs

2    don't have a different view of it all.  But it seems to me,

3    at least there, the government likely doesn't have the view

4    that my TRO makes it do much more than what it was already

5    intending to do.

6          **MR. HAMILTON:**  I think that's fair.

7          **THE COURT:**  On the administrative leave point,

8    though, of course, that's not the case?

9          **MR. HAMILTON:**  That's right.

10          **THE COURT:**  The government's view is, as I

11    understand it, we want to put these people on administrative

12    leave.  We have reasons to do so.  We've articulated them.

13    You need to vacate your TRO at least as to that question

14    because it's causing us the harms articulated here and it's

15    not redressing any injury to plaintiffs that is otherwise

16    irreparable.  Right?

17          **MR. HAMILTON:**  That's right.

18          **THE COURT:**  It does seems to me that one thing I

19    will likely do at the end of today's hearing is ask for more

20    information about the specific steps that the government is

21    or would be taking with respect to overseas employees placed

22    on administrative leave to protect their safety.

23          I understand the Morocco declaration says, We're

24    committed to that and we're doing this generally.  But I

25    very likely will want some more specifics on that.

1          We've obviously explored the *Thunder Basin* set of

2     questions.  We've also explored, to some extent, the timing

3     of what the government has presently clearly done, right,

4     administrative leave, choice about pull-back and the like.

5          And then there's, you know, the government's view,

6     I get, is this is a review and then a later decision will be

7     made about whether and to what extent something more

8     significant needs to happen.

9          Plaintiffs' view, on the other hand, is that that

10     is obvious and imminent now; it's what's happening.  And

11     plaintiffs' view is it's unlawful for the following reasons.

12          So can you tell me why, without going back to the

13     question of whether it's really happening, but would, in the

14     government's view, the President have the authority to cut

15     USAID by 75 percent either on funding or on people or both

16     consistent with the various statutes and constitutional

17     provisions the plaintiffs are relying on?

18          **MR. HAMILTON:**  Well, there are a number of

19     statutes implicated in answering that question.  One would

20     be the set of statutes that we begin with in our brief on

21     Page 3.  We cite eight statutes within the FAA that

22     recognize the President's authority over foreign aid.

23     That's Congress' recognition of a presidential power in this

24     space.

25          And in addition, the Appropriations Act does have

1    language about implementing a reorganization, redesign or

2    other plan, with a requirement for their first to be

3    consultation with Congress.

4        We don't think a reorganization has happened.  As

5    Your Honor noted, the Executive Order is a 90-day pause;

6    that's the policy that's being implemented on the ground

7    now.  But Secretary Rubio did transmit a letter to Congress

8    on February 3rd that satisfies that requirement in the

9    Appropriations Act.

10        **THE COURT:**  So he gives that notice and then what,

11    from the administration's perspective, if anything, is

12    supposed to happen in advance of what might be a

13    reorganization or some step that is contemplated by the

14    statute?

15        **MR. HAMILTON:**  That notice checks the box.  It's a

16    consultation requirement.  We think that the specifics of

17    that consultation would be a political question.  So the

18    administration has done what the statute requires of it to

19    do in a reorganization which, again, we don't think has

20    taken place yet.

21        **THE COURT:**  Right.  But if, as and when an

22    admitted reorganization occurs, the administration's

23    perspective is, That is now permitted by the Appropriations

24    Act, because the only thing the Appropriations Act requires

25    is notice?

1          **MR. HAMILTON:**  That's my understanding.

2          **THE COURT:**  Okay.  So would the government give me

3   a commitment that it would provide me some advance notice of

4   an impending reorganization or other thing that the

5   Appropriations Act discussed?

6          **MR. HAMILTON:**  I can't provide that right now.  We

7   could, perhaps, get back on that with what, it sounds like,

8   we'll be asked to file later today.

9          **THE COURT:**  Right.

10          It seems to me that, at least from the

11   government's perspective, there isn't yet a re-org or any

12   other thing that the Appropriations Act addresses.  The

13   government's also saying, We're complying with the

14   Appropriations Act by having given the notice.  And

15   obviously, it's possible that that might happen in the

16   future.

