**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| AMERICAN FOREIGN SERVICE ASSOCIATION, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> PRESIDENT DONALD TRUMP, *et al.*, <br><br> Defendants. | Civil Action No. 1:25-cv-00352-CJN |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY RELIEF**

**TABLE OF CONTENTS**

INTRODUCTION ..............................................................................................................1

BACKGROUND ...............................................................................................................3

I.      STATUTORY BACKGROUND ...........................................................................3

        A.      The Executive's Authority and Discretion to Set Foreign Aid..................3

II.     FACTUAL BACKGROUND .................................................................................5

III.    PROCEDURAL HISTORY....................................................................................7

LEGAL STANDARD .......................................................................................................9

ARGUMENT....................................................................................................................10

I.      PLAINTIFFS ARE NOT LIKELY TO PREVAIL ON THE MERITS OF THEIR
        CLAIMS. ...............................................................................................................10

        A.      The Court Lacks Jurisdiction Over Plaintiffs' Claims...........................11

                1.      Plaintiffs Must Pursue Their Claims Through the Statutory Scheme
                        Congress Established. ................................................................11

                        a.      The FSL-MRS and CSRA Preclude the Challenges Brought
                                by AFGE. ....................................................................12

                        b.      The FSA Precludes the Challenge Brought by AFSA. ................15

                2.      Plaintiffs Fail to Demonstrate Standing for the Broad Relief that
                        They Seek...................................................................................19

                        a.      Plaintiffs Fail to Demonstrate Associational Standing as to
                                Secretary Rubio's Order Because No Member is Injured by
                                the Pause on Funding. ..................................................20

                        b.      Plaintiffs Fail to Demonstrate Organizational Standing
                                Because the Organizations are Not Harmed by A Pause of
                                Foreign Assistance ......................................................21

        B.      Plaintiffs Are Not Likely to Prevail on Their Constitutional Claims
                (Counts I and II)......................................................................................22

                1.      Count I (Separation of Powers) Additionally Fails Because the
                        President's Powers in the Realm of Foreign Affairs are Vast and
                        Generally Unreviewable. ...........................................................23

2.      Count II (Take Care Clause Violation) Additionally Fails Because the Take Care Clause Cannot be Used to Obtain Affirmative Relief. ...................................................................................25

C.      Plaintiffs Are Not Likely to Prevail on Their Administrative Procedure Act Claims (Counts III and IV). ...........................................................28

1.      Plaintiffs Do Not Allege Any Agency Action. .......................................29

2.      Plaintiffs Do Not Allege Any Final Action. ...........................................31

3.      The APA Does Not Provide a Cause of Action Because an Alternative Adequate Remedy is Available to Plaintiffs.........................32

4.      Defendants Have Not Exceeded Their Statutory Authority. ...................33

5.      Defendants Have Not Acted Contrary to Law. .......................................35

6.      Defendants Have Not Acted Arbitrarily and Capriciously......................36

II.     PLAINTIFFS FAIL TO DEMONSTRATE THAT IRREPARABLE HARM WOULD RESULT IN THE ABSENCE OF A PRELIMINARY INJUNCTION............37

III.    THE BALANCE OF EQUITIES (INCLUDING THE PUBLIC INTEREST) DOES NOT FAVOR A PRELIMINARY INJUNCTION. ...............................................40

IV.     ANY PRELIMINARY INJUNCTION SHOULD BE NARROWLY TAILORED.........41

CONCLUSION....................................................................................................................42

# TABLE OF AUTHORITES

## Cases

*Adams v. Vance*,
  570 F.2d 950 (D.C. Cir. 1978) .........................................................................................10, 25

*Alabama-Coushatta Tribe of Tex. v. United States*,
  757 F.3d 484 (5th Cir. 2014).........................................................................................31

*Alexander v. Trump*,
  753 F. App'x 201 (5th Cir. 2018).........................................................................................29

*Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*,
  121 F.4th 1314 (D.C. Cir. 2024) .........................................................................................19

\**Am. Fed'n of Gov't Emps., AFL-CIO v. Trump, (AFGE)*,
  929 F.3d 748 (D.C. Cir. 2019) ....................................................................................*passim*

*Am. Ins. Ass'n v. Garamendi*,
  539 U.S. 396 (2003) .........................................................................................24

*Am. Soc'y for Prevention of Cruelty to Animals v. Feld Ent., Inc.*,
  659 F.3d 13 (D.C. Cir. 2011) .........................................................................................22

*Am. Whitewater v. Tidwell*,
  770 F.3d 1108 (4th Cir. 2014).........................................................................................28

*Ancient Coin Collectors Guild v. CBP*,
  801 F. Supp. 2d 383 (D. Md. 2011), *aff'd*, 698 F.3d 171 (4th Cir. 2012) ..........................29, 30

*Angelus Milling Co. v. Commissioner*,
  325 U.S. 293 (1945) .........................................................................................26

*Arch Coal, Inc. v. Acosta*,
  888 F.3d 493 (D.C. Cir. 2018) .........................................................................................13

*Axon Enter., Inc. v. Fed. Trade Comm'n*,
  598 U.S. 175 (2023) .........................................................................................18

*Ayele v. District of Columbia*,
  704 F. Supp. 3d 231 (D.D.C. 2023).........................................................................................37

*Baker v. Carr*,
  369 U.S. 186 (1962) .........................................................................................27

*Bancoult v. McNamara,*
   445 F.3d 427 (D.C. Cir. 2006) ...................................................................23

*Beacon Theatres, Inc. v. Westover,*
   359 U.S. 500 (1959) ...............................................................................34

*Bennett v. Spear,*
   520 U.S. 154 (1997) ...............................................................................29

*Bernstein v. Kerry,*
   962 F. Supp. 2d 122 (D.D.C. 2013), *aff'd* 584 F. App'x 7 (D.C. Cir. 2014)............19

*Bowen v. Massachusetts,*
   487 U.S. 879 (1988) ...............................................................................30

*Bowles v. Russell,*
   551 U.S. 205 (2007) ...............................................................................10

*Bureau of Alcohol, Tobacco & Firearms v. FLRA,*
   464 U.S. 89 (1983) ................................................................................13

*Califano v. Yamasaki,*
   442 U.S. 682 (1979) ...............................................................................39

*Changji Esquel Textile Co. v. Raimondo,*
   40 F.4th 716 (D.C. Cir. 2022) .....................................................................8

*\*Chaplaincy of Full Gospel Churches v. England,*
   454 F.3d 290 (D.C. Cir. 2006) .................................................... 18, 35, 36, 37

*Chi. & S. Air Lines v. Waterman S.S. Corp.,*
   333 U.S. 103 (1948) ............................................................................23, 25

*Church v. Biden,*
   573 F. Supp. 3d 118 (D.D.C. 2021)................................................................36

*Clinton v. Jones,*
   520 U.S. 681 (1997) ...............................................................................25

*Cmty. Oncology All. v. Becerra,*
   No. 23-CV-2168 (CJN), 2023 WL 9692027 (D.D.C. Dec. 21, 2023) ........................8

*\*Dalton v. Specter,*
   511 U.S. 462 (1994) .......................................................... 21, 24, 25

*Davis v. Pension Benefit Guar. Corp.,*
    571 F.3d 1288 (D.C. Cir. 2009) ............................................................................8, 37

*Detroit Int'l Bridge Co v. Canada,*
    189 F. Supp. 3d 85 (D.D.C. 2016) ...........................................................................27

*Ehrman v. United States,*
    429 F. Supp. 2d 61 (D.D.C. 2006) ............................................................................17

*Elec. Priv. Info. Ctr. v. Presidential. Advisory Comm'n on Election Integrity,*
    878 F.3d 371 (D.C. Cir. 2017) ...........................................................................20, 21

*Elgin v. Dep't of Treasury,*
    567 U.S. 1 (2012) ................................................................................................12, 16

*Elm 3DS Innovations LLC v. Lee,*
    No. 1:16–cv–1036, 2016 WL 8732315 (E.D. Va. Dec. 2, 2016)...............................30

*Farris v. Rice,*
    453 F. Supp. 2d 76 (D.D.C. 2006) ............................................................................36

*FDA v. All. for Hippocratic Med.,*
    600 U.S. 367 (2024) ...........................................................................................20, 21

*Fornaro v. James,*
    416 F.3d 63 (D.C. Cir. 2005) ....................................................................................12

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992) ..................................................................................................27

*Free Enter. Fund v. Pub. Co. Acct. Bd.,*
    561 U.S. 477 (2010) ..................................................................................................25

*Friends of Animals v. Jewell,*
    828 F.3d 989 (D.C. Cir. 2016) ..................................................................................18

*FTC v. Standard Oil Co. of Cal.,*
    449 U.S. 232 (1980) ..................................................................................................17

*Garcia v. Vilsack,*
    563 F.3d 519 (D.C. Cir. 2009) ..................................................................................30

*Ghaly v. Dep't of Agric.,*
    228 F. Supp. 2d 283 (S.D.N.Y. 2002) ......................................................................12

*Graham v. Ashcroft*,
  358 F.3d 931 (D.C. Cir. 2004) ................................................................................. 11, 13

*Gulf Oil Corp. v. Brock*,
  778 F.2d 834 (D.C. Cir. 1985) .......................................................................................38

*Harisiades v. Shaughnessy*,
  342 U.S. 580 (1952) ........................................................................................................23

*Holder v. Humanitarian L. Project*,
  561 U.S. 1 (2010) ............................................................................................................38

*Holy Land Found. for Relief & Dev. v. Ashcroft*,
  219 F. Supp. 2d 57 (D.D.C. 2002), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003) ...............38

*Hunt v. Wash. State Apple Advert. Comm'n*,
  432 U.S. 333 (1977) .......................................................................................................18

*Hunter v. United States*,
  36 Fed. Cl. 257 (1996) .............................................................................................. 14, 15

*In re Navy Chaplaincy*,
  738 F.3d 425 (D.C. Cir. 2013) ........................................................................................8

*Indigenous People of Biafra v. Blinken*,
  639 F. Supp.3d 79 (D.D.C. 2022) ................................................................................19

*Jarkesy v. SEC*,
  803 F.3d 9 (D.C. Cir. 2015) ..................................................................................... 13, 16

*Johnson v. Eisentrager*,
  339 U.S. 763 (1950) .......................................................................................................23

*Kim v. FINRA*,
  698 F. Supp. 3d 147 (D.D.C. 2023), *appeal dismissed*, 2025 WL 313965 (D.C. Cir. 2025)...37,
  38

*Louisiana v. Biden*,
  622 F. Supp. 3d 267 (W.D. La. 2022) ..........................................................................27

*Louisiana v. United States*,
  948 F.3d 317 (5th Cir. 2020)........................................................................................28

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ............................................................................................ 18, 19, 25

*Lujan v. Nat'l Wildlife Fed'n.*,
   497 U.S. 871 (1990) .........................................................................................28

*Mahorner v. Bush*,
   224 F. Supp. 2d 48 (D.D.C. 2002), *aff'd* 2003 WL 349713 (D.C. Cir. 2003).........................19

*Marbury v. Madison*,
   5 U.S. (1 Cranch) 137 (1803)...................................................................... 1, 25

*Mississippi v. Johnson*,
   71 U.S. (4 Wall) 475 (1866)...........................................................................25

*Morrison v. Olson*,
   487 U.S. 654 (1988) ......................................................................................25

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ........................................................................................26

*Munaf v. Geren*,
   553 U.S. 674 (2008) ........................................................................................8

*Nken v. Holder*,
   556 U.S. 418 (2009) ...................................................................................8, 37

*Norton v. S. Utah Wilderness*,
   *All.*, 542 U.S. 55 (2004)..................................................................................28

