## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN FOREIGN SERVICE ASSOCIATION, et al.,  *Plaintiffs*,  v.  DONALD TRUMP, et al.,  *Defendants*. | Civil Action No. 1:25-CV-352 |

## DECLARATION OF MARCUS DOE

I, Marcus Doe, declare the following under penalties of perjury:

1. I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2. I am a member of the American Foreign Service Association.

3. I am a USAID Foreign Service Officer assigned to USAID/Democratic Republic of the Congo in Kinshasa.

4. On January 20, 2025, the President of the United States issued an Executive Order imposing a 90-day "pause" on all U.S. foreign assistance. The scope of this Executive Order was unclear at first, given ambiguities and inconsistencies in the language used.

5. Beginning January 21, 2025, the first workday after the Executive Order was issued, USAID staff immediately set about determining how to interpret and implement the Executive Order. This effort continued zealously and in good faith

by all employees of USAID DRC that I was able to observe in Kinshasa and in the United States. I observed no instances of insubordination or opposition to efforts to implement the Order.

6.      Over the weekend of January 25–26, 2025, M23 rebels in eastern DRC took control of the city of Goma. Many Congolese citizens view western nations, including the United States, as having culpability for M23's ongoing war in eastern DRC. The fall of Goma led to rumors of protest in the capital city of Kinshasa the following week. On Monday, January 27, however, protests in Kinshasa were relatively limited.

7.      Over the course of the evening of Monday, January 27 in the DRC, dozens of USAID senior leaders were placed on administrative leave without notice or explanation and were cut off from USAID information systems. I learned of these actions first thing upon waking up and checking messages on January 28. I was deeply shaken by the sudden removal of nearly all USAID leadership without explanation. The Agency eventually issued a notice to all staff that these leaders were placed on administrative leave for allegedly circumventing Trump Administration Executive Orders. I have never read or heard of any specific allegations supporting this, nor have I ever seen anyone attempt to circumvent or subvert any of the January 20, 2025 Executive Orders.

8.      Given the minimal protests in Kinshasa on January 27, many U.S. Embassy staff, including me, prepared to go to the office the morning of Tuesday, January 28. Likewise, my children prepared to go to school. The children boarded the

school bus to go to school and I boarded the shuttle bound for the office. Each departed around the same time that morning, heading in different directions.

9. Shortly after leaving, the Embassy drivers received word that they should turn around and return employees back to their homes, as demonstrations began to form and the security situation near the U.S. Embassy began to deteriorate. Employees and children en route to their destinations were immediately returned home. All staff received messages through the Embassy's "SAFE Alert" system regarding the change in operational posture, and providing instructions to shelter in place. Some U.S. Embassy staff, including some from USAID, had already made it to work early, and could not leave the Embassy.

10. I continued to telework throughout the morning, focused primarily on understanding and implementing the foreign assistance "pause," while monitoring the Embassy-issued radios for information and instructions on security. At some point later that morning, I, along with others at USAID, learned via messages from another USAID employee that there were protesters outside his house setting fires and causing damage. He also described the situation over the radio.

11. Eventually, I heard this USAID employee describe over the radio that protesters had breached the gate of his home, and I heard him request an evacuation. I learned later that he and his family had been safely extracted from the situation by armed security working for the U.S. Embassy, but had lost all their belongings to looting. Videos of the looting of his home circulated on local social media. Shortly thereafter, around mid-day, I began to hear protesters chanting and shouting outside

the walls of my home. My children were playing outside, so I called them in, and my spouse and I set about locking all doors and gates of our home. We were scared. Mercifully, the protesters never attempted to breach our gate.

12. Within a few hours, Embassy leadership convened a meeting to discuss the security situation and determine whether the Embassy should evacuate and go on ordered departure, often referred to as "OD." Leadership determined in that meeting that we would evacuate and go on ordered departure, though a small number of staff would stay behind to maintain operations.

13. After learning of the impending ordered departure, I along with others from USAID/DRC communicated with colleagues in Washington about what was happening. My Washington colleagues were still reeling from the removal of multiple layers of leadership, and were unsure of who held what position.

14. I mentioned to these remaining Washington staff that the executive order pausing foreign assistance prevented USAID from obligating money to fund travel, and therefore USAID would be unable to fund the cost of the evacuation of its staff out of Kinshasa. Throughout the preceding week, USAID had been losing access to and control of its payment systems, as various standard payments for travel vouchers and cost of living allowances (COLA) were not successfully processed. It seemed that no one in Washington had yet considered the problem of funding the evacuation. It was unclear at the time who should have responsibility for resolving it, or what process existed for getting approval to spend money to save American lives. I began to worry that USAID staff would have to fund their own evacuations, and

communicated this concern to multiple Washington staff. I began to feel an intense sense of panic that my government might fully abandon Americans working for USAID in Kinshasa.

