# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| AMERICAN FOREIGN SERVICE ASSOCIATION, et al., | ) ) ) ) | |
| *Plaintiffs*, | ) ) | Civil Action No. 1:25-CV-352 |
| v. | ) ) ) | |
| DONALD TRUMP, et al., | ) ) | |
| *Defendants*. | ) ) | |

## FURTHER DECLARATION OF RANDALL CHESTER

I, Randall Chester, declare the following under penalties of perjury:

1. My name is Randall Chester.

2. I am the Vice President of the American Foreign Service Association (AFSA) representing 1,980 Foreign Service Officer and 485 non-career Foreign Service Limited officers who work for the United States Agency for International Development (USAID).

3. AFSA is both the principal advocate for the long-term institutional wellbeing of the professional career Foreign Service and responsible for safeguarding the interests of AFSA members.

4. AFSA also seeks to increase understanding among the American people about the vital role of the U.S. Foreign Service in sustaining American global

leadership. AFSA exists to support the United States Foreign Service, which deploys worldwide to protect and serve America's people, interests and values.

5. AFSA provides support to its bargaining unit as the officially recognized union to represent the interests of the Foreign Service to USAID. This role is codified in the AFSA-USAID Cooperative Framework.

6. In this role, AFSA enters into negotiations with USAID on a wide range of personnel issues including: appointments, promotion standards, assignment processes, disciplinary actions, and leave among others. AFSA assists its members when facing allegations of misconduct, investigations by the Office of Inspector General, Office of Civil Rights, and the Office of Security. AFSA also supports its members in the event USAID fails to repay valid expenses, incorrectly applies or denies applicable benefits and allowances, or other discrepancies that arise between USAID and the officer.

7. Last week USAID sent a RECALL notice to 1,400+ USAID Foreign Service Officers (FSO) serving overseas. The notice provided no reasons for the recall, no timeline for its duration, and no explanation of expectations for the returned FSOs.

8. The notice directs all FSOs to return to the United States within 30 days. The notice allows for extension requests to be granted under special circumstances. However, it does not provide a process to initiate a request or suggest a method for how or who will approve each request.

9. This notice is devasting to FSOs and their families who will suffer undue emotional stress, mental anguish, financial hardships, and for some FSOs professional liabilities.

10. The emotional and mental anguish is already presenting itself. Since this notice was issued, AFSA has received well over 500 emails and phone calls looking for details, explanations, and reasons for the recall. Normally, USAID would have already answered and provided these details, but none have been given. FSOs have reported high stress levels, sleeplessness, and anxiety over the recall. Additionally, FSOs report that their children are experiencing the same stress and anxiety levels after being told that they were moving potentially mid-school year and with little or no time to adjust.

11. Financially, this abrupt recall will devastate the bank accounts of many FSOs. The Agency has yet to provide any details on which transfer allowances will be afforded to the returnees. Assuming that the FSOs are returning under Permanent Change of Station (PCS) orders, FSOs would be entitled to the following, among other things:

- Allowances
    - 60-90 days housing and meal allowance (for an "Ordered Departure" this allowance goes up to six months (i.e., 180 days))
    - Home Service Transfer Allowance (between $5,000-$7,500) estimated
    - Rental Car reimbursement
- Other Expenses Paid by USAID
    - Shipping of Household Effects (HHE)
    - Unaccompanied Baggage Allowance (UAB)
    - Personal Vehicle Shipment (POV)

12. At this time, FSOs are not certain if any of the above will be provided. The lack of information on what allowances will be afforded mean that FSOs could be out of pocket for tens of thousands of dollars for just the first few months. These expenses would normally be covered by USAID. Furthermore, at this time USAID has informed staff that travel reimbursements are halted. This exacerbates the problem for FSOs who may not know when or if they will ever be reimbursed for their expenses.

13. Additionally, a normal transfer window for a FSO is six to nine months. A FSO is usually informed of their onward assignment well in advance from the actual departure. This affords them the opportunity to sell personal items they wish not to take to their next residence or sell items that can't be exported. For example, many countries restrict the importation of used vehicles which means that FSOs buy and sell cars rather than export them. The abrupt move may lead to FSOs being unable to sell their vehicles at market value or take a loss as they may not be eligible or inappropriate for export to the U.S. For example, many countries have right hand drive and/or engine and emission standards lower than the U.S. making them non-road worthy. The rapid departure may increase financial losses to FSO.

