**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| American Foreign Service Association, et al., | : | |
| Plaintiffs, | : | |
| | : | Case No. 1:25-cv-00352 |
| v. | : | |
| President Donald J. Trump, et al., | : | |
| Defendants. | : | |

**REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS'
<u>MOTION FOR PRELIMINARY INJUNCTION</u>**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................1

BACKGROUND ........................................................................................................1

ARGUMENT ..............................................................................................................4

   I.  PLAINTIFFS HAVE STANDING TO CHALLENGE DEFENDANTS' UNLAWFUL DISSOLUTION OF USAID. ........................................................................................ 4

  II.  PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS...................................... 6

    A.  This Court has jurisdiction over Plaintiff's claims, which do not challenge individual personnel actions. ........................................................................................ 6

    B.  The President and other Defendants violated the Constitution by unilaterally shutting down an agency created by Congress.......................................................................... 10

    C.  Agency Defendants' decision to shut down USAID is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. .................................................. 16

  III. WITHOUT A TEMPORARY RESTRAINING ORDER, PLAINTIFFS, THEIR MEMBERS, AND COUNTLESS OTHERS WILL BE IRREPARABLY HARMED..... 23

  IV. THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST WEIGH IN PLAINTIFFS' FAVOR. .................................................................................................. 26

CONCLUSION..........................................................................................................28

# TABLE OF AUTHORITIES

**Cases**

*Am. Fed. of Govt. Emps., AFL-CIO v. Trump*, 929 F.3d 748  (D.C. Cir. 2019)................. 9

*Am. Forest Res. Council v. United States*, 77 F.4th 787 (D.C. Cir. 2023) ...................... 15

*Arch Coal, Inc. v. Acosta*, 888 F.3d 493 (D.C. Cir. 2018).................................................. 9

*Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015) ..................................... 12

*Associated Gen. Contractors of Am. v. U.S. Dep't of Lab.*, No. 5:23-CV-0272-C,
    2024 WL 3635540 (N.D. Tex. June 24, 2024) ............................................................ 14

*Axon Enter., Inc. v. Fed. Trade Comm.*, 598 U.S. 175 (2023).......................................... 7

*Bennett v. Spear*, 520 U.S. 154 (1997) ............................................................................ 18

*Carpenters Indus. Council v. Zinke*, 854 F.3d 1 (D.C. Cir. 2017)..................................... 5

*Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996)................................. 16

*Christensen v. Harris Cnty.*, 529 U.S. 576 (2000)........................................................... 12

*Citizens for Resp. & Ethics in Washington v. Trump*, 302 F. Supp. 3d 127 (D.D.C.
    2018) ............................................................................................................................ 14

*Clinton v. City of New York*, 524 U.S. 417 (1998)........................................................... 11

*Crowley Caribbean Transp., Inc. v. Pena*, 37 F.3d 671 (D.C. Cir. 1994)....................... 14

*Dalton v. Specter*, 511 U.S. 462 (1994)........................................................................... 15

*Detroit Int'l Bridge Co. v. Gov't of Canada*, 189 F. Supp. 3d 85 (D.D.C. 2016)............ 17

*Endo Par Innovation Co., LLC v. Becerra,* No. CV 24-999, 2024 WL 2988904
    (D.D.C. June 10, 2024) ................................................................................................ 26

*Feds for Med. Freedom v. Biden*, 63 F.4th 366 (5th Cir.) ................................................. 8

*Florida v. United States*, No. 3:21CV1066-TKW-EMT, 2022 WL 2431414 (N.D.
    Fla. May 4, 2022)......................................................................................................... 14

*Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905 (D.C. Cir. 2015).............................. 5

*Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477 (2010)............ 14

*Holder v. Humanitarian L. Project*, 561 U.S. 1 (2010) ..................................................... 27

*Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57 (D.D.C. 2002) ........................................................................................................................... 27

*Hunter v. United States*, 36 Fed. Cl. 257 (1996)................................................................. 8

*INS v. Chadha*, 462 U.S. 919 (1983) ................................................................................. 11

*Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*, 477 U.S. 274 (1986) ......................................................................................................... 6

*Ipsen Biopharmaceuticals, Inc. v. Azar*, 943 F.3d 953 (D.C. Cir. 2019)......................... 17

*Jarkesy v. SEC*, 802 F.3d 9 (D.C. Cir. 2015) ................................................................... 10

*Kendall v. U.S. ex rel. Stokes*, 37 U.S. (12 Pet.) 524 (1838) ..................................... 11, 14

*Lamb v. Holder*, 82 F. Supp. 3d 416 (D.D.C. 2015)........................................................... 8

*League of Women Voters of the United States v. Newby*, 838 F.3d 1, 75 (D.C. Cir. 2016) ............................................................................................................................... 26

*Mach Mining, LLC v. EEOC*, 575 U.S. 480 (2015)............................................................ 7

*Marbury v. Madison*, 5 U.S. 137 (1803)...................................................................... 16, 22

*Marin Audubon Soc'y v. Fed. Aviation Admin.*, 121 F.4th 902 (D.C. Cir. 2024)............. 11

*Medellin v. Texas*, 552 U.S. 491 (2008) ..................................................................... 11, 13

*Morrison v. Olson*, 487 U.S. 654  (1988) ......................................................................... 15

*Nat'l Env't Dev. Ass'n's. Clean Air Project v. EPA*, 752 F.3d 999 (D.C. Cir. 2014) ............................................................................................................................... 19

*Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004) .................................................... 17

*Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017) ............................ 27

*Payne v. Biden*, 62 F.4th 598 (D.C. Cir. 2023)................................................................. 10

*Raleigh & Gaston R. Co. v. Reid*, 80 U.S. (13 Wall.) 269  (1872).................................... 12

*Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d
   726 (D.C. Cir. 2003) ................................................................ 20

*Sackett v. EPA*, 566 U.S. 120 (2012) ................................................ 18

*Salinas v. United States R.R. Ret. Bd.*, 592 U.S. 188 (2021) .............................. 7

*Soundboard Ass'n v. FTC*, 888 F.3d 1261 (D.C. Cir. 2018) .......................... 19

*Sw. Airlines Co. v. U.S. Dep't of Transp.*, 832 F.3d 270 (D.C. Cir. 2016)..................... 19

*tates v. Newby*, 838 F.3d 1, 75 (D.C. Cir. 2016)........................................ 24, 26

*Thompson v. Pope*, 397 F. Supp. 2d 28 (D.D.C. 2005) ................................ 8

*Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1998).................................. 7

*U.S. Air Tour Ass'n v. F.A.A.*, 298 F.3d 997 (D.C. Cir. 2002) ........................ 19

*United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544
   (1996) ............................................................................ 6

*United States v. Texas*, 577 U.S. 1101 (2016) .................................... 14

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) (Jackson, J.,
   concurring) ................................................................ 11, 12, 13

*Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1 (2015)................................ 13

**Statutes**

22 U.S.C. § 6563 ............................................................ 1, 11, 20

22 U.S.C. § 6601 ................................................................ 12, 20

31 U.S.C. § 3901 ................................................................ 22

5 U.S.C. § 6329a(b)(1)........................................................... 22

Pub. L. 118-47 § 7063(a), 138 Stat. 460 (2024) .................................... 2, 20, 21

**Other Sources**

@realDonaldTrump, Truth Social (Feb. 7, 2025, 9:31 AM ET),
   https://truthsocial.com/@realDonaldTrump/posts/113963085497636545 ............... 1, 2

DOGE (@DOGE), X (Feb. 7, 2025, 3:19 PM ET),
   https://x.com/DOGE/status/1887959408555995416 ...................................................... 3

Ellen Knickmeyer, *USAID staffers turned away from offices even after court
   suspends leave order*, AP News (Feb. 10, 2025),
   https://www.pbs.org/newshour/politics/trump-administration-takes-usaid-off-
   its-building-lease .................................................................................................... 3

