UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN FOREIGN SERVICE ASSOCIATION, *et al.*,<br><br>    Plaintiffs,<br><br>v.<br><br>PRESIDENT DONALD TRUMP, *et al.*,<br><br>    Defendants. | Civil Action No. 1:25-cv-00352-CJN |

I, Pete Marocco, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I am over 18 years of age, of sound mind, and otherwise competent to make this declaration. This declaration is based on my personal knowledge and information provided to me in my official capacity by others.

2. Since Thursday, January 30, 2025, I have performed the duties and functions of both Deputy Administrators of the United States Agency for International Development ("USAID" or the "Agency"). I manage the day-to-day operations at USAID including personnel matters and operations. Since January 20, 2025, I have also served as the Director of Foreign Assistance at the Department of State. Previously, I served as a United States Marine and as a Deputy Assistant Secretary at both the Department of State and the Department of Defense. Additionally, I served on a special assignment as the Senior Advisor for Intelligence and Security to the Secretary of Commerce and served as the Assistant to the Administrator at USAID, overseeing the Bureau for Conflict Prevention and Stabilization.

3. Under U.S. law and Presidential directive, all U.S. executive branch employees overseas on official business are under the authority of the Chief of Mission unless they meet

1

limited exceptions not applicable here. Such executive branch employees are under the direction, coordination, and supervision of the Chief of Mission. *See* 22 U.S.C. § 3927. Under this authority, the Chief of Mission is responsible for the security of the executive branch employees and their eligible family members. Additionally, the Secretary of State maintains security responsibility for these employees and their dependents, and also has responsibility to develop policies and programs to provide for their safe evacuation when their lives are endangered. *See* 22 U.S.C. § 4802.

4. Any USAID employee who is assigned to a post overseas would continue to fall under the authority of the Chief of Mission until such time as they depart post either for their new post of assignment or a designated location for separation. This includes employees who are on administrative leave. The Chief of Mission in a given country will be responsible for taking steps to ensure the safety of the individuals under his or her security responsibility.

5. The Department of State, through Regional Security Officers (RSOs) overseas, maintains robust and thorough security programs to protect these personnel and their families. While the Department of State provides posts with standardized guidance for security programs, at the direction of the Chief of Mission, security personnel manage locally tailored programs that reflect each Mission's particular safety and security needs.

6. Staff working at all diplomatic missions are protected through residential, personal, and physical security programs. In general, personnel worldwide are equipped with two-way radios that connect to Post One for 24/7 communications in the event of an emergency, or for conducting on the spot and regular safety checks with staff and their dependents. Mission staff are also required to prepare phone trees and mission directories for call down exercises that include both personal and government phone numbers, email addresses, and other means of

communication such as private messaging apps. Post also utilizes the SAFE Alert system which provides electronic messaging to staff with security and safety alerts. SAFE is a cloud-based emergency notification system that empowers overseas Posts to report events and operational status using SMS, email, phone, and IM (via mobile app) – from the field. It pushes notifications to Department devices and, if opted, personal devices. Each USAID Mission is equipped with "Go-Bags" for staff to use while going on field visits. Each "Go-Bag" includes personal tracking locators, satellite phones, first aid kits, and basic survival equipment in the event the staff member becomes captured, lost, or injured. Posts continue to provide the same security services that were in place before any direct-hire employees were placed on administrative leave in February 2025.

7. The Department of State maintains USAID connectivity and access to Scry Panic and SAFE, and to otherwise ensure that USAID personnel, like all personnel, have access to communications needed for their security and safety. When an emergency occurs, one of the top priorities of Department of State is determining the welfare of Mission personnel, family members, and other individuals affiliated with the Mission. Two of the tools the Department uses to accomplish this are SCRY Panic and SAFE. When a SCRY Panic user hits the panic button, the app can activate geospatial tracking and initiate a Diplomatic Security response. It is a situational awareness application designed specifically for all Chief of Mission Personnel, including EFM and Locally Employed Staff. SAFE, Safety and Accountability For Everyone (SAFE) is the Department's enterprise solution for emergency notification and accountability. In addition to general communications, security procedures and resources continue in full and without exception, regardless of leave status, for all personnel under Chief of Mission authority.

8.      A recent example of the use of these communication systems is the Democratic Republic of Congo (DRC), where the U.S. Embassy in Kinshasa is currently on ordered departure because of political unrest. Over 100 personnel, including dozens from USAID, were evacuated from Kinshasa starting on January 29, 2025. All of these personnel were evacuated in keeping with established safety and security procedures and in the same manner as afforded to other U.S. government personnel.

9.      As the security situation in DRC deteriorated leading up to an ordered departure, USAID personnel - including those on temporary duty- were being contacted through the SAFE alert emails from Post as well as through messages in a WhatsApp group messaging platform. On-the-ground reports indicate that communications appeared to be going through without issue and regardless of administrative leave status, and staff or their dependents retained access to their phones to include the Scry Panic App.

