# EXHIBIT A

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| AMERICAN FOREIGN SERVICE ) | |
| ASSOCIATION, et al., ) | |
| ) | |
| *Plaintiffs*, ) | Civil Action No. 1:25-CV-352 |
| ) | |
| v. ) | |
| ) | |
| DONALD TRUMP, et al., ) | |
| ) | |
| *Defendants*. ) | |
| _____ ) | |

### <u>THIRD DECLARATION OF RANDALL CHESTER</u>

I, Randall Chester, declare the following under penalties of perjury:

1.  My name is Randall Chester.

2.  I am the Vice President of the American Foreign Service
Association (AFSA) representing 1,980 Foreign Service Officers and 485 non-
career Foreign Service Limited officers who work for the United States
Agency for International Development (USAID).

3.  I previously submitted two declarations in this case. *See* ECF
No. 9-2 and ECF No. 24-17.

4.  Last Friday (February 14, 2025), Defendants submitted a
supplemental declaration on behalf of Pete Marocco in response to the below
two questions raised by this Court:

a. What steps is the Government planning to take to protect the safety of USAID employees who are located abroad and will be placed on administrative leave?

b. What, if any, benefits will USAID employees who are located abroad have access to if they voluntarily choose to stay beyond the 30-day period during which the Government would otherwise evacuate them to the United States?

5.    I submit this declaration with additional information on these topics based on my personal knowledge, as well as reports made to me by AFSA members regarding their experience over the last few weeks.

**Safety of USAID Employees Who Are Located Abroad and on Administrative Leave**

6.    In Paragraphs 6-7 of his supplemental declaration, Mr. Marocco suggests that USAID staff—including those on administrative leave—have access to USAID's security systems SCRY Panic, SAFE Alert, and various safety equipment and resources. These resources include "go-bags" that contain personal tracking locators, satellite phones, and other basic survival equipment. *See* ECF No. 35-1 ¶¶ 6-7. Mr. Marocco also stated that "[p]osts continue to provide the same security services that were in place before . . . February 2025" and that "general communications, security procedures and resources continue in full and without exception, regardless of leave status, for all personnel under Chief of Mission authority." *Id.*

7.      Reports from our members indicate that these security resources are neither universally available, nor functioning as usual.

8.      To begin, not all USAID employees have access to SCRY Panic, which is a relatively new service that is not universally available. Some of our members, such as Terry Doe, report that they have not been offered access to the SCRY Panic App on either their work or personal devices, *see* Terry Doe Decl. ¶ 21, despite being located in countries with "routine political upheaval," *id.* ¶ 3.

9.      Similarly, reports from some AFSA members indicate that the SAFE alert system is no longer fully functioning, even for employees who are not yet on administrative leave. For example, Terry Doe reports that a February 10 test of the SAFE program did not result in a notification of Terry's phone or email, despite the fact that Terry Doe received such notifications in numerous prior SAFE program tests. *See id.* ¶ 22.

10.     Likewise, the "go bags" mentioned in Mr. Marocco's declaration are not a security resource made available by the agency to employees. Instead, go-bags are a personal emergency preparedness measure initiated and maintained by employees for use on field visits.[1] They are not the responsibility of the Mission or Embassy and they are not prepared for the purposes of evacuation. Further, in most missions, such as the DRC

---

[1] Field visits are generally trips made by USAID staff into often dangerous areas to monitor and evaluate programs.

(discussed further below), there are not enough personal tracking locators, satellite phones, and other basic survival equipment to supply one to every individual under Chief of Mission (COM) authority.[2]

11.    Moreover, the agency's security systems will do nothing to keep USAID employees safe if they must remain in their host countries and are unable to obtain a waiver from the mandatory evacuation. Some employees will necessarily have to stay in their host countries for family and medical reasons[3] and will no longer reside in USG housing if they do not obtain a waiver. If forced to vacate under those circumstances, such employees will lose access to the security alarms and security guards provided by embassies for USG residences. Such employees will also lose access to the SCRY Panic App, the use of which is tied to an employees' official residence.

12.    Finally, the safety of all USAID employees is endangered by USAID's failure to process payments for operational expenses (discussed further below), some of which are incurred for security purposes. For example, USAID has not paid for the repair of an electric fence or for security-blinds at USAID residences in Botswana, leaving those residences vulnerable. Concerns about security at these particular residences are not hypothetical—one of them was burglarized in recent years. USAID is also

---

[2] Indeed, go bags were not made available to anyone in the DRC mission as part of the evacuation process.

