# EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN FOREIGN SERVICE ASSOCIATION, et al., | ) ) ) ) |
| Plaintiffs, | ) ) Civil Action No. 1:25-CV-352 |
| v. | ) ) ) |
| DONALD TRUMP, et al., | ) ) ) |
| Defendants. | ) ) |

**DECLARATION OF EMELIA DOE**

I, Emelia Doe, declare the following under penalty of perjury:

1. I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2. I am the spouse and eligible family member of a Foreign Service Officer assigned to South Africa.

3. I am a resident-hire United States personal services contractor ("USPSC") for USAID with responsibilities related to payment processing and certification for Southern Africa.

4. USAID Southern Africa currently has 235 operational payments in queue, totaling an estimated $1.6 million dollars. This includes an estimated $690,000 in employee allowances for education, medical, and other reimbursements. It also includes direct payments to vendors and service providers, including hospitals and medical providers who provide treatment to U.S. government employees on

1

letters of credit from the Embassy. It also includes payments to keep two buildings in Pretoria operational, which I describe in more detail below. In addition to this amount, employees are owed $55,000 in official travel reimbursements across 56 trips which took place before January 20, 2025.

5. These operational payments are, in theory, exempt from the foreign assistance pause because they are made with operational expense funds or specially designated program funds that can be used for operational expenses. Nevertheless, to my knowledge, no operational payments for USAID Southern Africa have been released since January 22, 2025, despite intense interagency efforts at Post to resolve the issue. These concerns have been escalated to the highest levels of USAID and the State Department through multiple channels. The delays in operational payments are significantly impacting my family and interagency operations in South Africa, and have the potential to put the safety of U.S. government employees and their families at risk.

6. Additionally, no program fund payments have been made since January 22, 2025, even for services provided prior to the date of the pause which are exempt from the pause. Nor have program fund payments been made for life-saving programs which fall within applicable waivers. There are currently $72.5 million dollars in overdue programmatic payments in Southern Africa that in theory, should be exempt from the pause.

7. It is my understanding that the operational and programmatic payment delays are due to the requirement that USAID and State Department political

2

appointees approve each USAID payment individually through a constantly changing process, as well as limits on the access and authorities of USAID personnel in our financial systems. To my knowledge, as of February 13, 2025, these processes and access restrictions remain in place despite the temporary restraining order in this case which required access to USAID systems to be restored and the temporary restraining order in the cases filed by USAID and State Department implementing partners which required the pause on disbursements to be lifted.

8. Many of these payments are more than 30 days past due, in violation of the Prompt Payment Act. As a result, the mission is accruing interest on these payments at approximately $1,000 per day. The mission currently owes an estimated $17,000 in interest due to these payment delays. This is an extraordinary amount of interest penalties, and is the result of losing financial management system access and payment certification authorities, as well as the requirement that each payment receive political approval. By contrast, for all of FY2024 through September 30, 2024, the entire agency accrued a total of $55,934 in interest penalties. In short, due to the payment freeze, USAID Southern Africa has accrued interest in the last three weeks equivalent to 30% of what the entire agency did all of last year.

9. I live with my spouse in United States Government-furnished housing in Pretoria, South Africa. The Department of State designates South Africa under a "Level 2" travel advisory for its high crime, civil unrest, and kidnapping, noting that "*violent crime is common and includes armed robbery, rape, carjacking, and mugging.*"

10.     Our home is on a compound with another home where a non-USAID foreign service officer lives. Our home is connected to the municipal electrical grid. The electrical service is paid for by USAID, through the State Department, which purchases pre-paid electrical service tokens from the municipality. The token for our home expired on February 15, 2025. We purchased a token out of pocket and have been told we will not be reimbursed, but the amount we paid was used for the overdue balance, rather than to provide additional electricity. At this point, we no longer receive grid power and are wholly reliant on solar power and battery backup. As a result, we have had to forego use of the electric stove, air conditioning, and laundry.

11.     We currently have 30% capacity left on our solar battery. Because it is raining today, the battery won't charge. Rain is currently forecast for the next several days. Once we run out of the solar battery, the generator will kick in, perhaps giving us one extra day of electricity. The situation is dire, and electrical failure seems imminent.

