## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AMERICAN FOREIGN SERVICE
ASSOCIATION, et al.,

    *Plaintiffs*,

  v.

DONALD TRUMP, et al.,

    *Defendants*.

Civil Action No. 1:25-cv-352 (CJN)

### <u>MEMORANDUM OPINION</u>

  The original plaintiffs in this lawsuit are two unions that represent employees of USAID; they challenge a "series" of executive branch actions that they allege will "systematically dismantle[]" that agency.  ECF No. 1 (Compl.) at 2.  Those plaintiffs initially moved for a temporary restraining order on February 7, 2025, ECF No. 9-1 (Mot), which the Court granted in part that day, ECF No. 15 (TRO).  Following full briefing on that Motion, the submission of various supplemental declarations, and multiple hearings, the Court concludes that plaintiffs have not demonstrated that further preliminary injunctive relief is warranted.

## I. Background

### A. Statutory Background

  In the Foreign Assistance Act of 1961, Congress "declare[d] that a principal objective of the foreign policy of the United States is the encouragement and sustained support of the people of developing countries in their efforts to acquire the knowledge and resources essential to development and to build the economic, political, and social institutions which will improve the quality of their lives."  22 U.S.C. § 2151(a).  To implement that objective, President Kennedy the

1

same year issued an Executive Order directing the Secretary of State to "establish an agency in the Department of State to be known as the Agency for International Development," or USAID.  Exec. Order 10,973 § 102, 26 Fed. Reg. 10,469 (Nov. 3, 1961).  From 1961 until today, USAID has been tasked by statute with "assist[ing] [] strategically important countries and countries in conflict; lead[ing] U.S. efforts to alleviate poverty, disease, and humanitarian need; and assist[ing] U.S. commercial interests by supporting developing countries' economic growth and building [their] capacity to participate in world trade."  Cong. Rsch. Serv., *U.S. Agency for International Development: An Overview* (Jan. 6, 2025).

More than 35 years after USAID was first established as an arm of the State Department, Congress passed the Foreign Affairs Reform and Restructuring Act of 1998 (FARRA), which recognized USAID as an "independent establishment" *outside* of that Department.  *See* 22 U.S.C. § 6563; 5 U.S.C. § 104.  The FARRA gave the President 60 days within which to submit to Congress a "report" that could provide for the "consolidation and streamlining" of USAID, the "transfer" of certain USAID functions back to the State Department, or even the wholesale "abolition" of the agency.  22 U.S.C. §§ 6601(a)(1), (d)(1).  But President Clinton's report took none of those steps, and instead determined that "USAID will remain a distinct agency with a separate appropriation."  *See* Reorganization Plan and Report Submitted by President Clinton to the Congress on December 30, 1998, Pursuant to Section 1601 of the FARRA, *as contained in* Public Law 105–277, 112 Stat 2681 (1998).

To be sure, the FARRA (together with President Clinton's determination) did not make USAID wholly independent of the State Department.  For example, the FARRA places the USAID Administrator "under the direct authority and foreign policy guidance of the Secretary of State," 22 U.S.C. § 6592, and some kinds of foreign aid are jointly administered by the State Department

and USAID.  *See, e.g.*, 22 U.S.C. § 2346(b) ("economic support programs").  But USAID nevertheless is considered an "independent establishment" and receives its own appropriations. The Further Consolidated Appropriations Act of 2024, for example, appropriates funds specifically for USAID (and for specific USAID programs), and provides that appropriated funds cannot be used to "implement a reorganization [or] redesign" of the agency without "prior consultation by the head of [the agency] with the appropriate congressional committees."  Pub. L. 118–47 § 7063(a), 138 Stat 460 (2024); *see also id.* § 7015(a).  By statute, that consultation must also include the provision of a "detailed justification for any proposed action."  Pub. L. 118–47 § 7063(a), 138 Stat 460 (2024).

## B.    Factual Background

The day he took office, President Trump issued an Executive Order entitled "Reevaluating and Realigning United States Foreign Aid."  Exec. Order. 14,168, 90 Fed. Reg. 8619 (Jan. 20, 2025).  That Executive Order provides that "[t]he United States foreign aid industry and bureaucracy are not aligned with American interests and in many cases [are] antithetical to American values," and accordingly mandates an "immediate[]" "90-day pause" on "new obligations and disbursements of development assistance funds . . . pending reviews of such programs for programmatic efficiency and consistency with United States foreign policy."  *Id.* §§ 1, 3(a).  At the end of that period, "responsible department and agency heads" are to "make determinations . . . on whether to continue, modify, or cease each foreign assistance program based upon the review recommendations."  *Id.* § 3(c).  But the Executive Order also allows obligations and disbursements to resume "prior to the end of the 90-day period" "if a review is conducted and the Secretary of State . . . decide[s] to continue the program in the same or modified form."  And

it permits the Secretary of State to completely "waive" the 90-day pause for "specific programs." *Id.* §§ 3(d), (e).

Four days later, on January 24, 2025, Secretary of State Rubio issued a memorandum pausing "all new obligations of funding, pending a review, for foreign assistance programs funded by or through the [State] Department and USAID." Dep't of State, Mem. 25 STATE 6828 ¶ 1 (Jan. 24, 2025). The memorandum also directs that, "[f]or existing foreign assistance awards, contracting officers and grant officers shall immediately issue stop work orders, consistent with the terms of the relevant award, until such time as the Secretary shall determine, following a review." *Id.* ¶ 7. But Secretary Rubio approved "waivers of the pause under the Executive Order" for "foreign military financing for Israel and Egypt"; "emergency food assistance"; "legitimate expenses incurred prior to the date of [the memorandum]"; and "salaries and related administrative expenses, including travel, for U.S. direct hire employees, personal services contractors, and locally employed staff." *Id.* ¶¶ 12(a)–(e). And Secretary Rubio later also waived the pause as to "life-saving humanitarian assistance during the period of review." *See* Sec'y of State, Emergency Humanitarian Waiver to Foreign Assistance Pause (Jan. 28, 2025); *see also* ECF No. 20-1 (Marocco Decl.) ¶ 10.

