**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**


AMERICAN FEDERATION OF          Civil Action
GOVERNMENT EMPLOYEES, et al.,    No. 1:25-0352
        Plaintiffs,


    vs.                   Washington, D.C.
                        February 19, 2025


DONALD J. TRUMP, et al.,


        Defendants.        11:38 a.m.
_____ /


TRANSCRIPT OF TELEPHONIC STATUS CONFERENCE
**BEFORE THE HONORABLE CARL J. NICHOLS**
UNITED STATES DISTRICT JUDGE


APPEARANCES:


**For the Plaintiffs:**    **Karla Gilbride**
                        **Lauren Bateman**
                        PUBLIC CITIZEN
                        1600 20th St NW
                        Washington, DC 20009
                        202-588-7739

                        **Kaitlyn Golden**
                        **Kayla Kaufman**
                        **Rachel Fried**
                        DEMOCRACY FORWARD FOUNDATION
                        P.O. Box 34553
                        Washington, DC 20043
                        202-448-9090

APPEARANCES CONT'D.:


**For Deft. Trump:**          **Eric Hamilton**
                             **Lauren Wetzler**
                              U.S. DEPARTMENT OF JUSTICE
                              1100 L Street, NW
                              Washington, DC 20530
                              202-305-8659




**Reported By:**              **Lorraine T. Herman, RPR, CRC**
                              Official Court Reporter
                              U.S. District & Bankruptcy Cts.
                              333 Constitution Avenue NW
                              Washington, D.C. 20001
                              lorraine_herman@dcd.uscourts.gov




**\*\*\*** Proceedings recorded by stenotype shorthand.
**\*\*\*** Transcript produced by computer-aided transcription.

1          **P R O C E E D I N G S**

2                **DEPUTY CLERK:**  Good afternoon, Your Honor.

3          For the record, civil action 25-352, *American*

4  *Federation of Government Employees, et al. versus Donald J.*

5  *Trump*, et al.

6          Counsel, beginning with the plaintiff, please

7  identify yourselves for the record.

8                **MS. GOLDEN:**  Good morning, Your Honor.  Kaitlyn

9  Golden on behalf of the plaintiffs.

10               **THE COURT:**  Good morning, Ms. Golden.

11               **MS. GOLDEN:**  I'm also happy to introduce my

12  colleagues, who are present on the phone, if that's easiest.

13               **THE COURT:**  Sure.  That is probably easiest.  Will

14  you be taking the lead this morning, Ms. Golden?

15               **MS. GOLDEN:**  Yes, sir.

16          Also on the phone on behalf of plaintiffs are

17  Kayla Kaufman, Kristen Miller, Rachel Fried, Karla Gilbride,

18  Lauren Bateman.  In person is Robin Thurston.

19               **THE COURT:**  Thank you very much.  Defendants.

20               **MR. HAMILTON:**  Good morning, Your Honor.  This is

21  Eric Hamilton for defendants.  And, I believe, Lauren

22  Wetzler is also on the line.

23               **THE COURT:**  Thank you very much.

24          Here is what I'd like to do.  I've reviewed the

25  supplemental declarations first from Mr. Marocco and more

1    recently the plaintiffs.

2              What I want to start with is questions directed at

3    the two  Marocco declarations and the government's brief,

4    just to make sure I understand exactly what would or has

5    been offered or what would happen with an overseas-stationed

6    USAID employee in the absence of a preliminary injunction.

7              So I think it's going to be most helpful to me to

8    start with just an example.  So let's just assume we are

9    talking about a USAID employee, somewhere in Africa, who was

10   employed and is currently employed by USAID and, let's just

11   assume for hypothetical purposes, the TRO expires on Friday.

12   I want to understand what choices have been put to the

13   employee and what the consequences of different choices are.

14             So, Mr. Hamilton, will you be taking the lead for

15   the government on this question?

16             **MR. HAMILTON:**  I will.

