# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| American Foreign Service Association, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> President Donald J. Trump, *et al.*, <br><br> *Defendants*. | Case No. 1:25-cv-00352 |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Lauren Bateman (DC Bar No. 1047285)
Karla Gilbride (DC Bar No. 1005886)
Allison Zieve (DC Bar No. 424786)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

Kaitlyn Golden (DC Bar No. 1034214)
Kristen Miller (DC Bar No. 229627)
Rachel L. Fried (DC Bar No. 1029538)
Kayla M. Kaufman (DC Bar No. 90029091)
Robin F. Thurston (DC Bar No. 1531399)
Skye L. Perryman (DC Bar No. 984573)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090

*Counsel for Plaintiffs*

March 10, 2025

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 1

   I.   Establishment and Funding of USAID ..................................................................... 1

   II.   Factual Background ................................................................................................. 3

      A.   The Foreign Aid Freeze and the Dismantling of USAID ................................ 4

      B.   Consequences of the USAID shutdown ........................................................ 8

   III.  Procedural History ................................................................................................. 9

STANDARD OF REVIEW ............................................................................................... 10

ARGUMENT .................................................................................................................. 11

   I.   This Court has jurisdiction over Plaintiffs' claims. .................................................. 11

      A.   Plaintiffs have organizational standing. ...................................................... 11

      B.   AFSA and AFGE have associational standing to sue on behalf of their
members. ................................................................................................ 13

      C.   Congress has not divested this Court of jurisdiction over Plaintiffs'
claims. .................................................................................................... 14

          1.   Plaintiffs' challenge to the dissolution of USAID is not an employment dispute. .... 15

          2.   Plaintiffs' claims are not of the type that Congress intended to remove from this
Court's jurisdiction. ......................................................................... 17

          3.   All three *Thunder Basin* factors point towards this Court retaining jurisdiction. ...... 19

   II.   Defendants violated the Constitution by unilaterally dismantling a federal agency. ........ 21

      A.   Shuttering an agency created by statute violates the principle of
separation of powers. ................................................................................ 21

      B.   Dismantling USAID violates the Take Care Clause. ...................................... 22

   III.  Defendants' decision to shut down USAID violates the Administrative Procedure Act. 23

      A.   Defendants' decision to shut down USAID is final agency action. .................. 23

      B.   Defendants' decision to shut down USAID is in excess of statutory
authority. ................................................................................................ 25

      C.   Defendants' decision to shut down USAID is arbitrary, capricious, and
not in accordance with law. ...................................................................... 288

   IV.  Defendants' dismantling of USAID is ultra vires. ................................................. 333

CONCLUSION ............................................................................................................... 33

# TABLE OF AUTHORITIES

**Cases**                                                                                        **Page(s)**

*AIDS Vaccine Advoc. Coal. v. United States Dep't of State*, No. CV 25-00400
   (AHA), 2025 WL 485324 (D.D.C. Feb. 13, 2025) ........................................................ 30

*Am. Fed. of Govt. Emps., AFLCIO v. Trump*, 929 F.3d 748 (D.C. Cir. 2019) ..................... 16, 19

*Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94 (1902) ............................... 33

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................................. 10

*AVAC v. Dep't of State*, No. 1:25-cv-400 (Feb. 18, 2025) ........................................... 3

*Axon Enter. Inc. v. Fed. Trade Comm'n*, 598 U.S. 175 (2023) ................................ 15, 17, 19, 20

*Bennett v. Spear*, 520 U.S. 154 (1997) ............................................................... 24, 25

*Biden v. Texas*, 597 U.S. 785 (2022) ................................................................... 24

*Brock v. United States*, 64 F.3d 1421 (9th Cir. 1995) ............................................... 18

*Carr v. Saul*, 593 U.S. 83 (2021) ........................................................................ 20

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ...................................................... 10, 11

*Christensen v. Harris Cnty.*, 529 U.S. 576 (2000) ................................................... 22

*Clinton v. City of New York*, 524 U.S. 417 (1998) ................................................... 22

*Ctr. for Biological Diversity v. McAleenan*, 404 F. Supp. 3d 218 (D.D.C. 2019) ..................... 23

*Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1 (2020) .................... 30

*Elgin v. U.S. Dep't of Treasury*, 567 U.S. 1 (2012) .............................................. 16, 17, 20

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016) ........................................... 30, 32

*Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136 (D.C. Cir. 2011) ........................... 11, 13

*Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367 (2024) ............................ 11

*Food and Water Watch, Inc. v. Vilsack*, 808 F.3d 905 (D.C. Cir. 2015) ............................ 11

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477 (2010) ........................... 17, 20

*Gustavson v. Adkins*, 803 F.3d 883 (7th Cir. 2015)................................................................18

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) .........................................................11

*Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333 (1977) ........................................13

*Immigr. & Naturalization Serv. v. Chadha*, 462 U.S. 919 (1983) .........................................22

*Kendall v. U.S. ex rel. Stokes*, 37 U.S. (12 Pet.) 524 (1838) ...........................................22, 23

*Manivannan v. Dep't of Energy*, 42 F.4th 163 (3d Cir. 2022) ................................................18

*Marin Audubon Soc'y v. Fed. Aviation Admin.*, 121 F.4th 902 (D.C. Cir. 2024) .....................22

*Medellin v. Texas*, 552 U.S. 491 (2008) .................................................................................22

*Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368 (2012) ...........................................................14

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29
    (1983) ..............................................................................................................28, 29, 32

*Myers v. United States*, 272 U.S. 52 (1926) ...........................................................................21

*Nat'l Ass'n of Postal Supervisors v. United States Postal Serv.*, 26 F.4th 960
    (D.C. Cir. 2022) ............................................................................................................33

*Nat'l Automatic Laundry and Cleaning Council v. Shultz*, 443 F.2d 689 (D.C. Cir.
    1971) .............................................................................................................................25

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. CV 25-239 (LLA),
    2025 WL 597959 (D.D.C. Feb. 25, 2025) .....................................................................25

*Nat'l Fed'n of Indep. Bus. v. U.S. Dep't of Labor*, 595 U.S. 109 (2022) ..................................21

*People for the Ethical Treatment of Animals v. USDA*, 797 F.3d 1087 (D.C. Cir.
    2015) ........................................................................................................................11, 12

*Raleigh & Gaston R. Co. v. Reid*, 80 U.S. (13 Wall.) 269 (1872) ...........................................22

*Rosencrans v. United States*, 165 U.S. 257 (1897) .................................................................14

*Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194 (1947) ...............................................28

*Soundboard Ass'n v. Fed. Trade Comm'n*, 888 F.3d 1261 (D.C. Cir. 2018) ............................25

*Spagnola v. Mathis*, 859 F.2d 223 (D.C. Cir. 1988) ...............................................................18

*Stewart v. Evans*, 275 F.3d 1126 (D.C. Cir. 2002) .................................................................18

*Sw. Airlines Co. v. U.S. Dep't of Transp.*, 832 F.3d 270 (D.C. Cir. 2016).................................. 24

*Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994)........................................ 17, 19

*Transactive Corp. v. United States*, 91 F.3d 232 (D.C. Cir. 1996)................................ 28

*U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590 (2016) ..................................... 24

*U.S. Info. Agency v. KRC*, 989 F.2d 1211 (D.C. Cir. 1993) ......................................... 15

*United States v. Fausto*, 484 U.S. 439 (1988) ...................................................... 15, 16

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ............................................ 21, 22

**Statutes**

22 U.S.C. § 4101................................................................................. 14

22 U.S.C. § 4140................................................................................. 19

22 U.S.C. § 6563.............................................................................. 2, 21

22 U.S.C. § 6601............................................................................ 21, 25

28 U.S.C. § 1331................................................................................. 14

31 U.S.C. § 3901................................................................................. 28

5 U.S.C. § 1101................................................................................. 14

5 U.S.C. § 6329................................................................................. 28

5 U.S.C. § 704................................................................................. 23

5 U.S.C. § 706................................................................................. 28

5 U.S.C. § 7703................................................................................. 19

5 U.S.C. §§ 2301, 3502......................................................................... 16

Further Consolidated Appropriations Act, 2024 (FCAA). Pub. L. 118-47, 138 Stat 460 (2024)........................................................................... *passim*

**Other Authorities**

170 Cong. Rec. H1501-01, H2087.................................................................27

Apoorva Mandavilli, *How Foreign Aid Cuts Are Setting the Stage for Disease Outbreaks*, N.Y. Times (Mar. 7, 2025), https://tinyurl.com/yc8y7r24 ......................................32

Emily M McCabe, Cong. Rsch. Serv., *U.S. Agency for International Development: An Overview* (Jan. 6, 2025), https://tinyurl.com/4dc4wjhp ................................1

George W. Bush Presidential Center, *Hope. Mercy. Compassion. 25 million lives saved — and counting* (May 25, 2023), https://tinyurl.com/2utn9a7t ........................................3

Gerald Imray, *Trump's permanent USAID cuts slam humanitarian programs worldwide: 'We are being pushed off a cliff'*, AP (Feb. 27, 2025), https://tinyurl.com/3ew6wh8y ......................................................................................9

