# Exhibit 12



# OFFICE OF INSPECTOR GENERAL
U.S. Agency for International Development

# Oversight of USAID-Funded Humanitarian Assistance Programming Impacted by Staffing Reductions and Pause on Foreign Assistance

February 10, 2025

*Advisory Notice*



## Introduction

The United States Agency for International Development Office of Inspector General (USAID OIG), through its investigations and audits, conducts independent oversight of USAID's programs and personnel. Our oversight work includes reviews of the Agency's controls over its humanitarian assistance funding. For example, in July 2024, we published a report identifying shortcomings and vulnerabilities in USAID's oversight mechanisms to prevent diversion of aid to U.S.-designated terrorist organizations in Gaza. Similarly, in late January 2025, we issued a memorandum highlighting challenges and potential "fixes" to ensure enhanced accountability of foreign assistance funding, including humanitarian assistance programs funded by USAID but implemented by United Nations agencies.

In this alert, we identify risks and challenges to the safeguarding and distribution of USAID's $8.2 billion in obligated but undisbursed humanitarian assistance funds following (1) the Department of State's pause on foreign assistance programs and (2) subsequent personnel actions by USAID that have substantially reduced the operational capacity of its Bureau of Humanitarian Assistance (BHA).

## Background

On January 24, 2025, the Secretary of State ordered a pause in all new obligations of foreign assistance funding pending an 85-day review of United States foreign assistance programs.[1] The Secretary additionally ordered contracting and grant officers to issue stop-work orders for all existing foreign assistance awards.[2] As such, all USAID programs were suspended, including those with funds already obligated and disbursed.[3]

The Secretary's January 24 order contained an initial waiver for "emergency food assistance." Four days later, the Secretary issued a waiver for disbursements under existing "lifesaving humanitarian assistance" programs, defined as "life-saving medicine, medical services, food, shelter, and subsistence assistance, as well as supplies and reasonable administrative costs as necessary." USAID guidance on implementation of the pause and subsequent waivers also included a directive for staff to refrain from external communications outside of "communications necessary to implement the pause."[4] Moreover, Agency officials' plans to place more than 90 percent of the USAID workforce on paid administrative leave effective February 9 were paused for at least a week by a court order issued on February 7.[5]

---

[1] 25 STATE 6828. The Secretary of State issued this order consistent with the President's Executive Order on Reevaluating and Realigning United States Foreign Aid.
[2] 25 STATE 6828.
[3] Pre-existing programs falling under a waiver were eligible for payments; however, USAID staff and implementers state that the uncertainty and lack of communication surrounding the scope of the waivers has caused payment delays and decisions by aid organizations to suspend work.
[4] "Clarification on Implementing the President's Executive Order on Reevaluating and Realigning United States Foreign Aid," FAQs from Acting Administrator Jason Gray, USAID, January 26, 2025.
[5] "Update on the Path Forward," Office of the Administrator, USAID, February 8, 2025.

This alert is intended to raise risk-related concerns related to USAID-funded humanitarian assistance and is based on information provided by USAID staff, implementers, government officials, and prior OIG oversight work. In producing this alert, we followed Quality Standards as required by the Council of the Inspectors General on Integrity and Efficiency.

## Personnel Actions Reduce the Operational Capacity of USAID Staff Responsible for Humanitarian Assistance Programs

USAID employs approximately 10,000 staff, with approximately two-thirds posted at the Agency's more than 60 missions overseas.[6] BHA is the Agency bureau responsible for providing humanitarian assistance—including food, water, shelter, emergency healthcare, sanitation and hygiene, and critical nutrition services. According to BHA, prior to the personnel actions over the past 2 weeks, the bureau employed approximately 1,089 staff: 741 U.S. Direct Hires and Personal Services Contractors (197 posted overseas with the remaining 544 posted in Washington, DC), and 348 Institutional Support Contractors who, while employed by private contractors, essentially function like regular staff.

On February 4, 2025, USAID notified its entire workforce that they would be placed on paid administrative leave beginning February 8 with limited exceptions. At the same time, BHA staff began reporting sudden loss of access to USAID email and information technology (IT) systems. On February 7, based on disabled user account information, BHA leadership identified approximately 535 Direct Hires and Personal Service Contractors who had been placed on administrative leave but expected the number of sidelined staff to increase to just over 600 later that day. Hundreds of BHA's Institutional Support Contractors were furloughed the week before by their private employer. Collectively, executed and planned personnel actions would remove, temporarily or permanently, approximately 90 percent of BHA's worldwide workforce.

