# Exhibit 13

# EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| AIDS VACCINE ADVOCACY COALITION, et al., | ) ) ) ) | |
| *Plaintiffs*, | ) ) | Civil Action No. 25-cv-400 |
| v. | ) ) ) | |
| UNITED STATES DEPARTMENT OF STATE, et al., | ) ) ) ) | |
| *Defendants*. | ) ) | |

## DECLARATION OF JESSICA DOE

I, Jessica Doe, declare the following under penalties of perjury:

1. I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2. I am a Contracting Officer and Foreign Service Officer at USAID.

3. On January 20, 2025, the President of the United States issued an Executive Order directing a 90-day "pause" on all U.S. foreign assistance.

4. On January 20, 2025, the President of the United States issued an Executive Order on "Ending Radical and Wasteful Government DEI Programs and Preferences."

5. On January 22, 2025, USAID Senior Procurement Executive (SPE) Jami Rodgers emailed the Office of Acquisition and Assistance (OAA) Mail List and all Foreign Service Contracting and Agreement Officers (COs) a DEIA Award Tracker

that "identifies awards with DEIA award titles or descriptions. He specified that, in accordance with "Initial Guidance Regarding DEIA Executive Orders" issued by the Office of Personnel management (OPM), COs must immediately terminate those contracts.

6. In order to faithfully execute these instructions and work in good faith to implement the Executive Order, COs began reviewing the scopes of all awards to ensure they did not contain DEIA components. It was a difficult exercise as DEIA was never defined by the Agency Front Office and therefore it was unclear whether terms just as "gender" or "sex" should also be removed despite being a federally protected status.

7. It is evident from SPE Rodger's instructions that this list of terminations was compiled from a search in GLAAS, our contract management system, for titles or descriptions that contained words like "diversity." The list was not compiled from a review of the scope of the awards.

8. On January 27, 2025, SPE Jami Rodgers wrote in an email to all of OAA and the Foreign Service COs: "We will provide further guidance and templates on specifics for different types of awards and actions that you can take as we administer stop work/suspensions as soon as possible. [Acquisitions and Assistance (A&A)] staff may submit questions and we will make FAQ responses available to all A&A staff."

9. The FAQs referred to in the January 27 email were not provided to OAA staff until February 6, 2025, when many of the questions about the pause were no longer relevant, such as "how do COs communicate with implementing partners

2

about what costs are 'legitimate' during the Stop Work Order period to ensure that they will not later be denied payment due to a differing opinion about what costs are allowable during a period of stopped work?".

10. In a normal review process, such questions would be answered. For example, when USAID implementation in Afghanistan stopped in 2021, the partners were notified that salaries may continue to be paid to maintain operational readiness. None of this guidance was provided to COs or partners in this instance.

11. On January 28, 2025, SPE Rodgers emailed all Foreign Service COs and stated that, for contracts, if "you have not already, issue a written stop-work order…" and for assistance awards, if "you have not already, issue a written suspension order…."

12. On January 30, 2025, our contract management system GLAAS was shut down. COs were thereby prevented from modifying any awards, such as to remove DEIA terminology.

13. On February 5, 2025, OAA/Washington instructed COs to terminate "media contracts/activities/purchase card awards," and that they had to "report back to the front office today on this matter."

14. When OAA/Washington asked senior USAID management to allow them to review the termination lists in advance, they were told they could not do so.

15. When OAA/Washington asked for the reasoning behind the specific terminations, they were told "a team" is reviewing "public data" and making these determinations.

16. When OAA/Washington asked that specific awards be removed from the termination list for a justifiable reason, they were told, these awards "Clearly don't fit in the president's agenda" and that "questioning Sectary Rubio and President Trump's decision" constitutes "dissension."

17. On February 9, 2025, SPE Jami Rodgers sent a tranche of terminations to COs. "Tranche 1" contained instructions to terminate 71 contracts and 66 grants. The list included awards with the terms "consulting," "energy," "elections," and "democracy," to name a few.

18. COs highlighted that several awards in Tranche 1 were within the scope of the current approved waivers, such as Third Party Monitoring for BHA (Bureau of Humanitarian Assistance) Programs. Had a thorough review of the awards been conducted, these awards would not have been listed for termination since they are within the scope of current waivers.

19. Other awards were clearly terminated without any actual process or consideration. For instance, Tranche 1 included termination of a contract for preliminary engineering and design for the construction of the U.S. Embassy in Juba. The contracting company was "Green Powered Technology LLC" (named after President and Founder Phillip S. Green and not because it is a "green" company). Eventually, that award was removed from the termination list.

