# Exhibit 19

No. 24A

# In the Supreme Court of the United States

————————

UNITED STATES DEPARTMENT OF STATE, ET AL., APPLICANTS

*v.*

AIDS VACCINE ADVOCACY COALITION, ET AL.

————————

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL., APPLICANTS

*v.*

GLOBAL HEALTH COUNCIL, ET AL.

————————

**APPLICATION TO VACATE THE ORDER ISSUED
BY THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
AND REQUEST FOR AN IMMEDIATE ADMINISTRATIVE STAY**

————————

SARAH M. HARRIS
  *Acting Solicitor General*
    *Counsel of Record*
  *Department of Justice*
  *Washington, D.C. 20530-0001*
  *SupremeCtBriefs@usdoj.gov*
  *(202) 514-2217*

## TABLE OF CONTENTS

Statement ............................................................................................................ 6

Argument ............................................................................................................ 9

    A.    The Government Is Likely To Succeed On The Merits ......................... 10

    B.    The Other Factors Support Relief From The District Court's Order ... 19

        1.    The issues in this case warrant the Court's review ................... 19

        2.    The district court's order causes irreparable harm to the Executive Branch ........................................................................ 20

        3.    Granting relief would not irreparably harm respondents ......... 25

    C.    This Court Should Grant An Administrative Stay ............................... 26

Conclusion ........................................................................................................ 27

ii

## PARTIES TO THE PROCEEDING

Applicants (defendants-appellants below) are the United States Department of State; the United States Agency for International Development (USAID); Marco Rubio, Secretary of State, and Acting Administrator of USAID; Peter Marocco, Acting Deputy Administrator for Policy and Planning, Acting Deputy Administrator for Management and Resources of USAID, and Director of Foreign Assistance at the Department of State; Office of Management and Budget; Russell T. Vought, Director of the Office of Management and Budget; and Donald J. Trump, President of the United States.

Respondents (plaintiffs-appellees below) are AIDS Vaccine Advocacy Coalition; Journalism Development Network, Inc.; Global Health Council; Small Business Association for International Companies; HIAS; Management Sciences for Health, Inc.; Chemonics International, Inc.; DAI Global LLC; Democracy International, Inc.; and the American Bar Association.

iii

**RELATED PROCEEDINGS**

United States District Court (D.D.C.):

> *AIDS Vaccine Advocacy Coalition* v. *United States Department of State*, No. 25-cv-400 (Feb. 25, 2025)

> *Global Health Council* v. *Trump*, No. 25-cv-402 (Feb. 25, 2025)

United States Court of Appeals (D.C. Cir.):

> *United States Department of State* v. *AIDS Vaccine Advocacy Coalition*, No. 25-5046 (Feb. 26, 2025)

> *Trump* v. *Global Health Council*, No. 25-5047 (Feb. 26, 2025)

# In the Supreme Court of the United States

————————

No. 24A

United States Department of State, et al., Applicants

*v.*

AIDS Vaccine Advocacy Coalition, et al.

————————

Donald J. Trump, President of the United States, et al., Applicants

*v.*

Global Health Council, et al.

————————

**APPLICATION TO VACATE THE ORDER ISSUED
BY THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
AND REQUEST FOR AN IMMEDIATE ADMINISTRATIVE STAY**

————————

Pursuant to Rule 23 of the Rules of this Court and the All Writs Act, 28 U.S.C. 1651, the Acting Solicitor General—on behalf of applicants United States Department of State, et al.—respectfully files this application to vacate the February 25, 2025 order issued from the bench by the U.S. District Court for the District of Columbia (App., *infra*, 85a-87a).  In addition, the Acting Solicitor General respectfully requests an administrative stay of the district court's order, which requires the government's immediate action by 11:59 p.m. tonight, pending the Court's consideration of this application.

Midday yesterday, a federal district court ordered the Executive Branch to pay

nearly $2 billion by 11:59 p.m. tonight as an interim remedy in a putative Administrative Procedure Act (APA) suit brought by ten plaintiffs—eight nonprofits and businesses that receive federal foreign-assistance funding and two membership associations whose members do. The order directs the Department of State and the United States Agency for International Development (USAID) to pay "all invoices and letter of credit drawdown requests" for reimbursements on foreign-aid-related contracts and grants for "work completed prior to" February 13, 2025. App., *infra*, 86a. On that date, the district court entered its original temporary restraining order (TRO), which barred the government from relying on the President's Executive Orders as grounds for blanket suspension or termination of foreign-aid funding. App., *infra*, 86a. And the government has, since then, complied with that order, instead relying on its discretionary authorities and individual reviews. Neither the original TRO nor the district court's subsequent clarifications in any way suggested that the government must pay particular invoices on particular dates.

The court's 11:59 p.m. 30-some-hour deadline thus moved all the goalposts. It is not tailored to any actual payment deadlines associated with respondents' invoices or drawn-down requests, or anyone else's. And it has thrown what should be an orderly review by the government into chaos. The order does not limit its abrupt deadline to respondents' own invoices or letters of credit, instead apparently compelling the government to pay requests from any organization that has asked for such funds. Those requests are not even in the record, nor are the underlying instruments. The timing of the order does not allow the government to conduct payment-integrity review to ensure that payments are made only for obligations that are legitimate or supported by necessary documentation—much less deny improper payments. The timing of the order does not even let the government ascertain whether the sums are

actually due or owing under the terms of the instruments. The timing of the order is particularly difficult because, based on the district court's other orders, the government has been expediting review of thousands of foreign-aid grants and contracts to decide which contracts are in the interests of the United States to terminate and which should be retained. Such wholesale, universal relief plainly exceeds what district courts can order under Article III and principles of equity and effectively allows a single federal district court to supervise the federal government's contracting decisions regarding foreign aid—an area where the Executive Branch ordinarily has the broadest discretion.

