**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| AMERICAN FOREIGN SERVICE ASSOCIATION, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 1:25-cv-00352-CJN |
| PRESIDENT DONALD TRUMP, *et al.*, | |
| Defendants. | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY
JUDGMENT, AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................1

BACKGROUND ...................................................................................................3

I.  STATUTORY BACKGROUND ...................................................................3

II.  FACTUAL BACKGROUND ........................................................................7

    A.  Changes Concerning Nonparty Employees' Working Conditions at USAID.........................................................................................................7

    B.  Changes Concerning USAID and State Funding Agreements with Nonparty Recipients.................................................................................9

III.  PROCEDURAL HISTORY...........................................................................12

LEGAL STANDARD ..........................................................................................13

ARGUMENT ........................................................................................................15

I.  THE COURT LACKS SUBJECT-MATTER JURISDICTION OVER ALL OF PLAINTIFFS' CLAIMS....................................................................15

    A.  All Claims of Employment-Related Harm Are Moot..........................16

    B.  Congress Has Channeled Subject-Matter Jurisdiction Over Plaintiffs' Claims Arising from Federal Employment into a Distinct System, Not Review in This Court in the First Instance...........................................18

    C.  Plaintiffs Lack Organizational Standing Because They Have Not Proven Cognizable Injury to Their Professed Missions....................................27

    D.  The Union Plaintiffs Lack Associational Standing Because the Claims Asserted Necessitate Individualized Findings....................................33

    E.  No Plaintiff Here Has Article III Standing to Seek Relief Based on Nonparties' Harms, Including Abstract Harms Reflecting Disagreement with the Executive's Foreign Policy Choices.........................................35

II.  DEFENDANTS' APA CLAIMS ARE UNREVIEWABLE (Counts IV and V). ............37

    A.  USAID's Pertinent Funding Decisions Are Committed to the Agency's Discretion by Law..............................................................................37

    B.  Plaintiffs Do Not Allege Any Agency Action.....................................39

    C.  Plaintiffs Do Not Allege Any Final Action..........................................42

D.    The APA Does Not Provide a Cause of Action Because an Alternative Adequate Remedy is Available to Plaintiffs. ......................................................43

III.    DEFENDANTS HAVE NOT VIOLATED THE ADMINISTRATIVE PROCEDURE ACT (Counts IV and V)...........................................................45

A.    Defendants Have Not Exceeded Their Statutory Authority (Count IV). ......................................................................................45

1.    Plaintiffs' Claims Do Not Fall Within the Zone of Interests Protected by the Statutes They Invoke. ....................................................45

2.    Defendants Have Not Violated the Foreign Affairs Reform and Restructuring Act of 1998.........................................................47

a.    FARRA Does Not Prevent State Department or Executive Control of USAID Remain Independent of the State Department or Executive Control. ................................................48

b.    Defendants Have Not Violated FARRA's 60-Day Reorganization Provision. ............................................................49

3.    Defendants Have Not Violated the Further Consolidated Appropriations Act of 2024. ..................................................................52

a.    The FCAA Does Not Foreclose USAID's Reorganization............52

b.    Defendants Have Not Violated the FCAA's Congressional Consultation Requirement. ............................................................53

B.    Defendants Have Not Acted Contrary to Law. .........................................56

C.    Defendants Have Not Acted Arbitrarily and Capriciously (Count V). .....57

IV.    DEFENDANTS DID NOT VIOLATE THE CONSTITUTION (Counts I and II). .........60

A.    Count I (Separation of Powers) Additionally Fails Because the Challenged Actions Are Supported by the President's Article II Authority, Numerous Statutes, and Historical Practice. ...........................62

B.    Count II (Take Care Clause Violation) Additionally Fails Because the Take Care Clause Cannot be Used to Obtain Affirmative Relief. .............64

V.    PLAINTIFFS DID NOT ACT *ULTRA VIRES* (Counts I, III, and IV). ...........................67

VI.    ANY RELIEF GRANTED ON SUMMARY JUDGMENT SHOULD BE NARROWLY TAILORED...............................................................................69

CONCLUSION.............................................................................................74

# TABLE OF AUTHORITIES

**Cases**

*Adams v. Vance,*
570 F.2d 950 (D.C. Cir. 1978) ............................................................................64

*AIDS Vaccine Advocacy Coalition v. United States Department of State,*
No. 1:25-cv-400 (AHA), 2025 WL 752378 (D.D.C. Mar. 10, 2025) .............................. 10, 21

*Air Transportation Association of America v. Reno,*
80 F.3d 477 (D.C. Cir. 1996) ............................................................................33

*Alabama-Coushatta Tribe of Texas v. United States,*
757 F.3d 484 (5th Cir. 2014)............................................................................41

*Alpharma, Inc. v. Leavitt,*
460 F.3d 1 (D.C. Cir. 2006) ............................................................................3

*Already, LLC v. Nike, Inc.,*
568 U.S. 85 (2013) ............................................................................16

*American Federation  of Governemnt Employees, AFL-CIO v. Trump,*
929 F.3d 748 (D.C. Cir. 2019) ............................................................ 13, 20, 23, 26

*American Federation  of Governemnt Employees, AFL-CIO v. United States Office of Personnel Management,.* 3:25-cv-1780 (WHA), 2025 WL 820782 (N.D. Cal. Mar. 24, 2025) .................8

*American Foreign Service Association v. Trump ("AFSA"),*
1:25-cv-352 (CJN), 2025 WL 573762 (D.D.C. Feb. 21, 2025) ........................................*passim*

*American Forest Resour Council v. United States,*
77 F.4th 787 (D.C. Cir. 2023) ............................................................................41

*American Immigration Lawyers Association v. Reno,*
199 F.3d 1352 (D.C. Cir. 2000) ............................................................................30

*American Insurance Association v. Garamendi,*
539 U.S. 396 (2003) ............................................................................62, 71

*American Whitewater v. Tidwell,*
770 F.3d 1108 (4th Cir. 2014)............................................................................45

*Ancient Coin Collectors Guild v. Customs & Border Protection,*
801 F. Supp. 2d 383 (D. Md. 2011), *aff'd*, 698 F.3d 171 (4th Cir. 2012) ................................40

*Angelus Milling Company v. Commissioner of Internal Revenue,*
    325 U.S. 293 (1945) ...........................................................................................65

*Armstrong v. Exceptional Child Center, Inc.,*
    575 U.S. 320 (2015) ...........................................................................................72

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ...........................................................................................14

*Baker v. Carr,*
    369 U.S. 186 (1962) ...........................................................................................66

*Bancoult v. McNamara,*
    445 F.3d 427 (D.C. Cir. 2006) ..........................................................................63

*Bell Atlantic Corporation v. Twombly,*
    550 U.S. 544 (2007) ...........................................................................................14

*Bennett v. Spear,*
    520 U.S. 154 (1997) ...........................................................................................42

*Bernstein v. Kerry,*
    962 F. Supp. 2d 122 (D.D.C. 2013), *aff'd*, 584 F. App'x 7 (D.C. Cir. 2014)..........................36

*\*Block v. Commmunity Nutrition Institute,*
    467 U.S. 340 (1984) ......................................................................................22, 23

*Bowen v. Massachusetts,*
    487 U.S. 879 (1988) ...........................................................................................43

*Burlington Northern Rail Road Company v. Surface Transportation Board,*
    75 F.3d 685 (D.C. Cir. 1996) ............................................................................16

*Center for Biological Diversity v. McAleenan,*
    404 F. Supp. 3d 218 (D.D.C. 2019)...................................................................65

*Center for Sustainable Economy v. Jewell,*
    779 F.3d 588 (D.C. Cir. 2015) ..........................................................................34

*Chamber of Commerce of United States v. Reich,*
    74 F.3d 1322 (D.C. Cir. 1996) ..........................................................................40

*Chang v. Republic of South Sudan,*
    548 F. Supp. 3d 34 (D.D.C. 2021) ....................................................................32

*Changji Esquel Textile Company v. Raimondo*,
40 F.4th 716 (D.C. Cir. 2022) ............................................................................67

*Chicago & Southern Air Lines v. Waterman S.S. Corp.*,
333 U.S. 103 (1948) ................................................................................... 63, 66

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971) ......................................................................................3

*City of New York v. Department of Defense*,
913 F.3d 423 (4th Cir. 2019) ...........................................................................64

*Clarke v. Securities Industry Association*,
479 U.S. 388 (1987) ....................................................................................46

*Clinton v. Jones*,
520 U.S. 681 (1997) ....................................................................................66

*Cobell v. Kempthorne*,
455 F.3d 301 (D.C. Cir. 2006) .........................................................................71

*Committee on Judiciary of United States House of Representatives v. McGahn*,
968 F.3d 755 (D.C. Cir. 2020) .........................................................................54

*Community Financial Services Association of America, Ltd. v. Federal Deposit Insurance Corporation*,
No. 14-cv-953, 2016 WL 7376847 (D.D.C. Dec. 19, 2016) ....................................35

*\*Dalton v. Specter*,
511 U.S. 462 (1994) .......................................................................... 60, 64, 66

*DCH Regional Medical Center v. Azar*,
925 F.3d 503 (D.C. Cir. 2019) .........................................................................67

*Department of Education v. California*,
No. 24A910, 2025 WL 1008354 (U.S. Apr. 4, 2025) ............................................21

*Department of Homeland Security v. New York*,
140 S. Ct. 599 (2020)...................................................................................69

*Department of Homeland Security v. Regents of the University of California*,
591 U.S. 1 (2020) ........................................................................................3

*Department of Justice v. Fair Labor Relations Authority*,
39 F.3d 361 (D.C. Cir. 1994) ..........................................................................48

*Detroit International Bridge Company v. Government of Canada*,
    883 F.3d 895 (D.C. Cir. 2018) ...................................................................................38, 40

*Detroit International Bridge Company v. Canada*,
    189 F. Supp. 3d 85 (D.D.C. 2016) ...........................................................................40

*DKT Mememorial Fund Ltd. v. Agency for International Development*,
    887 F.2d 275 (D.C. Cir. 1989) ..................................................................................61

*Doe # 1 v. Von Eschenbach*,
    No. 06-cv-2131, 2007 WL 1848013 (D.D.C. June 27, 2007)...................................32

*Doe 2 v. Trump*,
    319 F. Supp. 3d 539 (D.D.C. 2018).........................................................................73

*Doraiswamy v. Secretary of Labor*,
    555 F.2d 832 (D.C. Cir. 1976) .................................................................................3

*\*Elgin v. Department of the Treasury*,
    567 U.S. 1 (2012) .............................................................................................*passim*

*Elm 3DS Innovations LLC v. Lee*,
    No. 1:16–cv–1036, 2016 WL 8732315 (E.D. Va. Dec. 2, 2016)...............................44

*Equal Rights Center v. Post Properties, Inc.*,
    633 F.3d 1136 (D.C. Cir. 2011) ...............................................................................27

*Federal Communications Commission v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) .................................................................................................59

*Federal Communications Commission v. Prometheus Radio Project*,
    592 U.S. 414 (2021) .................................................................................................59

*Federal Express Corp. v. United States Department of Commerce*,
    39 F.4th 756 (D.C. Cir. 2022) ..................................................................................68

*Federation for American Immigration Reform, Inc. v. Reno*,
    93 F.3d 897 (D.C. Cir. 1996) ...................................................................................46

*First National City Bank v. Banco Nacional de Cuba*,
    406 U.S. 759 (1972) ...........................................................................................38, 71

*\*Food & Drug Administration v. Alliance for Hippocratic Medicine*,
    602 U.S. 367 (2024) .........................................................................................*passim*

*Food & Drug Administration v. Wages & White Lion Invs., LLC,*
  No. 23-1038, 2025 WL 978101 (Apr. 2, 2025) ....................................................59

*Fornaro v. James,*
  416 F.3d 63 (D.C. Cir. 2005) ........................................................................26

*\*Franklin v. Massachusetts,*
  505 U.S. 788 (1992) ........................................................................ 39, 72, 74

*Free Enterprise Fund v. Public Company Acctounting Oversight Board,*
  561 U.S. 477 (2010) ....................................................................................66

*Fund for Animals, Inc. v. United States Bureau of Land Management,*
  460 F.3d 13 (D.C. Cir. 2006) ........................................................................41,

*Garcia v. Vilsack,*
  563 F.3d 519 (D.C. Cir. 2009) ......................................................................44

*Gill v. Whitford,*
  585 U.S. 48 (2018) ........................................................................ 21, 36, 69

*Great-West Life & Annuity Insurance Company v. Knudson,*
  534 U. S. 204 (2002) ....................................................................................22

*Grosdidier v. Chairman, Broadcasting Board of Governors,*
  560 F.3d 495 (D.C. Cir. 2009) .................................................................. 18, 22

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,*
  527 U.S. 308 (1999) ....................................................................................72

*Gulf Oil Corp. v. Brock,*
  778 F.2d 834 (D.C. Cir. 1985) ......................................................................69

*Haitian Refugee Center v. Gracey,*
  809 F.2d 794 (D.C. Cir. 1987) ......................................................................61

*Harisiades v. Shaughnessy,*
  342 U.S. 580 (1952) ....................................................................................63

*Hartz Mountain Corp. v. Dotson,*
  727 F.2d 1308 (D.C. Cir. 1984) ....................................................................67

*Havens Realty Corp. v. Coleman,*
  455 U.S. 363 (1982) ................................................................................27, 28

*Heckler v. Chaney*,
  470 U.S. 821 (1985) ................................................................................................37, 38

*Hollingsworth v. Perry*,
  570 U.S. 693 (2013) ........................................................................................................36

*Hunt v. Washington State Apple Advertising Commission*,
  432 U.S. 333 (1977) ........................................................................................................33

*Hunter v. United States*,
  36 Fed. Cl. 257 (1996) ....................................................................................................18

*Immigration & Naturalization Service v. Legalization Assistance Project*,
  510 U.S. 1301 (1993) ......................................................................................................46

*In re Papandreou*,
  139 F.3d 247 (D.C. Cir. 1998) ........................................................................................14

*Independent Union of Pension Employees for Democracy & Justice v. Federal Labor Relations Authority*,
  961 F.3d 490 (D.C. Cir. 2020) ........................................................................................25

*Indigenous People of Biafra v. Blinken*,
  639 F. Supp. 3d 79 (D.D.C. 2022) ..................................................................................36

*J.G.G. v. Trump*,
  No. 25-5067, 2025 WL 914682 (D.C. Cir. Mar. 26, 2025) ............................................71

*James Madison Ltd. by Hecht v. Ludwig*,
  82 F.3d 1085 (D.C. Cir. 1996) ........................................................................................15

*Jarkesy v. Securities & Exchange Commission*,
  803 F.3d 9 (D.C. Cir. 2015) ............................................................................................19

*Jerome Stevens Pharmaceuticals, Inc. v. Food & Drug Administration*,
  402 F.3d 1249 (D.C. Cir. 2005) ......................................................................................14

*Johnson v. Eisentrager*,
  339 U.S. 763 (1950) ........................................................................................................63

*Kansas Health Care Association, Inc. v. Kansas Department of Social & Rehabilitation Services*,
  958 F.2d 1018 (10th Cir. 1992) ......................................................................................35

*Khadr v. United States*,
  529 F.3d 1112 (D.C. Cir. 2008) ......................................................................................14

*Kowalski v. Tesmer*,
   543 U.S. 125 (2004) ...........................................................................................30

*Lacson v. Department of Homeland Security*,
   726 F.3d 170 (D.C. Cir. 2013) ...........................................................................26

*Lewis v. Casey*,
   518 U.S. 343 (1996) .....................................................................................21, 69

*Lexmark International, Inc. v. Static Control Components, Inc.*,
   572 U.S. 118 (2014) .....................................................................................45, 47

*Lincoln v. Vigil*,
   508 U.S. 182 (1993) ...........................................................................................38

*Louisiana v. United States*,
   948 F.3d 317 (5th Cir. 2020)...............................................................................41

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) .....................................................................................27, 66

*Lujan v. National Wildlife Federation*,
   497 U.S. 871 (1990) .....................................................................................40, 41

*Madsen v. Women's Health Center, Inc.*,
   512 U.S. 753 (1994) ...........................................................................................70

*Mahorner v. Bush*,
   224 F. Supp. 2d 48 (D.D.C. 2002), *aff'd*, No. 02-5335, 2003 WL 349713
   (D.C. Cir. Feb. 12, 2003) ...................................................................................36

*Manhattan Tankers, Inc. v. Dole*,
   787 F.2d 667 (D.C. Cir. 1986) .............................................................................3

*Marbury v. Madison*,
   5 U.S. (1 Cranch) 137 (1803)..........................................................................2, 66

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
   567 U.S. 209 (2012) .....................................................................................46, 47

*McBryde v. Committe to Review Circuit Council Conduct & Disability Orders of Judicial
   Conference of United States*,
   264 F.3d 52 (D.C. Cir. 2001) .............................................................................17

*McGrain v. Daugherty,*
   273 U.S. 135 (1927) ...................................................................................54

*Metlife, Inc. v. Financial Stability Oversight Council,*
   865 F.3d 661 (D.C. Cir. 2017) ..................................................................32

*Milk Train, Inc. v. Veneman,*
   310 F.3d 747 (D.C. Cir. 2002) ............................................................38, 39

*\*Mississippi v. Johnson,*
   71 U.S. (4 Wall) 475 (1866) ..................................................65, 66, 72, 73

*Moms Against Mercury v. Food & Drug Administration,*
   483 F.3d 824 (D.C. Cir. 2007) ..................................................................14

*Morrison v. Olson,*
   487 U.S. 654 (1988) .............................................................................54, 66

*Motor Vehicle Manufacturers Association of United States, Inc. v. State Farm Mutual*
   *Automobile Insurance Company,*
   463 U.S. 29 (1983) ...............................................................................45, 59

*National Taxpayers Union, Inc. v. United States,*
   68 F.3d 1428 (D.C. Cir. 1995) ..................................................................27

*National Treasury Employees Union v. Federal Labor Relations Authority,*
   910 F.2d 964 (D.C. Cir. 1990) ..................................................................25

*National Treasury Employees Union v. Nixon,*
   492 F.2d 587 (D.C. Cir. 1974) ..................................................................73

*Natural Resources Defense Council, Inc. v. Hodel ("NRDC"),*
   865 F.2d 288 (D.C. Cir. 1988) ............................................................54, 55

*Newdow v. Roberts,*
   603 F.3d 1002 (D.C. Cir. 2010) ..........................................................72, 73

*Nixon v. Fitzgerald,*
   457 U.S. 731 (1982) ...................................................................................72

*\*Norton v. Southern Utah Wilderness Alliance,*
   542 U.S. 55 (2004) ...............................................................................40, 41

*Nyunt v. Chairman, Broadcasting Board of Governors,*
   589 F.3d 445 (D.C. Cir. 2009) ..................................................................26

*O'Hair v. White,*
   675 F.2d 680 (5th Cir. 1982)........................................................................35

*Ohio Valley Enviromental Coalition v. Aracoma Coal Company,*
   556 F.3d 177 (4th Cir. 2009).......................................................................45

*Olivares v. Transporation Security Administration,*
   819 F.3d 454 (D.C. Cir. 2016) ......................................................................3

*Payne v. Biden,*
   62 F.4th 598 (D.C. Cir.)..............................................................................25

*\*People for the Ethical Treatment of Animals v. Gittens,*
   396 F.3d 416 (D.C. Cir. 2005) .....................................................................16

*Perry Capital LLC v. Mnuchin,*
   864 F.3d 591 (D.C. Cir. 2017) .....................................................................44

*Preiser v. Newkirk,*
   422 U.S. 395 (1975) ....................................................................................16

*Printz v. United States,*
   521 U.S. 898 (1997) ....................................................................................66

*Raines v. Byrd,*
   521 U.S. 811 (1997) ....................................................................................54

*Renne v. Geary,*
   501 U.S. 312 (1991) ....................................................................................30

*Roberts v. United States,*
   883 F. Supp. 2d 56 (D.D.C. 2012), *aff'd,* 741 F.3d 152 (D.C. Cir. 2014) ...............................15

*Sale v. Haitian Centers. Council, Inc.,*
   509 U.S. 155 (1993) ...............................................................................38, 71

*Sampson v. Murray,*
   415 U.S. 61 (1974) ......................................................................................62

*Schneider v. Kissinger,*
   412 F.3d 190 (D.C. Cir. 2005) .....................................................................63

