# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| American Foreign Service Association, et al., | |
| *Plaintiffs*, | |
| v. | Case No. 1:25-cv-00352 |
| President Donald J. Trump, et al., | |
| *Defendants*. | |

## COMBINED REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR MOTION FOR SUMMARY JUDGMENT

Lauren Bateman (DC Bar No. 1047285)
Karla Gilbride (DC Bar No. 1005586)
Allison Zieve (DC Bar No. 424786)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

Kaitlyn Golden (DC Bar No. 1034214)
Kristen Miller (DC Bar No. 229627)
Rachel L. Fried (DC Bar No. 1029538)
Kayla M. Kaufman (DC Bar No. 90029091)
Robin F. Thurston (DC Bar No. 1531399)
Skye L. Perryman (DC Bar No. 984573)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090

*Counsel for Plaintiffs*

April 21, 2025

**TABLE OF CONTENTS**

INTRODUCTION ....................................................................................................................1

ARGUMENT .........................................................................................................................3

I. No jurisdictional barrier exists. ..........................................................................................3

    A. This case is not moot...................................................................................................3

    B. Plaintiffs' claims challenge USAID's dismantlement, not personnel actions. ...............4

        1. Denying district court jurisdiction would foreclose meaningful review. ............5

        2. The claims alleged are collateral to the administrative schemes. .......................5

        3. The claims do not fall within the expertise of the agencies. ..............................9

    C. Plaintiffs have standing. ...........................................................................................10

        1.  Oxfam, AFSA, and AFGE have organizational standing. ..............................10

        2. AFSA and AFGE have associational standing. .................................................12

II. Plaintiffs' APA claims are reviewable by this Court. .................................................14

    A. Dismantling USAID is a discrete agency action..........................................................14

    B. Dismantling USAID is final agency action.................................................................17

    C. The challenged action is not committed to agency discretion by law...........................19

    D. No alternative adequate remedies are available..........................................................21

III. Plaintiffs are entitled to summary judgment on their APA claims. .........................................22

    A. Dismantling USAID exceeds Defendants' statutory authority.....................................22

        1. Plaintiffs fall within the zone of interests of the FARRA and the FCAA. ........22

        2. Dismantling USAID violates FARRA............................................................24

        3. Dismantling USAID exceeds the authority provided by FARRA. ....................26

        4. Dismantling USAID exceeds Defendants' authority under the 2024 FCAA. ...29

i

B. Defendants' actions are arbitrary and capricious. .......................................................32

IV. Defendants' dismantling of USAID is unconstitutional. ........................................................35

    A.  Plaintiffs' constitutional claims are reviewable. ........................................................36

    B.  Defendants' action violates the separation of powers. ..................................................37

    C.  Defendants' action violates the Take Care Clause.  .....................................................38

V.  Plaintiffs properly seek non-statutory review of actions that are ultra vires. .........................41

VI. Plaintiffs' requested relief is appropriately tailored to address defendants' dissolution of USAID and the harms that dissolution is causing and will cause. .........................................43

CONCLUSION...............................................................................................................................45

# TABLE OF AUTHORITIES

**Cases**

*AIDS Vaccine Advocacy Coalition v. U.S. Department of State,*
    -- F. Supp. 3d --, No. 25-00400,
    2025 WL 752378 (D.D.C. Mar. 10, 2025)...........................................16, 20, 21, 33, 37, 41

*AFGE v. OPM,*
    -- F. Supp. 3d --, No. C 25-01780,
    2025 WL 900057 (N.D. Cal. Mar. 24, 2025)........................................................4, 5, 6, 9

*AFGE v. Trump,*
    929 F.3d 748 (2019)...........................................................................................................7

*In re Aiken County,*
    725 F.3d 255 (D.C. Cir. 2013) .......................................................................................20

*Air Transportation Association of America v. Reno,*
    80 F.3d 477 (D.C. Cir. 1996) .........................................................................................13

*Allina Health Services v. Sebelius,*
    746 F.3d 1102 (D.C. Cir. 2014) .....................................................................................43

*Aracely, R. v. Nielsen,*
    319 F. Supp. 3d 110 (D.D.C. 2018) .........................................................................15, 16

*Armstrong v. Exceptional Child Center, Inc.,*
    575 U.S. 320 (2015).......................................................................................................42

*Axon Enterprise, Inc. v. FTC,*
    598 U.S. 175 (2023).............................................................................................4–6, 9, 10

*Baker v. Carr,*
    369 U.S. 186 (1962).......................................................................................................40

*Bennett v. Spear,*
    520 U.S. 154 (1997).............................................................................................17, 18, 19

*Biden v. Texas,*
    597 U.S. 785 (2022).......................................................................................................17

*Block v. Community Nutrition Institute,*
    467 U.S. 340 (1984)....................................................................................................7, 8

iii

*Bowen v. Massachusetts,*
    487 U.S. 879 (1988)...........................................................................................22

*Bowen v. Michigan Academy of Family Physicians,*
    476 U.S. 667 (1986) .........................................................................................41

*Bowsher v. Synar,*
    478 U.S. 714 (1986)...........................................................................................36

*Center for Biological Diversity v. McAleenan,*
    404 F. Supp. 3d 218 (D.D.C. 2019) ..................................................................39

*Center for Sustainable Economy v. Jewell,*
    779 F.3d 588 (D.C. Cir. 2015) ..........................................................................14

*Chacoty v. Pompeo,*
    392 F. Supp. 3d 1 (D.D.C. 2019) ......................................................................42

*Chamber of Commerce v. Reich,*
    74 F.3d 1322 (D.C. Cir. 1996) ...............................................................41, 43, 45

*Chicago & Southern Air Lines v. Waterman S.S. Corp.,*
    333 U.S. 103 (1948)......................................................................................37, 38

*Church of Scientology of California v. United States,*
    506 U.S. 9 (1992)................................................................................................4

*City & County of San Francisco v. Trump,*
    897 F.3d 1225 (9th Cir. 2018) ...........................................................................20

*Clinton v. City of New York,*
    524 U.S. 417 (1998).......................................................................................... 45

*Community Services Administration,*
    7 F.L.R.A. 762 (1982)..........................................................................................5

*Dalton v. Specter,*
    511 U.S. 462 (1994)......................................................................................36, 39

*Dart v. United States,*
    848 F.2d 217 (D.C. Cir. 1988) ........................................................................41, 43

*Department of Commerce v. New York,*
    588 U.S. 752 (2019)......................................................................................20, 43

*Department of Homeland Security v. Regents of the University of California*,
　　591 U.S. 1 (2020)................................................................................................34, 43

*Detroit International Bridge Co v. Canada*,
　　189 F. Supp. 3d 85 (D.D.C. 2016) ...................................................................16

*El Rio Santa Cruz Neighborhood Health Center v. HHS*,
　　396 F.3d 1265 (D.C. Cir. 2005).......................................................................21, 22

*Elgin v. Department of Treasury*,
　　567 U.S. 1 (2012)..............................................................................................7

*Encino Motorcars, LLC v. Navarro*,
　　579 U.S. 211 (2016)..........................................................................................34

*Environmental Defense Fund v. Thomas*,
　　627 F. Supp. 566 (D.D.C. 1986) ......................................................................45

*FDA v. Alliance for Hippocratic Medicine*,
　　602 U.S. 367 (2024)..........................................................................................10, 11

*FDA v. Wages & White Lion Investments, LLC*,
　　145 S. Ct. 898 (2025)........................................................................................34

*Federal Express Corp. v. U.S. Department of Commerce*,
　　39 F.4th 756 (D.C. Cir. 2022)..........................................................................43

*Fornaro v. James*,
　　416 F.3d 63 (D.C. Cir. 2005)...........................................................................8

*Forrester v. U.S. Parole Comm'n*,
　　310 F. Supp. 2d 162 (D.D.C. 2004) .................................................................2

*Free Enterprise Fund v. Public Company Accounting Oversight Board*,
　　561 U.S. 477 (2010)..........................................................................................42

*Garcia v. Vilsack*,
　　563 F.3d 519 (D.C. Cir. 2009).........................................................................22

*Grosdidier v. Chairman, Broadcasting Board of Governors*,
　　560 F.3d 495 (D.C. Cir. 2009).........................................................................7

*HIAS, Inc. v. Trump*,
　　415 F. Supp. 3d 669 (D. Md. 2020).................................................................16

*Harmon v. Thornburgh,*
    878 F.2d 484 (D.C. Cir. 1989) .......................................................................................43

*Havens Realty Corp. v. Coleman,*
    455 U.S. 363 (1982)..........................................................................................................10

*Hazardous Waste Treatment Council v. Thomas,*
    885 F.2d 918 (D.C. Cir. 1989) .......................................................................................22

*Hills v. Gautreaux,*
    425 U.S. 284 (1976)...................................................................................................43, 44

*Hubbard v. U.S. EPA Administrator,*
    809 F.2d 1 (D.C. Cir. 1986) ............................................................................................42

*In re United Mine Workers of Am. Int'l Union,*
    190 F.3d 545 (D.C. Cir. 1999) .......................................................................................41

*Juliana v. United States,*
    947 F.3d 1159 (9th Cir. 2020) .......................................................................................42

*Kansas Health Care Ass'n v. Kansas Department of Social & Rehabilitation Services,*
    958 F.2d 1018 (10th Cir. 1992) ......................................................................................14

*Kendall v. U.S. ex rel. Stokes,*
    37 U.S. 524 (1838)....................................................................................................38, 41

*Kirwa v. United States Department of Defense,*
    285 F. Supp. 3d 257 (D.D.C. 2018) ...............................................................................33

*League of Women Voters v. Newby,*
    838 F.3d 1 (D.C. Cir. 2016) ............................................................................................12

*Lexmark International, Inc. v. Static Control Components, Inc.,*
    572 U.S. 118 (2014) ........................................................................................................23

*Local 2677, AFGE v. Phillips,*
    358 F. Supp. 60 (D.D.C. 1973) ................................................................................39, 40

*Louisiana v. Biden,*
    622 F. Supp. 3d 267 (W.D. La. 2022) ...........................................................................19

*Lujan v. National Wildlife Federation,*
    497 U.S. 871 (1990)...................................................................................................14, 15

*Madsen v. Women's Health Center*,
512 U.S. 753 (1994)........................................................................................43, 44

*Maryland v. USDA*,
-- F. Supp. 3d --, No. JKB-25-0748,
2025 WL 800216 (D. Md. Mar. 13, 2025).......................................................7, 18

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
567 U.S. 209 (2012)......................................................................................23, 24

*Milk Train, Inc. v. Veneman*,
310 F.3d 747 (D.C. Cir. 2002) ............................................................................20

*Mississippi v. Johnson*,
71 U.S. 475 (1866)...............................................................................................39

*Morgan Stanley DW Inc. v. Rothe*,
150 F. Supp. 2d 67 (D.D.C. 2001) ......................................................................11

*Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.*,
463 U.S. 29 (1983)........................................................................................33, 35

*Myers v. United States*,
272 U.S. 52 (1926)...............................................................................................27

*Natural Resources Defense Council, Inc. v. Hodel*,
865 F.2d 288 (D.C. Cir. 1988) ............................................................................32

*National Automobile Dealers Ass'n v. FTC*,
127 F.4th 549 (5th Cir. 2025) .............................................................................18

*National Council of Nonprofits v. OMB*,
-- F. Supp. 3d --, No. 25-cv-239,
2025 WL 368852 (D.D.C. Feb. 3, 2025) .............................................................19

*National Mining Ass'n v. Army Corps of Engineers*,
145 F.3d 1399 (D.C. Cir. 1998)...........................................................................43

*National Treasury Employees Union v. Nixon*,
492 F.2d 587 (D.C. Cir. 1974) ............................................................................40

*\*National Treasury Employees Union v. Vought*,
-- F. Supp. 3d --, No. CV 25-0381,
2025 WL 942772 (D.D.C. Mar. 28, 2025)................................9, 10, 12, 14–19

*New York v. Trump,*
  -- F. Supp. 3d --, No. 25-cv-39-JJM-PAS,
  2025 WL 715621 (D.R.I. Mar. 6, 2025) ....................................................17–19

*Nixon v. United States,*
  506 U.S. 224 (1993)................................................................................40

*Norton v. Southern Utah Wilderness Alliance,*
  542 U.S. 55 (2004)............................................................................14, 15

*Nyunt v. Chairman, Broadcasting Board of Governors,*
  589 F.3d 445 (D.C. Cir. 2009) ..................................................................8

*O.A. v. Trump,*
  404 F. Supp. 3d 109 (D.D.C. 2019) ...........................................................44

*O'Hair v. White,*
  675 F.2d 680 (5th Cir. 1982) ....................................................................14