17          You know, I, like many judges, are hopeful to get

18   as much advanced notice of changes to our cases as possible.

19   And so what I was just thinking about is, if, as and when

20   this case were to change significantly, because it goes

21   from, at least from the government's perspective, "pause and

22   review" to actual re-org, changing the nature and complexion

23   of the case, whether we could consider it's that a change on

24   its effects here on a somewhat more rational timeframe.

25          **MR. HAMILTON:**  Well, I suppose a concern I have at

1    the outset is it isn't obvious to me why this case would be

2    the vehicle for that. We're talking about a policy right

3    now that does not exist. And it would seem to me that

4    plaintiffs would need to bring a new lawsuit challenging a

5    new policy if that were to be the subject of litigation.

6           **THE COURT:** Maybe. I mean, they've amended their

7    complaint once but, if clearly alleged that the government's

8    actions are a violation of the Appropriations Act because it

9    is or will be a reorganization, and then they would just

10    say, Well, that claim that may not have been quite right

11    from the government's perspective now is.

12           And I'm not sure whether that needs to be a new

13    lawsuit or an amendment. But you may be right. I'd just

14    rather not have to decide that in a day. We can talk about

15    that later.

16           So beyond the Appropriations Act, what about

17    plaintiffs' non-statutory, maybe, APA claim? Is that

18    more -- would that be more dependent on the details of

19    either what happens or the justifications for it?

20           **MR. HAMILTON:** Well, there are a number of

21    problems with the APA claims. One is there's no final

22    agency action right now. The policy in place --

23           **THE COURT:** Yeah. I should say I was -- as I was

24    before, I was talking about in the event there is a

25    reorganization.

1          **MR. HAMILTON:**  Oh, I'm sorry, Your Honor.

2          **THE COURT:**  Yes.  No, that's okay.

3          In the event that what is now, from the

4    government's perspective merely possible, becomes actual, is

5    it the government's view that there would be no viable APA

6    claim, that it would -- that there could be no APA claim

7    because the President is involved or that it's just way too

8    premature to talk about it because something like arbitrary

9    and capricious review is so dependent on the what and the

10   justifications that it would be not very helpful to talk

11   about now?

12         **MR. HAMILTON:**  Yeah.  I think my answer is sort of

13   where Your Honor was ending, which is we're talking about

14   right now a hypothetical policy that doesn't exist and is

15   dependent on what is learned during this 90-day pause.  It's

16   very hard for me to make a representation about the

17   reviewability of that policy standing here right now.

18         **THE COURT:**  Do you -- this is going to go back to

19   more in the weeds of the facts.  Do you have a sense -- I

20   was asking plaintiffs' counsel of her understanding of the

21   roughly 4700 direct FTE USAID employees, what percentage of

22   those employees is stationed overseas either as a percentage

23   of the 4700 or a percentage of the tranche that was set to

24   go on administrative leave on Friday?

25         **MR. HAMILTON:**  No, Your Honor.  The Morocco

1    declaration has figures for those who were on administrative

2    leave at the time of the Friday hearing.

3         **THE COURT:**  Right.

4         **MR. HAMILTON:**  I don't believe we have numbers for

5    the other categories that you've identified.

6         **THE COURT:**  Right.  I made the mistake, the first

7    time I read it, of assuming that 98 percent of USAID

8    employees across the organization were in the United States.

9    And then I realized that was not right.  That's just for the

10   first group of people and it's very likely, as plaintiffs'

11   counsel said, a different percentage for the second group.

12        **MR. HAMILTON:**  That sounds right.

13        **THE COURT:**  That's your guess.  Right?

14        **MR. HAMILTON:**  That's my guess.

15        **THE COURT:**  Okay.

16        I guess we don't have a sense right now of

17   whether, when we're talking about the potential harms to

18   overseas USAID employees, just how many people we're talking

19   about.  It's weird.  No one in the courtroom knows if we're

20   talking about a thousand to 1500 to 2,000.