*Ohio Valley Envt'l Coal. v. Aracoma Coal Co.*,
   556 F.3d 177 (4th Cir. 2009)...........................................................................26

*People for Ethical Treatment of Animals v. U.S. Dep't of Agric.*,
   *(PETA)*, 797 F.3d 1087 (D.C. Cir. 2015)....................................................... 18, 20

*Perry Cap. LLC v. Mnuchin*,
   864 F.3d 591 (D.C. Cir. 2017) ........................................................................30

*Printz v. United States*,
   521 U.S. 898 (1997) ......................................................................................25

*Raines v. Byrd*,
   521 U.S. 811 (1997) ......................................................................................18

*Sampson v. Murray*,
   415 U.S. 61 (1974) ...................................................................................34, 36

*Schneider v. Kissinger*,
   412 F.3d 190 (D.C. Cir. 2005) ........................................................................22

*Sherley v. Sebelius,*
   644 F.3d 388 (D.C. Cir. 2011) ................................................................8

*Sierra Club v. Peterson,*
   228 F.3d 559 (5th Cir. 2000)..............................................................28

*Summers v. Earth Island Inst.,*
   555 U.S. 488 (2009) ........................................................................18

*Thompson v. Pope,*
   397 F. Supp. 2d 28 (D.D.C. 2005)....................................................14, 15

*Thunder Basin Coal Co. v. Reich,*
   510 U.S. 200 (1994) ........................................................................11

*Tulare Cnty. v. Bush,*
   306 F.3d 1138 (D.C. Cir. 2002) .........................................................27

*U.S. Info. Agency v. Krc,*
   989 F.2d 1211 (D.C. Cir. 1993) ....................................................14, 15

*United States v. Curtiss-Wright Exp. Corp.,*
   299 U.S. 304 (1936) ...................................................................22, 37

*United States v. Fausto,*
   484 U.S. 439 (1988) ..........................................................11, 12, 13, 14

*United States v. Paddack,*
   825 F.2d 504 (D.C. Cir. 1987) .........................................................17

*Versata Dev. Corp. v. Rea,*
   959 F. Supp. 2d 912 (E.D. Va. 2013) .................................................30

*Vill. of Bald Head Island v. U.S. Army Corps. of Eng'rs,*
   714 F.3d 186 (4th Cir. 2013)............................................................28

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ............................................................................8

*Worthy v. Herter,*
   270 F.2d 905 (D.C. Cir. 1959) .........................................................23

*Wyo. Outdoor Council v. U.S. Forest Serv.,*
   165 F.3d 43 (D.C. Cir. 1999) ...........................................................36

*Youngstown Sheet & Tube Co. v. Sawyer,*
   343 U.S. 579 (1952) ...........................................................................................22

*Zivotofsky ex rel. Zivotofsky v. Kerry,*
   576 U.S. 1 (2015) .......................................................................... 22, 23, 32

**Constitutional Provisions**

U.S. Const. art. II ..................................................................................... 25, 26, 27

**Statutes**

5 U.S.C. § 104.....................................................................................................3, 31

5 U.S.C. § 704.......................................................................................... 27, 29, 30

5 U.S.C. § 706............................................................................................... 26, 31

5 U.S.C. § 6329a....................................................................................................33

5 U.S.C. § 7703............................................................................................... 11, 13

22 U.S.C. § 2151.......................................................................................................3

22 U.S.C. § 2291.......................................................................................................3

22 U.S.C. § 2346...................................................................................................3, 4

22 U.S.C. § 2347.......................................................................................................3

22 U.S.C. § 2348.......................................................................................................3

22 U.S.C. § 2349aa...................................................................................................3

22 U.S.C. § 2382.......................................................................................................3

22 U.S.C. § 2601.......................................................................................................3

22 U.S.C. § 4106.....................................................................................................15

22 U.S.C. § 4107.....................................................................................................15

22 U.S.C. § 4131.....................................................................................................16

22 U.S.C. § 4135............................................................................................... 14, 17

22 U.S.C. § 4136............................................................................................... 14, 17

22 U.S.C. § 4137 .......................................................................................... 14, 15, 16, 17

22 U.S.C. § 4138 ......................................................................................................... 14, 17

22 U.S.C. § 6563 ........................................................................................................ 3, 4, 31

22 U.S.C.A. § 6592 ............................................................................................................... 3

28 U.S.C. § 1331 ................................................................................................................. 11

31 U.S.C. § 3901 ................................................................................................................. 33

Pub. L. No. 87-510, 76 Stat. 121 (1962) ............................................................................. 3

Pub. L. No. 101-179, 103 Stat. 1298 (1989) ....................................................................... 3

Pub. L. No. 105-277, 112 Stat. 2681 (1998) ....................................................................... 3

Pub. L. No. 118-47 § 7063(a), 138 Stat. 460 (2024) ........................................................ 32

## Regulations

Exec. Order 10,973, 26 Fed. Reg. 10,469 (Nov. 3, 1961) ..................................................... 3

 Exec. Order 14,169, 90 Fed. Reg. 8619 (Jan. 20, 2025) ....................................... *passim*

Exec. Order 14008 ............................................................................................................. 27

FAR 42.1303 ........................................................................................................ 19, 33, 34

## Other Authorities

Mem., Guidance on Probationary Periods, Admin. Leave Details, Jan. 20, 2025 (Guidance),
    https://chcoc.gov/sites/default/files/Guidance%20on%20Probationary%20Periods%
    2C%20Administrative%20Leave%20and%20Details%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%20FINAL.pdf ............. 5

S. Rep. No. 96–913 (1980), *reprinted in* 1980 U.S.C.C.A.N. 4419 ........................................... 14

Sec'y of State, Emergency Humanitarian Waiver to Foreign Assistance Pause (Jan. 28, 2025),
    http://state.gov/emergency-humanitarian-waiver-to-foreign-assistance-pause ........................ 4

**INTRODUCTION**

Plaintiffs, American Foreign Service Association (AFSA), a professional association that represents foreign service officers (FSOs), and American Federation of Government Employees (AFGE), a union that represents federal civilian employees, bring a scattershot attack against the policy decisions of the Executive Branch. *See generally Compl.*, ECF No. 1. They allege that Defendants President Donald J. Trump, the United States Department of State, the United States Agency for International Development (USAID), Department of Treasury, Secretary and Acting Administrator Marco Rubio, and Secretary Scott Bessent (collectively, Defendants) are "illegal[ly] and unconstitutional[ly] dismantling" USAID, by, *inter alia*, "laying off staff and contractors, halting foreign assistance funded by USAID, issuing stop work orders, closing down USAID headquarters, and taking down USAID's website." Pls.' Mot. for Temp. Restraining Order, ECF No. 9-1 (Pls.' Mot. for TRO) at 12. They seek to remedy these policy decisions through an overbroad injunction that would essentially place USAID in a receivership, superintended by the Court. *See*, *e.g.*., Proposed Order, ECF No. 9-14. This is not the proper role of the judiciary. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

Plaintiffs' motion for preliminary injunctions fails to establish a likelihood of success on the merits of their claims. As an initial matter, Plaintiffs' claims are not justiciable. Plaintiffs' claims, which, at bottom, challenge employment decisions made by the agency, are precluded pursuant to the Civil Service Reform Act of 1978 (CSRA), the Federal Service Labor-Management Relations Act (FSL-MRS), and the Foreign Service Act (FSA). Additionally, although Plaintiffs' members claim injury from the pause in foreign aid, none of the Plaintiffs have established a cognizable Article III injury-in-fact to demonstrate associational or organizational standing.

Even if Plaintiffs' claims were proper in this Court, the claims are meritless on their own terms. With respect to Plaintiffs' constitutional claims, Plaintiffs miss the mark because they raise purely statutory arguments. And in any event, Plaintiffs' Separation of Powers claim fails because the President's powers in the realm of foreign affairs are vast and generally unreviewable, and their Take Care Clause argument fails as that clause cannot be used to obtain affirmative relief.

Plaintiffs' Administrative Procedure Act (APA) claims also do not establish a likelihood of success. Principally, because Plaintiffs' claims do not challenge any *agency* action, much less any *final* agency action, they cannot be brought under the APA. Further, Plaintiffs have another adequate remedy at law, and Plaintiffs cannot demonstrate that Defendants have acted contrary to law, arbitrarily and capriciously, or exceeded their statutory authority.

Finally, as the declaration of Peter Marocco makes clear, any finding of irreparable harm would be misplaced. *See generally* Executive Order 14,169, *Reevaluating and Realigning United States Foreign Aid*, 90 Fed. Reg. 8619 (Jan. 20, 2025), Ex. A, Decl. of Peter Marocco (Marocco Decl). Although Plaintiffs argue that its members will suffer irreparable harm from their placement on administrative leave, their recall to America, and their claimed lack of access to security features, these fears are belied by the record. And because the public has an interest in the President taking decisive action in the realm of foreign affairs, the public interest and balance of the equities tip in Defendants' favor. As such, Plaintiffs have not established the criteria necessary for this Court to enter the extraordinary remedy of a preliminary injunction.

# BACKGROUND

I.    **STATUTORY BACKGROUND**

  **A.  The Executive's Authority and Discretion to Set Foreign Aid**

Under the statutory regime governing foreign assistance, and consistent with his responsibilities regarding the conduct of U.S. foreign affairs, the President has broad discretion to set the terms and conditions on which the United States provides such assistance.  Many of the authorities provided under the Foreign Assistance Act of 1961 (FAA), and similar statutes, explicitly allow for the provision of assistance "on such terms and conditions as [the President] may determine."  *See*, *e.g.*, section 104(c)(1) of the FAA (22 U.S.C. § 2151b(c)(1)) (health assistance); section 481(a)(4) of the FAA (22 U.S.C. § 2291(a)(4)) (counternarcotics and anti-crime assistance); section 531 of the FAA (22 U.S.C. § 2346) (assistance to promote economic or political stability); section 541(a) of the FAA (22 U.S.C. § 2347) (International Military Education and Training assistance); section 551 of the FAA (22 U.S.C. § 2348) (Peacekeeping Operations); section 571 of the FAA (22 U.S.C. § 2349aa) (anti-terrorism assistance); *see also* section 2(c)(1) of the Migration and Refugee Assistance Act of 1962, (MRAA), Pub. L. No. 87-510, 76 Stat. 121 (22 U.S.C. § 2601(c)(1)); section 201 of the SEED Act of 1989, Pub. L. No. 101-179, 103 Stat. 1298 (amending the FAA by inserting, inter alia, § 498b(i)).

The FAA delegates some of this authority.  For example, Section 622(c) of the FAA provides that the Secretary of State, under the direction of the President, "shall be responsible for the continuous supervision and general direction of economic assistance, military assistance, and military education and training programs . . .  to the end that such programs are effectively integrated both at home and abroad and the foreign policy of the United States is best served thereby." 22 U.S.C. § 2382(c).

In 1961, President Kennedy issued Executive Order 10973, directing the Secretary of State to "establish an agency in the Department of State to be known as the Agency for International Development." Exec. Order 10,973 § 102, 26 Fed. Reg. 10,469 (Nov. 3, 1961). Section 1413 of the Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, 112 Stat. 2681 (1998), (FARRA) recognized USAID as an "independent establishment." *See* 22 U.S.C. § 6563; 5 U.S.C. § 104 ("For the purpose of this title, 'independent establishment' means (a) an establishment in the executive branch . . . which is not an Executive department, military department, Government corporation, or part thereof, or part of an independent establishment…"). Under FARRA, the USAID Administrator is "under the direct authority and foreign policy guidance of the Secretary of State." 22 U.S.C.A. § 6592. And several types of foreign assistance are jointly administered by the Department of State and USAID. *See*, *e.g.*, 22 U.S.C. § 6563; *id.* § 2346(b) (economic support funds).