15. Washington staff, concerned that any spending not directly approved by then-acting Administrator Jason Gray would be met with accusations of subverting the executive order and swift retribution, determined that they needed to process a "waiver request" with approval from Acting Administrator Gray. Thankfully, the career staff took up this effort despite perceived risks that they may suffer retaliation for attempting to spend money to save lives. The Acting Administrator did not approve the waiver request until January 29, well after the evacuation had already begun.

16. Despite the lack of an approved waiver, USAID staff and their families participated in the evacuation from Kinshasa, and boarded small boats alongside friends and colleagues from other foreign affairs agencies to cross the Congo River to Brazzaville. Each individual was able to take only what would fit in their lap. For most families, this was one carry-on-sized bag per person. Staff remained in a hotel in Brazzaville for about two days before flying from Brazzaville to Dulles International Airport, landing in Dulles the afternoon of January 31.

17. By the time we landed in Dulles, news reports were swirling that President Trump and Elon Musk were actively planning to shutter USAID. While State Department and USAID staff welcomed us home and offered us food and warm clothing, we were being aggressively maligned by Musk and Trump as a "criminal

organization" composed of "marxists" who "hate America" that "needs to die." Musk bragged about missing parties to "feed USAID into the woodchipper." The President called USAID staff "radical lunatics;" both repeatedly and publicly asserted their intent to close the Agency.

18.   After landing in Dulles, all evacuees were allowed two nights in the airport hotel in which to figure out what we would do next. This involved figuring out where we would live, how we would get around, where our children would go to school, and all other aspects of daily life in the United States. This is a stressful endeavor under the best of circumstances, but for USAID families, we did not know whether we would ever receive the housing allowances and other support payments that would normally be owed to evacuated families, as we did not know how long our Agency would exist.

19.   To date we have still not received any of these payments, and USAID systems for processing and issuing such payments remain unavailable to USAID staff trained to use them. At the time of writing we have not yet even received the standard cost of living allowance (COLA) for Kinshasa that would normally have been paid to us weeks ago, before the evacuation.

20.   As part of the evacuation instructions, staff were informed they must locate in the Washington, DC area so they could go to the office for in-person work—a supposed priority for the Administration. While family members could separate and go to alternative safe haven locations, employees were mandated to appear in the office. However, on February 3, the first workday after we arrived in the United

States, the USAID building was closed to staff. As of the time of this writing, it has never reopened. Despite being forced to take on expensive DC-area leases and costs, USAID staff have never been allowed to go to the office. Again, despite significant efforts by USAID administrative staff, thus far no evacuation support payments have yet been made to anyone from USAID/DRC.

21. The evening of February 4, after most USAID/DRC staff had already taken on leases and made longer-term life decisions such as where children would attend school, all USAID staff received an email indicating they would be placed on administrative leave effective Friday, February 7. The unsigned email provided no reason for the decision nor any information on the longer-term implications. No one at USAID or the State Department could answer how this would affect eligibility for evacuation support payments. Even as of the morning of Friday, February 7, USAID evacuees did not know how they would live the next day.

22. For my part, I have taken on a month-to-month lease of a furnished 2-bedroom corporate apartment for my 4-person family. I will not be able to afford to continue this lease if I do not eventually receive evacuation support payments. If USAID is shuttered, I would lose those payments and my salary, and my family would have no home to live in and no income to procure one. We have already left nearly all our belongings in Kinshasa, save our four carry-on-sized suitcases. Even if those belongings were returned to us as part of the proposed mass repatriation of USAID Foreign Service Officers, we would have to pay to store them because we presently have no place to keep them.

23. The chaos of the Trump administration's haphazard and extra-Constitutional shutdown of USAID has caused my family and me immense emotional distress by contributing to the already intense sense of panic and uncertainty of the riots in Kinshasa. My family has left behind our home and all our belongings as a result of our service to the United States of America overseas, and we have been harassed through a combination of malignant, violent rhetoric and threats of financial ruin from the officials effecting this shutdown.

24. Trump administration officials have cut off my Agency's capacity to pay me what I am owed. I have undertaken significant costs and liabilities in good faith reliance on the government's obligations to my family and me for my service. These obligations, including Cost of Living Allowance (COLA), Special Evacuation Allowance (SEA), Meals and Incidental Expenses (M&IE), and hotel costs have not yet been paid or reimbursed, and it is unclear at the time of writing whether they will ever be paid. Despite my need to make long-term financial and other commitments regarding my life and lifestyle, the Agency that employs me makes unexplained short-term threats to my employment with no indication of any plan for what I can expect in the coming days, let alone in the coming months.

25. USAID/DRC staff are patriots who are proud of our service and have risked our lives and our family's lives to serve our country overseas in one of the most difficult environments on Earth. We deserve respect and dignity, or at least the payments promised to us for our sacrifices. To date, we have received none of those things.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 9, 2025.

/s/ *Marcus Doe*
Marcus Doe