14. While serving overseas, FSOs receive additional financial allowances. This includes Post Differential (5-25%), Hardship Pay (5-35%), Special Incentive Pay (15%), and host County Cost of Living Allowance (based on local currency cost of living and family size). These are percentages of a FSOs annual salary for a pay

period. The total of these allowances varies dramatically across countries for zero to 90% additional/bonus. Returning to the U.S. removes all these allowances and dramatic lowering of FSO salaries.

15. Many FSOs, likely the majority, have families. Often spouses work within the Embassy community as Eligible Family Members (EFM). EFMs provide vital support and professional services but are paid a sub-standard wage. Nonetheless, this added annual income of $30,000-$60,000 (estimates) will disappear as the FSO recall will force spouses of FSOs to terminate their employment. FSO families will be limited to that single income until the spouse is able to attain new employment in the US.

16. Finally, it is important to consider that this uncertainty makes it difficult for any decision regarding long-term housing. This raises the out-of-pocket costs for the FSO deciding to forgo purchasing a home versus remaining in a high-cost short term rental house.

17. The recall notice will also leave some FSOs vulnerable to professional liability claims. Some FSOs are "warranted" Contracting Officers (CO) and Financial Management Officers (FMO) are legally responsible for ensuring payments to providers are appropriate and accurate. They rely on other FSOs and foreign national staff (FSN) to confirm and verify service delivery. With no FSO or other staff working, the COs and FMOs have no way to legally approve payments for services prior to the stop work order issued two weeks ago. USAID has a variety of different contracting and grant mechanisms and USAID is responsible for

payment of all goods and services prior to when the stop work order was issued. Demands of repayment often come one to six months after the service is completed. If a CO or FMO does not pay a submitted receipt/voucher they can be held liable by the provider (note the prompt payment act requires payment within 30 days). The catch 22 for the CO and FMO is that they also cannot approve payment without verifying the services were delivered (often by a FSO or Foreign Service National) or be subject to an investigation by the Inspector General. This is a liability passed onto the FSO.

18. Because of this recall notice, some embassy/posts have already removed USAID FSOs from their internal security warning/alert systems and informed relevant host country ministries that USAID staff are not accredited diplomats with the U.S. government. This is added stress and legal jeopardy for FSOs. Without access to the embassy alert systems, FSOs and their families may miss critical weather, civil disobedience, or other safety notifications. Removing their diplomatic status may also result in the FSO having to pay "duty" on goods exported or sales of personal items adding to the above financial hardships.

19. Finally, we learned of reports that the administration plans to reduce the number of workers at USAID from more than 10,000 positions to just 290.[1] If this occurs, FSOs will necessarily be among those terminated, with catastrophic consequences to their careers, families, and finances.

---

[1] Karoun Demirjian and Aishvarya Kavi, *Trump Administration to Lay Off Nearly All of U.S. Aid Agency's Staff*, NEW YORK TIMES (Feb. 6, 2025), https://www.nytimes.com/2025/02/06/us/politics/usaid-job-cuts.html.

20. In sum, if the USAID shutdown is allowed to continue, it will result in a tremendous amount of undue and unwarranted financial, mental, and emotional stress on FSOs and their families. The potential professional liability jeopardies (discussed above) are unjust as FSOs will be prevented from performing their jobs with no recourse to prevent potential fraud or legally approve submitted payment vouchers. The mandatory recall is likewise punitive in nature given the unnecessary pace of the withdrawal. The recall by design serves only to harm the FSO and provides no real justification or path for a potential future return.  On its own, the recall puts FSOs, American citizens, in financial jeopardy that could take years to overcome. FSOs will experience even more devastating financial consequences if the administration moves forward with the reported plan to slash the workforce to 290 employes total. The shutdown of USAID is at its core inhumane.

21. The Recall Notice and placement or threatened placement of FSOs on administrative leave has also negatively impacted AFSA's ability to provide timely, accurate information to our members. AFSA normally receives approximately 50 emails a day from our members asking for assistance with a wide variety of employment-related issues. In the last two weeks, the volume of requests for assistance or information has exploded to 200 to 300 emails a day. Many of these emails ask very specific questions that we are simply not able to answer, due to both the sheer volume of emails and the lack of clear information provided by USAID.

22. AFSA has also had to spend a considerable amount of time updating its membership records to input private email addresses. AFSA estimates that, to date, it has had to update 500-600 member accounts in two different databases. Had we not done this, our members would not be able to receive the messages we have been sending out on a nearly daily basis.