Garrett Haake (@GarrettHaake), X (Feb. 7, 2025, 6:20 PM ET),
   https://x.com/garretthaake/status/1888004979698376963 ............................................ 3

Laura Barrón-López (@lbarronlopez), X (Feb. 7, 20205, 1:04 PM ET),
   https://x.com/lbarronlopez/status/1887925417773859268 ............................................ 3

Reorganization Plan and Report Submitted by President Clinton to the Congress
   on December 30, 1998, Pursuant to Section 1601 of the Foreign Affairs
   Reform and Restructuring Act of 1998, as Contained in Pub. L. 105-277,
   https://tinyurl.com/48kthcr8 ....................................................................................... 2

Robbie Gramer et al., *As USAID retreats, China pounces*, Politico (Feb. 10,
   2025), https://tinyurl.com/4vtyarbh .............................................................................. 29

Thalia Beaty, *Volunteers are now tracking what's already been lost in the USAID
   freeze*, AP News (Feb. 10, 2025) https://apnews.com/article/usaid-foreign-aid-
   freeze-international-development-325c807f4f3930adbaa5c42dfef69c69# ................ 18

U.S. Agency for Int'l Dev., Off. of Inspector Gen., *Oversight of USAID-Funded
   Humanitarian Assistance Programming Impacted by Staffing Reductions and
   Pause on Foreign Assistance* (Feb. 10, 2025),
   https://tinyurl.com/3bj8m5az ....................................................... 2, 3, 4, 18

U.S. Const., art. II § 3 ..................................................................................................... 13

## INTRODUCTION

Defendants have—over the course of mere weeks—eviscerated an entire federal agency, in contravention of the Constitution and federal law. They have done so methodically. First, they froze federal foreign assistance and issued stop work orders to contractors and grantees, hobbling USAID's partner organizations that perform work for the agency across the world. Next, they abruptly put thousands of employees on administrative leave, cutting off access to their computer systems and leaving them vulnerable to security threats abroad.

Even in the handful of days since the parties were last before the Court, Defendants have escalated their shutdown efforts. Defendants' intent to rapidly and irreversibly dismantle the agency, absent Congressional authorization, and without the opportunity for this Court to adjudicate the lawfulness of their actions on the merits, is apparent. Indeed, they have said it themselves: "CLOSE IT DOWN!"[1] These actions contravene the Constitution and statutes circumscribing Defendants' authority, cause irreparable harm to Plaintiffs and their members, and significantly impair the public interest. The Court should grant a preliminary injunction.[2]

## BACKGROUND

USAID was created in 1961 by President John F. Kennedy. Congress later codified USAID in statute in the Foreign Affairs Reform and Restructuring Act of 1998 as an independent agency outside the Department of State.[3] And President Clinton confirmed later that

---

[1] @realDonaldTrump, Truth Social (Feb. 7, 2025, 9:31 AM ET), https://truthsocial.com/@realDonaldTrump/posts/113963085497636545.

[2] On February 7, 2025, Plaintiffs filed an application for a temporary restraining order. ECF No. 9. The Court's Order of February 7, 2025, granted in part the TRO and converted Plaintiff's application into a motion for preliminary injunction. ECF No. 15 at 7.

[3] "[T]here is within the Executive branch of Government the United States Agency for International Development." 22 U.S.C. § 6563.

1

"USAID will remain a distinct agency with a separate appropriation."[4] Since the Foreign Affairs Reform and Restructuring Act of 1998, Congress has repeatedly appropriated funds for USAID as an independent agency, including in the recent Further Consolidated Appropriations Act, 2024 ("Appropriations Act").[5]

Defendants now seek to dismantle the agency, without Congressional authorization, in violation of the Constitution and federal statutes, through placing both direct hire employees and personal services contractors (PSCs) on administrative leave en masse, shuttering offices, freezing funding, and terminating grants and contracts.[6] Despite Deputy Administrator Marocco's suggestion that the agency had implemented Secretary Rubio's waiver for "life-saving humanitarian assistance programs," USAID workers report that the uncertainties as to the scope of the waivers, coupled with the slashing of staffing and blocking of access to programs, has made these theoretical waiver programs close to useless.[7]

At 9:31 am on Friday, February 7, Defendant Trump posted on Truth Social, with respect to USAID: "CLOSE IT DOWN!"[8] Later on Friday, USAID signage was removed from its D.C.

---

[4] Reorganization Plan and Report Submitted by President Clinton to the Congress on December 30, 1998, Pursuant to Section 1601 of the Foreign Affairs Reform and Restructuring Act of 1998, as Contained in Pub. L. 105-277, https://tinyurl.com/48kthcr8.

[5] Pub. L. 118-47 § 7063(a), 138 Stat. 460 (2024).

[6] *See* Complaint, ECF No. 1; Notice of Correction (Feb. 10, 2025), ECF No. 21; Decls. of Thomasina, Ulysses, Walter, and Xavier.

[7] See, e.g., U.S. Agency for Int'l Dev., Off. of Inspector Gen., Oversight of USAID-Funded Humanitarian Assistance Programming Impacted by Staffing Reductions and Pause on Foreign Assistance (Feb. 10, 2025), https://tinyurl.com/3bj8m5az, at 1–3 (hereinafter "USAID OIG Report").

[8] Donald Trump (@realDonaldTrump), Truth Social, *supra* note 1.

headquarters[9] while other signage referencing the agency was covered with black duct tape.[10] White House representatives reported the building's lease would be taken over by Customs and Border Protection.[11] USAID employees received communications on Sunday, February 9, providing notice that "the former USAID headquarters" were closed until further notice.[12] Employees who reported to work were turned away.[13]

Meanwhile, Defendants have continued to terminate contracts at a breakneck speed. A reported 800 contracts have been terminated,[14] with procurement teams reportedly subject to hourly checks on the speed of executing on these terminations.[15]

Yesterday, the USAID Office of the Inspector General issued a report detailing how Defendants' actions have wasted taxpayer dollars and imperiled the safety and security of Americans. Among other examples, the Inspector General describes that USAID staff who engage in "partner vetting"—a "risk-mitigation tool" aimed at "ensur[ing] that American taxpayer funds do not benefit terrorists and their supporters"—have been told not to report to work because they have been furloughed or placed on administrative leave.[16] The Inspector

---

[9] DOGE (@DOGE), X (Feb. 7, 2025, 3:19 PM ET), https://x.com/DOGE/status/1887959408555995416.

[10] Laura Barrón-López (@lbarronlopez), X (Feb. 7, 20205, 1:04 PM ET), https://x.com/lbarronlopez/status/1887925417773859268.

[11] Garrett Haake (@GarrettHaake), X (Feb. 7, 2025, 6:20 PM ET), https://x.com/garretthaake/status/1888004979698376963.

[12] Ellen Knickmeyer, *USAID staffers turned away from offices even after court suspends leave order*, AP News (Feb. 10, 2025), https://www.pbs.org/newshour/politics/trump-administration-takes-usaid-off-its-building-lease.

[13] *Id.*

[14] Karoun Demirjian and Aishvarya Kavi, *Trump Administration to Lay Off Nearly All of U.S. Aid Agency's Staff*, N.Y. Times (Feb. 6, 2025), https://www.nytimes.com/2025/02/06/us/politics/usaid-job-cuts.html.

[15] Atul Gawande (@agawande.bsky.social), Bluesky (Feb. 10, 2025, 9:23 AM ET), https://bsky.app/profile/agawande.bsky.social/post/3lhtdubyjv22j.

[16] USAID OIG Report at 3–4.