10.     USAID staff posted to DRC were contacted through the DS Safe Alert system, as well as through phone trees, text messaging, and outside platforms such as WhatsApp group messaging. Cursory review showed that USAID personnel still had access to information provided via the Scry Panic app, regardless of their leave status, through other means of communication with Post. Communication was clear, consistent, and without disruption which led to a successful evacuation. All USAID employees and their family members from the DRC were welcomed by a USAID landing team at Dulles Airport in Dulles, Virginia, and were provided a host of necessities and care packages upon their arrival to the United States. As a continued commitment to the safety and security of all USAID employees and their family members, USAID conducted a thorough review and immediate action was taken to rectify any telecommunication disruptions that may have impacted USAID personnel.

11. We plan to allow individuals who are placed on administrative leave in the future, and who remain at post, to retain access to communications systems that will ensure that they can be in contact with Mission security personnel, and to ensure that appropriate measures are in place so that USAID employees and their family members remain safe and secure. Examples of such measures include restrictions on travel to certain parts of a city or country, requirements to travel in armored vehicles, and curfews. Access to Department-issued mobile devices will facilitate continued connectivity to the DS SAFE Alert System, Whatsapp, Signal, and the Scry Panic App, and other messaging apps as needed, so that staff can continue to receive updates from and communicate updates to post. Chiefs of Mission are directed to issue clear policies and directives that are consistent with U.S. law and apply consistently across all agencies with employees under Chief of Mission authority.

12. When a U.S. executive branch employee is assigned overseas, the employee is eligible for allowances in accordance with U.S. law and as regulated by the Department of State Standardized Regulations (DSSR). The Secretary of State has delegated authority to establish the regulations and rates for overseas allowances consistent with the statutory authorities. Individual agencies may issue further guidelines within the scope of the regulations.

13. In accordance with DSSR 040i, an "employee" for purposes of the DSSR means an individual employed in the civilian service of a government agency (including ambassadors, ministers, and members of the Foreign Service of the United States under the Department of State); who is a citizen of the United States, officially stationed in a foreign area; who is receiving basic compensation; and who meets the eligibility requirements of DSSR subchapter 030 to receive allowances or applicable differential payments (additional monies over basic compensation for designated hardship posts).

14. USAID employees assigned to an overseas post who are approved to remain at their post of assignment under U.S. orders, even while on administrative leave, and are receiving basic compensation, would continue to qualify for the allowances and differentials currently applicable to the employee (to include those relating to cost of living, education, hardship, danger). Consistent with the DSSR, USAID would continue to fund the applicable allowances for each USAID employee until such time as the employee leaves the post under permanent change of station (PCS) orders for a new post of assignment or to the employee's selected location of separation. Thus, if an employee currently qualifies for an education allowance, that allowance would continue while the USAID employee remains at post and is receiving basic compensation. Likewise, if the employee qualifies for certain quarters allowances, including those relating to utilities, those too would continue.

15. An employee who is directed to depart post and fails to do so, including those who choose to stay beyond the 30 day period to leave the country and who do not receive a waiver, would no longer be "officially stationed overseas" and would not meet the definition of employee under the DSSR as described above. Such an employee would no longer qualify for allowances applicable to the assignment in a foreign location. There may be some flexibility to allow children to continue in a school if the employee or post already paid for tuition through the current school year consistent with the authorized education allowance (see DSSR 270). However, the family would be responsible for providing for their own housing and personal expenses, and would need to comply with applicable visa and related requirements. These individuals would therefore not qualify to receive the protections described in paragraph eleven above.

16.     When considering the transfer allowances available to an employee departing a post, either for their next post of assignment or to their selected location of separation, there are some statutory limitations on which employees may receive the Home Service Transfer Allowance (HSTA), which covers the extraordinary, necessary, and reasonable expenses, not otherwise compensated for, incident to an employee establishing him or herself from an overseas post to a post of assignment in the United States.  As is the case for all U.S. government employees, employees on administrative leave would only be eligible to receive the HSTA consistent with 5 U.S.C. 5924(2)(B), if "*the employee agrees in writing to remain in Government service for 12 months after transfer, unless separated for reasons beyond the control of the employee that are acceptable to the agency concerned.*"  USAID has discretion to pay the HSTA for those separated involuntarily by the agency, but not for those who voluntarily separate.  This would include, for example, employees who voluntarily opted into the Deferred Resignation Plan.

17.     Due to changes in the process by which payments can be made and approved by the Agency over the past weeks, there have been delays in processing certain payments, including certain allowance payments to USAID employees.  However, USAID is working diligently to address these delays.  For example, on February 13, I approved access to the USAID system for processing outgoing payments for a number of USAID employees and lifted certain additional layers of review for certain routine payments to employees, including many allowance payments.  This will allow USAID to more expeditiously process payments using Title II funds, including many payments of allowances to employees, going forward.  Although these delays could continue to impact certain payments to employees in the immediate future, an employee's leave status would not itself impact the timing or eligibility for such payments.

8

18. Additionally, the Department has operationalized a Coordination Support Team with more than 40 active participants and more than 200 total standing by with communications about how they can support any USAID personnel and dependents who desire to return to the United States.

19. The information provided in this declaration is applicable to direct-hire employees. Personal Services Contractors were not placed on administrative leave.

I declare under penalty of perjury under the laws of the United States that the information in this declaration is true and correct.

/s/ Peter Marocco
Peter Marocco
PTFD Deputy Administrator, USAID
February 14, 2025