[3] For example, one of our members, Terry Doe, will likely be forced to remain in the host country because Terry's wife is currently hospitalized. See the Terry Doe Declaration submitted concurrently with this declaration.

behind in paying essential operational bills in Botswana, including phone and
internet services. If these services are cut off, then USAID staff will not be
able to communicate in an emergency.

**The Democratic Republic of Congo Evacuation**

13.     In paragraphs 8-10 of his supplemental declaration, Mr.
Marocco described the recent evacuation from the Democratic Republic of
Congo (DRC) as a "successful evacuation" that was facilitated by the "use of
[USAID's security] communication systems." ECF No. 35-1 ¶¶ 8-10. He
further stated that "[o]n-the-ground reports indicate that communications
appeared to be going through without issue and regardless of administrative
leave status" during the DRC evacuation. *Id.* ¶ 9.

14.     The reference to the DRC evacuation as an example of successful
use of available security tools when employees are on administrative leave is
misleading. No one at the DRC mission had yet been placed on
administrative leave at the time of the evacuation, which began o/a January
29. In other words, the reason Defendants received "on-the-ground reports"
showing that communications "appeared to be going through without issue
and regardless of administrative leave status" is that no one in Kinshasa was
on administrative leave status.

15.     Moreover, as evidenced by the prior declarations submitted from
DRC staff in this matter, the evacuation was imperiled by Defendants'
actions. As those declarations explain, when USAID staff in the DRC reached

out to USAID/Washington for help, they were met with confusion due to Defendants' placement of virtually all USAID leadership on administrative leave the day before the security situation in Kinshasa deteriorated. *See* ECF 24-4, Nathan Doe Dec. ¶ 4 ("The people who coordinate evacuations for USAID were not around as a result of being placed on Admin Leave."). Those in Washington did not know which evacuation-related payments they could or could not approve because no delegations of authority had been executed. *See* ECF 24-2, Marcus Doe Dec. ¶¶ 14-15. Worse, Washington staff were afraid to make decisions for fear that they may run afoul of the administration and find themselves cut off as well. *Id.* at ¶ 15.

16.     Further, the problems articulated by DRC staff go beyond USAID/Washington's failures during the physical evacuation and extend to a total lack of support after the evacuation.

17.     Mr. Marocco's declaration also states that "[a]ll USAID employees and their family members from the DRC were welcomed by a USAID landing team at Dulles Airport in Dulles, Virginia, and were provided a host of necessities and care packages upon their arrival to the United States." ECF No. 35-1 ¶ 10. That statement is misleading.[4] It also belies the

---

[4] Indeed, our members among the DRC evacuees have reported to us that they were not provided with "care packages." Rather, they received breakfast and lunch at the Dulles Marriott for two days (although they were required to pay for the hotel stays themselves) and had an opportunity to peruse donated toys and clothes. Nor were they greeted by a landing team when they arrived at Dulles. Rather, a handful of remaining staff from the Africa Bureau showed up the following day. Although those staff did their best to answer

fact that USAID has completely failed to provide the DRC evacuees with the logistical and financial support that they would normally be due under standard evacuation processes. *See* ECF 24-2, Decl. of Marcus Doe, ¶ 19; ECF 24-6, Decl. of Ruth Doe, ¶¶ 4-5.

18.     During a normal evacuation, travel authorizations (TA) are issued to each FSO and their family members. These TAs outline the housing, Meals and Incidental per diem rate, and any other applicable allowances available to each person on a given FSO's TA. Additionally, the TA will provide the "funding authority" and duration. Travel costs are fronted by the FSO on their personal government credit card as required by Agency policy. These credit cards are directly linked to the FSOs individual credit report. The FSO assumes financial responsibility for all travel costs and is required to pay off the entire debt at the end of each billing cycle.

19.     A FSO can submit interim repayment vouchers against a TA in two-week intervals. To submit a voucher, a FSO must have access to the Agency's E2 voucher system through their government accounts. Evacuations are reviewed each month to determine if a return to Post is possible and at what staff levels. Generally, before this reassessment, TAs are extended for an additional 30 days or more depending on the availability of funds.