12.     In addition to our house, our grid connection supplied electricity to the guard house, perimeter lighting, vehicle gate, and electrified fencing for the entire compound. Due to USAID's inability to pay, the Embassy General Services Office took the extraordinary step of rewiring the security features so that they are connected to a non-USAID house to prevent their imminent failure. But, even if the emergency rewiring maintains electricity to security services at our home, it is my understanding that other homes and compounds in the housing pool will imminently be in the same situation and may also require emergency rewiring. These stop-gap measures may

4

not be possible in all cases. Further, these limited interventions to preserve grid-connected security systems, while welcome, do not solve the broader problem: Because USAID is not paying its bills, Americans in USAID-supported housing are in an increasingly untenable situation.

13.     Based on my role in payment processing and certification, I am aware that USAID is the alternate service provider ("ASP") for the Annex Compound (the "Annex") in Pretoria. This means that USAID is responsible for the operations of the Annex, including paying for the services that keep the building safe and secure. The ASP payments are separate from the State Department payments and subject to different payment approval processes which are also largely non-functional. The Annex is a two-building campus that houses more than 550 employees of eight United States Government agencies, including USAID, the Department of Homeland Security (Immigration and Customs Enforcement and U.S. Secret Service), Drug Enforcement Agency, Health and Human Services and the Center for Disease Control, and the State Department (Regional Security Office, PEPFAR Coordination Office, Financial Management Office, and General Service Office). In my role, I am aware of the payments that USAID is required to make to keep the Annex operating safely.

14.     During mission townhalls and other meetings, mission leadership and security personnel have been transparent about the payment problems. In these meetings, staff have been informed that USAID is not able to make critical payments for the services necessary to keep the Annex operational. I am aware that payments

for electricity, water, janitorial services, internet connectivity, and USAID official cell phones are all past due, and vendors could terminate services any day. Failure of these services will require these eight U.S. federal agencies to cease operations at the Annex. I am also aware that USAID's Citibank Travel Card has already been suspended for non-payment, meaning that we have lost the ability to make travel arrangements for American personnel in the event of an emergency, including medical evacuation, ordered departure, emergency visitation travel, or other travel necessary for the repatriation of USAID personnel to the United States.

15.    I am aware that on February 16, 2025, 95 operational expense vouchers, including some of the most critical operational payments for South Africa and other missions had been approved by a political appointee and sent to the mission for certification under a new *ad hoc* process. This new process allows only approximately 50 USAID employees worldwide access to Phoenix. Southern Africa usually has 20 employees with Phoenix access who process vouchers for six countries. Under the new process, Southern Africa has five employees to examine and certify vouchers for 16 countries. With such limited resources, even if the process works, it will take weeks to catch up on the payments already in the queue, while exempt expenses continue to be incurred. Even if these 95 payments are released, hundreds more exempt payments for the 16 countries will remain in the queue, not yet ready for immediate certification under the new process. These payments include hundreds of thousands of dollars in reimbursements for education and travel owed to USAID employees,

6

vendor payments for services to the Annex, and payments to partners for work completed before the pause.

16. Additionally, on Monday, February 3, 2025, my access to USAID systems, including email and USAID's financial management system (Phoenix) was turned off. I have received no explanation as to why. The contracting officer responsible for my employment contract has told me that I have not been placed on administrative leave and that he has not received any instruction to do so. On February 3, 2025, I contacted the USAID Chief Information Officer ("CIO") helpdesk phone number, and the person that talked to me said that CIO had been instructed to terminate my systems access. Based on media reports, I believe my access to USAID systems was ultimately terminated based on instructions from DOGE employees. As I have not been placed on leave, I continue to report to work and perform my duties as best I can given the systems access limitations. I am personally aware of 22 other USPSCs who are in the same situation in South Africa, who still have not had USAID systems access restored.

17. Finally, the stress and distress I have felt about this situation has been intense and worsening. I feel helpless because I do not have the systems access necessary to do my job well. I see other foreign service families dealing with the uncertain future of the agency, their careers, and even their access to electricity; and I know that implementing partners and beneficiaries are dealing with chaos which is placing lives at grave risk.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 17, 2025.

                                                   <u>/s/ Emelia Doe</u>

                                                   Emelia Doe