On January 30, 2025, Present Trump appointed Secretary Rubio as the Acting Administrator of USAID. Marocco Decl. ¶ 8. Four days later, the Secretary sent a letter to members of the Congressional Committees on Foreign Relations, Foreign Affairs, and Appropriations informing them, "[c]onsistent with applicable law, including sections 7063 and 7015 of the [Consolidated Appropriations Act of 2024]," of his "intent to initiate consultations with you regarding the manner in which foreign aid is distributed around the world through [USAID]." ECF No. 20-1 Ex. C at 1–2. In Secretary Rubio's view, "USAID's foreign assistance

processes reflected signs of severe inefficiency," and "a substantial number of the programs funded by USAID neither substantially benefited the American people, nor reflected the priorities of the President and [himself]." *Id.* ¶ 7; *see also* ECF No. 20-1 Ex. C at 2. Secretary Rubio also stated that he was delegating the duties of Deputy Administrator of USAID to Peter Marocco, who would "begin the process of engaging in a review and potential reorganization of USAID's activities to maximize efficiency and align operations with the national interest." *Id.* at 2.

In order to carry out that review process, and also to prevent alleged noncompliance by USAID employees with the President's and Secretary's "pencils down" directives, agency leadership began placing employees on paid administrative leave. Marocco Decl. ¶¶ 6, 9, 12, 14. Of the approximately 4,800 direct hire employees of USAID—who are stationed across both foreign and domestic posts—58 were initially placed on paid administrative leave. *Id.* ¶ 11. By February 7, 2025, USAID had placed 2,140 employees on administrative leave. *Id.* ¶ 12. The agency ultimately determined that approximately 611 staff were essential to carry out its statutory functions, and had planned to place the remaining approximately 2,014 employees on paid administrative leave by 11:59 p.m. on February 7, 2025. *Id.* ¶¶ 16–17.

USAID represents that it has "a careful plan" for any overseas employees who are placed on administrative leave. *Id.* ¶ 22; *see also* ECF No. 46-1 (Third Marocco Decl.) ¶ 4. Namely, those employees will be required to decide within thirty days whether they wish to return to the United States or remain at their foreign posts. Marocco Decl. ¶¶ 23, 25. Employees who choose to remain abroad "will be entitled to all of the benefits previously available, so long as [they] remain[] on paid administrative leave." *Id.* ¶ 23. As USAID informed its employees when announcing its administrative leave policy in early February, "[o]verseas USAID personnel retain the option to remain at their posts, even while placed on administrative leave and not working."

ECF No. 20-1 Ex. D.  Although employees on administrative leave "may lose access to certain USAID systems" in an effort to maintain internal security and "ensure that the 'pause' on Agency operations can truly go into effect," Deputy USAID Administrator Peter Marocco attests that USAID "has no plan or proposal that an employee would be shut out from access to overseas security resources at a high-risk post."  Marocco Decl. ¶ 27.

Overseas employees who choose to return to the United States within thirty days will have their travel "coordinate[d]" and "financially cover[ed]" by USAID, which has "a team of 257 employees . . . receiving and processing [return] requests and standing by to assist."  *Id.* ¶ 23; Third Marocco Decl. ¶ 4.  Those who choose to stay abroad on administrative leave beyond that time period will not receive travel compensation, unless they obtain an "individualized exception."  Third Marocco Decl. ¶ 4.  "For example, the Agency will consider exceptions based on the timing of dependents' school term[s], personal or familial medical needs, pregnancy, and other reasons."  Marocco Decl. ¶ 26.  According to Deputy Administrator Marocco, "there have been no forced or attempted evacuations of any USAID employee[s]" from their foreign postings, nor has USAID issued any mandate that all overseas employees placed on administrative "must return to the United States."  *Id.* ¶ 25.

The government has, however, made it clear that it separately reserves the right to "direct" USAID employees stationed overseas "to depart their post[s]," such as if they are terminated or are "needed elsewhere based on an agency reorganization."  Third Marocco Decl. ¶ 5.  In the event that an employee receives such direction and does not depart post within the required time frame, he or she "would no longer be 'officially stationed overseas' and would not meet the definition of employee under the Department of State Standardized Regulations."  *Id.*  In that case, the employee "would no longer qualify for allowances applicable to the assignment in a foreign location"—like

housing, personal expenses coverage, tuition payments, a diplomatic visa, and security resources. *Id.*; *see also* ECF No. 35-1 (Second Marocco Decl.) ¶ 11.  (There might, however, "be some flexibility to allow children to continue in a school" if tuition had already been paid.)  Third Marocco Decl. ¶ 5.  Regardless, Deputy Administrator Marocco attests that, "[i]n the case of any future . . . directed departures, [USAID] will allow a reasonable amount of time for the departure consistent with [USAID] policies and will maintain adequate communications and systems to ensure [employees'] safe return."  *Id.* ¶ 7.

### C.    Procedural History

Plaintiffs filed their first complaint on February 6, 2025, alleging that defendants were violating the Constitution and the APA by "dismantl[ing]" USAID.  Compl. at 2, ¶¶ 49–82.  Just before noon the following day—the day on which USAID had intended to place 2,014 additional employees on administrative leave by 11:59 p.m.—plaintiffs moved for a TRO that would enjoin defendants from "taking any further actions to shut down USAID operations."  Mot. at 1, 23.  In light of the midnight deadline, the Court scheduled a hearing on the motion for later that afternoon. *See* Min. Order of February 7, 2025.