17             **THE COURT:**  Okay.  I had understood, at least from

18   the government's original declaration and from our

19   discussion during the hearing in the Marocco original

20   declaration, that employees overseas were presented with the

21   following choice:  You can return within 30 days to the

22   United States.  And if you do so, among other things, your

23   travel back will be paid.  But, alternatively, as the brief

24   put it, if an employee ⸺ and this is the brief that those

25   employees who are abroad or at post were given and will be

1    provided with a choice to stay at post or return to the

2    United States.

3              The brief says, "If an employee chooses to stay at

4    post, he or she will be entitled to all of the benefits

5    previously offered, so long as he or she remains on paid

6    administrative leave.  If the employee chooses to return,

7    the agency will coordinate and financially cover that return

8    for the employee and his or her families."  Then there's

9    also the possibility of an exception discussed in the next

10   sentence.

11             I had understood from our prior discussion at the

12   hearing that the exception would be to allow an employ to

13   stay in country, so to speak, and even get his or her travel

14   paid for at some future time.

15             I read the second Marocco declaration introduced

16   more nuanced than perhaps I thought was going on.  Am I

17   right that the government's position is for an employee who

18   chooses not to return, it's still possible that the

19   government can decide that that employee has perhaps been

20   directed to depart post and therefore could be considered no

21   longer officially stationed overseas?

22        **MR. HAMILTON:**  Your Honor, we'll discuss this

23   specifically with our clients.  But my understanding is that

24   as long as someone is on administrative leave, they're going

25   to continue to be treated as an employee with their

1    benefits, if they got that waiver.  If they're denied the

2    waiver, but choose to remain overseas, then the services and

3    benefits that they are receiving could change.

4         **THE COURT:**  So I think this is different than what

5    you represented at the last hearing, or at least as I

6    understood it, because the government's brief essentially

7    posed the choice, as I understood it, as between two

8    questions.  One is, if an employee chooses to stay at post,

9    he or she will be entitled to all the benefits previously

10   offered, so long as he or she remains on paid administrative

11   leave.

12        Now, I get there is that qualifier there, but

13   nothing in the brief or the declaration says that the

14   exception process was to be able to remain on paid

15   administrative leave, which, as I understand it, is now what

16   the government is saying is a condition to being considered

17   on post for this universe of employees.

18        **MR. HAMILTON:**  Well, I think the alternative is if

19   someone is not on administrative leave, then they are

20   probably being separated from the agency.  So, if they are

21   separated from the agency, then, you know, of course there

22   is going to be a change to the benefits and things that they

23   are receiving from the government.

24        **THE COURT:**  So let's just step back.  Okay.  We

25   have an employee overseas for USAID.  As I understood it,

1    the employee was given a choice.  You can return within 30

2    days or you can stay in country on paid administrative

3    leave.

4           Do I have that right, at least in the first

5    instance?

6           **MR. HAMILTON:**  Yes.

7           **THE COURT:**  Okay.  That employee does not take the

8    30-day choice but stays on paid administrative leave.

9    Unless and until something more happens, am I right that

10   that employee is considered "on post"?

11          **MR. HAMILTON:**  Your Honor, I think the employee

12   would need the waiver to remain in that status.

13          **THE COURT:**  I don't understand that.

14          How is what you just said consistent with what the

15   brief says?  The brief doesn't say anything about the waiver

16   being necessary to accept the choice of remaining on paid

17   administrative leave.

18          **MR. HAMILTON:**  I think we were probably trying to

19   react to the assertion that there were maybe some forced

20   evacuations and explaining that nobody was being forced to

21   be evacuated from post.

22          **THE COURT:**  No, I understand that.  But the way

23   you portrayed the choice was that the choice was between

24   coming back or remaining on paid administrative leave, with

25   the exception being that for those people staying on paid

1      administrative leave, the exception apply to be able to get

2      your travel paid for.

3                What I am now understanding is that the employee

4      who chooses to stay in country, has to apply for and receive

5      an exception to be placed even on just administrative leave?

6           **MR. HAMILTON:**  The way I understand it there is no

7      waiver to stay on paid administrative leave.

8           **THE COURT:**  Okay.  So the person who stays in

9      country, does not take the 30-day offer, is automatically on

10     paid administrative leave, unless and until something else

11     happens in the future?

12          **MR. HAMILTON:**  That is my understanding.

13          **THE COURT:**  So what would the exception be applied

14     for?

15          **MR. HAMILTON:**  I think it would be if there is a

16     change in the administrative leave status.