Jennifer Furin, *The U.S. Is Cutting Off Foreign Aid. My Youngest Patients Are Paying the Price*, Time (Feb. 19. 2025), https://tinyurl.com/ydbs87k3 .....................................9

Letter from Thirty-Seven Senators to Marco Rubio, U.S. S. (Feb. 4, 2025), https://tinyurl.com/4e4eneu5/ ....................................................................................27

Letter from Twelve Senators to Marco Rubio, U.S. S. Comm. on Foreign Rels. (Feb. 2, 2025), https://tinyurl.com/3srm4cwm ...............................................................27

*Limitations on Presidential Power to Create A New Exec. Branch Entity to Receive & Administer Funds Under Foreign Aid Legis.*, 9 Op. O.L.C. 76 (O.L.C. 1985).....................................................................................................................21

Liz Goodwin, *Behind the scenes, GOP senators challenge legality of Trump's aid cuts*, Wash. Post (Feb. 27, 2025), https://tinyurl.com/5cmy4hmx.................................27

Mark Townsend et al., *Deaths Predicted Amid the Chaos of Elon Musk's Shutdown of USAid*, The Guardian (Feb. 4, 2025), https://tinyurl.com/s29vk8vn ...................31

Matt Bai, *The blinding contempt of the DOGE bros*, Wash. Post (Feb. 24, 2025), https://tinyurl.com/24z6rfd3 ...................................................................................29

Off. of Inspector Gen., USAID, *Oversight of USAID-Funded Humanitarian Assistance Programming Impacted by Staffing Reductions and Pause on Foreign Assistance* (Feb. 10, 2025), https://tinyurl.com/3bj8m5az..........................................31

PEPFAR Program Impact Tracker, https://tinyurl.com/mu5s5c3b (accessed 1:34 pm, Mar. 8, 2025). .................................................................................................31

*Reorganization Plan and Report Submitted by President Clinton to Congress* (Dec. 30, 1998), pursuant to § 1601 of the Foreign Affairs Reform and Restructuring Act of 1998, P.L. 105-277, https://tinyurl.com/48kthcr8................................2, 21

Sam Mednick et. al, *USAID Cuts Are Already Hitting Countries Around the World. Here Are 20 Projects That Have Closed*, AP (Mar. 1, 2025), https://tinyurl.com/2vhvn8dj.........................................................................................9

Stephanie Nolen, *Abandoned in the Middle of Clinical Trials, Because of a Trump Order*, N.Y. Times (Feb. 6, 2025), https://tinyurl.com/2p823ak5 ...............................................9

Stephanie Nolen, *Health Programs Shutter Around The World As Trump Pauses Foreign Aid*, N.Y. Times (Feb. 1, 2025), https://tinyurl.com/53j4mhw9 ...................................9

The Am. Presidency Proj., *Executive Order 10973 - Administration of Foreign Assistance and Related Functions* (Nov. 3, 1961), https://tinyurl.com/3pwptwat .....................1

U.S. Dep't of State, *Implementing the President's Executive Order on Reevaluating and Realigning United States Foreign Aid* (Jan. 26, 2025), https://tinyurl.com/5r9pd8x5 ........................................................................................29

**Rules**

Fed. R. Civ. P. 56(a) ........................................................................................... 10, 11

**Constitutional Provisions**

U.S. Const. art. I, § 1................................................................................................ 21

U.S. Const., art. II § 3 .............................................................................................. 22

# INTRODUCTION

Defendants are acting, rapidly and systematically, to shut down the United States Agency for International Development (USAID). They have shuttered life-saving projects funded and developed by the agency, leaving people to suffer and to die by the thousands. They have halted disease surveillance efforts, leaving Americans vulnerable to dangerous pathogens. They have created power vacuums in volatile parts of the world. They have fired American workers devoted to the ideals of democracy and who sought to make a difference across the world, leaving some in war-torn countries without security once provided for by their jobs. These actions have had untold costs, for the United States and for the world.

These actions are also unlawful. The shuttering of USAID violates both the Constitution and federal statutes. The Court should grant summary judgment to prevent Defendants from inflicting further harm in violation of law.

# BACKGROUND

## I.    Establishment and Funding of USAID

In 1961, President John F. Kennedy created USAID and charged the agency with "provid[ing] assistance to strategically important countries and countries in conflict; lead[ing] U.S. efforts to alleviate poverty, disease, and humanitarian need; and assist[ing] U.S. commercial interests by supporting developing countries' economic growth and building countries' capacity to participate in world trade."[1]

---

[1] Emily M. McCabe, Cong. Rsch. Serv., *U.S. Agency for International Development: An Overview* (Jan. 6, 2025), https://tinyurl.com/4dc4wjhp; *see also* The Am. Presidency Proj., *Executive Order 10973 - Administration of Foreign Assistance and Related Functions* (Nov. 3, 1961), https://tinyurl.com/3pwptwat (text of Executive Order 10973).

Through the Foreign Affairs Reform and Restructuring Act of 1998 (FARRA), Congress established USAID as a distinct agency, outside of the Department of State. 22 U.S.C. § 6563 ("[T]here is within the Executive branch of Government the United States Agency for International Development."). The act allowed the president a 60-day window to submit a "reorganization plan and report" for USAID, during which time the president could "provide for the abolition" of USAID, transfer its functions to the Department of State, or submit a plan to Congress for the "transfer to and consolidation" of certain USAID functions and "additional consolidation, reorganization, and streamlining" of USAID. *Id*. §§ 6601(a), (d). President Bill Clinton's report, submitted on December 30, 1998, determined that "USAID will remain a distinct agency with a separate appropriation."[2]

Since FARRA, Congress has repeatedly appropriated funds for USAID, including most recently in the Further Consolidated Appropriations Act, 2024 (FCAA). Pub. L. 118-47 § 7063(a), 138 Stat 460 (2024). The FCAA explicitly prohibited using the "funds appropriated by this Act, prior Acts making appropriations for the Department of State, foreign operations, and related programs, or any other Act … to implement a reorganization, redesign, or other plan … by the Department of State, the United States Agency for International Development, or any other Federal department, agency, or organization funded by this Act without prior consultation by the head of such department, agency, or organization with the appropriate congressional committees." *Id*. The Act defined "reorganization, redesign, or other plan" to include, *inter alia*, any action to "eliminate, consolidate, or downsize covered departments, agencies, or organizations," any action to "eliminate, consolidate, or downsize the United States official presence overseas," or "reduce the

---

[2] *Reorganization Plan and Report Submitted by President Clinton to Congress* (Dec. 30, 1998), pursuant to § 1601 of the Foreign Affairs Reform and Restructuring Act of 1998, P.L. 105-277, https://tinyurl.com/48kthcr8.

size of the permanent Civil Service, Foreign Service, eligible family member, and locally employed staff workforce" of USAID "from the staffing levels previously justified to the Committees on Appropriations for fiscal year 2024." *Id*. § 7063(b).

The FCAA also specified that no funds shall be available for obligation to "suspend or eliminate a program, project, or activity," "close, suspend, open, or reopen a mission or post," or "create, close, reorganize, downsize, or rename bureaus, centers, or offices" unless "previously justified to the Committees on Appropriations or such Committees are notified 15 days in advance of such obligation." *Id*. § 7015(a).

## II.    Factual Background

USAID has been the leading humanitarian development arm of the United States for the past 64 years, providing foreign assistance to alleviate poverty and disease and to provide other humanitarian assistance. *See* Plaintiffs' Statement of Undisputed Material Facts (SOMF) ¶¶ 1–3. USAID funds projects in approximately 120 countries aimed at fighting epidemics, educating children, providing clean water, and supporting economic development. SOMF ¶ 5. Its efforts have saved, quite literally, millions of lives across the globe: PEPFAR programming alone has saved over 25 million lives.[3] USAID also plays a crucial role in lowering the risk of infectious disease entering the United States. *See* SOMF Ex. 18, Decl. of L. Bateman, Ex. C at 3, *AVAC v. Dep't of State*, No. 1:25-cv-400 (Feb. 18, 2025), ECF No. 46-1 (Third Enrich Memorandum).This work is carried out in large part by implementing partners of the agency, such as nonprofits or private businesses, who receive contracts, grants, and other foreign assistance awards to fulfill agency priorities. SOMF ¶ 4.

---

[3] George W. Bush Presidential Center, *Hope. Mercy. Compassion. 25 million lives saved — and counting* (May 25, 2023), https://tinyurl.com/2utn9a7t.

As Defendant Trump and his advisor Elon Musk have repeatedly stated, Defendants are in the process of eliminating the agency in its entirety. In a February 7, 2025, Truth Social post, Defendant Trump declared: "USAID IS DRIVING THE RADICAL LEFT CRAZY … CLOSE IT DOWN!" *Id.* ¶ 60. Likewise, Mr. Musk has stated with respect to USAID: "Time for it to die," *id.* ¶ 37; and "I went over it with [President Trump] in detail and he agreed that we should shut it down," *id.* ¶ 39.

Over the past five weeks, Defendants have carried out their plans to dismantle USAID by freezing nearly all—and ultimately cancelling 90% of—USAID-funded awards; sending termination notices to thousands of the agency's 10,000+ person workforce; and closing down its headquarters. Indeed, President Trump declared on February 19, "we have effectively eliminated" USAID. *Id.* ¶ 71.