Existing waivers issued by the Department of State account for lifesaving humanitarian assistance programming should allow the flow of what BHA identifies as $8.2 billion in undisbursed obligations. However, BHA staff reductions, together with a lack of clarity about the scope of the humanitarian assistance waivers and the extent of permissible communications between BHA staff and its implementers, has significantly impacted USAID's capacity to disburse and safeguard its humanitarian assistance programming. Specifically, USAID's existing oversight controls—albeit with previously identified shortcomings[7]—are now largely nonoperational given these recent directives and personnel actions. Moreover, the February 7 court order that paused additional staff reductions[8] does not obviate, at this time, concerns regarding the capacity of BHA staff to work with implementing partners to protect and distribute humanitarian assistance commodities and conduct vital oversight of taxpayer-funded programs.

---

[6] Congressional Research Service, "U.S. Agency for International Development: An Overview," January 6, 2025. USAID FY 2022 Agency Financial Report,
[7] USAID OIG, "Assessment of USAID's Oversight Policies to Prevent the Diversion of Assistance to Hamas and Other Terrorist Organizations," July 25, 2024. USAID OIG, "Memorandum: Challenges to Accountability and Transparency Within USAID-Funded Programs," January 28, 2025.
[8] *American Foreign Service Association v. Donald Trump*, Civil Action No. 1:25-cv-352 (D.D.C. February 7, 2025) (granting temporary restraining order).

2

### Disruptions to the Delivery of Humanitarian Aid Place U.S.-Funded Commodities at Risk of Diversion and Spoilage

While initial guidance following the pause in foreign assistance funding provided a waiver for emergency food assistance, shipments of in-kind food assistance have been delayed around the world. USAID-funded implementers face conflicting instructions, and USAID staff express concerns about potentially circumventing the restrictions on external communications by providing clarifying guidance. According to USAID staff, this uncertainty put more than $489 million of food assistance at ports, in transit, and in warehouses at risk of spoilage, unanticipated storage needs, and diversion. As a routine matter, USAID pre-positions emergency food aid in BHA warehouses around the world, including approximately 29,000 metric tons in Houston, Texas, valued at nearly $39 million, more than 40,000 metric tons in a warehouse in Djibouti in East Africa valued at $40 million, and over 10,000 metric tons in a South African warehouse valued at $10 million. All BHA warehouses have pre-positioned emergency food aid commodities supplied by U.S. manufacturers and American farmers, as required by law.

Moreover, USAID staff identified over 500,000 additional metric tons of food currently at sea or ready to be shipped. The food is sourced from American farmers pursuant to Title II Food for Peace (the longest standing permanent program for international in-kind food aid, administered by USAID) and Commodity Credit Corporation (CCC) funding. Because this funding source was not included under the Secretary's emergency food assistance waiver,[9] these commodities were held in limbo, subjecting them to spoilage, unanticipated storage needs, and potential diversion.

### Recent Directives Have Curtailed USAID's Ability to Vet Humanitarian Assistance Awards for Potential Terrorist Ties and Monitor Aid Deliveries in High-Risk Environments

The pause in funding and reductions in staff, including over 90 percent of BHA's workforce furloughed or placed on administrative leave, has undermined two key oversight mechanisms to ensure accountability over humanitarian assistance funding: partner vetting and third-party monitoring.

#### Partner Vetting

USAID describes partner vetting as a risk-mitigation tool to "ensure that American taxpayer funds do not benefit terrorists and their supporters." Currently, partner vetting is required for programming in Afghanistan, Iraq, Lebanon, Pakistan, Syria, West Bank/Gaza, and Yemen where designated terrorist organizations such as Hamas, Hezbollah, ISIS, and Ansar Allah (also known as the Houthis) operate. Before the Agency awards a contract, grant, or cooperative agreement in these locations, the proposed awardee must submit to USAID data needed to vet the organization and its key personnel. The same vetting must be undertaken before an aid

---

[9] Reports indicate that food assistance under Title II programs has recently resumed. See U.S. Department of Agriculture, "USDA Global Food Security Programs Continue" (press release), February 7, 2025; Senator Jerry Moran's post on X, February 8, 2025; World Food Programme post on X, February 9, 2025.