20. Some of the awards included on the termination list also required Congressional, Government Accountability Office, and the Office of the Inspector General notification, including a contract with an audit firm to meet the oversight

requirement specified in GAO Report GAO-06-1052R, titled "Foreign Assistance: Recent Improvements made, but USAID Should Do More to Help Ensure Aid Is Not Provided for Terrorist Activities in West Bank and Gaza," and GAO-21-332, entitled, "Should Funding Resume, Increased Oversight of Subawardee Compliance with USAID's Antiterrorism Policies and Procedures May Reduce Risks." That GAO report stated, "The Administrator of USAID should conduct post-award compliance reviews of prime awardees and their subawards of ESF assistance for the West Bank and Gaza program in time to identify noncompliance and take appropriate action before the awards end, should funding for USAID's West Bank and Gaza program resume."

21. As the above example shows, while stating that the goal was to find "fraud and corruption" as part of the 90-day review, USAID was terminating contracts that were designed to do exactly that.

22. COs began to submit questions to SPE Rodgers to ask for clarification on the authority to instruct COs to terminate the awards and the basis for terminations. COs also sought instruction as to what to say to partners who were not being reimbursed for costs incurred prior to January 24.

23. Responses to these questions were not provided by SPE Jami Rodgers or OAA/Washington.

24. On February 10, 2025, SPE Jami Rodgers send a second tranche of terminations to COs. Tranche 2 included "Media Awards" and 58 grants.

25. Again, numerous awards on the list were found to be within the scope of the approved waivers, such as for PEPFAR and for lifesaving activities to respond to

the Ebola outbreak.

26.    Further, several of the awards were for basic education programs and contained funding appropriated through the READ (Reinforcing Education Accountability in Development) Act of 2017, which was originally signed into law on September 8, 2017 by President Trump, and introduced in 2023 for reauthorization by then Senator Marco Rubio.

27.    When the COs asked the Agency Front Office about these awards, the COs were instructed to terminate them without notification to Congress that funds appropriated through a specific Act of Congress were being terminated.

28.    On February 11, 2025, SPE Jami Rodgers sent a third tranche of terminations, along with instructions to terminate the awards in Tranche 1 and 2 by "close of business, Tuesday, February 11," and Tranche 3 by "Wednesday, February 12 close of business."

29.    SPE Jami Rodgers provided further instruction that the "termination authority is delegated to me as the Senior Procurement Executive from the Acting USAID Administrator, Secretary Rubio, who has instructed USAID to terminate these awards as part of the President's Executive Order on Reevaluating and Realigning United States Foreign Aid. An Action Memorandum for each tranche of awards was reviewed and cleared through the State Department's Director of Foreign Assistance and approved by the Secretary. These action memos will be filed in a shared drive. This documentation along with this email can be used to support the terminations."

30. These action memos were never shared with the COs.

31. A copy of an unsigned memo on a State Department letterhead dated February 10, 2025, entitled, "Tasking Memo to USAID Contracting and Agreement Officers," from Kenneth Jackson, Assistant to the Administrator for Management and Resources, drafted by Joel M. Borkert, stated, "The Secretary has approved the cancellation of the attached contracts after determining they do not advantage U.S. interests. These tranches have gone through multiple vetting processes, and should be expeditiously terminated. Let me or the Chief of Staff know immediately if you believe the contract falls within the current waiver guidance or needed modified [sic]."

32. On February 11, 2025, COs were notified by the GLAAS Helpdesk that Phoenix (the Agency payment system) was closed and that "the Agency has temporarily restricted access to Phoenix until further notice." As a result, no payments were able to proceed for any of my Mission's programs.

33. On February 12, 2025, SPE Jami Rodgers sent a fourth tranche of terminations. He also COs to, "complete as many termination notifications as possible today."

34. Again, many awards on the list are removed from termination as they fall within an approved waiver. In addition, many monitoring and evaluation contracts were listed to be terminated. These contracts are relied upon to ensure that there is no fraud, waste, or abuse in the delivery of approved activities, such as food assistance and PEPFAR medication distribution.

35. When individuals raised the need for an appeal to the termination of

monitoring services, OAA/Wahington instructed me to terminate the award on the basis that the State Department had called and said to do it immediately. This termination left critical food assistance and medication distribution without adequate monitoring and oversight and increasing the risk of fraud, waste and abuse.

36. On February 13, 2025, Mark Lloyd, who performs the duties of Assistant Administrator, Bureau for Global Health, issued a memorandum titled, "Clarifying that Global Health (GH) programming under the lifesaving humanitarian assistance waiver has continued uninterrupted and was never paused." The memorandum stated that its purpose was "to correct a false narrative in the press, and provide clarity for staff on external communications." It went on to say, "[t]he authority to waive lifesaving Global Health activities under Secretary Rubio's January 28, 2025, general waiver for lifesaving humanitarian assistance continues, and was never paused. Staff are reminded to confirm to Agency standards of conduct, and to leadership expectations, by using their chain of command to clarify any questions or misunderstandings; and are reminded that unauthorized engagement externally with the press or others is subject to discipline, including dismissal."