On top of that, the district court lacked any jurisdiction even to issue this order dictating contractual payments by a date certain to remedy purported contractual breaches. The federal government has sovereign immunity from this type of breach-of-contract claim everywhere but the Court of Federal Claims. See 28 U.S.C. 1346(a)(2). Congress has created an intricate statutory scheme—along with a court with jurisdiction—to address claims that the government owes money under its contracts and other funding instruments. That scheme precludes the district court's attempt to remedy alleged breaches of contract under the guise of a temporary restraining order in an APA case.

The district court sidestepped those arguments—though the government raised them in its opposition to a preliminary injunction filed last week and renewed them at yesterday's hearing—on the ground that the government had not adequately preserved them, in writing, between the filing of a motion Monday night and an emergency hearing convened at 11:00 a.m. Tuesday morning. As of midday yesterday, the court stated that it would not consider its jurisdiction now, but "[i]f you want to brief that at the PI stage, I suppose you can." App., *infra*, 65a. In today's order denying a

4

stay pending appeal, the district court now claims to have "considered its jurisdiction at each stage of this case," *id.* at 93a, and believes itself empowered to force the United States to make billions of dollars in expenditures from federal funds based on its preliminary view of the government's contractual obligations. That is plainly incorrect.

To be very clear, the government is committed to paying legitimate claims for work that was properly completed pursuant to intact obligations and supported by proper documentation. It is attempting to navigate the district court's evolving orders—and the ensuing, resource-consuming contract-review process—as best it can. The government is undertaking significant efforts to ensure that it can make proper payments. Agency leadership reports, for example, that the Secretary of State "has directed that invoices identified by the [respondents]" in their submissions to the district court "be processed and expedited for payment without the ordinary vetting procedures," and that approximately $4 million of such payments "are expected to be issued today." App., *infra*, 146a. And the payment process is "being prioritized" by USAID. *Ibid.* The district court's underlying orders are erroneous, but the government is doing what it reasonably can to comply in good faith.

What the government cannot do is pay arbitrarily determined demands on an arbitrary timeline of the district court's choosing or according to extra-contractual rules that the court has devised. That mandate creates an untenable payment plan at odds with the President's obligations under Article II to protect the integrity of the federal fisc and make appropriate judgments about foreign aid—clear forms of irreparable harm. The order appears to contemplate the immediate outlay of nearly $2 billion. And the government has no sure mechanism to recover wrongfully disbursed funds delivered to entities that claim to be near insolvency.

5

Worse, this order exposes the government to the risk of contempt proceedings and other sanctions. Agency leadership has determined that the ordered payments "cannot be accomplished in the time allotted by the" district court. App., *infra*, 97a. That risk is especially concerning because the district court appears poised to require mini-trials, discovery, and depositions of senior officials as to whether a host of foreign-aid decisions genuinely rested on the government's conceded discretionary authority to terminate contracts and grants, or were instead supposed pretexts for a blanket foreign-aid cut that the district court considers unlawful. See *id.* at 141a (respondents' proposed discovery plan) (requesting deposition of Secretary of State) Respondents are pressing even further, demanding discovery into personnel actions, payment-processing protocols, and other agency actions that have nothing to do with their original APA claims challenging a categorical funding pause. The threat of invasive discovery into senior officials' subjective motivations only exacerbates the Article II harms inflicted by the court's order.

This Court has jurisdiction to grant emergency relief from orders that, like this one, compel specific actions by a specific date—the very definition of a mandatory injunction. Vacatur of the order is warranted to ensure that the government is not subjected to an unlawful order with which it is not feasible to comply, despite the government's efforts. The court of appeals has not yet ruled on the government's request for an administrative stay by 1:00 p.m. today or a stay pending appeal by 4:00 p.m. In light of that extraordinary circumstance, and to allow this Court time to consider the issues this application raises before the order's 11:59 p.m. deadline, the government is filing this application now and respectfully requests, at a minimum, an immediate administrative stay. See Sup. Ct. R. 23.3.

## STATEMENT

1.    On January 20, 2025, the President issued Executive Order No. 14,169, 90 Fed. Reg. 8619 (Jan. 30, 2025), titled *Reevaluating and Realigning United States Foreign Aid*. That Executive Order recognized that foreign-assistance funds "are not aligned with American interests and in many cases antithetical to American values" in ways that "serve to destabilize world peace." *Id.* § 1. The Executive Order accordingly declared that "[i]t is the policy of the United States that no further United States foreign assistance shall be disbursed in a manner that is not fully aligned with the foreign policy of the President." *Id.* § 2.

To provide time to review foreign-assistance programs "for programmatic efficiency and consistency with United States foreign policy," the Executive Order directed agencies to "immediately pause new obligations and disbursements of development assistance funds to foreign countries" and implementing organizations and contractors. Executive Order No. 14,169, § 3(a). "[W]ithin 90 days," agencies would conduct a review and determine "whether to continue, modify, or cease each foreign assistance program" in consultation with the Director of the Office of Management and Budget and with the concurrence of the Secretary of State. *Id.* § 3(b), (c). The Secretary of State has authority to waive the pause "for specific programs" and may approve new obligations or resume disbursements during the 90-day review period if review is completed sooner. *Id.* § 3(d), (e).