*Sierra Club v. Peterson,*
   228 F.3d 559 (5th Cir. 2000)........................................................................41

*Silver State Land, LLC v. Schneider*,
  145 F. Supp. 3d 113 (D.D.C. 2015) ..................................................................45

*Spirit of the Sage Council v. Norton*,
  411 F.3d 225 (D.C. Cir 2005) ........................................................................16

*St. Mary's of Michigan v. Aza*r,
  No. 18-cv-1790, 2020 WL 4049912 (D.D.C. July 20, 2020) ..................................15

*Steel Company v. Citizens for a Better Enviroment*,
  523 U.S. 83 (1998) ..............................................................................13, 14

*Summers v. Earth Island Institute*,
  555 U.S. 488 (2009) ...................................................................................27

*Swan v. Clinton*,
  100 F.3d 973 (D.C. Cir. 1996) .......................................................................73

*Tanner-Brown v. Haaland*,
  105 F.4th 437 (D.C. Cir. 2024) ............................................................33, 34, 35

*Tenet v. Doe*,
  544 U.S. 1 (2005) ......................................................................................72

*Thompson v. North American Stainless, LP*,
  562 U.S. 170 (2011) ...................................................................................45

*Thunder Basin Coal Company v. Reich*,
  510 U.S. 200 (1994) ..............................................................................19, 23

*Totten v. United States*,
  92 U.S. 105 (1876) ....................................................................................72

*Transportation Trades Department, AFL-CIO v. National Mediation Board*,
  530 F. Supp. 3d 64 (D.D.C. 2021) ..................................................................14

*Travelers United, Inc. v. Hyatt Hotels Corp.*,
  No. 23-cv-2776, 2025 WL 27162 (D.D.C. Jan. 3, 2025) ......................................33

*Trudeau v. Fair Trade Commission*,
  456 F.3d 178 (D.C. Cir. 2006) .......................................................................68

*Trump v. Hawaii*,
  585 U.S. 667 (2018) ...................................................................................69

*Trump v. Sierra Club*,
  140 S. Ct. 1 (2019) ...........................................................................................47

*Tulare County v. Bush*,
  306 F.3d 1138 (D.C. Cir. 2002) .........................................................................39

*Tulare County v. Bush*,
  185 F. Supp. 2d 18 (D.D.C. 2001) ......................................................................39

*Turlock Irrigation District v. Federal Energy Regulatory Commission*,
  786 F.3d 18 (D.C. Cir. 2015) ..............................................................27, 31, 33

*Twin Rivers Paper Co. v. Securities & Exchange Commission*,
  934 F.3d 607 (D.C. Cir. 2019) .......................................................................46, 47

*United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*,
  517 U.S. 544 (1996) .........................................................................................34

*United States v. Curtiss-Wright Export Corp.*,
  299 U.S. 304 (1936) .....................................................................................62, 63

*\*United States v. Fausto*,
  484 U.S. 439 (1988) ..............................................................................18, 22, 23

*United States v. Louisiana*,
  363 U.S. 1 (1960) .............................................................................................38

*United States ex rel. McLennan v. Wilbur*,
  283 U.S. 414 (1931) .........................................................................................73

*United States Information Agency v. Krc*,
  989 F.2d 1211 (D.C. Cir. 1993) ........................................................................18

*Valley Forge Christian College  v. Americans United for Separation of Church & State, Inc.*,
  454 U.S. 464 (1982) .........................................................................................61

*Versata Development Corp. v. Rea*,
  959 F. Supp. 2d 912 (E.D. Va. 2013) ................................................................44

*Village of Bald Head Island v. United States Army Corps of Engineers*,
  714 F.3d 186 (4th Cir. 2013) .............................................................................41

*Virginia House of Delegates v. Bethune-Hill*,
  587 U.S. 658 (2019) .........................................................................................54

*Warth v. Seldin*,
　422 U.S. 490 (1975) ........................................................................33

*Weingarten v. Devos*,
　468 F. Supp. 3d 322 (D.D.C. 2020).................................................35

*Wilbur v. United States ex rel. Kadrie*,
　281 U.S. 206 (1930) ........................................................................73

*Worthy v. Herter*,
　270 F.2d 905 (D.C. Cir. 1959) ........................................................63

*Youngstown Sheet & Tube Company v. Sawyer*,
　343 U.S. 579 (1952) ..................................................................62, 63

*Zivotofsky ex rel. Zivotofsky v. Clinton*,
　566 U.S. 189 (2012) ........................................................................55

**Constituional Provisions**

U.S. Const. art. II, § 3 ...................................................................64, 65

**Statutes**

5 U.S.C. § 104..............................................................................4, 48

5 U.S.C. § 105....................................................................................48

5 U.S.C. § 701....................................................................................37

5 U.S.C. § 704........................................................................39, 42, 43

5 U.S.C. § 706........................................................................14, 45, 48

5 U.S.C. § 1101 *et seq.*.......................................................................18

5 U.S.C. § 6329a.................................................................................56

5 U.S.C. § 7105....................................................................................18

5 U.S.C. § 7118....................................................................................25

5 U.S.C. § 7121....................................................................................25

5 U.S.C. § 7122....................................................................................25

5 U.S.C. § 7123..................................................................................218

5 U.S.C. § 7703 ............................................................................................................18

5 U.S.C. § 2302 ............................................................................................................24

5 U.S.C. §§ 7101–35 ....................................................................................................18

6 U.S.C. § 468 ..............................................................................................................52

7 U.S.C. § 608c ............................................................................................................23

22 U.S.C. 2392 ............................................................................................................53

22 U.S.C. § 2151b ...................................................................................................3, 49

22 U.S.C. § 2151t ........................................................................................................70

22 U.S.C. § 2291 ............................................................................................................3

22 U.S.C. § 2346 ......................................................................................................4, 5

22 U.S.C. § 2347 ............................................................................................................4

22 U.S.C. § 2348 ............................................................................................................4

22 U.S.C. § 2349aa .......................................................................................................4

22 U.S.C. § 2381 ....................................................................................4, 49, 51, 72

22 U.S.C. § 2382 ............................................................................................................4

22 U.S.C. § 2601 ............................................................................................................4

22 U.S.C. § 4131 ..........................................................................................................25

22 U.S.C. § 6563 ............................................................................................4, 5, 46, 48

22 U.S.C. § 6592 ..................................................................................................5, 47, 48

22 U.S.C. § 6601 ..........................................................................................................47

28 U. S. C. § 1491 ........................................................................................................22

31 U.S.C. § 1531 ............................................................................................................6

31 U.S.C. § 3901 et *seq.* ...........................................................................................56

xv

31 U.S.C. § 3901 et *seq.* ..................................................................................56

79 Cong. ch. 582, 59 Stat. 613 (1945) ...............................................................52

Pub. L. No. 83-480, 68 Stat. 454 (1954) ............................................................51

Pub. L. No. 87-95, 75 Stat. 214 (1961) ..............................................3, 4, 52, 53

Pub. L. No. 87-510, 76 Stat. 121 (1962) ........................................................4, 51

Pub. L. No. 95-454, 92 Stat. 1111 (1978) ...........................................................18

Pub. L. No. 95-17 § 905, 91 Stat. 29 (1977) ......................................................52

Pub. L. No. 101-179, 103 Stat. 1298 (1989) ........................................................4

Pub. L. No. 105-277, 112 Stat. 2681 (1998) ........................................................4

Pub. L. No. 107-296, 116 Stat. 2135 (2002) ......................................................51

Pub. L. No. 118-47, 138 Stat. 460 ...............................................................*passim*

**Rules**

Federal Rule of Civil  Procedure 5.2 ..................................................................32

Federal Rule of Civil Procedure 12 ............................................................*passim*

**Executive Materials**

5 C.F.R. § 630.1404 ...........................................................................................57

48 C.F.R. § 42.1303 ............................................................................................57

Executive Order No. 10,973 26 Fed. Reg. 10,489 (Nov. 3, 1961) ........................4

Exececutive Order No. 14,169, 90 Fed. Reg. 8619 (Jan. 20, 2025) ........5, 40, 42, 58

Executive Order No. 14,251, 90 Fed. Reg.14,553 (Mar. 27, 2025) ......................17

**Other Authorities**

Congressional Research Service, *Foreign Aid Reform: Issues for Congress and Policy Options*, RL34243 at 11 (2009) ...............................................................50

Congressional Research Service, *Restructuring Foreign Aid: The Role of the Director of Foreign Assistance in Transformational Development*, RL33491 (2006)...........................................50

Congressional Research Service, *The President's Reorganization Authority: Review and Analysis* (2001)......................................................................................................................52

Congressional Research Service, *USAID Under the Trump Administration*, IN12500 (Feb. 3, 2025) ....................................................................................................................................71

Government Accountability Office, *Foreign Aid Reform: Comprehensive Strategy, Interagency Coordination, and Operational Improvements Would Bolster Current Effort*, GAO-09-192 (2009)......................................................................................................................................17

George Ingram, *Institutional Architecture of U.S. Foreign Aid* (2017).......................................51

Memorandum, Guidance on Probationary Periods, Administrative Leave Details, Jan. 20, 2025 ("Guidance"), https://chcoc.gov/sites/default/files/Guidance%20on%20 Probationary%20Periods%2C%20Administrative%20Leave%20and%20Details%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%20FINAL.pdf. ......................................................................................................... 5-6

Secretary of State, Emergency Humanitarian Waiver to Foreign Assistance Pause (Jan. 28, 2025), http://state.gov/emergency-humanitarian-waiver-to-foreign-assistance-pause................5

**INTRODUCTION**

Plaintiffs, American Foreign Service Association ("AFSA"), a professional association that represents foreign service officers ("FSOs"), American Federation of Government Employees ("AFGE"), a union that represents federal civilian employees, and Oxfam, a network of humanitarian organizations, bring a scattershot attack against the policy decisions of the Executive Branch. *See generally First Am. Compl.*, ECF No. 30 ("FAC"). They allege that Defendants President Donald J. Trump, the United States Department of State, the United States Agency for International Development ("USAID"), Department of Treasury, Secretary and Acting Administrator Marco Rubio, and Secretary Scott Bessent (collectively, Defendants) are "dismantling . . . USAID" because "[t]hey have placed approximately 90% of USAID employees on administrative leave and announced the intent to fire thousands of employees in the next couple months; terminated hundreds of" personal services contractors; "terminated nearly over 5,000 USAID awards—the overwhelming majority of the total; and closed USAID headquarters." Pls.' Mem. in Supp. of Mot. for Summ. Judg. at 24, ECF No. 51-1 ("Pls.' Mot.") (citations omitted). Despite the broad nature of Plaintiffs' attack and the wide scope of relief they seek, they impermissibly frame their complaint as an Administrative Procedure Act ("APA") challenge, notwithstanding that they do not challenge any discrete or particularized agency action.

Now, in their motion for summary judgment, Plaintiffs largely attempt to recycle arguments this Court rejected in denying them a preliminary injunction. *See Am. Foreign Serv. Ass'n v. Trump* ("*AFSA*"), No. 1:25-cv-352 (CJN), 2025 WL 573762, at *7 (D.D.C. Feb. 21, 2025). And Plaintiffs also continue to seek to overturn Defendants' policy decisions through an overbroad injunction that would essentially place USAID in a receivership, superintended by the Court. *See,*

*e.g.*, Proposed Order, ECF No. 51-25.  This is not the role of the judiciary.  *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

The Court should dismiss Plaintiffs' complaint for a host of reasons.  First and foremost, the Court lacks subject-matter jurisdiction over all of the claims.  As the Court has recognized, "plaintiffs' complaints about the effects on their members of being placed on administrative leave and of being asked to return to the United States on an expedited basis are, at bottom, archetypal complaints about changed employment conditions and their follow-on effects . . . ."  *AFSA*, 2025 WL 573762, at *7.  As such, these claims are precluded in light of the Civil Service Reform Act of 1978 ("CSRA"), the Federal Service Labor-Management Relations Act ("FSL-MRS"), and the Foreign Service Act ("FSA").  Moreover, none of the Plaintiffs has established a cognizable Article III injury-in-fact to demonstrate associational or organizational standing either.

Plaintiffs' motion for summary judgment fails on the merits of their claims as well.  Challenges to agency actions are appropriately bought as APA claims, but here, Plaintiffs' APA claims fall short.  They are not reviewable because the statutes Plaintiffs invoke give the agencies discretion to make the disputed choices without articulating a standard for a court to overturn those choices.  Additionally, Plaintiffs do not focus on discrete or final agency actions, and even if they had done so, they would have adequate alternative remedies via the various administrative review mechanisms the Court has identified.  And even if those actions were reviewable, the claims fail because Defendants have not exceeded their statutory authority and have not acted contrary to law or arbitrarily and capriciously.

Plaintiffs fare no better in attempting to invoke the Constitution.  Their purported constitutional arguments are purely statutory and therefore not cognizable as constitutional claims.  Moreover, the Separation of Powers claim fails because Defendants have complied with their

statutory obligations and the President's powers in the realm of foreign affairs are vast, and their Take Care Clause argument flops, as that clause cannot be used to obtain affirmative relief.

In sum, this Court lacks subject-matter jurisdiction and Plaintiffs fail to state a claim as to any of their counts, so the Court should grant Defendant's motion to dismiss under Rule 12(b)(1) or, alternatively, under Rule 12(b)(6).  In any event, even if it were necessary to reach Rule 56, Plaintiffs' claims fail at that stage, and the Court should grant Defendants' motion for summary judgment based on the Administrative Record[1] while denying summary judgment to Plaintiffs.

## BACKGROUND

### I.    STATUTORY BACKGROUND

Under the statutory regime governing foreign assistance, and consistent with his responsibilities regarding the conduct of U.S. foreign affairs, the President has broad discretion to set the terms and conditions on which the United States provides such assistance.  Many of the authorities provided under the Foreign Assistance Act of 1961 ("FAA"), and similar statutes, explicitly allow for the provision of assistance "on such terms and conditions as [the President] may determine."  *See*, *e.g.,* section 104(c)(1) of the FAA (22 U.S.C. § 2151b(c)(1)) (health assistance); section 481(a)(4) of the FAA (22 U.S.C. § 2291(a)(4)) (counternarcotics and anti-

---

[1] The rationale for Defendants' actions challenged in this case is provided in the declaration of Jeremy Lewin filed in support of these motions.  Where, as here, "the bare record" does not "disclose the factors that were considered" by the agency at the time it acted, *Doraiswamy v. Sec'y of Lab.*, 555 F.2d 832, 842 (D.C. Cir. 1976) (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971)), it has long been understood that the agency may file a declaration providing to the reviewing court the agency's "reasoning at the time of the decision," *Manhattan Tankers, Inc. v. Dole*, 787 F.2d 667, 672 n.6 (D.C. Cir. 1986) (citation omitted), which simply "furnishes an explanation of the administrative action," and is not an "impermissible 'post hoc rationalization[],'" *Olivares v. TSA*, 819 F.3d 454, 463–64 (D.C. Cir. 2016).  *Cf. DHS v. Regents of the Univ. of Calif.*, 591 U.S. 1, 20–21 (2020) (agency may provide an "amplified articulation" of a prior "conclusory" observation under precedents such as *Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 5–6 (D.C. Cir. 2006)).

crime assistance); section 531 of the FAA (22 U.S.C. § 2346) (assistance to promote economic or political stability); section 541(a) of the FAA (22 U.S.C. § 2347) (International Military Education and Training assistance); section 551 of the FAA (22 U.S.C. § 2348) (Peacekeeping Operations); section 571 of the FAA (22 U.S.C. § 2349aa) (anti-terrorism assistance); *see also* section 2(c)(1) of the Migration and Refugee Assistance Act of 1962, ("MRAA"), Pub. L. No. 87-510, 76 Stat. 121 (22 U.S.C. § 2601(c)(1)); section 201 of the SEED Act of 1989, Pub. L. No. 101-179, 103 Stat. 1298 (amending the FAA by inserting, inter alia, § 498B(i)).  And the FAA generally provides that "[t]he President may exercise any functions conferred upon him by this chapter through such agency or officer of the United States Government as he shall direct."  Section 621 of the FAA (22 U.S.C. § 2381).

The FAA delegates some of this authority.  For example, Section 622(c) of the FAA provides that the Secretary of State, under the direction of the President, "shall be responsible for the continuous supervision and general direction of economic assistance, military assistance, and military education and training programs . . . to the end that such programs are effectively integrated both at home and abroad and the foreign policy of the United States is best served thereby."  22 U.S.C. § 2382(c).

In 1961, President Kennedy issued Executive Order 10,973, directing the Secretary of State to "establish an agency in the Department of State to be known as the Agency for International Development."  Exec. Order No. 10,973 § 102, 26 Fed. Reg. 10,469 (Nov. 3, 1961).  Section 1413 of the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, 112 Stat. 2681 (1998), recognized USAID as an "independent establishment."  *See* 22 U.S.C. § 6563; 5 U.S.C. § 104 ("For the purpose of this title, 'independent establishment' means (1) an establishment in the executive branch . . . which is not an Executive department, military

department, Government corporation, or part thereof, or part of an independent establishment . . . ." ).  Under FARRA, the USAID Administrator is "under the direct authority and foreign policy guidance of the Secretary of State."  22 U.S.C. § 6592.  And several types of foreign assistance are jointly administered by the Department of State and USAID.  *See*, *e.g.*, 22 U.S.C. § 6563; *id.* § 2346(b) (economic support funds).

Consistent with this authority, President Trump promptly acted to ensure that the United States' provision of foreign aid is aligned with American interests.  Upon taking office on January 20, 2025, President Trump instituted a ninety-day pause in United States foreign development assistance to allow his administration to assess programmatic efficiencies, and to ensure that all foreign aid is consistent with United States foreign policy.  *See* Exec. Order No. 14,169, *Reevaluating and Realigning United States Foreign Aid*, 90 Fed. Reg. 8,619 (Jan. 20, 2025).  Secretary of State Marco Rubio implemented this Executive Order on January 24, 2025.  AR_0014 (Lewin Decl., Ex. A 2/10 Marocco Decl. ¶ 3).  Secretary Rubio also approved waivers, including waivers for foreign military financing for Israel and Egypt, emergency food expenses, administrative expenses, and legitimate expenses incurred before the pause went into effect, *id.* at 17–18 (Lewin Decl., Ex. A 2/10 Marocco Decl. ¶ 10), and a waiver on the pause for life-saving humanitarian assistance during the review, *see* Sec'y of State, Emergency Humanitarian Waiver to Foreign Assistance Pause (Jan. 28, 2025), http://state.gov/emergency-humanitarian-waiver-to-foreign-assistance-pause.

Not only is the Trump Administration reviewing foreign aid for programmatic inefficiencies, but it is also taking steps to reduce inefficiencies within the federal workforce.  On January 20, 2025, the Office of Personnel Management ("OPM") issued a guidance memorandum as to probationary periods and administrative leave.  Mem., Guidance on Probationary Periods,

Admin.        Leave        Details,        Jan.        20,        2025        ("Guidance"),
https://chcoc.gov/sites/default/files/Guidance%20on%20Probationary%20Periods%2C%20Admi
nistrative%20Leave%20and%20Details%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%20FINAL.pdf.  The Guidance reinforced
that federal agencies had the authority to place employees on paid administrative leave "when it is
in their best interest to do so," including when "(1) 'the absence is directly related to the agency's
mission,' (2) 'the absence is officially sponsored or sanctioned by the agency,' (3) 'the absence
will clearly enhance the professional development or skills of the employee in the employee's
current position,' or (4) 'the absence is in the interest of the agency or of the Government as a
whole.'" *Id.* at 2 (citation omitted).  The Guidance further explained that administrative leave may
"be an appropriate action where the agency component in which the employee works is being
eliminated or restructured, or where the agency weighs changes to the individual's role at the
agency as part of a workforce realignment." *Id.*

The Further Consolidated Appropriations Act, 2024 (the "FCAA") also gives the President
and the Secretary of State broad discretion to use appropriated funds.  The FCAA appropriated to
the President $1,695,000,000 for "necessary expenses to carry out the provisions of section 667 of
the [FAA.]" Pub. L. No. 118-47, 138 Stat. 460, 739.  It further provided that the Secretary of State
may transfer certain appropriated funds to USAID's operating expenses account under sections
610 and 109 of the FAA.  *Id*.  Finally, the FCAA allows for the reprogramming of funds pursuant
to prior notice to the Committees on Appropriations.  *Id*. at 766.  Similarly, elsewhere, Congress
generally has authorized the transfer of funds from one agency to another "to finance or discharge
a function or activity transferred or assigned under law . . . from one executive agency to another."
31 U.S.C. § 1531(a).