*Payne v. Biden,*
  62 F.4th 598 (D.C. Cir. 2023)....................................................................8

*PayPal, Inc. v. CFPB,*
  728 F. Supp. 3d 31 (D.D.C. 2024) .............................................................35

*Richardson v. Trump,*
  496 F. Supp. 3d 165 (D.D.C. 2020) ...........................................................43

*Richmond Tenants Organization v. Kemp,*
  956 F.2d 1300 (4th Cir. 1992) ..................................................................43

*SEC v. Chenery Corp.,*
  332 U.S. 194 (1947)................................................................................35

*Schneider v. Kissinger,*
  412 F.3d 190 (D.C. Cir. 2005) ..................................................................37

*Soucie v. David,*
  448 F.2d 1067 (D.C. Cir. 1971) ................................................................45

*Southwest Airlines Co. v. U.S. Department of Transportation,*
  832 F.3d 270 (D.C. Cir. 2016) ..................................................................18

*Summers v. Earth Island Institute,*
  555 U.S. 488 (2009)............................................................................31, 32

*Tanner-Brown v. Haaland*,
    105 F.4th 437 (D.C. Cir. 2024) .......................................................................13

*Thunder Basin Coal Co. v. Reich*,
    510 U.S. 200 (1994) ..........................................................................................5

*Travelers United, Inc. v. Hyatt Hotels Corp.*,
    -- F. Supp. 3d --, No. 23-cv-2776,
    2025 WL 27162 (D.D.C. Jan. 3, 2025) ....................................................13, 14

*Trudeau v. FTC*,
    456 F.3d 178 (D.C. Cir. 2006) .......................................................................42

*Trump v. Sierra Club*,
    140 S. Ct. 1 (2019) .........................................................................................24

*Twin Rivers Paper Co. v. SEC*,
    934 F.3d 607 (D.C. Cir. 2019) ................................................................22, 24

*United States v. Fausto*,
    484 U.S. 439 (1988) ..........................................................................................7

*Webster v. Doe*,
    486 U.S. 592 (1988) .......................................................................................42

*Weingarten v. Devos*,
    468 F. Supp. 3d 322 (D.D.C. 2020) ........................................................13, 14

*West Virginia v. EPA*,
    597 U.S. 697 (2022) .......................................................................................41

*Weyerhaeuser v. U.S. Fish & Wildlife Service*,
    586 U.S. 9 (2018) ....................................................................................20, 21

*Whitman v. American Trucking Ass'n*,
    531 U.S. 457 (2001) .......................................................................................43

*Widakuswara v. Lake*,
    -- F. Supp. 3d --, No. 25-cv-2390,
    2025 WL 945869 (S.D.N.Y. Mar. 28, 2025) ...............................9, 19, 20, 38, 40

*Williams Gas Processing-Gulf Coast Co. v. FERC*,
    475 F.3d 319 (D.C. Cir. 2006) .......................................................................33

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ..........................................................................36, 37, 45

*Z Street, Inc. v. Koskinen,*
    44 F. Supp. 3d 48 (D.D.C. 2014) ..................................................................42

*\*Zivotofsky ex rel. Zivotofsky v. Kerry,*
    576 U.S. 1 (2015) ......................................................................3, 21, 37, 40

## Constitutional Provisions

U.S. Const. art. I, § 8, cl. 1 ...........................................................................21

U.S. Const. art. I § 9, cl. 7 .............................................................................21

U.S. Const. art. II, § 3 ....................................................................................38

## Statutory Provisions and Legislative History

5 U.S.C. § 104 ...............................................................................................25

5 U.S.C. § 701(a)(2) ................................................................................19, 20

5 U.S.C. § 704 .........................................................................................14, 21

5 U.S.C. § 905(b) ..........................................................................................27

22 U.S.C. § 2151b(c)(1) ................................................................................29

22 U.S.C. § 2381(a) .......................................................................................28

22 U.S.C. § 6563 .....................................................................................23, 24

22 U.S.C. § 6581(a) .......................................................................................26

22 U.S.C. § 6592 ...........................................................................................25

22 U.S.C. § 6601 ...........................................................................................26

170 Cong. Rec. H1501-01 .............................................................................30

170 Cong. Rec. H2087....................................................................................30

Foreign Affairs Reform and Restructuring Act of 1998,
    Pub. L. No. 105-277, 112 Stat. 2681 (1998)...........................................23–26

Further Consolidated Appropriations Act, 2024,
    Pub. L. 118-47, 138 Stat 460 (2024).......................................................21–24, 29, 30, 38

**Other Authorities**

Cong. Rsch. Serv., RL33491, *Restructuring U.S. Foreign Aid: The Role of the*
    *Director of Foreign Assistance in Transformational Development* (2006),
    https://perma.cc/F4YX-MHQX ........................................................................28

Cong. Rsch. Serv., RL34243, *Foreign Aid Reform: Issues for Congress and*
    *Policy Options* (2009), https://perma.cc/F6NN-4BKJ...............................................27, 28

Cong. Rsch. Serv., R42852, *Presidential Reorganization Authority: History,*
    *Recent Initiatives, and Options for Congress* (2012),
    https://perma.cc/QY3T-XWG2...........................................................................27

DOJ, Office of Legal Counsel, *Limitations on Presidential Power to Create A New*
    *Executive Branch Entity to Receive & Administer Funds Under*
    *Foreign Aid Legislation*, 9 Op. O.L.C. 76 (1985)................................................27

GAO, *Foreign Aid Reform: Comprehensive Strategy, Interagency Coordination, and*
    *Operational Improvements Would Bolster Current Efforts*,
    GAO-09-192 (2009), https://perma.cc/X9Z8-BTVU ........................................28

GAO, *Delegation of Authorities to the Director of Foreign Assistance*,
    GAO B-316655 (2008), https://perma.cc/UGS2-W55D .................................28

George Ingram, *Institutional Architecture of U.S. Foreign Aid* (2017),
    https://perma.cc/G5JJ-QTEE ...........................................................................26

## INTRODUCTION

The material facts of this case are not in dispute: Defendants are dismantling USAID—a federal agency authorized by Congress—at an astonishing clip. In sweeping cuts, they have terminated 86 percent of USAID foreign assistance awards. AR_0273. And they "anticipate[]" that, by July 1 of this year, the Department of State will absorb certain functions of USAID, and by September 2, the remaining functions will be "wound down," thereby "retir[ing] USAID's independent operation." AR_0003–04; AR_0148. That process, Defendants explain, will entail eliminating "substantially all non-statutory positions" at the agency. AR_0004. Consequently, Defendants have notified "USAID personnel globally, across the civil and foreign services ... of a consolidated agency-wide Reduction-In-Force ('RIF') action." *Id.* Any personnel who currently remain are expected to participate in the "decommissioning of USAID assets and the wind-down of the Agency's independent operations." AR_0006. Concluding USAID's independent operations means, in Defendants' own telling, that "USAID missions overseas would be closed, U.S. direct hire personnel overseas would be returned to the United States, and most USAID locally employed staff would be separated from U.S. government service." AR_0265.

Defendants describe their actions as "USAID's Final Mission." AR_0147. And the President has made plain from the outset that Defendants' goal is not a reorganization of the agency; the goal is—in his words—to "CLOSE IT DOWN!" Pls.' Statement of Undisputed Material Facts (SOMF), ECF No. 51-2 at ¶ 60. Congress did not authorize any aspect of Defendants' actions. In fact, Defendants implicitly recognize as much: They acknowledge that "legislation" is necessary to "abolish USAID as an independent establishment." AR_0262. And they do not suggest that any such legislation exists.

Seeking to avoid judicial review, Defendants insist that the unlawful abolition of the agency is not the crux of Plaintiffs' challenge. By turns, Defendants cast Plaintiffs' challenge as one to the "simultaneous mass placement of all USAID workers on administrative leave," Mem. in Supp. of Defs.' Mot. to Dismiss or, in the Alternative, Mot. for Summ. J. and Opp'n to Pls.' Mot. for Summ. J. (Defs.' Mem.), ECF No. 70-1 at 17, to the foreign assistance "pause," *id.* at 42, 64, to a "reorganization" of the agency, *id* at 52, and to the President's foreign policy, *id.* at 36. Plaintiffs, however, have alleged and consistently argued that this action concerns Defendants' elimination of USAID.

In light of the uncontested facts, this Court should grant Plaintiffs' motion for summary judgment and deny Defendants' motion to dismiss.[1] To start, there is no jurisdictional barrier to relief. This case is not moot, and it cannot reasonably be characterized as a personnel dispute appropriate for an administrative forum. Moreover, Plaintiffs assert textbook Article III injuries, because the shutdown of USAID has led or will directly lead to economic and reputational consequences for Plaintiffs.

As for the substance of Plaintiffs' claims, no statute authorizes Defendants to abolish USAID, and doing so is final agency action. Notably, even after rounds of briefing and several declarations from government officials, Defendants have offered no reasoned explanation for the dismantlement of the agency, let alone any evidence that they considered reliance interests in the continued operation of the agency or that they contemplated any less disruptive alternative to the wholesale elimination of USAID.

---

[1] The administrative record is sufficient to resolve Plaintiffs' motion for summary judgment as to Plaintiffs' APA claims. This Court may also consider the undisputed facts in Plaintiffs' Statement of Undisputed Material Facts (ECF No. 51-2) with respect to statements made by Defendants and to standing. *See Forrester v. U.S. Parole Comm'n*, 310 F. Supp. 2d 162, 167 (D.D.C. 2004).

Defendants' closure of USAID is also unconstitutional. Defendants' repeated invocation of Executive authority in the realm of foreign affairs notwithstanding, "[t]he Executive is not free from the ordinary controls and checks of Congress merely because foreign affairs are at issue." *Zivotofsky ex rel. Zivotofsky v. Kerry,* 576 U.S. 1, 21 (2015). Defendants' action is likewise *ultra vires* because no statute or constitutional provision authorizes Defendants to dismantle USAID.

This Court should therefore halt the further unilateral destruction of a federal agency created by Congress and order Defendants to reverse their lawless action.

## ARGUMENT

**I.      No jurisdictional barrier exists.**

**A.      This case is not moot.**

Defendants' mootness argument turns on their characterization of the complaint in this case as "primarily challeng[ing]" the placement of workers on administrative leave. Defs.' Mem. at 17. As their pleading makes clear, though, Plaintiffs challenge the unlawful dissolution of USAID. *See* First Am. Compl. (FAC), ECF No. 30 at 26–31. Actions taken towards USAID personnel offer *evidence* that the agency is being shut down. But Plaintiffs' claims for relief do not turn on allegedly unlawful employment actions.

Plaintiffs' proposed order granting the motion for summary judgment reflects this reality. Although Defendants focus on the request that the Court order defendants to "recall[] all USAID employees currently placed on administrative leave," Proposed Order, ECF No. 51-25 at 2, they ignore that Plaintiffs also seek a declaratory judgment that Defendants' decision to dismantle USAID violated the separation of powers and the Take Care Clause, infringed on legislative authority, and is invalid; an injunction preventing Defendants from taking further actions to shut down USAID unless authorized by Congress; and numerous other discrete actions to reverse the dismantlement of the agency. *See id.* Contrary to Defendants' assertion, the Court can fashion

"meaningful relief in circumstances such as these." *Church of Scientology of California v. United States*, 506 U.S. 9, 12–13 (1992) (explaining that an intervening event does not render a case moot where the court can nonetheless order effectual relief).

### B.    Plaintiffs' claims challenge USAID's dismantlement, not personnel actions.

As Plaintiffs have repeatedly explained, this case challenges the shuttering of USAID. Defendants have carried out that process through a variety of actions, including announcing a plan to transfer or wind down agency functions and decommission its assets, *see* AR_0003–AR_0004, AR_0006, AR_0260; terminating nearly 90% of foreign assistance awards, *see* AR_0273; and emptying USAID buildings, *see* SOMF ¶¶ 65, 83–85. Not surprisingly, a decision to shut down an agency with nearly 5,000 employees also involves actions affecting employees, such as placing employees on administrative leave and initiating a "consolidated agency-wide Reduction-In-Force." AR_0004, AR_0018–19. Defendants themselves recognize this point, as they characterize their actions regarding USAID employees as necessary to accomplish their prime objective: the abolition of the agency. *See* AR_0004, Lewin Decl. at ¶ 16 (explaining that agency-wide reduction in force to eliminate "substantially all" positions at USAID is being undertaken "[a]s part of the reorganization and transfer of functions" from USAID to the State Department). It is that objective—not any particular personnel decision—that Plaintiffs challenge. *See* FAC at 26–31.