21        I do see a hand up which we will get to,

22   Ms. Gilbride.

23             [Laughter]

24        We've been here for two hours and nobody knew.

25   Anyway.

1          **MR. HAMILTON:**  Yes, this litigation has moved at a

2    rapid pace.

3          **THE COURT:**  Yes, I know.

4          **MR. HAMILTON:**  And we endeavored to provide best

5    information in the Morocco Declaration, and we'll work to

6    provide additional information.

7          **THE COURT:**  So one of the questions I asked on

8    Friday wasn't so much about the harm to the government of

9    pausing the administrative stay or the pausing the placement

10   of employees on administrative stay, but it was about the

11   harm to the government of if I were to pause the Friday

12   deadline, in other words, whether there was some magic about

13   Friday, the Friday that's now behind us.

14         In your view, do those questions collapse now or

15   is there a difference between ultimately being able to put

16   someone on administrative leave and the harm to the

17   government of not being able to do so immediately?

18         **MR. HAMILTON:**  There is a harm to it not happening

19   immediately because a 90-day pause policy began on

20   Inauguration Day with President's Executive Order.  We're

21   continuing in that time.

22         And as the Morocco declaration explains, the

23   judgment of those in leadership at USAID was that placing

24   the non-essential employees on administrative leave would be

25   helpful in facilitating that review.

1        **THE COURT:**  Why?

2        **MR. HAMILTON:**  Well, there were problems with

3    insubordination and people implementing --

4        **THE COURT:**  Surely not of 4,000 people.

5        [Laughter]

6        **MR. HAMILTON:**  No.  But, you know, the problems

7    did exist.  And trying to match the grants and contracts,

8    the aid that USAID is performing with the President's new

9    foreign policy is important.  And it was determined that the

10    best way to understand the aid that's going out was to put a

11    pause with a waiver process so that aid that is consistent

12    with the new President's foreign policy would go out.

13        **THE COURT:**  I think plaintiffs' position is that's

14    all very counterproductive.  Put differently, I'm sure you

15    want to do that analysis.  You want to get to the root of

16    whether each and every contract or each and every grant,

17    each and every program is good and consistent with the

18    President's policy.  But it's almost impossible to do that

19    in a rational, non-chaotic way if you put something like

20    80 percent of the workforce on administrative leave.

21        **MR. HAMILTON:**  But again, Your Honor, what we're

22    talking about is not ending salary or benefits.  We're

23    talking about whether plaintiff labor unions are able to

24    compel the executive branch to use the services of certain

25    individuals in implementing the President's foreign policy.

1          We think that the President has acted within his

2     Article II authority, which, *Curtiss-Wright* calls the

3     president the sole warden of the federal government in a

4     field of international relations.  And I noted the eight

5     foreign aid statutes that we cite on Page 3 that also

6     recognize the need for presidential direction in this space.

7          We would think it's consistent with all of those

8     authorities for the President to decide when he comes into

9     office on the first day of his new term, this is going to be

10    a brief pause to take stock of foreign aid and only let out

11    the aid that is consistent with his foreign policy.

12         **THE COURT:**  Going back to irreparable harm, I

13    asked plaintiffs' counsel about the extent to which

14    placement on administrative leave or other things occurring

15    with respect to USAID had created additional risk or had

16    been the cause of additional risk for the people in the

17    Congo.

18         And then, you know, we also talked about how the

19    difficulties with the system called -- I've forgot the name

20    of it now; I know it's in the materials -- the Phoenix

21    system have meant that current employees have not had things

22    like utilities and the like paid for.

23         What are your views on those two questions or what

24    are your responses?  I mean, the Congo situation is clearly

25    harrowing.  People were in danger there.  And at least

1    one of the declarations that counsel, Ms. Bateman, stood up

2    and talked about, does talk about how one of the people in

3    the Congo is affected -- or one of the people who was in the

4    Congo is affected by the current situation at USAID.

5          So is that not a basis on which to, at least for

6    people in high-risk situations or perhaps overseas, to

7    continue the TRO?