Consistent with this authority, President Trump promptly acted to ensure that the United States's provision of foreign aid is aligned with American interests. Upon taking office on January 20, 2025, President Trump instituted a ninety-day pause in United States foreign development assistance to allow his administration to assess programmatic efficiencies, and to ensure that all foreign aid is consistent with United States foreign policy. *See* Exec. Order 14,169, *Reevaluating and Realigning United States Foreign Aid*, 90 Fed. Reg. 8,619 (Jan. 20, 2025). Secretary of State Marco Rubio implemented this Executive Order on January 24, 2025. Marocco Decl., Ex. B., Dep't of State, Mem. 25 STATE 6828 (Jan. 24, 2025). Secretary Rubio also approved waivers, including waivers for foreign military financing for Israel and Egypt, emergency food expenses, administrative expenses, and legitimate expenses incurred before the pause went into effect, Marocco Decl. ¶ 10, and a waiver on the pause for life-saving humanitarian assistance during the

review, *see* Sec'y of State, Emergency Humanitarian Waiver to Foreign Assistance Pause (Jan. 28, 2025), http://state.gov/emergency-humanitarian-waiver-to-foreign-assistance-pause.

Not only is the Trump Administration reviewing foreign aid for programmatic inefficiencies, but it is also taking steps to ensure there are no inefficiencies within the federal workforce. On January 20, 2025, the Office of Personnel Management (OPM) issued a guidance memorandum as to probationary periods and administrative leave. Mem., Guidance on Probationary Periods, Admin. Leave Details, Jan. 20, 2025 (Guidance), https://chcoc.gov/sites/default/files/Guidance%20on%20Probationary%20Periods%2C%20Admi nistrative%20Leave%20and%20Details%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%20FINAL.pdf. The Guidance reinforced that federal agencies had the authority to place employees on paid administrative leave "when it is in their best interest to do so," including when (1) "the absence is directly related to the agency's mission," (2) "the absence is officially sponsored or sanctioned by the agency," (3) "the absence will clearly enhance the professional development or skills of the employee in the employee's current position," or (4) "the absence is in the interest of the agency or of the Government as a whole." *Id.* at 2. The Guidance further explained that administrative leave may "be an appropriate action where the agency component in which the employee works is being eliminated or restructured, or where the agency weighs changes to the individual's role at the agency as part of a workforce realignment." *Id.*

## II.    FACTUAL BACKGROUND

On January 30, 2025, President Trump appointed Secretary Marco Rubio to act as the Acting Administrator of USAID. Marocco Decl. ¶ 8. Secretary Rubio, in line with the views of the President, concluded that USAID's foreign assistance processes reflected signs of severe inefficiency, and a substantial number of the programs funded by USAID neither substantially

benefit the American people, nor reflect the priorities of the President and Secretary. *Id.* ¶ 7. Thus, Secretary Rubio sent a letter to Congress on February 3, stating that Peter Marocco was delegated the duties of Deputy Administrator of USAID and would "begin the process of engaging in a review and potential reorganization of USAID's activities to maximize efficiency and align operations with the national interest." *Id.* ¶ 8.

In line with those objectives, and to thoroughly review the operations of the agency and align its functions to the President's and Secretary's priorities, USAID leadership began placing employees on paid administrative leave. *Id.* ¶ 9. The use of paid administrative leave enabled agency leadership to begin a thorough review of USAID's operations and align its functions to the President's and Secretary's priorities, without continued noncompliance by former agency leadership and management undermining those priorities. *Id.* Of the total 4,765 employees at USAID, the agency initially put 58 on paid administrative leave. *Id.* ¶ 11. By February 7, 2025, approximately 2,140 employees were placed on, administrative leave. *Id.* ¶ 12. The agency also determined that approximately 611 employees were essential to perform USAID's statutory duties and had planned to place the remaining approximately 2,014 employees on paid administrative leave by 11:59 p.m. on Friday, February 7, 2025. *Id.* ¶¶ 16–17.

USAID has a careful plan for those employees currently stationed abroad placed on paid administrative leave. *Id.* ¶ 22. Those employees who are abroad, or "at Post," were given, and will be provided with, a choice to either stay at Post, or return to the United States. *Id.* ¶ 23; *see also* Marocco Decl. Ex. D, USAID Website (Feb. 7, 2025). But if an employee chooses to stay at Post, he or she will be entitled to all the benefits previously offered, so long as he or she remains on paid administrative leave. Marocco Decl. ¶ 23. If an employee chooses to return to the United States, the agency will coordinate and financially cover that return for the employee and his or her

family.  Understanding that some employees may not be in a position to leave their Post within thirty days, *id.* ¶ 25, USAID has made clear that it will consider case-by-case exceptions and offer extensions based on personal or family hardship, mobility or safety concerns, or other reasons. *Id.* ¶ 26.  For example, the agency will consider exceptions based on the timing of dependents' school term, personal or familial medical needs, pregnancy, and other reasons.  *Id.*

Further, when employees are placed on paid administrative leave, they may lose access to certain USAID systems, including their USAID email.  *Id.* ¶¶ 14, 27.  The rationale for this is to ensure the security of internal systems, and that the "pause" on agency operations can truly go into effect.  *Id.* ¶ 27.  But USAID has no plan or proposal that an employee would be shut out from access to overseas security resources at a high-risk post and is committed to the personal security of all personnel and their families.  *Id.*

## III.    PROCEDURAL HISTORY

Plaintiffs AFSA and AFGE filed their Complaint on February 6, 2025, alleging that Defendants are violating the Constitution and Administrative Procedure Act (APA) by "dismantl[ing]" USAID.  Compl., ECF No. 1 ¶¶ 1–8, 34.  The following day, on February 7, Plaintiffs filed a motion for a temporary restraining order and asked the Court to enjoin "Defendants immediately from taking any further actions to shut down USAID operation."  Pls.' Mot. for TRO at 23.  The Court held a hearing a few hours later.  *See* Min. Order dated Feb. 7, 2025.

After argument, the Court entered a temporary restraining order (TRO) preventing Defendants from placing additional employees on administrative leave, requiring Defendants to reinstate employees who had already been placed on administrative leave, and mandating that no employee was to be evacuated from their host country before February 14, 2025.  Temporary

Restraining Order, ECF No. 15 (TRO) at 7.  The Court found that, although Plaintiffs frame their request for an injunction over the "illegal and unconstitutional dismantling of USAID," their alleged harms really stemmed from "(1) the placement of USAID employees on administrative leave; (2) the expedited evacuation of USAID employees from their host countries; and (3) Secretary Rubio's January 24, 2025 order pausing all new obligations of funding." *Id.* at 2 (cleaned up).

As to the placement on administrative leave, the Court concluded that it did not have "the opportunity to consider" the merits of Plaintiffs' argument "in detail," but that Plaintiffs had "at least a colorable argument." *Id.* at 3.  The Court also determined that the loss of security apparatuses could constitute an irreparable injury, and that the equities favored the Plaintiffs. *Id.* at 3–4.  Regarding expedited evacuations, the Court concluded that such evacuations could disrupt the "educational progress" of employees' families, along with the employees' "physical safety[] and family relations" constituting an irreparable injury, and that the "remaining TRO factors shake out in a similar way as they did with respect to the administrative leave question." *Id.* at 4–5.  Finally, the Court concluded that Plaintiffs failed to establish an irreparable injury as to the funding pause because, although Plaintiffs claim that some of its members face financial exposure for contracts entered into by USAID, Plaintiffs had "not explained how or why contracting officers would be held personally liable for contracts entered into by USAID, nor have they explained why there would be no recourse after the fact if that did somehow happen." *Id.* at 6.  And the Court concluded that Plaintiffs' members alleged emotional harm resulting from the pause was the "kind of hypothetical harm insufficient to warrant a TRO." *Id.*

The Court then ordered Defendants to file a response to Plaintiffs' motion by 5:00 p.m. on February 10, 2025 and set a preliminary injunction hearing for February 12, 2025. *Id.* at 7.

## LEGAL STANDARD

A preliminary injunction is an "extraordinary and drastic remedy" that should "never [be] awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (citation omitted). To warrant relief, the movant must satisfy a four-prong test, establishing "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *accord Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011). The third and fourth factors of the analysis—harm to others and the public interest— "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Plaintiffs misleadingly claim that "[c]ourts in this Circuit continue to apply a 'sliding scale' approach, wherein 'a strong showing on one factor could make up for a weaker showing on another.'" Pls.' Mot. for TRO at 8 (quoting *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 726 (D.C. Cir. 2022)). Actually, *Changji* declined to opine on "whether the sliding-scale approach remains valid." *Id.* at 726. Subsequent case law confirms it is not. *See Cmty. Oncology All. v. Becerra*, No. 23-CV-2168 (CJN), 2023 WL 9692027, at *3 (D.D.C. Dec. 21, 2023) (Nichols, J.) ("Although the Court of Appeals has not yet expressly held that a plaintiff must make a clear showing on each of the four *Winter* factors, current caselaw in this jurisdiction favors that approach."); *see also In re Navy Chaplaincy*, 738 F.3d 425, 428 (D.C. Cir. 2013) (requiring proof on all four factors); *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) (Kavanaugh, J., concurring) (noting that, after *Winter*, "the old sliding-scale approach to preliminary injunctions—under which a very strong likelihood of success could make up for a failure to show a likelihood of irreparable harm, . . . is no longer . . . viable") (internal quotation and citation omitted). Indeed, injunctive relief that "deeply intrudes into the core concerns of the

executive branch"—including foreign affairs and national security—may be awarded only upon "an extraordinarily strong showing" as to each element. *Adams v. Vance*, 570 F.2d 950, 954–55 (D.C. Cir. 1978).

## ARGUMENT

Plaintiffs have failed to meet their burden to demonstrate any of the requirements to obtain preliminary injunctive relief because (1) they have not shown there is a likelihood of success on the merits on any of their constitutional or statutory claims because the Court lacks jurisdiction to hear them, and they are unlikely to succeed on the merits; (2) they have not demonstrated irreparable harm because all of Plaintiffs' alleged harms are redressable; and (3) the balance of equities and public interest tip in favor of Defendants because the public has an interest in ensuring that the executive is allowed to take decisive action in the realm of foreign affairs. For any one of these reasons, the Court should deny Plaintiffs' motion for a preliminary injunction.

## I. PLAINTIFFS ARE NOT LIKELY TO PREVAIL ON THE MERITS OF THEIR CLAIMS.

Plaintiffs' motion for preliminary injunctions fails to establish a likelihood of success on the merits of their claims. Plaintiffs' claims are not justiciable because (1) Plaintiffs' challenges to employment decisions are precluded by the CSRA and FSA and (2) Plaintiffs lack standing to challenge the pause in foreign aid. Even if Plaintiffs could get past these hurdles, their constitutional claims fail because (1) they raise purely statutory arguments, (2) the President's powers in the realm of foreign affairs are vast and generally unreviewable, and (3) the Take Care Clause cannot be used to obtain affirmative relief. Moreover, Plaintiffs' APA claims also do not establish a likelihood of success. Plaintiffs' claims do not challenge any *agency* action, much less any *final* agency action, and cannot be brought under the APA. Further, Plaintiffs have another adequate remedy at law, and Plaintiffs cannot demonstrate that Defendants have acted contrary to

law or arbitrarily and capriciously or exceeded their statutory authority. For these reasons, the Court should deny Plaintiffs' request for preliminary injunctive relief.