23. AFSA also held two townhall meetings with over 1,000 participants where we explained existing legal protections should USAID attempt to summarily terminate their employment. Prior to the meetings, members submitted over 350 individual questions. Unfortunately, due to the volume of questions and the absence of clear guidance or information from USAID, we were not able to answer many of these questions.

24. The resources AFSA has had to expend in response to the Administration's actions have been diverted from AFSA's other activities. AFSA is the exclusive bargaining agent at five other foreign affairs agencies, with the Department of State being our largest bargaining unit. We represent over 17,000 members. Because so many resources have been diverted to addressing urgent issues at USAID, AFSA has not been able to devote adequate time to assist members at these other agencies or to deal with general labor management issues at these agencies.

25. AFSA strives to provide accurate and timely support to all of our members. We normally have been able to get back to members with clear answers to their questions within one or two days. The Administration's actions within the

past two weeks have made it impossible for AFSA to do this, which not only threatens our good reputation but leaves our members with little guidance during this incredibly stressful period.

26. To the best of my knowledge, none of the Agency leadership removed January 27 interfered with implementation of the pause (SWO) or other EOs. The assumption is that the multiple requests for clarification regarding the structure and information needed for the "review" process; or for clarity on the waiver process and status of any requests were seen as "obstructionist" when we (Agency career leadership) simply needed direction, definition, and guidance so we could properly implement the EOs. This term again will hurt FSOs seeking future work and having to justify years of employment at the Agency.

27. Individual reputational damage is already happening. Our members fear that the word "criminal" ascribed to USAID's work and workforce will taint association or prior employment with the Agency and make it extraordinarily difficult to find work (particularly if an individual served with USAID for years/decades) - every interview (if you even make it that far) will have to be opened with a defense of past work history, actions, and experience. Essentially these claims (by the Administration) will create a broad "blacklist" for any employees or others associated with the Agency as they seek new employment.

28. Further, the term "Insubordination" and similar assertions by Secretary of State Rubio are unfounded. None of the Agency leadership removed January 27 interfered with implementation of the pause (SWO) or other EOs. The

assumption is that the multiple requests for clarification regarding the structure and information needed for the "review" process; or for clarity on the waiver process and status of any requests were seen as "obstructionist" when we (Agency career leadership) simply needed direction, definition, and guidance so we could properly implement the EOs.

29. Many FSOs and FSLs fear that seeking new employment will now have to justify their careers with USAID. This will make finding new work difficult if not impossible for many long-term officials.

30. On Sunday, February 9 at 11:28 PM USAID personnel received the following message from the Office of the Administrator: "The former USAID headquarters at the Ronald Reagan Building in Washington, D.C., the USAID properties at the USAID Annex, 400 C Street, SW (formerly SA-44), the SEC Warehouse in Springfield, the Alternate Operating Facility in Leesburg, as well as 555 12th Street, NW, will remain closed until further notice. Agency personnel normally assigned to work at these USAID properties should telework, unless otherwise notified with a specific reporting time and location…."

31. AFSA has heard from several of its members whose work often involves classified information that can only be viewed or discussed in a Sensitive Compartmented Information Facility, known as a SCIF. The closure of all USAID facilities in the area means that these individuals do not have access to a SCIF and cannot perform their duties. This remains true regardless of whether their USAID network access is restored.

32. Per the Framework Agreement between USAID and AFSA, AFSA has a physical office at USAID headquarters in the Ronald Reagan Building in Washington, D.C. AFSA maintains sensitive files and data, to include documents protected by attorney-client privilege and union privilege. AFSA has not been afforded the opportunity to enter into the building, and its office, to retrieve these files. AFSA also has legitimate and reasonable concerns that non-authorized individuals may have accessed our office and our files.

33. At approximately 2:45 pm on Monday, February 10, 2025, I was notified, by USAID's Bureau for Management, Office of Management Services (M/MS), that they no longer have the lease for the Ronald Reagan Building and that all staff who were there on the morning of February 10th were moved. I was also informed that none of USAID's domestic leases are listed as USAID leased property in General Service Administration's systems.

34. In addition, on February 11, we received firsthand accounts from our members posted overseas advising that, despite the Temporary Restraining Order, they were being encouraged to fill out paperwork to evacuate to the United States, and "departure rooms" were being set up to facilitate departures.

35. We also learned on February 11 that all USAID staff who were enrolled in various types of training, including language training, at the National Foreign Affairs Training Center in Arlington, Virginia, had been disenrolled.

Executed on February 11, 2025

/s/ *Randall Chester*
Randall Chester