General concluded that "[t]his gap leaves USAID susceptible to inadvertently funding entities or salaries of individuals associated with U.S.-designated terrorist organizations" such as Hamas, Hezbollah, ISIS, and Ansar Allah.[17] The Inspector General also wrote that USAID had nearly a half-billion dollars' worth of emergency food aid positioned in ports, transit, and warehouses at the time Defendants began to dismantle the agency.[18] Because USAID implementers faced "conflicting instructions" from Defendants, and USAID staff were muzzled from "providing clarifying guidance" to those implementing partners, that food is now "at risk of spoilage, unanticipated storage needs, and diversion."[19]

## ARGUMENT

## I.    PLAINTIFFS HAVE STANDING TO CHALLENGE DEFENDANTS' UNLAWFUL DISSOLUTION OF USAID.

Defendants assert that Plaintiffs lack standing for the relief they seek. Defs. Resp. Br. at 19 (Feb. 10, 2025), ECF No. 20. But this Court should start with what Defendants do not contest: Plaintiffs' numerous allegations of impending irreparable injury to their members and themselves stemming from the administrative leave and expedited evacuation orders. Those injuries include looming threats to physical safety, Mem. Supp. TRO ("TRO Brief") at 20, 22 (Feb. 7, 2025), ECF No. 9-1; Decl. of Marcus Doe ¶ 10–11; Decl. of Olivia Doe ¶ 4; disruption to the education of their children, ECF No. 9-1. at 18–10; Decl. of Olivia Doe ¶¶ 4, 6; the loss of employment under extraordinary circumstances, ECF No. 9-1 at 18–20; loss of employment's accompanying benefits, such as homes, health insurance, and pensions, ECF No. 9-1 at 20; Decl. of Marcus Doe ¶¶ 18, 22; Decl. of Sarah Doe ¶¶ 5, 8; Decl. of Wanda Doe ¶¶ 4–5, 7; loss of

---

[17] *Id.* at 4.
[18] *Id.* at 3.
[19] *Id.*

familial income as whole families are repatriated, *see* ECF No. 9-1 at 19; Decl. of Olivia Doe ¶ 7; Decl. of Ruth Doe ¶ 5; Decl. of Sarah Doe ¶ 10; Decl. of Wanda Doe ¶ 7; loss of property, Decl. of Marcus Doe ¶¶ 10–11, 22–23; Decl. of Nancy Doe ¶ 6; Decl. of Nathan Doe ¶¶ 4–6; Decl. of Olivia Doe ¶ 8; Decl. of Ruth Doe ¶ 4; Decl. of Wanda Doe ¶ 7; and, for the Unions, loss of members and drained resources, ECF No. 9-1 at 21. These are textbook Article III injuries that are sufficient for standing on Plaintiffs' administrative leave and expedited evacuation claims. *See* ECF No. 15 at 3–4. The Court thus need go no further to reject Defendants' standing argument.[20]

Nonetheless, Defendants, seeking to divide Plaintiffs' claim of unlawful dissolution of a statutorily authorized agency into smaller pieces, argue that Plaintiffs lack standing to challenge the freezing of USAID funds. *See* Defs. Resp. Br. at 21, 22 (Feb. 10, 2025), ECF No. 20. Plaintiffs' members, however, are injured by the funding freeze as they have not been, and will not be, reimbursed for their work expenses. Decl. of Jane Doe ¶ 21, ECF No. 9-10; Decl. of Carol Doe ¶ 6, ECF No. 9-12; Decl. of Marcus Doe ¶ 24; Decl. of Nancy Doe ¶ 6; Decl. of Olivia Doe ¶ 8; Decl. of Ruth Doe ¶ 5; *see Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017)

---

[20] To the extent Defendants purport to address concerns as to the Unions' Article III standing, they do so only in the context of the "pause in funding." Defs. Resp. Br. at 21. But Plaintiffs can demonstrate that Defendants' conduct has "perceptibly impaired" their ability to provide services, *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015), and that they have exerted abnormal resources to counteract the resulting harm, *id.* at 920 (citations omitted). AFGE stands to lose hundreds of members if the workforce reductions occur and will be required to divert significant resources to address the needs of its USAID employee members. TRO Brief at 21, ECF No. 9-1 (Feb. 7, 2025). AFSA has submitted a new declaration stating that it has already expended time and money addressing the crisis at USAID instead of on other union matters, all to the detriment of its thousands of other workers. Further Decl. of R. Chester, ¶¶ 21–24. Plaintiffs are not "spending [their] way" into standing, Defs. Resp. Br. at 22 (internal quotation marks and citations omitted); they are exhausting resources to combat the harms they and their members face as USAID dissolves.

(noting that a "dollar of economic harm is still an injury-in-fact for standing purposes" (citations omitted)). The funding freeze has also affected policies around pregnancy-related medevacs, causing emotional harm and, in at least one case, life-threatening medical complications. Decl. of Vanessa Doe ¶¶ 5-7. There is "little question" that concerns about the financial well-being of their members are germane to the Unions' purposes. *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*, 477 U.S. 274, 286 (1986). And no individual participation is required in this lawsuit. *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546 (1996).

## II.  PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

### A.  This Court has jurisdiction over Plaintiff's claims, which do not challenge individual personnel actions.

Defendants attempt to shoehorn this case into three different statutory schemes created to resolve federal workers' personnel disputes. But none of these shoes fit. Plaintiffs' claims, which challenge a sweeping scheme to dismantle an entire agency, fall outside these specialized statutory frameworks, all of which focus on individualized employment matters. Moreover, relegating Plaintiffs' claims to these slow-moving administrative processes would deprive them of meaningful judicial review where the agency that currently employs their members will, without swift court intervention, soon cease to exist. And neither the Federal Labor Relations Authority ("FLRA"), the Merit Systems Protection Board ("MSPB"), nor the Foreign Service Grievance Board ("FSGB") have the capacity or expertise to handle the Constitutional claims of USAID's entire multi-thousand-person workforce simultaneously—nor would many members of that workforce even be able to avail themselves of those agencies' protections. For all of these reasons, Defendants' channeling arguments fail.

6

1.  ***None of the statutory schemes invoked by Defendants apply to Plaintiffs'
    claims.***

In light of the "strong presumption favoring judicial review," Defendants bear a "heavy

burden" of showing that any of the statutes they invoke—the Federal Service Labor–

Management Relations Statute, the Civil Service Reform Act, or the Foreign Service Act—

foreclose judicial review. *See, e.g., Salinas v. United States R.R. Ret. Bd.*, 592 U.S. 188, 196

(2021) (citing *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 486 (2015)); *Thunder Basin Coal Co.

v. Reich*, 510 U.S. 200, 207, 212 (1998) (stating that preclusive intent must be "fairly

discernible" from the statutory scheme, and the claims at issue must be "of the type Congress

intended to be reviewed"). Here, while the FSLMRS, MSPB, and FSGB all supplant federal-

court jurisdiction in the fields they occupy, Plaintiffs' claims fall outside those fields. *See Axon

Enter., Inc. v. Fed. Trade Comm.*, 598 U.S. 175, 186 (2023) ("The ultimate question is how best

to understand what Congress has done—whether the statutory review scheme, though exclusive

where it applies, reaches the claim in question.").

The FSLMRS provides a scheme for resolving disputes between labor unions and the

federal agencies with whom they have collectively bargained. But that scheme does not apply to

most of the defendants here, who did not bargain with either plaintiff union. The only defendant

that did so bargain, USAID itself, will, if Defendants' scheme succeeds, not exist as an

independent entity for much longer, thus bringing this dispute outside the FLRA's jurisdiction.