---

logistical questions (e.g., about reporting to work at USAID headquarters), most of their answers were rendered quickly obsolete or outdated in the following days as the USAID headquarters was closed to staff and ultimately leased to a different agency.

20.    Currently, the Agency is not paying any travel vouchers from DRC evacuees or other FSOs who completed official travel prior to the funding shut down. FSOs have reported that they are carrying $10,000s of debt due to the Agency not paying vouchers. DROC evacuees have also reported that they have not yet received any reimbursements.

21.    As of today, no payments or reimbursements for the DRC evacuation have been made to evacuees, DRC evacuees remain on the hook for thousands of dollars of hotels, lodging, meals, and other expenses, and have no sense of Defendants' plans for them.

22.    The current 30-day evacuation period for DRC evacuees ends on February 26 and the evacuees have received no clarity on whether they will be eligible for further evacuation reimbursements should the evacuation period continue, as expected, due to the deteriorating situation in the DRC. Now facing administrative leave and/or termination by their employer, the evacuees and their families are left in limbo on a daily basis as they worry about their mounting financial burden and have no ability to plan for where their families should be from week to week.

23.    In addition, the DRC evacuees continue to lack clarity about the safety and security of their household property and in some cases, pets, that they have left behind in Kinshasa. These concerns are especially worrying because USAID's failure to cover basic operational expenses (such as the costs of evacuation) extends to yet other operational expenses such as

8

electricity and utility payments for employee housing in other countries. In the case of DRC, failure to pay landlords in Kinshasa for basic housing expenses could result (and may already have resulted) in landlords treating employee effects left behind in housing as abandoned, and claiming or disposing of them.

**Impacts From the 30-Day Evacuation on USAID Employees Located Abroad**

24.     Mr. Marocco states that he "plan[s] to allow" USAID staff in foreign countries who are placed on administrative leave to retain access to communication systems. ECF No. 35-1 ¶ 11. However, he does not adequately address how USAID will ensure the safety of individuals who must remain in a foreign country after the 30-day evacuation period has ended and have not yet been able to obtain an evacuation waiver. As noted above, some USAID employees will be required to do so for family and medical reasons.

25.     Chiefs of Missions may question their responsibility to ensure the safety of such individuals, as they would no longer be within the embassy community. Additionally, some host nations may revoke these individuals' diplomatic status based on the change in employment and visa status. Many individuals placed on administrative leave, and their families, will also need to obtain new types of visas to remain in the foreign country. Mr. Marocco does not address how the necessary visas and other documents will be obtained.

26. FSOs overseas also face financial uncertainty as a result of the confusion and lack of communication regarding the Agency's on-going effort to recall overseas staff. Several "committees" are operating inside the State Department despite last week's TRO to actively plan for the immediate departure of USAID FSOs. These committees have already contacted some FSOs to begin preparing TAs for their departure.

27. However, it remains unclear what work status these FSOs are returning to. As explained in my first declaration, a normal Permanent Change of Station (PCS) moves a FSO and their family to a new assignment with a fully funded TA that includes among other things, temporary housing, meals & incidental expenses, shipment of household effects, and personal vehicle. *See* ECF No. 9-2 ¶ 11. This process is normally done 3-6 months ahead of the FSOs departure.

28. In contrast, the rapid pace of the planned recall leaves FSOs with zero knowledge of where they are expected to reside nor where they are expected to report to work. The Agency has refused to clearly state its expectations and provide clarity on its financial obligations during the anticipated recall. FSOs are left to guess whether they should return to the DC metro area or to their home of record.

29. Either choice has financial concerns. Not all FSOs maintain residences in the United States. As a result, the financial burden placed on the FSO to establish a short-term residence without knowing if the Agency

will provide any allowances is great. Returning to the DC area only to be

subsequently terminated at a future date would likely result in added

incurred costs to the FSO who may need to relocate their family once again.

30.    On the other hand, if the Agency followed its own Reduction in

Force (RIF) policy, much of this uncertainty would disappear. Per this policy,

FSOs overseas are provided 90-days notice before being mustered out and

returned to the United States and their "home of record."  During this time,

TAs are prepared according to policy with accounting for all relevant

allowances. Furthermore, the FSO determines where they will land in the

United States based on their home of record. It is clear that the Agency

intends to conduct a RIF in the near future, per the president's direction to

all federal agencies. By recalling over 1,400 FSOs prior to a RIF, the agency

is looking to shift the financial burden away from itself and onto the FSO

upon final separation.