After argument, the Court entered a "limited" TRO.  TRO at 1.  It explained that, while plaintiffs' TRO request was styled as pertaining to the alleged wholesale dissolution of USAID, plaintiffs' allegations of irreparable injury actually "flow[ed] principally" from three subsidiary government actions: (1) the placement of USAID employees on administrative leave; (2) the expedited evacuation of USAID employees from their overseas posts; and (3) the 90-day pause on foreign assistance funding.  *Id.* at 2.  The Court concluded based on the limited record before it (and the looming midnight deadline, which the government expressly declined to extend) that plaintiffs had demonstrated entitlement to temporary injunctive relief with respect to the first and

second actions, in light of their "strong" arguments that their members would face irreparable harm from losing access to government security systems while abroad and being prematurely recalled to the United States, their "colorable" arguments that the government's actions were unlawful, and the government's failure to explain how it would be harmed by briefly abstaining from making any personnel changes. *Id.* at 3–5. But the Court reached the opposite conclusion as to the third action, explaining that plaintiffs' allegations that the funding freeze would inflict emotional harm on their members and expose them to personal financial liability were too "hypothetical" to support a finding of irreparable harm. *Id.* at 6–7. The Court accordingly ordered the government to reinstate all USAID employees who had already been placed on administrative leave, and to withhold from placing any additional employees on administrative leave or evacuating them from their overseas posts until February 14, 2025. *Id.* at 7. But it did not enjoin the funding pause in any way. *Id.*

The same order converted plaintiffs' TRO motion into a motion for a preliminary injunction, set a briefing schedule, and scheduled a hearing on February 13, 2025. *Id.* At the conclusion of that hearing, and as reflected in an Order amending the TRO, the Court explained that it intended to issue an Opinion on the motion for preliminary injunction and so extended the TRO by one week, until February 21, 2025, to permit itself time to do so. ECF No. 31. The Court also clarified that the TRO's restraint on evacuating USAID employees stationed abroad applied only to involuntary recalls, and that USAID was of course free to evacuate any employee who wished to return to the United States. *Id.* And the Court ordered the government to submit an

additional declaration on factual questions that arose during the February 13 hearing—which the government did at ECF No. 35.[1]

## II.    Legal Standard

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch,* 451 U.S. 390, 395 (1981).  Accordingly, a preliminary injunction is "an extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." *Cobell v. Norton,* 391 F.3d 251, 258 (D.C. Cir. 2004).  "To warrant preliminary injunctive relief, the moving party must show (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).  When the movant seeks an injunction against the government, the final two factors are analyzed as one.  *See*, *e.g.*, *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016).

## III.    Analysis

It is well-established that injunctions issued in "[g]overnment personnel cases" are not "orthodox stays." *Sampson v. Murray*, 415 U.S. 61, 83–84 (1974) (quotation marks omitted).  The

---

[1] After their motion for a preliminary injunction was fully briefed, plaintiffs filed an amended complaint joining as a plaintiff Oxfam America, "a global organization that fights inequality to end poverty and justice."  ECF No. 30 (Am. Compl.) ¶ 3.  Plaintiffs allege that the executive branch's actions with respect to USAID have "thwart[ed] Oxfam's mission" because USAID's "pending closure leaves a massive shortfall that will force Oxfam and other organizations to reallocate funds away from critical programs." *Id.* ¶ 56.  Claims involving Oxfam are not before the Court on the present Motion, however, because plaintiffs do not allege that Oxfam is at risk of any irreparable injury. *See* Mot. at 17–21.

government "has traditionally been granted the widest latitude in the dispatch of its own internal affairs," *id.* (quotation marks omitted), because "[i]nterference by the judicial department in such cases [regarding personnel matters] [c]ould lead to the utmost confusion in the management of executive affairs." *White v. Berry*, 171 U.S. 366, 378 (1898). The Supreme Court has thus been clear that, in considering whether to issue enjoin actions that bear on federal employment matters, courts may not "routinely apply" the "traditional [preliminary injunction] standards." *Sampson*, 415 U.S. at 83–84. Instead, they may issue relief only upon a far more rigorous showing of entitlement. *See id.*

### A.    Irreparable Harm

Because "the basis of injunctive relief in the federal courts has always been irreparable harm," *Full Gospel Churches*, 454 F.3d at 297, it is helpful to begin the analysis there. Plaintiffs assert that the executive branch's challenged conduct has harmed (and will harm) them and their members in multiple ways. *See* Mot. at 18–21; Reply at 23–26. But to qualify as irreparable harm, the injury alleged "must be both certain and great; it must be actual and not theoretical." *Full Gospel Churches*, 454 F.3d at 297. It must also, as the "key word . . . *irreparable*" indicates, "be beyond remediation." *Id.* Upon scrutiny, the employment-related injuries that plaintiffs assert here are not irreparable ones warranting the "extraordinary remedy" of a preliminary injunction. *Cobell*, 391 F.3d at 258. Nor are they "sufficient in kind and degree" to "override the factors cutting against the general availability of preliminary injunctions" in personnel cases like this one. *Sampson*, 415 U.S. at 85.

*First*, plaintiffs argue that their members will face irreparable harm from being placed on paid administrative leave because that status means they will lack access to agency email and security systems, posing "serious safety risks to employees overseas." Reply at 24. As reflected

during the TRO stage of this case, the Court was very concerned about this potential harm, and its TRO as to the administrative leave issue was significantly motivated by that concern.  *See* TRO at 3–4.  But several subsequent submissions by the government persuade the Court that the risk posed to USAID employees who are placed on administrative leave while stationed abroad—if there is any—is far more minimal than it initially appeared.