17          **THE COURT:**  Okay.  Well, this is not consistent

18     with what we discussed at the last hearing, but let's just

19     take the next step.

20                So for this employee who chooses to stay in

21     country, and is now, at least according to your

22     representations just now, is on administrative leave, unless

23     and until something additional happens.  Obviously, that

24     employee could remain on paid administrative leave, but it's

25     possible that an employee might be terminated, I assume.

1    Right?  That's possible, of course.

2              **MR. HAMILTON:**  Yes.  Yes.

3              **THE COURT:**  Okay.

4              Is it also possible that that employee would be

5    told, you know, we are still going to pay you, but we are

6    going to decide that you are no longer on post?

7              **MR. HAMILTON:**  That strikes me as a possibility.

8              **THE COURT:**  If an employee was told either, You

9    are going to be terminated or You are no longer going to be

10   considered on post, are those actions or statements of

11   future action things as to which the exception process would

12   apply?

13             **MR. HAMILTON:**  I do not know that specifically,

14   Your Honor.  Your Honor, we --

15             **THE COURT:**  Okay.  Let me ask you this then.  What

16   does the application process the government is relying on

17   apply to?

18             **MR. HAMILTON:**  The waiver process definitely

19   applies to a later opportunity for that employee to receive

20   government-funded travel back to the United States.

21             **THE COURT:**  So how is that consistent with the

22   first sentence of Paragraph 15 of the Marocco supplemental

23   declaration, which suggests that a waiver might be about

24   direction to depart post within 30 days?  And just to be

25   clear, this says, An employee who is directed to depart post

1   and fails to do so, including those who choose to stay

2   beyond the 30-day period to leave the country, and who do

3   not receive a waiver, which implies that the waiver could or

4   would apply to the direction to depart post within 30 days.

5   Is that the case?

6          **MR. HAMILTON:** Your Honor, that is something I am

7   going to have to discuss with our client agencies.

8          **THE COURT:** Okay. It strikes me this is a mess,

9   because there are a series of representations that were made

10  in the original declaration and the brief. We had a

11  discussion at the hearing, and I thought it was crystal

12  clear from our discussion that absent, perhaps,

13  individualized terminations, that employees who were

14  overseas have a choice, assuming that they are within the

15  group who is presented with a choice.

16         The choice is you can either come back in 30 days

17  and have your travel paid for or you can stay beyond the

18  30-day period, on paid administrative leave, and the

19  exception would be whether you get your travel to return

20  paid for. That then just led me to ask, Well, what are the

21  other benefits that go along with paid administrative leave?

22         But I'm now understanding for employees who stay

23  beyond the 30 days, either perhaps they need a waiver to do

24  that or at some future date they might have their paid

25  administrative leave changed or they might be declared "no

1    longer on post" and the exception or waiver process would

2    apply to that as well.

3             So I am at a loss. I am just trying to understand

4    the specifics of not individual treatment, in the sense of

5    ensuring that a particular employee decisions were made

6    right, but just what the current policy is or would be

7    absent an injunction.

8             **MR. HAMILTON:** Yes. I understand, Your Honor.

9    And I want to probe that specifically with our clients.

10   Again, we have been very focused in the last 36 hours on

11   studying the declarations that were submitted by the

12   plaintiffs; and that's where our focus has been in advance

13   of this hearing today.

14            **THE COURT:** Okay. But I'm now actually just

15   talking about what seemed to me at least potential

16   inconsistencies in what was filed before Friday or through

17   Friday.

18            **MR. HAMILTON:** I understand. I think I need to

19   have another conversation with our client agencies before

20   addressing that.

21            **THE COURT:** So to be I have clear, here is what I

22   need to know. I am going to need to know, very specifically

23   for an individual employee overseas, what exactly is the

24   choice presented to the employee or was presented before or

25   would be presented absent injunction. I'm happy to frame it

1    chronologically how we want or temporally, but what is the

2    choice?  Is it as articulated in the brief, which is, Well,

3    you can stay on administrative leave or you can come back

4    and there's a difference, but the difference is really about

5    travel expenses, and that's what the exception is about or

6    is it, Well, if you choose not to come back to the

7    United States, you have now chosen to stay beyond the 30-day

8    period; that means you have been directed to depart post;

9    and that's the phrase in the Marocco declaration, "directed

10   to depart post," not "You've chosen not to take an offer."