### A. The Foreign Aid Freeze and the Dismantling of USAID

On January 20, 2025, President Trump issued an executive order that directed a 90-day freeze of all "foreign development assistance programs," during which USAID was to conduct a review "for programmatic efficiency and consistency with United States foreign policy." *Id.* ¶¶ 16–17. The Order further directed "[t]he responsible department and agency heads" to determine within the 90-day review period "whether to continue, modify, or cease each foreign assistance program … with the concurrence of the Secretary of State." *Id.* ¶ 19.

To implement the Executive Order, Defendant Rubio, acting as Secretary of State, issued a diplomatic cable to all diplomatic and consular posts (referred to as an "ALDAC") on January 24, 2025, that prohibited the obligation of any new USAID funds and directed USAID contracting officers to immediately issue stop-work orders on existing assistance awards. *Id.* ¶¶ 20–22. Over the following days, USAID issued stop-work orders to nearly all implementing partners of the agency, requiring them to "immediately suspend work." *Id.* ¶ 23.

The Rubio cable purported to exempt certain types of payments—such as "legitimate expenses" incurred by implementing partners prior to the issuance of the cable. *Id.* ¶ 22. In reality, though, those payments were also frozen. *Id.* ¶¶ 24, 55–57. Specifically, Defendants restricted USAID staff from accessing the agency's financial management system and imposed heightened approval processes before payments could be disbursed. *Id.* ¶¶ 55–56. These changes prevented USAID from processing payments, even those that were not technically subject to the freeze. *Id.* ¶ 57. In fact, by the government's own accounting, it owed almost two billion dollars to aid organizations for work completed prior to the freeze.  SOMF ¶ 91.

Later, Defendants purported to issue temporary waivers of the funding freeze for "life-saving humanitarian assistance" and "HIV care and treatment services" on January 28 and February 1, *id.* ¶¶ 28–30, but these waivers were almost entirely ineffectual, *id.* ¶¶ 31–32, 66, 87–90. As the former Inspector General for USAID explained in a February 10 report, USAID's ability to distribute funds to qualifying programs was severely limited by reductions in staff, confusion about the scope of the waivers, and gag orders that limited USAID staff's ability to communicate with implementing partners. *Id.* ¶ 66.[4] The Acting Assistant Administrator for USAID's Global Health Bureau likewise reported that "[s]uccessful implementation" of the lifesaving humanitarian assistance waiver "was not possible due to administrative and bureaucratic challenges, including contradictory and shifting guidance regarding approval for required activities and failure of Agency leadership to process disbursement of funds for activities once approved," and that, as a result, the Bureau had been "wholly prevented from delivering life-saving activities." *Id.* ¶ 87–88.

At around the same time, Defendants accelerated their actions to eliminate USAID. They locked many USAID employees and contract personnel—including some in war zones—out of

---

[4] The Inspector General was fired the day after he released the report. SOMF ¶ 67.

their email and computer accounts. *Id.* ¶¶ 36, 41. They removed artwork and photographs of USAID's work from its offices. *Id.* ¶ 26. And on February 1, 2025, they took the USAID.gov website offline. *Id.* ¶ 34.[5] By February 3, 2025, USAID's headquarters was closed to its staff. *Id.* ¶ 42. Mr. Musk bragged on Twitter that he spent the weekend "feeding USAID into the wood chipper." *Id.* ¶ 38.

On February 3, 2025, Defendant Rubio announced that President Trump had appointed him to serve as Acting Administrator of USAID. *Id.* ¶ 43. That same day, Defendant Rubio sent a letter to the Senate Foreign Relations Committee and House Foreign Affairs Committee providing "notice" and advising Congress of the State Department's "intent to initiate consultations … regarding the manner in which foreign aid is distributed around the world." *Id.* ¶ 44. The letter stated that Defendant Rubio authorized Peter Marocco, the Deputy Administrator of USAID and the State Department Director of Foreign Assistance, to "begin the process of engaging in a review and potential reorganization of USAID's activities." *Id.* ¶ 45.

Defendants next eviscerated USAID's workforce. *Id.* ¶¶ 40, 48–53, 59, 78–82. That workforce is comprised of both direct agency hires and indirect hires, such as personal services contractors (PSCs), who hold employment contracts with the agency, and institutional support contractors (ISCs), who hold contracts with third parties, *id.* ¶¶ 8–9, 11–13. Prior to January 20, 2025, USAID's workforce consisted of over 10,000 employees, not including ISCs. *Id.* ¶ 6.

Defendants achieved the massive workforce reduction through a series of steps. On February 4, 2025, Defendants announced that, with limited exceptions, all USAID direct hire personnel would be placed on administrative leave starting that Friday, February 7. *Id.* ¶¶ 51–53.

---

[5] The website came back online on February 4, displaying a single page announcing Defendants' plans to place USAID personnel on administrative leave. *Id.* ¶ 51. It has since been updated several times to announce Defendants' plans to further dismantle the agency. *Id.* ¶¶ 53, 79–81, 83–85.

USAID also announced that it was planning to repatriate overseas personnel within 30 days and to terminate non-essential PSC and ISC indirect hires. *Id.* ¶ 51. That same day, USAID began placing large numbers of staff on administrative leave. *Id.* ¶ 50, 53. Reports began to circulate that the USAID workforce would be reduced to 290 personnel total. *Id.* ¶ 59.

Before the USAID-wide administrative leave went into effect on February 7, this Court entered a Temporary Restraining Order (TRO) that enjoined Defendants from placing any staff on leave and from evacuating personnel from their host countries. *Id.* ¶ 64. The TRO remained in place until Friday, February 21, 2025. *Id.* ¶¶ 69, 77.

After the TRO was lifted, Defendants moved quickly to continue dismantling the agency's workforce. By Sunday, February 23, 2025, hundreds of PSCs were terminated. *Id.* ¶ 78. On Sunday, February 23, 2025, USAID announced that, with limited exceptions, all direct hires would be placed on administrative leave by the end of the day, *id.* ¶ 80, and that the agency would implement a Reduction in Force (RIF) that would terminate approximately 1,600 USAID personnel stationed in the United States, *id.* ¶ 81. That same day, USAID employees began receiving individual RIF notices. *Id.* ¶ 82.

Defendants also continued terminating awards held by implementing partners. By Wednesday, February 26, 2025, USAID reported that it had finished its review of foreign development assistance programs, and that it had terminated approximately 5,800 of 6,300—or 92% of—USAID awards. *Id.* ¶ 86. This morning, Defendant Rubio stated that USAID had cancelled 5,200—or 83 % of—USAID awards. *Id.* The termination decisions were made at a breakneck pace, without input from key officials, and without a "careful, individualized review." *Id.* ¶¶ 72–75. A USAID Contracting Officer stated under oath that she had "not seen any evidence

that a thorough, case-by-case analysis has taken place with regard to the suspensions, stop-work orders, and terminations … issued by the Agency." *Id.* ¶ 74.

Today, USAID headquarters no longer exist. On February 7, 2025, Defendants took down USAID signs outside of the Ronald Reagan Building and International Trade Center. *Id.* ¶ 61. And that same day, White House officials confirmed that the building's lease had been transferred to United States Customs and Border Protection. *Id.* ¶ 62. On February 27 and February 28, 2025, USAID staff were each given 15 minutes to retrieve their personal belongings from the building where they used to work. *Id.* ¶¶ 83–85.

### B. Consequences of the USAID shutdown

Defendants' actions have imperiled vast swathes of the American economy. Thousands of Americans employed by the agency will lose their jobs, *id.* ¶ 6–8, 59, 78– 82, to say nothing of the many thousands of Americans across the international development sector who have already been or will soon be furloughed or terminated as a result of the agency's termination of the vast majority of contracts, grants, and cooperative agreements, *see id.* ¶¶ 23, 86. Defendants' actions have also threatened the physical safety of Americans stationed abroad in service to this country. For example, the mass termination of contracts included the sudden severance of a cell phone contract with AT&T, stranding employees in conflict areas like Ukraine and Haiti without cell phones and with no advance warning. *Id.* ¶ 75–76. The funding freeze caused others to lose access to basic utilities, including electricity that powers security features like electric fencing, perimeter lights, and guard housing. Emelia Doe Decl., ECF No. 36-3, ¶¶ 10-12. Nor are these safety risks limited to USAID employees, as the abrupt departure of USAID from volatile regions will leave staff members of the humanitarian organizations that remain behind, like Plaintiff Oxfam, exposed to heightened physical danger as they attempt to pick up the pieces. SOMF Ex. 20, Second Declaration of Abby Maxman ¶ 6 (March 10, 2025) ("Second Maxman Decl.").