3

organization issues a subaward. While USAID OIG has previously identified gaps in the scope of partner vetting,[10] USAID staff have reported that the counter-terrorism vetting unit supporting humanitarian assistance programming has in recent days been told not to report to work (because staff have been furloughed or placed on administrative leave) and thus cannot conduct *any* partner vetting. This gap leaves USAID susceptible to inadvertently funding entities or salaries of individuals associated with U.S.-designated terrorist organizations.

### Third-Party Monitors

Third-party monitoring[11] (TPM) is a mechanism USAID utilizes for oversight of humanitarian assistance programs, particularly in dangerous locations where its staff cannot safely travel. Site visits conducted by USAID-contracted TPMs help USAID verify if the delivery of physical goods align with self-reporting by aid organizations. TPM field monitors conduct simple, standardized surveys and interviews with recipients to check if USAID programming was delivered as intended. The January 24 pause on foreign assistance programming suspended all TPM contracts and activities, including in high-risk environments such as Ukraine, Afghanistan, Ethiopia, Haiti, Gaza, Iraq, Lebanon, Somalia, Syria, and Venezuela, impacting another layer of oversight over U.S. taxpayer-provided aid.

## Staff Reductions Have Constrained USAID's Ability to Receive and Respond to Allegations of Misconduct Involving Humanitarian Assistance Programming

The Secretary of State granted waivers for emergency food assistance and lifesaving humanitarian assistance. However, uncertainties about the scope of the waivers, the degree of permissible communication between USAID staff and aid organizations, the sudden dismissal of contract staff, and the placement of staff on paid administrative leave has limited BHA's ability to receive and respond to allegations of fraud, waste, abuse, or diversion of humanitarian aid.

As noted in our July 2024 advisory, USAID relies on aid organizations to self-report allegations of misconduct, consistent with their mandatory award obligations. Such mandatory reporting—particularly in nonpermissive environments such as Gaza and Ukraine where USAID's ability to travel to program sites is limited—enables USAID to take remedial measures to modify or in some cases terminate programming experiencing unacceptable losses. For example, in 2023 a USAID-funded nongovernmental organization (NGO) reported to USAID that food intended for families in the al-Hol displaced persons camp in northeast Syria had been diverted by the Asayish (Internal Security Forces of North and East Syria) and al-Hol camp administration to themselves. In response to this disclosure, USAID disallowed the relevant costs submitted by the NGO and undertook additional remedial measures to protect programming in Syria.

Further, USAID OIG has previously reported that USAID-funded commodities, supplies, and equipment in high-risk environments are susceptible to diversion to terrorist organizations,

---

[10] In July 2024, USAID OIG issued an advisory that identified the lack of vetting of UN agencies as a major vulnerability in USAID's partner vetting program.
[11] TPM includes the systematic collection of performance monitoring data by a contractor that has not been directly involved in the activity being monitored, either as a prime or subawardee.

4

such as Hamas. Over the past 2 weeks, staffing shortages and limitations on communications with aid organizations stemming from the cessation of U.S. foreign assistance have limited USAID's ability to receive, react to, and report allegations of diversion, all of which impacts the Agency's mandatory reporting obligations to Congress.[12] Additionally, according to BHA staff, the placement of most of its staff on administrative leave is preventing the bureau from responding to USAID OIG audit requests, reports of investigative findings, and other routine OIG oversight inquiries.

## Conclusion

USAID OIG's independent oversight of USAID's humanitarian assistance programs over the years has identified significant challenges and offered recommendations to improve Agency programming to prevent fraud, waste, and abuse. Our longstanding concerns about existing USAID oversight mechanisms persist. However, recent widespread staffing reductions across the Agency, particularly within BHA, coupled with uncertainty about the scope of foreign assistance waivers and permissible communications with implementers, has degraded USAID's ability to distribute and safeguard taxpayer-funded humanitarian assistance.

For more information on USAID OIG's work or to report allegations of fraud, waste, corruption, and abuse, please visit our website at oig.usaid.gov.

*On the cover:* USAID pallets with emergency food bars for Syrian refugees. Courtesy World Food Programme, 2013.

---

[12] Section 7015(j), P.L. 118-47, Further Consolidated Appropriations Act, 2024: "The Secretary of State and USAID Administrator, as applicable, shall promptly inform the appropriate congressional committees of each instance in which funds appropriated by this Act for assistance have been diverted or destroyed, to include the type and amount of assistance, a description of the incident and parties involved, and an explanation of the response of the Department of State or USAID, as appropriate."