37. As a CO, I issued a partial lifting of the Stop Work Order for PEPFAR partners to continue life savings activities in accordance with the limited waiver for life-saving HIV service provision approximately 14 days ago.

38. As of today, the Mission and I continue to raise to Washington leadership including the Agency Front Office that although we have authorized the restarting of the PEPFAR programs, the partners have not been able to restart due

to a lack of funding. For example, since January 24th, for the Mission programs I manage as a CO, over 28,000 orphans and vulnerable children will lose access to treatment and prevention to HIV services per day, and 5,000 living with HIV will lose access to anti-retroviral medication per day.

39. For non-PEPFAR lifesaving Mission activities that I manage, over 50 mothers suffering from severe bleeding following childbirth who cannot access treatment will have post-partum hemorrhage per day, 30 women will die per day related to childbirth, and over 1,000 newborns will be deprived of life saving newborn health services, including nearly 40 who will be deprived of life saving resuscitation at birth. An additional 250 newborns will die before being a month old.

40. Despite being authorized to proceed with implementation of lifesaving activities, PEPFAR implementing partners cannot proceed as their programmatic accounts are hundreds of thousands of dollars in debt.

41. Other PEPFAR partners authorized to restart activities have had to take out private loans to cover programmatic costs, and they also state they are now not following the local law because they do not have enough funding to pay required severance for local staff per local law.

42. The Mission also sent a request for authorization to the Agency Front Office to authorize other non-PEPFAR lifesaving activities that are within the scope of the waiver, such as tuberculosis treatment, malaria treatment, antenatal care to address emergency complications. That request has not been answered in over two weeks.

43.  On February 17, 2025, SPE Jami Rodgers instructed COs that this Court issued a TRO in the cases titled *AIDS Vaccine Coalition v. U.S. Department of State* and *Global Health Council v. Trump*. SPE Rodgers stated, "Accordingly, until further notice, all Contracting and Agreement Officers should not enforce any Agency directive issued under Executive Order 14169 and the Secretary's implementing memorandum that requires the generalized stop work order, suspension, or pause of Agency contracts, grants or other federal assistance awards. The Front Office is in the process of adopting a comprehensive review process for assuring payment integrity and determining that payments under existing contracts and grants are not subject to fraud or other bases for termination. These new case-by-case review processes will be consistent with the TRO. Further guidance on the new payment integrity and grants and contracts review process is forthcoming."

44.  On February 17, 2025, COs emailed Jami to ask for further clarification, and if OAA/Washington would send a template for COs to reverse Stop Work Orders (SWOs). Further, COs noted ambiguities in his directive: We did not know whether COs were being directed to take any specific actions based on his email. One CO asked in an email whether we are to rescind SWOs and terminations already issued, or just halt SWOs and terminations moving forward. Another asked about the new payment review process, and how to inform partners about the status of outstanding payments for vouchers incurred prior to January 24, 2025.

45.  SPE Jami Rodgers never responded.

46.  On February 18, 2025, COs were notified by USAID/M/OAA/Foreign

10

Operations that SPE Jami Rodgers would issue templates to reverse SWOs, but they had not been received at the date of this declaration.

47. Also, starting on February 18, USAID staff began to notice that all emails contained the language, "(SBU) Sensitive But Unclassified," at the bottom of their email and that the language could not be removed, even when not sending SBU information. The SBU disclaimer was not visible when drafting an email and only when an email was received by the intended recipient. Due to this SBU label, COs became hesitant to send out any information to implementing partners without unambiguous prior authorization from SPE Rodgers.

48. It has become clear that actions taken by Defendants to gut the staff of USAID also prevent compliance with the TRO. Without USAID Foreign Service Officers managing the many steps required, from budget, to contracting, to financial support, none of the Agency's overseas programs will be effectively restarted under the TRO, or as authorized to restart under the applicable waivers.

49. I have not personally seen any evidence that a thorough, case-by-case analysis has taken place with regard to the suspensions, stop-work orders, and terminations already issued by the Agency.

50. I will faithfully continue to execute the directives of the President, Courts, and USAID as a civil servant who is proud to serve my country. But I and other COs have been left without guidance or direction to implement this Court's order.

51. I declare under penalty of perjury that the foregoing is true and

11

correct.

      Executed on February 19, 2025.

/s/ Jessica Doe  
Jessica Doe