Consistent with the President's Executive Order, the Secretary of State directed a pause on foreign-assistance programs funded by or through the State De-

partment and USAID.  See D. Ct. Doc. 15-1, at 18-22 (Feb. 12, 2025).[1]  The Secretary has approved various waivers, including for foreign military financing for Israel and Egypt, emergency food expenses, and life-saving humanitarian assistance pending review.  *Id.* at 6-7; Sec'y of State, *Emergency Humanitarian Waiver to Foreign Assistance Pause* (Jan. 28, 2025), https://www.state.gov/emergency-humanitarian-waiver-to-foreign-assistance-pause.  The Secretary has also approved a waiver for legitimate expenses incurred before the pause went into effect.  D. Ct. Doc. 15-1, at 6-7.

2.     Respondents are organizations that receive, or have members who receive, federal funds for foreign-assistance work.  On February 10, 2025, they challenged the Executive Branch's decision to pause foreign-assistance funds pending further review as a violation of the Administrative Procedure Act (APA) and the Constitution.  D. Ct. Doc. 1 (Feb. 10, 2025); see 25-cv-402 D. Ct. Doc. 1 (Feb. 10, 2025).  They moved for temporary restraining orders on February 11 and 12, 2025.  See D. Ct. Doc. 13 (Feb. 12, 2025); 25-cv-402 D. Ct. Doc. 4 (Feb. 11, 2025).

The district court granted relief to respondents on February 13, 2025, without waiting for an opposition brief.  App., *infra*, 14a-15a.  While recognizing that the pause was designed to provide the government with an "opportunity to review programs for their efficiency and consistency with priorities" and that "there is nothing arbitrary and capricious about executive agencies conducting [such] review," the court questioned whether the pause "was a rational precursor to reviewing programs," and determined that the agencies had not adequately accounted for the reliance interests of aid recipients.  *Id.* at 10a.  Instead of ordering the government to

---

[1] Unless indicated otherwise, references to the district court docket are to the docket in *AIDS Vaccine Advocacy Coalition* v. *United States Department of State*, No. 25-cv-400 (D.D.C.).

consider or explain its treatment of reliance, the court concluded that respondents' harms outweighed "the importance of respecting the President's Article II power as it relates to foreign policy." *Id.* at 12a.

The district court enjoined the agency defendants and their heads from "enforcing or giving effect to" any directive implementing the President's Executive Order No. 14,169, including the State Department's memorandum. App., *infra*, 14a. The order implemented that prohibition by barring the government from "suspending, pausing, or otherwise preventing the obligation or disbursement of appropriated foreign-assistance funds" and "issuing, implementing, enforcing, or otherwise giving effect to terminations, suspensions, or stop-work orders" in connection with contracts, grants, or other agreements that existed on January 19, 2025. *Ibid.* The order, however, allowed the agency defendants to "tak[e] action to enforce the terms of particular contracts, including with respect to expirations, modifications, or terminations pursuant to contractual provisions." *Ibid.*

In the interim, the parties have submitted several status reports and filings regarding various factual developments and compliance efforts. Late in the evening on February 24, the *Global Health* respondents submitted an emergency motion to enforce the court's order. Their declarations focused on "work completed prior to January 24, 2025" and sought prompt payment for such work. *Global Health Council* v. *Trump*, No. 25-cv-402, Doc. 36-1, at 2 (D.D.C. Feb. 24, 2025); *see Global Health Council*, Doc. 36-2, at 1 (D.D.C. Feb. 24, 2025) (discussing invoices "for work that preceded Secretary Rubio's [memorandum] on January 24, 2025").

Yesterday morning (February 25), without first requesting or awaiting a written response from the government, the district court held a hearing and orally granted respondents' motion. App., *infra*, 85a. The court declined to address the

government's argument that claims for specific monetary payments did not fall within the waiver of sovereign immunity provided by the APA and would instead need to be pursued through ordinary dispute-resolution procedures or in another lawsuit, potentially in the Court of Federal Claims. Nor did the court explain why its original order, which simply suspended a categorical pause, compelled the payment of specific invoices by specific dates. But the court ordered that, by tonight, February 26, 2025, at 11:59 p.m., the agency defendants "shall pay all invoices and letter of credit drawdown requests" on all contracts, grants, and assistance agreements "for work completed prior to the entry of the Court's [order] on February 13." *Id.* at 86a. The court further directed that the defendants "shall take all necessary action to ensure the prompt payment of appropriated foreign assistance funds." *Ibid.* This directive was not party-specific, was not limited to invoices that are due or overdue, and did not explain how agencies are supposed to identify those invoices.

Last night, applicants filed an emergency motion for a stay pending appeal, first in the district court, and then in the court of appeals. See Gov't C.A. Emergency Mot. 3 n.1. The district court denied the stay, asserting that applicants have supposedly "already had nearly two weeks to come into compliance," and rejecting the government's assertion of sovereign immunity and an intrusion on its sovereign prerogatives. App., *infra*, 92a-94a.

Applicants asked the court of appeals to grant an administrative stay by 1:00 p.m. today, or to rule on the stay motion by 4:00 p.m. today. *Id.* at 1-2. At about 10:00 a.m. this morning, the court of appeals requested that respondents file a response by 1:00 p.m. But as of the time of this filing, the court of appeals has not acted on either the government's request for a stay pending appeal or for an administrative stay.