## II.    FACTUAL BACKGROUND

On January 30, 2025, President Trump appointed Secretary Marco Rubio to act as the Acting Administrator of USAID.  AR_0016 (Lewin Decl., Ex. A 2/10 Marocco Decl. ¶ 8).  The Secretary, in line with the views of the President, concluded that USAID's foreign assistance processes reflected signs of severe inefficiency, and a substantial number of the programs funded by USAID neither substantially benefited the American people, nor reflected the priorities of the President and Secretary.  *Id.* at 15–16 (Lewin Decl., Ex. A 2/10 Marocco Decl. ¶ 7).  Thus, the Secretary sent a letter to Congress on February 3, stating that Peter Marocco was delegated the duties of Deputy Administrator of USAID and would "begin the process of engaging in a review and potential reorganization of USAID's activities to maximize efficiency and align operations with the national interest." *Id.* at 16 (Lewin Decl., Ex. A 2/10 Marocco Decl. ¶ 8).

### A.  Changes Concerning Nonparty Employees' Working Conditions at USAID

In line with those objectives, and to thoroughly review the operations of the agency and align its functions to the President's and Secretary's priorities, USAID leadership began placing employees on paid administrative leave and terminating contracts with Personal Services Contractors (collectively "PSCs").  *Id.* at 17, 19–20 (Lewin Decl., Ex. A 2/10 Marocco Decl. ¶¶ 9, 15).  The use of paid administrative leave enabled agency leadership to begin a thorough review of USAID's operations and align its functions to the President's and Secretary's priorities, without continued noncompliance by former agency leadership and management undermining those priorities.  *Id.* at 17 (Lewin Decl., Ex. A 2/10 Marocco Decl. ¶ 9)*.*  The agency initially put 58 employees on paid administrative leave on January 27, and an additional 57 employees on February 1.  *Id.* at 19 (Lewin Decl., Ex. A 2/10 Marocco Decl. ¶ 11).  It similarly approved the

termination of 814 PSCs contracts on February 2. *Id.* at 78 (Lewin Decl., Ex. E 2/24 Marocco Decl. ¶ 4).

Agency leadership ultimately determined that the placement of a substantial number of USAID personnel on paid administrative leave was the only effective way to pause operations. *Id.* at 15–16 (Lewin Decl., Ex. A 2/10 Marocco Decl. ¶ 12). By February 7, before the temporary restraining order ("TRO") in this case was issued, approximately 2,140 employees were placed on administrative leave. *Id.* at 18–19 (Lewin Decl., Ex. A 2/10 Marocco Decl. ¶ 12).

While the February 7 TRO was in effect, however, the Agency did not place any additional employees on administrative leave except for four individuals placed on paid investigative leave pending further inquiry into specific and serious acts of deceit, insubordination, and refusal to follow direct and lawful orders. *Id.* at 21 (Lewin Decl., Ex. A 2/10 Marocco Decl. ¶ 20). USAID further reinstated all employees previously placed on any form of administrative leave, and restored access to email, payment, and security notification systems to those employees whose access was previously limited or shut off. *Id.* at 20–21 (Lewin Decl., Ex. A 2/10 Marocco Decl. ¶ 18).

USAID has continuously monitored its direct hire workforce. *Id.* at 7 (Lewin Decl. ¶ 25). As of February 8, 2025, the day after the TRO issued in this action, USAID had 4,746 U.S. direct hire ("USDH") employees. It had 4,738 USDH employees as of February 22, 2025. As of March 7, 2025, USAID had 4,716 USDH employees. *Id.* As noted, in preparation for the reorganization, USAID returned to active duty substantially all its global personnel and restored their access to Agency systems. *Id.* USAID also fully reinstated all 270 probationary employees consistent with the preliminary injunction issued in *Am. Fed'n of Gov't Emps., AFL-CIO v. U.S. Off. of Pers. Mgmt.*, ECF No. 131, No. 3:25-cv-1780 (WHA), 2025 WL 820782 (N.D. Cal. Mar. 24, 2025),

between March 13, 2025, and March 27, 2025.  AR_006–07 (Lewin Decl. ¶ 23).  By March 28, 2025, all USAID staff previously placed on administrative leave were restored to active status, apart from 36 who remained on administrative and 3 who remained on investigative leave.  *Id.* at 5–6 (Lewin Decl. ¶ 20).

### B.  Changes Concerning USAID and State Funding Agreements with Nonparty Recipients

Regarding the individual contracts and grants, on January 24, 2025, Secretary of State Rubio, consistent with the Executive Order, directed a "pause[]" on "all new obligations of funding, pending a review, for foreign assistance programs funded by or through the [State] Department and USAID."  *Id.* at 14 (Lewin Decl., Ex. A 2/10 Marocco Decl. ¶ 3).  Given the scale of these programs, an *ad hoc* review would have unduly burdened the execution of the President's other foreign policy priorities.  *Id.* at 15–16 (Lewin Decl., Ex. A 2/10 Marocco Decl. ¶ 7).  A blanket pause with a waive-in process was the more efficient and effective path.  *Id.*

Almost immediately, however, Secretary Rubio issued a number of programmatic waivers of the pause that permitted broad categories of foreign aid to flow where consistent with foreign policy priorities of the United States, including for foreign military financing for Israel and Egypt, emergency food assistance, related administrative expenses, and legitimate expenses incurred before the pause went into effect.  *Id.* at 17–18 (Lewin Decl., Ex. A 2/10 Marocco Decl. ¶ 10).  Secretary Rubio further adopted a waiver process to ensure that important aid programs within the national interest would be able to continue during the period of review.  *Id.* For instance, on January 28, Secretary Rubio issued an emergency humanitarian waiver for life-saving humanitarian assistance programs.  *Id.* .  On February 5, 2025, Secretary Rubio issued additional technical guidance for waivers, and, on February 25, 2025, amended FAQs were issued regarding the waiver

process for increased access and clarity.  *Id.* at 84 (Lewin Decl., Ex. F 2/25 Marocco Decl. ¶¶ 12, 13).

On February 13, 2025, the court in *AIDS Vaccine Advocacy Coalition v. United States Department of State*, ECF No. 60, No. 1:25-cv-400 (AHA), 2025 WL 752378 (D.D.C. Mar. 10, 2025) and *Global Health Council v. Trump*, ECF No. 60, No. 1:25-cv-402 (AHA), 2025 WL 752378 (D.D.C. Mar. 10, 2025) in this District entered a temporary restraining order against State, USAID, and OMB.  That order prevented them from suspending, pausing, or otherwise preventing the obligation or disbursement of appropriated foreign-assistance funds in connection with any contracts pursuant to the Secretary's original directive.  AR_0051 (Lewin Decl., Ex. C 2/18 Marocco Decl. ¶ 5, 6).  USAID and State provided notice of the court's order to contract and grant counterparties.  *Id.* at 53 (Lewin Decl., Ex. C 2/18 Marocco Decl. ¶ 14).

Consistent with the TRO, USAID continued to exercise agency discretion to individually examine outgoing payments pursuant to a new Payment Integrity Review Process, and, as appropriate, to enforce the terms and conditions, including provisions allowing the Agency to issue stop work or termination notices, contained in USAID awards and contracts. *Id.* at 51 (Lewin Decl., Ex. C 2/18 Marocco Decl. ¶ 6).  Among the reasons for eliminating awards were: DEIA oriented awards; unnecessary reliance on third-party consultants and contractors or organizations with accountability issues, operational expenses and/or general waste; being unrelated to USAID's core mission or delivery of life-saving aid, regime change, "civic society," or "democracy promotion," sustainability and climate change; or inconsistency with unrelated executive orders or presidential directives.  *Id.* at 53–54 (Lewin Decl., Ex. C 2/18 Marocco Decl. ¶ 16).

The Department of State also terminated foreign assistance-funded contracts and grants. *Id.* at 55 (Lewin Decl., Ex. C 2/18 Marocco Decl. ¶ 24).   Those contracts and grants were

terminated for convenience, which is a mandatory contract term that must be included in all contracts governed by the Federal Acquisition Regulation ("FAR"), or pursuant to their terms. *Id.* (Lewin Decl., Ex. C 2/18 Marocco Decl. ¶ 23, 24). As of March 3, 2025, individualized review of all USAID and State Department foreign assistance awards had concluded. *Id.* at 141 (Lewin Decl., Ex. I 3/3 Marocco Decl. ¶ 3). On March 1, 2025, the Department of State lifted the previously imposed stop work orders and suspensions on all contracts and federal assistance awards selected for retention. *Id.* The Department of State also directed officers to expeditiously process payment requests for both awards where work has resumed and for terminated awards for legitimate expenses incurred in connection with suspensions. *Id.* In total, USAID terminated 5,800 awards and retained 500. The State Department terminated approximately 3,950 awards and retained 2,850. *Id.* (Lewin Decl., Ex. I 3/3 Marocco Decl. ¶ 2).

For terminated agreements, USAID and State are making payments for legitimate expenses incurred prior to January 24, 2025, where counterparties provide an invoice that documents verifiable work and payment entries match the invoices. *Id.* at 83 (Lewin Decl., Ex. F 2/25 Marocco Decl. ¶ 9). Counterparties may also utilize closeout procedures and file a claim if they believe they are entitled to reimbursement of past work or other remedies. *Id.* at 83–84 (Lewin Decl., Ex. F 2/25 Marocco Decl. ¶ 10). If counterparties believe they have claims that the resolution process does not vindicate, established mechanisms are available for them to pursue any claims, including through settlement and, in certain cases, through judicial review in the Civilian Board of Contract Appeals or the United States Court of Federal Claims. *Id.* at 88 (Lewin Decl., Ex. F 2/25 Marocco Decl. ¶ 22).

On March 28, 2025, Secretary Rubio notified Congress of the Department of State and USAID's intent to undertake a reorganization that would involve realigning certain USAID

functions and discontinue other USAID functions that do not align with Administration priorities. *Id.* at 3–4 (Lewin Decl. ¶ 15).  It provided detail on plans regarding the future employment of USAID personnel, *Id.* at 4 (Lewin Decl. ¶ 16), as well as specific information pertaining to the benefits and protections that would remain accessible for those employees located abroad, Lewin *Id.* at 4–5 (Lewin Decl. ¶¶ 18–19).  It also reiterated what USAID has maintained all along, which is that USAID's top priority during this process is ensuring the continued safety and wellness of USAID personnel, and the orderly repatriation of staff overseas.  *Id.* at 5 (Lewin Decl. ¶ 19).

## III.    PROCEDURAL HISTORY

Plaintiffs AFSA and AFGE filed their Complaint on February 6, 2025, alleging that Defendants were violating the Constitution and APA by "dismantl[ing]" USAID.  Compl. ¶¶ 1–8, 34, ECF No. 1.  The following day, on February 7, Plaintiffs filed a motion for a temporary restraining order and asked the Court to enjoin "Defendants immediately from taking any further actions to shut down USAID operations."  Pls.' Mot. for Temp. Restraining Order at 23, ECF No. 9-1.  The Court held a hearing a few hours later.  *See* Min. Order dated Feb. 7, 2025.

Following argument, the Court entered a temporary restraining order preventing Defendants from placing additional employees on administrative leave, requiring Defendants to reinstate employees who had already been placed on administrative leave, and mandating that no employee was to be evacuated from their host country before February 14, 2025.  Temp. Restraining Order at 7, ECF No. 15.

On February 13, Plaintiffs filed an Amended Complaint, adding Oxfam America, Inc. as a plaintiff.  *See generally* FAC.  The Court also held a preliminary injunction hearing on the same day and amended the temporary restraining order to change language so that "[n]o USAID

employees shall be *involuntarily* evacuated from their host countries," and extending the TRO by one week to February 21, 2025.  Order, ECF No. 31.

On February 21, the Court denied Plaintiffs' Motion for Preliminary Injunction.  *AFSA*, 2025 WL 573762, at *1. Without explicitly deciding whether Plaintiffs had standing, the Court determined that they had "not demonstrated that any hindrance to their mission as a result of those challenged actions belongs to the 'great' harms that could warrant a preliminary injunction in a case like this." *Id*. at *7 n.3.  The Court further found that Plaintiffs' alleged injuries flowed from their members' existing employment relationships with USAID.  *Id*. at *7.  The Court thus found Plaintiffs' complaints of activities at USAID were "archetypal complaints about changed employment conditions."  *Id*.  The Court opined that "even [P]laintiffs' allegations of harm from the broader funding pause and stop-work orders pertain primarily to how those actions will affect their members in their capacities as USAID employees."  *Id*.  The Court further determined that Congress had established a comprehensive statutory scheme for reviewing Plaintiffs' complaints—the FSLMRS and CSRA.  *Id*. at *8.  The Court decided Congress has likely precluded district court jurisdiction with these statutes since the FSLMRS and the CSRA were "exclusive," and Plaintiffs could not bypass them "by filing suit in the district court."  *Id*. at *8, *11 (quoting A*m. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 761 (D.C. Cir. 2019).

Shortly after the Court denied Plaintiffs' Motion for Preliminary Injunction, on March 10, Plaintiffs filed this Motion for Summary Judgment, repeating nearly verbatim the same arguments they had made in their Motion for Preliminary Injunction.  *See generally* Pls.' Mot.

## LEGAL STANDARD

The "first and fundamental" question for any court is that of subject-matter jurisdiction. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (citation omitted).  Thus, "resolving

a merits issue while jurisdiction is in doubt 'carries the courts beyond the bounds of authorized judicial action.'" *See In re Papandreou*, 139 F.3d 247, 254–55 (D.C. Cir. 1998) (citation omitted). Here, the threshold issues of subject-matter jurisdiction make it appropriate for the Court to resolve Defendants' motion to dismiss under Rule 12(b)(1) before proceeding to the parties' cross-motions for summary judgment.

The plaintiff bears the burden of establishing the court's subject-matter jurisdiction. *See, e.g.*, *Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008). If the plaintiff is unable to do so, the Court must dismiss the action. *See Steel Co.*, 523 U.S. at 94. Under Rule 12(b)(1), a court may consider material beyond the allegations in the complaint. *Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253–54 (D.C. Cir. 2005); *Transp. Trades Dep't, AFL-CIO v. Nat'l Mediation Bd.*, 530 F. Supp. 3d 64, 69 (D.D.C. 2021) (Nichols, J.). "Where both standing and subject matter jurisdiction are at issue," the "court may inquire into either and, finding it lacking, dismiss the matter without reaching the other." *Moms Against Mercury v. FDA*, 483 F.3d 824, 826 (D.C. Cir. 2007).

A Rule 12(b)(6) motion tests whether a complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While a complaint "does not need detailed factual allegations," it "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted).

Under the APA, the court will set aside agency action when it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A)). "Generally speaking, district courts reviewing agency action under the APA's arbitrary and capricious

14

standard do not resolve factual issues." *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1096 (D.C. Cir. 1996). Instead, the function of the reviewing court is to decide "as a matter of law" whether "the evidence in the administrative record permitted the agency to make the decision it did." *Roberts v. United States*, 883 F. Supp. 2d 56, 62 (D.D.C. 2012), *aff'd*, 741 F.3d 152 (D.C. Cir. 2014) (citation omitted). "Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Id.*; *see St. Mary's of Mich. v. Azar*, No. 18-cv-1790, 2020 WL 4049912, at *3 (D.D.C. July 20, 2020) (In an APA action, "[t]he normal summary-judgment standards of [Fed. R. Civ. P. 56(c)] do not apply.") (Nichols, J.).

## ARGUMENT

This Court should dismiss the First Amended Complaint for lack of subject-matter jurisdiction under Rule 12(b)(1). If this Court were to reach the merits, it should dismiss for failure to state a claim or, in the alternative, deny summary judgment to Plaintiffs and grant summary judgment to Defendants.

## I. THE COURT LACKS SUBJECT-MATTER JURISDICTION OVER ALL OF PLAINTIFFS' CLAIMS.

The action should be dismissed for lack of subject-matter jurisdiction. *First*, Plaintiffs claims are moot now that nearly all USAID employees previously placed on administrative leave have been restored from it. *Second*, Congress has precluded district court jurisdiction over Plaintiffs' challenges to Defendants' decisions to place employees on paid administrative leave and evacuate employees under the Federal Service Labor–Management Relations Statute, the Civil Service Reform Act, and the Foreign Service Act.[2] *Third*, Plaintiffs lack both associational and

---

[2] Although Plaintiffs do not challenge Defendants' use of reductions-in-force actions or other forms of terminations and they are therefore not properly before this Court, this Court would

organizational standing to remedy any alleged injury flowing from the challenged "pause" and review of foreign aid, and all Plaintiffs lack standing to seek relief for intangible harms, including purported increased risks of certain harms, ultimately stemming from Plaintiffs' disagreements with the Executive Branch's foreign policy choices.

## A.  All Claims of Employment-Related Harm Are Moot.

"A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—'when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'" *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (citation omitted). "No matter how vehemently the parties continue to dispute the lawfulness of the conduct that precipitated the lawsuit, the case is moot if the dispute is no longer embedded in any actual controversy about the plaintiffs' particular legal rights." *Id.* (citation omitted). "The rule in federal cases is that an actual controversy must be *extant at all stages* of review, not merely at the time the complaint is filed." *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975) (citation omitted) (emphasis added).  And, most saliently, a case becomes moot when subsequent events permitted under an injunctive order make it "impossible for the court to grant any effectual relief." *See People for the Ethical Treatment of Animals v. Gittens*, 396 F.3d 416, 421 (D.C. Cir. 2005) ("[A]n appeal from an order granting a preliminary injunction becomes moot when, because of the defendant's compliance or some other change in circumstances, nothing remains to be enjoined through a permanent injunction." (citation omitted)); *Spirit of the Sage Council v. Norton*, 411 F.3d 225, 228–29 (D.C. Cir 2005) (completion of permitted agency action, a rulemaking, rendered original challenge moot); *Burlington N. R.R. Co. v. Surface Transp. Bd.*, 75 F.3d 685, 688 (D.C. Cir. 1996)

---

similarly lack subject-matter jurisdiction over any such challenges to employment decisions for the same reasons.

(a case is moot when "intervening events make it impossible to grant the prevailing party effective relief" against the originally challenged policy.).

Here, Plaintiffs' complaint primarily challenges the simultaneous mass placement of all USAID workers on administrative leave.  *See, e.g.*, FAC ¶¶ 23, 29, 37, 43, 93.  Similarly, the primary relief Plaintiffs seek relates to employment, including a directive to Defendants to "[r]efrain from placing any additional workers on administrative leave, or continuing the leave of those previously placed on administrative leave, unless such leave is authorized by this Court after giving legitimate, nonarbitrary, and particularized reasons."  FAC at 32 (Prayer for Relief).  But by March 28, 2025, all USAID staff previously placed on administrative leave were restored to active status, apart from 36 who remained on administrative leave and 3 who remained on investigatory leave.  AR_0005–6 (Lewin Decl. ¶ 20).  At any given time, agencies may have individuals on administrative leave or investigatory leave for a variety of reasons, but there is currently no "mass" placement of USAID workers on administrative leave, which is what Plaintiffs challenge.  This Court can therefore order no meaningful relief as to those alleged "mass" employment-related harms.  *See McBryde v. Comm. to Rev. Cir. Council Conduct & Disability Ords. of Jud. Conf. of U.S.*, 264 F.3d 52, 55 (D.C. Cir. 2001) ("If events outrun the controversy such that the court can grant no meaningful relief, the case must be dismissed as moot.").  Hence, Plaintiffs' core claims challenging the placement of USAID employees on administrative leave are now moot, and the Court should dismiss Plaintiffs' complaint on this basis.[3]

---

[3] In Executive Order No. 14,251 of March 27, 2025, entitled Exclusions from Federal Labor-Management Relations Programs, 90 Fed. Reg. 14,553, the President exempted certain segments of the federal workforce from federal labor-law requirements, including State and USAID and several of their components.  The Office of Personnel Management ("OPM"), which coordinates federal workforce policy, then issued guidance encouraging the agencies and subdivisions covered by Executive Order No. 14,251 to take appropriate steps toward terminating their previously

**B. Congress Has Channeled Subject-Matter Jurisdiction Over Plaintiffs' Claims Arising from Federal Employment into a Distinct System, Not Review in This Court in the First Instance.**

Congress has "established a comprehensive system for reviewing personnel action[s] taken against federal employees" that provides the "exclusive means" for review. *Elgin v. Dep't of the Treasury*, 567 U.S. 1, 5, 8 (2012) (citation omitted). The CSRA, Pub. L. No. 95-454, 92 Stat. 1111 (1978), which includes the FSL-MRS for federal labor-management relations, 5 U.S.C. §§ 7101–35, sets out an "integrated scheme of administrative and judicial review" for challenges to personnel actions taken against members of the civil service. *United States v. Fausto*, 484 U.S. 439, 445 (1988). That scheme permits some, but not all, challenges, with some challenges limited to certain types of employees; channels those challenges to agencies; and grants exclusive jurisdiction to the Federal Circuit over appeals from final agency action (subject to narrow exceptions not pertinent here). *See Elgin*, 567 U.S. at 5–6 & n.1; 5 U.S.C. § 7703(b)(1); *id.* §§ 7105(a)(2), 7123(a); *id.* § 1101, *et seq.*; *see also Grosdidier v. Chairman, Broad. Board of Governors*, 560 F.3d 495, 497 (D.C. Cir. 2009) ("[T]he CSRA is the exclusive avenue for suit even if the plaintiff cannot prevail in a claim under the CSRA.") (Kavanaugh, J., for the Court). For foreign service officers, the FSA similarly provides "a comprehensive system for reviewing personnel action[s] taken against federal employees," *see U.S. Info. Agency v. Krc*, 989 F.2d 1211, 1217 (D.C. Cir. 1993) (citation omitted), culminating in judicial review of Foreign Service Grievance Board or Secretary of State decisions in district court under APA standards, *see, e.g.*, *Hunter v. United States*, 36 Fed. Cl. 257, 259 (1996).