Plaintiffs' description of this suit as a challenge to the "systematic shutdown of the agency," Mem. of Law in Supp. of Pls.' Mot. for Summ. J. (Pls.' MSJ), ECF No. 51-1 at 16, then, is not "artful labeling," Defs.' Mem. at 26. It is an accurate description of the complaint, which concerns "fundamental, even existential" questions undergirding our Constitutional order. *Axon Enter. Inc. v. FTC*, 598 U.S. 175, 180 (2023); *see AFGE v. OPM*, -- F. Supp. 3d --, No. C 25-01780, 2025 WL 900057, at *3 (N.D. Cal. Mar. 24, 2025) (holding that employee unions' *ultra*

*vires* and separation of powers claims were not about employment decisions, but about whether the executive branch had any authority to direct agencies to terminate employees *en masse*).

Nonetheless, mischaracterizing Plaintiffs' claims, Defendants argue that this Court lacks subject-matter jurisdiction because it presents an employment dispute that belongs in an administrative forum. This case, however, does not challenge a personnel action; it challenges the dissolution of a federal agency. Neither the "sweeping constitutional claims" nor the APA claims pursuant to which Plaintiffs challenge that dissolution are the type that Congress intended to route through the systems established to resolve federal labor and personnel disputes. *Axon*, 598 U.S. at 189. And all three *Thunder Basin* factors—(1) whether denying district court jurisdiction could "foreclose all meaningful judicial review" of the claim, (2) whether the claim is "wholly collateral" to the statute's review provisions, and (3) whether the claim is "outside the agency's expertise"—support jurisdiction. *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212–13 (1994).

### 1. Denying district court jurisdiction would foreclose meaningful review.

As for the first *Thunder Basin* factor, Defendants offer no response to the point that judicial review following administrative proceedings cannot be meaningful if it comes "when the agency has long since ceased to exist." Pls.' MSJ at 19. That omission is telling, particularly in light of Defendants' plan to "substantially transfer[ ] to State or otherwise w[i]nd down" agency operations by September 2, 2025. AR_0003–04. Importantly, the Federal Labor Relations Authority has held that the termination of an agency moots an unfair labor practice proceeding pending before it. *See Cmty. Servs. Admin.*, 7 F.L.R.A. 762, 763 (1982).

### 2. The claims alleged are collateral to the administrative schemes.

Defendants argue that this case should be channeled to an administrative body because the relief requested includes recalling employees and restoring their systems access. *See* Defs.' Mem.

at 18–19. When considering the proper forum, however, "[t]he ultimate question is how best to understand what Congress has done" and whether the statutory review scheme "reaches the claim in question." *Axon*, 598 U.S. at 186. Again, Plaintiffs are not challenging personnel actions taken by Defendants against any particular USAID employee or group of employees. Rather, Plaintiffs challenge the shuttering of USAID, a "prior controlling event." *AFGE v. OPM*, 2025 WL 900057, at *3. That Defendants are carrying out their decision to dismantle the agency by placing on leave and terminating large swaths of the USAID workforce does not transform Plaintiffs' challenge to the agency's dissolution into an employment dispute.

Arguing otherwise, Defendants rely on this Court's preliminary injunction decision. *See* Defs.' Mem. at 19–20; *see* ECF No. 49 at 22. But in that decision, this Court emphasized that it reached its conclusion that Plaintiffs' claims likely fell within the statutory schemes of the Federal Service Labor Management Relations Statute (FSLMRS), Civil Service Reform Act (CSRA), and Foreign Service Act (FSA) in light of the procedural posture of the case at that time, noting that "based on their allegations of imminent irreparable harm, plaintiffs *at this point* seek the cessation of certain employment conditions presently affecting their members, such as their placement on administrative leave, their expedited repatriation, and their inability to perform certain job duties previously held." Mem. Op., ECF No. 49 at 21–22 (emphasis added). As the Court noted, "in the long run, plaintiffs' assertions of harm could flow from their constitutional and APA claims regarding the alleged unlawful 'dismantl[ing]' of USAID." *Id.* at 16. At that time, however, "the agency [was] still standing." *Id.*

Since then, both the facts and the procedural posture have meaningfully changed. Although the motion for preliminary relief naturally focused on the harm that was to imminently befall employees, the motion for summary judgment seeks relief from the illegal dismantlement of

USAID. Many of the steps that Defendants have taken to shut down the agency, including those that occurred after preliminary injunction briefing—such as Defendants' announcement that they intend to "realign[ ] certain USAID functions" to the Department of State and "discontinu[e] the remaining USAID functions," AR_0260—do not involve employment relationships at all.

Moreover, Plaintiff Oxfam America was not a party at the time of the Court's earlier ruling. *See* Mem. Op., ECF No. 49 at 9 n.1. The presence of a non-union plaintiff differentiates this case from decisions in which the Supreme Court or the D.C. Circuit have channeled a party into an agency forum. In each of those decisions, the plaintiffs were exclusively employees or their unions. *See, e.g.*, *Elgin v. Dep't of Treasury*, 567 U.S. 1, 6 (2012); *United States v. Fausto*, 484 U.S. 439, 441 (1988); *AFGE v. Trump*, 929 F.3d 748, 752 (2019); *Grosdidier v. Chairman, Broadcasting Bd. of Governors*, 560 F.3d 495 (D.C. Cir. 2009). Defendants suggest that Oxfam can seek remedies related only to award funding, not to agency personnel. *See* Defs.' Mem. at 21–22. As the declarations attest, however, Oxfam's injuries cannot be redressed unless USAID is functional because Oxfam relies on the expertise and logistical assistance of USAID personnel to perform its work. *See* Maxman Decl., ECF No. 30-1, ¶¶ 18–19; Second Maxman Decl., ECF No. 51-23, ¶ 11; *see also Maryland v. USDA*, -- F. Supp. 3d --, No. JKB-25-0748, 2025 WL 800216, at *14 (D. Md. Mar. 13, 2025) (rejecting the argument that the non-employee plaintiffs challenging mass termination of employees were "interjecting" themselves into the employment relationship, where those plaintiffs had suffered "unique harms" independent of "those harms' connection with the employee-agency relationship") (appeal pending).

Citing *Block v. Community Nutrition Institute*, 467 U.S. 340 (1984), Defendants argue that Oxfam is not authorized to raise claims that "affect[ ] federal employees." Defs.' Mem. at 22–23. In *Block*, the statutory scheme at issue established a mechanism for dairy handlers—but not for

consumers—to seek review of milk market orders issued by the Secretary of Agriculture. *Block,* 467 U.S. at 347. The Supreme Court held that the omission of consumers from the review provision indicated that Congress intended to foreclose consumer review. *Id.* Here, unlike in *Block*, Plaintiffs' claims fall entirely outside the scope of the statutory schemes related to federal personnel. *See* Pls.' MSJ at 17–19. Moreover, Defendants' breathtakingly capacious understanding of the scope of the FSLMRS, CSRA, and FSA would mean that no plaintiff could ever challenge any government action that in any way relates to or impacts federal employees or foreign service officers—an atextual reading of those statutes that goes far beyond what Congress intended.

Both because Plaintiffs' injuries stem from dissolving the agency entirely, and because Plaintiffs include non-employees, their claims are wholly collateral to the statutory review provisions for personnel and labor disputes. This case thus has little in common with cases like *Payne v. Biden*, 62 F.4th 598, 607 (D.C. Cir. 2023), *judgment vacated as moot*, 144 S. Ct. 480 (2023) (mem.), and *Fornaro v. James*, 416 F.3d 63 (D.C. Cir. 2005), where employee plaintiffs alleged harms stemming entirely from employment policies. *See Payne*, 62 F.4th at 604–06 (describing plaintiff's claim as a "challenge to adverse employment action … rooted in the looming disciplinary action" plaintiff faced for declining the COVID-19 vaccine); *Fornaro*, 416 F.3d at 64 (observing that plaintiffs sought "higher disability benefits" from the Office of Personnel Management); *see also Nyunt v. Chairman, Broadcasting Bd. of Governors*, 589 F.3d 445, 448–49 (D.C. Cir. 2009) ("systemwide" challenge to employment policy of not hiring U.S. citizens had to proceed under the CSRA). And despite Defendants' focus on the relief requested, that the remedy for their unlawful dissolution of a federal agency may address the termination of employees whose presence is necessary to that agency's continued operation does not transform this challenge to the unlawful dissolution of a federal agency into an employment dispute. *See*

*Nat'l Treasury Emps. Union v. Vought (NTEU)*, No. CV 25-0381 (ABJ), -- F. Supp. 3d --, 2025 WL 942772, at *46 (D.D.C. Mar. 28, 2025) (preliminarily enjoining actions to shut down the Consumer Financial Protection Bureau and ordering that "Defendants shall not terminate any CFPB employee, except for cause related to the individual employee's performance or conduct; and Defendants shall not issue any notice of reduction-in-force to any CFPB employee") (appeal pending); *Widakuswara v. Lake*, -- F. Supp. 3d --, No. 25-CV-2390, 2025 WL 945869, at *11 (S.D.N.Y. Mar. 28, 2025) (temporarily enjoining further actions to dissolve the U.S. Agency for Global Media (USAGM) and ordering that the defendants may "not take any action to reduce USAGM's workforce" including by "proceeding with any further attempt to terminate, reduce-in-force, place on leave, or furlough any USAGM employee").

### 3.    The claims do not fall within the expertise of the agencies.

For similar reasons, Plaintiffs' challenge does not fall within the expertise of the relevant agencies. That is because Plaintiffs do not challenge "employment conditions" at all. Defs.' Mem. at 2. Indeed, Plaintiffs' claims "have nothing to do with the" federal employment- and labor-related "matters [the agencies] regularly adjudicate." *Axon*, 598 U.S. at 193 (internal quotation marks and citations omitted). They are instead claims that the Executive Branch has exceeded its authority or otherwise acted *ultra vires*—the precise type of claims that administrative agencies are "ill suited" to address. *AFGE v. OPM*, 2025 WL 900057, at *2; *NTEU*, 2025 WL 942772, at *12 (exercising jurisdiction over a challenge, brought by an employee union and others, "to the wholesale cessation of activities—the decision to shut down the agency completely—which is not within the executive's authority").

The fact that a federal court might eventually review channeled claims, Defs.' Mem. at 26–27, is of no moment to whether agencies have the expertise to review those claims in the first place.

Here, the agencies know "a good deal" about federal labor and personnel law, but "nothing special about the separation of powers." *Axon*, 598 U.S. at 194.

For all of these reasons and those stated in Plaintiffs' memorandum in support of their motion for summary judgment, this case is within this Court's subject matter jurisdiction.

### C.    Plaintiffs have standing.

#### 1.    Oxfam, AFSA, and AFGE have organizational standing.

As the Supreme Court explained in *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 395 (2024), organizations have standing when the defendant's actions have "directly affected and interfered with" their "core business activities." *Id*. at 395 (discussing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 368 (1982)). Here, Defendants' actions have a concrete adverse impact on the core business activities of all three Plaintiffs. *See* Pls.' MSJ at 11–12. Although Defendants correctly note that standing cannot be premised on "[a]bstract [h]arms" stemming from policy "[d]isagreement," Defs.' Mem. at 35, the harms to Plaintiffs are concrete, including financial and reputational harm—textbook Article III injuries.

**a.** Focusing first on Plaintiff Oxfam America, Defendants contend that Oxfam asserts third-party standing. As Plaintiffs have explained, however, dismantling USAID has injured Oxfam directly. For instance, Oxfam implements programs funded by USAID, including through funding provided to the United Nations. *See* Second Maxman Decl., at ¶¶ 3–4. Since the cutoff of USAID funds, Oxfam projects partially funded by the United Nations—like one to provide clean and safe drinking water to thousands of people in South Sudan—are now on hold and may have to be discontinued entirely. *Id*.; Maxman Decl., at ¶ 16. This consequence of Defendants' actions directly interferes with Oxfam's mission. *See Alliance*, 602 U.S. at 395. In addition, "[i]n many countries where U.S. funding has been abruptly suspended, Oxfam faces direct physical harm and monetary injury." Second Maxman Decl., at ¶ 6. "Most members of the affected communities do

not follow international politics closely, and are likely to hold Oxfam responsible for an abrupt and inhumane discontinuation of lifesaving support." *Id*. Additionally, "Oxfam will be unable to fulfill contractual obligations to vendors," which "will put Oxfam staff in direct physical danger." *Id*. These injuries establish Article III standing. *See Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67, 77 (D.D.C. 2001) (finding reputational injury where those who depended on the company would lose "trust and goodwill"); *see also Alliance*, 602 U.S. at 384 (stating that non-regulated party may have standing to challenge government action that causes "downstream or upstream" injuries).