8          **MR. HAMILTON:**  My understanding is that the people

9    in the Congo who were in jeopardy were evacuated.  And so,

10   you know again, I can restate our commitment to the security

11   of every USAID employee.  And we note our objection to those

12   declarations which were filed with the plaintiffs' reply

13   brief.

14         **THE COURT:**  Yes.

15         I think implicit in what the government has said

16   is the following, but I just want to make sure I have it.

17   The government is intending for every overseas employee on

18   paid administrative leave to pay for every benefit that that

19   employee is entitled to whether on administrative leave or

20   not.

21         And so an employee in Switzerland should be

22   getting his or her utilities paid for or travel paid for so

23   long as it's consistent with being on paid administrative

24   leave.  And maybe there may be some hiccups here and there,

25   but it's the government's intent that that happens.  Do I

1    have that right?

2            **MR. HAMILTON:**  You're saying it's the government's

3    intent that the benefits and salary continue to be paid out

4    for those on administrative leave?

5            **THE COURT:**  Let's just be -- this may be a

6    terrible example because I don't know the details.  But A

7    USAID employee in Switzerland receives a salary and receives

8    a suite of benefits.  Maybe it's a lease for an apartment,

9    utilities in the apartment, a car, I don't know, a travel

10   allowance, school allowance, whatever it is.  Like there's a

11   suite of benefits that employee received up until

12   December as an employee.

13           The government wants to put that employee now on

14   paid administrative leave.  The government's intent is for

15   that employee to continue receiving all of those benefits

16   that I just went through.  And maybe sometimes they're not

17   getting paid for some snafu reason, but it's not because the

18   government is trying to cut them off.  Do I have that right?

19           **MR. HAMILTON:**  I really hesitate to say that every

20   single benefit that every foreign employee was enjoying in

21   December is going to be continued, especially if we're

22   looking out beyond the 30-day period.

23           But, you know, I think the bottom line of the

24   Morocco declarationis that folks who are stationed at post

25   do have a choice to come back to the United States or to

1    stay at post, whether there are --

2         **THE COURT:**  Yes, but the Morocco declarationwas

3    express on one thing and sort of implied by its

4    non-discussion of others, the -- well, something that was

5    intended.  It said, You can stay.  So long as you stay on

6    paid administrative leave, you can stay in country.

7         The one thing you might lose is the payment of

8    your travel back to the United States, which implied, to me,

9    you're going to get everything else.  Is that the case or

10   not the case?

11        **MR. HAMILTON:**  I don't know with certainty,

12   Your Honor.  And we're talking about a category of people

13   who, I think for the most part, were not placed on

14   administrative leave.  Right?  The folks on administrative

15   leave at the time of the Friday hearing, 98 percent of them

16   were in the United States.  So I don't know --

17        **THE COURT:**  No.  No.  I'm talking about what was

18   intended.  I mean, as I understand it, Morocco is saying,

19   we're offering people at post a choice.  You can come back

20   within 30 days and, if you do that, you'll get your travel

21   paid for.

22        The other choice is you go on paid administrative

23   leave for some period of time.  You can do that.  You're

24   free to do that.  You should know though that, if you do

25   that, you're not going to necessarily get us to pay for your

1    travel back to the country but you can apply for a waiver.

2              That leaves, to me, the question of, does the

3    offer include or not that you'll get these other non-salary

4    benefits while you're in country on post.

5         **MR. HAMILTON:**  I think there are at least some

6    non-salary benefits that are continued.  I can't say that it

7    is going to be all.

8              And we're talking about a large number of

9    employees.  I think there could be factual variations,

10   case-to-case situations.

11        **THE COURT:**  Uh-huh.  Am I right that you would

12   say, but to the extent that remaining in Switzerland on paid

13   administrative leave meant that you didn't receive your

14   child's school tuition but you think you should have, that's

15   something that that employee could pursue through the MSPB

16   or whatever the other administrative process is?