### A.  The Court Lacks Jurisdiction Over Plaintiffs' Claims.

As this Court has noted, Plaintiffs' harms stem from three actions: the placement of employees on administrative leave, the evacuation of USAID employees from their host countries, and the January 24, 2025, pause on foreign assistance funding. *See* TRO at 2. But the Court lacks jurisdiction over challenges to any of these decisions. First, Congress has precluded district court jurisdiction over Plaintiffs' challenges to Defendants' decisions to place employees on paid administrative leave and evacuate employees under the Federal Service Labor–Management Relations Statute (FSL-MRS), the Civil Service Reform Act (CSRA), and the Foreign Service Act (FSA). And second, Plaintiffs lack both associational and organizational standing to remedy any alleged injury flowing from the pause and review of foreign aid. For these reasons, Plaintiffs cannot establish a likelihood of success on the merits, and the Court should deny Plaintiffs' request for preliminary injunctive relief.

### 1.  Plaintiffs Must Pursue Their Claims Through the Statutory Scheme Congress Established.

At the outset, this case involves a challenge to policy decisions governing federal employees. The Court lacks jurisdiction over these claims because Congress has established a detailed statutory scheme for adjudicating disputes related to federal employment, and Plaintiffs' claims must be adjudicated through this administrative process.

"Within constitutional bounds, Congress decides what cases the federal courts have jurisdiction to consider." *Bowles v. Russell*, 551 U.S. 205, 212 (2007). Although district courts have jurisdiction over civil actions arising under federal law, *see* 28 U.S.C. § 1331, "Congress may preclude district court jurisdiction by establishing an alternative statutory scheme for

administrative and judicial review." *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump (AFGE)*, 929 F.3d 748, 754 (D.C. Cir. 2019). Here, as detailed below, Congress has precluded district court jurisdiction for the claims brought by Plaintiff AFGE on behalf of its members in the civil service under the FSL-MRS and CSRA, as well as the claims brought by AFSA for its members in the foreign service through the FSA.

### a. The FSL-MRS and CSRA Preclude the Challenges Brought by AFGE.

Congress has established a detailed statutory scheme for adjudicating disputes that arise in the sphere of federal employment for civil servants. The FSL-MRS, and the CSRA, of which the FSL-MRS is a part, together provide a comprehensive "scheme of administrative and judicial review" for resolving both disputes between employees and their federal employers and disputes between unions representing those employees. *AFGE*, 929 F.3d at 752 (regarding FSL-MRS); *see Graham v. Ashcroft*, 358 F.3d 931, 933 (D.C. Cir. 2004) (regarding CSRA more broadly). In these statutes, Congress provided that most federal labor and employment disputes must first be administratively exhausted before the employing agency and the applicable administrative review board—either the Merit Systems Protection Board (MSPB) for employment disputes or the Federal Labor Relations Authority (FLRA) for labor disputes. Judicial review, if any, is generally available only following the exhaustion of administrative review. *See AFGE*, 929 F.3d at 752 (citing 5 U.S.C. §§ 7105, 7123(a), (c)); *Graham*, 358 F.3d at 934 (citing *United States v. Fausto*, 484 U.S. 439, 448–50 (1988)); *see also* 5 U.S.C. § 7703(b) (providing for judicial review in the Federal Circuit or other court of appeals).

Statutory schemes like these largely preclude jurisdiction in the district courts, either altogether or prior to the completion of jurisdictional administrative exhaustion requirements. *AFGE*, 929 F.3d at 754. In *AFGE*, the D.C. Circuit applied the "two-step framework set forth in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994)," to conclude that the union plaintiffs in

that case could not challenge in district court three executive orders related to federal employment. *AFGE*, 929 F.3d at 754. Under that framework, district courts lack jurisdiction over suits like this one when the intent for exclusive review in the court of appeals is "(i) fairly discernible in the statutory scheme, and (ii) the litigant's claims are of the type Congress intended to be reviewed within [the] statutory structure." *See id.* at 755 (citations omitted).

Indeed, the Supreme Court has repeatedly held that the CSRA provides the exclusive means of redressing employment disputes involving federal employees. *See Elgin v. Dep't of Treasury*, 567 U.S. 1, 10–15 (2012); *Fausto*, 484 U.S. at 455. Likewise, the D.C. Circuit has repeatedly recognized that the FSL-MRS and the CSRA readily satisfy the first prong of the *Thunder Basin* framework. *See AFGE*, 929 F.3d at 755 (concluding that union plaintiffs could not challenge in district court three executive orders related to federal employment); *Fornaro v. James*, 416 F.3d 63, 66 (D.C. Cir. 2005). In other words, Congress intended to make the FSL-MRS and CSRA the exclusive scheme, and they satisfy the first step of the two-step *Thunder Basin* framework.

Plaintiffs' claims are also the type to be challenged through this statutory structure. In fact, "[c]laims 'will be found to fall outside of the scope of a special statutory scheme in only limited circumstances, when (1) a finding of preclusion might foreclose all meaningful judicial review; (2) the claims are wholly collateral to the statutory review provisions; and (3) the claims are beyond the expertise of the agency.'" *AFGE*, 929 F.3d at 755 (quoting *Arch Coal, Inc. v. Acosta*, 888 F.3d 493, 500 (D.C. Cir. 2018)).

Here, all three factors point toward preclusion. First, a finding of preclusion will not thwart meaningful judicial review. In essence, Plaintiff AFGE is challenging the placement of its members on paid administrative leave, and perceived consequences or incidental effects that will

flow from that placement, whether related to financial benefits or repatriation. But an employee's placement on administrative leave can be challenged under the CSRA or FSL-MRS. *Ghaly v. Dep't of Agric.*, 228 F. Supp. 2d 283 (S.D.N.Y. 2002) (plaintiff challenging his transfer to paid-administrative leave needed to exhaust administrative remedies). In particular, the Negotiated Collective Bargaining agreement between AFGE's USAID workers and the Agency has an established grievance procedure for determining whether the Agency violated, misinterpreted, or misapplied laws, rules, or regulations in setting conditions of employment. *See Negotiated Collective Bargaining Agreement Between USAID and AFGE Local 1534 (AFL-CIO)*, Art. 17, Art. 21, Dec. 22, 2016. If dissatisfied with the decision by the employing agency and the applicable administrative review board, Plaintiffs' members still have the opportunity for judicial review in a court of appeals. *See AFGE*, 929 F.3d at 752 (citing 5 U.S.C. §§ 7105, 7123(a), (c)); *Graham*, 358 F.3d at 934 (citing *Fausto*, 484 U.S. at 448–50); *see also* 5 U.S.C. § 7703(b) (providing for judicial review in the Federal Circuit or other court of appeals).

For similar reasons, Plaintiff AFGE's challenge—the placement of its members on administrative leave— is also not "wholly collateral" to the statutory review provisions. Rather, that claim may arise in the context of a specific labor dispute, as set forth above. *See AFGE*, 929 F.3d at 759–60 ("This consideration is 'related' to whether 'meaningful judicial review' is available, and the two considerations are sometimes analyzed together." (quoting *Jarkesy v. SEC*, 803 F.3d 9, 22 (D.C. Cir. 2015))).

Finally, Plaintiff AFGE's claims are precisely within the FLRA's expertise. The FLRA is—together with the MSPB—the federal authority on matters of federal employment and labor relations. *E.g., Bureau of Alcohol, Tobacco & Firearms v. FLRA*, 464 U.S. 89, 97 (1983). Even if clothed in constitutional or APA garb, Plaintiffs' claims are nonetheless subject to the CSRA

and FSL-MRS. On this point, *AFGE v. Trump* is instructive. The district court characterized the claims there as involving "separation-of-powers issues" and "whether a statute or the Constitution has authorized the President to act in a particular way," 929 F.3d at 760, much as Plaintiffs have framed their claims in this case. But the D.C. Circuit nonetheless concluded that the AFGE plaintiffs had to follow the statutory scheme, observing that, like here, the claims at issue could be adjudicated by resorting to the provisions of the relevant congressional legislation. *Id.* at 760–61. And even assuming the FLRA and MSPB have lesser expertise on questions of constitutional dimension, they may well be able to "offer an interpretation of the Statute[s] in the course of the proceeding that might alleviate or shed light on the constitutional concerns." *Id.* at 761 (cleaned up). Plaintiff AFGE's claims on behalf of its members are not subject to judicial review unless and until they have been pursued through the comprehensive statutory scheme Congress devised.

### b. The FSA Precludes the Challenge Brought by AFSA.

AFSA's claims asserted on behalf of its foreign service officer members are likewise precluded under the two-step *Thunder Basin* framework by a separate congressional enactment, the Foreign Service Act of 1980. Congress passed the FSA as "a companion measure" to the CSRA, S. Rep. No. 96–913 (1980), *reprinted in* 1980 U.S.C.C.A.N. 4419. And just as it held for the CSRA, the D.C. Circuit has long recognized that "the Foreign Service Act provides a comprehensive system for reviewing personnel action[s] taken against federal employees." *U.S. Info. Agency v. Krc*, 989 F.2d 1211, 1217 (D.C. Cir. 1993) (quoting *Fausto*, 484 U.S. at 455).

Chief among the FSA's many provisions for FSOs are "fundamental grievance procedures." *Thompson v. Pope*, 397 F. Supp. 2d 28, 34 (D.D.C. 2005). Under the FSA, the Foreign Service Grievance Board is "authorized to hear grievances and, where appropriate, recommend remedial action to the Secretary of State." *Hunter v. United States*, 36 Fed. Cl. 257, 259 (1996); *see also* 22 U.S.C. §§ 4135–38. Under authority provided by Congress, the Board has

established an extensive process for resolving grievances, including the right to a hearing, the right

to a representative, and the right to examine and cross-examine witnesses. *Id.* § 4136; *see also* 22

C.F.R., ch. IX (Foreign Service Grievance Board). The Board's decision must be in writing and

include findings of fact and a statement of reasons. 22 U.S.C. § 4137(a). And the FSA authorizes

the Board, when it "finds that the grievance is meritorious," to, among other things, direct the

Department to correct personnel records, reinstate the grievant, or recommend additional remedial

action to the Secretary of State. *Id.* § 4137(b), (d). A grievant who is dissatisfied with final action

by the Board or the Secretary, meanwhile, is entitled to judicial review "in the district courts of

the United States in accordance with the standards set forth in chapter 7 of title 5 [the APA]." *Id.*

§ 4140(a).[1]

Congress defined a "grievance" broadly, to include "any act, omission, or condition subject

to the control of the Secretary which is alleged to deprive a member of the [Foreign] Service who

is a citizen of the United States (other than a United States citizen employed under section 3951

of this title who is not a family member) of a right or benefit authorized by law or regulation or

which is otherwise a source of concern or dissatisfaction to the member." *Id.* § 4131(a)(1). A

grievance expressly includes both (1) "separation of the member allegedly contrary to laws or

regulations"; or (2) any "other alleged violation, misinterpretation, or misapplication of applicable

laws, regulations, or published policy affecting the terms and conditions of the employment or

career status of the member." *Id.* § 4131(a)(1)(A)–(B).

---

[1] The FSA also permits a labor organization such as AFSA to bring a complaint before the Foreign Service Labor Relations Board (FSLRB), established within the FLRA. 22 U.S.C. §§ 4106–07. Just as with a FSO's grievance, "any person aggrieved by a final order" of the FSLRB may seek and obtain judicial review. *Id.* § 4109(a). Congress conferred exclusive jurisdiction for such proceedings on the U.S. Court of Appeals for the District of Columbia. *Id.* Plaintiffs' claims are therefore precluded regardless of whether brought on behalf of Plaintiff AFSA or individual FSOs.

Courts have consistently concluded that the FSA is "a comprehensive and exclusive administrative scheme for review of personnel actions affecting U.S. citizen members of the Foreign Service." *Hunter*, 36 Fed. Cl. at 259; *Pope*, 397 F. Supp. 2d at 35 ("The comprehensive nature of the FSA's grievance procedures provides the plaintiff with an avenue for some redress [which] forclose[s] [sic] judicial imposition of a new substantive liability." (cleaned up)); *cf. Krc*, 989 F.2d at 1217 ("In withholding an administrative remedy from a former FSO alleging reprisal, it appears that the Congress intended also to deny him a judicial remedy."). The first step of the *Thunder Basin* test is readily satisfied.