The CSRA likewise does not apply here for two reasons. First, AFSA and AFGE

challenge Defendants' actions for causing them organizational harm separate from any adverse

personnel actions that have been taken or will be taken against individual union members. Decl.

of Ottis Johnson, Jr., ¶¶ 6-8, ECF No. 9-3; Further Decl. of R. Chester ¶¶ 21–25 (describing

injuries to AFSA). Second, Plaintiffs' complaint alleges violation of the separation of powers

doctrine and that Defendants, including the president, have exceeded their authority. These constitutional claims fall outside of the MSPB's province. *See, e.g., Lamb v. Holder*, 82 F. Supp. 3d 416, 423 (D.D.C. 2015) (collecting cases recognizing that constitutional claims by federal workers could be heard in federal court notwithstanding the CSRA). And the types of harms Plaintiffs' members are suffering and risk in the future as a result of Defendants' actions—threats to their physical safety, family instability and developmental setbacks for children due to a hasty forced evacuation, and disruptions to pregnancy-related medevacs due to a chaotic funding freeze—are not employment-related harms that the MSPB can remedy.

Moreover, it is not "fairly discernable," to put it mildly, that Congress intended the wholescale elimination of an agency to be addressed by the FSGB. That board's "fundamental grievance procedures" are well suited to individualized labor and employment actions. *See Thompson v. Pope*, 397 F. Supp. 2d 28, 34 (D.D.C. 2005) (addressing employer's investigation into an individual's private life); *Hunter v. United States*, 36 Fed. Cl. 257, 259 (1996) (challenging individual's entitlement to participation in a career program, in turn affecting pension rights). Here, where mass placements on administrative leave are but one tool in a larger campaign to unilaterally restructure USAID, the FSGB's individualized grievance procedures are not implicated.

Because none of these administrative schemes apply to Plaintiffs' claims, the *Thunder Basin* analysis can end there. *See Feds for Med. Freedom v. Biden*, 63 F.4th 366, 379 (5th Cir.), *judgment vacated as moot*, 144 S. Ct. 480 (2023). But should this Court consider the second step of *Thunder Basin*, that analysis too supports federal-court jurisdiction.

> **2.** *Only this Court can provide meaningful review, and the agencies lack the capacity or expertise to handle claims on such a large scale.*

Even when an administrative review scheme applies to a given claim and would ordinarily strip a federal court of jurisdiction, the court may choose to exercise jurisdiction anyway if 1) "a finding of preclusion could foreclose all meaningful judicial review"; (2) the claim is wholly collateral to the statutory review provisions; and (3) the "claim[] [is] beyond the expertise of the agency." *Arch Coal, Inc. v. Acosta*, 888 F.3d 493, 500 (D.C. Cir. 2018). Here, all three of these factors weigh in favor of federal jurisdiction, with the first factor doing so most strongly.

Some of the statutory schemes Defendants cite eventually allow for judicial review, such as the MSPB, which allows for appeal to the Federal Circuit. But by the time Plaintiffs' claims wind their way through the administrative process to reach a federal appeals court, even if their claim were successful, there would likely be no agency left to reinstate them. This situation does not present a mere choice between a preferred pre-enforcement challenge or mounting the same challenge later "in the context of concrete bargaining disputes." *Am. Fed. of Govt. Emps., AFL-CIO v. Trump*, 929 F.3d 748, 759 (D.C. Cir. 2019). Here, by contrast, only a limited time window exists in which these actions can be challenged at all, and the administrative forums cannot act with the needed dispatch. Only this Court can provide the relief Plaintiffs seek: halting the dissolution of USAID before it becomes irreversible.

Second, Plaintiffs' claims are wholly collateral to the applicable statutory review provisions. As the D.C. Circuit has explained, a claim is not collateral if it "serve[s] as the 'vehicle by which [the plaintiffs] seek[] to reverse' the adverse employment action." *Payne v. Biden*, 62 F.4th 598, 606 (D.C. Cir. 2023) (quoting *Jarkesy v. SEC*, 802 F.3d 9, 23 (D.C. Cir. 2015)). Unlike in *Payne*, where the plaintiff challenged the lawfulness of the vaccine mandate because of its impact on his continued employment, here Plaintiffs would be harmed by

Defendants' illegal actions in moving to shut down USAID, even if these actions had no effect on their employment.[21] Thus, the claims are collateral to the agencies' review procedures.

Finally, the agencies have no particular expertise that makes them better able to handle the claims at issue than this Court would be. If anything, the individualized nature of proceedings before these administrative forums make them a particularly poor fit for the sort of mass action taking place here, which affects virtually the entire USAID workforce. And the agencies have no jurisdiction whatsoever over large swaths of that workforce—the personal services contractors (PSCs), who are identically situated to direct hires in the harms they face from Defendants' actions but who lack FLRA, MSPB or FSGB protections. *See* Further Decl. of Jane Doe ¶¶ 3–6. In short, this Court is the only forum that can provide meaningful relief to all those employed by USAID.

### B. The President and other Defendants violated the Constitution by unilaterally shutting down an agency created by Congress.

#### 1. *Defendants' actions are ultra vires.*

Congress, acting under its sole authority to appropriate funds under Article I of the Constitution, created USAID as an independent agency under the Foreign Service Reform and Restructuring Act of 1998 ("FSRRA"). 22 U.S.C. § 6563. President Trump, citing his Article II powers over foreign affairs, claims that he can shutter USAID, effectively striking provisions of FSRRA and subsequent appropriations acts. *See* Defs. Resp. Br. at 23 (claiming to act under

---

[21] Indeed, Mr. Marocco tacitly acknowledges the distinction between individualized determinations to place employees on leave and the mass leave placement Defendants effectuated here; he singled out four employees that USAID placed on leave on February 9–while the TRO was in place–pending inquiry into employee misconduct. Decl. of Peter Marocco, ¶ 20 (Feb. 10, 2025), ECF No. 20-1.

"vast and generally unreviewable" powers under Article II). A "Presidential claim to a power at once so conclusive and preclusive must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 638 (1952) (Jackson, J., concurring). Defendants' actions here do not survive this scrutiny.

Defendants' attempts to shut down USAID are *ultra vires*. "There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes" like the FSRRA. *Clinton v. City of New York*, 524 U.S. 417, 438 (1998); *see also INS v. Chadha*, 462 U.S. 919, 954 (1983) (the "repeal of statutes, no less than enactment, must conform with Art. I"). Only Congress can do so. "As Madison explained in The Federalist No. 47, under our constitutional system of checks and balances, '[t]he magistrate in whom the whole executive power resides cannot of himself make a law.'" *Medellin v. Texas*, 552 U.S. 491, 528 (2008) (alteration in original). Holding otherwise "would be clothing the President with a power to control the legislation of congress." *Kendall v. U.S. ex rel. Stokes*, 37 U.S. (12 Pet.) 524, 613 (1838); *see also Marin Audubon Soc'y v. Fed. Aviation Admin.*, 121 F.4th 902, 908–09 (D.C. Cir. 2024) (striking down regulations issued by an executive body that did not have Congressionally granted legislative authority).

Moreover, Defendants have no statutory basis for their actions. Neither the FSRRA nor any other federal statute gives the Defendants the authority to unilaterally shrink USAID. *See infra* pages 19-21. To the contrary: Congress considered whether to give the President this authority and did grant that authority for a limited window of time, which has long closed. *See* 22 U.S.C. § 6601 (granting the President a 60-day window to choose to absorb USAID into the Department of State). Where Congress considered granting the President authority to shutter an

11

agency and chose not to, as is the case here with the FSRRA, the President is presumed to not have that authority under statute. *See Christensen v. Harris Cnty.*, 529 U.S. 576, 583 (2000) (noting the "canon" that "'[w]hen a statute limits a thing to be done in a particular mode, it includes a negative of any other mode'" (alteration in original) (quoting *Raleigh & Gaston R. Co. v. Reid*, 80 U.S. (13 Wall.) 269, 270 (1872))).