31.    These uncertainties, combined with the chaotic implementation

of the evacuation of USAID staff in foreign countries, is harming USAID

employees and their families. For example, Terry Doe's wife, who is 31 weeks

pregnant, experienced complications from the stress of the shutdown. Decl. of

Terry Doe ¶ 5. Terry Doe's wife was told she needed to immediately evacuate

due to the risk of a life-threatening hemorrhage. *Id.* However, the

Department of State twice denied Terry Doe's request for a Medivac. *Id.*

Terry Doe's wife began to hemorrhage, and is now in the care of a local

hospital that will likely not have sufficient resources to care for their newborn child when they arrive, as they will likely require a stay in the NICU. *Id.* ¶¶ 8-9. Despite requesting a medical waiver for evacuation multiple times, Terry Doe still has not received one. *Id.* ¶ 14. Nor has USAID provided any response to Terry Doe's questions about whether the agency will reimburse Terry Doe for the costs of remaining in the host country due to medical necessity. *Id.* ¶ 15. Moreover, Terry Doe's diplomatic visa status is uncertain. *Id.* ¶ 17.

**USAID Payments for Incurred Expenses**

32.    Mr. Marocco concedes that USAID is delayed in processing payments. He further concedes that "these delays could continue to impact certain payments to employees in the immediate future." ECF No. 35-1 ¶ 17.

33.    USAID's continued inability to process payments has created safety risks for USAID staff in foreign countries. As described above, USAID has not paid for the repair of an electric fence or blinds for security at USAID-owned houses in Botswana. USAID in Botswana is also behind in paying essential operational bills, including phone and internet services. If these services are cut off, then USAID staff will not be able to communicate in an emergency.

34.    USAID's inability to process payments is also impacting the ability of USAID staff in foreign countries to evacuate. For example, many local moving and packing companies are aware of the cessation of payments

to U.S. government contractors, so they will not accept jobs without a
payment guarantee. Additionally, many travel arrangers in Washington, D.C.
are contractors under stop-work orders.

35.    The USAID payment system, Phoenix, remains inoperable. The
payment approval process Mr. Marocco describes—whereby he and select
USAID employees may approve payments—is unworkable. Just one or a
handful of people do not have the capacity to process thousands of pending
payments in a timely manner. Mr. Marocco also concedes that "routine"
payments are still encumbered by "additional layers of review"—only
"certain" of them have been removed. ECF No. 35-1 ¶ 17. And because
USAID staff's access to systems continues to be sporadic—one person's
access, for example, may flip on and off by the hour—the approval process is
unclear and slow-moving.

36.    As Emelia Doe explains in a declaration filed concurrently with
this one, USAID Southern Africa currently has 235 operational payments in
queue. Decl. of Emelia Doe ¶ 4. Although these operational payments should
be exempt from the foreign assistance pause according to USAID and
Department of State officials, no operational payments for USAID Southern
Africa have been released since January 22. *Id.* ¶ 5. Additionally, no program
fund payments have been made since January 22, even for services provided
prior to the date of the pause in payments and which are exempt from the
payment pause. *Id.* ¶ 6. It will take weeks just to catch up on payments

13

already in the queue. *Id.* ¶ 15. Emelia Doe, despite not having been placed on administrative leave (to her knowledge), has not had access to her USAID email or the Phoenix system since February 3. *Id.* ¶ 16.

37.    Emelia Doe also explains that, due to USAID no longer paying for staff's utilities, she and her family are currently relying on solar power and backup battery. When that runs out, they will rely on the generator, which will provide only one day's worth of electricity. She and her family face imminent loss of electricity. *Id.* ¶¶ 10-11. USAID's refusal to pay bills also risks the security systems of Emelia Doe's and other U.S. government staff's residences. *Id.* ¶ 12.

**Personal Service Contractors**

38.    In paragraph 19 of his supplemental declaration, Mr. Marocco discussed Personal Service Contractors (PSCs). ECF No. 35-1 ¶ 19.

39.    While no PSCs were registered as associate members of AFSA as of February 13, 2025, many USPSCS serve overseas alongside AFSA members and are subject to the same security and family stability risks regarding the precipitous actions to dissolve USAID. *See* ECF No. 24-16, Further Declaration of Jane Doe.

Executed on February 17, 2025

__/s/__*Randall Chester*__

Randall Chester