In particular, in opposing plaintiffs' motion, the government submitted a declaration from the Deputy Administrator of USAID, Peter Marocco.  Deputy Administrator Marocco represents that, although employees on administrative leave may "lose access to certain USAID systems" in order "to ensure that the 'pause' on Agency operations can truly go into effect," USAID "has no plan or proposal that an employee would be shut out from access to overseas security resources at a high-risk post."  Marocco Decl. ¶ 27; *see also* Third Marocco Decl. ¶ 4.  In a supplemental declaration filed as required by the Court, Deputy Administrator Marocco further attests that all overseas employees placed on administrative leave will "continue to fall under the authority of the Chief of Mission" of their diplomatic posting—i.e., the individual at that posting who is statutorily "responsible for the security of the executive branch employees [stationed there] and their eligible family members."  Second Marocco Decl. ¶¶ 3–4; *see also* 22 U.S.C. § 3927(a) (outlining the duties of a chief of mission).  As a result, those employees will continue to be protected through standard "residential, personal, and physical security programs" in place at their mission posts. Second Marocco Decl. ¶ 6.  For instance, they will retain access to "two-way radios" that enable "24/7 communications in the event of an emergency" and the "SAFE Alert system which provides electronic messaging to staff with security and safety alerts," including on their personal devices. *Id.*  They will also retain access (where available) via USAID-issued devices to "SCRY Panic," a "situational awareness application" that enables users to hit a "panic button" which "activate[s]

geospatial tracking and initiate[s] a Diplomatic Security response," and will remain subject to all other applicable security mandates at their posts, like travel restrictions, armored vehicle requirements, and curfews. *Id.* ¶¶ 7, 11.

Based on this record, the Court concludes that the prospect of plaintiffs' members suffering physical harm from being placed on administrative leave while abroad is highly unlikely. And to the extent that plaintiffs allege that paid administrative leave will harm their members in ways other than via the supposed removal of security protections—such as by tarnishing their members' reputations or by preventing them from performing their standard duties, *see, e.g.*, ECF No. 24-17 (AFSA Decl.) ¶ 27; ECF No. 36-3 ¶ 17—those types of standard employment harms "fall[] far short of the type of irreparable injury which is a necessary predicate to the issuance of a [preliminary] injunction." *Sampson*, 415 U.S. at 91–92.

*Second*, plaintiffs argue that their members will be irreparably harmed by what they initially described as a "mandatory recall notice" requiring more than 1,400 USAID employees stationed overseas to "repatriate within 30 days." Mot. at 18. Again, the Court was concerned by this alleged harm when issuing the TRO: it observed that recalling employees on such short notice could subject them to non-financial injuries—like harms to the continuity of their healthcare and their children's education—that no future lawsuit could redress. *See* TRO at 4–5. But again, the government's subsequent submissions have convinced the Court that plaintiffs' initial assertions of harm were overstated.

The record now reflects that no USAID employee stationed abroad has been or imminently will be *required* to return to the United States within thirty days. Marocco Decl. ¶ 23; *see also* Third Marocco Decl ¶ 4. Rather, as matters presently stand, USAID employees stationed abroad have been given a choice. If they wish to return to the United States within thirty days, they may

do so, and will be eligible for agency-funded and arranged return travel.  Marocco Decl. ¶ 25; ECF No. 20-1 Ex. D.  Indeed, USAID has established a 200+ person team dedicated to coordinating those return trips.  Third Marocco Decl. ¶ 4.  And if employees wish to "remain at their posts" beyond that thirty-day period, they may also do so—even "while placed on administrative leave and not working."  ECF No. 20-1 Ex. D.  In that case, as long as an employee "remains on paid administrative leave," "he or she will be entitled to all of the benefits previously available."  Marocco Decl. ¶ 25.  However, USAID will not pay for the employee's eventual return travel unless he or she obtains "an individualized exception," such as one based on "the timing of dependents' school term[s], personal or familial medical needs, pregnancy, [or] other reasons."  ECF No. 20-1 Ex. D; *see also* Marocco Decl. ¶ 26.

This recall scheme of course does not eliminate the possibility of *financial* harm to USAID employees.  As plaintiffs point out, some employees may not receive exemptions, and thus may be required to pay for their own travel back to the United States (if they choose to stay at post) or to incur costs related to relocating to the United States earlier than expected (if they choose to leave post).  *See* Reply at 23; *but see* 5 U.S.C. § 5924(2)(B) (foreign service workers are statutorily eligible for otherwise uncompensated "transfer allowance[s] for extraordinary, necessary, and reasonable subsistence and other relocation expenses" if they "agree[] in writing to remain in Government service for 12 months after transfer, unless separated for reasons beyond the control of the employee"); Second Marocco Decl. ¶ 16 (USAID can pay statutory transfer allowances).  But monetary harm is typically not irreparable; and here, in the event that certain of plaintiffs' members are not reimbursed for expenses to which they believe they are entitled, they could seek "adequate compensatory . . . relief . . . at a later date."  *Full Gospel Churches*, 454 F.3d at 297.  To the extent that plaintiffs are also concerned that their members could in the future be "directed to

depart their posts," in which case they would be stripped of their employee-status and accompanying benefits if they did not depart within the applicable time frame, the record does not reflect that such a direction is imminent. Third Marocco Decl. ¶¶ 5–6. Instead, as noted above, USAID has expressly informed employees that they "retain the option to retain at their posts," "even while placed on administrative leave and not working." ECF No. 20-1 Ex. D. And in any event, the government has committed that any "directed departures" would be conducted on a "reasonable" timeline and "consistent with [USAID] policies," mitigating any theoretical future risk of irreparable harm.[2] Third Marocco Decl. ¶ 7.