11          Does it means you've been directed not to depart

12   post, you failed to take that direction, and you need an

13   exception from being declared no longer on post or no longer

14   on paid administrative leave.  As a result, a series of

15   consequences now flow?

16          **MR. HAMILTON:**  Got it.  Got it.

17          **THE COURT:**  Okay.  Why don't I turn to plaintiffs'

18   counsel and see if, on this topic, plaintiffs' counsel would

19   like to add anything.  Because, at least, I didn't read the

20   supplemental declarations from plaintiffs' counsel to go to

21   this question, as opposed to other issues.

22          **MS. GOLDEN:**  Sure, Your Honor.

23          I would say this mess really counsels in favor of

24   preliminary injunctive relief from plaintiffs' perspective.

25   The statements from USAID, both at the highest level, but

1   then also what our clients and their members are hearing at

2   post are shifting on a daily basis.  Because of the rapidly

3   changing landscape and the shifts occurring, we think

4   injunctive relief is necessary to slow this process down.

5          On the waiver process, I understood it differently

6   than what Mr. Hamilton is saying here.  Regardless, whatever

7   those waivers are for, our declarants, including our

8   declarant, Terry Doe, have noted that they have tried to

9   seek those waivers to stay in country for a variety of

10  important circumstances and they have been unable to obtain

11  those waivers.

12          **THE COURT:**  Right.  Right.

13          Would you want to turn to your declarations and

14  just walk me through, from your perspective, what is the

15  most salient parts of them?

16          **MS. GOLDEN:**  Sure.  I would be happy to,

17  Your Honor.

18          So we submitted three declarations earlier in this

19  week, as you are well aware.  I will start with the

20  declaration of Terry Doe.  Terry and Terry's wife, who I

21  will refer to as Mrs. Doe, are stationed overseas.  Mrs. Doe

22  is pregnant.  She is fairly far along in her pregnancy and

23  has been experiencing a series of complications.  Because of

24  those complications, the medical providers she has been

25  seeing have recommended a medical evacuation.

1          Terry and Mrs. Doe sought that medical evacuation

2     and were twice denied.  They were denied because they were

3     told there is no USAID funding for medevacs.  A medevac was

4     only approved after intervention from their United States

5     Senator.  But by the time that intervention was available,

6     by the time the medevac was available, it was too late for a

7     safe medical evacuation.

8          Mrs. Doe is now in the hospital and on bed rest

9     until her due date in two months.  The Does are now faced

10    with this impossible choice.  They need Mrs. Doe to stay in

11    the hospital.  They cannot evacuate in 30 days, if they are

12    required to by the government.  It's not safe for Mrs. Doe

13    to do so.

14         Based on our understanding of the Marocco

15    declaration, I believe at Paragraph 15, if they are ordered

16    to, quote, return to post and are unable to do so because of

17    this medical situation, they will lose access to their

18    government-provided housing, they will lose access to their

19    government reimbursements and they will be, quote, required

20    to apply with applicable visa and related requirements.

21         For the Does, that would require them to leave the

22    country, something they precisely cannot do because of

23    Mrs. Doe's hospitalization.  So for this family, this

24    situation has really placed them in an impossible position,

25    where they can't comply with what defendants are requiring

1    and keep Mrs. Doe and their unborn child safe.

2              I would also note that the Doe family have sought

3    a medical waiver to stay in country.  Again, based on

4    defendants' representations here today, we are not clear

5    what that waiver process means.  We had understood that the

6    waiver process meant people would be allowed to stay in

7    country, access their security, their housing, and all their

8    ancillary benefits, if they received a waiver that now,

9    hopefully, we will get clarity from the government there.

10   So that is, really, the situation that Terry Doe and Terry's

11   family are facing.

12             Our second declaration that we submitted from

13   Emilia Doe goes to some of the security issues that are

14   being experienced by foreign service officers abroad.

15   Because of the continued delay in payments by the

16   government, critical security services are not being paid

17   for.