Defendants' actions have also been astonishingly cruel. They have pulled the rug out from under millions of people across the world who depend on USAID for lifesaving health care, medicine, and support. *Id.* ¶¶ 86–94. In famine-stricken Khartoum, for example, soup kitchens that feed nearly a million people had to shut down. *See* Sam Mednick et. al, *USAID Cuts Are Already Hitting Countries Around the World. Here Are 20 Projects That Have Closed*, AP (Mar. 1, 2025), https://tinyurl.com/2vhvn8dj. In Somalia, an organization was forced to stop therapeutic nutrition for 1,700 malnourished children a day. *See* Gerald Imray, *Trump's permanent USAID cuts slam humanitarian programs worldwide: 'We are being pushed off a cliff'*, AP (Feb. 27, 2025), https://tinyurl.com/3ew6wh8y. In Burundi, too, American doctors ran out of therapeutic food to keep starving children from death. *See* Jennifer Furin, *The U.S. Is Cutting Off Foreign Aid. My Youngest Patients Are Paying the Price*, Time (Feb. 19. 2025), https://tinyurl.com/ydbs87k3. Toddlers in Zambia were deprived of rehydration salts to treat life-threatening diarrhea. *See* Stephanie Nolen, *Health Programs Shutter Around The World As Trump Pauses Foreign Aid*, N.Y. Times (Feb. 1, 2025), https://tinyurl.com/53j4mhw9. And across the world, medical trials were abruptly frozen, cutting off people around the world who had been given experimental drugs and medical devices from the researchers who were monitoring them. *See* Stephanie Nolen, *Abandoned in the Middle of Clinical Trials, Because of a Trump Order*, N.Y. Times (Feb. 6, 2025), https://tinyurl.com/2p823ak5.

## III.    Procedural History

Plaintiffs American Foreign Service Association (AFSA) and American Federation of Government Employees (AFGE) filed suit on February 6, 2025, alleging constitutional and Administrative Procedure Act claims against Defendants. ECF 1. The following day, this Court held a hearing and entered a TRO requiring reinstatement of all employees then on administrative

leave, ordering Defendants to give such employees "complete access to email, payment, and security notification systems," and enjoining Defendants from placing additional employees on administrative leave or evacuating USAID employees from their host countries. ECF 15. It later extended the TRO with modifications on February 13. ECF 31.

On February 13, Plaintiffs filed an amended complaint, adding Oxfam America as a Plaintiff. ECF 30. The TRO dissolved on February 21, and the Court denied Plaintiffs' motion for a preliminary injunction on that day. ECF 48 & 49.

## STANDARD OF REVIEW

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material" facts are limited to those identified by substantive law: "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* The moving party "bears the initial responsibility" of "identifying those portions" of the record that "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party carries that initial burden, the burden then shifts to the nonmoving party to show that sufficient evidence exists for a reasonable jury to find in the nonmoving party's favor with respect to the "element[s] essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The nonmoving party's opposition must consist of competent evidence setting forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324.

## ARGUMENT

**I.    This Court has jurisdiction over Plaintiffs' claims.**

Each of the three Plaintiffs has standing to challenge Defendants' ongoing dissolution of USAID because that dissolution has "perceptibly impaired" their "core" activities and will cause them further imminent injury if permitted to continue. *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). AFGE and AFSA also have associational standing on behalf of their members, and no statute governing employment disputes or labor-management relations implicitly divests this Court of jurisdiction over their constitutional and Administrative Procedure Act claims.

### A.    Plaintiffs have organizational standing.

An organization establishes standing to sue on its own behalf in the same way as an individual plaintiff: by "show[ing] actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision." *Food and Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) (internal quotation marks omitted). The D.C. Circuit has developed a two-part test to determine whether an organization has standing based on injury to its activities: First, the court asks whether the agency's act or omission "injured the [organization's] interest' and, second, whether the organization 'used its resources to counteract that harm." *People for the Ethical Treatment of Animals v. USDA*, 797 F.3d 1087, 1094 (D.C. Cir. 2015) (*PETA*) (quoting *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1140 (D.C. Cir. 2011)). In *PETA*, for example, the plaintiff organization had standing where the Department of Agriculture's failure to apply animal-welfare protections to birds injured the organization's interest in protecting animals from cruel and inhumane treatment, and where the organization alleged that it had expended resources to counter those injuries. *Id*. at 1094–95.

Here, as in *PETA*, Defendants' actions have injured Plaintiffs' interests, and each has expended resources to counter those harms. Oxfam America offers life-saving support in times of crisis as part of its mission to "end inequality and injustice." Maxman Decl., ECF 30-1, ¶ 4. Oxfam is currently conducting humanitarian action in over 30 countries, including the Democratic Republic of Congo, Venezuela, Bangladesh, South Sudan, Somalia, Ethiopia, and Ukraine. *Id.* ¶ 6. The rapid evaporation of USAID funding is placing an "inordinate burden" on Oxfam, which has already diverted resources in response and "would be fundamentally challenged and overstretched in an attempt to fill the $63 billion void left by USAID's abrupt dissolution." *Id.* ¶ 10; *see id.* ¶ 12 (describing "massive shortfall" caused by USAID's abrupt closure and need to "reallocate funds away from critical programs" to address it); *id.* ¶ 16 (Oxfam has already been told to halt work on several UN-funded projects that rely on U.S. government funds, including "three humanitarian projects providing water, sanitation, and other humanitarian assistance in which work has been conducted and [Oxfam has] not received payment."); Second Maxman Decl. ¶¶ 3-10 (describing effects of Defendants' actions on Oxfam's humanitarian programs, staff safety, and budget, as well as Oxfam's efforts to "assess gaps and fill in where needed").

Similarly, AFSA and AFGE have a strong interest in representing and protecting their members who are USAID employees, and their resources have been stretched as a result of Defendants' unlawful actions. *See* Ottis Johnson Decl., ECF 9-3, ¶¶ 6–7 (explaining resources expended to answer questions from USAID employee AFGE members, and expectation that need for resources will grow exponentially if more USAID employee AFGE members are placed on administrative leave or terminated); Further Randall Chester Decl., ECF 24-17, ¶¶ 21-25. These resource expenditures are traceable to, and intended to respond to or blunt the effects of, Defendants' rapid dismantling of the federal agency that employs their members. *See Equal Rights*

*Ctr.*, 633 F.3d at 1140 (holding that organizations' expenditures of resources conferred Article III standing when they were made "in response to, and to counteract" the effects of the defendants' actions). Finally, the injury is redressable by injunctive relief halting further dismantling of the agency and reversing the unlawful actions that have already occurred.

### B. AFSA and AFGE have associational standing to sue on behalf of their members.

An organization can sue on behalf of its members when 1) the members could sue in their own right; 2) the interests the organization seeks to protect are germane to its purpose; and 3) neither the claim pursued nor the relief requested requires the participation of individual members. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). All three elements are easily met here.

First, Defendants' actions have caused AFSA and AFGE members emotional, reputational, and financial harms that would give them standing in their own right. *See* Decl. of Frances Doe, ECF 9-9, ¶¶ 5–8 (AFSA member describing extreme stress and a panic attack and separation from her spouse who works for the UN if she must return to the United States); Decl. of Jeanne Doe, ECF 9-12, ¶¶ 4, 7, 8 (AFGE member describing trauma of being locked out of building, memorial wall of pictures of colleagues who died in service being torn down, and violent anti-USAID rhetoric making her feel unsafe and exacerbating medical condition). Although Defendants earlier sought to dismiss the emotional harms by pointing to the existence of waivers as reassurance that Plaintiffs' fears of a "global humanitarian crisis" were speculative and exaggerated, Defs. Opp, ECF 20, at 20-21, the waivers have proven illusory, SOMF ¶¶ 81–89. And with the overwhelming majority of USAID foreign assistance awards terminated, USAID-funded programs closing, and staff layoffs throughout the world, the fears of Plaintiffs' members have proven to be well-founded. *See* SOMF ¶¶ 77–90.

As for the second and third factors, both unions exist for the purpose of assisting their members. Johnson Decl., ECF 9-3, ¶¶ 2–4; Further Chester Decl., ECF 24-17, ¶¶ 2–5. Bringing this lawsuit to defend the existence of the agency where their members work, and the continued viability of the foreign aid profession to which they have dedicated their careers, is germane to that purpose. Finally, the declaratory and injunctive relief that AFSA and AFGE seek pertains to Defendants' wholesale dissolution of USAID and does not depend on the individual circumstances of any union member, making it unnecessary for any member to participate.

### C.  Congress has not divested this Court of jurisdiction over Plaintiffs' claims.

Congress expressly conferred jurisdiction on this Court to decide the constitutional and Administrative Procedure Act (APA) questions this case presents for Plaintiffs AFSA and AFGE. *See* 28 U.S.C. § 1331. When considering the preliminary injunction motion of AFGE and AFSA, this Court suggested that the administrative review schemes created by Congress in the Civil Service Reform Act (CSRA), 5 U.S.C. § 1101, and the Foreign Service Act (FSA), 22 U.S.C. § 4101, may preclude district court jurisdiction because those plaintiffs could challenge their members' "administrative leave placements, expedited evacuations, and other changes to working conditions" in those administrative fora. Mem. Op., ECF 49 at 21. Those statutes do not bar review here for three reasons. *See Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 383 (2012) (quoting *Rosencrans v. United States*, 165 U.S. 257, 262 (1897)) (cautioning that explicitly conferred jurisdiction "should hold firm against mere implication flowing from subsequent legislation" (internal quotation marks omitted)). First, the Plaintiffs are not alleging employment claims on behalf of individual employees. Indeed, Plaintiff Oxfam does not in any way represent employees. Second, the claims at issue fall outside the scope of the CSRA and FSA. Third, the *Thunder Basin* factors counsel against preclusion and in favor of district court jurisdiction.