10

## ARGUMENT

Under Rule 23 of the Rules of this Court and the All Writs Act, 28 U.S.C. 1651, the Court may stay or vacate a district order's interlocutory order granting emergency relief. See, *e.g.*, *Trump* v. *International Refugee Assistance Project*, 582 U.S. 571 (2017) (per curiam); *Brewer* v. *Landrigan*, 562 U.S. 996 (2010); *Brunner* v. *Ohio Republican Party*, 555 U.S. 5, 6 (2008). An applicant must show (1) a likelihood of success on the merits, (2) a reasonable probability of obtaining certiorari, and (3) a likelihood of irreparable harm. See *Hollingsworth* v. *Perry*, 558 U.S. 183, 190 (2010) (per curiam). In "close cases," "the Court will balance the equities and weigh the relative harms." *Ibid.* Those factors overwhelmingly support relief here.[2]

### A.     The Government Is Likely To Succeed On The Merits

The district court ordered the government to pay—within 36 hours—nearly $2 billion on thousands of foreign-assistance payment requests for already-performed work without knowing what all of those requests actually are or even how to identify them. The vast bulk of them do not involve respondents. And the court refused to consider whether it has jurisdiction to command such payments when issuing the order—instead purporting to consider jurisdiction only in this morning's stay denial. That jurisdictional problem is severe. Congress created an intricate and exclusive statutory scheme to address disputes over contractual payments for already-performed work. The court's order in this APA suit sidestepped that scheme entirely, and is thus unlikely to survive this Court's review.

---

[2] The government has applied to "vacate" rather than "stay" the district court's order because the affected agencies believe that the order's deadline cannot feasibly be met. See p. 26, *infra*. Regardless of the label, the practical effect of the relief is the same, and the traditional stay standard should govern. See Appl. to Vacate Order at 11 n.4, *Bessent* v. *Dellinger*, 144 S. Ct. 338 (No. 24A790).

1.    The district court lacked jurisdiction to order the government to make immediate payments of nearly $2 billion on thousands of separate requests.  Federal courts generally lack jurisdiction to order the federal government to pay money unless Congress "unequivocally" waives the government's sovereign immunity.  *Lane* v. *Pena*, 518 U.S. 187, 192 (1996).  Although respondents purported to bring their claims under the APA, the APA does not waive the government's sovereign immunity from suit for the relief that the court ordered here.  The APA provides a limited waiver of sovereign immunity for claims "seeking relief other than monetary damages." 5 U.S.C. 702.  The APA's waiver, however, "comes with an important carve-out":  it does not apply "'if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.'"  *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians* v. *Patchak*, 567 U.S. 209, 215 (2012) (quoting 5 U.S.C. 702).  That carve-out "prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes."  *Match-E-Be-Nash-She-Wish*, 567 U.S. at 215.

Congress has provided detailed, comprehensive statutory schemes for recovering payments based on federal funding instruments, and those schemes either explicitly or impliedly displace the APA's waiver of sovereign immunity.  See *Brown* v. *GSA*, 425 U.S. 820, 834 (1976) (explaining that "a precisely drawn, detailed statute preempts more general remedies").  First, to the extent that some of the funding instruments at issue in this case are procurement contracts, any dispute about payment on those contracts for work already performed would be governed by the Contract Disputes Act (CDA).  Critically, the CDA permits suit only following administrative exhaustion in the Civilian Board of Contract Appeals and the United States Court of Federal Claims, pursuant to specific review procedures set out by statute.  See 41 U.S.C. 7103, 7104, 7105.  Those remedies operate to the exclusion of any suit in dis-

trict court under the APA. See *A&S Council Oil Co.* v. *Lader*, 56 F.3d 234, 239-242 (D.C. Cir. 1995); see *United Aeronautical Corp.* v. *United States Air Force*, 80 F.4th 1017, 1028 (9th Cir. 2023) ("The availability of [a CDA] action in the Court of Federal Claims 'impliedly forbids' Aero from bringing its action in district court" under the APA.).

For other instruments, the Tucker Act may provide a remedy. That statute states that the "United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded" on "any express or implied contract with the United States." 28 U.S.C. 1491(a); see 28 U.S.C. 1346(a)(2) ("the district courts shall not have jurisdiction of any civil action or claim against the United States founded upon any express or implied contract with the United States"). The D.C. Circuit has "held that the Tucker Act impliedly forbids" the bringing of "contract actions" against "the government in a federal district court." *Albrecht* v. *Committee on Employee Benefits of the Fed. Reserve Emp. Benefits Sys.*, 357 F.3d 62, 67-68 (2004) (citation omitted). It has, in other words, "interpreted the Tucker Act * * * to 'impliedly forbid[]' contract claims against the Government from being brought in district court under the waiver in the APA," and conducted careful analysis to determine whether "an action is 'in essence' contractual." *Perry Capital LLC* v. *Mnuchin*, 864 F.3d 591, 618-619 (D.C. Cir. 2017). To the extent that the government has implemented its grant programs by "employ[ing] contracts to set the terms of and receive commitments from recipients," then the proper recourse for any asserted violation of those grant terms may also be a "suit in the Claims Court for damages relating to an alleged breach." *Boaz Housing Auth.* v. *United States*, 994 F.3d 1359, 1368 (Fed. Cir. 2021).