Much of the relief Plaintiffs seek explicitly addresses the relationship between USAID and its employees, including foreign service officers: Their proposed order would command the

---

negotiated Collective Bargaining Agreements ("CBAs"), and, once they have done so, to adopt certain personnel policies that align with the President's priorities.

agency to "recall[] all USAID employees currently placed on administrative leave," Proposed Order, ECF No. 51-25 at 2, item (d); to "restor[e] to all USAID personnel the access to email, computer systems, and security systems that they had as of January 19, 2025," *id.*, item (f); and not to "reduce the size of the permanent Civil Service, Foreign Service, eligible family member, and locally employed staff workforce" below preferred limits, *id.* at 3. Those proposed directives plainly center Plaintiffs' summary judgment contentions on the relationship between the employing agency and its workers—as at the preliminary injunction stage. Hence, the Court should adhere to its prior determination that Plaintiffs' disputes about USAID employees' employment status and evacuation from host countries must be brought, if at all, through the FSL-MRS, and the CSRA, as to domestic civil servants, and the FSA, as to foreign service officers. *See AFSA*, 2025 WL 573762, at *7.

In particular, the Court found it likely "that Congress intended" for Plaintiffs' "current claims of employment-based harm—whether brought by individual civil servants, individual foreign service officers, or unions representing either category of worker"—to "proceed exclusively through" the "statutory scheme of administrative and judicial review" for federal employee and foreign service claims because "(i) 'such intent is fairly discernible in the statutory scheme,' and (ii) the [asserted] claims are 'of the type Congress intended to be reviewed within [the] statutory structure.'" *AFSA*, 2025 WL 573762, at *8 (quoting *Jarkesy v. SEC*, 803 F.3d 9, 15 (D.C. Cir. 2015) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207 (1994))). That was so, the Court reasoned, first, because "the remedial schemes laid out in . . . the FSLMRS and CSRA" and the FSA "are 'exclusive' with respect to claims within their scope." *Id.* And, second, the Court found *none* of the "limited circumstances" authorizing departure from those remedial schemes to apply here, because Plaintiffs failed to show that "(1) a finding of preclusion might

foreclose all meaningful judicial review; (2) the claim[s] [are] wholly collateral to the statutory review provisions;" or "(3) the claims are beyond the expertise of the agency." *Id.* at *9 (quoting *AFGE v. Trump*, 929 F.3d 748, 755 (D.C. Cir. 2019)).

The Court summed up by recognizing that "it appears likely that the claims made by plaintiffs in seeking preliminary injunctive relief 'fall within the exclusive statutory scheme[s]' of the FSLMRS, CSRA, and FSA, which plaintiffs 'may not bypass by filing suit in the district court.'" *AFSA*, 2025 WL 573762, at *11 (quoting *AFGE*, 929 F.3d at 761). The Court found that preclusion to be "almost certain[]" for the disputes "regarding the placement of [plaintiffs'] members on administrative leave and their members' possibly expedited recall from post," and observed the grounds for preclusion "may well also" extend to disputes "regarding" the challenged "funding freeze itself, because plaintiffs' present allegations of injury" from the challenged freeze "again turn on its effects on their members in their capacities as employees." *See id.* None of Plaintiffs' summary judgment arguments provides a valid basis for the Court to reach a different conclusion at this stage.

Contrary to Plaintiffs' contention, Pls.' Mot. at 16–17, the addition in the Amended Complaint of one Plaintiff entity, Oxfam (which obviously is neither a federal employee nor a purported representative of one) does not warrant allowing Plaintiffs' disputes about USAID employment conditions to circumvent the FSL-MRS, CSRA, and FSA procedures. As explained in the discussion below, Oxfam lacks Article III standing to seek injunctive relief against agency employment conditions, and Oxfam separately fails to meet the prudential requirements for third-party standing, so it cannot press the claims of USAID funding recipients not before the Court. *See infra* Sections I.C–E.

And, in any event, even if Oxfam had shown that it met the Article III and prudential standing requirements, at most, that would allow Oxfam to request an injunction concerning the distribution of "federal foreign assistance award[s]" to Oxfam (none of which are alleged)—not the claims federal employees could raise regarding employment conditions. *See* Proposed Order, ECF No. 51-25 at 2, item (a) (seeking relief, including monetary relief, concerning such "contracts, grants, cooperative agreements, loans, or other federal foreign assistance awards"); *see id.*, items (b) and (c) (seeking other foreign assistance award relief). Indeed, Article III would *not* countenance granting Oxfam relief as to USAID employment conditions, given that Oxfam's "remedy must be 'limited to the inadequacy that produced" Oxfam's "injury.'" *Gill v. Whitford*, 585 U.S. 48, 66 (2018) (brackets and citation omitted); *see Lewis v. Casey*, 518 U.S. 343, 360 (1996) (narrowing an injunction that improperly granted "a remedy beyond what was necessary to provide relief" to the injured parties). Oxfam has scant need even for funding-centered relief at any rate, given that the funding recipients whose injuries Oxfam strains to assert already benefit from the preliminary injunction issued on March 10, 2025 in the *AVAC* and *GHC* actions in this District. *See AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, No. 25-cv-400 2025 WL 752378 (D.D.C. Mar. 10, 2025) (granting preliminary injunction in part in *AVAC* and in *Global Health Council v. Trump*, No. 25-cv-402), *appeal filed*, No. 25-5097 (D.C. Cir. Apr. 2, 2025).

And, moreover, insofar as Oxfam seeks monetary relief (namely, an order directing USAID to "pay[] all due or overdue invoices in connection with any" funding agreement), the proper course would be for the parties to those agreements to seek appropriate recourse under the terms of the funding agreements—not for Oxfam, as a nonparty, to seek such relief through this suit. *See Dep't of Educ. v. California*, No. 24A910, 2025 WL 1008354, at *1 (U.S. Apr. 4, 2025) (per curiam) (granting Government's stay application, where District Court "enjoin[ed] the

Government from terminating various education-related grants," and directed "the Government to pay out past-due grant obligations," but "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of" such challenged order) (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U. S. 204, 212 (2002)). "Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" *Id.* (quoting 28 U. S. C. § 1491(a)(1)). Hence, depending on the terms of particular funding agreements, a dispute about "due or overdue invoices" may proceed in the Court of Federal Claims, and Plaintiffs have not met their burden to show subject-matter jurisdiction would exist over such disputes in this Court in the first instance.

Additionally, allowing a stranger to the federal-employment relationship such as Oxfam to raise claims in this Court that the affected federal employees themselves cannot raise would upend the entire reticulated process Congress set out in the exclusive statutory schemes of the CSRA and the other statutes this Court analyzed in denying the preliminary injunction. The "exclusion" of Oxfam "from the provisions establishing administrative and judicial review for personnel action" of the type challenged here "prevents [Oxfam] from seeking review" under other provisions. *Fausto*, 484 U.S. at 455; *see also Grosdidier*, 560 F.3d at 497 ("[T]he CSRA is the exclusive avenue for suit even if the plaintiff cannot prevail . . . ."). When a comprehensive scheme of the sort at issue here permits review at the behest of some types of plaintiffs but not others, it implicitly precludes review by plaintiffs who are not authorized to bring claims. *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 347 (1984) considered a statute that permitted dairy handlers to obtain review of certain "market orders" after exhausting administrative remedies, but did not authorize review by anyone else. *See id.* at 346 (citing 7 U.S.C. § 608c). When a group of dairy consumers sought review of a marketing order, the Supreme Court explained that the statute omits a "provision for

22

participation by consumers in any proceeding," and that "[i]n a complex scheme of this type, the omission of such a provision is sufficient reason to believe that Congress intended to foreclose consumer participation in the regulatory process." *Id.* at 347.

Hence, the "structure of this Act indicates that Congress intended only producers and handlers, and not consumers, to ensure that the statutory objectives would be realized." *Id.* And the "restriction of the administrative remedy to handlers strongly suggests that Congress intended a similar restriction of judicial review of market orders." *Id.* Any other holding would facilitate circumvention of the comprehensive statutory scheme. *See id.* at 348. The principles described in *Block* fully apply to the CSRA. *See Fausto*, 484 U.S. at 448 (applying *Block* to conclude that certain employees who lack CSRA appeal rights "should not be able to demand judicial review for the type of personnel action covered by that chapter"); *see also Thunder Basin*, 510 U.S. at 207 (citing *Block* for governing standards in determining if review is precluded). Because Congress intentionally foreclosed judicial review by parties other than those whom it specifically authorized to seek relief, the addition of Oxfam as a plaintiff does not alter the conclusions this Court reached at the preliminary injunction stage about the unions' failure to establish subject-matter jurisdiction in the first instance over the asserted employment conditions contentions.

Furthermore, even setting aside Oxfam's addition to this action, Plaintiffs reiterate various arguments for "bypass[ing]" the statutory procedures Congress established for federal employee disputes—but those arguments remain as mistaken as they were when this Court previously rejected them. *AFSA*, 2025 WL 573762, at *11 (quoting *AFGE*, 929 F.3d at 761).

Plaintiffs' main argument is their strained depiction of the "exclusive statutory schemes of the FSLMRS, CSRA, and FSA," *AFSA*, 2025 WL 573762, at *11, as limited to challenges to "specified adverse personnel actions for specified categories of federal employees," coupled with

their insistence that they are not here disputing "specific personnel actions," *id.* (alterations omitted), "within the heartland of those statutes," but instead are contesting "the dismantling of a federal agency." Pls.' Mot. at 15–16. To that end, Plaintiffs assert they have adduced "facts related to employment to illustrate the systematic shutdown of the agency—along with taking down webpages, transferring leases, reorganizing lines of authority, and canceling the vast majority of USAID awards and contracts." *Id.* at 16–17. Their effort to paint the specialized statutory scheme as insufficient remains incorrect.

Although they purport to challenge the "canceling . . . of . . . awards and contracts" with foreign assistance funding recipients, *id.* at 17, no Plaintiff here is such a recipient; at most, Oxfam asserts that the economic injuries of those recipients are causing downstream problems for Oxfam, but as explained, that does not bestow on Oxfam authority to seek injunctive relief for those recipients. And as for the agency "webpages" and office "leases" and internal "lines of authority" that Plaintiffs say are keys to their challenge, all of those disputed items fall within the agency employee working conditions that this Court understood are capable of being litigated through the exclusive statutory schemes consistent with the text of the pertinent statutes: For example, "[w]ith respect to domestic employees," this Court noted, "under the CSRA," the administrative scheme encompasses "any claim that an employee has suffered a 'significant change in duties, responsibilities, or working conditions' in a manner that 'violates any law, rule, or regulation implementing . . . the merit system principles.'" *AFSA*, 2025 WL 573762, at *9 (quoting 5 U.S.C. §§ 2302(a)(1), (a)(2)(A)(xii), (b)(12)). Or, as the Supreme Court put it, "[g]iven the painstaking detail with which the CSRA sets out the method for covered employees to obtain review of adverse employment actions, it is fairly discernible that Congress intended to deny such employees an additional avenue of review in district court." *Elgin*, 567 U.S. at 11–12.

Moreover, this Court explained: "[T]he collective bargaining agreement in place between USAID" and AFGE "contains a 'negotiated grievance procedure' that permits arbitration, subject to FLRA review, of whether USAID violated or misapplied any 'law, rule, regulation, or Agency policy related to conditions of employment.'" *AFSA*, 2025 WL 573762, at *9 (citing, *inter alia*, 5 U.S.C. §§ 7121–22). And, for its part, the FSA deploys a "sweeping definition of 'grievance'— again, 'any act, omission, or condition' that is 'a source of concern or dissatisfaction' to the foreign service officer," which "would permit a foreign USAID *employee or union representative* to challenge before the FSGB or FSLRB the whole range of actions to which plaintiffs now object." *Id.* (citing 22 U.S.C. § 4131(a)(1)) (emphasis added). For example, the Court noted, it is "far from clear that the FLRA would lack jurisdiction to hear a retrospective claim that agency defendants had engaged in an unfair labor practice by shuttering the agency." *Id.* at *9 (citing 5 U.S.C. § 7118); *cf. Indep. Union of Pension Emps. for Democracy & Just. v. FLRA*, 961 F.3d 490, 499 (D.C. Cir. 2020) (FSL-MRA "exude[s] indications of a broad congressional delegation of discretion to the FLRA to fashion appropriate remedies for an unfair labor practice" (quoting *NTEU v. FLRA*, 910 F.2d 964, 967 (D.C. Cir. 1990) (en banc))).

Tellingly, Plaintiffs do not attempt to grapple with the text of any those cited statutes, which supported the Court's determination that Plaintiffs' disputes boil down to "adverse employment action[s]" that would receive "meaningful judicial review" through, and are not "wholly collateral" to, the FSLMRS, CSRA, and FSA procedures. *See AFSA*, 2025 WL 573762, at *9–10 (citing, *inter alia*, *Payne v. Biden*, 62 F.4th 598, 607 (D.C. Cir.), *judgment vacated as moot*, 144 S. Ct. 480 (2023) (mem.)). Unsupported by text or precedent, Plaintiffs' "conclusory assertion" that their disputes fall outside the exclusive statutory schemes is, again, mistaken. *See id.* at *10 (rejecting,

25

at preliminary injunction stage, Plaintiffs' "conclusory assertion" that agency "shut down" would harm union members even apart from "effect on their employment").

Nor is Plaintiffs' artful labeling of this suit as a "systematic" challenge, *see* Pls.' Mot. at 16, disputing "the USAID shutdown as a whole," *id*. at 18, of any consequence.  Even where challengers "frame their suit as a systemwide challenge to" agency "policy" rather than "individual benefits determinations," the exclusive review procedures for federal employees remain mandatory.  *Fornaro v. James*, 416 F.3d 63, 67–68 (D.C. Cir. 2005) (Roberts, J., for the Court); *accord Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 448–49 (D.C. Cir. 2009) (rule that federal employees may not use APA challenge to "circumvent" CSRA process "applies to a 'systemwide challenge' to an agency policy interpreting a statute just as it does to the implementation of such a policy in a particular case") (Kavanaugh, J., for the Court); *see also Lacson v. DHS*, 726 F.3d 170, 175 (D.C. Cir. 2013) (describing *Elgin* as having "echoed and amplified the approach taken" in D.C. Circuit cases such as *Fornaro* and *Nyunt*).  So even if this Court were to accept Plaintiffs' characterization of their suit as a "systematic" challenge, that would not allow Plaintiffs to "bypass" the FSL-MRS, CSRA, and FSA.  *AFSA*, 2025 WL 573762, at *11 (quoting *AFGE*, 929 F.3d at 761).

Similarly incompatible with precedent is Plaintiffs' repeated contention, *see, e.g.*, Pls.' Mot. at 20, that such a "bypass" is warranted based on their assertion that "the federal agencies created by the CSRA or FSA" lack "particular expertise" in deciding constitutional and APA claims.  That simply repeats the contention this Court rejected at the preliminary injunction stage, relying on *Elgin*, 567 U.S. at 20–21:  "Where plaintiffs are entitled to review before the MSPB, FLRA, FSGB, or FSLRB and subsequent judicial review, there is no reason to fear that plaintiffs' constitutional claims could wholly evade consideration," because, for example, "even if the MSPB

'determine[s] that it lacks authority to decide' a constitutional issue," the U.S. Court of Appeals for the Federal Circuit "can then review the MSPB decision, including any factual record developed by the MSPB in the course of its decision on the merits." *AFSA*, 2025 WL 573762, at *10.

Allowing separate litigation by the instant Plaintiffs would "seriously undermine[]" "[t]he CSRA's objective of creating an integrated scheme of review," *Elgin*, 567 U.S. at 14, and harm "the development . . . of a unitary and consistent Executive Branch position on matters involving personnel action," *Fausto*, 484 U.S. at 449.  Plaintiffs' arguments for avoiding the MSPB, FLRA, FSGB, or FSLRB should again be rejected and their entire complaint dismissed for lack of subject-matter jurisdiction.

### C.  Plaintiffs Lack Organizational Standing Because They Have Not Proven Cognizable Injury to Their Professed Missions.

Plaintiffs here are neither agency employees nor direct recipients of foreign assistance funds disbursed by the agency, so, here, Plaintiffs are not themselves "the object of the government action or inaction" they "challenge," meaning that although "standing is not precluded[,] . . . it is ordinarily 'substantially more difficult' to establish."  *See Summers v. Earth Island Inst.*, 555 U.S. 488, 493–94 (2009) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992)).  And organizations, like all plaintiffs, must prove an injury-in-fact that is fairly traceable to the challenged actions.  For a plaintiff organization such as Oxfam, AFSA, or AFGE, that showing requires "more than simply a setback to the organization's abstract social interests."  *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)).  Each organization must establish that the challenged conduct "'perceptibly impaired' the organization's *ability to provide* services."

*Turlock Irrigation Dist. v. Fed. Energy Reg. Comm'n*, 786 F.3d 18, 24 (D.C. Cir. 2015) (quoting *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011)) (emphasis added).

The limited scope of organizational standing under *Havens* is clarified in *Food & Drug Administration v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024). The *Alliance* plaintiffs, four pro-life medical associations and several individual doctors, challenged FDA actions regarding the regulation of mifepristone, a pregnancy-termination drug, making it easier for doctors to prescribe and for pregnant women to obtain the drug. *Id.* at 376. Plaintiffs did not prescribe or use mifepristone, and FDA did not impose any requirements on plaintiffs. The *Alliance* Court observed that organizations may "sue *on their own behalf* for injuries they have sustained," *id.* at 393 (citing *Havens*, 455 U.S. at 379 n.19) (emphasis added), but made clear that an organization cannot establish injury by asserting the right of others: "By requiring the plaintiff to show an injury in fact, Article III standing screens out plaintiffs who might only have a general legal, moral, ideological, or policy objection to a particular government action," *id.* at 381.

The *Alliance* Court explicitly rejected the organizations' assertion that "standing exists when an organization diverts its resources in response to a defendant's actions," and clarified that "*Havens* does not support such an expansive theory of standing." *Alliance*, 602 U.S. at 395. The *Alliance* Court noted that the organization plaintiff in *Havens*, HOME, "not only was an issue-advocacy organization, but also operated a housing counseling service." *Id.* The false information provided by the realty defendant about apartment availability "perceptibly impaired" HOME's counseling and referral services, meaning that the realty's "actions directly affected and interfered with" the organization's "core business activities" distinct from its advocacy activities—"not dissimilar," the *Alliance* Court added, "to a retailer who sues a manufacturer for selling defective goods to the retailer." *Id.* By contrast, FDA's relaxation of the regulation of mifepristone in

*Alliance* did not present any similar impediment to the medical associations' business. *Id.* A plaintiff "cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action. An organization cannot manufacture its own standing in that way." *Id.* at 394. Indeed, if diversion of resources could confer standing on an organization, that "would mean that all the organizations in America would have standing to challenge almost every federal policy that they dislike, provided they spend a single dollar opposing those policies," which take the Article III courts far outside their properly limited role. *Id.* at 395.