Further, as a consequence of defendants' actions, Oxfam will be forced to expend tremendous resources to "fill the $63 billion void left by USAID's abrupt dissolution," Maxman Decl., at ¶ 10; *see id.* at ¶ 11. These massive, unanticipated expenditures will interfere with Oxfam's core activities, as it will have to reallocate resources to ensure that it is able to meet minimum standards in its own programs. *Id.* at ¶ 11. For projects where Oxfam's partners have lost USAID funding, Oxfam will have to incur additional financial responsibility to keep those projects going. *See id*. at ¶¶ 12–13. And those "life-or-death decisions" about resource allocation, *id*. at ¶ 13, "will leave millions of children, women and men living without food, water, sanitation services, medicine, education, shelter, protection, or other essential emergency relief in disaster and conflict areas around the world," *id.* at ¶ 12. These consequences impede Oxfam's core work: fighting inequality, ending poverty and injustice, and offering lifesaving support in times of crisis, through, for example, delivery of food and clean water, installation of water systems, and other support to increase resilience of war-torn and hunger-ravaged communities. *See id*. ¶¶ 4–6.

**b.** As for Plaintiffs AFSA and AFGE, because the dues of their government-employee members fund these Plaintiffs, Defendants' actions have a concrete effect on their bottom lines.

Moreover, fighting for the member-workers is the whole province of each union. Further Chester Decl., ECF No. 51-14, at ¶ 3 ("AFSA is both the principal advocate for the long-term institutional wellbeing of the professional career Foreign Service and responsible for safeguarding the interest of AFSA members."); Second Johnson Decl., ECF No. 51-24, at ¶ 3 ("AFGE advocates on behalf of its members and seeks to promote dignity, safety, and fairness for government employees."); *see also* Further Chester Decl. at ¶ 6 (describing negotiating role). And Defendants' actions have forced AFSA and AFGE to divert their resources from other core activities, to support affected members. *See* Further Chester Decl. at ¶¶ 21–25 (describing activities undertaken to support members since USAID closures began); Second Johnson Decl. at ¶¶ 6–10. More succinctly stated, given that a government employee union's "existence depends on the existence of an agency workforce, the actions by defendants to eliminate the [agency] would undoubtedly 'make it more difficult for' the association 'to accomplish [its] primary mission.'" *NTEU*, 2025 WL 942772, at *15 (quoting *League of Women Voters v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016)).

### 2. AFSA and AFGE have associational standing.

Defendants do not dispute that AFSA and AFGE meet the first two prongs of associational standing: that AFSA and AFGE's members would have standing to sue in their own right and that they seek to protect interests germane to their purpose. *See* Defs.' Mem. at 33. Instead, Defendants assert that participation of AFSA and AFGE's members is necessary because Plaintiffs' claims require individualized determinations regarding the employment conditions of USAID employees. *See id.* at 34. That assertion is wrong on both the facts and the law.

As to the facts, as explained above, *see supra* I.B, Plaintiffs are not challenging employee-specific employment actions. Instead, they challenge the unlawful shutdown of the agency. Defendants cannot reasonably suggest that individual members' participation is needed to consider Defendants' actions transferring leases, taking down webpages, reorganizing lines of authority,

12

and cutting grant funding. Even as to Defendants' employment decisions, their own description of the facts reflects no individualized determinations are at issue and that no employee-specific findings are necessary to resolve this case. On their own telling, Defendants made decisions that affect AFSA and AFGE members *en masse*. In February, Defendants decided to place "a substantial number of USAID personnel" on administrative leave and began to do so on a rolling basis. AR_0018–19, Marocco Decl. at ¶ 12; *see also id.* at ¶ 13. And "beginning on March 28, 2025, USAID personnel *globally*, across the civil and foreign services, were notified of a *consolidated agency-wide* Reduction-In-Force ("RIF") action." AR_0004, Lewin Decl. at ¶ 17 (emphasis added). Because Defendants agree that they made no individualized decisions with respect to Plaintiffs' members, their assertion that adjudicating this matter requires "individualized proof" that is "peculiar to the individual member," Defs.' Mem. at 33, should be quickly rejected.

The case law on which Defendants rely is inapposite. *See Tanner-Brown v. Haaland*, 105 F.4th 437, 447 (D.C. Cir. 2024) (finding that "given the nature of the trust claim, a claim for an accounting requires information about an individual allottee's property, its lease terms and any earlier appointment of a representative or legally analogous action by the Secretary"); *Air Transp. Ass'n of Am. v. Reno*, 80 F.3d 477, 483 (D.C. Cir. 1996) (finding that individualized proof was needed where the plaintiff association sought reimbursement for individual travelers); *Travelers United, Inc. v. Hyatt Hotels Corp.*, -- F. Supp. 3d --, No. 23-cv-2776, 2025 WL 27162, at *12 (D.D.C. Jan. 3, 2025) (finding that individual participation was required for calculating monetary relief); *Weingarten v. Devos*, 468 F. Supp. 3d 322, 335–36 (D.D.C. 2020) (finding that individual participation was needed where "close to 190 paragraphs of the complaint contain[ed] detailed allegations about the distinctly different types and different amounts of process" that each affected

member received).[2] By contrast, here, where the suit "turns entirely on whether [the agency] complied with its statutory obligations, and the relief [Plaintiffs] seek[] is invalidation of agency action," individual participation is not necessary. *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 597 (D.C. Cir. 2015).

## II.    Plaintiffs' APA claims are reviewable by this Court.

Defendants' dismantling of USAID is final agency action that is subject to judicial review under the APA. *See* 5 U.S.C. § 704. Defendants' arguments to the contrary fail.

### A.    Dismantling USAID is a discrete agency action.

As a court in this district recently stated, "the impending closure of [an] agency" is "an action that can be a subject of review under the APA." *NTEU*, 2025 WL 942772, at *13. Defendants, however, assert that Plaintiffs have failed to plead "an identifiable action or event" and instead bring a "programmatic challenge." Defs.' Mem. at 41 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990), and *Norton v. S. Utah Wilderness All. (SUWA)*, 542 U.S. 55 (2004)). But again, Plaintiffs here—as in *NTEU* and unlike in *Lujan* and *SUWA*—do "not challenge the exercise of the agency's discretionary authority to regulate activities within its purview or to enforce particular statutory provisions." *NTEU*, 2025 WL 942772, at *12. They challenge "the decision to shut down the agency completely—which is not within the executive's authority." *Id.* Accordingly, unlike *SUWA*, this case does not run counter to the "purpose of the APA's discrete agency action requirement … 'to protect agencies from undue judicial interference with their

---

[2] The out-of-circuit cases cited by Defendants are likewise distinguishable. *See O'Hair v. White*, 675 F.2d 680, 692 (5th Cir. 1982) (holding that the plaintiff lacked associational standing where "constitutional violations affect [one member] alone and do not have any legal or practical significance for the rest of the [association's] membership"); *Kansas Health Care Ass'n v. Kansas Dep't of Social & Rehab. Serv.*, 958 F.2d 1018, 1021–22 (10th Cir. 1992) (holding that the plaintiff lacked associational standing where the court needed to investigate individual providers to determine reasonableness of reimbursement rates).

lawful discretion and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve.'" *Id.* (quoting *SUWA*, 542 U.S. at 66–67). As the court in *NTEU* elaborated:

> The decision to close an agency is not a theoretical or hypothetical concept – it's real. The agency is either open or it's not. It is either responding to calls from consumers or it's not. There is nothing abstract about firing employees, cutting off the funding stream, terminating contracts, or stopping all work[.]

*Id.* at *13.

Defendants' "repeated incantation of the word[] 'programmatic' … cannot "change the character of what is actually going on." *Id.* at *9. And whereas in *NTEU* Judge Jackson found "at least one discrete order before the Court," *id.* at *9, here, there are several discrete actions. *See, e.g.*, AR_0029–33 (Secretary Rubio's directive prohibiting the obligation of any new USAID funds and directing USAID contracting officers to issue stop-work orders on existing assistance awards; AR_0004, Lewin Decl. at ¶ 16 (USAID personnel globally were subject to a consolidated RIF in late March); SOMF ¶¶ 65, 83–85 (USAID headquarters closed). In addition, in unambiguous language, Defendants have repeatedly acknowledged the action challenged here: their decision to shutter USAID. *See* SOMF ¶¶ 60, 71 (collecting statements from President Trump to "CLOSE IT DOWN!" and "we have effectively eliminated [USAID]").[3] The decision is "final agency action" because it has had "an actual or immediately threatened effect." *Lujan*, 497 U.S. at 894, as their actions over the past two months confirm that Defendants. *See* Pls.' MSJ at 4–9; *cf. Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 138 (D.D.C. 2018) (finding final agency action where "Plaintiffs allege that Defendants took specific, discrete steps … and that those steps have harmed

---

[3] Although Defendants suggest that President Trump's statement in paragraph 71 of the Statement of Material Facts constitutes "inadmissible evidence from a news article," Defs.' Resp. to Pls.' Statement of Undisputed Material Facts, ECF No. 71-1 at ¶ 71, the statement is posted on the official White House website, *see* SOMF at ¶ 71.

them"). More recently, Defendants stated in a March 28 Memorandum that they "seek to retire USAID's independent operation." AR_0148. Likewise, in the March 28 Letter to Congress, they stated that they are "realigning certain USAID functions to the Department" of State and "discontinuing the remaining USAID functions." AR_0260. As each of these undisputed facts shows, "Plaintiffs are not engaged in a 'policy' disagreement with the agency, but a battle for its existence. *NTEU*, 2025 WL 942772, at \*13.

Defendants briefly assert that Plaintiffs cannot challenge the Foreign Aid Executive Order, Executive Order 14169—or any actions taken by the Agency Defendants to implement it—because such actions are presidential and therefore unreviewable under the APA. Defs.' Mem. at 40. Plaintiffs have not, however, alleged APA claims challenging the Executive Order. Their APA claims challenge final agency actions. *See generally* FAC at ¶¶ 83–93 (APA counts challenging the "dissolution of USAID"). The APA claims are far afield from those at issue in the cases on which Defendants rely, concerning the President's "discretionary authority." Defs.' Mem. at 40 (quoting *Detroit Int'l Bridge Co v. Canada*, 189 F. Supp. 3d 85, 100 (D.D.C. 2016)). The President has no "discretionary authority" to shutter an agency without Congress's authorization. *See AIDS Vaccine Advocacy Coal. v. U.S. Dep't of State* (*AVAC*), -- F. Supp. 3d --, No. 25-00400, 2025 WL 752378, at \*7 (D.D.C. Mar. 10, 2025) (finding jurisdiction over APA claims challenging the State Department's "directives implementing Executive Order No. 14169") (appeal pending); *HIAS, Inc. v. Trump*, 415 F. Supp. 3d 669, 682–83 (D. Md. 2020), *aff'd*, 985 F.3d 309 (4th Cir. 2021) (finding that APA claims, "even if not applicable to the President, [did] apply to" cabinet secretaries who implemented an Executive Order).

**B.      Dismantling USAID is final agency action.**

To be "final" for purposes of the APA, an agency action must (1) "mark the consummation of the agency's decisionmaking process" and (2) be an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (internal quotation marks omitted). Dismantling USAID satisfies both criteria.

First, Defendants have completed their decision to dissolve the agency. *See NTEU*, 2025 WL 942772, at *13 ("decision to shut down the [CFPB] entirely" was a "final, concrete decision"). Defendants themselves have referred to shuttering the agency as "USAID's Final Mission." AR_0147. Reflecting that the decision is final, Defendants are in the process of implementing it: They have cancelled 86% of foreign assistance awards, AR_0273, closed the agency's headquarters, SOMF ¶¶ 65, 83–85, and issued a global RIF to its personnel, AR_0004. The decision came from top agency officials, not staff—further evidence of final agency action. *See* Pls.' MSJ at 25 (collecting cases).

Second, this decision has enormous legal consequences. As Plaintiffs have explained, Defendants have subjected USAID to a massive reduction-in-force; they have ordered contractors and grant recipients to stop work or terminated their agreements; and humanitarian organizations have had to reallocate resources and have been left unable to fulfill contracts with vendors. Pls.' MSJ at 25; *see also Biden v. Texas*, 597 U.S. 785, 808–09 (2022) (holding that the decision to end the Migrant Protection Protocols program was final agency action because it forbade staff "to continue the program in any way from that moment on" (internal quotations omitted)); *New York v. Trump*, No. 25-cv-39-JJM-PAS, 2025 WL 715621, at *9 (D.R.I. Mar. 6, 2025) (holding that a funding freeze was final because its "legal consequence" was an "abrupt, categorical, and indefinite pause of obligated federal funds") (appeal pending); *Maryland v. USDA*, 2025 WL

800216, at *11 (holding that the mass termination of probationary employees was final agency action). Defendants do not dispute these legal consequences.