17        **MR. HAMILTON:**  That's right.  It's not uncommon

18   for employees to have disputes with their federal government

19   employer over the benefits that they're receiving.  There

20   are processes for those issues to be litigated.

21             But a labor union coming into a federal trial

22   court seeking agency-wide relief is not the way that those

23   case-by-case situations are to be adjudicated.

24        **THE COURT:**  Mr. Hamilton, anything else you'd like

25   to add before I give Ms. Gilbride an opportunity to rebut?

1          **SPEAKER2:**  No, Your Honor.  I think we can stand

2    on our briefing for the remaining points.

3          **THE COURT:**  Thank you.

4          **MR. HAMILTON:**  Thank you.

5          **THE COURT:**  Ms. Gilbride.

6          **MS. GILBRIDE:**  May I have a short recess,

7    Your Honor?

8          **THE COURT:**  How long do you need?

9          **MS. GILBRIDE:**  Five minutes?

10         **THE COURT:**  Five minutes is great.  Let's go back

11   on at 1:30.

12         (Recess from 1:23 p.m. to 1:34 p.m.)

13         **DEPUTY CLERK:**  Your Honor, we are now back on the

14   record.

15         **THE COURT:**  Thank you, Ms. Moore.

16         Ms. Gilbride.

17         **MS. GILBRIDE:**  Thank you, Your Honor.

18         There has been a mismatch in the proceedings today

19   and throughout the short life of this case between words on

20   paper and actions experienced on the ground by our clients

21   and their members.  And that disconnect between words and

22   actions is at the heart of why there's so much fear and

23   uncertainty about what is going to happen next.

24         You know, we've heard a lot today about a 90-day

25   pause just to get arms around the situation, but what's

1    happening on the ground is contracts are being canceled

2    en masse in the hundreds.

3          We've heard that, you know, that there's a waiver

4    process that will orderly for exceptions to the freeze on

5    program spending.  The reality is that waivers are held up

6    because of problems with the Phoenix system and payments are

7    not being made across the board.

8          And so when we hear that there will be an -- you

9    know, there will be an ability for people to stay on post if

10   they don't choose the 30-day evacuation offer, there's a lot

11   of concern about what that actually means.

12         So turning to irreparable harm, with regard to the

13   return home, people are being forced under extreme time

14   pressure to make a very difficult choice.  They either

15   evacuate on, you know, an accelerated basis without being

16   able to put the continuity and plans in place for moving

17   their family, for pets, for children in school.

18         They may be losing health coverage.  Some of them

19   are in, you know, fragile medical states.  They have to do

20   that on an accelerated timetable.  If they choose not to do

21   that, then they have an uncertain future staying on post

22   without any assurances of what will be provided to them.

23         Will they have their embassy housing?  Will they

24   have diplomatic immunity?  Will they have access to

25   healthcare and education and for how long?  If they have

1    those things initially, when will they be cut off?

2            And so people have to, without full information

3    and without a lot of trust at this point in what the

4    leadership and defendants who are pushing for this whole

5    scale dismantling of the agency, what they will do and what

6    assurances they can actually provide and whether those

7    assurances can be trusted.

8            Switching gears and talking about standing, you

9    know, we have two organizational clients here who have

10    standing in their own right.  If this goes forward and they

11    lose members in the hundreds, they, you know, are harmed by

12    that.

13            And they are harmed by this taking up a lot of

14    their time right now because, for all of the reasons I just

15    mentioned, their members are scared and they're, you know,

16    taking up a lot of their time trying to get answers to these

17    questions that no one really has answers to.

18            The individual members have standing in various

19    ways.  In addition to some of the, you know, the future

20    forward-looking harms around, you know, access to healthcare

21    and perhaps a chaotic evacuation, we have concrete actual

22    harms that are happening right now, financial harms because

23    bills are not being paid.

24            And those are, you know, bills that people are

25    several months in arrears on, and that certainly is a

1    pocketbook injury, which is sufficient for standing.