At the second step, as stated above, Plaintiffs must show that "(1) a finding of preclusion might foreclose all meaningful judicial review; (2) the claim[s] [are] wholly collateral to the statutory review provisions; and (3) the claims are beyond the expertise of the agency." *AFGE*, 929 F.3d at 755 (cleaned up). Plaintiffs cannot do so.

Meaningful judicial review for FSOs will not be foreclosed because, as explained above, they can resort to a federal district court in the event they are dissatisfied with a final action by the Board. This Court is "fully competent to adjudicate" the claims of AFSA's members, *Elgin*, 567 U.S. at 17, a point made evident by the fact that Plaintiffs chose to file this action (erroneously and prematurely) in this Court in the first instance. Notably, a grievance is defined to encompass "any act, omission, or condition subject to control of the Secretary which is . . . a source of concern or dissatisfaction to the [FSO]." 22 U.S.C. § 4131 (a)(1)(A)–(H) (listing examples of a grievance). Plaintiffs' concerns alleged here, whether related to administrative leave, financial benefits, repatriation, or even allegations that Defendants have caused FSOs' "immunity status [to be] revoked," all fall within this broad scope. Compl. ¶¶ 42–43. Even before getting to judicial review, the Board's remedial authority under the Act includes ordering previously denied

compensation or "any other perquisite of employment," retention of any FSO "whose separation would be in consequence of the matter by which the member is aggrieved," and reinstatement. 22 U.S.C. § 4137(b). Even if such remedies were denied to an FSO, a reviewing court possesses the authority to order them.

Nor is Plaintiff AFSA's challenge "wholly collateral" to the FSA's comprehensive scheme. *AFGE*, 929 F.3d at 759. Plaintiffs "aim to obtain the same relief" that FSOs could seek in a Board proceeding, *Jarkesy*, 803 F.3d at 23, and the FSA "empower[s] the agency and the reviewing [district] court to provide the relief sought by the plaintiffs," *AFGE*, 929 F.3d at 760. A claim is not "wholly collateral" when it could be pursued through the mechanisms Congress established; indeed, it is not collateral at all.

And finally, Plaintiffs' claims are precisely within the Board's expertise to decide personnel matters affecting FSOs. *See United States v. Paddack*, 825 F.2d 504, 514 (D.C. Cir. 1987) ("[T]he prevailing customs and practices of the foreign service [are] a subject matter about which the Board has special expertise."); *Ehrman v. United States*, 429 F. Supp. 2d 61, 71 (D.D.C. 2006) (citing "[t]he FSGB's expertise in Foreign Service personnel matters"). Indeed, that is the Board's exclusive function. *See* 22 U.S.C. §§ 4135–38. Again, even though Plaintiffs' frame their claim as one under the Constitution, AFSA's claims are still subject to the statutory scheme. *AFGE*, 929 F.3d at 760, *see also supra* at Section I.A.1.a. Plaintiff AFSA's claims on behalf of FSOs are not subject to judicial review in this Court unless and until they have been pursued through the comprehensive statutory scheme Congress devised.[2]

---

[2] Plaintiffs may contend that they are subject to an immediate injury that cannot justify awaiting the administrative process called for by *Thunder Basin* and its progeny. But the only "'here-and-now' injury" that the Supreme Court has suggested permits bypassing a dedicated statutory scheme is an alleged "subjection to an unconstitutionally structured decisionmaking process," for example by an unaccountable ALJ. *Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 192 (2023).

### 2. Plaintiffs Fail to Demonstrate Standing for the Broad Relief that They Seek

Additionally, Plaintiffs lack Article III standing to enjoin Secretary Rubio's January 24, 2025 order freezing funding to USAID's contractors. The standing requirement ensures "that there is a real need to exercise the power of judicial review in order to protect the interests of the complaining party." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (cleaned up). And the "standing inquiry [must be] especially rigorous when reaching the merits of the dispute would force [a court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Raines v. Byrd*, 521 U.S. 811, 819–20 (1997).

Under any theory of standing, "the irreducible constitutional minimum" requires that,

(1) the plaintiff have suffered an "injury in fact" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; (2) there must exist "a causal connection between the injury and the conduct complained of"; and (3) it must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."

*Friends of Animals v. Jewell*, 828 F.3d 989, 991–92 (D.C. Cir. 2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). Membership-based associations like Plaintiffs can establish standing in one of two ways: they can assert "associational standing" to sue on behalf of their members, *see Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977), or "organizational standing" to sue on behalf of themselves, *see People for Ethical Treatment of Animals v. U.S. Dep't of Agric. (PETA)*, 797 F.3d 1087, 1093 (D.C. Cir. 2015). In seeking to

---

Here, however, there is no adjudicatory process yet underway, let alone a claim that such a process has been "unconstitutionally structured." And in any event, the Supreme Court has "made clear . . . that 'the expense and disruption' of 'protracted adjudicatory proceedings' on a claim do not justify immediate review." *Id.* (quoting *FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 244 (1980)). The D.C. Circuit more recently explained the *Axon* Court's holding in a way that, if it has any bearing here at all, cuts sharply against preliminary relief: "*Axon* at most says that, as a matter of statutory jurisdiction, a federal-court challenge to an unconstitutional *appointment* can begin before the agency acts. It does not say that every agency proceeding already underway must immediately be halted because of an asserted constitutional flaw." *Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*, 121 F.4th 1314, 1336 (D.C. Cir. 2024) (emphasis added).

enjoin Secretary Rubio's January 24, 2025 Order, Plaintiffs fail to make the showing required for either associational standing or organizational standing.

### a. Plaintiffs Fail to Demonstrate Associational Standing as to Secretary Rubio's Order Because No Member is Injured by the Pause on Funding.

To meet the "constitutional minimum," a plaintiff must demonstrate that at least one of its members suffered an injury that is "concrete and particularized" as well as "actual or imminent." *Lujan*, 504 U.S. at 560 (citation omitted); *Summers*, 555 U.S. at 498. Plaintiffs assert that at least one of its members will be injured by this funding pause because they will be held personally liable for contracts entered into by USAID. But as the Court already correctly observed, Plaintiffs failed to demonstrate "how or why contracting officers would be held personally liable for contracts entered into by USAID." TRO at 6; *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (holding that to obtain a preliminary injunction, a plaintiff must demonstrate a "clear showing" that they are entitled to relief). Plaintiffs seemingly rely upon the Federal Acquisition Regulations (FAR 42.1303) for the notion that contracting officers can be personally liable for government contracts. Doe Decl., Exhibit E ¶ 14, ECF No. 9-6. But nothing in Section 42.1303 of the Federal Acquisition Regulations imposes personal liability on contracting officers. *See generally* FAR 42.1303. And indeed, Declarant Marocco is "aware of no instances where an individual employee of USAID would be liable in a personal capacity for the United States terminating a grant, contract, or similar program." Marocco Decl. ¶ 28. Having failed to demonstrate that they suffer any real, concrete harm from the pause in funding, Plaintiffs lack standing to enjoin it. *See Lujan*, 504 U.S. at 560–61.

Plaintiffs also maintain they suffer an emotional injury from "watching a slow speed train wreck as the agency reneges on its humanitarian commitments." TRO at 6. But to establish Article III standing, plaintiffs must show a "concrete" injury. *See Lujan*, 504 U.S. at 560–61. And courts

in the D.C. Circuit have specifically recognized that "the specific fear arising from a foreign policy, no matter how severe a plaintiff's disagreement with that foreign policy may be, cannot constitute injury-in-fact without a concrete harm." *Bernstein v. Kerry*, 962 F. Supp. 2d 122, 127 (D.D.C. 2013), *aff'd* 584 F. App'x 7 (D.C. Cir. 2014).   Nor is Plaintiffs' emotional harm certainly impending.   Although Plaintiffs fear an emotional injury from a "global humanitarian crisis" caused by the funding pause, *see* Pls.' Mot. for TRO at 1, this "amounts to nothing more than speculation about future events that may or may not occur," especially given Defendants' waiver process for certain funds.   *Mahorner v. Bush*, 224 F. Supp. 2d 48, 50 (D.D.C. 2002) ("The plaintiff's allegation that he will suffer an increased chance of losing his life if President Bush initiates a military conflict with Iraq, amounts to nothing more than speculation about future events that may or may not occur."), *aff'd* 2003 WL 349713 (D.C. Cir. 2003); *Indigenous People of Biafra v. Blinken*, 639 F. Supp.3d 79, 85 (D.D.C. 2022) (concluding that the John Does who "reasonably fear[] injury at the hands of the Nigerian government"—after the United States's sale of aircrafts to the Nigerian government—failed to plead a sufficient injury-in-fact); *see also* Marocco Decl. ¶ 10.   Without injury, Plaintiffs fail to demonstrate associational standing to challenge the 90-day pause in foreign-aid funding.

#### b.   Plaintiffs Fail to Demonstrate Organizational Standing Because the Organizations are Not Harmed by A Pause of Foreign Assistance

Plaintiffs' failure to demonstrate associational standing as to the pause in funding cannot be saved by the doctrine of organizational standing.   To establish organizational standing, a plaintiff must demonstrate "that the defendant's actions cause a 'concrete and demonstrable injury to the organization's activities' that is 'more than simply a setback to the organization's abstract social interests.'"   *Elec. Priv. Info. Ctr. v. Presidential. Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017) (quoting *Am. Soc'y for Prevention of Cruelty to Animals v.*

*Feld Ent., Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011)).  To determine whether a plaintiff's allegations are sufficient to convey organizational standing, a court must find that the plaintiff satisfied two prongs: (1) the defendants' "action or omission . . . injured [the plaintiff's] interest;" and (2) that the plaintiff "used its resources to counteract that harm."  *Id.* (quoting *PETA*, 797 F.3d at 1094).

AFGE[3] asserts that it has "devoted considerable resources in recent days responding to requests and providing guidance about the Trump administrations actions at USAID" and will need to divert resources if its members are placed on administrative leave.  Decl. of Ottis Johnson, Jr., Ex. B ¶¶ 6, 8, ECF No. 9-3.  Fundamentally, "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action."  *FDA v. All. for Hippocratic Med.*, 600 U.S. 367, 394 (2024).  And here, AFGE it does not demonstrate, or even allege, that the pause in foreign aid injures its interests.  *See id.*  Nor does it contend that it is using its resources to counteract any purported harm from the pause on foreign aid.  *See id.*  Without such a showing, Plaintiffs cannot "spend its way into standing," *All. for Hippocratic Medicine*, 600 U.S. at 294, and the Court should deny Plaintiffs' request to enjoin the pause in funding.  *Elec. Priv. Info. Ctr*, 878 F.3d at 378.

### B. Plaintiffs Are Not Likely to Prevail on Their Constitutional Claims (Counts I and II).

Plaintiffs' constitutional claims are barred at the outset because they are purely statutory. In Count I, Plaintiffs allege, "President Trump's actions to dissolve USAID" exceed the "numerous . . . statutes regarding USAID appropriations and oversight . . . preserving USAID's status as an independent federal agency."  Compl. ¶¶ 57, 59.  In Count II, Plaintiffs allege, "President Trump's

---

[3] AFSA does not provide a declaration asserting how it is using its resources to counteract any alleged harm, and thus, cannot demonstrate organizational standing.  *See generally* Ex. A, Decl. of Randall Chester, Ex. B, ECF No. 9-2. *Elec. Priv. Info. Ctr*, 878 F.3d at 378.

actions in dissolving USAID violate the Take Care Clause because they violate duly enacted statutes establishing USAID as an independent agency." *Id.* ¶ 66. Both claims are purely statutory. The Supreme Court has made clear that "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims, subject to judicial review . . . ." *Dalton v. Specter*, 511 U.S. 462, 473 (1994). This keeps with the long tradition of "distinguish[ing] between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id.* at 472. Plaintiffs therefore cannot prevail at the outset on the merits of Counts I or II alleging constitutional violations. There are also additional reasons why each of these two claims must fail.