As Justice Jackson noted in his famous concurrence in *Youngstown Steel*, where "the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter." *Youngstown Steel, 343 U.S.* at 637. Here, because the President has *no* power to repeal or amend statutes unilaterally, his actions are *ultra vires*, and the Court has the authority to enjoin them under its longstanding equitable powers. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) ("The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England.").

Defendants' argument that a president's "broad authority to attend to the foreign affairs of the nation," Defs. Resp. Br. at 23, authorizes him to ignore separation of powers mirrors President Truman's in *Youngstown Steel* and fails for the same reason. The Supreme Court there struck down President Truman's executive order seizing certain strike-bound steel mills during wartime, noting that Congress had not authorized this presidential action and had in fact created multiple statutory paths to seizing the mills, none of which President Truman had taken. *Youngstown Steel,* 343 U.S. at 585. Much like Defendants' arguments here, President Truman justified his actions under "the several constitutional provisions that grant executive power to the

President." *Id.* at 585. The Court disagreed: "The Founders of this Nation entrusted the law making power to the Congress alone in both good and bad times. It would do no good to recall the historical events, the fears of power and the hopes for freedom that lay behind their choice." *Id.* at 589. Here too, absent Congressional authority, and in fact in the face of contrary statutory commands, President Trump cannot sustain his actions through a mere reference to his authority over foreign affairs.

Moreover, the President's foreign affairs authority has little bearing on this case. The Appropriations Act of 2024 established a mechanism for the President to consult with Congress if he believes that changes to USAID's structure are necessary. And, "whether the realm is foreign or domestic, it is still the Legislative Branch, not the Executive Branch, that makes the law." *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 21 (2015); *see Medellin v. Texas*, 552 U.S. 491 (2008) (refusing President's argument that his authority over foreign affairs allows him to bypass Congressional action).

## 2. *Defendants have violated the Take Care Clause by refusing to implement FSRRA.*

To the extent that Defendants seek to narrow this case to involve only a refusal to issue payments or allow staff to carry out their roles, those actions alone violate the Take Care Clause of the Constitution, which confers upon the President the duty to "take care that the Laws be faithfully executed." U.S. Const., art. II § 3. As the Supreme Court has stated, "[t]o contend that the obligation imposed on the President to see the laws faithfully executed, implies a power to forbid their execution, is a novel construction of the constitution, and entirely inadmissible." *Kendall,* 37 U.S. at 613.

Contrary to Defendants' insinuation, such claims are justiciable. *See Crowley Caribbean Transp., Inc. v. Pena*, 37 F.3d 671, 676 (D.C. Cir. 1994) ("general enforcement policies" that

could show that the agency has abdicated its duty to faithfully execute the law may be subject to review); *see also United States v. Texas*, 577 U.S. 1101 (2016) (asking parties to brief potential violations of the Take Care Clause); *Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (collecting cases regarding implied private rights of action for violations of structural safeguards in the Constitution); *Citizens for Resp. & Ethics in Washington v. Trump*, 302 F. Supp. 3d 127, 139 (D.D.C. 2018) (recognizing the potential vitality of Take Care Clause claims); *Florida v. United States*, No. 3:21CV1066-TKW-EMT, 2022 WL 2431414, at *13 (N.D. Fla. May 4, 2022) ("the Court sees no reason why such a claim could not be pursued at least in circumstances where (as alleged here) the executive branch has completely abdicated its responsibility to enforce the law as written"); *Associated Gen. Contractors of Am. v. U.S. Dep't of Lab.*, No. 5:23-CV-0272-C, 2024 WL 3635540, at *13 (N.D. Tex. June 24, 2024) ("Defendants engaged in egregious violations of Article II, section 3 of the Constitution, because rather than taking care to faithfully execute the DBA, Defendants instead usurped Congress' law-making power and attempted substantive amendments to the DBA.").

To be clear, Plaintiffs are not asking this Court to direct Defendants *how* to take care of the law or to, in Defendants' words "advance their own political and policy views." Defs. Resp. Br. at 28.[22] Plaintiffs are instead asking the Court to direct Defendants to carry out required non-discretionary actions under federal law and to faithfully "take care" to carry out their pre-existing

_____

[22] Defendants make a puzzling argument that only the President can violate the Take Care Clause and not subordinate executive branch officials due to the Clause speaking only of the President. *See* Defs. Resp. Br. at 27. Yet the authority of *every* executive branch official derives from the President's powers and responsibilities under Article II of the Constitution. Indeed, much of modern Appointments Clause jurisprudence is built on ensuring that executive officers are accountable to the President in order to ensure the President can "take care" that the laws are faithfully executed. *Morrison v. Olson*, 487 U.S. 654, 689 (1988). None of the cases cited by Defendants suggest anything to the contrary. *Cf.* Defs. Resp. Br. at 27-28.

obligations. Ruling for Plaintiffs would not require the Court to direct USAID to fund rehydration salts to treat diarrhea in Zambia for the foreseeable future, as Defendants suggest. *See* Defs. Resp. Br. at 28. Rather, Plaintiffs ask this Court to enjoin Defendants from illegally *stopping* provision of that and all other USAID work without consideration of constitutional requirements.

Defendants' reliance on *Dalton v. Specter*, 511 U.S. 462 (1994), Defs. Resp. Br. at 23, is unavailing. In *Dalton*, the Supreme Court made explicit that claims about the President acting *without* statutory authority are subject to constitutional review, but claims about the President abusing discretion granted to him by statute are not. *See Dalton*, 511 U.S. at 477 ("Where a statute, such as the 1990 Act, commits decisionmaking to the discretion of the President, judicial review of the President's decision is not available."). And as the D.C. Circuit has recently held, non-statutory *ultra vires* review is available even where some discretion is granted to the President by statute. *Am. Forest Res. Council v. United States*, 77 F.4th 787 (D.C. Cir. 2023). "*Dalton*'s holding merely stands for the proposition that when a statute entrusts a discrete specific decision to the President and contains no limitations on the President's exercise of that authority, judicial review of an abuse of discretion claim is not available." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1331 (D.C. Cir. 1996).

Here, where the President has acted *contrary* to the Constitution and statute, and not within any discretion granted to him, this Court has the authority to hold him to account. *See Marbury v. Madison*, 5 U.S. 137, 166 (1803) (where the legislature imposes on an executive officer "direct[ions] peremptorily to perform certain acts; when the rights of individuals are dependent on the performance of those acts; he is so far the officer of the law; is amenable to the laws for his conduct; and cannot at his discretion sport away the vested rights of others").

**C.  Agency Defendants' decision to shut down USAID is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.**

For the reasons set forth in Plaintiffs' TRO brief (at 12–17), Plaintiffs' APA claims are likely to succeed on the merits. Defendants offer a string of arguments to the contrary; none is compelling.

*First*, Plaintiffs do challenge *agency* action. As Defendants acknowledge, Defs. Resp. Br. at 4, 6–7, 19, 34, 37 (identifying various actions taken by Defendant Rubio or USAID), Defendant Rubio, in his capacity as Acting Administrator of USAID and/or Secretary of State, or "USAID leadership" under Defendant Rubio, have taken the steps to dismantle USAID. *See* Compl. ¶¶ 20–22, 29–30, 33, 36–38 (alleging numerous actions by agency defendants or officials). Plaintiffs do not allege an APA claim against President Trump.

Defendants cite two cases in support of their argument that Plaintiffs "effectively seek[] review of the President's action by suing an agency acting on behalf of the President." Defs. Resp. Br. at 29. These cases are inapposite. The cases explain that an APA action does not lie where an agency exercises "discretionary authority committed to the President by law," that has been directly delegated by the President to an agency. *Detroit Int'l Bridge Co. v. Gov't of Canada*, 189 F. Supp. 3d 85, 100 (D.D.C. 2016). As explained in detail in Plaintiffs' TRO Brief, and *supra*, the steps taken to effectuate a dissolution or substantial diminishment of USAID are not within the President's lawful discretionary authority. Nor may the agency defendants reorganize or restructure USAID in violation of the Appropriations Act.