*Third*, plaintiffs argue that, in various ways, their members will be irreparably harmed by the funding pause and stop-work orders. The Court previously explained in its TRO why plaintiffs' initial allegations that USAID's default on foreign aid contracts would financially and emotionally harm individual USAID employees were too "hypothetical" to warrant relief. TRO at 6–7. In their reply brief, plaintiffs switch tacks to argue that, because modification or termination of certain existing contracts "may be unlawful," employees directed to make such changes will face irreparable harm as a result of losing "goodwill" with partner agencies. Reply at 25. But this new argument does not lead to a new result. Without any clarity about the terms of the contracts at issue, plaintiffs' allegations of illegality remain too speculative to support a finding of irreparable harm. Nor, in any event, does the Court find it likely that a partner agency would attribute a contract modification, whether unlawful or not, to any USAID employee in his or her personal capacity.

---

[2] Of course, plaintiffs remain free to renew their motion for a TRO or a preliminary injunction should an imminent risk of irreparable harm from "directed departures" arise, such as if any individual were directed to leave post on a timeline that would pose the choice between disrupting familial or medical arrangements or remaining abroad without critical government protections.

At the February 12 hearing, plaintiffs also contended that the funding freeze has prevented USAID from paying for the living expenses of its overseas employees, such as their utility bills and the tuition bills of their dependents. *See, e.g.*, ECF No. 24-11 ¶ 14 (overseas USAID controller attesting that he has "pending administrative payments of $0.2 million"). But as plaintiffs' declarant himself notes, Secretary Rubio waived the funding pause for the "living and operating expenses" of USAID employees. *Id.* ¶ 5; *see also* Dep't of State, Mem. 25 STATE 6828 ¶ 12(c) (Jan. 24, 2025). And while Deputy USAID Administrator Marocco has acknowledged that the widespread changes at the agency have caused "delays" in processing "certain allowance payments to USAID employees," he represents that "USAID is working diligently to address these delays" and that all overseas employees remain eligible to receive timely living expenses reimbursements notwithstanding their "leave status." Second Marocco Decl. ¶ 17. It thus appears that any nonpayment to date was unintentional and will soon be resolved. *See, e.g.*, ECF No. 36-3 ¶ 15 (plaintiffs' declarant describing recently updated payment process for operational expenses designed to allow USAID to "catch up on the payments already in the queue"); ECF No. 36-3 ¶ 12 (plaintiffs' declarant describing how "rewiring maintain[ed] electricity to security services at [her] home"). In fact, with respect to specific instances of delayed payments, the government attested at the February 19 hearing that those bills would be settled within "3 to 5 business days."

*Finally*, plaintiffs assert a number of harms premised on the notion that, beyond being placed on paid administrative leave, their members will ultimately lose their jobs. *See, e.g.*, Mot. at 19 (asserting that "members will [] lose their source of income and the benefits that come with employment"). But many of the harms that would result from such an action (such as the allegedly unlawful non-payment of salary or other benefits) would be financial and therefore not irreparable. *See Full Gospel Churches*, 454 F.3d at 297; *see also Sampson*, 415 U.S. at 91–92 (loss of income

cannot establish irreparable injury in a government personnel case).  Nor are those harms obviously imminent, posing "a clear and present need for equitable relief."  *Id.*  The government has reiterated that its intent in placing USAID employees on administrative leave is to conduct a thorough "audit" of the agency's spending.[3]  Marocco Decl. ¶¶ 12, 14, 17.

For these reasons, plaintiffs have not established that their members would suffer imminent irreparable harm as a result of the government's challenged actions absent a preliminary injunction.

### B.    Likelihood of Success on the Merits

Turning to likelihood of success on the merits, it may be the case that, at a high level of generality and in the long run, plaintiffs' assertions of harm could flow from their constitutional and APA claims regarding the alleged unlawful "dismantl[ing]" of USAID.  Compl. at 2.  But at present, the agency is still standing, and so the alleged injuries on which plaintiffs rely in seeking injunctive relief flow essentially from their members' existing employment relationships with USAID.  As reflected above, plaintiffs' complaints about the effects on their members of being placed on administrative leave and of being asked to return to the United States on an expedited basis are, at bottom, archetypal complaints about changed employment conditions and their follow-on effects—which at this point appear to be largely financial.  Indeed, even plaintiffs' allegations of harm from the broader funding pause and stop-work orders pertain primarily to how those actions will affect their members in their capacities as USAID employees, such as by

---

[3] The Court recognizes that the plaintiff unions also assert standing on their own behalf in this case, based on their allegation that they are "diverting significant resources from other members and priorities" to address the concerns of their USAID members.  *See* Reply at 25–26. Setting aside whether that allegation is sufficient to support Article III standing, Plaintiffs have not demonstrated that any hindrance to their mission as a result of those challenged actions belongs to the category of "great" harms that could warrant a preliminary injunction in a case like this.  *See Full Gospel Churches*, 454 F.3d at 297; *Sampson*, 415 U.S. at 84.

supposedly requiring them to pay their own living expenses while abroad or by damaging their professional goodwill.

This matters because Congress has established "comprehensive" statutory schemes governing the review of employment disputes arising between the federal government and its civil and foreign service officers. *U.S. Info. Agency v. Krc*, 989 F.2d 1211, 1217 (D.C. Cir. 1993). For civil servants, the applicable scheme is set forth in the Federal Service Labor-Management Relations Statute (FSLMRS) and the Civil Service Reform Act (CSRA) (of which the FSLMRS is a part). *See Am. Fed'n of Gov't Emps., AFL-CIO v. Trump (AFGE)*, 929 F.3d 748, 752 (D.C. Cir. 2019); *Graham v. Ashcroft*, 358 F.3d 931, 933 (D.C. Cir. 2004). Under those statutes, "labor disputes" involving civil servants—i.e., disputes in which unions are involved—are generally adjudicated by an agency called the Federal Labor Relations Authority (FLRA)—while "personnel" disputes—i.e., disputes about adverse "personnel action[s]" taken against individual civil servants—are generally adjudicated by an agency called the Merit Systems Protection Board (MSPB). *AFGE*, 929 F.3d at 752; *United States v. Fausto*, 484 U.S. 439, 445–47 (1988). FLRA decisions "are subject to direct review in the courts of appeals," *AFGE*, 929 F.3d at 752, and MSPB decisions can be reviewed specifically by the Court of Appeals for the Federal Circuit. *Graham*, 358 F.3d at 934.