18             Amelia Doe and her family live in housing provided

19   by USAID, and the electric bills in the home are going

20   unpaid.  They've covered the back payments with their own

21   money.  They do not know if they are going to be reimbursed.

22   Most critically, putting aside their access to just

23   electricity in their house, their home and electricity from

24   it powered the electric fence, the guard tower, the

25   perimeter lighting that keeps their home safe.

1          Because of the inability of USAID to pay the

2    embassy general services office took an extreme step of

3    rewiring their compound so the security features would be

4    attached to a different home on their compound where the

5    services would be paid for.  You know, this is an

6    extraordinary step where rather than paying its obligations,

7    the U.S. government is rewiring electricity to ensure that

8    people are kept safe.  So for this family and others like

9    them, the non-payment of obligations is creating a real

10   security risk that will continue until those obligations are

11   paid.

12         And the last declaration we submitted is from

13   AFSA, Vice President Randall Chester, the third declaration

14   of Randall Chester.  As Mr. Chester notes, the second

15   declaration from Marocco states that security services will

16   be continued to be provided to individuals who are on

17   administrative leave and have a waiver; that is not

18   necessarily going to be the case.  Some AFSA members have

19   been experiencing issues with safe alert system not fully

20   functioning, even for employees who are not yet out on

21   administrative leave.  Not all employees have access to the

22   SCRY Panic App and, you know, employees who are placed on

23   administrative leave, but removed from post, are unable to

24   access those security services, which will place them at

25   significant risk.

1          Mr. Chester's declaration also explains the

2   ongoing issues with failure to pay obligations, particularly

3   for the individuals who were evacuated from the Congo.

4   Those individuals have not been able to seek reimbursement

5   for their expenses since returning to the United States

6   because the E2 Payment System is inaccessible.  This is the

7   system where employees submit travel expenses.  So currently

8   employees are paying out of pocket for their living

9   expenses, not knowing if they are going to be reimbursed.

10          Mr. Chester also notes a few other situations

11  where employees are not —— where bills were going unpaid,

12  including repairs for security in Botswana.  There is an

13  electric fence and blinds for security that need repaired

14  and are not being repaired because of the government's

15  inability to pay its obligations.

16          So, you know, those —— Mr. Chester's declaration

17  highlights just a few of the reasons why the plan posed by

18  the government is inadequate to protect the safety and

19  stability of USAID employees and really the reason

20  injunctive relief is so necessary here for the Court to

21  preserve the safety and stability of employees while

22  considering the lawfulness of defendant's actions.

23          The last thing I will note is the situation here

24  is rapidly changing with new developments happening every

25  day.  We submitted these declarations to the Court on

1      Monday, a mere 36 hours ago.  And the facts on the ground

2      have continued to evolve.  We are happy to provide updates

3      on those developments to the Court today or through

4      additional declarations.

5              I think what's clear is that the defendants are

6      continuing to proceed at a rapid clip with their unlawful

7      efforts to shut down USAID entirely, and those efforts will

8      continue to cause significant irreparable harm to plaintiffs

9      and their members.

10             So we ask the Court to grant injunctive relief to

11     stave off those harms and allow the Court time to consider

12     the merits of this case.

13             **THE COURT:**  Thank you, Ms. Golden.

14             Mr. Hamilton, would you like to respond to --

15     we'll start with the plaintiffs' newest set of declarations

16     and anything else you would like to add.

17             **MR. HAMILTON:**  Yes.  Thank you, Your Honor.

18             If I could just start by saying we have done our

19     best to investigate the facts alleged in the plaintiffs'

20     declarations, since they were filed Monday night.  We've had

21     more than 20 personnel in seven bureaus across two agencies

22     looking at this.  Some of our investigation is complicated

23     by the fact that the USAID employees are using pseudonyms.

24     We have been doing our best to understand the allegations as

25     they have been presented.

1    I can share our best understanding of what we've

2    learned so far, with the caveat that the investigation

3    remains on going and understanding of the facts could

4    change.  I'll start with the declaration that concerns the

5    medevac.  Our understanding is that this medevac was

6    approved within four days of the request being made.  And we

7    further understand that the delay was not because of a new

8    USAID policy.  The medevacs are health assistance.

9    Our understanding is that at least two things

10   contributed to this delay.  One is a specific request that

11   the individual made as part of the medevac.  And, two, some

12   processing issues with existing systems.  I can say that the

13   State Department's Bureau of Medical Services has attempted

14   to clarify procedures with USAID employees to ensure that we

15   do better going forward.  And I'd add that medevacs remain

16   available for USAID employees overseas.