**1. Plaintiffs' challenge to the dissolution of USAID is not an employment dispute.**

Challenging Defendants' wholesale dissolution of USAID, this lawsuit alleges five claims: that the action violates the separation of powers (Count One) and the Take Care Clause (Count Two), is ultra vires (Count Three), exceeds statutory authority (Count Four), and is arbitrary and capricious in violation of the APA (Count Five). *See* First Am. Compl., ECF 30. None of these claims invokes the substantive protections of the CSRA or FSA for employee-specific personnel actions. When considering whether Congress has implicitly stripped district-court jurisdiction by channeling cases to an agency forum, the "ultimate question" is always "how best to understand what Congress has done." *Axon Enter. Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 186 (2023). Neither the CSRA nor the FSA "implicitly" route "fundamental, even existential" questions about the structure of our constitutional system to agencies that handle employment and labor disputes. *Id.* at 180, 185.

More specifically, the CSRA provides an administrative process to seek review of specified adverse personnel actions for specified categories of federal employees. *See United States v. Fausto*, 484 U.S. 439, 445-47 (1988). The FSA establishes a similar system for certain foreign service employees. *See U.S. Info. Agency v. KRC*, 989 F.2d 1211, 1217 (D.C. Cir. 1993). Plaintiffs' claims in this case, however, do not challenge specific personnel actions. Rather, they challenge the dismantling of a federal agency, of which the en masse termination of employees is but one part. Likewise, Plaintiffs' claims do not involve the details of AFGE's or AFSA's collective bargaining agreements with USAID or whether the agency failed to bargain with the unions in good faith—claims that would implicate the labor relations review schemes of the Federal Service Labor-Management Relations Statute (FSLMRS) or the Foreign Service Labor Review Board

(FSLRB). *See Am. Fed. of Gov't. Emps., AFLCIO v. Trump*, 929 F.3d 748, 752 (D.C. Cir. 2019) (describing FSLMRS); 22 U.S.C. § 4107 (describing functions of FSLRB).

Simply put, this case is not about employment. Indeed, although two Plaintiffs bring this case on behalf of their employee members, the case is also brought by plaintiff Oxfam, as well as by AFSA and AFGE on their own behalf. *See supra* I.A.; Johnson Decl., ECF 9-3, ¶¶ 6–7; Further Chester Decl., ECF 24-17, ¶¶ 21–25 (describing harms to AFGE and AFSA, respectively); Maxman Decl., ECF 30-1, ¶¶ 10–19, Second Maxman Decl. ¶¶ 3-15 (describing harms caused by stoppage of payments, closing of USAID-funded programs, and loss of USAID employees' expertise and logistical support).

Naturally a campaign to shut down an agency comprised of thousands of federal employees will entail massive job losses, and Plaintiffs have pointed to those job losses as evidence to support their claim that an unlawful dismantling of the agency is underway. But Plaintiffs are not challenging the forthcoming RIFs as inconsistent with Merit System Principles or Office of Personnel Management (OPM) regulations. *See* 5 U.S.C. §§ 2301, 3502. And they are not challenging any past or contemplated personnel action affecting any particular USAID employee. *Cf. Elgin v. U.S. Dep't of Treasury*, 567 U.S. 1, 6–8 (2012) (employees challenged their removal from federal agencies for failure to register for Selective Service); *Fausto*, 484 U.S. at 441-42 (employee challenged his suspension for unauthorized use of government vehicle); *AFGE v. Trump*, 929 F.3d at 754 (unions challenged executive orders regarding federal labor relations for, among other things, violating "particular requirements" of the FSLMRS). Unlike *Elgin*, *Fausto*, and *AFGE v. Trump*, which either invoked the jurisdiction-stripping statutory schemes directly or challenged adverse employment actions within the heartland of those statutes, this case describes facts related to employment to illustrate the systematic shutdown of the agency—along with taking

16

down webpages, transferring leases, reorganizing lines of authority, and canceling the vast majority of USAID awards and contracts.

Moreover, unlike the plaintiffs in those cases, here, Plaintiff Oxfam has no claims that could even arguably be channeled into the CSRA's or FSA's administrative review schemes. And while the Supreme Court in *Elgin* pointed to the desire to avoid competing adjudications of the same issues in multiple fora as a reason to channel all federal personnel disputes to the CSRA, 567 U.S. at 13–14, here, the same considerations militate in the opposite direction, because channeling the unions' constitutional and APA claims into administrative proceedings while allowing Oxfam's identical claims to remain in this court would multiply proceedings rather than streamlining them.

In short, this is not a case about personnel or labor practices, and "[t]he ordinary statutory review scheme does not preclude a district court from entertaining" this extraordinary action. *Axon*, 598 U.S. at 180.

### 2. Plaintiffs' claims are not of the type that Congress intended to remove from this Court's jurisdiction.

Even where Congress created comprehensive statutory schemes in which expert agency adjudicators partially supplant ordinary judicial review, that scheme "does not necessarily extend to every claim concerning agency action." *Axon*, 598 U.S. at 185. Rather, courts engage in a claim-specific inquiry to determine whether the statutory scheme "displays a 'fairly discernible' intent to limit jurisdiction, and the claims at issue are 'of the type Congress intended to be reviewed within th[e] statutory structure.'" *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 489 (2010) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207, 212 (1994)).

When conducting this claim-specific inquiry with regard to claims brought by federal employees, the D.C. Circuit and other courts have found various types of claims to fall outside of

the CSRA's scope. For example, in *Stewart v. Evans*, 275 F.3d 1126 (D.C. Cir. 2002), an employee of the Department of Commerce brought a Fourth Amendment claim against the agency, alleging that in the course of investigating a discrimination complaint, two agency employees illegally searched her papers without a warrant. *Id*. at 1128–29. The D.C. Circuit held that she could pursue her Fourth Amendment claim in court through a *Bivens* action, notwithstanding the CSRA's comprehensive scheme, because warrantless searches are not a "personnel action" within the meaning of the CSRA. *Id.* at 1130. Similarly, in *Spagnola v. Mathis*, 859 F.2d 223 (D.C. Cir. 1988), while finding a damage claim precluded by the CSRA, the D.C. Circuit noted that "time and again this court has affirmed the right of civil servants to seek equitable relief against their supervisors, and the agency itself, in vindication of their constitutional rights." *Id*. at 229–30. Other circuits are in accord. *See, e.g.*, *Manivannan v. Dep't of Energy*, 42 F.4th 163, 174 (3d Cir. 2022) (claim that supervisor converted federal employee's personal property did not implicate any CSRA provision and fell outside its review scheme); *Gustavson v. Adkins*, 803 F.3d 883, 888–90 (7th Cir. 2015) (installing a hidden camera in the women's bathroom of a VA facility was not a "personnel action" covered by the CSRA); *Brock v. United States*, 64 F.3d 1421, 1424–25 (9th Cir. 1995) (Forest Service employee's allegation of rape against a supervisor could proceed in court under the Federal Tort Claims Act because it "fits no category of personnel actions listed in" the CSRA).

Plaintiffs' claims similarly fall outside the scope of the CSRA and FSA—even putting aside Oxfam's claims. The claims of AFSA and AFGE on behalf of their members challenge the USAID shutdown as a whole, including the aspects of that shutdown, like contract and award terminations, that have no connection to union members' employment. And the harms that union members described in their declarations also extend far beyond the ordinary employment-related harms of lost income and benefits. *See* Diane Doe Decl., ECF 9-7, ¶ 15 (AFSA member describing

fear of returning to United States because of online attacks and threatening comments about USAID); Ellen Doe Decl., ECF 9-8, ¶ 10 (AFGE member describing distress she feels for foreign partners left behind in unsafe situations when USAID leaves overseas posts); Virginia Doe Decl., ECF 24-10, ¶ 9 (AFGE member describing chaotic and rushed process of terminating contracts).

### 3. All three *Thunder Basin* factors point towards this Court retaining jurisdiction.

Consideration of the *Thunder Basin* guideposts for assessing whether district courts should retain jurisdiction of a particular claim notwithstanding an otherwise comprehensive statutory review scheme confirms this conclusion: (1) whether denying district court jurisdiction could "foreclose all meaningful judicial review" of the claim; (2) whether the claim is "wholly collateral" to the statute's review provisions; and (3) whether the claim is "outside the agency's expertise." *Thunder Basin*, 510 U.S. at 212–13 (internal quotations omitted). Although all three questions need not be answered in the affirmative for a district court to retain jurisdiction, *Axon*, 598 U.S. at 186, here, all three point in the same direction and reinforce this Court's jurisdiction.