The inability to establish which of those alternative remedial frameworks precludes review as to each individual funding instrument only underscores the breadth of the district court's remedy and its failure to respect proper procedures or jurisdictional guardrails. The court's order requiring the government to make specific contractual or grant-based payments exceeds the court's jurisdiction. Yet, when issuing the 11:59 p.m. payment deadline, the district court declined to consider the jurisdictional question before entering its order. Although the court recognized that the government had articulated many of these principles in its "briefing at the preliminary injunction stage," the court believed that the argument was "not sufficiently developed to be considered" before entering its order. App., *infra*, 85a; see *id.* at 65a (government pressing the jurisdictional argument at the hearing). The court, however, had entered its original TRO before the government even filed an opposition brief.

Earlier today, in denying applicants' stay motion, the district court asserted that it has, in fact, "considered its jurisdiction at each stage of the case." App., *infra*, 93a. But at the hearing at which it orally entered the challenged order, the court said the opposite: that it was waiting to give applicants' jurisdictional argument "due consideration at the [preliminary-injunction] stage" because it was "not sufficiently developed to be considered today." *Id.* at 85a. Shifting tack, the court said that the government's "undeveloped arguments on this point to date" had not "persuaded the Court that they would affect [its] prior likelihood of success analysis as it relates to the TRO." *Id.* at 93a. The court stated for the first time that the government has not "meaningfully engage[d] with the large body of precedent on this question," but the court cited only cases about the potential availability in an APA suit of "monetary relief" on the basis of statutory and regulatory requirements and entitlements. *Ibid.* That does not address the jurisdiction of the Court of Federal Claims over *contract-*

14

based claims, which is exclusive for the type of claim effectively asserted by respondents' motion granted yesterday.

The district court's refusal to consider its own jurisdiction before entering its order was wrong several times over. To begin, the government's jurisdictional argument was indeed "sufficiently developed" in both the government's preliminary-injunction briefing and during yesterday's telephone hearing. Regardless, courts have an "independent obligation to assure" themselves "that jurisdiction is proper" before ordering relief. *Plains Commerce Bank* v. *Long Family Land & Cattle Co.*, 554 U.S. 316, 324 (2008). That "obligation extends to sovereign immunity," including whether the APA's waiver applies or is impliedly displaced by other statutes. *Perry Capital LLC*, 864 F.3d at 619. If the district court wanted more time to consider its jurisdiction, the court could have refrained from ordering sweeping relief in an emergency posture. Courts must seriously consider their jurisdiction *before* ordering the disbursement of billions of dollars, not afterwards.

2.    At a minimum, the district court's order is impermissibly overbroad. Rather than adhering to equitable principles mandating a tailored remedy, the court's order directs the government to "pay *all* invoices and letter of credit drawdown requests on *all* contracts" for pre-TRO work, App., *infra*, 86a (emphasis added)—even contracts to which neither respondents nor their members are parties. As Members of this Court have recognized, such universal remedies exceed "the power of Article III courts," conflict with "longstanding limits on equitable relief," and impose a severe "toll on the federal court system." *Trump* v. *Hawaii*, 585 U.S. 667, 713 (2018) (Thomas, J., concurring); see *DHS* v. *New York*, 140 S. Ct. 599, 599-601 (2020) (Gorsuch, J., concurring in the grant of stay).

15

Under Article III, "a plaintiff's remedy must be 'limited to the inadequacy that produced his injury.'" *Gill* v. *Whitford*, 585 U.S. 48, 66 (2018) (brackets and citation omitted); see *Lewis* v. *Casey*, 518 U.S. 343, 360 (1996) (narrowing an injunction that improperly granted "a remedy beyond what was necessary to provide relief" to the injured parties). This Court recently granted a stay of an injunction to the extent it provided relief to non-parties. See *Labrador* v. *Poe*, 144 S. Ct. 921 (2024). That action served to "remind lower courts of the foundational rule that any equitable remedy they issue" must be tailored to "the plaintiff's injuries." *Id.* at 927 (Gorsuch, J., concurring).

Principles of equity reinforce that constitutional limitation. A federal court's power to grant equitable relief is generally limited to the types of relief that were "traditionally accorded by courts of equity." *Grupo Mexicano de Desarrollo, S.A.* v. *Alliance Bond Fund, Inc.*, 527 U.S. 308, 319 (1999). Courts of equity traditionally adhered to the principle that relief must, at most, be "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano* v. *Yamasaki*, 442 U.S. 682, 702 (1979). And courts of equity traditionally "did not provide relief beyond the parties to the case." *Hawaii*, 585 U.S. at 717 (Thomas, J., concurring).

The universal relief entered by the district court flouts those principles. And it does so without any apparent justification. The court did not explain why such broad relief was necessary or appropriate in these circumstances. At a minimum, the government should have been allowed to identify the at-issue payment requests and flag any defenses or concerns about their validity or legitimacy.

3.     Compounding the problems with the district court's latest order, the court has signaled that it will not accept the agencies' decisions to terminate partic-

ular contracts going forward, even when those decisions are based on the unambiguous terms of the instrument authorizing termination and thus have nothing to do with the original pause that respondents challenged. The court has maintained that its order directing the payment of nearly $2 billion for already-performed work is a way to "enforce" the original TRO. The original TRO, however, made clear that the agencies could continue to "tak[e] action to enforce the terms of particular contracts, including with respect to expirations, modifications, or terminations pursuant to contractual provisions." App., *infra*, 14a. Consistent with that order, the agencies have been "expeditiously examining each USAID and State foreign assistance award on an individual basis and through a multi-step process to determine whether, beyond the directives to the contract and grant officers to comply with the TRO, USAID and State will" terminate funding under the authority conferred by the terms of the specific instrument. App., *infra*, 145a. As of this morning, the Secretary has "made a final decision with respect to each award, on an individualized basis," ultimately deciding to terminate, for USAID, nearly 5800 awards and retain more than 500 awards. *Ibid.* And with respect to State Department grants and awards, the Secretary has decided to terminate approximately 4100 and retain 2700. *Ibid.* The original pause that the court enjoined was designed to provide breathing room so that those individualized decisions could be made over the course of months. As a result of the court's order, the agencies prioritized their review, shifted resources, and reached those final determinations in a matter of days.