Each Plaintiff here attempts to recharacterize asserted harms to nonparties—USAID employees or funding recipients—as harms to the Plaintiffs themselves, and hence, attempts to use "injuries" that nonparties allegedly "have sustained" as a basis for standing. Each also attempts to assert that it has standing based on diversion of resources. Those contentions fail under *Alliance* and fail to grapple with the indirect nature of the asserted harms given that Plaintiffs themselves are not the objects of the challenged agency conduct.

Oxfam is unable to assert that USAID has directly harmed it, such as by stopping payments of funds under some agreement with Oxfam *itself*, so Oxfam predicates purported resource allocation harm upon nonparties. Oxfam attests it "is implementing programs funded by United Nations agencies, which *are in turn funded* by the U.S. government," such as a drinking water project in South Sudan "currently on hold." Second Maxman Decl., ECF No. 51-23, ¶¶ 3–4 (emphasis added). Additionally, Oxfam states that "many partner" nongovernmental organizations "that receive" U.S. funds—again, not Oxfam itself—"are laying off staff and scaling back operations," and that those "NGO partners who received USAID funding have reported a great deal of confusion regarding the waiver process." *Id.* ¶¶ 9, 14; *see also* First Maxman Decl., ECF No. 30-1, ¶¶ 9, 13 (additional assertions regarding "implementing partners" "many of which

receive USAID funding"). And although Oxfam asserts it "will be unable to fulfill contractual obligations to vendors," Second Maxman Decl. ¶ 6, Oxfam still does not connect such an alleged inability to USAID's direct conduct against Oxfam. Rather, Oxfam's overall objection is that "the erasure of any large aid organization—particularly one of USAID's magnitude—undermines the humanitarian sector as a whole." First Maxman Decl. ¶ 5. But Oxfam identifies no authorization for Oxfam to press the claims of "NGO partners" who are USAID funding recipients absent from this action (let alone the "sector as a whole"). To the contrary, there are multiple actions pending in this District by USAID funding recipients, confirming there is no practical obstacle to those entities suing on their own behalf rather than through Oxfam's indirect effort.

Such an indirect effort not only reflects a failure to sue on Oxfam's "own behalf," *Alliance*, 602 U.S. at 393, but also flouts the prudential rule against third-party standing: In general, only the party afforded a given constitutional right "has the appropriate incentive to challenge (or not challenge) governmental action" in a way that genuinely furthers the right-holder's interests, "and to do so with the necessary zeal and appropriate presentation," the third-party standing doctrine requires a plaintiff with its own Article III injury-in-fact to "make two additional showings" before asserting the right of a nonparty: that it has "a 'close' relationship with the person who possesses the right," and that "there is a 'hindrance' to the possessor's ability to protect his own interests." *Kowalski v. Tesmer*, 543 U.S. 125, 129–30 (2004). Here, even assuming, *arguendo*, Oxfam has a sufficiently "close" relationship with nonparty USAID funding recipients (a point for which Oxfam tenders no evidence), Oxfam identifies no "hindrance" to those recipients proceeding with their own cases (as indeed they have, including in this District), meaning "no obvious barrier exists that would prevent" any such recipient "from asserting" its "own rights." *Renne v. Geary*, 501

U.S. 312, 320 (1991); *see, e.g., Am. Immigr. Lawyers Ass'n v. Reno*, 199 F.3d 1352, 1362 (D.C. Cir. 2000).

Nor is Oxfam's attempt "to assess gaps and fill in where needed," Second Maxman Decl. ¶ 9, or its perception that USAID's challenged conduct results in "a massive shortfall that will force Oxfam and other agencies to reallocate funds away from critical programs," First Maxman Decl. ¶ 12, sufficient to show its standing. Such resource allocation choices do not establish that Defendants' "actions" "*directly* . . . interfered with" Oxfam's "core business activities" in a manner akin, to use the *Alliance* Court's example, to the harm suffered by a retailer from a manufacturer's sale of "defective goods" to that retailer. *Alliance*, 602 U.S. at 395 (emphasis added). Rather, Oxfam's reliance on its expenditures to address perceived conditions resulting from the challenged conduct essentially repeats the erroneous standing argument the *Alliance* Court rejected—where it closed the door on the notion that "standing exists when an organization diverts its resources in response to a defendant's actions." *See id.* ("*Havens* does not support such an expansive theory of standing."). And insofar as D.C. Circuit organizational standing cases predating *Alliance* remain valid, Oxfam has not heeded the teachings of those cases either, because it has not shown that the challenged agency conduct "perceptibly impaired" Oxfam's "*ability* to provide services," *Turlock Irrigation Dist.*, 786 F.3d at 24 (emphasis added), only that Oxfam perceives the need for its "humanitarian sector" services to have increased. First Maxman Decl. ¶ 5. Such a boundless conception of standing would allow Oxfam to sue to challenge any government shift in budgetary priorities that Oxfam deems to be a change in the status quo, which flouts Article III, as the *Alliance* Court explained.

AFSA and AFGE's organizational standing submissions display the same critical flaws as those of Oxfam. In a misguided effort to conflate associational standing with organizational

standing, their asserted injuries-in-fact are predicated on assertions about the employment conditions of USAID personnel allegedly affected by the agency's personnel decisions: They insist they "have a strong interest in representing and protecting their members who are USAID employees." Pls.' Mot. at 12; *see* Further Chester Decl., ECF No. 51-14, ¶ 20 (predicating harm to AFSA on "financial, mental, and emotional stress" on employees and their families); Second Johnson Decl., ECF No. 51-24, ¶ 13 (predicating harm to AFGE on emotional states of AFGE members). In line with those organizations' assertions about employee effects, some agency personnel have supported AFSA and AFGE's assertions of harm via declarations filed in this Court under fictitious names.[4] But even assuming, *arguendo*, those declarations could properly be considered, the *indirect* harm asserted to AFSA and AFGE from direct action by Defendants upon nonparty employees is not an injury-in-fact on those organizations' "own behalf." *Alliance*, 602 U.S. at 393.

Nor do AFSA and AFGE establish that their resource allocation choices show that Defendants' "actions" "*directly* . . . interfered with" either union's "core business activities," such as where a manufacturer sells "defective goods" to a retailer. *Id.* at 395 (emphasis added). Again, like Oxfam, the unions proceed from the assumption that "standing exists when an organization diverts its resources in response to a defendant's actions," which is a misreading of *Havens* the *Alliance* Court rejected. *Id.* So even accepting the representations that the unions have

---

[4] Consistent with the "strong presumption in favor of public access to judicial proceedings," *Metlife, Inc. v. Fin. Stability Oversight Council*, 865 F.3d 661, 665 (D.C. Cir. 2017), courts traditionally require a person seeking to use a pseudonym in filings to make a showing akin to "good cause" for that course, *see Doe # 1 v. Von Eschenbach*, No. 06-cv-2131, 2007 WL 1848013, at *2 (D.D.C. June 27, 2007); *cf. Chang v. Republic of S. Sudan*, 548 F. Supp. 3d 34, 37 (D.D.C. 2021) ("court may . . . *for good cause*, 'require redaction of additional information'" from filings) (quoting Fed. R. Civ. P. 5.2(e)(1)) (emphasis added). Here, Plaintiffs attempt no showing at all, let alone a "good cause" showing, to support their redaction of the declarants' names.

"divert[ed]" their "resources" to address the perceived needs of union members affected by the challenged agency conduct, such resource diversion does not show that those challenged decisions "*directly* . . . interfered with" the "core business activities" of the unions and hence does not show Article III standing under *Alliance. Id.* (emphasis added); *see* Second Johnson Decl., ECF No. 51-24, ¶¶ 7–9 (AFGE "townhall meetings" for "members," attorney assigned to "work with USAID members," and correspondence with "USAID employees"); Further Chester Decl. ¶¶ 21–23 (AFSA correspondence "from our members" and "townhall meetings" tackling members' "individual questions"). Nor do those representations show "impair[ment]" of the unions' "*ability* to provide services," *Turlock Irrigation Dist.*, 786 F.3d at 24 (emphasis added), rather than their decision to reallocate their resources to address, at most, effects on their members.

### D. The Union Plaintiffs Lack Associational Standing Because the Claims Asserted Necessitate Individualized Findings.

AFSA and AFGE also assert associational standing, requiring each to show that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither *the claim asserted* nor the relief requested requires the participation of individual members in the lawsuit." *Tanner-Brown v. Haaland*, 105 F.4th 437, 447 (D.C. Cir. 2024) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)) (emphasis added). At issue here is the third, or "member-participation," prong. *Travelers United, Inc. v. Hyatt Hotels Corp.*, No. 23-cv-2776, 2025 WL 27162, at *12 (D.D.C. Jan. 3, 2025). It is unsatisfied when "whatever injury may have been suffered is peculiar to the individual member concerned, and both the fact and extent of injury would require individualized proof," *Air Transp. Ass'n of Am. v. Reno*, 80 F.3d 477, 483 (D.C. Cir. 1996) (quoting *Warth v. Seldin*, 422 U.S. 490, 515–16 (1975)). The member-participation prong thus concentrates on "whether the claim asserted and relief requested require individualized

determinations," an inquiry that "is prudential and reflects a 'judicially self-imposed limit on the exercise of federal jurisdiction' rather than a 'constitutional mandate,' focusing instead on 'matters of administrative convenience and efficiency.'" *Tanner-Brown*, 105 F.4th at 447 (quoting *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 557 (1996) (cleaned up)).

Here, the unions' claims, albeit purportedly for injunctive and declaratory relief, require "consideration of the individual circumstances of any aggrieved member of the organization," *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 597 (D.C. Cir. 2015), namely, individualized findings concerning the employment conditions of USAID employees. (Because the unions are not funding recipients, they have no Article III standing to seek relief concerning USAID's agreements with funding recipients, and Oxfam has no Article III standing to seek such relief either given that Oxfam itself holds no such agreement, as explained above.) The employment conditions have changed at various times and for various reasons calling for individualized inquiry. For example, USAID has explained that agency leadership placed "an initial set of 58 employees" on administrative leave on January 27, 2025, and another set of 57 employees on February 1, 2025, because of noncompliance with instructions implementing the challenged funding "pause" "or other acts of insubordination or questionable contracting practices" or because they worked on initiatives deemed outside the national interest. AR_0018 (Lewin Decl., Ex. A 2/10 Marocco Decl. ¶ 11). But different reasons prompted subsequent administrative leave placements. *See id.* at 18–19 (Lewin Decl., Ex. A 2/10 Marocco Decl. ¶ 12) (describing leave placements to administer "pause" and audit agency operations). And the agency then removed some personnel from leave based on risks particular to the countries to which those personnel are assigned. *See* Lewin Decl., Ex. A 2/10 Marocco Decl. ¶ 13. Without, at a minimum, considering the particular rationales for

particular determinations, a court could not appropriately assess the asserted harm to the unions' members on which Plaintiffs have predicated their claims.

Plaintiffs' mere styling of the relief sought as equitable does not obviate the need to analyze whether the claim asserted requires member participation because of the necessity for "individualized determinations": In *Tanner-Brown*, for example, the D.C. Circuit concluded the prong was not satisfied because the association sought the equitable remedy of accounting, which could not issue "without making individualized findings." 105 F.4th at 447; *see Weingarten v. Devos*, 468 F. Supp. 3d 322, 335–36 (D.D.C. 2020) (member-participation prong unsatisfied for due process claim where union relied on member-specific evidence to prove asserted deficiencies despite purported character of relief sought) (citing *Cmty. Fin. Servs. Ass'n of Am., Ltd. v. FDIC*, No. 14-cv-953, 2016 WL 7376847, at *4 (D.D.C. Dec. 19, 2016)).[5] Similarly, here, although the ultimate relief Plaintiffs seek is styled as injunctive or declaratory, that does not dispense with the need for individualized inquiry into the bases for and characteristics of the many workplace decisions, such as "taking down webpages, transferring leases," and "reorganizing lines of authority" that Plaintiffs themselves have identified as vital aspects of their claims. *See* Pls.' Mot. at 16–17. Moreover, by submitting multiple declarations to this Court from multiple *individual* agency personnel (albeit under fictitious names), Plaintiffs themselves have tacitly admitted that the proof required to make their case requires considering *individual* employment conditions.

### E. No Plaintiff Here Has Article III Standing to Seek Relief Based on Nonparties' Harms, Including Abstract Harms Reflecting Disagreement with the Executive's Foreign Policy Choices.

---

[5] *See also O'Hair v. White*, 675 F.2d 680, 691 (5th Cir. 1982) (association lacked standing to raise member's individual due process and equal protection claims affecting only the member who was "best representative of her personal interests"); *Kansas Health Care Ass'n Inc. v. Kansas Dep't of Social & Rehab. Serv.*, 958 F.2d 1018, 1021–22 (10th Cir. 1992) (denying associational standing because claim asserted required evidence particular to individual members).

In granting a limited TRO, this Court rejected the union's "allegations that the funding freeze would inflict emotional harm on their members" as a basis for irreparable harm because those allegations were "too 'hypothetical.'" *AFSA*, 2025 WL 573762, at *3. Nevertheless, Plaintiffs' summary judgment submissions again attempt to speculate about harms of nonparties, or assertions about unspecified increases in risk of various harms. *See, e.g.*, Second Johnson Decl. ¶ 13 (declarant has "heard" from union members who are "frightened and confused" by unspecified decisions); Second Maxman Decl. ¶ 6 (conjecturing that unnamed foreign persons will "likely . . . hold Oxfam responsible for an abrupt and inhumane discontinuation of lifesaving support"—that is, the unidentified foreign persons will blame Oxfam for USAID conduct). Such harms are insufficiently concrete to count as injury-in-fact, and Plaintiffs' attempt to rely on them exposes the suit as seeking adjudication of a policy dispute with the Executive Branch, not an Article III case or controversy. The "threshold requirement" of Article III standing, of course, "ensures that" federal judges "act as *judges*, and do not engage in policymaking properly left to elected representatives." *Gill*, 585 U.S. at 54 (quoting *Hollingsworth v. Perry*, 570 U.S. 693, 700 (2013)).

To the contrary, courts in this Circuit recognize that "the specific fear arising from a foreign policy, no matter how severe a plaintiff's disagreement with that foreign policy may be, cannot constitute injury-in-fact without a concrete harm." *Bernstein v. Kerry*, 962 F. Supp. 2d 122, 127 (D.D.C. 2013), *aff'd*, 584 F. App'x 7 (D.C. Cir. 2014). And Plaintiffs' forecasts of harms resulting from conditions overseas "amount[] to nothing more than speculation about future events that may or may not occur." *See Mahorner v. Bush*, 224 F. Supp. 2d 48, 50 (D.D.C. 2002) ("The plaintiff's allegation that he will suffer an increased chance of losing his life if President Bush initiates a military conflict with Iraq, amounts to nothing more than speculation about future events that may

or may not occur."), *aff'd*, No. 02-5335, 2003 WL 349713 (D.C. Cir. Feb. 12, 2003); *Indigenous People of Biafra v. Blinken*, 639 F. Supp. 3d 79, 85 (D.D.C. 2022) (John Does who "reasonably fear[] injury at the hands of the Nigerian government," after the United States' sale of aircraft to Nigerian government, failed to allege injury-in-fact).

Hence, this Court should adhere to its prior reasoning and reject Plaintiffs' assorted emotional and other intangible harm and increased-risk-of-harm averments as insufficient to support Article III standing.

## II. DEFENDANTS' APA CLAIMS ARE UNREVIEWABLE (Counts IV and V).

Even if Plaintiffs had sufficiently alleged and proven subject-matter jurisdiction (which they have not), their claims are not plausibly alleged under Rule 12(b)(6), or, alternatively, cannot survive summary judgment in light of the administrative record.  Plaintiffs fail to state APA claims here because (1) the challenged agency appropriations decisions are unreviewable under the APA and, instead, are committed to agency discretion by law, (2) Plaintiffs do not allege any *agency* action, (3) they do not allege any *final* action, and (4) an adequate alternative remedy is available to Plaintiffs.

### A. USAID's Pertinent Funding Decisions Are Committed to the Agency's Discretion by Law.

Dismissal is proper because Plaintiffs challenge funding decisions by USAID that are committed to the agency's discretion by law.  *See* 5 U.S.C. § 701(a)(2).  In appropriating funds for USAID, Congress gave the agency broad discretion to decide when and how to spend funds consistent with the various purposes specified in the appropriations laws. Those appropriations provide no standards "against which to judge the agency's exercise of discretion" in making the many choices the agency must make concerning how to spend those funds.  *See Heckler v. Chaney*, 470 U.S. 821, 830 (1985).  Consistent with Congress's broad mandate, *see infra* Section III.A,

agency leadership is conducting necessary planning activities in connection with anticipated expenditure of appropriated funds, as recently described by agency leadership in the notification to Congress. The agency has unreviewable discretion to make those choices: USAID's decisions about how best to spend FAA funds "requires 'a complicated balancing of a number of factors which are peculiarly within its expertise,'" and the "agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993) (quoting *Heckler*, 470 U.S. at 831–32). That teaching applies with special force in this case, which concerns the distribution of *foreign* assistance funds, therefore implicating the President's responsibilities "[i]n the foreign affairs arena," where "the court lacks a standard to review the agency action." *Cf. Detroit Int'l Bridge Co. v. Gov't of Canada*, 883 F.3d 895, 903 (D.C. Cir. 2018). Of course, in this setting, as "the constitutional representative of the United States in its dealings with foreign nations," *United States v. Louisiana*, 363 U.S. 1, 35 (1960), the President has "unique responsibility" for the conduct of "foreign . . . affairs." *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 188 (1993); *see also, e.g.*, *First Nat'l City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 767 (1972) (noting "the lead role of the Executive in foreign policy") (plurality). And although Plaintiffs also attempt to invoke FARRA, another statute in the "foreign affairs arena," *Detroit Int'l Bridge*, 883 F.3d at 903, they do not identify a standard in that statute by which to measure exercises of discretion, either.

*Milk Train, Inc. v. Veneman*, 310 F.3d 747 (D.C. Cir. 2002), supports the Government's position regarding the Executive's discretion over appropriated funds. There, the D.C. Circuit considered a challenge to the Secretary of Agriculture's implementation of a subsidy program for milk producers, where the agency received an appropriation "to provide assistance directly to . . . dairy producers, in a manner determined appropriate by the Secretary" "to compensate dairy

38

producers for economic losses incurred during 1999." *Id.* at 750, 751. Plaintiffs challenged the agency's method for calculating how much money a milk producer should receive, but the court held that the statutory appropriations language "left to the Secretary the decision about how the moneys for 1999 economic losses could best be distributed," and that decision was unreviewable. *Id.* at 751–52. The court also ruled that plaintiffs could challenge the Secretary's calculation insofar as it compensated dairy producers for the wrong year. But that was because Congress had specified that compensation must be for "economic losses incurred *during 1999.*" 310 F.3d at 752 (emphasis added). In that limited regard, "Congress limited the Secretary's authority to disburse funds." *Id.*

No similar limitation exists here: Congress merely appropriated funds for broad purposes, including for the expenses of USAID operations, but the further delineation of broad purposes does not require that the Government provide particular funds to particular private persons (and certainly not to the instant Plaintiffs). *See, e.g.*, Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 460, 740, 742 (providing that certain funds "to enable the President to carry out the provisions of the Foreign Assistance Act of 1961, and for other purposes," for, *inter alia*, "global health activities" and "international disaster relief, rehabilitation, and reconstruction assistance"). How those funds "could best be distributed" is not, as in *Milk Train*, a judicially reviewable question, but instead is left to agency discretion.

### B. Plaintiffs Do Not Allege Any Agency Action.

Review under the APA is available only for "agency action." 5 U.S.C. § 704. Presidential actions are not agency actions reviewable under the APA. It is "well-settled" that Presidential action is not subject to review under the APA. *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992); *Tulare Cnty. v. Bush*, 306 F.3d 1138, 1143 (D.C. Cir. 2002). Because the President is not

an "agency" under the APA, his actions cannot meet the APA's requirement of a "final agency action." *Franklin*, 505 U.S. at 796; *Tulare Cnty. v. Bush*, 185 F. Supp. 2d 18, 28 (D.D.C. 2001).