Defendants concede that they intend to shutter the agency, although they characterize the action as a "reorganization." Defs.' Mem. at 43. They assert, though, that the action is not final because "it remains to be determined how exactly" it will be carried out. Defs.' Mem. at 42; *see id.* at 43. This argument misunderstands the first prong of finality, which looks to whether the decisionmaking has come to an end, not whether the decision has been fully implemented. *See Bennett*, 520 U.S. at 178; *see, e.g.*, *Nat'l Auto. Dealers Ass'n v. FTC*, 127 F.4th 549, 554 (5th Cir. 2025) (adjudicating a challenge filed in January 2024, to an FTC rule with an effective date in July 2024). And that Defendants are currently implementing the decision evidences that the decision is final. *See Sw. Airlines Co. v. U.S. Dep't of Transp.*, 832 F.3d 270, 275 (D.C. Cir. 2016) ("In assessing whether" action "qualifies as final," courts "look[] to the way in which the agency subsequently treats the challenged action."). Most strikingly, their March 28 memorandum confirms their plan to "retire USAID's independent operation." AR_0148; *see* AR_0007 (noting that Defendants have returned USAID personnel to active duty "in preparation for the reorganization"). That some details of such a massive undertaking remain to be worked out does not alter the finality of the decision. *See NTEU*, 2025 WL 942772, at *13 (stating that the defendants' "attempts to deny what [is] afoot are at odds with the undisputed facts in the record and the documents produced by both sides").

Focusing on some of the specific actions taken to shut down the agency, Defendants argue that the 90-day freeze on foreign aid funds and the mass placement of employees on administrative leave are not final because both were temporary in nature and because the leave did not have legal consequences. Defs.' Mem. 42–43. Even putting aside that the final agency action at issue is the

18

decision to dismantle the agency, the freeze and *en masse* placement of employees on leave were final agency action. *See Louisiana v. Biden*, 622 F. Supp. 3d 267, 291–92 (W.D. La. 2022) (collecting cases in which agency decisions to pause or delay programs were held to be final agency actions); *see, e.g.*, *New York v. Trump*, 2025 WL 715621, at *8; *Nat'l Council of Nonprofits v. OMB*, 2025 WL 368852, at *11 (D.D.C. Feb. 3, 2025). Defendants also argue that Plaintiffs lack standing to challenge the funding terminations because they affect the rights only of non-parties. *See* Defs.' Mem. at 43. This argument suffers from two flaws: Plaintiffs challenge the USAID closure—which *does* affect the legal rights of Plaintiffs. And, in any event, Defendants conflate Article III standing with finality. *See Bennett*, 520 U.S. at 178.

## C.    The challenged action is not committed to agency discretion by law.

Defendants also assert that USAID's "funding decisions" are actions "committed to agency discretion by law" and, therefore, excepted from judicial review under the APA. Defs.' Mem. at 37 (citing 5 U.S.C. § 701(a)(2)). This argument once again mischaracterizes Plaintiffs' claims.

At the risk of repetition, Plaintiffs are challenging the wholesale dismantlement of the agency, which is *not* within Defendants' discretion under any source of law. The Constitution confers such authority on the legislature, not the executive branch, and Congress has not enacted any statute providing such authority to Defendants. *See* Pls.' MSJ at 21–22; *see also NTEU*, 2025 WL 942772, at *23 (finding that "defendants are not free to eliminate an agency created by statute on their own" and that such action likely violates the separation of powers); *Widakuswara*, 2025 WL 945869, at *2, *7 (holding that actions taken to "eliminate" the "functions" of the United States Agency for Global Media were not authorized by Congress and likely violated separation of powers). Defendants themselves concede that "legislation would be required to eliminate USAID." Defs.' Mem. at 49; *see* AR_0004; AR_0262 (planning to propose such legislation).

19

Moreover, even as to funding, Defendants are wrong to claim that their funding decisions are unreviewable. The Supreme Court "applie[s] a strong presumption favoring judicial review" under the APA. *Weyerhaeuser v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018), and "read[s] the exception in § 701(a)(2) quite narrowly, restricting it to those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" *Id.* (internal quotation marks omitted). Thus, the Court has "generally limited the exception to" actions "that courts traditionally have regarded as committed to agency discretion, such as a decision not to institute enforcement proceedings." *Dep't of Commerce v. New York*, 588 U.S. 752, 772 (2019) (internal quotation marks omitted). Whereas Defendants emphasize their discretion to decide how appropriated "funds 'could best be distributed,'" Defs.' Mem. at 38–39 (quoting *Milk Train, Inc. v. Veneman*, 310 F.3d 747 (D.C. Cir. 2002)), they do not have discretion *not* to expend the appropriated funds. *See In re Aiken County*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (stating "the President does not have unilateral authority to refuse to spend the funds"); *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018) (stating "the Administration may not … withhold properly appropriated funds in order to effectuate its own policy goals"); *Widakuswara*, 2025 WL 945869, at *7 ("By withholding the funds … the executive is usurping Congress' power of the purse."); *AVAC*, 2025 WL 752378, at *1 (holding that refusing to spend appropriated funds likely violates the separation of powers by "usurp[ing] Congress's exclusive authority to dictate whether the funds should be spent"); *see also AVAC*, 2025 WL 752378, at *15 (finding that defendants "have no intent to spend" the funds frozen by USAID). Accordingly, the funding decisions at issue in this case are not within Defendants' authority at all, much less committed to their discretion by law.

Although the funds are for foreign assistance, as Defendants emphasize, *see* Defs.' Mem. at 38, the Supreme Court has made clear that the Executive is "not free from the ordinary controls and checks of Congress merely because foreign affairs are at issue." *Zivotofsky*, 576 U.S. at 20. And the Constitution explicitly vests in Congress the power to spend and appropriate funds. U.S. Const. art. I, § 8, cl. 1; *id.* art. I § 9, cl. 7. Thus, the "constitutional power over whether to spend foreign aid is not the President's own—and it is Congress's own." *AVAC*, 2025 WL 752378, at *16. And in the Further Consolidated Appropriations Act, 2024 (FCAA), Congress imposed restrictions on how the funds can be spent: That Act prohibits Defendants from using appropriated funds "to implement a reorganization*,* redesign, or other plan … by the Department of State [or] [USAID] … without prior consultation" with Congress. FCAA § 7063(a). And the Act defines the phrase "reorganization, redesign, or other plan," *id.*, thus providing this Court with a "meaningful standard against which to judge the agency's exercise of discretion," *Weyerhaeuser*, 586 U.S. at 23. Defendants' argument that the action challenged here falls within the bounds of their discretion is wholly without merit.

### D.    No alternative adequate remedies are available.

In a last attempt to evade APA review, Defendants argue that Plaintiffs have an "adequate remedy" through the channeling statutes that govern certain employment claims (*i.e.*, the FSLMRS, CSRA, and FSA). Defs.' Mem. at 44 (citing 5 U.S.C. § 704). That is incorrect. The "adequate remedy" exception is "intended to avoid [ ] duplication" where "Congress has provided special and adequate review procedures," but the exception "should not be construed to defeat the central purpose of providing a broad spectrum of judicial review of agency action." *El Rio Santa Cruz Neighborhood Health Ctr. v. HHS*, 396 F.3d 1265, 1270 (D.C. Cir. 2005) (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 903-04 (1988)). Accordingly, alternative review procedures do not

preclude APA review where it is "doubtful" that the procedure allows for review of the claim at issue, *Bowen*, 487 U.S. at 905, or where the alternative remedy is not "of the same genre," *Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009).

In this case, the channeling statutes do not provide an "adequate remedy" because, as Plaintiffs have explained, they do not apply. *See supra* I.B. Those statutes provide for review of adverse *personnel actions*. Pls.' MSJ at 15–16 (collecting cases that provide overviews of each statute). In contrast, the APA claims here challenge a decision to dismantle a federal agency, including by transferring or eliminating USAID's functions, cutting funding programs, and closing the agency's physical offices. Nor is it likely that, through those channels, Plaintiffs could obtain the remedy that they seek here: an injunction barring Defendants from further dismantling the agency and ordering them to restore the agency to the prior status quo. In short, nothing in those statutes provides "clear and convincing evidence" that Congress intended to prevent courts from reviewing agency closures. *El Rio Santa Cruz*, 396 F.3d at 1270.

## III. Plaintiffs are entitled to summary judgment on their APA claims.

### A. Dismantling USAID exceeds Defendants' statutory authority.

#### 1. Plaintiffs fall within the zone of interests of the FARRA and the FCAA.

Plaintiffs' interests fall within the zone of interests protected by both FARRA and the FCAA. The D.C. Circuit has explained, "[p]rotected interests are ones asserted either by 'intended beneficiaries' of the statute at issue or by other 'suitable challengers'—*i.e.*, parties whose interests coincide 'systemically, not fortuitously' with those of intended beneficiaries." *Twin Rivers Paper Co. v. SEC*, 934 F.3d 607, 616 (D.C. Cir. 2019) (quoting *Hazardous Waste Treatment Council v. Thomas*, 885 F.2d 918, 922–24 (D.C. Cir. 1989)). And as the Supreme Court has highlighted, the zone of interests "test is not 'especially demanding'" in "the APA context." *Lexmark Int'l, Inc. v.*

*Static Control Components, Inc.*, 572 U.S. 118, 130 (2014) (quoting *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012)). The Court explained further:

> [T]he benefit of any doubt goes to the plaintiff and … the test forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized that plaintiff to sue. … That lenient approach is an appropriate means of preserving the flexibility of the APA's omnibus judicial-review provision, which permits suit for violations of numerous statutes of varying character that do not themselves include causes of action[.]

*Id.* (internal quotation marks and citation omitted). In *Patchak*, for example, the Supreme Court held that the plaintiff had standing to bring suit under a statute that addressed acquisition of property "for the purpose of providing land to Indians," although his interest concerned use of land for a casino. *Patchak*, 567 U.S. at 225.

Here, all three Plaintiffs comfortably fall within the zone of interests protected by the relevant FCAA provisions and the Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, 112 Stat. 2681 (FARRA), *codified at* 22 U.S.C. § 6563. The central focus of section 7063 of the FCAA is to prohibit Defendants from using funds to "reorganiz[e]" or "redesign" USAID. FCAA § 7063(a). The statute defines those terms to include "any action" to "eliminate … or downsize" the agency, including by "reduc[ing] the size of the permanent Civil Service [or] Foreign Service … workforce of … USAID from the staffing levels previously justified to the Committees on Appropriations for fiscal year 2024." *Id.* § 7063(b). Likewise, FARRA established USAID and mandates its existence. 22 U.S.C. § 6563 ("[T]here is within the Executive branch of Government the United States Agency for International Development as an [independent establishment].").

Plaintiffs' asserted interests in this case are exactly that: ensuring that USAID continues to exist and functions at its capacity prior to Defendants' actions. To begin, AFSA and AFGE assert

the interests of their members, who are among the "intended beneficiaries" of the FCAA, *Twin Rivers*, 934 F.3d at 616, which expressly prohibits Defendants from using funds to "reduce the size" of USAID's "workforce." FCAA § 7603(b). As for the interests of AFSA and AFGE themselves, such interests "coincide systematically" with their members' interests, making them "suitable challengers." *Twin Rivers,* 934 F.3d at 616. For the same reason, both the unions and their employee members are suitable challengers to enforce FARRA's mandate that USAID exist, as their interests are inextricably intertwined with the agency's own in that respect. Oxfam's interests are likewise in lockstep with the FCAA's and FARRA's intention to protect USAID's continuation. As explained above, Oxfam's mission of delivering humanitarian aid relies on USAID's services and programs. *See* Second Maxman Decl. at ¶¶ 3–4; *see generally* Maxman Decl. The zone-of-interest "test forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Patchak*, 567 U.S. at 225 (internal quotation marks omitted). The test is satisfied here.[4]

## 2.    Dismantling USAID violates FARRA.

Dismantling USAID violates FARRA, which mandates that USAID exist as an agency independent of the State Department. *See* 22 U.S.C. § 6563 (establishing the existence of USAID as an entity described in 5 U.S.C. § 104); 5 U.S.C. § 104 (describing "independent establishments").

---

[4] Defendants rely on *Trump v. Sierra Club*, 140 S. Ct. 1 (2019) (Mem.), but that 1-paragraph decision granting a stay is not to the contrary. Defs.' Mem. at 47. There, the Court stated that the plaintiffs likely lacked a cause of action to challenge the Department of Defense's reprogramming of funds to build a border wall. The decision does not mention zone of interests.

Defendants concede that FARRA mandates USAID's existence as an "independent establishment" and that "further legislation would be required to eliminate USAID." Defs.' Mem. at 48–49. They contend, though, that USAID is still today "an independent establishment" because it "retains personnel who carry out the agency's remaining functions." *Id*. at 49. And even after the planned "reorganization," Defendants assert, USAID will "simply be a *smaller* independent establishment following the transfer of 'select USAID functions' to the State Department." *Id*.