2    Whether those people are in the U.S., whether they're

3    abroad ...

4         **THE COURT:**  Can I just ask you a question there?

5    Why would someone be several months in arrears on something

6    when the inauguration was less than a month ago?

7         **MS. GILBRIDE:**  Because my understanding of how

8    these invoices are paid is they're on a 30-day -- some, you

9    know, even 45 days in some cases, between when a cost is

10   incurred and the invoice is paid.

11        So, again, I would refer you to 24-11 the Walter

12   Doe Declaration.  He's a controller who is processing and

13   dispersing these payments.  He said all of the payments that

14   he's trying unsuccessfully to pay through the system are

15   charges that were incurred in November and December of 2024.

16        And so those are harms.  To the extent that, you

17   know, some of these unpaid bills are our clients' members'.

18   And you know, again, just because they are employees -- and

19   we've spent a lot of time talking about, you know, *Thunder*

20   *Basin* and the MSPB.

21        Just because they happen to be employees of this

22   agency, doesn't mean that anything that this agency does to

23   them, if what it does to them does not sound in employment

24   and the sorts of harms that they're experiencing do not

25   sound in employment, when you look at the *Thunder Basin*

1    test, it doesn't say, Is this employee/employer

2    relationship?

3            It says, Is this the type of claim that this

4    administrative proceeding was set up to handle?  And these

5    are not the type of claim -- first of all, this is a claim

6    for injunctive relief.  Those are our, you know,

7    backward-looking remedial organizations or agencies that can

8    provide backward-looking relief.

9            And this is just an unprecedented situation where

10   the entire agency is being dismantled.  The MSBP cannot put

11   the agency back together again.  And even the cases that we

12   were talking about with government counsel, the *AFGE* case in

13   Massachusetts District Court from yesterday, you know,

14   again, that was a situation where there could be a remedy

15   after the fact, potentially, at the MSPB to say, Was this a

16   valid offer of, you know, deferred resignation.

17           Here, there is no relief.  Once the agency is

18   dismantled, there is no way for the MSPB or the federal

19   circuit to provide any meaningful relief to that injury.

20           And the final thing that I want to say --

21       **THE COURT:**  Can I just ask you?  Let's just talk

22   about employers and employees for a second.

23       **MS. GILBRIDE:**  Sure.

24       **THE COURT:**  Imagine a private company that had a

25   thousand employees owned by a single person.  The single

1    person says, You know what, I've decided I don't want to

2    have this company exist anymore.  I'm just going to stop it,

3    like, I don't want this company.  Not only am I -- I'm not

4    going to sell it.  I'm literally going to stop it from being

5    a thing altogether tomorrow.

6              Isn't the nature of the employees, to the extent

7    that they have claims, aren't those claims for damages

8    arising out of that decision by the employer to dismantle

9    altogether that private company?

10             And wouldn't the nature of that claim be one for

11   damages?  You hurt me with respect to my livelihood, my

12   benefits and the like.  And why wouldn't that be very -- not

13   exactly the same but similar to what we're talking about

14   here if and when the thing that hasn't quite yet happened

15   happens, which is, perhaps, the disestablishment of the

16   USAID.

17             Why isn't that an employer/employee claim for

18   damages?

19             **MS. GILBRIDE:**  Well, there are claims, like under

20   the WARN Act, for example, if a business is going to cease

21   operations and what statutory rights people have in that

22   situation.

23             The situation here is unique in several respects.

24   It's unique, again, because we have people who are living

25   abroad.  And to give you a number on that that you had asked

1      for, what's the percentage.

2              **THE COURT:**  Yes, thank you.

3              **MS. GILBRIDE:**  Out of the 4700, 1400 approximately

4      are living overseas so around one third.

5              **THE COURT:**  Thank you.  That's very helpful.

6              **MS. GILBRIDE:**  And so we have over a thousand

7      people who are living abroad who are reliant on the

8      government for their basic living needs and who, because

9      this is being done on such a massive scale, everyone is

10     being destabilized in ways that go far beyond employment.