### 1. Count I (Separation of Powers) Additionally Fails Because the President's Powers in the Realm of Foreign Affairs are Vast and Generally Unreviewable.

Plaintiffs argue that Defendants violated the principle of the separation of powers because "'[t]here is no statute that expressly authorizes the President to' dissolve USAID, '[n]or is there any act of Congress . . . from which such a power can be fairly implied.'" Pls.' Mot. for TRO at 10 (citation omitted). The President's actions were in fact within his authorized discretion to make. *See infra* Section I.B.2. There can be no reasonable doubt that it is the President whose authority reigns principally in the realm of foreign affairs.

Pursuant to Article II of the Constitution, as well as powers conferred by Congress in the Foreign Service Reform and Restructuring Act of 1998, the President has broad authority to attend to the foreign affairs of the nation, including by determining how foreign aid funds are used. While the Executive is "not free from the ordinary controls and checks of Congress merely because foreign affairs are at issue," *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 21 (2015), the "historical gloss on the 'executive Power' vested in Article II of the Constitution has recognized the President's 'vast share of responsibility for the conduct of our foreign relations,'" *Am. Ins.*

*Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610–11 (1952) (Frankfurter, J., concurring)). Thus, "in foreign affairs the President has a degree of independent authority to act." *Id.*; *see also United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 320 (1936) (The President's power in the field of international relations "does not require as a basis for its exercise an act of Congress."); *Youngstown*, 343 U.S. at 635–36, n.2 (the President can "act in external affairs without congressional authority").

The upshot is that Article II affords the President tremendous discretion over foreign affairs, and the actions at issue here must be understood against that backdrop. Again, at bottom, Plaintiffs challenge a general policy initiated by the President—and implemented by his subordinates—to *pause* general aid to confirm that those initiatives were within the national interest. That fits comfortably within the Executive Branch's unique expertise and constitutional role; and it is the sort of conduct that a federal court should be loath to disrupt, absent a valid and binding direction to the contrary.

Plaintiffs' request that this Court step in to supervise USAID's operations in some sort of receivership arrangement would create a grave separation of powers problem. This is because diplomacy and foreign relations fall within the "plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations." *Curtiss–Wright*, 299 U.S. at 319–20; *see Schneider v. Kissinger*, 412 F.3d 190, 195 (D.C. Cir. 2005) ("It cannot [] be denied that decision-making in the areas of foreign policy and national security is textually committed to the political branches."); *see Bancoult v. McNamara*, 445 F.3d 427, 433 (D.C. Cir. 2006) ("[A]n extensive list of constitutional provisions . . . entrusted foreign affairs and national security powers to the political branches[.]"); *Chi. & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948) ("[T]he very nature of executive decisions as to foreign policy is political,

not judicial. Such decisions are wholly confided by our Constitution to the political departments of the government, Executive and Legislative.''); *Johnson v. Eisentrager*, 339 U.S. 763, 789 (1950) (noting that the President is "exclusively responsible" for "conduct of diplomatic and foreign affairs"); *Harisiades v. Shaughnessy*, 342 U.S. 580, 589 (1952) (matters relating "to the conduct of foreign relations . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference"); *Worthy v. Herter*, 270 F.2d 905, 911 (D.C. Cir. 1959) ("It is settled that in respect to foreign affairs the President has the power of action and the courts will not attempt to review the merits of what he does. The President is the nation's organ in and for foreign affairs.''). As such, injunctive relief related to foreign affairs "deeply intrudes into the core concerns of the executive branch" and may be awarded only upon "an extraordinarily strong showing" as to each element. *Adams*, 570 F.2d at 954–55. Plaintiffs are not likely to prevail on their separation of powers claim where the relief they seek would in fact result in a serious overstep of the judiciary into the exclusive domain of the Executive.

### 2. Count II (Take Care Clause Violation) Additionally Fails Because the Take Care Clause Cannot be Used to Obtain Affirmative Relief.

Plaintiffs attempt to circumvent the limitations of the APA by asserting what can only be characterized as a broad programmatic attack against the President as well as the agency Defendants under the Take Care Clause, U.S. Const. art. II, § 3. *See* Compl. ¶¶ 63–71 (Count II). Plaintiffs' theory is that Defendants' actions "violate the Take Care Clause because they violate duly enacted statutes establishing USAID as an independent agency," *id.* ¶ 66, and they seek both declaratory and injunctive relief to correct this alleged failure, *id.* at 28–29, Compl., Prayer for Relief (b). It should be noted at the outset that the Government is not aware of any case that has ever held that the Take Care Clause can be used as a mechanism to obtain affirmative relief. Plaintiffs cannot prevail on their Take Care Clause claim because the Take Care Clause does not

provide a cause of action against the President or any other Defendant, and this Court, in any event, has no jurisdiction to issue declaratory or injunctive relief against the President in his official capacity based on constitutional claims. *See Dalton*, 511 U.S. at 473. Moreover, even if the Clause could furnish a basis for affirmative relief, Plaintiffs seek to rely on violations of purported duties that are found nowhere in the statutes establishing USAID themselves, but rather, are based on Plaintiffs' subjective views about how to best implement and administer USAID.

In their Complaint, Plaintiffs cite *Angelus Milling Co. v. Commissioner*, 325 U.S. 293, 296 (1945) for the proposition that "[t]he Take Care Clause is judicially enforceable against presidential actions that violate or undermine statutes duly enacted by Congress." Compl. ¶ 65. But in fact, that case holds no such thing and does not even reference the Take Care Clause. *See Angelus Milling Co.*, 325 U.S. at 296 (holding only and uncontroversially that "[i]nsofar as Congress has made explicit statutory requirements, they must be observed and are beyond the dispensing power of Treasury officials"). And Plaintiffs' motion for a temporary restraining order contains no case law citations whatsoever and no substantive argument beyond conclusory allegations supporting their Take Care Clause argument. *See* Pls.' Mot. for TRO at 11–12.

Through the Take Care Clause, the Constitution vests broad, discretionary authority to "take Care that the Laws be faithfully executed" by the President. U.S. Const. art. II, § 3. Inevitably, the Laws that the President executes are those enacted by Congress. But no court has read the Take Care Clause as opening the door to any plaintiff seeking to challenge the way the President executes Congress's laws. Rather, as the Supreme Court has recognized, the duty of the President when exercising his power to see that the laws are faithfully executed is "purely executive and political," and not subject to judicial direction. *Mississippi v. Johnson,* 71 U.S. (4 Wall) 475, 499 (1866); *see Marbury*, 5 U.S. (1 Cranch) at 137 ("[T]he President is invested with

certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character."). To hold otherwise would upset our constitutional scheme of separation of powers and allow judicial superintendence over the exercise of Executive power that the Clause commits to the President alone. *Baker v. Carr*, 369 U.S. 186, 217 (1962) (Courts lack jurisdiction over a claim where there is "a textually demonstrable constitutional commitment of the issue to a coordinate political department."); *see also Dalton*, 511 U.S. at 474–75 (judicial review of discretionary Presidential decisions "is not available"); *Lujan*, 504 U.S. at 577 (holding that it would be improper for the courts to take over the President's duty to "take Care that the Laws be faithfully executed" (quoting U.S. Const. art. II, § 3)); *Marbury*, 5 U.S. (1 Cranch) at 170 ("The province of the court is, solely, to decide on the rights of individuals, not to enquire how the executive, or executive officers, perform duties in which they have a discretion. Questions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court."); *Chi. & S. Air Lines*, 333 U.S. at 114 (refusing to review President's decision that "embod[ied] Presidential discretion as to political matters beyond the competence of the courts to adjudicate"); *Mississippi*, 71 U.S. at 499.

Nor does the Take Care Clause provide a basis to review the actions of subordinate Executive Branch officials. The Clause speaks only to the President, not to his subordinates, and ensures that the President is principally responsible for the actions of the Executive Branch and directly accountable to the people through the political process. *See Free Enter. Fund v. Pub. Co. Acct. Bd.*, 561 U.S. 477, 492–93 (2010) ("It is *his* responsibility to take care that the laws be faithfully executed."); *id.* at 495–97; *see also Printz v. United States*, 521 U.S. 898, 922 (1997); *Morrison v. Olson*, 487 U.S. 654, 689–90 (1988); *Clinton v. Jones*, 520 U.S. 681, 712–13 (1997) (Breyer, J., concurring). A subordinate Executive officer cannot violate the President's duty to

faithfully execute the laws. To the extent Plaintiffs seek to challenge the other Federal Defendants' alleged attempt to undermine the statutes recognizing USAID, they cannot do so through the Take Care Clause, but must do so, if at all, through the APA, which in this case presents separate insurmountable obstacles for Plaintiffs.

Moreover, Plaintiffs' invocation of the Take Care Clause is particularly inappropriate as a mechanism to advance their own political and policy views. Their challenge must fail because the actions that they identify are discretionary in nature. For example, Plaintiffs challenge USAID's decision to reduce or cut funding for programs like clinics distributing HIV medication, soup kitchens in Khartoum, and rehydration salts to treat diarrhea in Zambia, *see* Compl. ¶ 23, but these are discretionary budgetary decisions made by the agency based on its experience and expertise. The discretionary nature of these programs makes them ill-suited for a Take Care Clause challenge because it is within the President's purview to interpret the statutory guidance Congress provides him as he sees fit in executing the duties of the executive branch.

### C. Plaintiffs Are Not Likely to Prevail on Their Administrative Procedure Act Claims (Counts III and IV).

Under the APA, the Court may set aside an agency action if the Court finds that challenged action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). The Court's review is "ultimately narrow and highly deferential" and focused on "ensur[ing] that the agency has 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action.'" *Am. Whitewater v. Tidwell*, 770 F.3d 1108, 1115 (4th Cir. 2014) (citations omitted). The agency need only "provide[] an explanation of its decision that includes a rational connection between the facts found and the choice made" to have its decision sustained. *Id.* (quoting *Ohio Valley Env't'l Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir.

2009)).  A court "is not to substitute its judgment for that of the agency."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Plaintiffs' APA claims are not likely to succeed here because (1) they do not allege any *agency* action, (2) they do not allege any *final* action, (3) an adequate alternative remedy is available to Plaintiffs, (4) Defendants have not exceeded their statutory authority, (5) Defendants have not acted contrary to law, and (6) Defendants have not acted arbitrarily and capriciously.

### 1. Plaintiffs Do Not Allege Any Agency Action.

Review under the APA is available only for "agency action."  5 U.S.C. § 704.  Presidential actions are not agency actions reviewable under the APA.  It is "well-settled" that Presidential action is not subject to review under the APA.  *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992) *Tulare Cnty. v. Bush*, 306 F.3d 1138, 1143 (D.C. Cir. 2002).  Because the President is not an "agency" under the APA, his actions cannot meet the APA's requirement of a "final agency action."  *Franklin*, 505 U.S. at 796; *Alexander v. Trump*, 753 F. App'x 201, 206 (5th Cir. 2018).