Defendants suggest that the action challenged here is not sufficiently "discrete." Defs. Resp. Br. 30; *see Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004). That the action challenged here–dismantling an agency established by statute–requires numerous actions to

16

effectuate does not mean that the case does not challenge a discrete action within the meaning of the case law. *See Ipsen Biopharmaceuticals, Inc. v. Azar*, 943 F.3d 953, 956 (D.C. Cir. 2019) (a "not self-executing" order that required "separate enforcement action" to effectuate was final agency action). Further, agency defendants implemented their decision to dissolve or substantially diminish USAID through discrete, identifiable actions—e.g., closing USAID headquarters, placing staff on administrative leave en masse, canceling contracts en masse, refusing to pay contractors' invoices for work performed[23]—actions that, again, the agency or agency official defendants undisputedly took. Indeed, to characterize abruptly placing nearly 90% of an agency's staff on administrative leave, evacuating all staff in foreign countries, closing down agency headquarters, and canceling agency contracts en masse as "day-to-day" operations of an agency, Defs. Resp. Br. at 30, is absurd. And Defendants are plainly wrong to suggest that Plaintiffs quibble with particular decisions concerning particular agency programs. *See* Defs. Resp. Br. 31. Plaintiffs challenge the wholesale gutting of agency programs and personnel committed in violation of law.

    *Second*, Plaintiffs challenge *final* agency action. As Plaintiffs explained in their opening brief, the decision to gut USAID both "mark[s] the consummation of the agency's decisionmaking process" and is "one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citations omitted). *See* TRO Br. at 12-13. Defendants attempt to paint their actions as a mere "pause of operations." Defs. Resp. Br. 31. But their actions—attempting to place 90% of agency staff on leave, canceling contracts, giving up the lease, and moving all oversees staff to the United

---

[23] *See* Further Decl. of Randall Chester; Decls. of Thomasina, Virginia, Walter, Xavier Doe.

States—belie that description, as does President Trump's statement that the agency is being "close[d] down." *Supra* note 8. Reflecting that objective, the actions are not ones that can readily be undone after a "pause."[24] Overseas staff are being told to uproot their families. Contractors working with USAID after running the hoops of the procurement process will no longer have USAID contracts to fulfill. Grantees that rely on USAID funding may have shut down. *See, e.g.*, Decl. of Ulysses Doe. And in any event, the decision to dismantle an agency, currently being effectuated, qualifies as final even if the agency could change its mind later. As the Supreme Court has explained, "[t]he mere possibility that an agency might reconsider . . . does not suffice to make an otherwise final agency action nonfinal," *Sackett v. EPA*, 566 U.S. 120, 127 (2012); *see Nat'l Env't Dev. Ass'n's. Clean Air Project v. EPA*, 752 F.3d 999, 1006 (D.C. Cir. 2014) ("An agency action may be final even if the agency's position is 'subject to change' in the future."); *U.S. Air Tour Ass'n v. F.A.A.*, 298 F.3d 997, 1013 (D.C. Cir. 2002) ("[I]f the possibility of future revision in fact could make agency action non-final as a matter of law, then it would be hard to imagine when any agency rule would ever be final as a matter of law." (quotation omitted) (cleaned up)).

Additionally, "[i]n assessing whether a particular agency action qualifies as final for purposes of judicial review," courts, including the Supreme Court, "have looked to the way in which the agency subsequently treats the challenged action." *Sw. Airlines Co. v. U.S. Dep't of*

---

[24] *See, e.g.*, Decl. of Olivia Doe (explaining that, as a result of Defendants' actions, the US will likely lose much of its share of contracts to purchase critical minerals mined in Africa like cobalt to China); Report of Office of Inspector General (explaining disastrous consequences of the USAID shutdown to US national interests and security); Thalia Beaty, *Volunteers are now tracking what's already been lost in the USAID freeze*, AP News (Feb. 10, 2025) https://apnews.com/article/usaid-foreign-aid-freeze-international-development-325c807f4f3930adbaa5c42dfef69c69#; *see also* Decls. of Marcus, Nathan, Nancy, Sarah, and Wanda Doe.

*Transp.*, 832 F.3d 270, 275 (D.C. Cir. 2016). At the very least, Defendant Rubio announced an intent to, as he phrased it, "reorganiz[e]" Ex. C to Decl. of Peter Marocco (Feb. 10, 2025), ECF No. 20-1, and has clearly been implementing that "reorganization" in his capacities as Acting Administrator of USAID and Secretary of State. The actions Defendants have taken toward shutting down USAID operations have, in fact, effectuated a near-total shutdown of USAID operations, as evidenced by the declarations of numerous USAID staff. Finally, that the decision to dissolve USAID and the actions taken in pursuit of that goal derive from top agency officials, not agency staff, is further indication that the decision to dismantle USAID is a final one. *Cf. Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1268 (D.C. Cir. 2018) (letter that expressed the "views of 'staff' and not the Commission was not final agency action); *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 733 (D.C. Cir. 2003) (no final agency action where "the Commission itself has never considered the issue").[25]

*Third*, Defendants' argument that review under the APA is not available because Plaintiffs have other avenues of relief, Defs. Resp. Br. 32–33, is incorrect. For the reasons stated *supra*, the channels Defendants propose are inappropriate to resolve Plaintiffs' constitutional and statutory challenge to Defendants' decision to dismantle USAID.

*Fourth*, Defendants offer no compelling argument that the actions they have taken to dismantle USAID are consistent with their statutory authority. Defs. Resp. Br. 33–35. They first contend that the Foreign Affairs Reform and Restructuring Act of 1998 (FARRA) does not prevent them from dismantling USAID because USAID is located within the Executive Branch. But it is an agency established by statute. As discussed above, the mantra "Executive" authority

---

[25] Even were the Court to agree that there is no final agency action, Defendants took actions that exceeded their statutory authority and that violated statutes, and which are therefore *ultra vires*.

is not a basis for defying the law. And FARRA, 22 U.S.C. § 6563, requires that USAID, "[u]nless abolished" pursuant to a 1998 presidential reorganization plan, *id.* § 6601 (which did not occur), continue to exist—and not in name alone. Allowing Defendants to dismantle the agency as they are doing would render the statute nugatory.

Likewise, Defendants' dismantling of USAID is in defiance of the Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47 § 7063(a), 138 Stat. 460 (2024). *See* TRO Br. at 13–15. Defendants agree that the Appropriations Act permits only "reorganization"—it does not supersede FARRA—and only "under certain circumstances." Defs. Resp. Br. 34. Those circumstances are not present here. By their own account of the facts, Defendants have not complied with the Appropriations Act. Defendant Rubio's February 3, 2025, letter to members of the Committees on Appropriations and Foreign Affairs and Foreign Relations, Decl. of Peter Marocco, Ex. C, ECF No. 20-1, does not satisfy the statutory prerequisites to implementing a reorganization of USAID—let alone one so extreme as to constitute an effective dismantling of the agency.