For foreign service officers, the Foreign Service Act of 1980 (FSA) was passed as a "companion measure" to the CSRA and provides an analogous system for reviewing allegedly adverse actions taken against those employees. *Krc*, 989 F.2d at 1217. In that system, the Foreign Service Grievance Board (FSGB) (which hears individual complaints) and the Foreign Service Labor Relations Board (FSLRB) (which hears union complaints) are the "administrative bodi[es] charged with resolving grievances brought under the Act." *Hunter v. United States*, 36 Fed. Cl.

257, 259 (1996); 22 U.S.C. §§ 4106–07. "Grievance" is defined broadly under the FSA, and includes "any act, omission, or condition subject to the control of the Secretary [of State] which is alleged to deprive a member of the [Foreign] Service. . . of a right or benefit authorized by law or regulation or which is otherwise a source of concern or dissatisfaction to the member." 22 U.S.C. § 4131(a)(1). FSGB decisions are reviewable in federal district court, *id.* 4140(a), while FSLRB decisions are reviewable in the D.C. Circuit. *Id.* §4109(a).

District courts, of course, generally have jurisdiction over civil actions arising under the Constitution and laws of the United States. *See* 28 U.S.C. § 1331. But it is well established that "Congress may preclude district court jurisdiction by establishing an alternative statutory scheme for administrative and judicial review." *AFGE*, 929 F.3d at 754. "[C]ourts determine that Congress intended that a litigant proceed exclusively through a statutory scheme of administrative and judicial review when (i) 'such intent is fairly discernible in the statutory scheme,' and (ii) the litigant's claims are 'of the type Congress intended to be reviewed within [the] statutory structure.'" *Jarkesy v. S.E.C.*, 803 F.3d 9, 15 (D.C. Cir. 2015) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207, 212 (1994)). Here, both considerations indicate that Congress likely intended for plaintiffs' current claims of employment-based harm—whether brought by individual civil servants, individual foreign service officers, or unions representing either category of worker—to proceed exclusively through the three statutory schemes just discussed.

As for the first step in the inquiry, the Court of Appeals has held that the remedial schemes laid out in both the FSLMRS and CSRA are "exclusive" with respect to claims within their scope. *AFGE*, 929 F.3d at 755 (FSLMRS); *Am. Fed'n of Gov't Emps. v. Sec'y of Air Force*, 716 F.3d 633, 636 (D.C. Cir. 2013) (CSRA). And by analogy to those schemes, the Court of Appeals has said the same about the FSA. *See Krc*, 989 F.2d at 1217. As the Court of Appeals has explained, "[l]ike

18

the CSRA, the [FSA] provides 'a comprehensive system for reviewing personnel action[s] taken against federal employees.'" *Id.* (quoting *Fausto*, 484 U.S. at 455). Thus, where the FSA prohibits a certain category of administrative grievance, a foreign service officer may not "demand judicial review" for that same harm. *Id.*

The first step of the inquiry also goes part way to deciding the second, because "[c]laims will be found to fall outside of the scope of a special statutory scheme [like the FSLMRS, CSRA, or FSA] in only limited circumstances." *AFGE*, 929 F.3d at 755 (quotation marks omitted). Those are when: "(1) a finding of preclusion might foreclose all meaningful judicial review; (2) the claim[s] [are] wholly collateral to the statutory review provisions; and (3) the claims are beyond the expertise of the agency." *Id.* None appears likely to apply to the claims that plaintiffs raise here.

*First*, plaintiffs would not be deprived of "meaningful judicial review" if their claims are channeled out of this court and into the applicable administrative body. With respect to domestic employees, under the CSRA, the MSPB's Office of Special Counsel may review any claim that an employee has suffered a "significant change in duties, responsibilities, or working conditions" in a manner that "violates any law, rule, or regulation implementing . . . the merit system principles." 5 U.S.C. §§ 2302(a)(1), (a)(2)(A)(xii), (b)(12); *Carducci*, 714 F.2d at 175. Those principles, in turn, "include protection against arbitrary action, [5 U.S.C.] § 2301(b)(8)(A), and 'fair and equitable treatment in all aspects of personnel management . . . ,' [*id.*] § 2301(b)(2)." *Carducci*, 714 F.2d at 175. Similarly, the collective bargaining agreement in place between USAID and plaintiff American Federation of Government Employees (AFGE)—the union that represents civilian USAID employees—contains a "negotiated grievance procedure" that permits arbitration, subject to FLRA review, of whether USAID violated or misapplied any "law, rule, regulation, or

Agency policy related to conditions of employment." *Negotiated Collective Bargaining Agreement Between USAID and AFGE Local 1534 (AFL-CIO)*, Arts. 21, 22, Dec. 22, 2016; *see also* 5 U.S.C. §§ 7121–22.