17   On payments, the Marocco declaration does explain

18   there have been some delays in processing some payments.  We

19   are working on fixing those.  There are some facts alleged

20   in plaintiffs' declarations concerning payments for fencing

21   in Botswana.  Those payments have been certified.  And my

22   understanding is they are being processed so that that

23   processing will take at least three to five business days.

24   On the DRC evacuees, I've also been told that the USAID is

25   certifying and prioritizing payments to DRC evacuees.

1          **THE COURT:**  Okay.  Anything else you would like to

2     add on these?

3          **MR. HAMILTON:**  I mean, there is some additional

4     allegations about the SCRY and safe apps.  We understand a

5     lot of those contentions to be somewhat individualized and

6     we encourage employees to take problems with those apps to

7     regional security officers at post.

8          **THE COURT:**  Right.  So long as they remain on

9     post, which gets back to the questions that I asked at the

10    beginning of the hearing.

11         **MR. HAMILTON:**  Yes.  Yes.

12         **THE COURT:**  In what circumstance --

13         **MR. HAMILTON:**  We are --

14         **THE COURT:**  Go ahead.  Sorry.

15         **MR. HAMILTON:**  I did not mean to talk over the

16    Court.

17         Yes.  We will work to provide clarity on that.

18    And we are doing our best to provide the best information we

19    can to the Court in this fast-moving case.

20         **THE COURT:**  Okay.  So on that point, what I would

21    like is a declaration from the government or a brief

22    together with a declaration, I need actual facts, by noon

23    tomorrow that attempts at least to answer my questions about

24    the options available to an employee overseas.

25         I'm not going to go through, again, the questions

1    as I see them.  I think they are well understood.  I just

2    need to make sure that I have a full and accurate picture

3    of, not whether a payment that was supposed to be made was

4    paid too late or anything like that.  I just want to

5    understand what the official current U.S. government policy

6    is with respect respect to overseas employees, what the

7    actions are and what the consequences are, if certain

8    choices, assuming these are choices we are talking about,

9    assuming the choices are made in a particular direction.

10   I'll leave it to the government in the first instance to

11   submit that by noon tomorrow.

12           And then, depending on what it says, I may but I'm

13   not yet sure if it will be necessary, I may hold another

14   hearing on it.  Obviously we have an impending deadline, of

15   sorts, of Friday this week at midnight that I am very

16   cognizant of; that's why I am ordering the government to

17   submit something by tomorrow.  And I will take it up from

18   there, depending on what we get.

19           Mr. Hamilton, anything questions you want to ask

20   about what I am hoping to get from the government?

21           **MR. HAMILTON:**  No, Your Honor.

22           **THE COURT:**  Okay.  Anything else you would like to

23   add at this point?

24           **MR. HAMILTON:**  No, Your Honor.

25           **THE COURT:**  Thank you very much.

1          And, Ms. Golden, anything you would like add or

2    anything you would like to ask about?

3          **MS. GOLDEN:**  Plaintiffs would ask that they have

4    an opportunity to respond to anything, if necessary, in the

5    government's submission tomorrow.

6          **THE COURT:**  Yes.  I'm not going to order "yes" or

7    order "no," but you'll see what the government submits and

8    if you think it's necessary to submit something, feel free

9    to do so and I will consider it.  Okay?

10          **MS. GOLDEN:**  Thank you, Your Honor.

11          **THE COURT:**  Okay.  Thank you, all.  I look forward

12    to seeing the submission.  Bye.

13          (Proceedings concluded at 12:12 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1                    **C E R T I F I C A T E**

2

3          I, **Lorraine T. Herman, Official Court Reporter,**

4    certify that the foregoing is a true and correct transcript

5    of the record of proceedings in the above-entitled matter.

6

7

8

9

10    ___February 19, 2025___     __/s/___Lorraine T. Herman___
                **DATE**                        **Lorraine T. Herman**
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25