First, judicial review under the CSRA or FSA would come only after multiple layers of agency review, a process that could take years. *See* 5 U.S.C. § 7703 (judicial review provision in CSRA); 22 U.S.C. § 4140 (judicial review provision in FSA); *cf. Axon*, 598 U.S. at 213–16 (Gorsuch, J., concurring) (describing multi-year history of cases subject to statutory administrative review schemes). For some types of cases, such back-end judicial review may be adequate. *See AFGE v. Trump*, 929 F.3d at 759 (unions could challenge executive orders in context of specific bargaining disputes rather than through a pre-enforcement challenge). This is not such a case. The relief being sought here—an order that USAID not be unlawfully and unilaterally dissolved—cannot be obtained years from now when the agency has long since ceased to exist. Judicial review

from an administrative proceeding here "would come too late to be meaningful." *Axon*, 598 U.S. at 191.

Second, the collateral nature of the claims also supports district court jurisdiction. As discussed above, *supra* I.C.1, there are no claims in this case of the type that the administrative bodies created by the CSRA and FSA "customarily handle[]." *Axon*, 598 U.S. at 186. For example, the discharge claim at issue in *Elgin*, although it had a constitutional dimension because it involved a sex-based challenge to Selective Service registration, was still "the type of personnel action regularly adjudicated by" the Merit Systems Protection Board (MSPB). *Elgin*, 567 U.S. at 22. By contrast, the claims at issue in *Free Enterprise Fund* and *Axon* involved challenges to the constitutionality of the agencies conducting the first-level adjudication under the statutory schemes, which the Supreme Court considered collateral to the substance of their review procedures. *See Free Enter. Fund*, 561 U.S. at 490 (noting that the objection was "to the Board's existence, not to any of its auditing standards). Here, Plaintiffs' claims are more collateral still. *See Axon*, 598 U.S. at 192 (explaining that the "wholly collateral" factor turns on "the nature of the claims).

Finally, the constitutional and APA claims in this case are not within the particular expertise of the federal agencies created by the CSRA or FSA. As the Supreme Court has observed, "agency adjudications are generally ill suited to address structural constitutional challenges." *Carr v. Saul*, 593 U.S. 83, 92 (2021). And here, no threshold employment questions that the agencies would be well equipped to handle are mixed with the weighty constitutional ones. *See Elgin*, 567 U.S. at 22-23. Rather, this case seeks review of agency action and constitutional abuses far beyond the competence of specialized adjudicative bodies focused on labor and employment issues. This Court has jurisdiction over Plaintiffs' claims.

II.    **Defendants violated the Constitution by unilaterally dismantling a federal agency.**

A.    **Shuttering an agency created by statute violates the principle of separation of powers.**

The power to make laws rests exclusively with Congress. *See* U.S. Const. art. I, § 1. As part of that authority, the power to establish, reorganize, restructure, and abolish agencies likewise rests squarely with Congress. *See Myers v. United States,* 272 U.S. 52, 129 (1926) ("To Congress under its legislative power is given the establishment of offices, the determination of their functions and jurisdiction[.]"); *see also Nat'l Fed'n of Indep. Bus. v. U.S. Dep't of Labor*, 595 U.S. 109, 117 (2022) ("Administrative agencies are creatures of statute."); *Limitations on Presidential Power to Create A New Exec. Branch Entity to Receive & Administer Funds Under Foreign Aid Legis.*, 9 Op. O.L.C. 76, 78 (O.L.C. 1985) (recognizing the "Executive Branch's acquiescence in the need for reorganization legislation in order to restructure or consolidate agencies within the Executive Branch"). The President's role with respect to lawmaking, by contrast, is limited to the "recommending of laws he thinks wise and the vetoing of laws he thinks bad." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952).

Given the constitutional division of powers, Defendants lack authority unilaterally to shutter USAID. Congress established USAID as a federal agency under the Foreign Service Reform and Restructuring Act of 1998 (FSRRA). *See* 22 U.S.C. § 6563. That statute gave the President a 60-day window during which he could choose to abolish or restructure USAID, including by transferring its functions to the State Department. *See* 22 U.S.C. § 6601(a), (d). The President declined to abolish USAID, determining instead that "USAID will remain a distinct agency with a separate appropriation." *Reorganization Plan and Report*, *supra* n.2. And presidential authority to abolish the agency therefore expired, by statute, over a quarter century ago. That Congress once delegated that authority highlights its absence today. *See Christensen v.*

*Harris Cnty.*, 529 U.S. 576, 583 (2000) (noting the "canon" that "'[w]hen a statute limits a thing to be done in a particular mode, it includes a negative of any other mode'" (alteration in original) (quoting *Raleigh & Gaston R. Co. v. Reid*, 80 U.S. (13 Wall.) 269, 270 (1872))). And since then, Congress has repeatedly appropriated funds to USAID, most recently in the FCAA, which specifically prohibits the use of appropriated funds to reorganize the agency absent Congressional consultation, which did not take place here. *See* Pub. L. 118-47 § 7063(a), 138 Stat 460 (2024).

Defendants are bound by these statutes. "There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998); *see Immigr. & Naturalization Serv.. Chadha*, 462 U.S. 919, 954 (1983) (explaining that the "repeal of statutes, no less than enactment, must conform with Art. I"). "As Madison explained in The Federalist No. 47, under our constitutional system of checks and balances, '[t]he magistrate in whom the whole executive power resides cannot of himself make a law.'" *Medellin v. Texas*, 552 U.S. 491, 527–28 (2008) (alteration in original) (quoting J. Cooke ed., p. 326 (1961)). Holding otherwise "would be clothing the President with a power to control the legislation of congress." *Kendall v. U.S. ex rel. Stokes*, 37 U.S. (12 Pet.) 524, 613 (1838); *see also Marin Audubon Soc'y v. Fed. Aviation Admin.*, 121 F.4th 902, 908–09 (D.C. Cir. 2024) (holding invalid regulations issued pursuant to an executive order, not pursuant to a congressional delegation of authority).

### B.  Dismantling USAID violates the Take Care Clause.

The Constitution imposes on the President the duty to "take care that the Laws be faithfully executed." U.S. Const., art. II § 3. This obligation "to see that the laws are faithfully executed refutes the idea that [the President] is to be a lawmaker." *Youngstown*, 343 U.S. at 587. As the Supreme Court has stated, "[t]o contend that the obligation imposed on the President to see the laws faithfully executed, implies a power to forbid their execution, is a novel construction of the

constitution, and entirely inadmissible." *Kendall*, 37 U.S. at 613. Holding otherwise "would be clothing the President with a power entirely to control the legislation of congress." *Id.*

The unilateral dissolution of USAID is directly contrary to law, flouting both the FSRRA and appropriations statues. The dismantling of USID thus violates the Take Care Clause. *See Ctr. for Biological Diversity v. McAleenan*, 404 F. Supp. 3d 218, 244 (D.D.C. 2019) (recognizing that "separation-of-powers principles also drive evaluations of claims brought under the Constitution's Take Care Clause"). Whether viewed as an encroachment on Congress's exclusive authority to legislate or as a dereliction of the executive's duty to faithfully take care that the laws are faithfully executed, the upshot is the same: Unilateral dissolution of the agency violates the balance struck in the Constitution and is unlawful.

## III.    Defendants' decision to shut down USAID violates the Administrative Procedure Act.

The Administrative Procedure Act (APA) authorizes courts to review "final agency action." 5 U.S.C. § 704. The APA requires courts to set aside final agency actions that are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(C), (A). Defendants' decision to shut down USAID is final agency action subject to review under the APA. That decision exceeded their statutory authority, and it is arbitrary, capricious, and contrary to law.[6]

### A.  Defendants' decision to shut down USAID is final agency action.

Defendants' decision to shut down USAID is final agency action subject to review under the APA. It both "mark[s] the consummation of the agency's decisionmaking process" and is a

---

[6] Plaintiffs' APA claims are not alleged against Defendant Trump. *See* First Am. Compl. Accordingly, the term "Defendants" in part III of this memorandum does not include the President unless otherwise noted.

determination of "rights or obligations … or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotation marks and citations omitted).

First, Defendants' dismantling of USAID marks the consummation of the decisionmaking process. From the get-go, Defendants have made no secret of their plan to shut down USAID. Since President Trump expressed his desire to "close" USAID "down," SOMF ¶ 60, Defendants have done exactly that. They have placed approximately 90% of USAID employees on administrative leave and announced the intent to fire thousands of employees in the next couple months, *id.* ¶¶ 79–82; terminated hundreds of PSCs and furloughed hundreds of ISCs, *id.* ¶¶ 33, 78; terminated nearly over 5,000 USAID awards—the overwhelming majority of the total, *id.* ¶ 86; and closed USAID headquarters, *id.* ¶¶ 42, 61–62, 65. There is nothing "tentative" about this sweeping shutdown of the agency. *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 597 (2016) (citing *Bennett*, 520 U.S. at 177–178); *see Biden v. Texas*, 597 U.S. 785, 808–09 (2022) (holding that Department of Homeland Security's decision to end the Migrant Protection Protocols program was final agency action because it forbade staff "to continue the program in any way from that moment on" (internal quotations omitted)).