Yet despite those efforts, the district court continues to express concern that the government is "just coming up with a pretextual basis for" the blanket pause that has been enjoined. App., *infra*, 67a; see *id.* at 25a (indicating that the court would probe whether terminations were based on "good faith" or "pretext"). The court's ap-

parent assumption that outstanding payments on already-performed work somehow violate its TRO, instead of reflecting the operation of the agencies' review process, shows that the court is poised to question the agencies' lawful individualized termination decisions going forward—and that the court may seek to do so by directing discovery requests at Cabinet secretaries or through contempt proceedings (both of which respondents have already sought). See App., *infra*, 140a-142a (requesting deposition of Secretary of State and other senior officials). Indeed, the court's recent orders explicitly contemplate discovery into whether the government's termination decisions—even if undertaken pursuant to express termination clauses in the instruments themselves—were undertaken with the correct subjective motivation. See *id*. at 28a (requesting parties to identify, in the event of a dispute over compliance, officials for depositions and any expedited discovery that is needed).

The district court's threats of discovery reflect how far this litigation has strayed from any appropriate conception of an APA case and amplify the already serious intrusion on Article II prerogatives. The government cannot function—and the President cannot discharge his Article II responsibilities over foreign affairs—if a district court can appoint itself the claims-processor for the federal government and second-guess the Executive Branch's determinations on pain of contempt proceedings.

4. The fact that the district court labeled its February 25 order as an order granting a motion to enforce a temporary restraining order should not deprive the government of relief. The "label attached to an order is not dispositive." *Abbott* v. *Perez*, 585 U.S. 579, 594 (2018). Instead, "where an order has the 'practical effect' of granting or denying an injunction, it should be treated as such for purposes of appellate jurisdiction." *Ibid.* "This 'practical effect' rule serves a valuable purpose. If an

interlocutory injunction is improperly granted or denied, much harm can occur before the final decision of the district court." *Id.* at 595. Accordingly, "Congress authorized interlocutory appellate review of such orders. But if the availability of interlocutory review depended on the district court's use of the term 'injunction' or some other particular language, Congress's scheme could be frustrated." *Ibid.* A district court could "shield its orders from appellate review merely by designating them as temporary restraining orders, rather than as preliminary injunctions," and thereby "would have virtually unlimited authority over the parties in an injunctive proceeding." *Sampson* v. *Murray*, 415 U.S. 61, 86-87 (1974).

Although the district court labeled its order as one granting a motion to enforce a temporary restraining order, the order has the practical effect of an injunction. Rather than seeking to maintain the status quo while the district court considers a request for a preliminary injunction, the court's order directed the government to disburse money in less than 36 hours. The order was therefore not temporary in any relevant sense—the district court has definitively resolved how the government must dispose of this specific universe of funds with no time to even ensure that the demands for payment are legitimate. And the order will indeed do "much harm" unless the court grants immediate relief, given that recovering wrongly disbursed funds would be challenging if not impossible under these circumstances. *Abbott*, 585 U.S. at 595. It would be especially anomalous not to treat the order at issue as an appealable injunction when "an adversary hearing has been held, and the court's basis for issuing the order strongly challenged." *Sampson*, 415 U.S. at 87.

Even if the district court's order were not directly appealable, the government asked the court of appeals, in the alternative, to treat its appeal and stay motion as a petition for a writ of mandamus. C.A. Gov't Emergency Mot. 21-22. The district

court's extraordinary order—sweeping so broadly, requiring immediate compliance, and entered without consideration of the court's jurisdiction—readily satisfies the mandamus standard.  See *Cheney* v. *United States Dist. Ct. for D.C.*, 542 U.S. 367, 380-381 (2004).  If the government could not directly challenge the district court's order, it would have "no other adequate means to attain the relief [it] desires."  *Id.* at 380 (citation omitted).  The government's right to relief is also "clear and indisputable" in light of the district court's lack of jurisdiction and outright refusal to consider the jurisdictional question before ordering sweeping relief.  *Id.* at 381 (citation omitted).  And mandamus is "appropriate under the circumstances" because the district court's actions "threaten the separation of powers."  *Ibid.*

\* \* \*

In short, the district court's order exceeds the district court's jurisdiction and directs the government to immediately release billions of dollars of payments without permitting the Executive Branch to conduct review needed to ensure the legitimacy of those expenditures.  The court also flouts the limitations of Article III by ordering the government to fulfill funding obligations entirely unrelated to respondents and their members.  That unlawful order is unlikely to survive this Court's review.

## B.     The Other Factors Support Relief From The District Court's Order

In deciding whether to grant emergency relief, this Court also considers whether the underlying issues warrant its review, whether the applicant likely faces irreparable harm, and, in close cases, the balance of equities.  See *Hollingsworth*, 558 U.S. at 190.  Each of those factors overwhelmingly supports relief here.