Because an executive order is a presidential action, and not an agency action, Plaintiffs' challenges to Executive Order 14,169 under the APA are not reviewable, irrespective of whether they bring those claims against the President, as a technicality. *See Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1326 (D.C. Cir. 1996) (finding a cause of action under the APA is not available to challenge an executive order because the APA applies only to a "person suffering legal wrong because of *agency* action."). Thus, Plaintiffs' claim that the President lacked authority to issue the Executive Order, that he relied on insufficient evidence, or that he did not make appropriate findings are all non-cognizable under the APA. *See id.*

Plaintiffs' challenge to the implementation of the Executive Order likewise fails. First, where the complaint is effectively seeking review of the President's action by suing an agency acting on behalf of the President, the agency actions are not reviewable under the APA. *See Ancient Coin Collectors Guild v. CBP*, 801 F. Supp. 2d 383, 402 (D. Md. 2011) (concluding that where the Department of State was acting on behalf of the President, its actions were not reviewable under the APA), *aff'd*, 698 F.3d 171 (4th Cir. 2012); *Detroit Int'l Bridge Co v. Canada*, 189 F. Supp. 3d 85, 100 (D.D.C. 2016) (noting that "several cases have concluded that an agency's action on behalf of the President, involving discretionary authority committed to the President, is 'presidential' and unreviewable under the APA" and concluding that the action by the Department of State on behalf of the President was unreviewable under the APA), *aff'd on other grounds*, 883 F.3d 895 (D.C. Cir. 2018).

Second, and even more fundamentally, Plaintiffs do not even identify a discrete action that either of the defendant agencies here—USAID or State—has taken that is subject to APA review.

A plaintiff must plead "an identifiable action or event." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 899 (1990); *see Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004) (APA limits judicial review to "circumscribed, discrete agency actions"). The agency actions that can properly be challenged under the APA are those that are "circumscribed [and] discrete." *Norton*, 542 U.S. at 62. By contrast, the APA does not provide for "general judicial review of" agency conduct, *Lujan*, 497 U.S. at 899, like "constructing a building, operating a program, or performing a contract," *Vill. of Bald Head Island v. U.S. Army Corps. of Eng'rs*, 714 F.3d 186, 193 (4th Cir. 2013) (cited approvingly in *Louisiana v. United States*, 948 F.3d 317, 321 n.13 (5th Cir. 2020)), or making a budget request, *see Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 20 (D.C. Cir. 2006). The APA thus contains "a prohibition on programmatic challenges," meaning "challenges that seek 'wholesale improvement' of an agency's programs by court decree." *Alabama-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484, 490 (5th Cir. 2014) (quoting *Sierra Club v. Peterson*, 228 F.3d 559, 566 (5th Cir. 2000)); *Am. Forest Res. Council v. United States*, 77 F.4th 787, 805 (D.C. Cir. 2023) (rejecting a "blunderbuss challenge" in which the plaintiffs "complain not that the Secretary failed to take a specific action but rather that she failed to carry out the . . . Act's general directives").

Here, Plaintiffs' complaint does not challenge a discrete agency action. Rather, Plaintiffs argue that "Defendants' dismantling of USAID" is a final agency action because Defendants "have placed approximately 90% of USAID employees on administrative leave and announced the intent to fire thousands of employees in the next couple months; terminated hundreds of PSCs and furloughed hundreds of ISCs; terminated nearly over [sic] 5,000 USAID awards—the overwhelming majority of the total; and closed USAID headquarters." Pls.' Mot. at 24 (citations omitted). This is the exact type of broad programmatic or "blunderbuss" challenge seeking Article

III supervision of an agency's day-to-day activities that courts have repeatedly ruled are impermissible under the APA. *See Fund for Animals*, 460 F.3d at 20; *see also Am. Forest Res. Council*, 77 F.4th at 805.

### C. Plaintiffs Do Not Allege Any Final Action.

Agency action must be "final" to be reviewable under the APA. 5 U.S.C. § 704. Agency action is final only if two requirements are met. The agency action "must mark the consummation of the agency's decisionmaking process," and "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted). As the Court has already determined, "at present," USAID "is still standing." *AFSA*, 2025 WL 573762, at *7. And although Secretary Rubio has informed Congress of the intent to transfer "certain USAID functions" to State, it remains to be determined exactly how these actions will be carried out, meaning they are plainly not final for purposes of APA review. Lewin Decl. Ex. R, at 1.

Plaintiffs contend that "Defendants' dismantling of USAID marks the consummation of the decisionmaking process [because] . . . [t]hey have placed approximately 90% of USAID employees on administrative leave and announced the intent to fire thousands of employees in the next couple months; terminated hundreds of PSCs and furloughed hundreds of ISCs; terminated nearly over [sic] 5,000 USAID awards—the overwhelming majority of the total; and closed USAID headquarters." Pls.' Mot. at 24 (citations omitted). But, by definition, the challenged "pause" of operations to permit "reviews of such programs for programmatic efficiency and consistency with United States foreign policy, to be conducted within 90 days of this order," Exec. Order No. 14,169 §3(a), was not a final decision. Indeed, "[t]he responsible department and agency heads, in consultation with the Director of OMB, will make determinations within 90 days

of this order on whether to continue, modify, or cease each foreign assistance program based upon the review recommendations, with the concurrence of the Secretary of State." *Id.* §3(c). And given that the reorganization of USAID outlined in the notification to Congress of March 28, 2025 indicates only what "the Department *intends* to" do, AR 0260 (Lewin Decl. Ex. R, at 1), and thus requires many more decisions before that reorganization is final, that reorganization also cannot be characterized as a "final" agency action for APA purposes.

There may be no clearer indication that there has been no final agency action than that the precise action Plaintiffs complain of—the simultaneous placement of most USAID employees on administrative leave—has been undone. *See supra* Section I.A. State and USAID's decisional processes for the reorganization previewed in the March 28 Congressional notification remain ongoing—not consummated—and to the extent the reorganization one day manifests in a final agency action pursuant to the March 28 Congressional notification, Plaintiffs cannot maintain this suit by speculating now about the contours of that action.

Furthermore, the consequences to the members of the plaintiff associations such as the placements on paid administrative leave are not ones involving the determination of rights or obligations—particularly as to those associations. Administrative leave is not permanent, and employees previously placed on leave continued to receive pay. As to Defendants' terminations of funding agreements, as explained above in describing Plaintiffs' lack of Article III standing, no Plaintiff before the Court holds such a terminated funding agreement, and therefore cannot obtain APA review of such a termination. Plainly, there is no final agency action here so far as the instant Plaintiffs are concerned.

**D. The APA Does Not Provide a Cause of Action Because an Alternative Adequate Remedy is Available to Plaintiffs.**

Review under the APA is available only where "there is no other adequate remedy in a court." 5 U.S.C. § 704. The requirement that a plaintiff have "no other adequate remedy in court," *id.*, reflects that "Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action," *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988). "[T]he alternative remedy need not provide relief identical to relief under the APA, so long as it offers relief of the 'same genre.'" *Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009) (citation omitted). Further, a remedy may be adequate even if "the arguments that can be raised [in the alternative proceeding] are not identical to those available in an APA suit." *Elm 3DS Innovations LLC v. Lee*, No. 1:16–cv–1036, 2016 WL 8732315, at *6 (E.D. Va. Dec. 2, 2016). If there exists an alternative adequate judicial remedy, a plaintiff lacks a cause of action under the APA. *See Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 621 (D.C. Cir. 2017); *see also Versata Dev. Corp. v. Rea*, 959 F. Supp. 2d 912, 927 (E.D. Va. 2013) (dismissing putative APA claim under Rule 12(b)(6) because decision at issue was not a final agency action and an alternative adequate remedy existed by way of appeal to the Federal Circuit). As already described above in Section I, the instant suit is, in essence, an attempt to obtain mass adjudication of employment claims, and there is a CSRA, FSL-MRS, or FSA remedy potentially available to Plaintiffs that is an adequate alternative. Plaintiffs are therefore barred from bringing this suit in this Court in the first instance. After all, as this Court has already ruled, "Congress likely intended for plaintiffs' current claims of employment-based harm—whether brought by individual civil servants, individual foreign service officers, or unions representing either category of worker—to proceed exclusively through the three statutory schemes just discussed." *AFSA*, 2025 WL 573762, at *8. Given the adequate

44

alternative remedy the Court has already determined is available, Plaintiffs fail to state an APA claim.

### III. DEFENDANTS HAVE NOT VIOLATED THE ADMINISTRATIVE PROCEDURE ACT (Counts IV and V).

Even if Plaintiffs were able to properly assert APA claims, those claims would fail on summary judgment.  Under the APA, the court may set aside an agency action if the court finds that challenged action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).  The Court's review is ultimately "highly deferential and narrow" and focused on ensuring the agency has set forth its reasons for decision and provided a reasoned explanation for its action.  *Silver State Land, LLC v. Schneider*, 145 F. Supp. 3d 113, 124 (D.D.C. 2015) (citations omitted).  The agency need only "provide[] an explanation of its decision that includes a rational connection between the facts found and the choice made" to have its decision sustained.  *Am. Whitewater v. Tidwell*, 770 F.3d 1108, 1115 (4th Cir. 2014) (quoting *Ohio Valley Env't Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009)).  A court "is not to substitute its judgment for that of the agency."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Here, Defendants have not exceeded their statutory authority, acted contrary to law, or acted arbitrarily and capriciously.

### A.  Defendants Have Not Exceeded Their Statutory Authority (Count IV).

Plaintiffs argue that Defendants' actions exceed their authority under FARRA and the FCAA.  Pls.' Mot. at 25–27.  These arguments are unfounded.

#### 1.  Plaintiffs' Claims Do Not Fall Within the Zone of Interests Protected by the Statutes They Invoke.

In seeking to enforce FARRA and appropriations laws, Plaintiffs face a threshold problem separate from their lack of subject-matter jurisdiction, *see supra* Section I:  They do not "fall within

the zone of interests protected by the [statutes] invoked." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129–30 (2014) (citation omitted). That limitation reflects the common-sense intuition that Congress does not intend to extend a cause of action to "plaintiffs who might technically be injured in an Article III sense but whose interests are unrelated to the statutory prohibitions" they seek to enforce. *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 178 (2011). When a plaintiff brings an APA cause of action to challenge the Government's compliance with another statute, the "interest he asserts must be 'arguably within the zone of interests to be protected or regulated by the statute' that he says was violated." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012) (citation omitted). But where a plaintiffs' "interests are so marginally related to . . . the purposes implicit in the statute," it "cannot reasonably be assumed that Congress intended to permit" the plaintiffs' suit. *Id.* at 225 (quoting *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987)); *see also Twin Rivers Paper Co. v. SEC*, 934 F.3d 607, 616 (D.C. Cir. 2019) ("Protected interests are ones asserted either by 'intended beneficiaries' of the statute at issue or by other 'suitable challengers'—i.e., parties whose interests coincide 'systemically, not fortuitously' with those of intended beneficiaries.").

Plaintiffs here are not proper parties to enforce FARRA or any appropriations statute. Plaintiff organizations are not themselves subject to FARRA or appropriations laws. When Justice O'Connor confronted a challenge brought by "organizations that provide legal help to immigrants," she concluded that the relevant provisions of immigration law were "clearly meant to protect the interests of undocumented aliens, not the interests of [such] organizations," and that the fact that a "regulation may affect the way an organization allocates its resources . . . does not give standing to an entity which is not within the zone of interests the statute meant to protect." *INS v. Legalization Assistance Project*, 510 U.S. 1301, 1302, 1305 (1993) (O'Connor, J., in

chambers); *see Fed'n for Am. Immigr. Reform, Inc. v. Reno*, 93 F.3d 897, 900–04 (D.C. Cir. 1996) (similarly rejecting organization's zone-of-interest argument).

Nothing in the text or "the purposes implicit" in the statutes Plaintiffs invoke, *Patchak*, 567 U.S. at 225 (quoting *Clarke*, 479 U.S. at 399), indicates that Congress sought to protect private party interests besides those of USAID, State, and Congress in the federal spending and appropriations process and in the structural relationship between State and USAID. *Compare* 22 U.S.C. § 6563 *with* 22 U.S.C. § 6592. There is no basis to conclude that Congress contemplated suits seeking to advance the interests of a private party who asserts, for example, that federal spending decisions *indirectly* harm it. For example, the appropriations statute does not require USAID or State to consider the impact on private parties or constrain those agencies' spending discretion as a means of protecting any private party interests. And FARRA, in describing the relationship between USAID and State, likewise does not provide a basis for private parties to seek to rebalance that relationship.

To the contrary, in *Trump v. Sierra Club*, 140 S. Ct. 1 (2019) (mem.), the Supreme Court held that "the Government ha[d] made a sufficient showing" that the parties challenging the Department of Defense's border-barrier spending "have no cause of action to obtain review" of actions taken under that department's appropriations statute, and accordingly stayed the district court's permanent injunction pending the Government's appeal. And *Patchak* further weighs against Plaintiffs' apparent assumption that they can enforce the appropriations laws or FARRA, which nowhere specify Plaintiffs as the "intended beneficiaries" of the USAID appropriations, or FARRA provisions describing USAID as "independent" but still under direction and guidance of State. *Twin Rivers Paper*, 934 F.3d at 616; *see Patchak*, 567 U.S. at 224 (plaintiff must fall within zone of interests of the statute "that he says was violated"). Hence, they do not satisfy the zone-

47

of-interests test for the statutes they seek to enforce through the APA, which "is a 'requirement of general application'" that "always applies and is never negated."  *See Lexmark*, 572 U.S. at 129.

### 2. Defendants Have Not Violated the Foreign Affairs Reform and Restructuring Act of 1998.

FARRA does not prevent Defendants from acting as they have done here.  Plaintiffs' entire APA argument as to FARRA is this: "USAID was established by statute, the FARRA, as a federal agency. *See* 22 U.S.C. § 6601.  No subsequent act of Congress has altered USAID's status. Shutting down the agency thus violates FARRA."  Pls.' Mot. at 25.  This barebones argument misconceives FARRA.

#### a. FARRA Does Not Prevent State Department or Executive Control of USAID Remain Independent of the State Department or Executive Control.

True, Section 1413 of FARRA established USAID as an "independent establishment."  *See* 22 U.S.C. § 6563.  But an "independent establishment" is defined, in relevant part, as an entity "in the executive branch" that is "not an Executive department" or "part thereof."  5 U.S.C. § 104(1). In other words, USAID is "independent" in the sense that it is not part of another executive branch agency, but it is still firmly within Executive Branch control.  This status has various legal consequences:  Independent establishments constitute "agencies" for many purposes under federal law, which enables USAID to take various actions and subjects it to, among other things, judicial review under the APA.  *See, e.g.*, 5 U.S.C. § 706; *see also DOJ v. FLRA*, 39 F.3d 361, 365 (D.C. Cir. 1994) (noting that "Executive agency" is defined to include "an independent establishment," 5 U.S.C. § 105, which has implications for labor disputes).

This status does not, however, say anything about what functions or personnel the agency must retain.  Nor does this status require USAID to remain independent of State Department control.  To the contrary, FARRA expressly placed the USAID Administrator "under the direct

authority and foreign policy guidance of the Secretary of State." 22 U.S.C. § 6592. USAID thus

is still an "independent establishment" consistent with FARRA. USAID retains personnel who

carry out the agency's remaining functions. And even during the reorganization outlined in the

March 28, 2025 notification to Congress, USAID would be simply a *smaller* independent

establishment, following the transfer of "select USAID functions" to the State Department. AR_

0262 (Lewin Decl. Ex. R, at 3). But the March 28, 2025 notification to Congress acknowledges

that further legislation would be required to eliminate USAID.

### b. Defendants Have Not Violated FARRA's 60-Day Reorganization Provision.

Plaintiffs similarly err, *see* Pls.' Mot. at 21, in invoking FARRA's 60-day period for

USAID's reorganization. Plaintiffs emphasize that FARRA directed the President to decide how

to reorganize USAID within 60 days, but that provision did not create a sole, one-time opportunity

for agency reorganization that expired in 1998. Read in context, that provision directed the

President to timely weigh in on options for the reorganization of USAID pursuant to the authorities

and requirements in FARRA, thereby ensuring that the President would play a central role in

Congress's effort to restructure foreign affairs agencies within the Executive Branch. FARRA

thus invited presidential participation in USAID's reorganization in 1998, without limiting the

President from taking future action in this area. In other words, the 60-day provision may have

created a limited window for the President to reorganize USAID *pursuant to FARRA*, but it did

not purport to constrain the President's ability to reorganize USAID more generally. And under

the FAA, as noted above, the President has explicit authority to "exercise any functions conferred

upon him by this Act through such agency or officer of the United States as he shall direct," 22

U.S.C. § 2381, and has broad authority to administer aid programs "on such terms and conditions

as [the President] may determine," *e.g.*, *id.* § 2151b(c)(1). Nowhere did Congress preclude

subsequent Presidents from revisiting these issues or undertaking future reorganizations related to foreign aid.

Ossifying USAID's structure as of 1998 also would be inconsistent with the stated goals of FARRA.  FARRA expressly *authorized* the President to reorganize foreign affairs agencies, including to transfer USAID's functions to the State Department pursuant to FARRA.  It would turn that authorization on its head to conclude that Congress thereby implicitly *prohibited* future reorganization efforts to achieve similar efficiency gains.  By consolidating agencies with overlapping functions, Congress sought "to strengthen . . . the leading role of the Secretary of State in the formulation and articulation of United States foreign policy" and "to consolidate and reinvigorate the foreign affairs functions of the United States *within the Department of State*."  *Id.* § 6501(1), (2) (emphasis added).  Congress aimed to do so, in part, by "providing for the reorganization of the Department of State to maximize the efficient use of resources, which may lead to budget savings, eliminated redundancy in functions, and improvement in the management of the Department of State."  *Id.* § 6501(2)(C).  Congress therefore set a floor for efficiency gains, including at USAID.  *See id.* § 6581(b) (requiring, "at a minimum, for the transfer to and consolidation with the Department of State" of certain USAID functions).  FARRA has never been understood to restrain future Administrations from working to achieve those same goals through additional reorganization efforts.

Historical practice confirms that FARRA contains no such limitation.  For example, in 2006, President Bush undertook a "major transformation in the U.S. government's procedures for directing and managing foreign assistance programs."  GAO, *Foreign Aid Reform: Comprehensive Strategy, Interagency Coordination, and Operational Improvements Would Bolster Current Effort*, GAO-09-192 (2009).  Those reforms created a new Bureau of Foreign Assistance at the State

Department to improve the coordination of foreign aid. CRS, *Foreign Aid Reform: Issues for Congress and Policy Options*, RL34243 at 11 (2009). They also eliminated certain USAID offices, transferring those functions and some staff from USAID to the State Department. Had FARRA prohibited future Administrations from reorganizing USAID, President Bush's efforts to do so likely would have been challenged as contrary to statute. It does not appear that anyone questioned the lawfulness of those actions. *See* CRS, *Restructuring Foreign Aid: The Role of the Director of Foreign Assistance in Transformational Development*, RL33491 (2006) ("[T]he current restructuring requires no legislative action."); George Ingram, *Institutional Architecture of U.S. Foreign Aid*, 2 (2017) (highlighting the 2006 reforms as demonstrating the President's "wide latitude in how they structure foreign assistance"). Furthermore, Congress expressly confirmed in the FCAA that the President retains authority to reorganize USAID—consistent with a long line of statutes that have required only congressional consultation and notification for reorganization of the Department of State and USAID. *See, e.g.*, 138 Stat. at 764, § 7015(a) (including a congressional notification requirement to "create, close, reorganize, downsize, or rename bureaus, centers, or offices"); *id.* at 843–44, § 7063(a), (b) (recognizing that the President retains authority to reorganize USAID, providing that appropriated funds may not be used to "implement a reorganization [or] redesign" of USAID without "prior consultation" with Congress, including actions to "eliminate" or "consolidate" USAID or "transfer" its authorities "to other agencies"); 22 U.S.C. § 2381 (authorization to exercise FAA functions "through such agency or officer" as the President "shall direct"); Agricultural Trade Development and Assistance Act of 1954, Pub. L. No. 83-480, 68 Stat. 454, § 203 (similar authority delegated to President); Migration and Refugee Assistance Act of 1962, Pub. L. No. 87-510, 76 Stat. 121, § 4 (similar).