To begin, they conflate USAID's independent existence with the State Department's authority to exercise some control over certain USAID functions. Defs.' Mem. at 48. As this Court recognized, FARRA requires that USAID exist "*outside* of [the State] Department." Mem. Op., ECF No. 49 at 2. That FARRA directs the USAID administrator to "report to … the Secretary of State," 22 U.S.C. § 6592, does not negate the requirement that USAID exist independently. In addition, the relevant question is not whether USAID remains (somewhat) in existence today. The question is whether USAID will exist once Defendants' decision is fully implemented. The answer to *that* question is unequivocally no. As stated in the March 28 agency-wide memorandum, the "transfer" of functions to the State Department will "obviate the need for USAID to continue operating as an independent establishment." AR_0148. That statement—and others throughout the Administrative Record—belie Defendants' assertion in this litigation that USAID will "be simply a *smaller* independent establishment." Defs.' Mem. at 49; *see, e.g.*, AR_0148 ("USAID personnel globally will be subject to a consolidated [RIF]"); AR_0260 (notifying Congress of their intent to "realign[] certain USAID functions to the Department by July 1, 2025, and discontinu[e] the remaining USAID functions"); AR_0263 (describing functions that will be "realigned" to State and stating that the others "would be eliminated"); AR_0004 (USAID's operations will be "substantially transferred to State or otherwise wound down" by September 2, 2025 and

"substantially all non-statutory positions at USAID will be eliminated" through a "consolidated agency-wide [RIF]").

### 3.    Dismantling USAID exceeds the authority provided by FARRA.

As Plaintiffs have explained,  Pls.' MSJ at 2, section 6601 of FARRA gave the President a time-limited opportunity in 1998 to reorganize or even abolish USAID. The President opted not to exercise that option. Now, more than 25 years later, Defendants lack authority to do so.

Defendants contend that section 6601 did not create a "one-time opportunity for … reorganization," but instead invited the President to "reorganize USAID pursuant to FARRA" without constraining the President's authority to reorganize under some other (unnamed) authority. Defs.' Mem. at 49 (emphasis omitted). This argument is flawed in three respects.

First, Defendants are not just reorganizing; they are shutting down USAID. As they concede, they cannot do so under existing law. *Id.* ("acknowledge[ing] that further legislation would be required to eliminate USAID").[5] To the extent that Defendants argue that FARRA *itself* provides authority for a reorganization that takes place after 1998, such a reading cannot stand. The operative text states that USAID "shall be reorganized *in accordance with* this chapter and *the reorganization plan* transmitted pursuant to section 6601 of this title." 22 U.S.C. § 6581(a) (emphasis added). Section 6601, in turn, required the President to submit the "reorganization plan and report" within "60 days after October 21, 1998." *Id.* § 6601. Defendants point to no language in FARRA authorizing the President to reorganize USAID after 1998.

Second, Defendants' argument that section 6601 does not "implicitly prohibit[]" the President's authority to reorganize USAID, Defs.' Mem. at 50 (emphasis omitted), is premised on

---

[5] *See* George Ingram, *Institutional Architecture of U.S. Foreign Aid* 2 (2017), https://perma.cc/G5JJ-QTEE (noting that the 2006 Reform demonstrated the Executive's "wide latitude" to structure foreign assistance, but emphasizing that "USAID cannot be abolished or officially merged into . . . State without legislation").

the assumption that, absent an express prohibition, the President has authority to shutter an agency created by statute. He does not. Just as the power to create agencies rests squarely with Congress, *see* Pls.' MSJ at II.A, so too does Congress possess the authority to abolish or reorganize them. *See Myers v. United States*, 272 U.S. 52, 129 (1926) ("To Congress under its legislative power is given the establishment of offices, the determination of their functions and jurisdiction[.]"); DOJ, Office of Legal Counsel, *Limitations on Presidential Power to Create A New Exec. Branch Entity to Receive & Administer Funds Under Foreign Aid Legis.*, 9 Op. O.L.C. 76, 78 (O.L.C. 1985) (recognizing the "Executive Branch's acquiescence in the need for reorganization legislation in order to restructure or consolidate agencies"). Congress has, from time to time, given the President specific, circumscribed authority to reorganize the federal bureaucracy. *See* Cong. Rsch. Serv., R42852, *Presidential Reorganization Authority: History, Recent Initiatives, and Options for Congress* (2012), https://perma.cc/QY3T-XWG2. But it has consistently declined requests for open-ended reorganization authority. *See id*. at 15–16, 20–23, 32. The last Reorganization Act expired in 1984, *see* 5 U.S.C. § 905(b), and Congress has rejected requests for reorganization authority ever since. *See* 2012 CRS Report on Reorganization, at 31–33.

Third, Defendants' invocation of "[h]istorical practice" does not help them here. Defs.' Mem. at 50–51. In the example cited, the Secretary of State in 2006 created a new position and office at the State Department: the Director of Foreign Assistance (DFA) (who serves concurrently as the USAID Administrator) and the Bureau of Foreign Assistance (to be led by the new DFA).[6]

---

[6] Although Defendants assert in their brief that the 2006 Reform resulted in certain USAID offices being eliminated, the documents they cite do not support that claim. *See* Cong. Rsch. Serv., RL34243, *Foreign Aid Reform: Issues for Congress and Policy Options* 11 (2009), https://perma.cc/F6NN-4BKJ (describing the creation of the DFA and Bureau of Foreign Assistance); GAO, *Foreign Aid Reform: Comprehensive Strategy, Interagency Coordination, and Operational Improvements Would Bolster Current Efforts*, GAO-09-192, at 1 (2009), https://perma.cc/X9Z8-BTVU (same); *see also See* Cong. Rsch. Serv., RL33491, *Restructuring*

The Secretary delegated specific functions to the DFA and charged that position with coordinating foreign assistance across the various agencies that provide such aid.[7] The 2006 change did not eliminate any USAID contracts, staff, or functions (and was not challenged in court). By contrast, through the current "reorganization," Defendants already have cancelled the vast majority of foreign assistance awards, issued RIFs to nearly all USAID staff, and closed USAID buildings. *See* Pls.' MSJ at 7–8. Going forward, Defendants plan to transfer some functions from USAID to State, while *eliminating* the rest. *See* AR_0260.

Lacking reorganization authority in FARRA, Defendants point to provisions of the Foreign Assistance Act (FAA) and various appropriations acts. Defs.' Mem. at 49. None provides Defendants authority for the actions they have taken and plan to take here.

The FAA states that the "President may exercise any functions conferred upon him by this chapter through such agency or officer of the United States Government as he shall direct." 22 U.S.C. § 2381(a). In other words, the President can delegate certain functions under the FAA to whichever agency he chooses—so long as the FAA explicitly confers those functions "upon him." That provision enables the President to delegate to others the tasks that the FAA assigns to him. It does not itself assign functions to the President and does not authorize him to "direct" that an "agency or officer" take action *not* "conferred upon him" by the FAA.

Section 2151b(c)(1) likewise does not support Defendants. That provision states that "the President is authorized to furnish assistance, on such terms and conditions as he may determine, for health programs." 22 U.S.C. § 2151b(c)(1). This provision, but its plain terms, grants discretion

---

*U.S. Foreign Aid: The Role of the Director of Foreign Assistance in Transformational Development* (2006), https://perma.cc/F4YX-MHQX (stating that the 2006 Reform "require[d] no legislative action").

[7] GAO, *Delegation of Authorities to the Director of Foreign Assistance*, GAO B-316655, at 2 (2008), https://perma.cc/UGS2-W55D.

regarding *how* funds should be spent for a subset of USAID assistance. It does not provide authority to refuse to spend funds appropriated to those health programs. And it says nothing about the many USAID programs geared toward food security, economic growth, education, the environment, democracy promotion, and other types of humanitarian assistance. Section 2151b(c)(1) thus offers no authority for the dismantling, or "reorganizing," of USAID.

Finally, the appropriations acts cited by Defendants—including the 2024 FCAA—are also unavailing. Defendants argue that these statutes "expressly confirm[ ]" the President's "authority to reorganize USAID" because they "require[ ] only congressional consultation and notification for reorganization." Defs.' Mem. at 51. Defendants are mistaken. The provisions cited by Defendants are not an affirmative grant of authority to reorganize agencies; to the contrary, they *prohibit* such action. For example, the 2024 FCAA states that appropriated funds "*may not be used* to implement a reorganization … by the Department of State [or] [USAID] … without prior consultation" with Congress. FCAA § 7063(a) (emphasis added).

### 4.    Dismantling USAID exceeds Defendants' authority under the FCAA.

The FCAA's prohibition on the use of appropriated funds to "implement a reorganization, redesign, or other plan" without "prior consultation" with Congress defines those terms to include, among other things, the transfer of functions between agencies, reductions in staff, and the downsizing or elimination of agencies. *Id.* § 7063(b). If Defendants seek to implement such an action, the FCAA requires that they first provide a "detailed justification for [that] proposed action." *Id.* § 7063(a). Defendants, however, have proceeded to dismantle USAID without providing detailed justification and without the required consultation with Congress. *See* Pls.' MSJ at 26–27.

In response, first, Defendants assert that they satisfied the congressional consultation requirement through their February 3 letter and March 28 Congressional Notice. Defs.' Mem. at

54, 56. Neither was sufficient. With respect to the February 3 letter, the letter itself acknowledges that it does not constitute consultation. Rather, it merely "advises [Congress] of [Defendants'] intent to initiate consultations[.]" AR_0036. Further, the letter states that the agency was just "begin[ning] the process of engaging in a review and potential reorganization of USAID's activities." AR_0037. Accordingly, the letter did not describe a "proposed action" or provide a "detailed justification" as required by the statute. FCAA § 7063(a). Although Plaintiffs previously articulated this point, *see* Pls.' MSJ at 27, Defendants do not respond to it.

Moreover, neither the February 3 letter nor the March 28 Notice can satisfy the "prior consultation" requirement, and neither is a "detailed justification" for a "proposed action." FCAA § 7063(a). As the FCAA's Explanatory Statement specifies:

> For purposes of the Act and this explanatory statement, the term "prior consultation" means a pre-decisional engagement between a relevant Federal agency and the Committees on Appropriations during which such Committees are given a meaningful opportunity to provide facts and opinions, in advance of any public announcement, to inform: (1) the use of funds; (2) the development, content, or conduct of a program or activity; or (3) a decision to be taken.

170 Cong. Rec. H1501-01, H2087. Neither the letter nor the notice can reasonably be deemed "pre-decisional" as both were sent *after* Defendants decided to dissolve the agency and *after* Defendants had already started to implement that decision. And neither the letter nor the notice can reasonably be deemed "engagement" with Congress "during which [the Appropriations] Committees are given a meaningful opportunity to provide facts and opinions, in advance of any public announcement" so that their views can "inform" the "decision." Indeed, on or before February 3, Defendants paused all foreign assistance, AR_0014, AR_0026–33; terminated hundreds of awards, AR_0052; directed Secretary Rubio to perform the functions and duties of the Administrator of USAID, AR_0016; approved the termination of the vast majority of Personal Service Contracts, AR_0078; and placed hundreds of employees on administrative leave,

AR_0018. The March 28 Notice postdates additional implementation actions, including putting all staff on administrative leave, AR_0017 (describing going "pencils down"), SOMF ¶¶ 51–52, 79–80; and issuing an initial wave of RIFs, SOMF ¶ 81; terminating 86 percent of awards, AR_0273; and recalling all staff from administrative leave "in preparation for the reorganization," AR_0007. In sum, neither the February 3 letter nor the March 28 notice satisfied the statutory requirement.

Second, Defendants rehash their argument that the President has discretion regarding which agencies will implement the functions set forth in the Foreign Assistance Act, for which the FCAA appropriates funds to Defendants. *See* Defs.' Mem. at 53. Relatedly, they highlight that both the 2024 FCAA and the Foreign Assistance Act authorize USAID to transfer certain funds to the State Department so that the latter can implement the former's programs. *Id.* But Defendants again fail to explain how this discretion—the discretion to choose which agencies implement certain foreign assistance functions and to transfer a specific subset of funds to the State Department—translates into authority to eliminate USAID functions, institute a global RIF, and terminate the vast majority of foreign assistance funding.

Third, Defendants argue that the Court cannot consider the violation of the consultation requirement because Plaintiffs lack standing to assert the interests of the legislature. *See* Defs.' Mem. at 54. But Plaintiffs do not assert the legislature's interests; they seek to assert their own interests, which the "prior consultation" and "detailed justification" requirements help to protect. *Cf. Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) (recognizing standing to assert a procedural violation that affects a concrete interest). The cases on which Defendants rely, which concern the standing of individual legislators, are inapposite.