11             It involves their living situation.  It involves

12     their families who are living with them.  And it involves,

13     again, you know, a type of work, this work on behalf of

14     humanitarian causes that people feel deeply about just being

15     slandered.  And it would be as if the owner of the company,

16     in your hypothetical, said, This, you know, type of work

17     that I dedicated my company to is actually fraudulent and,

18     you know, I think the people who do it are terrible, and I'm

19     going to be sort of gleeful when they get attacked on social

20     media.  And so it goes far beyond just a loss of income from

21     employment.

22             **THE COURT:**  Right, but unfortunately they're not.

23     That would sound like a defamation claim, which is almost

24     always backward-looking and for damages.

25             **MS. GILBRIDE:**  And there are several ways in which

1    this situation is unique.  So certainly, there are things

2    that take this outside of the employer/employee context and

3    make it collateral to and not within the agency expertise of

4    the MSPB and the FLRA.

5           It is, you know, something that is in the process

6    of happening.  It has not yet happened.  And those bodies

7    are not able to provide the sort of equitable relief that is

8    needed to avert this constitutional miscarriage of justice

9    that is happening right now because, you know, there is no

10   adequate remedy at law for the President acting in excess of

11   authority in violation of the Constitution.

12          You know, the only way to stop that from happening

13   is to enter injunctive relief, to halt the worst and most

14   harmful abuses of what's happening.

15          Of course, as we address in our Amended Complaint

16   as to the newly added plaintiff of Oxfam America, there are

17   larger-scale humanitarian consequences of this shutdown.

18   But the near-term effects that it's having right now on our

19   clients and their members should be remedied.

20          We would respectfully ask the Court to continue

21   the TRO in terms of preventing anyone from being placed on

22   administrative leave unless it's for specific articulable

23   reasons.

24          I think it's interesting that there was a

25   distinction in the Morocco declarationbetween four

1      individuals who were not returned to their active status

2      because they were being investigated for some specific

3      alleged infraction.  So if there are specific individualized

4      issues, this whole scale placement of everyone on

5      administrative leave across the board should -- we would ask

6      the Court to continue to enjoin that.

7              We would ask the Court to include in that order

8      restoration of access to physical spaces because people

9      cannot access their computers and other things that they

10     need, especially when they need to access secure documents

11     without having access to physical buildings as well.  That

12     would necessarily require not handing over those physical

13     buildings to other agencies or repurposing them so that the

14     employees could continue to access and use them.

15             We would ask that restoration of the USAID.gov

16     website and other web-based resources so that employees can

17     use those which they rely on for their work.

18             And then, finally, with regard to the Phoenix

19     payment system and resuming payments, at least for operating

20     expenses that affect employees so that they can be paid for

21     debts that are owing and accruing.  Those are the types of

22     relief that we would ask from this Court by way of

23     preliminary injunction.

24             And in conclusion, I would just say that when

25     there's a dispute or debate or discussion about whether this

1    is actually an imminent destruction and dissolution of the

2    agency versus just a pause, I would take the defendants at

3    their word.

4        The President stated not I'm to going to, you

5    know, look into this.  He said, shut it down.  The actions

6    that have been taken over the past three weeks indicate a

7    plan to shut down or at least drastically shrink and shutter

8    this agency.  And because that was done without

9    constitutional authority and in violation of statutory law,

10   it should be enjoined.  Thank you.

11       **THE COURT:**  Thank you, Counsel.

12   (Brief pause.)

13       Here is how we're going to proceed.  I'm going to

14   be writing an opinion on the PI motion.  It's not going to

15   be ready by tomorrow, but I have every intention of it being

16   ready by next week.  And this will be part of an order that

17   I issue today, I'm going to extend the TRO by one week such

18   that, every date in the TRO, basically add seven days to.