Because an executive order is a presidential action, and not an agency action, Plaintiffs' challenges to EO 14169 under the APA are not reviewable.  *See Louisiana v. Biden*, 622 F. Supp. 3d 267, 288 (W.D. La. 2022) (citation omitted) (holding that a challenge to EO 14008 "cannot be reviewed under the APA because the President is not an agency")*.*  Thus, Plaintiffs' claim that the President lacked authority to issue the EO, relied upon evidence which lacked veracity, and did not make appropriate findings are all non-cognizable under the APA.  *See id.*

Plaintiffs' challenge to the implementation of the EO likewise fails.  First, where the complaint is effectively seeking review of the President's action by suing an agency acting on behalf of the President, the agency actions are not reviewable under the APA.  *See Ancient Coin Collectors Guild v. CBP*, 801 F. Supp. 2d 383, 402 (D. Md. 2011) (concluding that where the Department of State was acting on behalf of the President, their actions were not reviewable under

the APA), *aff'd*, 698 F.3d 171 (4th Cir. 2012); *Detroit Int'l Bridge Co v. Canada*, 189 F. Supp. 3d 85, 100 (D.D.C. 2016) (noting that "several cases have concluded that an agency's action on behalf of the President, involving discretionary authority committed to the President, is 'presidential' and unreviewable under the APA" and concluding that the action by the Department of State on behalf of the President was unreviewable under the APA).  Second, Plaintiffs do not even so much as allege that either of the defendant agencies here—USAID and State—has taken any action that could specifically be redressed.  Rather, they level a broad programmatic challenge that is not suitable for APA adjudication.

Plaintiffs' challenge to the implementation of the EO likewise fails.  First, where the complaint is effectively seeking review of the President's action by suing an agency acting on behalf of the President, the agency actions are not reviewable under the APA.  *See Ancient Coin Collectors Guild.*, 801 F. Supp. 2d at 402 (concluding that where the Department of State was acting on behalf of the President, their actions were not reviewable under the APA), *aff'd*, 698 F.3d 171 (4th Cir. 2012).

Second, Plaintiffs do not even identify a concrete action that either of the defendant agencies here—USAID and State—has taken that could specifically be redressed by a federal court.  A plaintiff must plead "an identifiable action or event." *Lujan v. Nat'l Wildlife Fed'n.*, 497 U.S. 871, 899 (1990)*; Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004) (APA limits judicial review to "circumscribed, discrete agency actions").  These final agency actions must be "circumscribed [and] discrete." *Norton v. S. Utah Wilderness Alliance, (SUWA)*, 542 U.S. 55, 62 (2004).  The APA does not provide for "general judicial review of [an agency's] day-to-day operations," *Lujan*, 497 U.S. at 899, like "constructing a building, operating a program, or performing a contract," *Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs*, 714 F.3d 186,

193 (4th Cir. 2013) (cited approvingly in *Louisiana v. United States*, 948 F.3d 317, 321 (5th Cir. 2020)). The APA thus contains "a prohibition on programmatic challenges," meaning "challenges that seek 'wholesale improvement' of an agency's programs by court decree." *Alabama-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484, 490 (5th Cir. 2014) (quoting *Sierra Club v. Peterson*, 228 F.3d 559, 566 (5th Cir. 2000)).

Here, Plaintiffs' Complaint does not challenge a discrete agency action. Rather, Plaintiffs argue that "Agency Defendants' decision to shut down USAID constitutes final agency action and is thus subject to review by this Court. Agency Defendants' decision to dissolve USAID is evident from their actions laying off staff and contractors, halting foreign assistance funded by USAID, issuing stop work orders, closing down USAID headquarters, and taking down USAID's website." Pls.' Mot for TRO at 12. This is the exact type of broad programmatic challenge and supervision of an agency's day-to-day activities that courts have repeatedly ruled are impermissible under the APA.

### 2.  Plaintiffs Do Not Allege Any Final Action.

Agency action must be "final" to be reviewable under the APA. 5 U.S.C. § 704. Agency action is final only if two requirements are met. The agency action "must mark the consummation of the agency's decisionmaking process," and "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted). Plaintiffs argue that "[s]huttering the operations of USAID marks the end of the decisionmaking process by the Agency Defendants to dissolve USAID—a decision that includes the immediate halting of USAID programs and operations and the firing and furloughing of USAID employees and contractors." Pls.' Mot. for TRO at 12. But by definition, this pause of operations to permit "reviews of such programs for programmatic efficiency and consistency with United States foreign policy, to be conducted within 90 days of

this order," Exec. Order 14,169, cannot be a final decision.   Indeed, "[t]he responsible department and agency heads, in consultation with the Director of OMB, will make determinations within 90 days of this order on whether to continue, modify, or cease each foreign assistance program based upon the review recommendations, with the concurrence of the Secretary of State." *Id.*   In other words, the agency's decisionmaking process is ongoing—not consummated—and to the extent it one day manifests in a final agency action, that day would come, if at all, only following the review period.   The other consequences to the members of the plaintiff associations such as the placements on paid administrative leave are not ones involving the determination of rights or obligations. Administrative leave is not permanent, and those placed on leave continue to receive pay and have not been fired or told that they will be fired.   Plainly, there is no final agency action here.

### 3.   The APA Does Not Provide a Cause of Action Because an Alternative Adequate Remedy is Available to Plaintiffs.

Review under the APA is available only where "there is no other adequate remedy in a court."  5 U.S.C. § 704.  The requirement that a plaintiff have "no other adequate remedy in court," *id.*, reflects that "Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action," *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988).  As the D.C. Circuit has observed, "the alternative remedy need not provide relief identical to relief under the APA, so long as it offers relief of the 'same genre.'"  *Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009) (citation omitted).  Further, a remedy may be adequate even if "the arguments that can be raised [in the alternative proceeding] are not identical to those available in an APA suit."  *Elm 3DS Innovations LLC v. Lee*, No. 1:16–cv–1036, 2016 WL 8732315, at *6 (E.D. Va. Dec. 2, 2016).  If there exists an alternative adequate judicial remedy, a plaintiff lacks a cause of action under the APA.  *See Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 621 (D.C. Cir. 2017); *see also Versata Dev. Corp. v. Rea*, 959 F. Supp. 2d 912, 927 (E.D. Va. 2013) (dismissing

putative APA claim under Rule 12(b)(6) because decision at issue was not a final agency action and an alternative adequate remedy existed by way of appeal to the Federal Circuit).  As already described above in Section I.A.1, this is, in essence, an employment action, and there is a CSRA, FSL-MRS, or FSA remedy potentially available to Plaintiffs that is an adequate alternative. Plaintiffs are therefore barred from bringing this as an APA claim.

### 4. Defendants Have Not Exceeded Their Statutory Authority.

As explained above, the Court may set aside an agency action under the APA only if the Court finds that challenged action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A), (C).  Plaintiffs first argue that "[t]he decision to shut down USAID is in excess of the Agency Defendants' statutory jurisdiction, authority, and limitations" found in the Foreign Affairs Reform and Restructuring Act of 1998 and the Further Consolidated Appropriations Act of 2024.  Pls.' Mot. for TRO at 13.  These arguments are unfounded.

The Foreign Affairs Reform and Restructuring Act of 1998 (FARRA) in no way prevents Defendants from acting as they have done here.  Plaintiffs claim Defendants have exceeded their statutory authority by preventing USAID from operating as "an independent agency" and that "no statute or delegation of authority gives the Secretary of State, the Administrator of USAID, or any Agency Defendant the power to dissolve USAID."  *Id.*  These arguments appear to be borne out of a misunderstanding of the FARRA.  True, Section 1413 of the FARRA established USAID as an "independent establishment."  *See* 22 U.S.C. § 6563.  But "[f]or the purpose of this title, 'independent establishment' means (a) an establishment in the executive branch . . . which is not an Executive department, military department, Government corporation, or part thereof, or part of an independent establishment."  5 U.S.C. § 104.  In other words, USAID is "independent" in the

sense that it is not part of another executive branch agency, but it is still firmly within Executive Branch control. No court has ever read that to mean USAID must be independent from the President, or presidential supervision.

The Further Consolidated Appropriations Act of 2024 similarly grants the President reorganization authority under certain circumstances. Plaintiffs claim that Defendants violated the provisions of that act that provide that "neither the Department of State nor USAID may use any appropriated funds to 'implement a reorganization, redesign, or other plan . . . by the Department of State, [USAID], or any other Federal department, agency, or organization funded by th[at] Act without prior consultation by the head of such department, agency, or organization with the appropriate congressional committees.'" Pls.' Mot. for TRO at 14 (quoting Pub. L. No. 118-47 § 7063(a), 138 Stat. 460 (2024)). "The Act further requires that the congressional committees must be provided a 'detailed justification for any proposed action.'" *Id.* (quoting Pub. L. No. 118-47 § 7063(a)). Plaintiffs claim Defendants violated these provisions by failing to "consult with the appropriate congressional committees or provide them with a 'detailed justification' for shutting down USAID prior to implementing any reorganization, as the statute requires." *Id.* at 14–15. But in fact, as Plaintiffs even admit, Secretary Rubio notified Congress on February 3, 2025, of his "intent to initiate consultations with [Congress] regarding the manner in which foreign aid is distributed around the world through [USAID]." Marocco Decl., Ex. C., Letter from Sec'y of State (Feb. 3, 2025) at 2. And more specifically, Secretary Rubio noted that this review "may include, among other things, the suspension or elimination of programs, projects, or activities; closing or suspending missions or posts; closing, reorganizing, downsizing, or renaming establishments, organizations, bureaus, centers, or offices; reducing the size of the workforce at such entities; and contracting out or privatizing functions or activities performed by Federal

employees." *Id.* at 3. No further notice was required here, particularly because Defendants have made no final decision regarding reorganization and have simply paused operations to permit a review process to make those decisions. Defendants have therefore complied with the notice requirement. And, in any event, any issue pertaining to the adequacy of the notice is a political question. The provision is for the benefit of Congress, and it is up to Congress to determine whether it is satisfied—not the courts. If not, Congress has a number of constitutional tools at its disposal to push back on the Executive Branch. But the federal courts have no role in that back-and-forth; and this Court should not inject itself, superintending Congress's judgment about whether a given notice *really* is sufficient to pass muster. Instead, this is the precise sort of statutory condition that is not privately enforceable.

### 5. Defendants Have Not Acted Contrary to Law.

Plaintiffs next argue that "Agency Defendants' decision to shut down USAID is contrary to law," Pls.' Mot. for TRO at 17, for two reasons. First, Plaintiffs claim that agencies may only place employees on administrative leave for up to ten days pursuant to 5 U.S.C. § 6329a(b)(1). And second, they claim Defendants have violated the Prompt Payment Act, 31 U.S.C. § 3901 *et seq.*, and implementing regulations, requiring agencies to pay valid invoices by their contracted due date or within 30 days. Both are wrong. Although employees are generally placed on administrative leave for no more than ten days, the President's inherent Article II authority, which cannot be superseded by statute or regulations, permits him, acting through executive branch agencies, to place employees on paid administrative leave for such time as he deems appropriate.[4] This is particularly true in the realm of foreign affairs, where the President enjoys great latitude to craft policy and actions as he sees fit. *See supra* Section I.B.1.

---

[4] And again, Plaintiffs' members have a separate statutory scheme for bringing these types of challenges. *See supra* Section I.A.1.

And as to the Prompt Payment action, although Plaintiffs allege "Defendants have caused USAID to stop payments to contractors," Pls.' Mot. for TRO at 17, they do not claim that stoppage of payments violated any actual contracts, some of which provide that the Government may withdraw from its obligations if compliance is determined to no longer be in the national interest. Moreover, Federal Acquisition Regulation permits "[s]top-work orders [to be] used, when appropriate, . . . if work stoppage may be required for reasons such as . . . realignment of programs." FAR 42.1303.  And certainly, the Government could not have been more than thirty days late on any payments when Plaintiffs only allege it stopped making them on January 24, just seventeen days ago and with time to change course should the Government choose to do so.