First, Defendant Rubio's letter does not describe a "proposed action," as required by the statute. Appropriations Act § 7063(a). Rather, the notice states that the agency is "begin[ning] the process of engaging in a review and potential reorganization of USAID's activities." Decl. of Peter Marocco, Ex. C, ECF No. 20-1. In other words, the notice announces an intent to formulate a reorganization plan; it does not describe any actual reorganization plan. Second, the letter does not include a "detailed justification" for a proposed plan. Appropriations Act § 7063(a). The letter includes a few sentences supporting Defendant Rubio's perceived need to formulate some sort of reorganization plan, but provides no justification for the extreme measures Defendants have taken, let alone "detailed" ones. Third, the letter does not constitute "prior consultation," as

the Appropriations Act requires. *Id.* Instead, the letter merely "advises [Congress] of our *intent* to *initiate* consultations" about a reorganization of USAID. Decl. of Peter Marocco, Ex. C, ECF No. 20-1 (emphases added). Finally, as Plaintiffs explained in their TRO Brief (at 13-15), the Appropriations Act does not give Defendants authority to pursue a "reorganization" so extreme that it effectively dissolves or dismantles USAID, as FARRA would not countenance that.[26]

Furthermore, whether Defendants complied with the Appropriations Act is not a political question. *See* Defs. Resp. Br. 35. This Court certainly has jurisdiction to decide whether agency officials violated a validly enacted statute. *See Marbury*, 5 U.S. at 177.

*Fifth*, Defendants' actions are contrary to law. Defendants contend the statutory limitation on the number of days that agencies may place employees on administrative leave, 5 U.S.C. § 6329a(b)(1), does not apply to the placement, or intended placement, of nearly 90% of USAID staff on leave because they seek to put staff on leave in furtherance of a decision by the President, who is "acting through executive branch agencies," and that he has "inherent Article II authority." Defs. Resp. Br. 35. Defendants cite no legal support for the proposition that Article II permits the President to place 90% of an agency's employees on leave, and to direct the dissolution of a federal agency, in violation of a duly enacted statute.

Defendants' argument that they have not violated the Prompt Payment Act, 31 U.S.C. § 3901 *et seq.*, relies on an incomplete understanding of the facts. Defendants have not been canceling only those contracts that they have "determined to no longer be in the national

---

[26] Defendants have also violated § 514(a) of the Appropriations Act, which prohibits the use of funds appropriated under the Act to "eliminate[] a program, project, or activity"; "relocate[] an office or employees"; "reorganize[] or rename[] offices"—note Defendants covered up the name of USAID's office at its headquarters; or "reorganize[] programs or activities" without first consulting the congressional Committees on Appropriations 15 days prior, and notifying them in writing 10 days prior, to performing those actions.

interest." Defs. Resp. Br. 36. Rather than making individualized determinations, they have been canceling contracts en masse, inconsistent with the FAR, and in ways that jeopardize the nation's interests and security. *See* Decls. of Thomasina, Virginia, Walter, and Zeb Doe; USAID OIG Report at 3–4. Additionally, Defendants have stopped paying the government's obligations on existing contracts, even those obligations incurred prior to January 24. *See id.*

*Sixth*, Defendants acted arbitrarily and capriciously in taking actions to dismantle USAID. Defendants rely on the Declaration of Pete Marocco to establish the basis for their actions. Specifically, Mr. Marocco claims that after he assumed management of day-to-day operations of USAID on January 30, he found that a set of senior agency staff were "unwilling or unable to provide [him] basic compliance and oversight information," raising "systemic concerns" about the agency and leading him to conclude that a "blanket pause with a waive-in process was the more efficient and effective path" to resolving these concerns. Decl. of Peter Marocco, ¶¶ 5-8, 11, ECF No. 20-1. But numerous USAID staff credibly contest this assertion of insubordination. *See* Further Decl. of R. Chester; Decl. of Yolanda Doe. And USAID staff explain that comprehensive reviews of USAID programs are possible and have previously been conducted without shutting down the agency. Decl. of Zeb Doe.

Mr. Marocco claims that "USAID did not intentionally place any employee in a high-risk location on administrative leave." Decl. of Peter Marocco, ¶13, ECF No. 20-1. Intentionally or not, many such employees *were* in fact placed on leave and abruptly cut off from agency computer systems and intelligence information. That Defendants' actions risked American lives is not hypothetical. On January 28, violent protests aimed at western embassies and diplomatic installations broke out in Kinshasa in the Democratic Republic of the Congo. Decl. of Nathan Doe. As protestors grew to the thousands, the USAID Mission Director and his wife were

"trapped in their residence as tens of looters breached their residence." Decl. of Olivia Doe ¶4.

They and others were eventually able to evacuate back to Washington, DC, but USAID

employees have been forced by the funding freeze to cover substantial out-of-pocket costs for

accommodation, food, clothes, and other necessities. *See, e.g.*, Decl. of Ruth Doe.

For these and the reasons addressed in Plaintiffs' opening brief (at 15-17), Defendants'

actions to dismantle USAID were arbitrary and capricious.

### III. WITHOUT A TEMPORARY RESTRAINING ORDER, PLAINTIFFS, THEIR MEMBERS, AND COUNTLESS OTHERS WILL BE IRREPARABLY HARMED.

Defendants' attempt to neutralize the irreparable harm found by this Court through a

series of post hoc rationalizations. First, they suggest that expedited recalls will not cause

irreparable harm to Plaintiffs' members and their families because USAID will grant "case-by-

case exceptions and offer extensions, including 'timing of dependents' school term, personal or

familial medical needs, pregnancy, and other reasons." Defs. Resp. Br. 38. But USAID's

purported willingness to consider exemptions does not mean employees will receive them.

Meanwhile, AFSA employees overseas are "being encouraged to fill out paperwork to evacuate

to the United States," despite the temporary restraining order. Further Decl. of R. Chester 34.

One AFSA member, who is both pregnant and has high school children, was already informed

that she would not receive an exception. Pls. TRO Br., Ex. D (Feb. 7, 2025), ECF No. 9-4. She is

now left "urgently searching" for schools that can admit her three children, all of whom are on

Individual Education Plans and require special accommodations. *Id.* ¶¶ 5, 7. Moreover, one of

her children had a previous mental health breakdown caused by the multiple transitions the child

has experienced; "the mental health and counseling team that cared for them recommended that

they stay at post until they can graduate to provide stability." *Id.* ¶7. Other pregnant USAID

employees, who have medical evacuations for pregnancy, have been told those medical evacuations will be cancelled, Decl. of Wanda Doe ¶¶ 5-6, or that their posts will be cut short when evacuated. Decl. of Sarah Doe ¶5. Plaintiffs' members' harm is therefore sufficiently "certain" to qualify for preliminary injunctive relief. *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 8–9 (D.C. Cir. 2016) (recognizing that "Damocles's sword does not have to actually fall on all appellants before the court will issue an injunction.").

Defendants nonetheless contend that employees will not experience irreparable harm because their administrative leave will be paid. Defs. Resp. Br. 38. This contention ignores the serious safety risks to employees overseas if they are placed on administrative leave. Defendants' suggestion that they have "no plan" that any USAID employee "at a high-risk post" who remains overseas during administrative leave will "be shut out from access to overseas security resources," Defs. Resp. Br. 39, does not resolve this harm. Defendants suggest these protections will be available only to the employees at certain posts, leaving an unknown set of USAID employees vulnerable. Defendants also acknowledge that placement on administrative leave means that staff will lose access to "some" USAID systems. *Id.* USAID's Chief Information Officer clarified that employees placed on paid administrative leave prior to the Court's entry of a temporary restraining order lost access to their email accounts, "information and contracting databases, and their "Agency-owned devices (*e.g.* their mobile phones and laptops)." Defs. Resp. Mot. for Hearing ¶ 4 (Feb. 11, 2025); Decl. of Jason Gray, (Feb. 11, 2025), ECF No. 22-1. Without access to those systems, USAID employees cannot access vital safety resources. Access to email remains critical for safety warnings. USAID employees stationed overseas access security information through their email, including "warnings on local issues such as protests or security advisories." Ex. H, Decl. of Frances Doe, ¶ 8, ECF No. 9-9. Access to agency issued

devices is critical for access to the Scry Panic safety app. Ex. I, Decl. of Jane Doe, ¶ 4, ECF No. 9-10. Indeed, employees had already begun to lose access to some security systems after the recall notice was issued, *see* Ex A., Decl. of R. Chester, ¶ 18, ECF No. 9-2; ECF No. 9-10 ¶¶ 13-14. The experience of USAID employees assigned to the Democratic Republic of the Congo in Kinshasa just last month demonstrate the risks faced by foreign services officers and the importance of the security apparatus *See* Decl. of Marcus Doe ¶¶ 9-11; Decl. of Olivia Doe ¶¶ 4-5.