It thus appears likely that a domestic USAID employee or union representative could object to the agency's administrative leave placements under either the CSRA or FSLMRS. *See, e.g.*, *Chiang v. Gonzales*, 2006 WL 8449284, at *7 (C.D. Cal. 2006), *aff'd*, 278 F. App'x 728 (9th Cir. 2008) (plaintiff's claim regarding her placement on paid administrative leave "f[e]ll within the ambit of the CSRA" and could not be adjudicated in district court); *Ghaly v. U.S. Dep't of Agric.*, 228 F. Supp. 2d 283, 290 (S.D.N.Y. 2002) (plaintiff challenging paid administrative leave alleged a "prohibited personnel practice" under CSRA, depriving district court of jurisdiction). To be sure, plaintiffs argue that those schemes are insufficient to address their claims regarding their civil servant members because they cannot pursue claims of "organizational harm" through the CSRA, and may ultimately be unable to do so through the FSMLRS if USAID—the only defendant with which plaintiffs collectively bargained—ceases to "exist as an independent entity." Reply at 7. But even if that did occur in the future, it is far from clear that the FLRA would lack jurisdiction to hear a retrospective claim that agency defendants had engaged in an unfair labor practice by shuttering the agency. *See generally* 5 U.S.C. § 7118.

The FSA's administrative scheme is even broader than that established by the FSLMRS and CSRA. Its sweeping definition of "grievance"—again, "any act, omission, or condition" that is "a source of concern or dissatisfaction" to the foreign service officer—would permit a foreign USAID employee or union representative to challenge before the FSGB or FSLRB the whole range of actions to which plaintiffs now object. 22 U.S.C. § 4131(a)(1). As the government puts it, "[p]laintiffs' concerns alleged here, whether related to administrative leave, financial benefits,

repatriation, or [otherwise], all fall within t[hat] broad scope." Opp. at 17. And plaintiffs' objection that the FSA's grievance procedures are too "individualized" to address "mass placements on administrative leave" fails to grapple with the fact that the FSLRB is expressly designed to handle union complaints of the sort that plaintiffs have brought here. Reply at 8; *see* 22 U.S.C. § 4107.

Nor, in any event, would the administrative bodies have the last word as to any of these claims. As noted above, judicial review is available from decisions of all the relevant agencies. *See AFGE*, 929 F.3d at 752; *Graham*, 358 F.3d at 934; 22 U.S.C. §§ 4109(a), 4140(a). Plaintiffs argue that no judicial review could be effectual here because "the administrative forums cannot act with the needed dispatch" in order to "halt[] the dissolution of USAID before it becomes irreversible." Reply at 9. But plaintiffs have presented no irreparable harm they or their members are *imminently* likely to suffer from the hypothetical future dissolution of USAID. And it is not clear why the speed of proceedings in the relevant agencies would be insufficient to address the only actions that *have* already happened and are presently ripe for review: administrative leave placements, expedited evacuations, and other changes to working conditions of the sort those bodies routinely confront. *See, e.g.*, *Nat'l Treasury Emps. Union v. Trump (NTEU)*, Civ. A. No. 25-cv-420, ECF No. 28 at 14 (explaining that union plaintiffs objecting to "sweeping executive actions" regarding federal employees could "seek relief from the FLRA on behalf of a class," mitigating efficiency concerns).

*Second*, and for similar reasons, plaintiffs' challenges to the government's actions are not "wholly collateral" to the statutory review provisions at issue. "This consideration is related to whether meaningful judicial review is available," but focuses on "whether the plaintiffs aim[] to seek the same relief they could obtain in the agency proceeding." *AFGE*, 929 F.3d at 759–60 (quotation marks omitted). Surely they do—based on their allegations of imminent irreparable

harm, plaintiffs at this point seek the cessation of certain employment conditions presently affecting their members, such as their placement on administrative leave, their expedited repatriation, and their inability to perform certain job duties they previously held.  Proceedings before the MSPB, FLRA, FSGB, or FSLRB could culminate in some or all of that relief.  *See, e.g.*, *Payne v. Biden*, 62 F.4th 598, 607 (D.C. Cir.), *judgment vacated as moot*, 144 S. Ct. 480 (2023) (MSPB can resolve "challenges to adverse employment actions"); 22 U.S.C. § 4137(b)(2) (FSGB can order any "perquisite of employment" previously denied).  Plaintiffs make the conclusory assertion that their claims here are not the "vehicle by which [they] seek[] to reverse th[ose] adverse employment action[s]," *Payne*, 62 F. 4th at 606 (quotation marks omitted), because their members "would be harmed by Defendants' illegal actions in moving to shut down USAID [] even if th[o]se actions had no effect on their employment."  Reply at 9–10.  But that assertion simply cannot be squared with plaintiffs' motion, which, as discussed, alleges injury to their members distinctly—and indeed, solely—in their capacities as USAID workers.  *See Payne*, 62 F.4th at 606–07 (constitutional challenge to vaccine mandate was not collateral to CSRA where "one of [the plaintiff's] interests" was "to avoid an impending adverse employment action" as a result of his noncompliance).

*Third*, plaintiffs' claims fall within the scope of "expertise" of the applicable agencies.  This factor, like the first two, is to be "interpreted broadly": it will be satisfied so long as the agency's expertise is applicable to the "threshold questions that may accompany" otherwise broader claims.  *Id.* at 607.  Here, even if the farthest reaches of plaintiffs' lawsuit involve "separation-of-powers issues" and "whether a statute or the Constitution has authorized the President to act in a particular way," the "preliminary" questions the lawsuit poses are plainly employment-related—such as the lawfulness of the government's changes to plaintiffs' members' employment conditions.  *Id.*;

*AFGE*, 929 F.3d at 760–61 (reversing district court's decision that the presence of constitutional claims removed plaintiffs' challenges to executive orders from the ambit of FLRA's expertise).