Likewise, "the way in which [Defendants] … treat[ ] the challenged action" evinces its finality. *Sw. Airlines Co. v. U.S. Dep't of Transp.*, 832 F.3d 270, 275 (D.C. Cir. 2016). The President has stated plainly that he is shutting the agency down, SOMF ¶ 60; Defendant Rubio stated his intent to "abolish[ ]" the agency and move any remaining functions to the Department of State, *id.* ¶ 46; and employees were given 15 minutes to empty their offices, *id.* ¶ 85. In short, while the Court observed in its decision on the preliminary injunction motion that "at present, the agency is still standing," Mem. Op. at 16, the agency has been further dismantled in the intervening

two weeks, *see* SOMF ¶¶ 78–86. That implementation of the decision is not yet complete does not

make the decision non-final.

Second, the decision to shut down the agency is one that "determines 'rights or obligations

… from which legal consequences will flow." *Nat'l Council of Nonprofits v. Off. of Mgmt. &*

*Budget*, No. CV 25-239 (LLA), 2025 WL 597959, at *13 (D.D.C. Feb. 25, 2025) (quoting *Bennett*,

520 U.S. at 177-78). For Plaintiffs and others, the consequences have been staggering. Thousands

of USAID employees have been placed on administrative leave, and more than a thousand have

received termination notices. SOMF ¶¶ 78–83. Contractors and grant recipients were directed to

stop work and have largely not been compensated for work already performed. *Id.* ¶¶ 21–23, 78,

86–91. Suddenly left without USAID's resources and expertise, Oxfam and other humanitarian

organizations have had to reallocate resources and have been left unable to fulfill contracts with

vendors. *See* Maxman Decl. ¶¶ 10, 12, 16.

Finally, that the decision to dissolve USAID and the actions taken in pursuit of that goal

derive from top agency officials, not agency staff, is further indication that the decision is a final

one for purposes of APA review. *See Nat'l Automatic Laundry and Cleaning Council v. Shultz*,

443 F.2d 689, 702 (D.C. Cir. 1971) (holding agency head approval of an agency action as a

"signpost[] of authoritative determination, finality[,] and ripeness"); *cf. Soundboard Ass'n v. Fed.*

*Trade Comm'n*, 888 F.3d 1261, 1268 (D.C. Cir. 2018) (holding letter that expressed the "views of

'staff'" and not the Commission was not final agency action).

### B.  Defendants' decision to shut down USAID is in excess of statutory authority.

USAID was established by statute, the FARRA, as a federal agency. *See* 22 U.S.C. § 6601.

No subsequent act of Congress has altered USAID's status. Shutting down the agency thus violates

FARRA.

In addition, Defendants' action violated the FCAA. In that statute, Congress appropriated funds to carry out USAID programs and activities through September 30, 2025. *See* FCAA, Pub. L. 118-47, Div. F, Title II, 138 Stat. 460 (2024). The FCAA specifies that no funds appropriated by Congress can be used to "implement a reorganization, redesign, or other plan … by the Department of State, the United States Agency for International Development, or any other Federal department, agency, or organization funded by th[at] Act without prior consultation by the head of such department, agency, or organization with the appropriate congressional committees." Pub. L. 118-47 § 7063(a). Congress defined such a plan to include any action to:

(1) expand, eliminate, consolidate, or downsize covered departments, agencies, or organizations, including bureaus and offices within or between such departments, agencies, or organizations, including the transfer to other agencies of the authorities and responsibilities of such bureaus and offices;

(2) expand, eliminate, consolidate, or downsize the United States official presence overseas, including at bilateral, regional, and multilateral diplomatic facilities and other platforms; or

(3) expand or reduce the size of the permanent Civil Service, Foreign Service, eligible family member, and locally employed staff workforce of the Department of State and USAID from the staffing levels previously justified to the Committees on Appropriations for fiscal year 2024.

*Id.* § 7063(b). The Act also requires that the congressional committees must be provided a "detailed justification for any proposed action." *Id.* § 7063(a).

Notably, Defendants' suggestion that they have met the prior consultation requirement is easily dismissed. As the FCAA's Explanatory Statement states:

[T]he term "prior consultation" means a pre-decisional engagement between a relevant Federal agency and the Committees on Appropriations during which such Committees are given a meaningful opportunity to provide facts and opinions, in advance of any public announcement, to inform: (1) the use of funds; (2) the development, content, or conduct of a program or activity; or (3) a decision to be taken.

170 Cong. Rec. H1501-01, H2087. Although Defendant Rubio sent a letter on February 3, 2025, to members of the Committees on Appropriations and Foreign Affairs and Foreign Relations, that letter neither stated the "proposed action" nor provided "detailed justification" for it. Rather, the letter states that the agency is "begin[ning] the process of engaging in a review and potential reorganization of USAID's activities" and "advises [Congress] of [the] intent to initiate consultations." Decl. of Peter Marocco, Ex. C, ECF 20-1. Thus, a bipartisan group of Senators, including members of the Senate Appropriations Committee, have written to Defendant Rubio expressing concern about "reorganization" of USAID without the consultation required by law.[7]

Since then, Defendants have "effectively eliminated" USAID. SOMF ¶ 71 (statement by Defendant Trump that "we have effectively eliminated" the agency). They have slashed USAID programs, placed thousands of USAID staff on administrative leave, and announced an intent to fire thousands of USAID staff and evacuate foreign service officers—all of which constitute "actions to" "consolidate, or downsize" USAID, "eliminate, consolidate, or downsize the United States official presence overseas," or "reduce the size of the permanent" work force of USAID. FCAA § 7063(b). And they have announced an intent to transfer the few remaining USAID programs to the State Department. SOMF ¶ 4. Thus, by using appropriated funds to "eliminate" or to implement a "reorganization" of USAID without prior consultation with the appropriate congressional committees, Defendants have violated the FCAA.[8]

---

[7] *See* Liz Goodwin, *Behind the scenes, GOP senators challenge legality of Trump's aid cuts*, Wash. Post (Feb. 27, 2025), https://tinyurl.com/5cmy4hmx; *see also* Letter from Twelve Senators to Marco Rubio, U.S. S. Comm. on Foreign Rels. (Feb. 2, 2025), https://tinyurl.com/3srm4cwm; Letter from Thirty-Seven Senators to Marco Rubio, U.S. S. (Feb. 4, 2025), https://tinyurl.com/4e4eneu5/.

[8] Defendants have also violated notification requirements of the FCAA. *See, e.g.*, FCAA §§ 514(a), 7015(a).

### C.  Defendants' decision to shut down USAID is arbitrary, capricious, and not in accordance with law.

The APA provides that a "reviewing court shall … hold unlawful and set aside agency action" that is "arbitrary [and] capricious" or "not in accordance with law." 5 U.S.C. § 706(2)(A). As explained above, Defendants' actions in excess of their authority violate FARRA and the FCAA.[9] The decision to shut down USAID is also arbitrary, capricious, and contrary to law for several reasons.

*First*, Defendants failed to articulate "a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks and citation omitted). Indeed, they failed to provide any "reasoned basis for their decision." *Transactive Corp. v. United States*, 91 F.3d 232, 236 (D.C. Cir. 1996). In addition to failing to provide any reasoned explanation for the shutdown decision as a whole—a breathtaking failure given the magnitude of the decision, they failed to provide a reasoned explanation for the key actions taken to implement it. *See* SOMF ¶ 20–22 (diplomatic cable pausing new obligations of funding and requiring stop work orders for existing foreign assistance awards); *e.g.*, *id.* ¶¶ 25, 27, 33, 35, 40, 48–54, 67, 78, 80–85 (actions taken to furlough or place staff on administrative leave); *id.* ¶¶ 24, 26, 36, 41–42, 61–62, 65, 68, 83–85 (locking employees out of computer accounts, closing agency headquarters).

Defendants' smattering of explanations for discrete actions taken to effectuate the shutdown are inadequate and after-the-fact. *See Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S.

---

[9] Specific actions undertaken to effectuate the dismantling are also contrary to law. For instance, Defendants' actions have violated 5 U.S.C. § 6329a(b)(1), which limits the period of administrative leave to 10 work days during a calendar year. *See* SOMF ¶¶ 49, 78–79; Decl. of Patricia Doe, ECF 19-1 ¶¶ 4, 8; Decl. of Quinn Doe, ECF 19-2, ¶¶ 5, 7; Decl. of Rebecca Doe, ECF 19-3, ¶¶ 4, 7. And they violate the Prompt Payment Act, 31 U.S.C. § 3901 *et seq.*, which requires agencies to pay valid invoices by their contracted due date or within 30 days. *Id.* § 3903(a)(1).

194, 196 (1947) (holding a "reviewing court … must judge the propriety of [agency] action solely by the grounds invoked by the agency" at the time of the action). For example, they have stated that 119 USAID employees were placed on administrative leave for "insubordination." Decl. of Marocco, ECF 20-1 ¶ 11, 20. Yet even if true that 119 of over 4,750 full-time USAID employees were insubordinate, *but see* ECF No. 24-17 ¶ 28, that would not be a reasoned explanation for placing 90% of agency staff on leave and cutting more than 90% of agency programs.[10]

Similarly, the decision to dismantle USAID cannot be reasonably explained as a review of agency programs for consistency with the "America First agenda."[11] Every other new Presidential administration reviewed [USAID] plans and programs and worked with USAID staff to align programs to the new priorities" without abruptly canceling them, terminating most agency staff, and shuttering its headquarters. Decl. of Yolanda Doe, ECF 24-14, ¶ 4. Additionally, because any bona fide review of agency programming would require the involvement of agency staff and subject-matter experts, Decl. of Zeb Doe, ECF 24-15, ¶ 7, placing that staff on leave hinders the review process. The total disconnect between dismantling a federal agency and reviewing agency programs is a hallmark of arbitrary and capricious decisionmaking. *See State Farm*, 463 U.S. at 43.