### 1.     The issues in this case warrant the Court's review

The district court's order directs agencies to process nearly $2 billion in contract payments in less than 36 hours, an arbitrary timeline that is not tailored to the

20

underlying requests and effectively precludes the agencies from exercising their law-ful authority to ensure that those payments are legitimate.  This Court routinely in-tervenes in cases in which lower courts have attempted to direct the functioning of the Executive Branch.  See, *e.g.*, *Heckler* v. *Lopez*, 463 U.S. 1328, 1329 (1983) (Rehnquist, J., in chambers) (granting stay of district court order requiring Secretary of Health and Human Services "immediately to reinstate benefits to the applicants" and mandating that the Secretary then make certain showings "before terminating benefits"); cf. *Trump* v. *Sierra Club*, 140 S. Ct. 1 (2019) (granting stay of district court order enjoining the Department of Defense from undertaking any border-wall con-struction using funding the Acting Secretary transferred pursuant to statutory au-thority); *INS* v. *Legalization Assistance Project*, 510 U.S. 1301, 1305-1306 (1993) (O'Connor, J., in chambers) (granting stay of district court order requiring INS to engage in certain immigration procedures, as "an improper intrusion by a federal court into the workings of a coordinate branch of the Government").  This case in-volves intrusions on a far greater scale.  It therefore necessarily presents an issue that likewise would warrant this Court's review.

    **2.**    **The district court's order causes irreparable harm to the Executive Branch**

The district court's order represents an extraordinary usurpation of the Presi-dent's authority, causing significant and irreparable harm.

Under the guise of "enforcing" its TRO, the district court ordered the govern-ment to, "[b]y 11:59 p.m." today, "pay all invoices and letter of credit drawdown re-quests on all contracts for work completed prior to the entry of the Court's [order] on February 13."  App., *infra*, 85a-86a.  Although the previous order did not address or resolve claims under any specific funding instruments—or even *identify* them—the

21

court ordered the government to "permit and promptly pay letter of credit drawdown requests and requests for reimbursements on grants and assistance agreements." *Id.* at 86a. The government's understanding is that the universe of potential payments encompassed by this order—which is not limited to requests submitted by respondents—approaches $2 billion, although it is difficult to be certain given the vagueness of the order and the difficult of identifying its bounds. See App., *infra*, 97a.

This new order requiring payment of enormous sums of foreign-assistance money in less than 36 hours intrudes on the prerogatives of the Executive Branch. The President's power is at its apex—and the power of the judiciary is at its nadir— in matters of foreign affairs. See *American Ins. Ass'n* v. *Garamendi*, 539 U.S. 396, 414 (2003) ("[T]he historical gloss on the 'executive Power' * * * has recognized the president's 'vast share of responsibility for the conduct of our foreign relations.'") (quoting *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U.S. 579, 610-611 (1952) (Frankfurter, J., concurring)); *Chicago & Southern Air Lines, Inc.* v. *Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948) (observing that foreign policy decisions are "of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and which has long been held to belong in the domain of political power not subject to judicial intrusion or inquiry"); *United States* v. *Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936) (describing "the very delicate, plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations"). Here, the district court's order blocks the Executive Branch not only from ensuring that foreign-aid payments are consistent with the President's policy priorities, but from conducting even basic diligence to ensure that payments are free from fraud and abuse.

22

Relevant agency leadership have determined that, "[h]istorically, USAID had limited and insufficient payments control or review mechanisms," which led to payments being made "without sufficient opportunity for payments integrity or program review." D. Ct. Doc. 22-1, at 2. Agency leadership has determined that those "system deficiencies and inability to provide complete information" have "led to serious questions about waste, fraud, abuse, and even illegal payments." *Ibid.* For example, agency leadership's "understanding is that some payment requests are not supported by any documentation"—or are supported by "inadequate documentation to show actual work performed, compliance with the terms of the relevant contract or award, and the like." App., *infra*, 103a. As a result, "USAID is in the process of adopting a comprehensive review process for assuring payment integrity and determining that payments under existing contracts and grants are not subject to fraud." D. Ct. Doc. 22-1, at 3. Agency leadership has determined that payments "will be released as they are processed through" this comprehensive review structure. *Ibid.* None of this is inconsistent with the terms of the district court's original temporary restraining order.

Similarly, agency leadership has "implemented revisions to the system for disbursements of foreign assistance funds" from the State Department. D. Ct. Doc. 22-1, at 7. Those "new procedures" are intended to "ensure payments are both in compliance with policy and have the appropriate management controls"—controls that "are intended to assure payment integrity and determine that payments under existing contracts and grants are not subject to fraud or other bases for termination." *Ibid.* As with USAID, the record reflects that the State Department has begun processing legitimate payments through these new systems—including "authoriz[ing] or request[ing] the disbursement of $112.9 million" between January 24 and February 18.

*Id.* at 8.  Again, none of this is inconsistent with the terms of the district court's original temporary restraining order against the funding pause.

The district court's order disregards the Executive Branch's serious interest in ensuring that payments are made only for legitimate expenses and bypasses the Executive's procedures for reviewing payments.  By requiring that the government make nearly $2 billion payments by 11:59 p.m. tonight—less than 36 hours after entry of the court's order—the court has precluded the government from scrutinizing the relevant invoices or conducting a payment-by-payment analysis to ensure the legitimacy of all payments.  As a result, the government faces the possibility of being forced to expend enormous sums of taxpayer dollars without knowing whether those payments are even for legitimate expenses.  And even setting that serious concern aside, agency officials have stated that the payment of all outstanding amounts by tonight is not logistically or technically feasible.