51

In contrast, where Congress intends to foreclose significant reorganizations of Executive Branch entities, it does so explicitly.  For example, when Congress transferred the U.S. Coast Guard to the Department of Homeland Security, Congress provided that the Coast Guard "shall be maintained as a distinct entity" and that generally no "function" of the Coast Guard "may be diverted to the principal and continuing use of any other organization, unit, or entity of the Department."  Homeland Security Act of 2002, Pub. L. No. 107-296, § 888(b)–(d), 116 Stat. 2135, 2249, codified at 6 U.S.C. § 468(b)–(d); *see also, e.g.*, Reorganization Act of 1945, 79 Cong. ch. 582 § 5, 59 Stat. 613 (prohibiting "abolishing or transferring an executive department or all the functions thereof" as well as "any reorganization affecting" certain designated agencies); Reorganization Act of 1977, Pub. L. No. 95-17 § 905, 91 Stat. 29, 31 (prohibiting "abolishing or transferring an executive department or independent regulatory agency, or all the functions thereof").[6]  Congress included no such limitation on the transfer of USAID's functions in FARRA or any other statute.

### 3. Defendants Have Not Violated the Further Consolidated Appropriations Act of 2024.

Plaintiffs also incorrectly claim that USAID's reorganization is incompatible with the FCAA.  *See* Pls.' Mot. at 26–27.

#### a. The FCAA Does Not Foreclose USAID's Reorganization.

Contrary to Plaintiffs' contention, Pls.' Mot. at 26, Congress did not foreclose USAID's reorganization by appropriating specific funds to USAID in the 2024 appropriations provisions of the FCAA.  As noted above, Congress appropriated those funds *to the President*, not USAID, for purposes of carrying out the FAA.  That appropriation reflects the President's authority under the

---

[6] The Reorganization Act of 1977 "remains 'on the books' but is not presently operative for execution as it expired on December 31, 1984."  CRS, *The President's Reorganization Authority: Review and Analysis*, i n.1 (2001).

FAA to decide which agencies to task with the FAA's administration, as well as Congress's recognition in the 2024 Act that the President retains authority to reorganize USAID. Reinforcing that discretion, the 2024 Act specifically authorized the Secretary of State to transfer certain funds to the Operating Expenses Account to best carry out the FAA. *See* 138 Stat. at 739 ("[T]he authority of sections 610 and 109 of the [FAA] may be exercised by the Secretary of State to transfer funds appropriated to carry out chapter 1 of part I of such Act to 'Operating Expenses' in accordance with the provisions of those sections."); FAA §§ 109, 610 (permitting transfers between accounts); FAA ch. 1, pt. I (authorizing foreign aid programs).

Moreover, while the 2024 Act provided that certain funds were to be apportioned to USAID, Congress separately authorized the transfer of those funds to the State Department or other agencies to implement programs for which USAID is responsible. *See, e.g.*, section 632(a) of the FAA (22 U.S.C. § 2392(a)) (authorizing the President to "allocate or transfer to any agency of the United States Government any part of any funds available for carrying out the purposes of [the FAA]. . . ."); section 632(b) of the FAA (22 U.S.C. § 2392(b)) (authorizing any officer of the U.S. government carrying out functions under the FAA to utilize the services . . . and facilities of, or procure commodities, defense articles, or military education and training from, any agency of the United States Government as the President shall direct, or with the consent of the head of such agency") Accordingly, the FAA authorizes USAID to transfer funds to the State Department to perform functions for which USAID is responsible, including statutory functions.

### b. Defendants Have Not Violated the FCAA's Congressional Consultation Requirement.

Plaintiffs further err by contending that the reorganization violated the 2024 Act's requirement of prior consultation with Congress. Pls.' Mot. at 26–27.

*First*, Plaintiffs' challenge to the adequacy of the Secretary's notice to Congress is not justiciable.  In the 2024 Act, Congress provided that appropriated funds may not be used to "implement a reorganization" of USAID "without prior consultation" with Congress.  138 Stat. at 843–44, § 7063(a).  It is undisputed that the Secretary provided notification to Congress:  On February 3, 2025, the Secretary informed Congress of his "intent to initiate consultations with [Congress] regarding the manner in which foreign aid is distributed around the world through [USAID]." AR_0016 (Lewin Decl., Ex. A 2/10 Marocco Decl. ¶ 8).

Plaintiffs argue that the Secretary's February 3 notice fails to provide the "detailed justification" envisioned by Congress, 138 Stat. at 844, but Plaintiffs "lack standing to assert the institutional interests of a legislature," *Comm. on Judiciary of U.S. House of Representatives v. McGahn*, 968 F.3d 755, 775 (D.C. Cir. 2020) (quoting *Va. House of Delegates v. Bethune-Hill*, 587 U.S. 658, 667 (2019)); *see also Raines v. Byrd*, 521 U.S. 811 (1997).  The 2024 Act includes a notice requirement for the benefit of Congress itself, not Plaintiffs.  Such reporting requirements are "incidental to the legislative function of Congress," *Morrison v. Olson*, 487 U.S. 654, 694 (1988) (citing *McGrain v. Daugherty*, 273 U.S. 135 (1927)), and are "a management tool employed by Congress for its own purposes," *Nat. Res. Def. Council, Inc. v. Hodel* ("*NRDC*"), 865 F.2d 288, 319 (D.C. Cir. 1988).

Irrespective of Defendants' compliance with notification requirements, the D.C. Circuit has held that similar reporting requirements generally are not justiciable because they present a political question.  In *NRDC*, the D.C. Circuit rejected a challenge to the Secretary of the Interior's compliance with a statutory requirement to report certain decisions "in detail" to Congress.  865 F.2d at 317.  The court held that the adequacy of the Secretary's response was "quintessentially within the province of the political branches to resolve as part of their ongoing relationships." *Id.*

at 319.  The court recognized that congressional reporting requirements are "legion in federal law" and yet could not identify "a single pertinent authority that suggests, much less holds, that these commonplace requirements are judicially reviewable."  *Id.* at 317.  Such requirements involve "basic interrelationships between the Article I and Article II branches," *id.*, and are "distinct from the prototypical exercise of agency power" that affects individual rights, *id.* at 318.  At least where a reporting measure is "[l]acking a provision for judicial review," it "embodies a requirement that by its nature seems singularly committed to *congressional* discretion in measuring the fidelity of the Executive Branch actor to legislatively mandated requirements."  *Id.*

So too here.  The 2024 Act includes no provision authorizing judicial review of the congressional notification requirements.  Nor does it confer any rights on Plaintiffs (or any other individual)—which is "certainly relevant to the Judiciary's power to decide" the issue.  *See Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012).  Instead, there is "a textually demonstrable constitutional commitment of the issue to a coordinate political department"— namely, to Congress.  *See id.* at 195.  Congress is the only proper judge of whether the President has provided the "detailed" justification that Congress required to support its own legislative functions.  "If the Secretary's response has indeed been deemed inadequate (in the statutory sense of 'insufficiently detailed') by its recipient, then it is most logically for the recipient of the report to make that judgment and take what it deems to be the appropriate action."  *Hodel*, 865 F.2d at 319–20.  There also are no "judicially discoverable and manageable standards" by which this Court can judge the adequacy of the Secretary's notice.  *See Zivotofsky*, 566 U.S. at 195 (citation omitted).  As in *Hodel*, "the contention is not that the Secretary failed entirely to report back to Congress," but that "the Secretarial response lacked the requisite 'detail.'"  865 F.2d at 318.  "Whether a report to Congress is sufficiently 'detailed' within the meaning" of a statutory

reporting requirement is an "elusive" inquiry, "especially in light of the statute's apparent purpose to inform and further the ongoing interbranch negotiation process." *Id.* at 319. The 2024 Act simply provides no standard for deciding how "detailed" a notification must be to adequately support Congress's review of proposals to reorganize the Executive Branch.

*Second*, even if this Court were to evaluate the Secretary's compliance with the notice requirement, there was no violation. The Secretary provided adequate notice to Congress, including on March 28, 2025. Plaintiffs fault the Secretary for not providing a "detailed justification for any proposed action" to "eliminate" or "consolidate" USAID, *id.* at 844, but at the outset, the proposed action was to pause USAID's operations, which was designed to evaluate *whether* to transfer certain functions to the State Department. The Secretary need not provide a detailed justification for a conclusion that the Secretary has not yet made. Once the Secretary's plans matured, he provided the more detailed notification to Congress. *See* AR_0159 (Lewin Decl. Ex. N).

### B.  Defendants Have Not Acted Contrary to Law.

Although their complaint does not actually include a "contrary to law" claim, Plaintiffs include a footnote stating, "Specific actions undertaken to effectuate the dismantling are also contrary to law," Pls.' Mot. at 28 n.9, for two reasons. First, Plaintiffs contend that under 5 U.S.C. § 6329a(b)(1), agencies may only place employees on administrative leave for up to ten days. And second, they contend Defendants have violated the Prompt Payment Act, 31 U.S.C. § 3901 *et seq.*, requiring agencies to pay valid invoices by their contracted due date or within 30 days. Those contentions are forfeited. In any event, they lack merit. Although the statute that plaintiffs cite authorizes administrative leave for up to ten days, it does not exclude the possibility of longer-term administrative leave under other authorities. Indeed, the 2024 rule implementing the statute's

ten-day limits construes the act as not impairing the Executive Branch's long-asserted, general authority to place employees on administrative leave for those instances not governed by the investigate regime. *See* 5 C.F.R. § 630.1404(a) (construing the 6329a(b)'s ten-day limit on agencies' ability to "place" employees on leave as a limits to "a management-initiated action to put an employee in administrative leave status, with or without the employee's consent, for the purpose of conducting an investigation (as defined in § 630.1502)" and specifying that "[t]he 10–workday annual limit does not apply to administrative leave for other purposes.").[7]  According such flexibility to the President as he supervises and directs Executive Branch employees is particularly important in the setting of this suit concerning the realm of foreign affairs, where the President enjoys great latitude to craft policy and actions as he sees fit. *See infra* Section IV.A.

And as to the Prompt Payment statute, although Plaintiffs allege Defendants have "violate[d]" that statute, Pls.' Mot. at 28 n.9, they do not identify any particular invoices (let alone invoices describing payments owed *to Plaintiffs*) that allegedly have gone unpaid.  Similarly, they do not assert that any potential stoppage of payments violated any actual contracts, many or all of which provide that the Government may withdraw from its obligations if compliance is determined to no longer be in the national interest.  AR_0055 (Lewin Decl. Ex. C 2/18 Marocco Decl. ¶¶ 23, 24).  Moreover, the Federal Acquisition Regulation permits "[s]top-work orders [to be] used, when appropriate, . . . if work stoppage may be required for reasons such as . . . realignment of programs." 48 C.F.R. § 42.1303.

### C.  Defendants Have Not Acted Arbitrarily and Capriciously (Count V).

---

[7] And again, Plaintiffs' members have a separate statutory scheme for bringing these types of challenges. *See supra* Section I.B.

Plaintiffs further err in arguing that Defendants' "decision to shut down USAID" is arbitrary and capricious. Pls.' Mot at 28–32. As already explained, Plaintiffs have not identified discrete, reviewable, final agency actions to form the basis of such a challenge. In any event, Defendants adequately explained the actions that they have taken thus far.

*First*, Plaintiffs err by arguing that Defendants failed to articulate a rational connection between the facts and the choices they made. *See id.* at 28–29. Plaintiffs perplexingly claim that Defendants have "fail[ed] to provide *any* reasoned explanation for the shutdown decision as a whole." *Id.* at 28 (emphasis added). But that contention overlooks the numerous declarations Defendants have already submitted in this case—all prior to any dispositive motions briefing, as well as the Administrative Record. Indeed, Defendants have gone to great lengths to explain the basis for the actions they took. *See supra* at 9–14.

Relatedly, Plaintiffs assert that "the decision to dismantle USAID cannot be reasonably explained as a review of agency programs for consistency" with the Administration's agenda, which simply attempts to substitute Plaintiffs' judgments for those of the President and the Secretary of State. Pls.' Mot. at 29. Their argument fundamentally misunderstands that the entire reason for the pause in activity at USAID is to permit "reviews of such programs for programmatic efficiency and consistency with United States foreign policy, to be conducted within 90 days of this order" and "[t]he responsible department and agency heads, in consultation with the Director of OMB, will make determinations within 90 days of this order on whether to continue, modify, or cease each foreign assistance program based upon the review recommendations, with the concurrence of the Secretary of State." Exec. Order No. 14,169 §§ 3(a), (c). President Trump and Secretary Rubio exercised their discretion to determine that it would not be possible to consider the consequences of various approaches in the absence of a temporary pause because it was

impossible to access sufficient information in one place to determine whether the foreign assistance policies and interests supported by appropriations are not duplicated, are effective, and are consistent with President Trump's foreign policy. AR_0014–16 (Lewin Decl., Ex. A 2/10 Marocco Decl. ¶¶ 5–8). *Second*, Plaintiffs err by arguing that Defendants failed to consider important aspects of the problem.  *See* Pls.' Mot. at 29–32.  In particular, Plaintiffs argue Defendants failed to consider the asserted "reliance" interests of USAID employees, the "reliance" interests of businesses and nonprofits that might have to reduce or cease operations, and, in addition, the harmful consequences to beneficiaries of USAID programs, and the "wastefulness" of terminating certain programs.  Those arguments are mistaken.  Plaintiffs' views of what subjective expectations independent nonparty employees and independent nonparty funding recipients had about how USAID would "exercise its enforcement discretion" regarding working conditions and foreign assistance funding arrangements do not amount to "serious reliance interests" for purposes of Plaintiffs' APA claims.  *See FDA v. Wages & White Lion Invs., LLC*, No. 23-1038, 2025 WL 978101, at *22 (Apr. 2, 2025) ("[S]uch a belief about how an agency is likely to exercise its enforcement discretion is not a 'serious reliance interes[t].'") (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).  In any event, the Administrative Record describes how Defendants considered the effects of their actions on USAID employees, AR_0004–06 (Lewin Decl. ¶¶ 18–20), and on affected businesses and nonprofits, AR_0006, AR_0008, AR_0009 (Lewin Decl. ¶¶ 22, 26–31).  Plaintiffs' sheer speculation based on unsubstantiated news articles that Defendants' "actions have led to death, impoverishment, and sicknesses," Pls.' Mot. at 31, and that food spoiled because it could not be delivered, *id.* at 32, are fundamentally policy disagreements with Defendants, not valid APA arguments.  For example, any time USAID chooses to use its limited resources to fund one initiative and not another,

Plaintiffs could level the same allegation that some harm to a nonparty resulted from USAID's failure to fund the initiative that Plaintiffs would prefer the agency support. But although that may be the basis for a political disagreement, it most certainly is not the basis for an APA claim.

Ultimately, the court's review under the APA is "narrow," and the court "is not to substitute its judgment for that of the agency." *State Farm*, 463 U.S. at 43. Under that "deferential" standard, a court "simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021) (citation omitted). No relief is available where, as here, Plaintiffs simply disagree with an agency's reasonable weighing of the different considerations involved in a policy decision.

*Third*, Plaintiffs, in a single conclusory sentence, wrongly claim that Defendants failed to consider less disruptive alternatives. *See* Pls.' Mot. at 32. The many declarations filed to date and the Administrative Record resoundingly refute that notion. AR_0002, AR_0003 (Lewin Decl. ¶¶ 4, 12).

## IV. DEFENDANTS DID NOT VIOLATE THE CONSTITUTION (Counts I and II).

Plaintiffs also cannot succeed by repackaging their statutory claims as alleged constitutional violations. Plaintiffs claim that the challenged actions run afoul of various statutory provisions, but those are statutory claims, not constitutional claims. The Supreme Court has rejected Plaintiffs' position "that whenever the President acts in excess of his statutory authority, he also violates the constitutional separation-of-powers doctrine." *Dalton v. Specter*, 511 U.S. 462, 471 (1994). As discussed above, the challenged actions are supported by numerous statutes that authorize the President or his delegee to determine which agency to task with the administration of foreign aid. To be sure, Plaintiffs disagree with the government's interpretation of those statutes, arguing that the challenged actions violate various provisions of FARRA and the

60

FCAA of 2024.  But such "claims simply alleging that the President has exceeded his statutory authority" under the FAA and similar statutes are not 'constitutional' claims," *id.* at 473.  Courts have a long tradition of "distinguish[ing] between claims of constitutional violations and claims that an official has acted in excess of his statutory authority."  *Id.* at 472.  Where, as here, the President is acting pursuant to statutory authority (and not, as in *Youngstown*, with "the conceded absence of any statutory authority"), Plaintiffs bring a statutory claim that "the President acted in excess of such authority."  *Id.* at 473.  Any other approach would improperly transform routine statutory violations, including of procedural notice requirements, into constitutional violations.  Hence, Plaintiffs' claims in Counts I and II fail at the outset because they are repackaged statutory claims essentially identical to the erroneous APA contentions that should be rejected for the reasons stated above.

Moreover, as with their statutory claims, Plaintiffs cannot satisfy the zone-of-interests requirement for those constitutional claims.  As explained above, they have predicated their challenges not on asserted direct harms to themselves, but on harms to independent nonparties (such as nonparty federal employee members of the union Plaintiffs and nonparty "NGO partners" of Oxfam), but they have not met the traditional Article III and prudential standing requirements to proceed.  *See supra* Sections I.C–D. *Cf. Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 812 (D.C. Cir. 1987) ("If the litigant asserts both his own rights and those of third parties, then he must satisfy the zone of interests test with respect to both his own interests and those of the third parties whose rights he has standing to assert.").  Whatever the prospects those independent nonparties may have for meeting the zone-of-interests test for the separation of powers and the Take Care Clause, there is no basis for allowing Plaintiffs to assert the claims of those independent nonparties. *See Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S.

464, 475 (1982) (Plaintiffs' complaint must "fall within 'the zone of interests to be protected or regulated by the statute *or constitutional* guarantee in question.'") (emphasis added) (citation omitted); *cf. DKT Mem'l Fund Ltd. v. Agency for Int'l Dev.*, 887 F.2d 275, 291 (D.C. Cir. 1989) (foreign nongovernmental organizations "do not enjoy standing to assert the constitutional claims under any application of the zone of interest analysis").

In any event, even if viewed through a constitutional lens, Plaintiffs' claims fail on the merits.  They are not plausibly alleged, warranting Rule 12(b)(6) dismissal, or, alternatively, they fail at summary judgment.

### A. Count I (Separation of Powers) Additionally Fails Because the Challenged Actions Are Supported by the President's Article II Authority, Numerous Statutes, and Historical Practice.

Plaintiffs argue that Defendants violated the constitutional separation of powers because "Defendants lack authority unilaterally to shutter USAID."  Pls.' Mot. at 21.  But neither the separation of powers nor the Take Care Clause generally constrains how the President organizes the Executive Branch, reflecting "the well-established rule that the Government has traditionally been granted the widest latitude in the 'dispatch of its own internal affairs.'"  *See Sampson v. Murray*, 415 U.S. 61, 83 (1974) (citation omitted).  Article II of the Constitution gives the President a "vast share of responsibility for the conduct of our foreign relations," *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610–11 (1952) (Frankfurter, J., concurring)).  The President exercises that authority by, among other things, ensuring that the Executive Branch is well organized to properly administer foreign aid.  Such actions are intertwined with diplomacy and foreign relations, which fall within the "plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations."  *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 319–20 (1936).

Contrary to Plaintiffs' contention, Pls.' Mot. at 21–22, *Youngstown* does not support them. Plaintiffs identify no statute that bars USAID's restructuring. To the contrary, Congress has recognized and reinforced the President's authority in this area, enacting myriad statutes that authorize the President to organize the administration of foreign aid. *See supra* Section III.A. Numerous administrations have exercised their authority in similar ways, including by transferring USAID functions to the State Department. *See id.* Thus, to the extent the *Youngstown* framework applies at all (which it does not, given that Plaintiffs allege statutory violations), the challenged actions fall into Category 1, not Category 3 as Plaintiffs claim. *See Youngstown*, 343 U.S. at 635 (Jackson, J., concurring) ("When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate."); *Schneider v. Kissinger*, 412 F.3d 190, 195 (D.C. Cir. 2005) ("It cannot [] be denied that decision-making in the areas of foreign policy and national security is textually committed to the political branches."); *Bancoult v. McNamara*, 445 F.3d 427, 433 (D.C. Cir. 2006) ("[A]n extensive list of constitutional provisions . . . entrusted foreign affairs and national security powers to the political branches."); *Chi. & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948) ("[T]he very nature of executive decisions as to foreign policy is political, not judicial. Such decisions are wholly confided by our Constitution to the political departments of the government, Executive and Legislative.''); *Johnson v. Eisentrager*, 339 U.S. 763, 789 (1950) (noting that the President is "exclusively responsible" for "conduct of diplomatic and foreign affairs" (citation omitted)); *Harisiades v. Shaughnessy*, 342 U.S. 580, 589 (1952) (matters relating "to the conduct of foreign relations . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference"); *Worthy v. Herter*, 270 F.2d 905, 911 (D.C. Cir. 1959) ("It is settled that in respect to foreign affairs the

President has the power of action and the courts will not attempt to review the merits of what he does.  The President is the nation's organ in and for foreign affairs.").