Last, Defendants cite to *NRDC v. Hodel*, 865 F.2d 288 (D.C. Cir. 1988), in which the D.C. Circuit held that it could not review an agency's failure to comply with a reporting requirement to

Congress. *See* Defs.' Mem. at 54–55. In that case, California challenged the adequacy of a report to Congress from the Secretary of the Interior regarding the Secretary's decision to deny a lease proposal by the Governor of California. *Hodel*, 865 F.2d at 316. That report was made under an appropriations act that directed the Secretary to "indicate in detail why … the proposal[] … was not accepted." *Id.* The court found that the action was unreviewable because the appropriations act "contain[ed] no set of factors … for a court to consider," *id.* at 317, causing the court to "despair at formulating judicially manageable standards by which to gauge the fidelity of the Secretary's response to the strictures of the" appropriations act. *Id.* at 319. And the court suggested that the outcome might be different if the State's contention was "that the Secretary failed entirely to report back to Congress," rather than "that the Secretarial response lacked adequate detail." *Id.* at 318. Here, unlike in *Hodel*, Plaintiffs do not challenge the adequacy of Defendants' consultation, but rather that Defendants "failed entirely to" to consult with Congress prior to taking the challenged action. *Id.* This Court therefore has a standard by which to gauge Defendants' actions.

### B.   Defendants' actions are arbitrary and capricious.

Defendants' actions bear all the hallmarks of arbitrariness. While proclaiming that they "have gone to great lengths to explain the basis for the actions they took," Defs.' Mem. at 58 (citing Defs.' Mem. at 9–14), the explanation they cite is remarkably sparse. That "explanation" for dismantling a federal agency (1) justifies the wholesale funding pause in a sentence asserting that doing so was less burdensome than individual review, *id*. at 9, and (2) lists reasons for the subsequent mass termination of awards, *id*. at 10. Otherwise, the explanation they cite is largely a factual description of actions taken and the proceedings in this case. *Id*. at 11–14. While it lists some objections to some grantees' programs, the "explanation" they offer says nothing about why they chose to dismantle an entire federal agency. Defendants thus make minimal effort to articulate "a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n*

*v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Kirwa v. United States Dep't of Def.*, 285 F. Supp. 3d 257, 269 (D.D.C. 2018) ("The APA requires an agency to explain the rationale for its decision in order to demonstrate that the agency reached its decision in a well-reasoned manner after considering appropriate factors."); *see also Williams Gas Processing-Gulf Coast Co. v. FERC*, 475 F.3d 319, 328–29 (D.C. Cir. 2006) ("Arbitrary and capricious review strictly prohibits us from upholding agency action based only on our best guess as to what reasoning truly motivated it.").

Moreover, the cursory reasons provided for the shutdown of USAID do not provide a rational connection between the available facts and decision made even as to the one discrete act Defendants address: the halt on foreign assistance funding. Defendants assert that it was necessary to stop funding across the board because it was "impossible to access sufficient information in one place to determine whether the foreign assistance policies and interests supported by appropriations are not duplicated, are effective, and are consistent with President Trump's foreign policy." Defs.' Mem. at 59. But they do not offer any explanation as to why their blanket approach provided easier access to "sufficient information." And "[t]he desire to review programs for efficiency or consistency, and to access information in one place, does not have a rational connection to the directives to proceed with a sudden, blanket suspension of congressionally appropriated aid." *See AVAC*, 2025 WL 752378, at *10.

Furthermore, while essentially conceding that they failed to take into account reliance interests, Defendants briefly suggest that the Lewin Declaration shows that they "considered the effects of their actions" on employees, affected businesses, and non-profits. Defs.' Mem. at 59. The paragraphs that they cite, however, do not support the suggestion. *See* AR_0004–AR_0006 (Lewin Decl. ¶¶ 18–20) (describing the process for employee terminations and repatriation of the

entire USAID foreign service); AR_0006, AR_0008, AR_0009 (Lewin Decl. ¶¶ 22, 26–31) (cited by Defendants as showing consideration of the effects on businesses and nonprofits but not showing such consideration). Primarily, Defendants seek to discount the substantial reliance interests of USAID employees, businesses and grantees, and beneficiaries. Defendants strangely declare that expectations "about how USAID would 'exercise its enforcement discretion' regarding working conditions and foreign assistance funding arrangements" are not reliance interests. Defs.' Mem. at 59. But those matters, and this case, are not matters of "enforcement discretion." And the case on which Defendants rely, *FDA v. Wages & White Lion Investments, LLC*, 145 S. Ct. 898 (2025), notes the importance of "reliance interests" formed after "decades"— a circumstance not at issue in that case but very much present here. *Id.* at 927. Here, Plaintiffs, AFSA and AFGE's members—the foreign and civil service employees of USAID—and Oxfam had long relied on the existence of USAID. Acting without consideration of those interests was arbitrary and capricious. *See Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 30 (2020) ("When an agency changes course, … it must 'be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.'" (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016)).

In addition, neither declaration on which Defendants rely shows consideration of any less disruptive alternatives to dismantling the agency. The February 10 Marocco Declaration (AR_0012–AR_0024) addresses only the decision to pause funding and initially to place all employees on administrative leave. And the March 3 Marocco Declaration (AR_0140–AR_0141), provides only an update on the number of contracts retained and terminated. *See PayPal, Inc. v. CFPB*, 728 F. Supp. 3d 31, 41–42 (D.D.C. 2024) ("While, to be sure, the APA does not require that agencies tailor their regulations as narrowly as possible to the specific concerns that generated

them, it certainly requires the agency to consider responsible alternatives to its chosen policy and to give a reasoned explanation for its rejection of such alternatives." (internal citations and quotations omitted)) (appeal pending).

Finally, in a few paragraphs deriding the work and operations of the agency, the Lewin Declaration seeks to justify dismantling USAID. *See* AR_0008–AR_0009 (Lewin Decl. ¶¶ 26–31). Putting aside whether the declaration is properly considered part of the administrative record, *see SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (stating that post hoc rationalizations are not properly considered in review of agency action), the broad statements about inefficiency and American interests lack specificity or sources; they are talking points. To survive arbitrary and capricious review, an agency "must examine the relevant data and articulate a satisfactory explanation for its action." *State Farm*, 463 U.S. at 43. Doing so, of course, requires the agency to identify the "relevant data," but the paragraphs in the Lewin Declaration are devoid of that information. They also do not reflect "consideration of the relevant factors." And because Defendants have made such an abrupt change in course, they were "obligated to supply a reasoned analysis for the change beyond that which" would be required in the first instance. *Id.* at 42.

## IV.    Defendants' dismantling of USAID is unconstitutional.

USAID was created by an act of Congress and may only be shuttered by an act of Congress. Defendants seem to accept this fact, indicating that they plan on "proposing legislation to abolish USAID as an independent establishment." AR_0262. Nonetheless, Defendants have stated that, even absent congressional authorization, "[b]y September 2, 2025, the Agency's operations will have been substantially transferred to State or otherwise wound down." AR_0148. The Executive's dissolution of an agency whose existence and continued operation Congress has mandated is unconstitutional.

**A.    Plaintiffs' constitutional claims are reviewable.**

Defendants argue that Plaintiffs have impermissibly repackaged their statutory claims as a constitutional claim that the President has acted in excess of his statutory authority. Defs.' Mem. at 60–61. Citing *Dalton v. Specter*, 511 U.S. 462 (1994), Defendants explain that the President does not violate the Constitution every time he exceeds the bounds of statutory authority that Congress has conferred on him. Defendants' reliance on *Dalton*, however, is misplaced. Unlike in *Dalton*, Plaintiffs here challenge unlawful action taken in the *absence* of any statutory authority. Pls.' MSJ at 21. Under such circumstances, a constitutional claim is available to enforce the separation of powers. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637–38 (1952) (Jackson, J., concurring) (assessing separation of powers claim, and assessing whether there was an express or implied authorization of Congress).

Defendants also contend that Plaintiffs exclusively assert harms to nonparties and, therefore, fall outside the zone of interests of the constitutional protections that they invoke. But as explained earlier, AFSA, AFGE, and Oxfam are directly harmed by Plaintiffs' actions. And Defendants do not explain why a party that has suffered injury as a result of a violation of constitutional separation of powers principles does not come within the Constitution's zone of interests. *See also Bowsher v. Synar*, 478 U.S. 714, 722 (1986) (stating that the constitutional "checks and balances" were intended to form "the foundation of a structure of government that [will] protect liberty").

**B.    Defendants' action violates the separation of powers.**

On the merits, Defendants do not dispute that the executive branch lacks authority to refuse to implement congressional directives. Instead, Defendants argue that the President may shutter USAID because of his foreign affairs powers and powers over the government's internal

organization, and because Congress has granted him broad authority to "organize the administration of foreign aid." Defs.' Mem. at 62–64.

As a threshold matter, the President's Article II foreign affairs powers and powers to manage the Executive Branch's internal affairs do not permit the President to violate laws enacted by Congress. "The Executive is not free from the ordinary controls and checks of Congress merely because foreign affairs are at issue." *Zivotofsky*, 576 U.S. at 21. Rather, "[i]t is well established that whether the realm is foreign or domestic, it is still the Legislative Branch, not the Executive Branch, that makes the law." *AVAC*, 2025 WL 752378, at *15 (quoting *Zivotofsky*, 576 U.S. at 21 (internal quotations omitted)). Thus, although the President has significant power in the realm of foreign affairs, *see* Defs.' Mem. at 63, that proposition does not resolve the constitutionality of executive action that runs headlong into Congress's own constitutional authority to legislate on matters that touch on foreign affairs. *See Zivotofsky*, 576 U.S. at 16 ("In foreign affairs, as in the domestic realm, the Constitution 'enjoins upon its branches separateness but interdependence, autonomy but reciprocity.'" (quoting *Youngstown*, 343 U.S. at 635 (Jackson, J., concurring))).

Moreover, the Supreme Court has rejected Defendants' suggestion that the President enjoys "unbounded power" in the realm of foreign affairs, *Zivotofsky*, 576 U.S. at 20, and has cautioned that "it is essential the congressional role in foreign affairs be understood and respected," *id*. at 21. *See also Schneider v. Kissinger*, 412 F.3d 190, 194–95 (D.C. Cir. 2005) (recognizing the Constitution is "richly laden with delegation of foreign policy and national security powers" to Congress, and "likewise" allocates powers to the president); *Chicago & S. Air Lines v. Waterman S. S. Corp.*, 333 U.S. 103, 111 (1948) (recognizing foreign policy as "confided by our Constitution to the political departments of the government, Executive and Legislative.").

Defendants assert that "Plaintiffs identify no statute that bars USAID's restructuring." Defs.' Mem. at 63. As explained above, though, Defendants are not merely restructuring USAID—they are shuttering a congressionally created and funded agency. Whatever the scope of the President's lawful authority to reorganize, *id.*, that authority does not empower the President to close down an agency that Congress has directed the President to maintain. What is more, Defendants overstate even their authority to effect even a reorganization of USAID. The "myriad statutes" on which Defendants rely to justify such a power, *id.*, have long since expired, *see* Pls.' MSJ at 21, and more recently Congress has expressly limited the authority of the Executive branch to reorganize USAID. *See* FCAA § 7063 (requiring agency consultation with Congress prior to effecting reorganizations, including "the transfer to other agencies of the authorities and responsibilities" of USAID).

Finally, Defendants suggest that Plaintiffs' requested relief, if granted, would itself create a separation of powers concern by requiring the Court to "superintend an agency." Defs.' Mem. at 64. But Plaintiffs do not ask this Court to exercise oversight over Defendants' day-to-day operations.