19   So February 14th becomes February 21st; that's the first

20   thing.  And absent some massive problem, I will be entering

21   a PI opinion and order before the expiration of the extended

22   TRO; that's the first thing.

23       The second thing is I'm going to order the

24   government to provide me with whatever facts it can on two

25   questions:  First, the specifics around the systems, steps

1    or anything else that the government would have or has or

2    will have in place for overseas employees placed on

3    administrative leave to ensure that they are not put at any

4    risk to their person, safety and the like.

5         In other words, to expand upon the colloquy I had

6    with Mr. Hamilton and as reflected in the Morocco

7    Declaration, just the details.  To the extent there are more

8    details about the kinds of things the government can do to

9    ensure that USAID employees overseas who are placed on

10   administrative leave are not at risk of personal safety.

11        And then, second point, if the government shall

12   submit whatever facts it can submit, is on this question of,

13   for employees who take the offer to or choose to stay on

14   post rather than return within the 30-day period and stay on

15   administrative leave, obviously the record reflects that

16   those people are on paid administrative leave, the record

17   reflects that there is this possibility that they won't get

18   their travel reimbursed, their return travel reimbursed and

19   they have to apply for an exception.

20        But what, if anything, is the government prepared

21   to say about other benefits, payment of utilities, schools,

22   I don't know, whatever the normal suite of benefits that

23   might exist for a USAID employee stationed overseas, whether

24   and to what extent those will continue if an employee takes

25   the offer to stay on post and come back later?

1    So the government should submit to me no later

2    than tomorrow and it doesn't have to be by 5:00, although

3    I'll leave it to the government.  Just submit by tomorrow

4    whatever additional facts the government has on those

5    points.

6    And then the last thing is -- and this will be

7    part of the slight modification to the TRO I'm going to do.

8    I'm just going to clean up the point I was discussing

9    earlier, which is to say that the TRO says that no USAID

10   employee shall be evacuated from their host countries before

11   February 14th, tomorrow, at 11:59 p.m.

12   That will be February 21st, 2025 p.m. [sic] but

13   I'm going to add the phrase -- I'm going to make something

14   to the effect that they shouldn't be evacuated over their

15   objection or without their consent or something, because I

16   do think that there may be some employees who, for whatever

17   reason, would want to take the government up on the offer in

18   the near term to return to the United States, have their

19   travel paid for and the like.

20   So I'll make that very slight modification.  And

21   with that, I will look forward to the government's

22   submission, and everyone should hear from me next week on

23   the PI.

24   Ms. Gilbride, any questions you have for me?

25       **MS. GILBRIDE:**  Yes, I do have one question.  I did

1    not include this in my summing up, but I did want to ask

2    about there's an ambiguity with regard to the personal

3    services contractors who are considered employees of the

4    federal government for payroll --

5         **THE COURT:**  I mean, the problem is --

6         **MS. GILBRIDE:**  -- but not OPM.

7         **THE COURT:**  -- as we discussed earlier, as I

8    heard, you don't know whether there are any personal service

9    contractors who are members of your associations.  So I

10   don't see how you have standing to pursue their claims at

11   least on the present record.

12        So the order was perhaps ambiguous but it was not

13   intended expressly to cover them.

14        **MS. GILBRIDE:**  Understood, Your Honor.

15        Would we be --

16        **THE COURT:**  You can submit something to

17   supplement.

18        **MS. GILBRIDE:**  -- permitted to supplement the

19   record if I learn whether there are any members of the

20   association?

21        **THE COURT:**  Yes, you may.  You may do that.

22        **MS. GILBRIDE:**  Thank you, Your Honor.

23        **THE COURT:**  Okay.

24        Mr. Hamilton, anything you would like to raise?

25        **MR. HAMILTON:**  No, Your Honor.

1                **THE COURT:**  Okay.  Thank you, all.

2          (Proceedings concluded at 1:54 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      **C E R T I F I C A T E**

2

3           I, **Lorraine T. Herman, Official Court Reporter,**

4   certify that the foregoing is a true and correct transcript

5   of the record of proceedings in the above-entitled matter.

6

7

8       _____February 14, 2025_____      ___/s/ Lorraine T. Herman___
                    **DATE**                        **Lorraine T. Herman**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25