### 6.  Defendants Have Not Acted Arbitrarily and Capriciously.

Plaintiffs further argue that Defendants acted arbitrarily and capriciously by failing to articulate a "satisfactory explanation for their decision to shut down USAID." Pls.' Mot for TRO at 15.  But again, Defendants have not "shut down USAID."  Defendants are free to place employees on paid administrative leave—a personnel question—without having to publicly articulate any reason for doing so.  And as already explained, the President's powers in the realm of foreign affairs as they relate to funding for various USAID initiatives are vast.  *See supra* Section I.B.1.  These are not actions reviewable under the APA in the first place, much less ones that are arbitrary and capricious.

Plaintiffs also wrongly argue that "[t]he decision to shut down USAID is also arbitrary and capricious because Agency Defendants failed to consider its harmful consequences." Pls.' Mot. for TRO at 16.  This argument fundamentally misunderstands that the entire reason for the pause in activity at USAID is to permit "reviews of such programs for programmatic efficiency and consistency with United States foreign policy, to be conducted within 90 days of this order" and "[t]he responsible department and agency heads, in consultation with the Director of OMB, will

make determinations within 90 days of this order on whether to continue, modify, or cease each foreign assistance program based upon the review recommendations, with the concurrence of the Secretary of State."  Exec. Order 14,169 § 3(a), (c).  President Trump and Secretary Rubio exercised their discretion to determine that it would not be possible to consider the consequences of various approaches in the absence of a temporary pause because "it is currently impossible to access sufficient information in one place to determine whether the foreign assistance policies and interests supported by appropriations are not duplicated, are effective, and are consistent with President Trump's foreign policy."  Marocco Decl., Ex. B. ¶ 2.

## II. PLAINTIFFS FAIL TO DEMONSTRATE THAT IRREPARABLE HARM WOULD RESULT IN THE ABSENCE OF A PRELIMINARY INJUNCTION.

The touchstone for injunctive relief "has always been irreparable harm."  *Sampson v. Murray*, 415 U.S. 61, 88 (1974) (quoting *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506 (1959)).  To that end, a court can deny a motion for preliminary injunctive relief if the movant fails to demonstrate irreparable harm, "even if the other three factors entering the calculus merit such relief."  *Full Gospel Churches*, 454 F.3d at 297.  To be irreparable, the threatened injury "must be both certain and great; it must be actual and not theoretical."  *Id.* (citation omitted).  And the injury must also be "beyond remediation."  *Id.*  The mere fact that a complaint alleges a violation of a constitutional right does not automatically demonstrate an irreparable injury.  *Ayele v. District of Columbia*, 704 F. Supp. 3d 231, 239 (D.D.C. 2023) ("[T]here is no per se rule that the violation of any constitutional right is inherently irreparable.").

First, Plaintiffs assert that Defendants' recall of foreign service officers to the United States is an irreparable injury.  Although Plaintiffs' claim that their members are subject to a "mandatory recall notice" that requires FSOs to repatriate within thirty days, Pls.' Mot. for a TRO at 18, personnel are not required to return to the United States within any specific deadline, Marocco

Decl. ¶ 23.  In fact, employees who are abroad, were given, and will be provided with, a choice to either stay at Post, or return to the United States.  *Id.*  Employees only must choose to make a decision to return to the United States within thirty days, and those who chose to return to the United States within that period will have their travel coordinated and financially covered by Defendants.  *Id.* ¶ 25.  But USAID also understands that employees may not be in a position to repatriate within thirty days, and to that end, it will grant case-by-case exceptions and offer extensions based on personal or family hardship, mobility or safety concerns, or other reasons.  *Id.* ¶ 26.  For example, the agency will consider exceptions based on the timing of dependents' school term, personal or familial medical needs, pregnancy, and other reasons. *Id.*

For these reasons, although the Court concluded that the expedited recalls could cause an irreparable injury for the potential damage done to "educational progress, physical safety, and family relations," TRO at 5, that finding was misplaced.  These areas are the exact considerations which Defendants will take into account in granting exemptions.  Marocco Decl. ¶ 26.  Plaintiffs thus cannot show "that they will suffer immediate and significant hardship in the absence of immediate judicial intervention."  *Church v. Biden*, 573 F. Supp. 3d 118, 136 (D.D.C. 2021) (quoting *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 50 (D.C. Cir. 1999); *see also Full Gospel Churches*, 454 F.3d at 297 (holding that to be irreparable, the threatened injury must be "certain" and "actual").

Next, Plaintiffs claim that the placement of their members on paid administrative leave constitutes an irreparable injury.  But typically, employment decisions, like a loss of employment, are only irreparable in "genuinely extraordinary situation[s]."  *Sampson*, 415 U.S. at 92 n.68.  Loss of income or reputation are not such extraordinary situations.  *See id.* at 89–92; *see also id.* at 92 n.68 (declining "to define in advance of their occurrence" what might constitute extraordinary

circumstances, but ruling out "insufficiency of savings or difficulties in immediately obtaining other employment . . . however severely they may affect a particular individual"). And this case does not present such a situation, where the employees are placed on *paid* administrative leave. *See, e.g.*, *Farris v. Rice*, 453 F. Supp. 2d 76, 79–80 (D.D.C. 2006) ("[C]ases are legion holding that loss of employment does not constitute irreparable injury"). Although Plaintiffs' claim that the "mass-termination of the USAID workforce" constitutes an extraordinary circumstance, Pls.' Mot. for TRO at 20, such a situation is not before the Court. And the placement on administrative leave itself cannot not present irreparable injury, especially where any incidental harms Plaintiffs' members' face from this action can be redressed through the CSRA or FSA. *See Sampson*, 415 U.S. at 92 n.68; *supra* Section I.A.1.

Finally, Plaintiffs argue that their members are irreparably injured by the loss of USAID's security apparatuses. Pls.' Mot. for TRO at 20. Although it is possible that an employee put on administrative leave will lose access to certain USAID systems,[5] USAID presently has no plan or proposal that an employee would be shut out from access to overseas security resources at a high-risk post. Marocco Decl. ¶ 27. Thus, there is no certain, irreparable injury. *Full Gospel Churches*, 454 F.3d at 297.

Nor has AFGE demonstrated irreparable injury. The organization asserts that it will "lose hundreds of members if the forecast drastic workforce reductions occur" and will be forced to "divert significant resources from other priorities to address pressing needs of its USAID employee members." Pls.' Mot. for TRO at 21. Because the question before the Court is only the placement of employees on administrative leave, AFGE's argument is of no moment. Accordingly, because

---

[5] This is necessary to ensure the security of internal systems and that the "pause" on agency operations can truly go into effect. Marocco Decl. ¶ 27.

Plaintiffs have failed to demonstrate an irreparable injury, the Court should deny their request for a preliminary injunction. *Full Gospel Churches*, 454 F.3d at 297.

### III. THE BALANCE OF EQUITIES (INCLUDING THE PUBLIC INTEREST) DOES NOT FAVOR A PRELIMINARY INJUNCTION.

An injunction also is not appropriate because the balance of the equities and the public interest tip in Defendants' favor. *See Nken*, 556 U.S. at 435 (holding that "[t]hese factors merge when the Government is the opposing party"). As an initial matter, given that Plaintiff cannot establish the first two factors necessary to obtain an injunction, "it is clear [it] cannot make the corresponding strong showings [on the second two factors] required to tip the balance in their favor." *Davis*, 571 F.3d at 1295.

But even if Plaintiff could satisfy one or both of those factors, the remaining factors weigh in Defendants' favor. *See Kim v. FINRA*, 698 F. Supp. 3d 147, 172 (D.D.C. 2023) ("[A] court can deny preliminary injunctive relief solely on the balance of equities and public interest factors even in cases, like this, involving constitutional claims."), *appeal dismissed*, 2025 WL 313965 (D.C. Cir. 2025). The public has an interest in permitting the President to take decisive action when it comes to foreign affairs. *Curtiss–Wright*, 299 U.S. at 319–20 (holding that foreign affairs fall within the "plenary and exclusive power of the President," as it is a "vast external realm, with . . . important, complicated, delicate and manifold problems"). Here, the President has determined that the "the United States foreign aid industry and bureaucracy are not aligned with American interests and in many cases antithetical to American values," and that such work "serve[s] to destabilize world peace by promoting ideas in foreign countries that are directly inverse to harmonious and stable relations internal to and among countries." *See* Exec. Order 14,169, § 1, Reevaluating and Realigning United States Foreign Aid (Jan. 20, 2025). A preliminary injunction would displace and frustrate the President's decision about how to best address that threat to

foreign affairs, and the Court must give deference to the Executive Branch's "evaluation of the facts" and the "sensitive and weighty interests of national security and foreign affairs," *Holder v. Humanitarian L. Project*, 561 U.S. 1, 33–34 (2010), including "the timing of those . . . decisions." *Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 74 n.28 (D.D.C. 2002), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003).  To be sure, Defendants are acting this quickly and decisively to gain control of an organization that included some employees who had refused to comply with lawful directives by the President and Secretary, directives designed to identify wasteful or fraudulent programs or those contrary to the foreign policy interests of the United States. *See* Marocco Decl. ¶ 9.  Because the public has an interest in the executive branch effectuating foreign affairs, this final factor tips in favor of Defendants.  The Court should deny Plaintiffs requested preliminary injunctive relief.  *See Kim*, 698 F. Supp. 3d at 172.

## IV. ANY PRELIMINARY INJUNCTION SHOULD BE NARROWLY TAILORED.

For all the foregoing reasons, it would be inappropriate for the Court to issue any preliminary injunction in any form.  However, should the Court choose to do so, "an injunction must be narrowly tailored to remedy the harm shown." *Gulf Oil Corp. v. Brock*, 778 F.2d 834, 842 (D.C. Cir. 1985).  Here, at most, Plaintiffs have attempted to show that "their members are facing irreparable injury from their placement on administrative leave."  TRO at 3.  As such, any preliminary injunction should apply no more broadly than a prohibition on placing a large number of USAID employees on simultaneous administrative leave.  While the Court may have believed the scope of the current TRO was appropriate as a very short-term stopgap measure, it would be overbroad if applied for any duration in two significant ways.  First, by preventing USAID from placing any employee on administrative leave for any reason whatsoever, it interferes with the day-to-day operations of an executive branch agency that should have available to it a full array of leave options.   Second, by preventing USAID from evacuating *any* employee from *any* host

country for *any* reason whatsoever, it impermissibly prevents USAID from conducting normal evacuations where necessary for routine purposes. Thus, the current TRO, if extended to a PI, would defy established principles barring equitable relief that is "more burdensome to the defendant[s] than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Instead, the Court should limit any preliminary injunctive relief to a bar on the simultaneous placement of nearly all USAID employees on administrative leave. And should the Court decide to issue any preliminary relief, the Government respectfully requests that the Court stay its order for a short time period to permit the Government to consider whether to appeal.

## CONCLUSION

For these reasons, the Court should deny Plaintiffs' motion for a preliminary injunction.

Dated: February 10, 2025                    Respectfully submitted,

                                            BRETT A. SHUMATE
                                            Acting Assistant Attorney General
                                            Civil Division

                                            ALEXANDER K. HAAS
                                            Director
                                            Federal Programs Branch

                                            LAUREN A. WETZLER
                                            Deputy Director
                                            Federal Programs Branch

                                            CHRISTOPHER R. HALL
                                            Assistant Branch Director
                                            Federal Programs Branch

                                            */s/ Christopher D. Edelman*
                                            CHRISTOPHER D. EDELMAN
                                            DOROTHY M. CANEVARI
                                            Trial Attorneys
                                            United States Department of Justice
                                            Civil Division, Federal Programs Branch
                                            1100 L St. NW
                                            Washington, DC 20005
                                            Phone:
                                            Email:

                                            *Counsel for Defendants*