In addition, the funding freeze will irreparably harm Plaintiffs' members who are responsible for carrying out an unlawful agency action. USAID employees are being directed to modify or terminate contracts, although such terminations may be unlawful. *See* Decl. of Virginia Doe ¶ 9; Decl. of Thomasina Doe ¶¶ 8-9. Terminating agreements unlawfully risks destabilizing relationships with USAID's partners, harming and undermining the decades of established aid provided to developing countries. *See* Decl. of Ruth Doe ¶ 6; *see also* Complaint ¶¶ 23, 39 (Feb. 6, 2025), ECF No. 1. These harm to goodwill and relationships of staff who work in this field constitutes irreparable harm. *Cf. Endo Par Innovation Co., LLC v. Becerra,* No. CV 24-999, 2024 WL 2988904, at *8 (D.D.C. June 10, 2024) (finding loss of goodwill with customers irreparable harm).

AFGE and AFSA likewise will experience irreparable harm flowing from Defendants unlawful actions to dissolve USAID. Obstacles that "make it more difficult for [Plaintiffs] to accomplish their primary mission" are sufficient to demonstrate irreparable harm. *League of Women Voters of the United Stes v. Newby*, 838 F.3d 1, 75 (D.C. Cir. 2016). AFGE and AFSA both anticipate diverting significant resources from other members and priorities to address the shut down. Ex. B, Decl of Ottis Johnson Jr., ¶ 7, ECF No. 9-3; Decl. of R. Chester ¶ 24. AFSA

has already begun to do so, receiving between 200-300 emails a day from members with inquiries about USAID, holding multiple townhalls with employees, and updating its membership records to include private email addresses. Decl. of R. Chester ¶¶ 22-24.

## IV. THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST WEIGH IN PLAINTIFFS' FAVOR.

Defendants incorrectly assess the balance of the equities, which should tip in favor of Plaintiffs. Invoking their oft-repeated theme, Defendants posit that the "public has an interest in permitting the President to take decisive action when it comes to foreign affairs," and that injunctive relief "would displace and frustrate the President's decision about how to best address [the] threat to foreign affairs" allegedly posed by USAID. Defs. Resp. Br. at 40–41. This may be so if the President were acting lawfully. Yet here, "[t]o the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws[.]" *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017) (internal quotation marks and citations omitted). This holds true even if Defendant Trump believes circumventing the law is "how to best address" his concerns.

Defendants further argue the "Court must give deference," Defs. Resp. Br. 40, based on the Executive Branch's "evaluation of the facts" and the "sensitive and weighty interest of national security and foreign affairs," *Holder v. Humanitarian L. Project*, 561 U.S. 1, 33–34 (2010), including "the timing of those [] decisions," *Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 74 n.28 (D.D.C. 2002), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003). But "concerns of national security and foreign relations do not warrant abdication of the judicial role," and when such "sensitive interests" are at stake, "the political branches [must] adequately substantiate[] their determination." *Holder*, 561 U.S. at 33. Broad, vague allegations of fraud and waste, without corresponding substance, cannot allow for deference.

26

Defendants also complain that they are "are acting this quickly and decisively to gain control of an organization that included some employees who had refused to comply with lawful directives by the President and Secretary, directives designed to identify wasteful or fraudulent programs or those contrary to the foreign policy interests of the United States." Defs. Resp. Br. at 41, citing Decl. of Marocco ¶ 9. But Plaintiffs report that in the face of this chaotic action, complying with directives has proven difficult if not impossible along the way, despite their attempts for further clarification or information on Defendants' processes. *See* Further Decl. of R. Chester ¶¶ 7–8, 12, 26, 28 (describing uncertainty despite pleas for clarification and information); Decl. of Walter Doe ¶¶ 4–12; Decl. of Xavier Doe ¶¶ 6–9; Decl. of Thomasina Doe ¶¶ 4–9; Decl. of Marcus Doe ¶¶ 4–5, 7, 10.

Moreover, Defendant's actions are *in fact* creating a national security crisis. *See generally* USAID OIG Report (reporting on the "risks and challenges to the safeguarding and distribution of USAID's $8.2 billion in obligated but undisbursed humanitarian assistance funds following (1) the Department of State's pause on foreign assistance programs and (2) subsequent personnel actions by USAID that have substantially reduced the operational capacity of its Bureau of Humanitarian Assistance (BHA)"). As a direct result of Defendants' actions, two of USAID's key oversight mechanisms, partner vetting and third party monitoring, have been undermined, compromising USAID's ability to ensure no money flows to terrorist organizations and to monitor high-risk environments abroad. *Id.* at 3–4 (listing programs in Afghanistan, Iraq, Lebanon, Pakistan, Syria, West Bank/Gaza, and Yemen that require oversight for anti-terrorist vetting and high-risk environments in Ukraine, Afghanistan, Ethiopia, Haiti, Gaza, Iraq, Lebanon, Somalia, Syria, and Venezuela that require third party monitoring for successful aid programs). Furthermore, Defendants' interruptions in USAID's workforce have also constrained

27

their ability to receive, react, report, and respond to allegations of fraud, waste, abuse, or diversion of humanitarian aid, as required by Congress. *Id.* at 4–5. Thus, the very risks Defendants allege to care for are put in a place of real threat through their actions.

In addition, approximately $8.2 billion in undisbursed obligations for humanitarian assistance programs have been unable to flow; $489 million in food assistance is at risk of diversion and spoilage. *Id.* at 2–3; *see also* Decl. of Ruth Doe ¶ 6 (describing patients awaiting treatment typically provided by USAID). These gaps in USAID's functioning have allowed for other countries to move in to replace the critical assistance that other countries have gratefully relied upon in the past, with countries including Nepal, The Cook Islands, and Colombia already reporting that the Chinese government has expressed interest in moving in upon USAID's withdrawal. *See* Robbie Gramer et al., *As USAID retreats, China pounces*, Politico (Feb. 10, 2025), https://tinyurl.com/4vtyarbh; *see also, e.g.,* Decl. of Olivia Doe ¶¶ 3, 7(2) (describing USAID's efforts to decrease DRC's dependence on cobalt trade with China, and Defendants' shutdown leaving these developments in jeopardy). These real national security concerns weigh towards granting Plaintiffs the injunctive relief they seek.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court enter a preliminary injunction enjoining Defendants immediately from taking any further actions to shut down USAID operations and requiring Defendants immediately to take the remedial measures outlined in the Proposed Order until further order of this Court.

Dated: February 11, 2025                                      Respectfully submitted,

/s/ Lauren Bateman                                /s/ Kaitlyn Golden
Lauren Bateman                                      Kaitlyn Golden

(DC Bar No. 1047285)
Karla Gilbride
(DC Bar No. 1005886)
Allison Zieve
(DC Bar No. 424786)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
lbateman@citizen.org

(DC Bar No. 1034214)
Kristen Miller
(DC Bar No. 229627)
Kayla M. Kaufman
(DC Bar No. 90029091)
Robin F. Thurston
(DC Bar No. 1531399)
Skye L. Perryman
(DC Bar No. 984573)
Rachel L. Fried
(DC Bar No. 1029538)
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
kgolden@democracyforward.org

*Counsel for Plaintiffs*

**Certificate of Service**

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the NEF (NEF) and paper copies will be sent to those indicated as non-registered participants.

Dated: February 11, 2025                                    /s/ *Kaitlyn Golden*