Indeed, agency adjudicators could moot plaintiffs' constitutional and APA claims entirely by ruling in their favor, *see Payne*, 62 F.4th at 607, or, at a minimum, could "alleviate" or "shed light on" the concerns those claims implicate by "offer[ing] an interpretation of the [relevant statutes] in the course of the proceeding[s]." *AFGE*, 929 F.3d at 761. Where plaintiffs *are* entitled to review before the MSPB, FLRA, FSGB, or FSLRB and subsequent judicial review, there is no reason to fear that plaintiffs' constitutional claims could wholly evade consideration.[4] *See Elgin v. Dep't of Treasury*, 567 U.S. 1, 20–21 (2012) (explaining that, even if the MSPB "determine[s] that it lacks authority to decide" a constitutional issue, "[t]he Federal Circuit can then review the MSPB decision, including any factual record developed by the MSPB in the course of its decision on the merits"); *cf. Lamb v. Holder*, 82 F. Supp. 3d 416, 422–23 (D.D.C. 2015) (exercising subject matter jurisdiction over plaintiff's constitutional claims regarding termination where plaintiff was not entitled to review under CSRA).

In sum, it appears likely that the claims made by plaintiffs in seeking preliminary injunctive relief "fall within the exclusive statutory scheme[s]" of the FSLRMRS, CSRA, and FSA, which plaintiffs "may not bypass by filing suit in the district court." *AFGE*, 929 F.3d at 761; *see also, e.g.*, *NTEU*, Civ. A. No. 25-cv-420, ECF No. 28 (finding that plaintiffs' claims regarding anticipated implementation of large-scale reductions in force at federal agency were precluded by the FSLMRS and CSRA). That is almost certainly true of plaintiffs' claims regarding the

---

[4] Plaintiffs note that the agencies lack jurisdiction to hear the claims of "personal services contractors" of USAID, who plaintiffs contend are "identically situated to direct hires in the harms they face from Defendants' actions." Reply at 10. But plaintiffs have not alleged that any of their members are contractors rather than employees of USAID, so this nuance is irrelevant here.

placement of their members on administrative leave and their members' possibly expedited recall from post, because, for all the reasons just discussed, those claims concern changes in employment conditions and are thus "of the type" that Congress intended to be redressed through the applicable remedial frameworks. *Jarkesy*, 803 F.3d at 15. And it may well also be true of plaintiffs' claims regarding the funding freeze itself, because plaintiffs' present allegations of injury from that action again turn on its effects on their members in their capacities as employees—like its supposed infliction of additional financial liability for the cost of contracts or unpaid living expenses. As much as plaintiffs assert that they "challenge a sweeping scheme to dismantle an entire agency," Reply at 6, their only ripe theories of harm fundamentally rely on their members' employment relationship with USAID.

In sum, because the Court likely lacks jurisdiction over plaintiffs' claims, they have not established a likelihood of success on the merits.

### C.    Balance of the Hardships and the Public Interest

When, as here, a plaintiff fails to demonstrate irreparable harm or a likelihood of success on the merits, there is no requirement that the Court consider the remaining two preliminary injunction factors. *See CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995); *Ark. Dairy Coop Ass'n, Inc. v. U.S. Dep't of Agric.*, 573 F.3d 815, 832 (D.C. Cir. 2009). But it is worth noting that, in any event, the record now indicates that those factors at the very least "do not decidedly tip in [plaintiffs'] favor." *Fort Myer Constr. Corp. v. Shrensky*, 2024 WL 181075, at *5 n.1 (D.D.C. 2024).

Plaintiffs identify numerous "harsh consequences" that they contend will ensue if the 90-day foreign-assistance pause and related USAID personnel changes are permitted to resume. Mot. at 22. Abroad, plaintiffs suggest that there will be "catastrophic" "humanitarian consequences" if

USAID—either due to the funding freeze or a lack of staff—cannot continue to administer its standard foreign aid programs. *Id.* at 21–22. And at home, plaintiffs point to the already-discussed harms to USAID employees, harms to USAID's "status as a globally critical agency," and harms to the United States' "political and contractual relationships" with other nations and organizational partners. *Id.* at 23.

The Court certainly recognizes these potential effects of the government's actions. But the government has also identified plausible harms that could ensue if its actions with respect to USAID are *not* permitted to resume. In the President's view, "the United States foreign aid industry" is "not aligned with American interests and in many cases [is] antithetical to American values" and indeed, "world peace." Exec. Order. 14,168 § 1, 90 Fed. Reg. 8619 (Jan. 20, 2025). The government is thus undertaking a "thorough review of USAID's operations" in order to determine "which [aid] programs continue[] to make sense for the American people, and which d[o] not." Marocco Decl. ¶ 9. And it has determined that the best way to conduct that review is by first "pausing a substantial portion of [USAID's] ongoing work," so as to fully "examine USAID's processes and the manner by which [it] funds its programs" while also "gain[ing] control of an organization that included some employees who had refused to comply with lawful directives by the President and Secretary." *Id.* According to the government, interfering with this "'pencils down' approach" would prevent it from auditing USAID's operations in the manner necessary to ensure the agency is acting in the national (and perhaps global) interest. *Id.* ¶¶ 8, 21.

Weighing plaintiffs' assertions on these questions against the government's is like comparing apples to oranges. Where one side claims that USAID's operations are essential to human flourishing and the other side claims they are presently at odds with it, it simply is not possible for the Court to conclude, as a matter of law or equity, that the public interest favors or

disfavors an injunction.  But because plaintiffs have not carried their burden as to the other preliminary injunction factors, and because the government has made a colorable case that the actions challenged in this case are essential to its policy goals, the final two factors are at least not in tension with the denial of preliminary injunctive relief.

## IV.    Conclusion

For the reasons explained above, the Court concludes that plaintiffs have not demonstrated that they or their members will suffer irreparable injury absent an injunction; that their claims are likely to succeed on the merits; or that the balance of the hardships or the public interest strongly favors an injunction.  The Court will accordingly deny plaintiffs' motion for a preliminary injunction, ECF No. 9, and will dissolve its previously issued temporary restraining order, ECF No. 15.  An Order will accompany this Opinion.

DATE: February 21, 2025

_____
CARL J. NICHOLS
United States District Judge