*Second*, Defendants "failed to consider … important aspect[s] of the problem," *State Farm*, 463 U.S. at 43: the obvious and predictable consequences of abruptly ending USAID's key functions, including reliance interests. *See Dep't of Homeland Sec. v. Regents of the Univ. of*

---

[10] Defendants' claim of insubordination was apparently based on their misplaced belief that USAID staff were paying grants despite being told not to. It turned out that those grants were disbursed through the Department of Health and Human Services, not USAID. *See* Matt Bai, *The blinding contempt of the DOGE bros*, Wash. Post (Feb. 24, 2025), https://tinyurl.com/24z6rfd3.
[11] U.S. Dep't of State, *Implementing the President's Executive Order on Reevaluating and Realigning United States Foreign Aid* (Jan. 26, 2025), https://tinyurl.com/5r9pd8x5.

*California*, 591 U.S. 1, 30 (2020) ("When an agency changes course, … it must be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'" (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016)).

More specifically, Defendants entirely neglected the reliance interests of USAID employees. USAID staff stationed abroad relied on Defendants to protect their health and safety, including by timely providing Medivacs to employees or their family members, *see* Decl. of Sarah Doe, ECF 24-7 ¶¶ 5, 9; Decl. of Wanda Doe, ECF 24-12 ¶¶ 4–6, 9; Decl. of Terry Doe, ECF 36-2 ¶¶ 5–10, ensuring the safety features of their homes are maintained, *see* Decl. of Emelia Doe, ECF 36-3 ¶¶ 5, 9-14; Third Decl. of Randall Chester, ECF 36-1 ¶¶ 6–12, and preserving their access to communication platforms, *see* Decl. of Emelia Doe, ECF 36-3, ¶ 16; Third Decl. of Randall Chester, ECF 36-1 ¶¶ 6–12.

Defendants also entirely neglected "the massive reliance interests of the countless small and large businesses" and nonprofits that—as a result of the dismantlement of the agency—"would have to shutter programs or shutter their businesses altogether and furlough or lay off swaths of Americans in the process." *AIDS Vaccine Advoc. Coal. v. United States Dep't of State*, No. CV 25-00400 (AHA), 2025 WL 485324, at *5 (D.D.C. Feb. 13, 2025); *see also, e.g.*, Decl. of Walter Doe, ECF 24-11 ¶¶ 6–12.

Likewise, they failed to consider impacts on organizations like Oxfam, whose lifesaving humanitarian mission has been impeded, who will suffer reputational harm from individuals who incorrectly conclude that Oxfam is responsible for the abrupt and cruel cessation of lifesaving assistance, who will be unable to fulfill contractual obligations to vendors, and whose staff will be in direct physical danger. Second Maxman Decl. ¶¶ 3-10 Oxfam relied on USAID's expertise,

research, and evidence to develop and conduct its humanitarian efforts, all of which vanished overnight. Maxman Decl., ECF 30-1, ¶¶ 18-19; Second Maxman Decl. ¶ 11.

And, most acutely, Defendants have never meaningfully contested that their actions have led to death, impoverishment, and sickness. *See generally* SOMF Ex. 18, Third Enrich Memorandum; *see also* SOMF Ex. 12, Off. of Inspector Gen., USAID, *Oversight of USAID-Funded Humanitarian Assistance Programming Impacted by Staffing Reductions and Pause on Foreign Assistance*, 3 (Feb. 10, 2025), https://tinyurl.com/3bj8m5az (OIG Report). Children around the world have been "left without food and battling malnutrition,"[12] and Defendants' actions will lead to the denial of acute malnutrition treatment for 1 million such children each year. Third Enrich Memorandum at 2. Internal agency estimates predict that Defendants' actions will result in an additional 71,000–166,000 malaria deaths annually, a 28–32% increase in global tuberculosis incidence, including multidrug-resistant tuberculosis, an additional 200,000 paralytic polio cases per year, and 2–3 million more deaths per year resulting from the shuttering of immunization programs. Third Enrich Memorandum at 1–2, 12. A website tracking the deaths related *solely* to the partial suspension of PEPFAR funds estimates that over eighteen thousand adults and two thousand infants have already died completely preventable deaths.[13] These global health impacts will inexorably reach American shores, resulting in an estimated annual increase of 2,000 U.S. cases of malaria, 7,300 U.S. cases of tuberculosis, 105 million U.S. cases of highly

---

[12] Mark Townsend et al., *Deaths Predicted Amid the Chaos of Elon Musk's Shutdown of USAid*, The Guardian (Feb. 4, 2025), https://tinyurl.com/s29vk8vn.
[13] PEPFAR Program Impact Tracker, https://tinyurl.com/mu5s5c3b (accessed 1:34 pm, Mar. 8, 2025).

pathogenic avian influenza, 15 U.S. cases of emerging infectious diseases like Ebola and Marburg, and 34,000 U.S. cases of mpox. *Id.* at 4–5, 7.[14]

Defendants have also failed to account for the enormous wastefulness of their actions. USAID's Inspector General, before he was terminated, concluded that Defendants' actions "put more than $489 million of food assistance at ports, in transit, and in warehouses at risk of spoilage." OIG Report at 3. More than "500,000 additional metric tons of food currently at sea or ready to be shipped," provided by the Food for Peace Program, were "held in limbo, subject[ed] … to spoilage, unanticipated storage needs, and potential diversion." *Id*. Dismantling USAID also compromised the federal government's ability to ensure that "American taxpayer funds do not benefit terrorists and their supporters," and provide oversight for humanitarian assistance programs in high-risk zones. OIG Report at 3–4. Furthermore, Defendants' dismantling of USAID has also constrained the ability to receive, report, and respond to allegations of fraud, waste, abuse, or diversion of humanitarian aid, as required by Congress. *Id.* at 4–5.

Finally, Defendants failed to consider less disruptive alternatives, *see State Farm*, 463 U.S. at 51, such as targeted reductions in programs or funding consistent with the agency's legal obligations or reductions over a period of time that would account for established reliance interests.

In sum, looked at from every angle, Defendants' shutdown of USAID exhibits all the defining characteristics of arbitrary and capricious agency action. *See Encino Motorcars*, 579 U.S. ay 222; *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43.

---

[14] *See also* Apoorva Mandavilli, *How Foreign Aid Cuts Are Setting the Stage for Disease Outbreaks*, N.Y. Times (Mar. 7, 2025), https://tinyurl.com/yc8y7r24 (reporting that, as a result of the dismantlement of the agency, "[d]angerous pathogens [have been] left unsecured at labs across Africa," "inspections for mpox, Ebola and other infections at airports and other checkpoints" have been halted, and "[m]illions of unscreened animals [have been] shipped across borders.").

## IV.    Defendants' dismantling of USAID is ultra vires.

Because Defendants have violated applicable statutes in shutting down USAID, their actions are ultra vires and should be enjoined by the Court. "Review for ultra vires acts rests on the longstanding principle that if an agency action is 'unauthorized by the statute under which the agency assumes to act,' the agency has 'violated the law' and 'the courts generally have jurisdiction to grant relief.'" *Nat'l Ass'n of Postal Supervisors v. United States Postal Serv.*, 26 F.4th 960, 970 (D.C. Cir. 2022) (quoting *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108 (1902)) (cleaned up); *see Nat'l Ass'n of Postal Supervisors*, 26 F.4th at 971-974 (holding that the Postal Service acted ultra vires by refusing to consult with National Association of Postal Supervisors on compensation in violation of a "mandatory consultation provision"). As discussed above, *supra* Part III.B., Defendants have violated clear mandates in FARRA and the FCAA. That Defendants offered no legitimate "contemporaneous justification," but rather only a "post hoc explanation by counsel," is further evidence of ultra vires action. *Nat'l Ass'n of Postal Supervisors*, 26 F.4th at 975 (D.C. Cir. 2022) (internal quotations and citations omitted).

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion for summary judgment.

Dated: March 10, 2025                      Respectfully submitted,

                                           _/s/ Kaitlyn Golden_____
                                           Kaitlyn Golden (DC Bar No. 1034214)
Lauren Bateman (DC Bar No. 1047285)        Kristen Miller (DC Bar No. 229627)
Karla Gilbride (DC Bar No. 1005886)        Rachel L. Fried (DC Bar No. 1029538)
Allison Zieve (DC Bar No. 424786)          Kayla M. Kaufman (DC Bar No.
Public Citizen Litigation Group            90029091)
1600 20th Street NW                        Robin F. Thurston (DC Bar No. 1531399)
Washington, DC 20009                       Skye L. Perryman (DC Bar No. 984573)
(202) 588-1000                             Democracy Forward Foundation
lbateman@citizen.org                       P.O. Box 34553
                                           Washington, DC 20043
                                           (202) 448-9090
                                           kgolden@democracyforward.org