To be clear, the government is committed to paying for work that was properly completed, so long as the claims are legitimate.  To that end, the State Department will make about $4 million in payments to two respondents today, which will take approximately two days to process.  App., *infra*, 153a.  And USAID has been authorized by the Secretary to pay more than $11 million on respondents' other invoices, which the agency estimates will be fully issued within two weeks.  *Ibid.*  But USAID's payment systems involve "the need to manually identify, review, and pull each invoice," and thus take time.  *Id.* at 146a.  "[T]his process has already begun and is being prioritized by the agency."  *Ibid.*  Yet the court's latest order requires the government to make thousands more payments immediately, on an untenable timeline, and without conducting review that the Executive Branch has deemed critical for fraud, abuse, payments without documentation, and other problems.

24

The order's universal scope amplifies the harms to the government. As explained, the district court ordered the government to immediately make payments not just on any outstanding obligations to respondents but on thousands of obligations to absent parties. See pp. 14-15, *supra*. That breadth substantially increases the financial burden on the government. Agency leadership estimates that the order requires the payment of nearly $2 billion on thousands of payment requests that have been nowhere identified and extend well beyond the respondents and even their organizational members. App., *infra*, 97a. The order's reach also impedes case-by-case analysis for all payment requests, and makes it impossible for the government to conduct such an analysis by the court's arbitrary 11:59 p.m. deadline.

That breadth is particularly inexplicable and unnecessary because, had the court tailored its order to provide relief for only respondents and their members, the order would have imposed much smaller financial and administrative burdens on the government. The State Department is already prepared to issue $4 million in payments to two respondents today, which should be received in two days. App., *infra*, 153a. Instead, the court reached out far beyond its jurisdiction and ordered relief that will impose more substantial harms on the government, and by extension, the public.

b.    The harms to the government and the public that will result from the district court's order likely cannot be unwound. Even apart from the order's intrusion on the government's sovereign interests, the order threatens to require the government to release billions of dollars in federal funds without confirming that those payments are for legitimate expenses. See p. 23, *supra*. And if the government later discovers that particular payments did reflect fraud or abuse, there would be no guarantee that the funds would be retrievable from the recipients after the fact. The

agencies report that the prospect of recovery is particularly uncertain given that "many USAID programs involve sub-awards," making it "likely that any funds disbursed would soon be transferred to third-party sub-vendors and contractors."  App., *infra*, 105a.  That "[c]ontractual counterparties and grant recipients are often overseas" only adds to the uncertainty of recovery.  *Ibid.*  In addition, to the extent that respondents have claimed "that many grant recipients and contractual counterparties are insolvent or nearly so," that raises the possibility that "they will immediately spend any funds they receive—making it impossible for the Government to recover those funds as a practical matter."  *Ibid.*

### 3.    Granting relief would not irreparably harm respondents

Conversely, respondents have not established that the district court's order is necessary to protect them from irreparable harm.  If respondents believe that the government has failed to make timely payments for work already performed on contracts or quasi-contractual funding instruments, they may be able to pursue claims under the Contract Disputes Act or the Tucker Act, under the specific procedures that those statutes provide.  See pp. 11-13, *infra.*  Agency leadership has confirmed that the State Department and USAID are "prepared to entertain such claims and seek resolution."  App, *infra*, 104a.  And the CDA in particular is designed to ensure quick resolution of claims:  it requires administrative contracting officers to adjudicate claims brought under that statute "within 60 days" for claims less than $100,000, and within a reasonable time for larger claims.  41 U.S.C. 7103(f).  Respondents will therefore have the opportunity to recover that Congress has provided if the government wrongly fails to make prompt payment on their legitimate claims.  That "possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, [weighs] heavily against a claim of irrepa-

26

rable harm." *Dennis Melancon, Inc.* v. *City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (citation omitted), cert. denied, 569 U.S. 994 (2013).

### C.    This Court Should Grant An Administrative Stay

At a minimum, the Acting Solicitor General respectfully requests that this Court grant an administrative stay while it considers applicants' submission.  The Executive Branch takes seriously its constitutional duty to comply with the orders of Article III courts.  The government is undertaking substantial efforts to review payment requests and release payments.  Officials at the highest levels of government are engaged on this matter.  And as described above, agency leadership has reported that the agencies have been "expeditiously examining" individualized contracts and have even bypassed ordinary protocols to allow payment to respondents. App., *infra*, 145a.

But the district court's imminent and arbitrary deadline makes full compliance impossible.  Even assuming all of the relevant payment requests are legitimate, agency leadership has determined that the ordered payments "cannot be accomplished in the time allotted by the" district court. App., *infra*, 146a.  That is because "restarting funding related to terminated or suspended agreements is not as simple as turning on a switch or faucet," but instead requires multiple steps, involves multiple agencies, and requires substantial documentary evidence. *Id.* at 146a-147a.  An administrative stay is warranted to ensure that the agencies are not placed in the position of violating a federal court order requiring payments on thousands of requests within a 30-some-hour deadline, despite their efforts, while this Court reviews the merits of their challenge.

27

**CONCLUSION**

This Court should vacate the district court's February 25, 2025 order granting respondents' motion to enforce the February 13, 2025 temporary restraining order. In addition, the Acting Solicitor General respectfully requests an immediate administrative stay of the district court's order pending the Court's consideration of this application.

Respectfully submitted.

SARAH M. HARRIS
  *Acting Solicitor General*

FEBRUARY 2025