At bottom, Plaintiffs challenge a general policy initiated by the President—and implemented by his subordinates—to pause general aid to confirm that those initiatives were within the national interest.  That fits comfortably within the Executive Branch's unique expertise and constitutional role; and it is the sort of conduct that a federal court should be loath to disrupt, absent a valid and binding direction to the contrary.  Indeed, Plaintiffs create their own constitutional problem:  They ask a court to superintend an agency by declaring the sum of agency actions unconstitutional, which would itself create separation of powers concerns by effectively authorizing a "broad programmatic attack" and the kind of "day-to-day oversight of the executive's administrative practices" for which courts are "ill-suited."  *City of New York v. Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2019).  Plaintiffs simply have not made the "extraordinarily strong showing" required for injunctive relief related to foreign affairs, which would "deeply intrude[] into the core concerns of the executive branch."  *Adams v. Vance*, 570 F.2d 950, 954–55 (D.C. Cir. 1978).

## B. Count II (Take Care Clause Violation) Additionally Fails Because the Take Care Clause Cannot be Used to Obtain Affirmative Relief.

Plaintiffs attempt to circumvent the limitations of the APA by asserting a broad programmatic attack against the President and the agency Defendants under the Take Care Clause, U.S. Const. art. II, § 3.  *See* FAC ¶¶ 71–79 (Count II).  Plaintiffs' theory is that Defendants' actions "violate the Take Care Clause because they violate duly enacted statutes establishing USAID as an independent agency," *id.* ¶ 74, and they seek both declaratory and injunctive relief to correct this alleged failure, *id.* at 32, Prayer for Relief (b).  It should be noted at the outset that the Government is not aware of any case that has ever held that the Take Care Clause can be used as

a mechanism to obtain affirmative relief. Plaintiffs cannot prevail on their Take Care Clause claim because the Take Care Clause does not provide a cause of action against the President or any other Defendant, and this Court, in any event, has no jurisdiction to issue declaratory or injunctive relief against the President in his official capacity based on constitutional claims, *see Dalton*, 511 U.S. at 473–74. Moreover, even if the Clause could furnish a basis for affirmative relief, Plaintiffs seek to rely on violations of purported duties that are found nowhere in the statutes establishing USAID, but rather, are based on Plaintiffs' subjective views about how to best implement and administer USAID.

In their complaint, Plaintiffs cite *Angelus Milling Co. v. Commissioner of Internal Revenue*, 325 U.S. 293, 296 (1945) for the proposition that "[t]he Take Care Clause is judicially enforceable against presidential actions that violate or undermine statutes duly enacted by Congress." FAC ¶ 73. But that case holds no such thing and does not even mention the Take Care Clause. *See Angelus Milling Co.*, 325 U.S. at 296 (holding only and uncontroversially that "[i]nsofar as Congress has made explicit statutory requirements, they must be observed and are beyond the dispensing power of Treasury officials"). Plaintiffs' motion for summary judgment misleadingly cites a D.C. District Court case that they imply suggests that Take Care Clause claims are justiciable. *See* Pls.' Mot. at 22. But that decision, *Ctr. for Biological Diversity v. McAleenan*, 404 F. Supp. 3d 218, 249 (D.D.C. 2019) (citation omitted), recognized that "it is not at all clear that a claim under the Take Care Clause presents a justiciable claim for this Court's resolution" and dismissed the plaintiffs' Take Care Clause claim for failure to state a claim. Plaintiffs actually make almost no substantive argument beyond conclusory allegations supporting their Take Care Clause argument. *See* Pls.' Mot. at 22–23.

Through the Take Care Clause, the Constitution vests broad, discretionary authority to "take Care that the Laws be faithfully executed" by the President. U.S. Const. art. II, § 3. Inevitably, the Laws that the President executes are those enacted by Congress. But no court has read the Take Care Clause as opening the door to any plaintiff seeking to challenge the way the President executes Congress's laws. Rather, the duty of the President when exercising his power to see that the laws are faithfully executed is "purely executive and political," and not subject to judicial direction. *Mississippi v. Johnson,* 71 U.S. (4 Wall) 475, 499 (1866); *see Marbury,* 5 U.S. (1 Cranch) at 137 ("[T]he President is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character."). To hold otherwise would upset our constitutional scheme of separation of powers and allow judicial superintendence over the exercise of Executive power that the Clause commits to the President alone. *See Baker v. Carr*, 369 U.S. 186, 217 (1962) (courts lack jurisdiction over a claim where there is "a textually demonstrable constitutional commitment of the issue to a coordinate political department."); *see also Dalton*, 511 U.S. at 474–75 (judicial review of discretionary Presidential decisions "is not available"); *Lujan*, 504 U.S. at 577 (holding that it would be improper for the courts to take over the President's duty to "take Care that the Laws be faithfully executed" (quoting U.S. Const. art. II, § 3)); *Marbury*, 5 U.S. (1 Cranch) at 170 ("The province of the court is, solely, to decide on the rights of individuals, not to enquire how the executive, or executive officers, perform duties in which they have a discretion. Questions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court."); *Chi. & S. Air Lines*, 333 U.S. at 114 (refusing to review President's decision that "embod[ied] Presidential discretion as to political matters beyond the competence of the courts to adjudicate"); *Mississippi*, 71 U.S. at 499.

Nor does the Take Care Clause provide a basis to review the actions of subordinate Executive Branch officials.  The Clause speaks only to the President, not to his subordinates, and ensures that the President is principally responsible for the actions of the Executive Branch and directly accountable to the people through the political process.  *See Free Enter. Fund v. Pub. Co. Acct. Bd.*, 561 U.S. 477, 492–93 (2010) ("It is *his* responsibility to take care that the laws be faithfully executed."); *id.* at 495–97; *see also Printz v. United States*, 521 U.S. 898, 922 (1997); *Morrison v. Olson*, 487 U.S. 654, 689–90 (1988); *Clinton v. Jones*, 520 U.S. 681, 712–13 (1997) (Breyer, J., concurring).  A subordinate Executive officer cannot violate the President's duty to faithfully execute the laws.  To the extent Plaintiffs seek to challenge the other Federal Defendants' alleged attempt to undermine the statutes recognizing USAID, they cannot do so through the Take Care Clause, but must do so, if at all, through the APA, which in this case presents separate insurmountable obstacles for Plaintiffs.

Moreover, Plaintiffs' invocation of the Take Care Clause is particularly inappropriate as a mechanism to advance their own political and policy views.  Their challenge must fail because the actions that they identify are discretionary in nature.  For example, Plaintiffs challenge USAID's decision to reduce or cut funding for programs like clinics distributing HIV medication, soup kitchens in Sudan, and rehydration salts to treat diarrhea in Zambia, *see* FAC ¶ 24, but these are discretionary decisions made by the agency based on its experience and expertise.  The discretionary nature of these programs makes them ill-suited for a Take Care Clause challenge because it is within the President's purview to interpret the statutory guidance Congress provides him as he sees fit in executing the duties of the executive branch.

## V.  PLAINTIFFS DID NOT ACT *ULTRA VIRES* (Counts I, III, and IV).

Plaintiffs argue Defendants acted outside their constitutional and statutory authority in Counts I, III, and IV of their amended complaint, and then assert a non-statutory right to enjoin

*ultra vires* action in Counts I and III. *See* FAC ¶¶ 59, 82, 84. Plaintiffs' Count I and III *ultra vires* claims are improper because Plaintiffs can, and do, seek review under the APA in Count IV. *Ultra vires* review is "extraordinarily narrow," *Hartz Mountain Corp. v. Dotson*, 727 F.2d 1308, 1312 (D.C. Cir. 1984), covering only "extreme agency error," *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 509 (D.C. Cir. 2019) (citation omitted). *Ultra vires* claims are generally limited to circumstances where a plaintiff is completely deprived of a means of vindicating its statutory rights and lacks any other mechanism for judicial review. *See Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022) ("To prevail on an *ultra vires* claim, the plaintiff must establish . . . there is no alternative procedure for review of the statutory claim . . . ."); *see also Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 765 (D.C. Cir. 2022) (explaining *ultra vires* review's "demanding standard" is necessary because it is based on the assumption Congress has not statutorily barred judicial review of agency action). Hence, the Court can only reach the merits of the *ultra vires* claims if it concludes that APA review is unavailable, and even then, the claims fail for the same reasons as those described above as to the APA, given that "if the plaintiff's claims would have failed under the APA, then those same claims necessarily 'could not succeed under' *ultra vires* review, which has an even 'narrower scope.'" *See id.* (quoting *Trudeau v. FTC*, 456 F.3d 178, 190 (D.C. Cir. 2006)).

The *ultra vires* claims also fail because Counts I, III, and IV are duplicative. Counts I and III explicitly repeat each other: "Plaintiffs have a non-statutory right of action to declare unlawful official action that is ultra vires." FAC ¶¶ 59, 82. Plaintiffs continue to conflate their claims in their Motion for Summary Judgment. Regarding Count I, Plaintiffs argue that "[g]iven the constitutional [separation] of power, Defendants lack authority unilaterally to shutter USAID." Pls.' Mot. at 21. And on Count IV, Plaintiffs argue Defendants' actions violated the FCAA because

they used appropriated funds to "reorganize" USAID without prior consultation with the appropriate congressional committees. *Id*. at 27. Plaintiffs then use their Count III *ultra vires* claim to rehash their Count I and IV arguments—asserting that "[b]ecause Defendants have violated applicable statutes in shutting down USAID, their actions are ultra vires and should be enjoined by the Court." *Id*. at 33. Such arguments are refuted above, *see supra* Sections III.A, IV.A. For the same reasons that the challenged actions are lawful, they are not "*ultra vires*," "that is, in clear excess of statutory authority." *Fed. Express*, 39 F.4th at 762.

## VI. ANY RELIEF GRANTED ON SUMMARY JUDGMENT SHOULD BE NARROWLY TAILORED.

For all the foregoing reasons, the proper course is to dismiss the complaint or to grant summary judgment to Defendants. But at any rate, if the Court concludes it is necessary to grant summary judgment in part to Plaintiffs and to issue a remedy, any "injunction must be narrowly tailored to remedy the harm shown," *Gulf Oil Corp. v. Brock*, 778 F.2d 834, 842 (D.C. Cir. 1985), and is properly limited only to the Plaintiffs before the Court. And should the Court decide to issue any relief, the Government respectfully requests that the Court stay its order for a short time to permit the Government to consider whether to appeal.

*First*, extending relief to individuals not properly before the Court would violate the teaching (noted above in addressing Article III standing) that judicial remedies "must be tailored to redress the plaintiff's particular injury." *Gill*, 585 U.S. at 73 (citation omitted). A federal court may entertain a suit only by a plaintiff who has suffered a concrete "injury in fact," and the court may grant relief only to remedy "the inadequacy that produced [the plaintiff's] injury." *Id.* at 66 (citation omitted). Principles of equity reinforce those limitations, and "[u]niversal injunctions have little basis in traditional equitable practice." *DHS v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring). Indeed, nationwide injunctions "take a toll on the federal court system,"

69

and "prevent[] legal questions from percolating through the federal courts." *Trump v. Hawaii*, 585 U.S. 667, 713 (2018) (Thomas, J., concurring).

The presence of associational plaintiffs does not change those principles and cannot justify awarding relief to nonparties to this case who are "not the proper object of th[e court's] remediation." *Lewis v. Casey*, 518 U.S. 343, 358 (1996). Instead, at a minimum, equitable principles preclude granting relief to any member who has not been identified in Plaintiffs' filings and agreed to be bound by the judgment. *Alliance*, 602 U.S. at 401–02 (Thomas, J., concurring) (noting that "[u]niversal injunctions" as a means of granting relief to an entire association's members are "legally and historically dubious" (citation omitted)). Moreover, providing relief to any *unidentified* members of the associational plaintiffs in these circumstances undermines basic principles of preclusion and claim splitting. *See id.* at 402 (Thomas, J., concurring) (noting that broad associational standing "subverts the class-action mechanism" by allowing an organization to "effectively bring a class action without satisfying any of the ordinary requirements").

Plaintiffs' requests for remedies on summary judgment as to nonparties are inconsistent with the teaching that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted). Relief as to nonparties in this action would be especially improvident because the challenged actions stem from the President's exercise of his Article II authorities over foreign affairs—authorities that Congress has confirmed, not undermined, through various provisions of the foreign assistance statutes conferring marked discretion on Executive Branch agencies and the President. *See, e.g.*, 22 U.S.C. § 2151t(a).

*Second*, Plaintiffs' requests for remedies on summary judgment impermissibly seek structural relief incompatible with the separation of powers and the public interest. Their proposed

order would command particular "actions to reverse the dismantling of USAID" concerning both the working conditions of nonparty USAID employees and Defendants' decisions concerning nonparty funding recipients—including by overriding such agency choices as the appropriate "computer systems, webpages, and security systems" for employees.  Proposed Order, ECF No. 51-25 at 2.  That effort to transform this Court into an ongoing monitor of foreign assistance funding determinations would disrespect the role of the President in foreign affairs and would flout the separation of powers, which assigns to the President the "lead role" and "'vast share of responsibility for the conduct of our foreign relations.'"  *Am. Ins. Ass'n*, 539 U.S. at 414 (citation omitted); *see Sale*, 509 U.S. at 188; *see also, e.g.*, *First Nat'l City Bank*, 406 U.S. at 767 (plurality). Yet the proposed injunction would impede the Executive Branch in ensuring that foreign-aid payments are consistent with the President's policy priorities, disregarding  Moreover, the proposed order fails to account for the countervailing harms to the agency and the public from judicial superintendence of agency operations.  *See Cobell v. Kempthorne*, 455 F.3d 301, 316–17 (D.C. Cir. 2006) ("in light of the far-reaching effects this order would have on [Department of] Interior's operations," D.C. Circuit was "skeptical that the district court could provide . . . explanation" that "the public interest would benefit from" structural injunction, which D.C. Circuit vacated as abuse of discretion).

Relatedly, to the extent this Court orders any relief at all, it should limit such relief to the specific actions determined to be unlawful.  For example, to the extent that Plaintiffs broadly challenge the transfer of USAID's programs to the State Department, they have not identified any statutory provisions that prohibit the transfer of particular programs.  "[N]early all USAID programs are authorized through" the FAA, CRS, *USAID Under the Trump Administration*,

IN12500 at 2 (Feb. 3, 2025), and the FAA specifically authorizes the President to determine which agency to task with the administration of programs under that statute, 22 U.S.C. § 2381.

*Third*, the requested equitable and declaratory relief is categorically unavailable against the President, named as a defendant here. *See J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *13 (D.C. Cir. Mar. 26, 2025) (Millet, J., concurring) ("At common law, the Chancellor could not grant 'any relief against the king, or direct any act to be done by him.' This historic limitation carries forward to today and strips the federal courts of equitable 'jurisdiction . . . to enjoin the President in the performance of his official duties.'" (citations omitted)). Although courts of equity may in some circumstances permit suits to "enjoin unconstitutional actions by . . . federal officers," *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015), the availability of such relief depends on whether it "was traditionally accorded by courts of equity," *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999). There is no such tradition of equitable relief against the President. To the contrary, federal courts have "no jurisdiction of a bill to enjoin the President in the performance of his official duties." *Mississippi*, 71 U.S. (4 Wall.) at 501.[8] The Supreme Court reaffirmed that principle more recently in *Franklin*, 505 U.S. at 800–01, where the Court declined to construe the APA to supply a cause of action against the President

---

[8] Rejection of the demand for injunctive and declaratory relief against the President is correct whether viewed as a jurisdictional or merits determination. To be sure, D.C. Circuit and Supreme Court precedent indicates that the restriction in *Mississippi* is jurisdictional. The Supreme Court has repeatedly described the bar against suing the President for his official duties as jurisdictional in character. *See Franklin*, 505 U.S. at 802–03 (quoting *Mississippi*, 71 U.S. (4 Wall) at 501). And the D.C. Circuit has noted that "[w]ith regard to the President, *courts do not have jurisdiction to enjoin him*, . . . and have never submitted the President to declaratory relief." *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) (citations omitted) (emphasis added). Moreover, even if that bar were to be classified as non-jurisdictional, it still would be a "threshold" basis for ending the case without further inquiry into the merits. *Cf. Tenet v. Doe*, 544 U.S. 1, 6 n.4 (2005) ("unique and categorical" rule of *Totten v. United States*, 92 U.S. 105 (1876), prohibiting suits based on covert espionage agreements, is sort of "threshold question" court may "resolve[] *before* addressing jurisdiction" (emphasis added)).

"[o]ut of respect for the separation of powers and the unique constitutional position of the President." That tradition properly respects the President's "unique position in the constitutional scheme." *See Nixon v. Fitzgerald*, 457 U.S. 731, 748 n.27, 749–50 (1982) (declining to assume that implied damages "cause[s] of action run[] against the President of the United States"); *see also Franklin*, 505 U.S. at 827 (Scalia, J., concurring in part and concurring in the judgment).

In this case, similarly, the "reasons why courts should be hesitant to grant" injunctive relief "are painfully obvious" given the President's unique constitutional role and the potential tension with the separation of powers. *Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996). Although, for the reasons explained above, no relief at all is proper here, if the Court were to conclude otherwise, relief could only be directed at subordinate officials. *See id.*; *see also Doe 2 v. Trump*, 319 F. Supp. 3d 539, 541 (D.D.C. 2018) (dismissing "the President as a party").

The narrow exception potentially left open by *Mississippi* for injunctions seeking to direct the Executive to perform "ministerial" functions does not apply here. Left unresolved by that decision was "whether a court can compel the President to perform a ministerial act" (there, adjusting federal employee compensation under a statute). *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 607 (D.C. Cir. 1974). "A ministerial duty . . . is one in respect to which nothing is left to discretion." *Mississippi*, 71 U.S. at 498. "It is a simple, definite duty, arising under conditions admitted or proved to exist, and imposed by law." *Id.* Such a duty must be "so plainly prescribed as to be free from doubt and equivalent to a positive command." *Wilbur v. U.S. ex rel. Kadrie*, 281 U.S. 206, 218 (1930); *see also U.S. ex rel. McLennan v. Wilbur*, 283 U.S. 414, 420 (1931). But the alleged acts of the President here in issuing the Executive Order directing the "pause" cannot be characterized, as a matter of law, as "ministerial." Rather, the Executive Order entails an exercise of the President's discretion in supervising and directing the Executive Branch,

and an injunction invalidating that order would countermand that discretion, not direct the President to carry out a "ministerial" task.

Nor could Plaintiffs' invocation of the Declaratory Judgment Act warrant issuance of a declaration in lieu of an injunction: The D.C. Circuit's observation that courts "have never submitted the President to declaratory relief," *Newdow*, 603 F.3d at 1013, built on Justice Scalia's separate opinion in *Franklin*, which properly regarded declaratory relief as unavailable against the President under the same historical tradition denying injunctive relief against the President, 505 U.S. at 827 (Scalia, J., concurring in part and concurring in the judgment). Declaratory relief is therefore unavailable for essentially the same reasons that any injunction would be unavailable against the President.

## CONCLUSION

For these reasons, the Court should grant Defendant's motion to dismiss and dismiss this case in its entirety. In the alternative, the Court should deny Plaintiffs' motion for summary judgment and grant Defendants' motion for summary judgment.

Dated: April 7, 2025

Respectfully submitted,

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General
Civil Division

ALEXANDER K. HAAS
Director
Federal Programs Branch

LAUREN A. WETZLER
Deputy Director
Federal Programs Branch

CHRISTOPHER R. HALL
Assistant Branch Director
Federal Programs Branch

*/s/ Christopher D. Edelman*
CHRISTOPHER D. EDELMAN
INDRANEEL SUR
Senior Counsel
MICHAEL P. CLENDENEN
RICHARD C. GILES
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20005
Phone: (202) 305-8659
Email: christopher.edelman@usdoj.gov

*Counsel for Defendants*