## C.    Defendants' action violates the Take Care Clause.

The Take Care Clause directs the President to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. Although Defendants argue that Plaintiffs' Take Care Clause claim is non-justiciable, "it has been the case for centuries that neither the President, nor his executive branch, may unilaterally refuse to carry out a congressional command." *Widakuswara*, 2025 WL 945869, at *6 (citing *Kendall v. U.S. ex rel. Stokes*, 37 U.S. (12 Pet.) 524, 525 (1838)). And "effectively shuttering a congressionally created agency simply cannot be construed as following through on this constitutional mandate." *Id.* at *7 (finding that the plaintiffs had shown

a likelihood of success on the merits of their claim that an agency closure violated the Take Care Clause).[8]

Rather than attempt to show that their actions are consistent with the Take Care Clause, Defendants argue that the President's duty to see that the laws are faithfully executed is "purely executive and political" and that, therefore, violation of that duty cannot be the subject of judicial review. Defs.' Mem. at 66. In contrast to the cases cited by Defendants, however, Plaintiffs do not seek review of an executive action that has been "commit[ted]" by statute "to the discretion of the President." *Dalton*, 511 U.S. at 474; *see also Chicago & S. Air Lines*, 333 U.S. at 106 (noting that Congress had statutorily exempted certain executive actions that were "unconditionally subject to the President's approval" from judicial review); *Mississippi v. Johnson*, 71 U.S. 475, 499 (1866) (contrasting cases where Congress has left "room for the exercise of [executive] judgment," in which the exercise of executive discretion is unreviewable, from cases where "[t]he law require[s] the performance" of a particular act, in which case the executive can be judicially compelled to comply). Plaintiffs do not, for example, ask that Defendants enact a particular policy or spend lawfully appropriated money in a certain way. Rather, they challenge the decision to act in direct contravention of congressional directives by unlawfully shutting down an agency that Congress created, funded, and tasked with ongoing statutory responsibilities. Federal courts act well within their power by deciding claims such as these. *See Loc. 2677, AFGE v. Phillips,* 358 F. Supp. 60, 67 (D.D.C. 1973) (holding that a challenge to dismantlement of Office of Economic

---

[8] Defendants say that Plaintiffs "misleadingly" cite *Center for Biological Diversity v. McAleenan*, 404 F. Supp. 3d 218, 244 (D.D.C. 2019), to suggest the court there found that a Take Care clause claim was justiciable. Defs.' Mem. at 65. But Plaintiffs cited that case for the point that separation of powers principles animate Take Care clause claims. *See* Pls.' MSJ at 23.

Opportunity was not a political question); *Widakuswara*, 2025 WL 945869, at *6–*7 (addressing Take Care Clause claims in a challenge to the closure of the U.S. Agency for Global Media).

At bottom, Defendants conflate a "political" case with a case that presents a "political question." *Baker v. Carr,* 369 U.S. 186, 217 (1962) ("The courts cannot reject as 'no law suit' a bona fide controversy as to whether some action denominated 'political' exceeds constitutional authority."). A controversy is nonjusticiable under the political question doctrine only "where there is 'a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it." *Nixon v. United States*, 506 U.S. 224, 228 (1993) (quoting *Baker*, 369 U.S. at 217). Defendants have not identified any constitutional provision committing resolution of Plaintiffs' claims to another branch of government, and "familiar principles of constitutional interpretation" provide standards for resolving those claims. *Zivotofsky*, 566 U.S. at 201. Accepting Defendants' invitation "[t]o deny inquiry into the President's power in a case like this, because of the damage to the public interest to be feared from upsetting its exercise by him, would in effect always preclude inquiry into challenged power, which presumably only avowed great public interest brings into action." *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 610–11 (D.C. Cir. 1974). Such a result would allow the Executive Branch to ignore Congressional mandates with impunity, evading judicial scrutiny in the process. *See Loc. 2677, AFGE*, 358 F. Supp. at 77 ("[I]f the power sought here were found valid, no barrier would remain to the executive ignoring any and all Congressional authorizations if he deemed them, no matter how conscientiously, to be contrary to the needs of the nation.").

**V.    Plaintiffs properly seek non-statutory review of actions that are *ultra vires*.**

"Needless to say, the President is without authority to set aside congressional legislation by executive order." *In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999); *see Kendall*, 37 U.S. at 613 ("To contend that the obligations imposed on the President to see the laws faithfully executed, implies a power to forbid their execution; is a novel construction of the constitution, and is entirely inadmissible."). Holding otherwise "would be clothing the President with a power to control the legislation of congress." *Kendall*, 37 U.S. at 613. Courts "presume that Congress intends the executive to obey its statutory commands and, accordingly, that it expects the courts to grant relief when an executive agency violates such a command." *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (quoting *Bowen v. Michigan Acad. of Family Physicians*, 476 U.S. 667, 681 (1986)); *see also Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988) ("When an executive acts *ultra vires,* courts are normally available to reestablish the limits on his authority.").

Here, Defendants have not identified any statutory authorization for their dismantlement of the agency. "Even if they did, Defendants do not dispute that they would be in the territory of having to show 'clear congressional authorization' based on the 'vast economic and political significance' of [their] actions." *AVAC*, 2025 WL 752378, at *18 n.18 (quoting *West Virginia v. EPA*, 597 U.S. 697, 716, 723 (2022) (citations omitted)). Defendants do not attempt to make this showing, and they cannot, because their actions violated clear and specific provisions of FARRA and the FCAA. *See*  Pls.' MSJ at 25–27.

Defendants respond that *ultra vires* review is narrow, available only in the limited circumstance where review is otherwise unavailable. Defs.' Mem. at 68–69. From this point, they argue that Plaintiffs cannot plead both APA claims and claims that Defendants actions were ultra

vires. At the same time, they argue that Plaintiffs' APA claims are unreviewable or non-meritorious for various reasons. Defs.' Mem. at 37–59. Together, then, their position is that Plaintiffs have no means of seeking judicial redress for the unlawful actions at issue. That is incorrect. *See, e.g.*, *Webster v. Doe*, 486 U.S. 592, 603 (1988) (foreclosing any judicial review of constitutional claims would raise serious constitutional questions of its own).

Independent of the APA, "the court's power to enjoin unconstitutional acts by the government . . . is inherent in the Constitution itself." *Trudeau v. FTC*, 456 F.3d 178, 190 n.22 (D.C. Cir. 2006) (quoting *Hubbard v. U.S. EPA Adm'r*, 809 F.2d 1, 11 n.15 (D.C. Cir. 1986)); *see generally Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). This power applies just as much to a "separation-of-powers claim" as it does to "every other constitutional claim." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010). "Nothing in the APA evinces … an intent" to bar courts from exercising this traditional jurisdiction over constitutional claims. *Juliana v. United States*, 947 F.3d 1159, 1167 (9th Cir. 2020) (rejecting argument that "APA's comprehensive remedial scheme for challenging the constitutionality of agency actions implicitly bars the plaintiffs' freestanding constitutional claims"); *see also Trudeau*, 456 F.3d at 185 ("[T]he APA neither confers nor restricts jurisdiction."); *Armstrong*, 575 U.S. at 328 (courts' traditional jurisdiction exists, unless the defendants "establish Congress's intent to foreclose equitable relief"). As then-Judge Ketanji Brown Jackson explained, "the Constitution itself" provides "a cause of action independent of the APA" that "eschew[s] the statutory requirements that apply only to APA claims." *Z St., Inc. v. Koskinen,* 44 F. Supp. 3d 48, 65 (D.D.C. 2014), *aff'd*, 791 F.3d 24 (D.C. Cir. 2015); *see also, e.g.*, *Trudeau*, 456 F.3d at 189–90 (recognizing stand-alone constitutional claim separate from the APA and its final agency action requirement); *Juliana*, 947 F.3d at 1167–68 (compiling cases); *Chacoty v. Pompeo*, 392 F. Supp.

3d 1, 12 (D.D.C. 2019). So too here. Defendants' reliance on *Federal Express Corp. v. U.S. Department of Commerce*, 39 F.4th 756, 763 (D.C. Cir. 2022), is therefore misplaced. *See Dart*, 848 F.2d at 224; *Chamber of Commerce*, 74 F.3d at 1327–28.

## VI. Plaintiffs' requested relief is appropriately tailored to address defendants' dissolution of USAID and the harms that dissolution is causing and will cause.

"[A] federal district court has wide discretion to fashion appropriate injunctive relief." *Richardson v. Trump*, 496 F. Supp. 3d 165, 189 (D.D.C. 2020) (quoting *Richmond Tenants Org. v. Kemp*, 956 F.2d 1300, 1308 (4th Cir. 1992)); *see Nat'l Mining Ass'n v. Army Corps of Eng'rs*, 145 F.3d 1399, 1408 (D.C. Cir. 1998). Injunctive relief should generally be "no more . . . than necessary to provide complete relief" to Plaintiffs. *See Madsen v. Women's Health Ctr.*, 512 U.S. 753, 765 (1994) (citations and internal quotation marks omitted). But longstanding D.C. Circuit precedent confirms that, when an agency action with "broad applicability" is deemed to violate the APA, "a single plaintiff, so long as he is injured by the" unlawful agency action, "may obtain programmatic relief that affects the rights of parties not before the court." *Nat'l Mining Ass'n*, 145 F.3d at 1409 (citation and internal quotation marks omitted); *see Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989) ("When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed.").[9] Likewise, where "a constitutional violation is found, a federal court is required to tailor the scope of the remedy to fit the nature and extent of the

---

[9] *See also*, *e.g.*, *DHS v. Regents of Univ. of Calif.*, 591 U.S. at 8 (holding that the challenged agency action must be vacated where it violated the APA); *Dep't of Commerce v. New York*, 588 U.S. 752 (affirming a district court's decision that vacated the challenged agency action); *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 471 n.4 (2001) (stating that if allegations that the EPA violated rulemaking requirements "could be proved, it would be grounds for vacating the [agency action], because the Administrator had not followed the law"); *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014) (stating that "vacatur is the normal remedy" for an APA violation).

constitutional violation." *Hills v. Gautreaux*, 425 U.S. 284, 293–94 (1976) (citations and internal quotation marks omitted)).

Defendants argue that any relief should be limited to Plaintiffs in this case. *See* Defs.' Mem. at 69–70. This argument suffers from a fundamental conceptual problem: Any order ameliorating the unlawful dissolution of the agency would necessarily extend beyond Plaintiffs. *Cf. O.A. v. Trump*, 404 F. Supp. 3d 109, 153 (D.D.C. 2019) ("As a practical matter, for example, how could this Court vacate the Rule with respect to the organizational plaintiffs in this case without vacating the Rule writ large? What would it mean to 'vacate' a rule as to some but not other members of the public?"). For good reason, then, Defendants do not offer a vision of what narrower relief might look like.

Here, the relief requested in the proposed order would extend "no more . . . than necessary to provide complete relief" to Plaintiffs. *See Madsen*, 512 U.S. at 765. With respect to "computer systems, webpages, and security systems," the proposed order requests only that personnel should retain access to them so that the agency can continue to function. ECF No. 51-25 at 2. The proposed order is silent about what computer or security systems USAID should use, and it envisions no role for this Court in such matters. Similarly, with respect to employees and funding, the proposed relief seeks to ensure that employees will not be fired and awards will not be canceled *en masse* as part of an agency shutdown. *Id.* The proposed order does not seek to limit Defendants' ability to make individualized decisions about particular employees or awards, and, contrary to Defendants' suggestion, Defs.' Mem. at 71, the relief requested does not include ongoing monitoring by this Court of the conduct of USAID operations.

Finally, Defendants argue that the Court can issue neither declaratory nor injunctive relief against the President. Defs.' Mem. at 72–74. Courts have authority, however, to issue declaratory

relief against presidential action. *See, e.g.*, *Clinton v. City of New York*, 524 U.S. 417, 425 n.9 (1998) (affirming summary judgment). And Plaintiffs have not sought injunctive relief against the President (regardless of whether injunctive such may be available), but only against the other Defendants. As has been long settled, "courts have power to compel subordinate executive officials to disobey illegal Presidential commands." *Soucie v. David*, 448 F.2d 1067, 1072 n.12 (D.C. Cir. 1971) (citing *Youngstown*, 343 U.S. 579); *see, e.g.*, *Chamber of Commerce*, 74 F.3d at 1332; *Envt'l Defense Fund v. Thomas*, 627 F. Supp. 566 (D.D.C. 1986). Thus, the cases cited by Defendants afford no basis for limiting relief in this case.

## CONCLUSION

For the foregoing reasons, and those set forth in Plaintiffs' opening brief, the Court should grant Plaintiffs' motion for summary judgment and should deny Defendants' motion to dismiss or, in the alternative, motion for summary judgment. Plaintiffs respectfully request that this Court render a decision on their motion in advance of June 15, 2025, the date by which overseas personnel with a RIF date of July 1 are required to repatriate. *See* AR_0149.

Dated: April 21, 2025                            Respectfully submitted,

                                                 */s/ Kaitlyn Golden*
Lauren Bateman (DC Bar No. 1047285)              Kaitlyn Golden (DC Bar No. 1034214)
Karla Gilbride (DC Bar No. 1005586)              Kristen Miller (DC Bar No. 229627)
Allison Zieve (DC Bar No. 424786)                Rachel L. Fried (DC Bar No. 1029538)
Public Citizen Litigation Group                  Kayla M. Kaufman (DC Bar No. 90029091)
1600 20th Street NW                              Robin F. Thurston (DC Bar No. 1531399)
Washington, DC 20009                             Skye L. Perryman (DC Bar No. 984573)
(202) 588-1000                                   Democracy Forward Foundation
lbateman@citizen.org                             P.O. Box 34553
                                                 Washington, DC 20043
                                                 (202) 448-9090
                                                 kmiller@democracyforward.org